**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA**

---

| | | |
|---|---|---|
| *In re* **Amie Adelia Vague,** *et al.* | ) ) ) | **Case No.: 2:22-mc-3977-WKW**<br>**(UNDER SEAL)** |

## FINAL REPORT OF INQUIRY

Before Proctor, D.J., Watkins, D.J., and Beaverstock, D.J.:

FOR THE PANEL:

On April 18, 2022, Judge Liles C. Burke entered an order in *Walker v. Marshall*, 5:22-cv-480-LCB (N.D. Ala.), in which he expressed concern about certain actions taken by counsel for the plaintiffs in *Walker* and *Ladinsky v. Ivey*, 5:22-cv-447-LCB (N.D. Ala.), that may have evidenced judge shopping. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 24). At Judge Burke's direction, his order was forwarded to the chief judge of each federal district court in Alabama. The chief judges convened the undersigned three-judge panel to inquire about the issues raised by counsel's actions.

This Final Report sets out the Panel's findings after inquiring into the key question presented here: whether counsel for the plaintiffs in *Walker* and *Ladinsky*, and in a subsequently filed case, *Eknes-Tucker v. Ivey*, 2:22-cv-184-LCB (M.D. Ala.) attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama.

In conducting this inquiry, the Panel elicited sworn testimony from all 39 lawyers involved in *Walker*, *Ladinsky*, and *Eknes-Tucker*. The Panel conducted five hearings and also received written declarations. The testimony provided the Panel a clear understanding of counsel's actions and motivations regarding *Walker* and *Ladinsky*. Based solely on the Panel's review of counsel's conduct, and for the reasons explained in this Final Report, the Panel concludes without reservation that certain lawyers for the plaintiffs in *Walker* and *Ladinsky* purposefully attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama.

In this Final Report, first, the Panel explains its legal authority to conduct this inquiry. Second, the Panel sets out the history of *Walker* and *Ladinsky* before this inquiry commenced, which establishes the basis for Judge Burke's concerns and the genesis of this inquiry. Third, the Panel describes the procedural history of this inquiry. Fourth, the Panel sets out all the relevant testimony gleaned from this inquiry in a narrative statement of facts that describes counsel's actions from the time before they filed *Walker* and *Ladinsky*, up through filing the subsequent and related case *Eknes-Tucker*. Finally, the Panel explains its factual findings and will forward this Final Report to Judge Burke.

## I.    Legal Authority to Conduct the Inquiry

As noted at the outset of this inquiry, courts have inherent authority to address lawyer conduct that abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). The Eleventh Circuit has explained why so-called judge shopping -- that is, attempting to circumvent a court's random case assignment -- abuses the judicial process:

> We have no difficulty concluding that a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice. Every court considering attempts to manipulate the random assignment of judges has considered it to constitute a disruption of the orderly administration of justice.

In *McCuin*, the Fifth Circuit held that permitting such manipulation would bring "the judicial system itself into disrepute" and "would permit unscrupulous litigants and lawyers to thwart our system of judicial administration." [*McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1265 (5th Cir. 1983)]. This court in *Robinson* . . . expressed the obvious concern with respect to the effects of such manipulation and judge-shopping on the proper administration of justice. [*Robinson v. Boeing Co.*, 79 F.3d 1053, 1055-56 (11th Cir. 1996)]. The Second Circuit's decision in *FCC* . . . implicitly recognized that such manipulation is disruptive of the orderly administration of justice; the court used its inherent power to disqualify a lawyer in order to preserve "the neutral and random assignment of judges to cases." [*In re F.C.C.*, 208 F.3d 137, 139 (2d Cir. 2000)]. Similarly, the Supreme Court of Michigan, in *Fried*, . . . emphatically condemned such manipulation: "It is prejudicial to the administration of justice, because it is an undue interference with the proper assignment of cases." [*Grievance Adm'r v. Fried*, 570 N.W.2d 262, 267 (1997)]. *See also Standing Committee on Discipline v. Yagman*, 55 F.3d 1430, 1443 (9th Cir. 1995) (stating in dictum that "[j]udge-shopping doubtless disrupts the proper functioning of the judicial system and may be disciplined."); *United States v. Phillips*, 59 F. Supp. 2d 1178, 1180 (D. Utah 1999) (collecting cases and scholarly literature indicating that manipulation of the random case assignment process is universally condemned as a disruption of the integrity of the judicial system that would undermine public confidence in the assignment process).

*In re BellSouth Corp.*, 334 F.3d 941, 959-60 (11th Cir. 2003).

When a court becomes aware that judge shopping may have occurred, the court may -- and should -- conduct an appropriate inquiry. *See, e.g.*, *BellSouth*, 334 F.3d at 946 ("Judge Smith conducted an evidentiary hearing to elicit testimony both about the circumstances of BellSouth's hiring of LMPP and about whether plaintiff's counsel improperly steered the *Jenkins* case to Judge Clemon by falsely claiming that it was related to the *Wright* case."); *see also Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) (reviewing a district court hearing into whether counsel engaged in judge shopping by filing a Rule 41 voluntary dismissal); *In re Fieger*, 191 F.3d 451 (Table), 1999 WL 717991, at *1, 4 (6th Cir. 1999) (finding that a district court three-judge panel appropriately sanctioned an attorney for judge shopping after appointing independent counsel to prosecute the matter and holding a hearing). Such hearings are part of a judicial inquiry, not an adversarial proceeding. *See United States v. Shaygan*, 652 F.3d 1297, 1308 (11th Cir. 2011).

After this inquiry began and while it was under way, some of the counsel raised due process questions. But, the Panel provided all counsel due process. (*See* Doc. # 22 at 4-5). The Panel provided notice to counsel in the May 10, 2022 order that the Panel would inquire about the conduct Judge Burke described in his order that could be viewed as evidencing an intent to circumvent the practice of random case assignment in the District Courts for the Northern and Middle Districts of Alabama. (Doc. # 1 at 1-2). In that order, the Panel also identified specific actions taken by counsel, stated it would "inquire about the issues raised by counsel's actions" pursuant to the court's inherent authority to police judge shopping, and referenced potential sanctions. (*Id.* at 5). The Panel continued to give fair notice to counsel, especially by identifying the Panel's specific areas of concern at the first hearing in this inquiry and again in the July 8, 2022 order. (*See* May 20 Hearing Tr. at 48-52; Doc. # 22 at 2-3). All attorneys in this inquiry were afforded an opportunity to respond over the course of five hearings and in written declarations.

## II.     History of *Walker*, *Ladinsky*, and *Eknes-Tucker*

On Friday, April 8, 2022, after the court was closed, plaintiffs Dr. Morissa J. Ladinsky, Dr. Hussein D. Abdul-Latif, Robert Roe, and Jane Doe filed suit in the Northern District of Alabama against the Governor, Secretary of State, and the district attorneys for Shelby and Jefferson counties. (*Ladinsky*, 5:22-cv-447-LCB (N.D. Ala.), Doc. # 1). The attorneys who filed the complaint were Melody Eagan, Jeffrey Doss, and Amie Vague from Lightfoot, Franklin & White LLC; Andrew Pratt, Misty Peterson, Adam Reinke, Gilbert Oladeinbo, Brent Ray, Abigail Hoverman Terry, and Michael Shortnacy from King & Spalding LLP; Asaf Orr from National Center for Lesbian Rights; Jennifer Levi from GLBTQ Legal Advocates & Defenders; Scott McCoy, Diego Soto, and Jessica Stone from Southern Poverty Law Center; and Sarah Warbelow and Cynthia Weaver from Human Rights Campaign Foundation. (*Id.* at 33-36). The *Ladinsky*

4

lawsuit challenged Alabama's Vulnerable Child Compassion and Protection Act, which the Alabama Legislature passed on April 7, 2022, and the Governor signed into law on April 8, 2022. (*Id.* at 2, ¶ 1). The Act, in part, prohibits certain medical treatments for transgender minors. The Act's effective date was to be May 8, 2022.

The court entered *Ladinsky* on its docket on the morning of April 11, 2022. The case was initially randomly assigned to Judge Anna M. Manasco. At 1:15 p.m. that day, Judge Manasco recused, and the case was then randomly reassigned to Magistrate Judge Staci G. Cornelius. (*Ladinsky*, 5:22-cv-447-LCB (N.D. Ala.), Docs. # 2, 3). The parties did not unanimously consent to dispositive jurisdiction by a Magistrate Judge, so, on April 14, 2022, *Ladinsky* was randomly reassigned to Judge Annemarie Carnie Axon. (*Ladinsky*, 5:22-cv-447-LCB (N.D. Ala.), Doc. # 11).

On Monday, April 11, 2022, at 3:04 p.m., plaintiffs Jeffrey Walker, Lisa Walker, H.W., Jeffrey White, Christa White, and C.W. filed suit in the Middle District of Alabama against the Secretary of State and the district attorneys for Limestone and Lee counties. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 1). The *Walker* lawsuit, like *Ladinsky*, challenged Alabama's Vulnerable Child Compassion and Protection Act. (*Id.*). The attorneys who filed the complaint were LaTisha Faulks and Kaitlin Welborn from American Civil Liberties Union of Alabama Foundation; Lisa Nowlin-Sohl, Malita Picasso, Chase Strangio, and James Esseks from American Civil Liberties Union Foundation, Inc.; Carl Charles, Tara Borelli, and Sruti Swaminathan from Lambda Legal; Kathleen Hartnett, Julie Veroff, Zoë Helstrom, Andrew Barr, Adam Katz, Elizabeth Reinhardt, Katelyn Kang, Valeria Pelet del Toro, and Robby Saldaña from Cooley LLP; and Lynly Egyes, Milo Inglehart, and Dale Melchert from Transgender Law Center. (*Id.* at 46-48).

On the JS 44 Civil Cover Sheet accompanying the *Walker* complaint, *Walker* counsel marked the case related to *Corbitt v. Taylor*, 2:18-cv-91-MHT (M.D. Ala.). (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 1-1). The Civil Cover Sheet instructions state, "[The Related Cases] section of the JS 44 is used to reference related pending cases, if any." *Instructions for Attorneys Completing Civil Cover Sheet Form JS 44*, https://www.almd.uscourts.gov/sites/default/files/2022-06/JS-044-civil-cover-sheet-rev-04-2021.pdf. *Corbitt*, a lawsuit challenging an Alabama policy that prevented transgender people from obtaining a driver's license without first disclosing to the government health information about surgical procedures, was filed in 2018, was on appeal to the Eleventh Circuit, and had been closed for over a year since January 15, 2021. (*Corbitt*, 2:18-cv-91-MHT (M.D. Ala.), Doc. # 102). The State appealed the judgment in favor of the plaintiffs in *Corbitt*, and when *Walker* was filed that appeal remained pending. The deadline for the plaintiffs to file a motion for attorney's fees in *Corbitt* was extended until after resolution of the appeal. (*Corbitt*, 2:18-cv-91-MHT (M.D. Ala.), Doc. # 113).

On Tuesday, April 12, 2022, the court entered *Walker* on its docket and randomly assigned the case to Chief Judge Emily C. Marks. At 5:37 p.m. that day, the *Walker* plaintiffs filed a motion to reassign the case to Judge Myron H. Thompson, who previously presided over *Corbitt*. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 8). At 5:41 p.m., the *Walker* plaintiffs filed a motion for a temporary restraining order and/or preliminary injunction blocking enforcement of Alabama's Vulnerable Child Compassion and Protection Act. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 9). Before filing that motion, the *Walker* plaintiffs' counsel took steps in an attempt to steer the case to Judge Thompson – including marking the case related to *Corbitt* and calling Judge Thompson's chambers.

On Wednesday, April 13, 2022, Chief Judge Marks entered an order to show cause why *Walker* should not be transferred to the Northern District of Alabama, where *Ladinsky*, the first-filed action, was pending. Lawyers from the two cases conducted a conference call to discuss matters. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 3). Eventually, the parties consented to the transfer. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Docs. # 16, 18). The next day, April 14, around 9:00 p.m., the *Walker* plaintiffs' lawyers responded to the order to show cause, withdrew their motion to reassign *Walker* to Judge Thompson and stated, "Plaintiffs' interest is in the expeditious injunction of the unconstitutional law they challenge, and [p]laintiffs will seek to pursue their motion for this preliminary relief expeditiously in the Northern District." (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 18 at 3). Less than 24 hours later, they would dismiss the case under Rule 41.

On Friday, April 15, 2022, Chief Judge Marks transferred *Walker* to the Northern District of Alabama. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 20). Chief Judge Marks's transfer order states, "After evaluating the factors and requirements for a transfer pursuant to 28 U.S.C. § 1404(a), and in light of the first-filed rule, the Court finds that in the interest of justice, this action should be transferred to the Northern District of Alabama where it might have been brought, to which all parties have consented, and where it may be decided with *Ladinsky* to avoid the possibility of conflicting rulings and to conserve judicial resources." (*Id.* at 2). Chief Judge Marks "ma[de] no finding on the issues of consolidation." (*Id.*).

Upon transfer to the Northern District, *Walker* was docketed in the Northeastern Division because there was no division designation by the parties and on the transfer order the only Northern District parties named in the suit each resided in that division. *Walker* was randomly assigned to Judge Burke upon its arrival in the Northern District on April 15, 2022. At 4:07 p.m. that day,

Judge Burke set *Walker* for a status conference for the following Monday, April 18, 2022, at 10:00 a.m. in Huntsville. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 22). Judge Burke's order setting the status conference states, "The purpose of the hearing is to discuss the status of the case, not to argue the merits of the motion for injunctive relief." (*Id.*).

On April 15, 2022, Judge Axon was presiding over day four of a criminal trial with multiple defendants, which at the time of trial was anticipated to last for more than two weeks.[1] So, at 4:41 p.m., considering the pending motion for a preliminary injunction in *Walker* and the pressing claims for injunctive relief in the *Ladinsky* complaint, Judge Axon transferred *Ladinsky* to Judge Burke "[i]n the interest of efficiency and judicial economy." (*Ladinsky*, 5:22-cv-447-LCB (N.D. Ala.), Doc. # 14).

At 6:24 p.m. that same day, the *Walker* plaintiffs filed a notice of voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 23). Minutes later, at 6:33 p.m., the *Ladinsky* plaintiffs did the same. (*Ladinsky*, 5:22-cv-447-LCB (N.D. Ala.), Doc. # 15).

After the assignment of *Walker* to Judge Burke, the parties in *Walker* and *Ladinsky* agreed to consolidate the two cases. As part of that process, the parties began coordinating with each other and prepared to file a motion to consolidate. As the state made final preparations to file the unopposed motion to consolidate, *Ladinsky* was transferred by Judge Axon to Judge Burke. After that occurred, the attorneys for the state of Alabama indicated that they no longer planned to file a motion to consolidate.

The next day, Saturday, April 16, 2022, an article published online at 5:43 p.m. and updated at 9:22 p.m. stated that Eagan, an attorney for the *Ladinsky* plaintiffs, wrote to a reporter via email,

---

[1] All of the lawyers in this inquiry testified that they were not aware of Judge Axon's criminal trial until the Panel informed the lawyers of such at the May 20, 2022 hearing.

"We do plan to refile imminently, to challenge this law that criminalizes medical treatment accepted as the standard of care in the medical profession and deprives parents of their right to choose such medical care for their children." Paul Gattis, "*Lawsuits Seeking To Overturn New Alabama Transgender Law Dropped, Could Be Refiled.*" AL.com (Apr. 16, 2022, 5:43 p.m.), https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html. On Monday, April 18, 2022, Eagan made a similar statement to a different media outlet. *See* Brian Lyman, "*Attorney: Plaintiffs Challenging Alabama's Ban On Transgender Medicine Plan New Case.*" Montgomery Adviser (Apr. 18, 2022, 11:34 a.m.), https://www.montgomeryadvertiser.com/story/news/2022/04/18/plaintiffs-challenging-alabama-ban-transgender-medicine-plan-new-case-sb-184-kay-ivey-lawsuit/7355576001/.

On Monday, April 18, 2022, Judge Burke entered an order in *Walker* denying the motion for temporary restraining order as moot because of the plaintiffs' voluntary dismissal. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 24). In that order, Judge Burke described the procedural history of *Walker* and *Ladinsky* leading up to the voluntary dismissals and noted that "[p]laintiffs' counsel is now telling the media that they 'plan to refile immediately.'" (*Id.* at 3). Judge Burke stated, "At the risk of stating the obvious, [p]laintiffs' course of conduct could give the appearance of judge shopping—'a particularly pernicious form of forum shopping'—a practice that has the propensity to create the appearance of impropriety in the judicial system." (*Id.*) (footnote omitted). At Judge Burke's direction, the Clerk of Court for the Northern District of Alabama forwarded a copy of his order to the chief judge of each district court in Alabama.

The following day, on Tuesday, April 19, 2022, plaintiffs Rev. Paul A. Eknes-Tucker, and pseudonym defendants Brianna Boe, James Zoe, Megan Poe, Kathy Noe, Dr. Jane Moe, and Dr. Rachel Koe filed suit in the Middle District of Alabama against the Governor, the Secretary of

State, the district attorneys for Montgomery, Cullman, Lee, and Jefferson counties, and the district attorney for the 12th Judicial Circuit. (*Eknes-Tucker*, 2:22-cv-184-LCB (M.D. Ala.), Doc. # 1). This third lawsuit also challenged Alabama's Vulnerable Child Compassion and Protection Act. (*Id.*). The complaint was signed by the same attorneys who filed *Ladinsky*. (*Compare id. with Ladinsky*, 5:22-cv-447-LCB (N.D. Ala.), Doc. # 1). *Eknes-Tucker* was randomly assigned to Judge R. Austin Huffaker. On April 20, 2022, Judge Huffaker, "by the authority of the Court to manage the district court docket, promote the orderly and expeditious disposition of cases, and reassign a case to a judge who presided over a prior-related case," reassigned *Eknes-Tucker* to Judge Burke. (*Eknes-Tucker*, 2:22-cv-184-LCB (M.D. Ala.), Doc. # 3). Judge Burke sat by designation and presides over *Eknes-Tucker* in the Middle District. (*Id.*).

### III.    Procedural History of the Inquiry

The Panel commenced this inquiry on May 10, 2022. (Doc. # 1). In its initial order, the Panel wrote, "As Judge Burke noted, the conduct he described in his Order could be viewed as evidencing an intent to circumvent the practice of random case assignment in the District Courts for the Northern and Middle Districts of Alabama." (*Id.* at 1-2). The order described the sequence of events from the filing of *Ladinsky* through the reassignment of *Eknes-Tucker* to Judge Burke. (*Id.* at 2-5). The order identified the Panel's legal authority for conducting this inquiry, noted that binding precedent condemned judge shopping, and referenced potential sanctions. (*Id.* at 5). The Panel ordered all attorneys who appeared in *Walker*, *Ladinsky*, and *Eknes-Tucker* to appear before the Panel on May 20, 2022 "to allow the panel to inquire about the issues raised by counsel's actions." (*Id.*).

With the exception of three excused lawyers, all of the lawyers who appeared in *Walker*, *Ladinsky*, and *Eknes-Tucker* attended the May 20, 2022 hearing. (May 20 Hearing Tr. at 4-7). Each

lawyer was either represented by counsel at the hearing or secured counsel soon after the hearing. (*See id.* at 8-10; Docs. # 10-15). At the outset of the hearing, the Panel advised all parties that all district judges in the State had been consulted about the three-judge panel format of this inquiry. The Panel also advised all parties that preliminarily, the Panel did not view the possible judge-shopping as supporting criminal penalties or disbarment sanctions, unless a lawyer lied to the Panel.

Of the 39 lawyers subject to this inquiry, 21 lawyers appeared in *Walker*, 17 lawyers appeared in *Ladinsky/Eknes-Tucker*, and Shannon Minter, the Legal Director for National Center for Lesbian Rights, did not appear in any case but materially contributed to *Ladinsky/Eknes-Tucker*. The Panel divided the lawyers into three categories based on their knowledge of and roles in the decision-making in *Walker* and *Ladinsky/Eknes-Tucker*: (1) attorneys who have knowledge but had no input; (2) attorneys who have knowledge and had input; and (3) attorneys who were leaders and decision-makers in this litigation. (*See id.* at 18-21, 23-27, 30-31, 45-73, 84-93). The Panel identified the following topics as areas of potential knowledge or input: where to file a lawsuit; who to name as a plaintiff or defendant in a lawsuit; any discussion about making a related case request; any communication about transfer or dismissal of a case; whether or where to refile a case; coordinating between the groups prosecuting the cases; any discussions about judge assignments; any discussions about intentions or efforts to get a judge on a case or avoid a judge on a case; and any communication about any of those topics with anyone outside the groups involved in the cases. (*Id.* at 48-52).

After each lawyer testified as to his or her level of knowledge and input, the lawyers in *Walker* were categorized as follows:

- Individuals who have knowledge but had no input: Picasso; Swaminathan; Inglehart; Melchert; Barr; Reinhardt; Kang; Helstrom; Katz; Saldaña; Veroff; and Pelet del Toro.

- Individuals who have knowledge and had input: Charles; Strangio; Nowlin-Sohl; and Welborn.

- Leaders and decision-makers: Esseks; Hartnett; Borelli; Egyes; and Faulks.

(May 20 Hearing Tr. at 46, 52-62, 84-90). The lawyers in *Ladinsky*/*Eknes-Tucker* were categorized as follows:

- Individuals who have knowledge but had no input: Vague; Pratt; Peterson; Reinke; Oladeinbo; Hoverman Terry; Stone; and Soto.

- Individuals who have knowledge and had input: Orr and Weaver.

- Leaders and decision-makers: Eagan; Doss; McCoy; Ray; Warbelow; Levi; and Minter.

(May 20 Hearing Tr. at 46-48, 63-73, 90-93).

The Panel enlisted former Alabama Supreme Court Justice Bernard Harwood as a special master to interview each person who had knowledge but no input. (May 20 Hearing Tr. at 12, 74-76). Justice Harwood interviewed that group of lawyers in a separate courtroom. (*See id.* at 74-75, 81).

Lawyers from the State of Alabama appeared at the May 20 hearing and presented information relevant to the Panel's judge shopping inquiry. (*See id*. at 33-45). Edmund Lacour, the Solicitor General of Alabama, presented on behalf of the State. Lacour noted that one of the arguments the State raised in opposing the preliminary injunction motion in *Eknes-Tucker* centered on the plaintiffs' delay in seeking emergency relief. (*Id*. at 34). He indicated that these delays seemed attributable to what the State thought was judge shopping. (*Id.*). He further pointed out that lawyers from the Civil Rights Division of the United States Justice Department were coordinating with attorneys for the various plaintiffs who filed suit in the Northern and Middle Districts of Alabama. (*Id.* at 36-37). Lacour also observed that named-plaintiffs in the first two actions – Dr. Ladinsky and Jeff Walker – appeared in a press conference together, each opposing

the state legislation. (*Id.* at 38-39). The press conference was held on April 8, 2022, the date the legislation was signed into law by the Governor and *Ladinsky* was filed. (*Id.*).

Lacour recounted a separate press conference that took place on April 11, the date *Walker* was filed. Appearing at that conference was Alabama Representative Neil Rafferty, an outspoken critic of the legislation. (*Id.* at 40). Rep. Rafferty stated that the dispute would move on to the courts and that HRC, SPLC, the Center for Lesbian Rights, and Lambda Legal had "teamed up" to challenge the law and had "plaintiffs ready to go." (*Id.*). Obviously, HRC, SPLC, and the Center for Lesbian Rights appeared in *Ladinsky* and Lambda Legal appeared in *Walker*. Lacour next recounted the timing of the events of April 15, when *Ladinsky* and *Walker* were dismissed, press coverage over the weekend (including quotes from the plaintiffs' counsel), and the filing of *Eknes-Tucker* in the Middle District the next week. (*Id.* at 42-45).

Meanwhile, the Panel took the sworn testimony of the *Walker* lawyers Nowlin-Sohl, Welborn, Strangio, Faulks, and Charles at the May 20 hearing. The Panel inquired about each lawyer's role in the litigation – including communications they had with the *Ladinsky* team and others, the history of preparing the *Walker* lawsuit, the decision to mark *Walker* related to *Corbitt*, communications regarding *Walker*'s transfer to the Northern District, discussions about potential judge assignments, any explanations for voluntarily dismissing *Walker* soon after Judge Axon transferred *Ladinsky* to Judge Burke, and communications regarding potentially filing a new lawsuit. (*See, e.g.*, May 20 Hearing Tr. at 98-130).

The Panel invoked a modified version of Federal Rule of Evidence 615 at the hearing to prevent the lawyers from hearing other lawyers' testimony before providing their own. (May 20 Hearing Tr. at 74, 93-94). This modified rule continued throughout all proceedings and applied to oral and written testimony. (*See* Doc. # 22 at 3-4 n.3; Doc. # 40 at 1-2).

At the parties' request the Panel next convened on June 17, 2022 for a status conference. (*See* Docs. # 16, 20). At the conference, the parties' counsel raised several objections related to the way the Panel conducted the May 20, 2022 hearing, requested that the Panel conclude its inquiry based on the information gleaned from that hearing, and advanced several arguments as to why the parties did not engage in wrongful judge shopping. (*See* June 17 Conference Tr. at 3-40). At the close of the conference, the Panel instructed the parties to submit a joint proposal for how this inquiry should proceed. (*Id.* at 41-43).

The parties submitted their joint proposal on June 24, 2022, requesting that the Panel dismiss this inquiry, or, alternatively, dismiss the non-decision-makers, provide the parties with the transcripts of all proceedings, permit the parties to submit written declarations, and not require any additional oral testimony. (Doc. # 21).

On July 8, 2022, the Panel ordered 21 of the parties to file *in camera* declarations of their participation in and knowledge of the following categories:

    1. The actual or potential judicial assignments in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*;

    2. Any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, and/or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama;

    3. Any action or decision that relates to which parties to name in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, where to file each action, and all the reasons related to any such decision about who to name and where to file;

    4. Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*;

    5. Any and all actions or decisions that relate to coordination and/or dismissal of the *Ladinsky* and *Walker* cases and the reasons for dismissal, including but not limited to (1) the conference call that occurred on April 15, 2022 and (2)

any other communications between *Ladinsky* counsel and *Walker* counsel on that topic;

      6. Any and all actions that relate to the decision to file *Eknes-Tucker* in the United States District Court for the Middle District of Alabama;

      7. Any knowledge you have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing; and

      8. The identity of each attorney, not included in the style of the original order, whom you are aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced above and the details of each such person's involvement.

(Doc. # 22 at 2-3). The July 8, 2022 order also reminded the lawyers of the sequestration order that had been in effect since the start of the May 20, 2022 hearing, applied those same restrictions to the written declarations, ordered preservation of relevant materials, and explained how the Panel afforded the parties due process and would continue to do so. (*Id.* at 3-5).

In response to the July 8, 2022 order, the parties filed several motions regarding transcripts, declarations, the sequestration order, privileges, and whether the inquiry should proceed. (*See* Docs. # 23, 24, 25, 26, 27, 28, 32, 34, 35, 37, 38, 39). The Panel resolved those motions with two orders on July 25, 2022. (Docs. # 40, 41). The orders afforded certain individuals access to certain hearing transcripts, clarified the scope of the sequestration order, reiterated the Panel's authority to conduct the inquiry, further justified the order for *in camera* declarations, and denied all requests to stay or terminate the inquiry. (*See id.*).

After receiving the written *in camera* declarations, the Panel conducted four more hearings. On August 3, 2022, *Walker* attorneys Hartnett, Borelli, Charles, and Esseks testified. (The Panel called Charles to testify a second time to follow up on information about a phone call he made to

Judge Thompson's chambers on April 12, 2022). On August 4, 2022, *Ladinsky* attorneys Eagan, Hoverman Terry, Ray, Shortnacy, and Doss testified.[2]

On November 3, 2022, *Ladinsky* attorneys Orr, Stone, McCoy, Minter, Soto, Weaver, and Warbelow testified. And on November 4, 2022, *Ladinsky* attorney Levi testified. At those hearings, the Panel inquired about the same broad topics as those discussed at the May hearing and contained in the attorneys' declarations. (*See* Doc. # 22 at 2-3).

On September 23, 2022, the Panel terminated the following 21 lawyers from the inquiry because the inquiry produced no evidence of their intent to circumvent the practice of random case assignment: Vague; Katz; Barr; Strangio; Melchert; Reinhardt; Veroff; Welborn; Kang; Nowlin-Sohl; Picasso; Inglehart; Saldaña; Swaminathan; Pelet del Toro; Helstrom; Hoverman Terry; Reinke; Oladeinbo; Pratt; and Peterson. (Doc. # 59). In its last order, the Panel terminated the following lawyers from the inquiry for the same reason: Gotell, Egyes, Borelli, Ray, Weaver, Soto, Stone, and Warbelow. (Doc. # 70). Those terminations left the following lawyers in the proceedings: Doss, Eagan, Charles, Esseks, Harnett, Levi, McCoy, Minter, Faulks, Orr, and Shortnacy.  (Docs. # 1, 59, 70).

## IV.    Facts

The relevant facts gleaned from the oral and written testimony elicited in this inquiry are set out below. Many lawyers provided the same accounts of the same events; so, in some instances, the Panel cites representative testimony, but this does not imply that any declarant did not testify

---

[2] At the August 4 hearing, Sam Franklin, a partner at Lightfoot, Franklin and White, who represents lawyers from that firm who are subjects in this inquiry, renewed a motion to terminate these proceedings. (Aug 4 hearing Tr. at 274-76). Franklin indicated that the Panel's inquiry had been discussed among the Birmingham bar and was even heard by summer law clerks at Lightfoot Franklin. He also indicated that the inquiry was weighing heavily over lawyers at his firm. Of course, the Panel fully understands that this is a serious matter. But, we are convinced that we have proceeded in the correct fashion here.

about a particular matter simply because that declarant's testimony is not cited.  The Panel discusses below several areas of concern, in turn.

    A.       **Marking *Walker* Related to *Corbitt***

The Panel inquired about *Walker* counsel's decision to mark *Walker* related to *Corbitt*, a closed case. *Corbitt* involved a suit against officials of the Alabama Law Enforcement Agency for not allowing transgender persons to change their sex designation on their driver's license if they have not had male-to-female or female-to-male surgery. Welborn, Charles, Faulks, Hartnett, Borelli, and Esseks each testified that *Walker* counsel had a good faith belief that *Walker* was related to *Corbitt* because of overlapping legal and factual issues between the two cases. (May 20 Hearing Tr. at 148, 171-74, 179; Aug. 3 Hearing Tr. at 19-21, 23, 91-94, 104, 186-87). But *Corbitt* was a closed case. *Walker* counsel believed that *Corbitt* was arguably "pending," and could therefore be marked as related per the instructions on the JS 44 Civil Cover Sheet, because the appeal of the final judgment in *Corbitt* was still pending in the Eleventh Circuit and the plaintiffs planned to file a post-judgment motion for attorney's fees in *Corbitt* if they prevailed on appeal. (May 20 Hearing Tr. at 179, 185-87; Aug. 3 Hearing Tr. at 19-20, 102, 132-34, 186-87); (*see Corbitt*, 2:18-cv-91-MHT (M.D. Ala.), Doc. # 113).

Hartnett testified that a Cooley attorney looked for, but could not find, any local rule or case law in the Middle District of Alabama pertaining to case relatedness (other than the JS 44 instructions). (Aug. 3 Hearing Tr. at 20). Cooley attorneys discovered a rule in the Southern District and case law in the Northern District that would preclude *Walker* from being related to *Corbitt* if those standards applied in the Middle District. (*Id.*). Nevertheless, Hartnett testified, that "because there was not a controlling standard in the Middle District, we believed it was reasonable to mark it." (*Id.*).

In addition to and independent of the purported related factual and legal issues, counsel testified candidly[3] they marked *Walker* related to *Corbitt* because they wanted *Walker* assigned to Judge Thompson. (May 20 Hearing Tr. at 171-74; Aug. 3 Hearing Tr. at 23, 91-94). Counsel has stated they considered Judge Thompson a favorable draw because of his handling of *Corbitt* and that he ruled in favor of the plaintiffs who asserted transgender rights claims. (*Id.*). Of course, counsel's concessions are consistent with the motion they filed seeking to have *Walker* reassigned to Judge Thompson.

### B.     Contact With Judge Thompson's Chambers

*Walker* counsel mistakenly believed that, by marking *Walker* related to *Corbitt*, Judge Thompson would review the *Walker* complaint to determine whether it was indeed related to *Corbitt*. (Aug. 3 Hearing Tr. at 145; Nov. 3 Hearing Tr. at 23; Esseks Dec. at 7, ¶¶ 18, 20; Charles Dec. at 21, ¶ 74). So, although *Walker* was never assigned to Judge Thompson, Esseks suggested on the morning of Tuesday, April 12 that someone call Judge Thompson's chambers to alert him that a motion for preliminary injunction would soon be filed. (Aug. 3 Hearing Tr. at 26, 95; Esseks Dec. at 7, ¶ 20). Borelli testified that she remembered several emails discussing when the best time of day would be to call Judge Thompson's chambers. (Aug. 3 Hearing Tr. at 96). Charles volunteered to make the call. (Charles Dec. at 20, ¶ 72). Charles called Judge Thompson's chambers that afternoon and spoke with his law clerk. (*Id.* at 20, ¶ 73). Charles informed the clerk that *Walker* had been filed and marked related to *Corbitt* and that the *Walker* team would soon file a motion for preliminary injunction. (*Id.*; May 20 hearing Tr. at 194). Charles reported the details of the call to the *Walker* team via email. (Aug. 3 Hearing Tr. at 29, 31; Charles Dec. at 21, ¶ 73).

---

[3] To be clear, however, *Walker* counsel's candor on the whole is concerning. For example, Esseks's testimony that, "based on [his] understanding of what related means," he would have marked *Corbitt* as related to *Walker*, even if that case had been assigned to a judge that had previously ruled against them, strains credulity, particularly considering the extent of counsel's efforts to steer *Walker* to Judge Thompson. (Aug. 3 Tr. at 188-89).

Charles was carrying out a task that the *Walker* team thought obviously important at the early stages of *Walker*. No one in the *Walker* case ever called Chief Judge Marks's chambers to alert her of the motion for preliminary relief.

The Panel asked Charles multiple questions about his phone call to Judge Thompson's chambers. He unequivocally and repeatedly testified that he did not call judge's chambers. At the May 20 hearing, Charles initially denied several times that he called Judge Thompson's chambers. (May 20 Hearing Tr. at 178-79, 184-85, 187, 190-91). Initially, the Panel first inquired of Charles generally if he made any phone call to the Middle District. (*Id.* at 178). Next, the Panel asked if he "call[ed] anyone's chambers about the assignment of the case." (*Id.* at 179). Then the Panel specifically asked him three times whether he spoke to any law clerk of any judge in the Middle District about assignment of *Walker* to that judge or the potential for a motion for temporary restraining order being filed in *Walker*. (*Id.* at 184-85, 187, 190-91). Each time, Charles responded that he never made any phone call and testified that he "was incredibly certain" he would have remembered if he did. (*Id.* at 191). But, shortly after the Panel read his cell phone number to him, Charles asked if he could correct his earlier answers and admitted that he did call Judge Thompson's chambers. (*Id.* at 191-92). Charles's testimony is even more troubling given that he made this statement while being questioned about his call to Judge Thompson's chambers: "My pause is only because I am endeavoring to be as candid as possible. I do not recall ever calling any chambers with this request, Your Honor, at any point." (*Id.* at 179).

Calling chambers to alert a judge to an upcoming motion for emergency relief might be innocent and even helpful. But Judge Thompson was not – and never was – assigned to *Walker*. When Charles called Judge Thompson's chambers, *Walker* had already been assigned to Chief Judge Marks. After Charles called Judge Thompson's chambers, either Joshua Block, an ACLU

attorney who was not counsel in the *Walker* case, or Katz informed a member of the *Walker* team that *Walker* was assigned to Chief Judge Marks. (*Id.* at 31, 141-42, 192). Katz then spoke to a Middle District clerk's office employee and was told that counsel would need to file a motion to relate *Walker* to *Corbitt* and that simply marking the cases related would not put *Walker* before Judge Thompson. (May 20 Hearing Tr. at 100; Aug. 3 Hearing Tr. at 102-03; Esseks Dec. at 8, ¶ 21; Charles Dec. at 21, ¶ 76). So, on April 12, 2022, at 5:37 p.m., *Walker* counsel filed a motion to reassign *Walker* to Judge Thompson as a related case. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 8). At no point, however, did any of the *Walker* counsel call Judge Marks's chambers to alert her to the existence or filing of a TRO.

The only reasonable reading of Charles's testimony is that, initially, he deliberately misled this Panel about the phone call to Judge Thompson's chambers – and continued to do so up until the moment in his testimony that it became clear to him that the Panel was fully aware of his call. It is inconceivable that, in light of all the circumstances surrounding the call, Charles genuinely forgot about the phone call to Judge Thompson's chambers.

In addition to Charles's call to Judge Thompson's chambers, the *Walker* team took other steps designed to have the case assigned to Judge Thompson.  Charles was also involved in an April 14 late afternoon telephone call among the *Walker* counsel during which Julie Veroff reported her efforts to gain information from the chambers of Judge Thompson through a "friend of a friend" at Equal Justice Initiative. Through the afternoon, several messages were received by Veroff, first through an unnamed former clerk of Judge Thompson, and eventually fourth or fifth-hand allegedly from an unnamed current clerk. In her first declaration submitted on July 27, 2022, Veroff explained how she learned this information:

> [O]n April 14, 2022, I reached out to an attorney in Alabama referred to me by a friend to request information on Judge Axon and Chief Judge Marks. During our

communication, the Alabama attorney also offered to seek information about how
Judge Thompson handles related cases, and I accepted the offer. I understand that,
around this time, other attorneys on the *Walker* team reached out to former clerks
of Judge Thompson to ask how Judge Thompson handles related case assignments.
I do not recall receiving much information based on these conversations, other than
that, as a general practice, a case would be randomly assigned or the originally
assigned judge would hear any motion to reassign.

(Veroff Dec. at 8). In Veroff's supplemental declaration, submitted on August 1, 2022, which was

submitted in response to her counsel's request to provide additional detail about those

communications, she explained that she communicated with that Alabama attorney via text

messages as follows:

4. The messages reflect that the Alabama attorney I contacted
communicated with me about Judge Marks's reputation with respect to criminal
defendants but did not have any information about Judge Marks's reputation in civil
cases or about Judge Axon. I also explained to her that we were trying to transfer
the case to Thompson but had heard that he may not be taking on new cases if he
could avoid it. She then offered to put some questions before one of his clerks. I
responded by thanking her, and explained that "[i]f you happen to know a current
clerk and would be able to find out how his chambers handles requests to transfer
to him (*e.g.*, is it up to him or the judge they [sic] has the case) and if he's accepting
new cases, that'd be incredibl[y] [sic] helpful . . . "

The information Veroff eventually received, though not necessarily reliable,
was in response to her interest in the workings of Judge Thompson's chambers on
case assignments. By the end of the April 14 late telephone conference, *Walker*
counsel had decided to consent to a transfer to the Northern District of Alabama,
and filed a pleading reporting such at 9:06 p.m. (Doc. 18).

5. Later that afternoon, she reported to me from a former Thompson clerk
that "cases are assigned randomly but [sic] the clerk's office. Once in a while judges
will trade cases because of external issues (*i.e.*, not subject matter but other
things)[.] But it is otherwise luck of the draw whether a case is assigned to him[.]
I'm not aware of a mechanism to have the case transferred to be honest[.]" I then
explained that we had "indicated on the civil cover sheet that the case is related to
one of his cases and filed a motion to relate the cases . . . ."

(Veroff Supp. Dec. at 2-3).

On April 12, 2022, at 5:41 p.m., the *Walker* plaintiffs filed their motion for a temporary

restraining order and/or preliminary injunction. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 9).

They did not call Chief Judge Marks's chambers to alert her to the filing of the motion. (May 20 Hearing Tr. at 196-97; Aug. 3 Hearing Tr. at 197-98). Charles testified that he did not call Chief Judge Marks because the *Walker* team had a good faith belief that the case would be assigned to Judge Thompson based on the related-case designation. (May 20 Hearing Tr. at 196-97). Esseks testified that giving advance notice to Chief Judge Marks before filing the motion for preliminary injunction was unnecessary because they planned to file the motion for preliminary injunction soon after learning of Chief Judge Marks's assignment in the afternoon of April 12. (Aug. 3 Hearing Tr. 197-98). Esseks also testified that the afternoon of April 12 was much more hectic than that morning (when they decided to call Judge Thompson). (*Id.*).

Understood in the context of all the evidence – including (1) Charles's phone call to Judge Thompson's chambers, (2) additional research and plotting regarding how the case might be assigned to Judge Thompson, (3) the absence of a phone call to Judge Marks's chambers, and (4) Charles's misrepresentations at the hearing – what occurred is quite clear. Behind the scenes, counsel took surreptitious steps calculated to steer *Walker* to Judge Thompson even before filing their motion to have *Walker* reassigned to him. All of their explanations to the contrary ring hollow.

### C.   *Walker* is Transferred to the Northern District of Alabama

On the morning of Wednesday, April 13, Chief Judge Marks entered the order to show cause why *Walker* should not be transferred to the Northern District of Alabama where it could be decided with *Ladinsky*, the first-filed case, to avoid the possibility of conflicting rulings and to conserve judicial resources. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 3). That order sparked several conversations between and among the two teams. That same day, members of the *Walker* team discussed whether *Walker* might actually be the first-filed case because, though *Ladinsky* was filed on Friday, April 8, and *Walker* was filed on Monday, April 11, *Ladinsky* was dropped in

the after-hours box on Friday, *Walker* was marked related to *Corbitt*, and *Walker*, unlike *Ladinsky*, had a pending motion for preliminary injunction. (Aug. 3 Hearing Tr. at 38-42). Nowlin-Sohl testified that the *Walker* team initially decided to oppose transfer to the Northern District. (May 20 Hearing Tr. at 103).

Members of both teams – at least Esseks, Orr, Eagan, Nowlin-Sohl, Charles, and Soto – participated in a conference call that started at 5:00 p.m. on April 13, 2022. (Aug. 3 Hearing Tr. at 212-14; Aug. 4 Hearing Tr. at 31-38; Nov. 3 Hearing Tr. at 16-17, 30-31; Eagan Dec. at 5, ¶ 11). Esseks testified that he asked for the call with the *Ladinsky* team to inform them that the *Walker* team was considering responding to Chief Judge Marks's order with an argument that the first-filed rule should not apply because *Walker* was further along than *Ladinsky*. (Aug. 3 Hearing Tr. at 212, 219-20). Orr testified that the *Walker* team informed the *Ladinsky* team on the call that they were considering responding to Chief Judge Marks's order with an argument that *Ladinsky* should be transferred to the Middle District and consolidated with *Walker* before Judge Thompson in the interests of judicial efficiency. (Nov. 3 Hearing Tr. at 24). Despite this proposal, Judge Thompson still was not assigned *Walker* (and, in fact, never was). The *Ladinsky* team was very clear on the call – they did not agree to transfer to the Middle District. (*Id.* at 25; Nov. 4 Hearing Tr. at 12-13).

The *Ladinsky* team thought it was a "fantasy" that *Walker* would end up before Judge Thompson as a case related to *Corbitt*. (Nov. 3 Hearing Tr. at 114-15, 263). McCoy understood that Judge Thompson was presiding over one of his last cases before retiring and thought there was only a remote chance that Judge Thompson was taking on new cases. (*Id.*). Levi testified that she knew *Walker* would not be related to *Corbitt* because the latter was not a current case at the time. (Nov. 4 Hearing Tr. at 13).

Based on the call, Eagan believed that the *Walker* team still intended to seek to have their case reassigned to Judge Thompson. (Aug. 4 Hearing Tr. at 36-37; Eagan Dec. at 5, ¶ 11). Eagan asked the *Walker* team if they would want to remain in the Middle District if *Walker* stayed with Chief Judge Marks, and she recalled that the team had not yet reached a decision on that question. (Aug. 4 Hearing Tr. at 37).

The topic of Northern District judges came up in an April 13 call that took place between the *Ladinsky* and *Walker* teams. This call occurred in the evening after Chief Judge Marks had entered her show cause order earlier in the day. One question is this: why were the two teams discussing Northern District judges during a call that the *Walker* team convened to hopefully drum up support for *Ladinsky* counsel transferring their case to the Middle District and proceeding before Judge Thompson? (*See* Aug. 3 Hearing Tr. at 215-16). But it was Eagan's impression that the *Walker* team wanted information about judges in the Northern District to assist in deciding whether to oppose transfer. (Aug. 4 Hearing Tr. at 40).

Eagan acknowledged that during the call she "gave some viewpoints from [her] perspective as to how [she] thought judges might receive this type of controversial case." (Aug. 4 Hearing Tr. at 38). She testified that she did not remember if she discussed every judge in the Northern District. (*Id.*). And she testified that she could not remember specifically what she said about any particular judge. (*Id.* at 38-39). She testified she "may have made some reference" to Judge Axon and Judge Burke "because they were in the mix," but "there was no reason that [she] would have singled out Judge Axon or Judge Burke versus any other judge at that point." (*Id.* at 42). Regardless, whether she communicated these particular opinions on the call, she testified that Judge Axon would have been a "favorable draw" and that Judge Burke was "toward the bottom of the list" if she ranked the judges. (*Id.* at 47-48, 50).

Esseks denied wanting information about judges in the Northern District on the April 13 call and could not recall how the topic arose. (*Id.* at 215). He testified that the *Ladinsky* team, and specifically Eagan, may have brought up potential judge assignments in their own case. (*Id.* at 214, 216, 218). Esseks testified that Eagan said on the call that Judge Burke "would not be a good draw" or would be a "bad draw." (Aug. 3 Hearing Tr. at 215, 218). He did not remember if those were Eagan's exact words, but that was "the gist of what she said." (*Id.* at 214-15). Eagan's impression of Judge Axon was consistent with an email that Orr sent to Charles indicating that someone at Lightfoot believed Judge Axon was a good draw at a time when "there was some research being done, certainly about Judge Axon when [*Walker*] was still in the Middle District." (*Id.* at 210-12).

Similarly, Nowlin-Sohl testified that the *Ladinsky* team talked about the Northern District judges with the *Walker* team in terms of "who they might pull." (May 20 Hearing Tr. at 115). On the other hand, Eagan testified that *Walker* counsel wanted information from her about Northern District judges on the April 13 call. (Aug. 4 Hearing Tr. at 38, 40). She testified that *Walker* counsel was "interested in knowing what we knew about the judges in the Northern District" and "they were curious or they wanted to know what input we could give to them about the judges in the Northern District." (*Id.*).

Shortnacy testified that another call took place on April 13 between at least himself, Esseks, Charles, Orr, and Eagan. (Aug. 4 Hearing Tr. at 213-14; Shortnacy Dec. at 7-8, ¶ 8). According to Shortnacy, someone from the *Walker* team convened the call as a sort of "meet and greet" with the King & Spalding advocacy group to discuss common interests. (Aug. 4 Hearing Tr. at 213-14). Shortnacy testified that someone from the *Walker* team asked for input on Chief Judge Marks's order to show cause. (*Id.*; Shortnacy Dec. at 7-8, ¶ 8). The King & Spalding attorneys said, and confirmed after the call in writing, that they took no position on the order or whether *Walker*

should be related to *Corbitt* and reassigned to Judge Thompson. (Aug. 4 Hearing Tr. at 214; Shortnacy Dec. at 8, ¶ 8.c).

The *Walker* team shifted strategy the following day, Thursday, April 14, and decided to not oppose transfer to the Northern District. (May 20 Hearing Tr. at 103; Aug. 3 Hearing Tr. at 41, 103-04). The *Walker* team believed that transfer was inevitable because of their impression of Chief Judge Marks's order and that the State agreed to the transfer. (*Id.*; Egyes Dec. at 6, ¶ 20). So, on April 14, the *Walker* plaintiffs filed their response to the order to show cause in which they withdrew their motion to reassign the case to Judge Thompson and stated, "Although this case was properly filed in the Middle District, [p]laintiffs do not oppose transfer to the Northern District so that this matter can be adjudicated alongside *Ladinsky*. Plaintiffs' interest is in the expeditious injunction of the unconstitutional law they challenge, and plaintiffs will seek to pursue their motion for this preliminary relief expeditiously in the Northern District." (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 18 at 3).

By April 14, it appeared to Soto that the *Ladinsky* team considered Judge Axon a "very good draw," Judge Manasco a "good draw," and Judge Cornelius a "good draw." (Soto Dec. at 60, ¶¶ 2-4). Soto explained that Judge Axon earned the "very" distinction because of local counsel's asserted familiarity with her. (Nov. 3 Hearing Tr. at 226, 228).

On April 15, Chief Judge Marks transferred *Walker* to the Northern District. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 20). Around this time, *Walker* counsel believed that the case would end up assigned to Judge Axon because she was assigned to *Ladinsky* and Chief Judge Marks transferred *Walker* to the Northern District so that it could be adjudicated alongside *Ladinsky*. (Aug. 3 Hearing at 63, 107, 109, 156; Esseks Dec. at 8, ¶ 24; Charles Dec. at 7-8, ¶ 25). Contrary to counsel's assumption, *Walker* was randomly assigned to Judge Burke on the morning

of April 15. The assignment seemed to surprise or confuse all *Walker* attorneys who were aware of it. (May 20 Hearing Tr. at 103-04, 126; Aug. 3 Hearing Tr. at 46, 63, 109; Veroff Dec. at 15; Egyes Dec. at 6, ¶ 21).

Around the time *Walker* arrived in the Northern District in the morning of April 15, Hoverman Terry called the phone number for either Judge Axon's chambers or her docket clerk to ask about requirements for filing *pro hac vice* motions because the *Ladinsky* team was concerned about providing attorneys' home addresses on the motions. (Hoverman Terry Dec. at 6, ¶ 11; Aug. 4 Hearing Tr. at 159-60). She initially believed that she spoke with Judge Axon's courtroom deputy, (Hoverman Terry Dec. at 6, ¶ 11; Aug. 4 Hearing Tr. at 156), but later testified that she may have actually spoken with someone else from Judge Axon's chambers or her docket clerk (Aug. 4 Hearing Tr. at 156-59). The staff member answered Hoverman Terry's questions about the *pro hac vice* motions and, according to Hoverman Terry, volunteered that she anticipated *Walker* being assigned to Judge Axon. (Hoverman Terry Dec. at 6, ¶ 11; Aug. 4 Hearing Tr. at 160-61). Hoverman Terry conveyed that information to the *Ladinsky* team, after which, according to Warbelow, "the collective assumption appeared to be that the assignment [of *Walker* to Judge Burke] was temporary." (Warbelow Dec. at 78,[4] ¶ 13; *see* Nov. 3 Hearing Tr. at 39).

Soon after *Walker* was assigned to Judge Burke, Veroff contacted the Northern District Clerk's Office and the clerk told her that *Ladinsky* counsel would need to file a motion to consolidate before Judge Axon in the *Ladinsky* case if the parties wanted to consolidate the cases. (Veroff Dec. at 15; Charles Dec. at 8, ¶ 26). To coordinate their consolidation efforts, members of both teams – including at least Hartnett, Charles, Levi, Egyes, and Nowlin-Sohl – attended and

---

[4] The declarations of Warbelow, Levi, McCoy, Minter, Orr, Soto, and Weaver were submitted as a combined PDF. The citations to any of those declarations refer to the pagination of the combined PDF, not the written page numbers on each declaration.

participated in a conference call in the afternoon of April 15. (Aug. 3 Hearing Tr. at 63-64, 153; Veroff Dec. at 15-16; Charles Dec. at 8, ¶ 25; Levi Dec. at 10; Egyes Dec. at 6, ¶ 21). During this call, and based on other conversations around this time, the two teams understood that *Ladinsky* counsel would have to file the motion to consolidate in their case. (Aug. 3 Hearing Tr. at 110; Charles Dec. at 8, ¶ 26; Veroff Dec. at 15-16; Levi Dec. at 10, ¶ 15; Eagan Dec. at 6, ¶ 13).

Eagan testified that Charles emailed her a draft motion to consolidate at 3:17 p.m. for the *Ladinsky* team to review and file. (Aug. 4 Hearing Tr. at 67-68; Eagan Dec. at 6, ¶ 13). At some point around this time, the teams learned that the State was also preparing a motion to consolidate the two cases. (Aug. 3 Hearing Tr. at 64, 69, 110; Aug. 4 Hearing Tr. at 69; Charles Dec. at 8, ¶ 27; Veroff Dec. at 16; Eagan Dec. at 7, ¶ 14). Hartnett informed the State that the *Walker* plaintiffs would consent to the State's eventual motion to consolidate, and Eagan did the same on behalf of the *Ladinsky* plaintiffs. (Aug. 3 Hearing Tr. at 64-65; Aug. 4 Hearing Tr. at 69-71; Eagan Dec. at 7, ¶ 14). As the state made final preparations to file the unopposed motion to consolidate, *Ladinsky* was transferred by Judge Axon to Judge Burke. Attorneys for the state of Alabama indicated that they no longer planned to file a motion to consolidate. Other than phone conferences between the *Ladinsky* and *Walker* teams, no other events occurred between the transfer of *Ladinsky* to Judge Burke and the dismissal of the *Ladinsky* and *Walker* actions. That is, less than three hours after the transfer of *Ladinsky* to Judge Burke, both cases were dismissed.

**D.   Counsel's Response to Judge Axon Transferring *Ladinsky* to Judge Burke**

At 4:07 p.m. on April 15, Judge Burke entered the order in *Walker* setting the case for a status conference on the following Monday, April 18, at 10:00 a.m. in Huntsville. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 22). As Judge Burke specifically stated, "The purpose of the

hearing is to discuss the status of the case, not to argue the merits of the motion for injunctive relief." (*Id.*).

Shortly thereafter, at 4:41 p.m., Judge Axon entered the order in *Ladinsky* transferring *Ladinsky* to Judge Burke "[i]n the interest of efficiency and judicial economy." (*Ladinsky*, 5:22-cv-447-LCB (N.D. Ala.), Doc. # 14). The Panel explained at the May 20 hearing that Judge Axon transferred *Ladinsky* because she was then "on day four of what was scheduled to be a two-plus-week criminal trial, an 18-defendant case with four defendants at trial, and quite a lot of moving parts in that criminal case. And based upon judicial efficiency and economy, Judge Burke took the case. Judge Axon would not have had the judicial resources to start the case right away …. [T]here was a simple determination that we would have the judge who could handle the case and wasn't in a long criminal trial to handle that case." (May 20 Hearing Tr. at 33). Every attorney who testified on the matter stated that they were not aware of Judge Axon's criminal trial on April 15 or that the trial was a reason for transferring the case to Judge Burke.

To borrow some of the attorneys' words, members of both teams were immediately "surprised," "confused," "concerned," "in a bit of a panic," and thrown into "a pretty hectic" and "chaotic" state by Judge Axon transferring *Ladinsky* to *Walker*. (*See, e.g.*, May 20 Hearing Tr. at 104; Aug. 3 Hearing Tr. at 109, 226; Aug. 4 Hearing Tr. at 63, 77, 177, 242; Veroff Dec. at 16; Eagan Dec. at 8, ¶ 16; Hoverman Terry Dec. at 8, ¶ 13). In general, the lawyers stated concern that *Ladinsky* was the first-filed case but was being transferred to the judge who had the second-filed case, *Ladinsky* would possibly lose its position as the lead case, they did not have an opportunity to respond to the order, and they had always assumed from Chief Judge Marks's order to show cause that *Walker* was transferred to the Northern District so that it could eventually be consolidated with *Ladinsky*. (*See, e.g.*, Hoverman Terry Dec. at 8-9, ¶ 13; Shortnacy Dec. at 9,

29

¶ 9.b; Levi Dec. at 12, ¶ 19; McCoy Dec. at 28-29, ¶¶ 24-26; Minter Dec. at 37, ¶ 5; Orr Dec. at

53, ¶ 19; Warbelow Dec. at 78, ¶ 15).

For example, Eagan testified that she was surprised and concerned by the order because it

seemed "contrary to the established process in the Northern District relating to first-filed cases and

consolidation of related matters—procedures [she] assumed were intended to protect the random

assignment of cases." (Eagan Dec. at 8, ¶ 16). Additionally, she testified, "I was concerned, as the

*Ladinsky* matter was transferred to the judge with the second-filed case (which was pending in the

Northeastern Division/Huntsville), without any notice, explanation, or opportunity for the parties

to respond. Moreover, I was also concerned that *Ladinsky*, the first-filed case, was potentially

losing its position as the lead case to *Walker*." (*Id.*). She called the transfer "inexplicable," in

violation of "established procedure," and without "any acceptable means." (*Id.* at 9, ¶ 18; *see also*

Aug. 4 Hearing Tr. at 63, 77).

Similarly, Doss testified that the Transfer Order was "surprising and concerning."

[I]t has long been the practice in the Northern District that, when there are two
related cases, a motion to consolidate must be filed in the first-filed case and then
the cases, if they are consolidated, are consolidated before the first-filed case's
judge.

(Doss Dec. at 7, ¶¶ 22-24; *see also* Aug. 4 Hearing Tr. at 239-42, 253-55).  Doss further indicated

that the stated reason – "efficiency and judicial economy" – did not make sense to him. (*Id.* at ¶

23). So, as Doss claims he concluded,

"the standard procedure, which had been recognized by the Court for many years,
was not followed. Given the political sensitivities of the *Ladinsky* Litigation, it gave
me concern that there was an appearance of a different procedural rule being
applied to the case. . . .".

(*Id.* at ¶ 24).

30

McCoy and others testified to an additional, and more troubling, concern: they suspected that Judge Burke reached out to obtain the *Ladinsky* case. (McCoy Dec. at 28-29, ¶ 25; Nov. 3 Hearing Tr. at 61, 90-91, 185-87, 232). Barry Ragsdale, counsel for some of the attorneys in this inquiry, stated, "It scared people. It looked to me and to others like Judge Burke had reached out to get the case" (*see* May 20 Hearing Tr. at 133); "[T]here was a risk – I think a small risk, certainly probably a very small risk, with hindsight – that [the transfer] had occurred because Judge Burke had reached out for the case" (June 17 Conference Tr. at 5-6). According to Eagan, she heard "some people" from either or both teams wonder if Judge Burke "reached out and snagged this case because he wants it." (Aug. 4 Hearing Tr. at 136-37).

Counsel note they were never informed of Judge Axon's criminal trial. But, even if counsel had questions about that process, those questions do not even come close to justifying counsel's wholly unwarranted suspicions regarding why the case was assigned to Judge Burke.

### E.    Discussions About Voluntarily Dismissing *Walker* and *Ladinsky*

Less than one-half hour after Judge Axon's transfer order was entered, lead counsel and other members of both litigation teams convened a conference call.  The Panel cannot determine a complete roster of attendees, but at least Nowlin-Sohl, Hartnett, Minter, Eagan, Doss, Vague, Hoverman Terry, Shortnacy, and Soto participated. (May 20 Hearing Tr. at 125-26; Aug. 3 Hearing Tr. at 77; Aug. 4 Hearing Tr. at 77-79, 167-68, 239-40; Minter Dec. at 42, ¶ 12; Soto Dec. at 70, ¶ 36).

The purpose of the call was for the attorneys to determine how they should respond to the transfer order.[5] Eagan testified that the conference call may have lasted less than 30 minutes. (Aug.

---

[5] Someone floated the idea of filing a motion to reconsider the transfer. (Aug. 4 Hearing Tr. at 241). However, once it became clear that Judge Burke would be the judicial officer tasked with deciding the motion to reconsider,

4 Hearing Tr. at 105-06). Before, during, and after the 5:00 p.m. conference call, several other discussions took place among the various groups within each team to discuss next steps. (*See, e.g.*, Nov. 3 Hearing Tr. at 45-46). Shortly after the conference call ended and less than two hours after the transfer of *Ladinsky* to Judge Burke, both *Ladinsky* and *Walker* were dismissed.

Before the 5:00 p.m. conference call, Orr and Minter had a one-on-one call. (Nov. 3 Hearing Tr. at 46, 139-40). On that call, according to Orr, Minter brought up the idea of dismissing *Ladinsky*. (*Id.* at 49-50). Minter testified that he thought about dismissing "right away" after the transfer order. (*Id.* at 139). Orr told Minter that dismissing *Ladinsky* could be perceived as judge shopping. (*Id.* at 49-50). They also discussed their concerns about how Judge Burke would analyze their claims based on his prior opinions on the Alabama Court of Criminal Appeals and his prior political affiliations. (*Id.* at 52, 73). The call ended with Orr having the impression that it was Minter's opinion that they should dismiss *Ladinsky*. (*Id.* at 53).

Turning back to what the lawyers specifically discussed during their conference call that Friday afternoon, the lawyers first shared with each other their confusion and concerns with respect to Judge Axon transferring *Ladinsky* to Judge Burke (for the reasons discussed above). (*See, e.g.*, May 20 Hearing Tr. at 104; Aug. 3 Hearing Tr. at 75-77; Aug. 4 Hearing Tr. at 77-79, 240-41).

The attorneys also discussed concerns related to the timing of the transfer order and the status conference scheduled for the morning of Monday, April 18. Multiple out-of-state attorneys testified they were concerned about traveling to Huntsville over Easter weekend (despite having local counsel in Alabama), and the Birmingham attorneys testified they were caught off guard by having to appear in Huntsville instead of the courthouse in Birmingham. (May 20 Hearing Tr. at

---

counsel did not pursue this option because of a concern that it might communicate to Judge Burke that they did not want him as the judge. (*Id.* at 89, 140-41, 241).

106, 109-21, 152-53, 164, 170; Aug. 3 Hearing Tr. at 75; Aug. 4 Hearing Tr. at 81, 136). Borelli testified that the *Walker* team was concerned that the two teams might not be prepared to discuss the merits of the preliminary injunction on such short notice. (Aug. 3 Hearing Tr. at 121). Similarly, Strangio testified that he thought the teams would not be adequately prepared for the status conference. (May 20 Hearing Tr. at 166). And Esseks testified that he was not sure whether the *Walker* team could express a clear vision for how the two cases would move forward together. (Aug. 3 Hearing Tr. at 206-07).

No attorney even seriously considered contacting Judge Burke's chambers to ask if they could attend the status conference remotely. (Aug. 3 Hearing Tr. at 70-71, 126-27). Harnett and Borelli hesitated to do so because Judge Burke's order setting the status conference did not contain remote call-in information and they were concerned they might not reach chambers after the close of business hours on a Friday afternoon. (*Id.* at 70-71).

Also, even though the two sides had just agreed to have the cases consolidated, some (and, to be clear, not all) counsel now claim that it would have been very difficult for the two teams to work together. (May 20 Hearing Tr. at 103-05, 125-26, 165-66, 170-71, 188; Aug. 3 Hearing Tr. at 52-53, 55, 88-89, 173-75, 208-09; Esseks Dec. at 12, ¶ 8). It is primarily the *Walker* counsel who contend there were issues with coordination and collaboration. They claim the two teams did not have a unified front as to legal theories or a hierarchy of command and control. (Aug. 3 Hearing Tr. at 52-53, 55, 113-14, 203, 208-09, 222). They assert it was daunting, if not impossible, for 39 lawyers across 11 organizations to coordinate and cooperate with each other, especially considering the clear discord between certain lawyers. (May 20 Hearing Tr. at 125-26, 165, 170-71; Aug. 3 Hearing Tr. at 88-89, 161-62, 173-75, 200-03; Esseks Dec. at 12-13, ¶¶ 8-9). Hartnett testified that the potential divisions between the two teams were apparent even before April 15.

(Aug. 3 Hearing Tr. at 52-53, 55). Likewise, Esseks testified that the difficulties of working together were apparent as early as 2020. (*Id.* at 201-02). Esseks testified that Levi and Minter were particularly difficult to work with because of their personalities and strong opinions. (*Id.* at 203-04, 222). Yet, the two sides had just agreed with the State to consolidate the two cases.

The *Ladinsky* team did not share these concerns to the same degree. They claim their primary concern was maintaining their first-filed case status. (*See, e.g.*, Nov. 3 Hearing Tr. at 266). *Walker* had a pending motion for preliminary injunction and *Ladinsky* did not. And *Walker*, not *Ladinsky*, had been set for a status conference. So, it seemed to the *Ladinsky* team that the case might lose its status as the lead case if the cases were consolidated. (Aug. 4 Hearing Tr. at 77, 242; Nov. 3 Hearing Tr. at 56, 145; Nov. 4 Hearing Tr. at 19).

Attorneys compared their impressions of Judge Axon and Judge Burke. The attorneys' testimony was consistent: Judge Axon was viewed as a good draw for their cases and Judge Burke was not. (*See, e.g.*, Shortnacy Dec. at 10, ¶ 9.f; Hoverman Terry Dec. at 9-10, ¶ 13.e; Levi Dec. at 12-13, ¶ 9; Warbelow Dec. at 78, ¶ 18; Soto Dec. at 60, ¶ 4; Aug. 4 Hearing Tr. at 77-79, 179, 218, 249; Nov. 3 Hearing Tr. at 151, 185-87, 191-94, 269). Hoverman Terry testified that, on the Friday afternoon conference call, a Lightfoot attorney expressed that Judge Axon was "a good draw" or "a great draw." (Aug. 4 Hearing Tr. at 179). Quite significantly, she testified that Eagan told those on the call "that there was zero percent chance that Judge Burke would grant our motion if we filed a PI motion before him in this case."[6] (*Id.* at 179-80). Someone apparently forwarded a webpage to counsel stating that Judge Burke had a portrait of Jefferson Davis in his state court chambers before he was nominated to the federal bench, which everyone took as evidence of unfavorable conservative leaning. (Aug. 3 Hearing Tr. at 227; Aug. 4 Hearing Tr. at 180-81). Even during the

---

[6] As it turns out, Judge Burke awarded significant interim relief to plaintiffs in *Eckness-Tucker*. This led one member of the Panel to note that it is fortunate for Eagan that she was not an Old Testament prophet.

course of that conference call, a strategy was being considered. When an attorney mentioned potentially refiling in the Southern Division, Eagan stated that Judge Burke does not draw from the Southern Division. (Aug. 4 Hearing Tr. at 183-84).

Charles testified that "general information . . . publicly available," and research conducted by others, suggested to the ACLU team that Judge Burke was not a good draw. (Aug. 3 Hearing Tr. at 164-65). Charles testified that Orr "mentioned that [Judge Burke] was a judge that they did not want." (*Id.* at 165).

Levi testified that she "was part of communications among lawyers on the *Ladinsky* team in which they said that they had concerns about the prospects of our case before Judge Burke." (Levi Dec. at 12-13, ¶ 9). Levi testified, "Judge Burke was not considered a good draw for our case." (*Id.* at 13, ¶ 19). And, Levi recalled being informed by someone at some point that Judge Axon was a good draw because she had children. (Nov. 4 Hearing Tr. at 22).

Eagan testified that, on the Friday afternoon conference call, people were concerned "how receptive [Judge Burke] would be to [their] clients and to the issues in the case." (Aug. 4 Hearing Tr. at 77). Eagan testified that she "was concerned as to what his personal perspectives might be." (*Id.* at 78). But, when specifically asked about the phone call, Eagan did not admit that she had said about Judge Burke that there was a "zero percent chance" they would have of succeeding before him.

Minter testified about learning on the call "that Judge Burke was considered a very conservative judge who might turn out to be a particularly bad draw for our case. That was not because of any concern that he would be personally biased, but rather that a conservative judge might not be receptive to our legal arguments, which rested on substantive due process and the premise that discrimination against transgender people is sex discrimination. The fact that Judge

Burke was considered a very conservative judge increased my concern . . . ." (Minter Dec. at 38, ¶ 6). On the other hand, Minter recalled discussions about Judge Axon being sympathetic to their case because she worked with organizations that worked with children and she had children herself. (Nov. 3 Hearing Tr. at 148).

Minter confirmed that the attorneys compared their impressions of Judge Burke and Judge Axon on either the Friday afternoon conference call between members of both teams or the conference call among *Ladinsky* team members. (*Id.* at 151). Minter also testified that, before the cases were dismissed, "there was some thought about . . . if we're thinking Judge Burke is not a good draw, we probably don't want to [re-]file in his division." (*Id.* at 157).

Orr testified about communicating to the *Walker* team at some point that he did not have positive impressions of Judge Burke "based on an initial review of some of his opinions prior to joining the federal bench and information regarding his political affiliations prior to becoming a judge." (Orr Dec. at 52-53, ¶ 17). On the flip side, Orr testified that he shared with the *Walker* team that Judge Axon was a good draw. (Nov. 3 Hearing Tr. at 29, 31). Orr testified that he received the favorable impression of Judge Axon from Eagan, Doss, or both. (Nov. 3 Hearing Tr. at 31-33). Orr testified that Eagan had mentioned to him at some point that her husband practiced law with Judge Axon's husband and that Judge Axon would be a favorable draw because she has children. (*Id.* at 33-34). And Orr recalled that someone said on a conference call between members of the *Ladinsky* team on Friday, April 15 that Judge Burke may have reached out to take *Ladinsky*. (*Id.* at 61).

Esseks learned from an email sent by Orr to Charles and from a separate call that the Lightfoot group thought that "Judge Axon was in their view a good draw, and that Judge Burke would not be a good draw." (Aug. 3 Hearing Tr. at 211-13).

36

McCoy testified that he heard from Lightfoot counsel that Judge Axon was a good draw for them in part because of the fact that Judge Axon has children. (Nov. 3 Hearing Tr. at 118-19). McCoy remarked on a conference call with the *Ladinsky* team on Friday, April 15 that Judge Burke may have reached out for *Ladinsky*. (*Id.* at 185-87).

Shortnacy testified "there were reservations expressed about Judge Burke; that he was a conservative judge. We had a politically charged issue on our hands, and whether or not he was the best draw was a question." (Aug. 4 Hearing Tr. at 218).

Every attorney who testified on these matters acknowledged that their perceptions of Judge Burke and their chance of success before him was a factor in deciding to dismiss the two cases. They contend, however, that it was not the only factor. These assertions, which ring hollow, took various forms.

For example, Nowlin-Sohl testified that she "was not saying [Judge Burke] ha[d] nothing to do" with dismissing *Walker*. (May 20 Hearing Tr. at 105). In other words, Judge Burke's assignment "was a factor, but it . . . wasn't the factor." (*Id.* at 109).

Charles first testified that Judge Burke's assignment was a factor in dismissing *Walker* only to the extent that "he was unknown to [ACLU of Alabama]" and they "had not done any research and were . . . unaware of any of the judges in the Northern District." (May 20 Hearing Tr. at 189). However, Charles then testified that Judge Burke's assignment was a factor (actually he admitted it was "not *not* a factor") because they "understood in a very general way that Judge Burke is more conservative, and we were concerned about his openness to our plaintiffs' claims." (Aug. 3 Hearing Tr. at 163-64).

Eagan testified, "[D]id we also consider that Judge Burke was the person that it had been assigned to? Yes, that was in my mind, too, but that wasn't the primary driving factor that day."

(Aug. 4 Hearing Tr. at 81). Egan admits she did consider her "viewpoints on how Judge Burke would potentially receive these issues. That was a factor that was in my mind when we did the dismissal. It was not the driving factor." (*Id.* at 93).

Shortnacy testified that a factor in deciding to dismiss was "reservations expressed about Judge Burke" as a "conservative judge" and "whether or not he was the best draw." (Aug. 4 Hearing Tr. at 218).

Levi testified that her impression of Judge Burke was a factor in deciding to dismiss but not the exclusive factor. (Nov. 4 Hearing Tr. at 20-21).

Doss testified that the *Ladinsky* team, in deciding to dismiss, "took into account [Judge Burke] under" the "very unusual circumstance" of a "politically sensitive case" with "an appearance of a deviation from the rule of how the first filed case procedure would work." (Aug. 4 Hearing Tr. at 242).

Ray specifically testified that the Lightfoot firm thought that something was "amiss" based on that transfer order. (Aug. 4 Hearing Tr. 197-98). Doss testified that "it had the appearance that the case was being almost pulled over" to Judge Burke. (*Id.* at 268). And, one of the lawyers' lawyers, Barry Ragsdale, told the panel that he told Franklin that he viewed the transfer as "suspicious." (May 20, 2022 Tr. at 129). Eagan also testified that if Judge Axon had transferred the case to "one of the judges that [Lightfoot] viewed at the top" of the list of Northern District judges who "might be receptive to [their] clients' claims" (rather than to Judge Burke), she did not know whether she would have dismissed *Ladinsky*. (*Id.* at 138).

The suggestion that the dismissals occurred primarily because counsel thought something was awry with the transfer to Judge Burke is difficult to reconcile with the undisputed facts that (1) the dismissals did not fit with the posture of the extremely time-sensitive case at all (*i.e.*,

*Ladinsky* counsel had won the race to the courthouse, consented to consolidation, and was feverishly drafting a motion seeking injunctive relief; *Walker* had consented to transfer and consolidation and filed a motion for a TRO); (2) the dismissals were a hairpin reversal of decisions (made both just before the transfer and going back a number of years) about how the litigation would move forward; and (3) the event that immediately preceded that hairpin reversal was the transfer of *Ladinsky* to Judge Burke instead of a transfer of *Walker* to Judge Axon.

Plaintiffs' counsel have also noted that while they did not like Judge Burke as the judge, it seemed to them that the State did. They base this conclusion on the fact that shortly after the transfer order was entered, the State emailed Eagan informing her that the State would no longer file its motion to consolidate *Walker* with *Ladinsky* before Judge Axon. (Aug. 4 Hearing Tr. at 73-74; Eagan Dec. at 8, ¶ 17). Some of the counsel took this to mean that the State preferred Judge Burke and wanted to lock the two cases before Judge Burke by quickly filing an answer. (Aug. 3 Hearing Tr. at 226-27; Aug. 4 Hearing Tr. at 73-76; Nov. 3 Hearing Tr. at 69-70; Nov. 4 Hearing Tr. at 39-40). Of course, that "theory" does not account for the fact that there apparently was no longer a need to seek consolidation of cases that were by then already assigned to the same judge.

Minter suggested – and the leaders of each organization agreed – that they voluntarily dismiss their cases and undertake planning to refile a new case. (Minter Dec. at 38, ¶ 6; Esseks Dec. at 13-14, ¶¶ 40-41; Aug. 3 Hearing Tr. at 77-78; Aug. 4 Hearing Tr. at 79). Warbelow testified (and this was consistent with each lawyer's recollections of the conversations on Friday, April 15) that Levi, Minter, Eagan, and Doss drove the decision to dismiss and refile. (Nov. 3 Hearing Tr. at 270).

The lawyers discussed how they had an unconditional right to voluntarily dismiss their case under Federal Rule of Civil Procedure 41(a)(1)(A)(i) because the State had not filed an answer or

moved for summary judgment.[7] (Aug. 3 Hearing Tr. at 80, 82-84; Eagan Dec. at 9, ¶ 18). It is telling that the attorneys moved so quickly from being eager to challenge the statute and obtain a preliminary injunction for their clients as soon as possible to the sudden decision to dismiss their cases to "regroup." (Levi Dec. at 14, ¶ 22; Eagan Dec. at 10, ¶ 20; Doss Dec. at 9, ¶ 27; Minter Dec. at 38, ¶ 6; Aug. 3 Hearing Tr. at 75-78, 85-86, 117; Nov. 4 Hearing Tr. at 29-30, 34, 45-46). There are also a number of holes in counsel's various explanations about the decision.

Levi testified that she and Hartnett were on a phone call on Friday, April 15 when Harnett "agreed that the *Walker* team would also dismiss their case" and that the teams would then "join forces." (Nov. 4 Hearing Tr. at 30). Levi and Hartnett "had some conversations about what the composition of that [new] case would look like, about where it was filed," and Hartnett "represented to [Levi] that . . . that conversation would have to happen among more attorneys from the *Walker* case, . . . but we would all be quickly moving forward, joining forces to file a new case." (*Id.*).

Hartnett's testimony suggests that the *Ladinsky* team reached the decision to dismiss their case before the *Walker* team did. That is, Hartnett testified that she was on a Zoom call with members of the *Walker* team around 5:00 p.m. on Friday and, during the call, received information from the *Ladinsky* team that they were considering dismissal. (Aug. 3 Hearing Tr. at 75-77, 80, 82-84; *see also* Egyes Dec. at 9, ¶ 32). She spoke with Minter about the *Ladinsky* team's decision, and then reported back to the *Walker* team that the *Ladinsky* team wanted to dismiss their case. (*Id.*). The *Walker* team then decided to dismiss in coordination with *Ladinsky*. (Aug. 3 Hearing Tr. at 75-76; Egyes Dec. at 9, ¶ 32). However, *Walker* counsel did not request permission to dismiss

---

[7] Apparently, the lawyers hang one hat on the language of Rule 41 and contend that the court no longer has jurisdiction over a case voluntarily dismissed before the filing of an answer or Rule 56 motion. Even if that is so, the courts here – the Middle and Northern Districts of Alabama – nevertheless have jurisdiction over the attorneys.

from their clients, or even inform their clients of the dismissal until after it was filed. (May 20 Hearing Tr. at 180-81).

Hoverman Terry testified, "There was mention from I believe Lightfoot on the April 15 call about potentially filing in the Southern Division of the Northern District because of the judges." (*Id.* at 183-84). She also testified that Eagan said on a Friday evening call that Judge Burke does not draw from the Southern Division. (*Id.* at 184). Eagan testified that she talked with Doss on Friday evening about Northern District and Middle District judges and how they would receive the issues in their next case. (*Id.* at 92-93).

Eagan testified that it was crucial to the *Ladinsky* team that *Walker* be dismissed before *Ladinsky*. (Eagan Dec. at 9-10, ¶ 19; Aug. 4 Hearing Tr. at 94; Nov. 4 Hearing Tr. at 31). The *Ladinsky* team did not want to dismiss their case only for *Walker* to proceed, and the *Ladinsky* team wanted to re-file a new case to regain the first-filed status they were concerned they had lost. (Eagan Dec. at 9, ¶ 19; Aug. 4 Hearing Tr. at 94-95). Minter testified that it was an implicit assumption that *Walker* dismissing first was a condition for *Ladinsky*'s dismissal. (Nov. 3 Hearing Tr. at 154-55). Eagan made clear that was a condition of the dismissal of *Ladinsky*. (Aug. 3 Hearing Tr. at 85-86). To be sure, the *Walker* team understood that both cases would be dismissed in coordination so both teams could regroup later. (*See, e.g.*, Aug. 3 Hearing Tr. at 75-77, 85-86, 117). So, Eagan "coordinated the filing of the notices of dismissal with *Walker* counsel, where *Walker* would be filed first and the *Ladinsky* dismissal would be filed within minutes after *Walker*." (Eagan Dec. at 10, ¶ 19).

The testimony made clear that only some of the plaintiffs were informed by their attorneys that their cases were being dismissed. (*See* Aug. 3 Hearing Tr. at 166; Aug. 4 Hearing Tr. at 105-06; Nov. 3 Hearing Tr. at 57, 120, 185). But, in some instances, that news was not delivered until

after dismissal. Charles testified that he informed the White family plaintiffs in *Walker* that their case would be dismissed "[i]mmediately after" *Walker* counsel made that decision. (May 20 Hearing Tr. at 180-81). Borelli testified that she did not participate in client phone calls, but she understood that "calls were made to the clients that weekend . . . to discuss the events that had occurred" and their "view of how things should proceed after [their] communications with the other team." (Aug. 3 Hearing Tr. at 117). On the other hand, Orr contacted the *Ladinsky* plaintiffs and received their consent to dismiss. (Nov. 3 Hearing Tr. at 57, 120, 125; *see* Aug. 4 Hearing Tr. at 104). And Weaver informed her client, who was not at that time a plaintiff in *Ladinsky* (but eventually was named a plaintiff in *Eknes-Tucker*), that *Ladinsky* was being dismissed. (Nov. 3 Hearing Tr. at 250-51).

At 6:24 p.m. on Friday, April 15, the *Walker* plaintiffs filed their notice of voluntary dismissal. (*Walker*, 5:22-cv-480-LCB (N.D. Ala.), Doc. # 23). At 6:33 p.m., the *Ladinsky* plaintiffs filed their notice of voluntary dismissal. (*Ladinsky*, 5:22-cv-447-LCB (N.D. Ala.), Doc. # 15).

A particularly revealing fact is that Minter suggested within minutes of the transfer order on his one-on-one call with Orr that they dismiss *Ladinsky*. (Nov. 3 Hearing Tr. at 48). Minter and Orr hypothesized with Eagan how Judge Burke might analyze their claims from a political perspective. (*Id*. at 52, 57). Orr cautioned Minter about the appearance of judge shopping. (*Id*. at 49). That counsel wanted to avoid Judge Burke is the only logical explanation of these and the other events discussed in this opinion, including the degree, speed, and substance of counsel's reaction to the transfer order.

### F.      Filing *Eknes-Tucker*

On the morning of Saturday, April 16, 2022, leadership from both teams – including Esseks, Minter, Levi, Camilla Taylor from Lambda Legal, and Egyes – had a phone call to discuss

the possibility of refiling a single case together. (Esseks Dec. at 14, ¶ 43; Levi Dec. at 15, ¶ 25; Egyes Dec. at 10, ¶ 33; Borelli Dec. at 12, ¶ 39; Aug. 3 Hearing Tr. at 88-89, 115, 161-62, 203-04; Nov. 4 Hearing Tr. at 46-47). The call was fruitless and acrimonious. For example, Esseks testified, "Early in the call, it became apparent to me that due to complicated relationship dynamics among team members of the many involved organizations and differences of opinion concerning case strategy and decision-making structure, it would be extremely challenging for the ACLU to move forward in partnership with the former *Ladinsky* counsel to file a new case." (Esseks Dec. at 14, ¶ 43). He also testified that Levi and Minter were particularly difficult on the call. (Aug. 3 Hearing Tr. at 203-04, 230-31). Levi testified, "It was quickly apparent that we could not agree on many things, including where to file a new case, who the plaintiffs would be, and how disagreements among counsel would be resolved. We concluded the call with no final agreements made." (Levi Dec. at 15, ¶ 25). And, Charles testified that Taylor reported to him that within moments "the call" disintegrated into shouting and other unpleasantries. (Aug. 3 Hearing Tr. at 162).

Levi was the only lawyer who testified that the appearance of judge shopping came up during the Saturday morning call. (*See* Nov. 4 Hearing Tr. at 46). She testified that one of the *Walker* lawyers suggested they should take steps to ensure their potential next case did not look like judge shopping. (*Id.*).

According to Esseks, after the Saturday morning call, members of the *Walker* team discussed whether they should proceed with the *Ladinsky* team in filing a new case. (*See* Aug. 3 Hearing Tr. at 230-36). They discussed which plaintiffs they might name in a new case, which subset of attorneys should participate, whether to file suit in the Northern District or the Middle District, and, if they were to file in the Northern District, whether they should file suit in the

43

Southern Division or the Northeastern Division. (Aug. 3 Hearing Tr. at 234-36). Esseks admitted that was a judge-based decision.  (*Id.*). The *Walker* attorneys ultimately decided to not file a new case and to not be involved with the *Ladinsky* team's next case. (Aug. 3 Hearing Tr. at 231-33; Esseks Dec. at 14, ¶ 43).

In the evening of Saturday, April 16, a reporter for AL.com asked Eagan via email whether there were plans to refile the lawsuit. (Eagan Dec. at 11, ¶ 22); *see* Paul Gattis, "*Lawsuits Seeking To Overturn New Alabama Transgender Law Dropped, Could Be Refiled.*" AL.com (Apr. 16, 2022, 5:43 p.m.), https://www.al.com/news/2022/04/lawsuits-seeking-to-overturn-new-alabama-transgender-law-dropped-could-be-refiled.html. Eagan responded, "We do plan to refile imminently, to challenge this law that criminalizes medical treatment accepted as the standard of care in the medical profession and deprives parents of their right to choose such medical care for their children." (*Id.*). Eagan testified that she made that statement because the Attorney General "was already making comments in the press about the dismissal, and we wanted the message to be clear that the fight was not done, and we were sending that message to those people who were impacted by this law that had been passed." (Aug. 4 Hearing Tr. at 91; *see* Eagan Dec. at 11, ¶ 22).

The *Ladinsky* team worked through the weekend to prepare their new case. (*See* Aug. 4 Hearing Tr. at 231-32; Nov. 3 Hearing Tr. at 167; Doss Dec. at 10, ¶ 30; Eagan Dec. at 11-12, ¶ 23; Levi Dec. at 15-16, ¶¶ 26-27). Two of their most important decisions were which plaintiffs to use and where to file their new case. (Levi Dec. at 15-16, ¶¶ 26-27; Doss Dec. at 10-11, ¶¶ 30-32; Eagan Dec. at 11-12, ¶ 23). Levi had the "strong view" that they should use all new plaintiffs: "While I believed the *Ladinsky* plaintiffs had an absolute right to dismiss their claims, and my initial research led me to believe it would not be unethical to re-file the same case with the same plaintiffs, in an abundance of caution I thought it would be preferable to file a new case with new

plaintiffs." (Levi Dec. at 15-16, ¶ 26). Likewise, Eagan was concerned that they would be accused of judge shopping if they filed a new action with the same plaintiffs. (Eagan Dec. at 12, ¶ 23). Doss agreed to use new plaintiffs to "dispel any concern that there was any sort of impropriety that had occurred." (Aug. 4 Hearing Tr. at 246). And, Minter recalled that someone mentioned on Saturday that they should use new plaintiffs to avoid the appearance of judge shopping. (Nov. 3 Hearing Tr. at 163).

Once the decision was made to refile, the question became what would be filed and where. The decision was made to file a suit with all new plaintiffs. There were concerns stated by counsel that if the case were refiled with the same plaintiffs that would look like they were judge shopping. The *Ladinsky* leadership initially discussed whether they should file in the Northern District. (Aug. 4 Hearing Tr. at 183-84, 233-35; Eagan Dec. at 12, ¶ 23; Ray Dec. at 7, ¶ 10). Shortnacy testified that someone on the *Ladinsky* team – he initially thought it was Eagan, but then could not recall – said on Friday evening that "it would less likely be assigned to [Judge Burke]" if they filed in the Southern Division of the Northern District.[8] (Aug. 4 Hearing Tr. at 235).

Levi told the team that they should not file in the Northern District because of "the concerns that our team had about the unusual transfer of the *Ladinsky* case to the judge presiding over the second-filed case." (Levi Dec. at 16, ¶ 27). She "thought that filing the new case in the Northern District of Alabama created a high risk that the case would be reassigned to the judge to whom the *Ladinsky* and *Walker* cases had eventually been assigned." (*Id.*). Eagan did not want to file in the Northern District because she "was concerned that if we were to file in the Northern District, the

---

[8] Eagan claimed at the hearing that when she filed *Ladinsky* in the Southern Division of the Northern District she believed that it was a possibility that Judge Burke would draw it. (Aug. 4 Hearing Tr. at 93). But, Terry stated that, after *Ladinsky* was dismissed, there were conversations about whether to refile in the Southern Division of the Northern District to avoid Judge Burke. Terry testified that Eagan told the group that Judge Burke did not draw cases from the Southern Division. (*See id.* at 184; *accord id.* at 235 (recollection to the same effect by King & Spalding attorney Shortnacy, hesitating whether Eagan was the person who made the representation)).

case could be taken out of the random assignment process and assigned to Judge Burke, considering the events of April 15, and all our questions about how *Ladinsky* ended up before Judge Burke remained unanswered." (Eagan Dec. at 12, ¶ 23; *see also* Aug. 4 Hearing Tr. at 109).

Similar to their concerns with using the same plaintiffs, the *Ladinsky* team was aware that refiling in the same district could look like judge shopping. For example, Soto testified that McCoy shared with him a text message from Minter indicating that the Lightfoot attorneys thought they should file in the Middle District to avoid the impression that they were judge shopping. (Nov. 3 Hearing Tr. at 240-41). Similarly, Orr testified that Minter told him on Saturday, April 16 that they would file their new case in the Middle District with new plaintiffs because they did not want to give the appearance of judge shopping. (*Id.* at 62-63).

The *Ladinsky* team claims they ultimately settled on the Middle District. (*See, e.g.*, McCoy Dec. at 31, ¶ 30; Minter Dec. at 42, ¶ 10; Doss Dec. at 11, ¶ 32; Nov. 3 Hearing Tr. at 206-07, 275-76; Nov. 4 Hearing Tr. at 35-36). McCoy testified that the new parties resided in the Middle District and counsel was "worried about drawing Judge Burke again because we were uncertain as to whether he was associated with procedural irregularities." (McCoy Dec. at 31, ¶ 30; *see* Nov. 3 Hearing Tr. at 197-98). Minter testified that they filed in the Middle District "because many of our plaintiffs were there and because of our concerns about the prior departure from the first-filed rule in the Northern District." (Minter Dec. at 42, ¶ 10; *see also* Nov. 3 Hearing Tr. at 162). These claims -- that the decision about where to file *Eknes-Tucker* was driven by the identity of the newly selected plaintiffs -- are difficult to square that with the fact that most of the *Eknes-Tucker* plaintiffs (*i.e.*, four out of seven) reside in the Northern District. And, even if all severed new plaintiffs had been from the Middle District, counsel decided to start from scratch and select new clients, which they hoped would not raise an inference of judge shopping.

Eagan testified filing in the Middle District "might [make it] more likely to go into the random selection process and get a randomly selected judge," and avoid being "right back where we were on Friday afternoon, which is outside of the random selection process, . . . with these unanswered questions." (Aug. 4 Hearing Tr. at 109). Warbelow testified that it was not "Judge Burke himself so much as what happened that resulted in the cases being transferred to him." (Nov. 3 Hearing Tr. at 275-76). And Doss provided this explanation for filing in the Middle District:

> Our concern was if we were to file a new lawsuit in the Northern District, it gets randomly assigned to a judge, and the judge looks and sees that Judge Burke had the *Ladinsky* litigation and transfers it back to him as some sort of related action, and then we find ourselves right back where we started with a nonrandom assignment.
>
> That was part of our thought process in filing in the Middle District; that if we were to file in the Northern District, we may find ourselves right back where we started in this awkward, uncomfortable situation where we didn't understand why the case got to him.
>
> But the other aspect of it was once we had our new slate of plaintiffs that ultimately became *Eknes-Tucker*, there were a number of them who the defendants – which were – made venue proper in both the Middle District and the Northern District, to be honest, but there was a slight leaning toward the Middle District. So, I mean, it did have to do with getting out from under the procedural issue we were worried about in the Northern District, but it also had to do with we had a slate of plaintiffs who made venue proper in the Middle District.
>
> . . . .
>
> So, it's not that we were trying to get away from Judge Burke, at least from my perspective. We were not trying to get away from Judge Burke, we were trying to get away from being automatically assigned back to him on a related case basis and again finding ourselves in a position where we felt like we did not have a randomly assigned judge. And that was our issue.
>
> It was not Judge Burke. All along – I mean, and some background, we'd been working on this matter for almost two years, and very early on in all of this we talked about the different judges of the Northern District and the Middle District and receptivity and that sort of thing to these types of claims. We knew Judge Burke was always a possibility, yet we still filed in the Northern District. It was never – there was never a disqualifying factor for us that we could draw Judge Burke. And

it goes back to had this been a random assignment, it would have been a different analysis.

. . . .

The issue that arose with the Northern District assignment was it had the appearance that the case was being almost pulled over to him, and that was the concern. And if that was the concern, then we did take into account our prospects of potential success based on what we knew of him.

(Aug. 4 Hearing Tr. at 266-68).

But, there are major problems with Doss's explanation. First, Minter testified that his perception of Judge Burke as a bad draw was a reason for filing in the Middle District: "we weren't sure what the heck had just happened, and we're not sure [Judge Burke] would be a good draw for the case." (Nov. 3 Hearing Tr. at 158). He shared his views about refiling to avoid Judge Burke with Eagan, Doss, McCoy, and Orr. (*Id.* at 160-61). Minter testified that it was he and Levi who drove the decision on where to refile. (*Id.* at 158-59).

Second, Judge Burke was randomly assigned the *Walker* case. When it was transferred from the Middle to the Northern District, there was not a reference to the division it should be transferred into. (May 20 Hearing Tr. at 32). The only party-plaintiffs in *Walker* who resided in the Northern District lived in the District's Northeastern Division. (*Id.* at 31-32). Therefore, the Clerk's office for the Northern District docketed the case in that division. (*Id.*). Judge Burke, who sits in Huntsville, and regularly draws cases out of the Northern District's northern jury area, was randomly assigned *Walker*. This was not a "nonrandom assignment."

Third, and contrary to the lawyers' real, imagined, or conjured "concerns" otherwise, there was no "procedural issue." Counsel claim they were caught off guard by what they now say was the irregular assignment of *Ladinsky* to Judge Burke. They contend the assignment violated the "first-filed rule." (*See* Aug. 4 Hearing Tr. at 62-63). But, that position misses the mark. As the

Panel explained at the August 4 hearing, the first filed rule comes into play when there are multiple filings in different districts and the cases have significant overlap. In such a circumstance, the district court assigned to the later-filed case can exercise its discretion to transfer that case to the forum (*i.e.*, the district) of the first-filed case. So, the first filed rule deals with inter-district transfers. Obviously, here, *Walker* was transferred by Chief Judge Marks from the Middle District to the Northern District.

What counsel claim they were concerned with here is perhaps more accurately described as the procedure that comes into play when two cases are filed in the same district and there is a question about whether they should be consolidated or otherwise transferred so that the same judge presides over them. This procedure is not so much a rule as a practice. The practice of the Northern District is that if there is a motion to consolidate or reassign a subsequently filed case to a judge presiding over an earlier filed and related case, the motion is decided by the judge presiding over the earlier filed case. Of course, that is exactly what occurred here, although there was not technically a motion filed. (Counsel for the state of Alabama and the *Ladinsky* and *Walker* attorneys had agreed to file a motion to consolidate, but it was not yet filed at the time of the dismissal of *Walker* and *Ladinsky*). Judge Axon, who presided over *Ladinsky*, which was the earlier filed case, decided that the cases should be assigned before the same judge, and she entered in order transferring *Ladinsky* to Judge Burke. The problem that the lawyers who are subject to this inquiry had with that ruling was not that the wrong process was followed, but the wrong result (at least in their mind) was reached.

Indeed, McCoy's testimony at the hearing held on November 3 is indicative of results-oriented decision-making, not a good faith objection to any alleged procedural irregularity. As McCoy candidly informed the Panel, had the posture been reversed -- *i.e.*, the case been reassigned

49

in the supposedly irregular manner from Judge Burke to Judge Axon -- the *Ladinsky* team would have regarded such a reassignment as a "bank error in [their] favor." (Nov. 3 Hearing Tr. at 214). Of course, counsel and parties are permitted to have opinions about (and even gauge their likelihood of) success before different judges. But, McCoy's testimony is difficult to square with the notion that the *Ladinsky* counsel were truly focused on any supposed procedural irregularity.

By Tuesday, April 19, the decisions were made. The *Ladinsky* team filed the *Eknes-Tucker* complaint in the Middle District. (*Eknes-Tucker*, 2:22-cv-184-LCB (M.D. Ala.), Doc. # 1). The case was randomly assigned to Judge Huffaker. On April 20, 2022, Judge Huffaker reassigned *Eknes-Tucker* to Judge Burke under the court's authority "to manage the district court docket, promote the orderly and expeditious disposition of cases, and reassign a case to a judge over a prior-related case," as Judge Burke "was previously assigned two cases substantially similar to [*Eknes-Tucker*], both of which were voluntarily dismissed on April 15, 2022." (*Eknes-Tucker*, 2:22-cv-184-LCB (M.D. Ala.), Doc. # 3). Counsel did not challenge the reassignment. Perhaps ironically, on May 13, Judge Burke granted in part the *Eknes-Tucker* plaintiffs' motion for preliminary injunction and enjoined enforcement of Section 4(a)(1)-(3) of the Act pending trial. (*Eknes-Tucker*, 2:22-cv-184-LCB (M.D. Ala.), Doc. # 107).

## V.     The Panel's Findings

The Panel is not naïve. Lawyers sometimes consider potential judicial assignments in determining where to file a case, and there may be reasons why in certain cases some judges may be considered more favorable draws than others. So, the Panel does not condemn the lawyers for fretting about their chances of success before a particular judge. Of course, the irony here is that

counsel ultimately succeeded before Judge Burke. But in this case, counsel did more than fret. They made plans and took steps in an attempt to manipulate the assignment of these cases.[9]

After carefully considering all the testimony provided in this inquiry, the Panel finds without hesitation that Eagan, Doss, McCoy, Levi, Minter, Esseks, Hartnett, Shortnacy, Faulks, Orr, and Charles purposefully attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama.

Counsel's misconduct in the three cases (both individual and collective) included:

(1) *Walker* counsel marking *Walker* related to a case closed one year earlier decided by a "favorable" judge,

(2) *Walker* counsel contacting the chambers of Judge Thompson (who was never assigned to *Walker*) to directly and indirectly influence or manipulate assignments away from Chief Judge Marks to Judge Thompson,

(3) *Walker* counsel attempting to persuade *Ladinsky* counsel to transfer the latter case to the Middle District to be before Judge Thompson,

(4) coordinating the dismissal of the *Walker* and *Ladinsky* cases after their assignment to Judge Burke, and then making clear that the case would be refiled when commenting to the media about re-filing,

(5) engaging in numerous and wide-ranging discussions about how judges were favorable or unfavorable <u>in the context</u> of deciding whether to dismiss and refile their cases,

(6) suddenly dismissing *Walker* and *Ladinsky* after a series of phone conferences in which counsel discussed a number of matters, including their prospects in front of Judge Burke and that he was a bad draw,

(7) even though (as they admit) time was of the essence and their stated goal was to move quickly to enjoin what they viewed as an unconstitutional law, abruptly stopping their pursuit of emergency relief, and deciding to dismiss and refile a case in the Middle District with brand new plaintiffs,

---

[9] All of these decisions and actions were driven by counsel's assessment of the judges assigned to the cases (or preferred by the lawyers). It is one thing for attorneys to fret about potential judicial assignments before the ball is snapped (*i.e.*, before a case is assigned). It is another to try to change the play after the case has been assigned.

(8)     *Ladinsky* counsel's over-the-weekend decision to file *Eknes-Tucker* in the Middle District, even though the plan for years had been to file suit in the Northern District,

(9)     *Ladinsky* counsel's decision to file a new case with new plaintiffs in the Middle District to avoid the appearance of judge shopping and to avoid Judge Burke, and

(10)    claiming that the dismissal was because Judge Axon did not explain the reassignment of *Ladinsky* and Judge Burke set *Walker* for a status conference in Huntsville on April 18.[10]

The testimony and evidence convince the Panel that *Walker*, *Ladinsky*, and *Eknes-Tucker* counsel intentionally attempted to direct their cases to a judge they considered favorable and, in particular, to avoid Judge Burke. The Panel has no doubt that *Walker* counsel and *Ladinsky* counsel would not have dismissed their cases, and *Ladinsky* counsel would not have filed *Eknes-Tucker* in a wholly different district than *Ladinsky*, if Judge Burke was never assigned to *Ladinsky*.

## VI.    Conclusion

The Clerk of Court is **DIRECTED** to serve a copy of this Final Report on the Honorable Liles C. Burke, United States District Judge of the Northern District of Alabama, so he may proceed as appropriate.

The Clerk of Court is **FURTHER DIRECTED** to serve a copy of this Final Report on the Honorable L. Scott Coogler, Chief United States District Judge of the Northern District of Alabama, and the Honorable Emily C. Marks, Chief United States District Judge of the Middle District of Alabama.

The Clerk of Court is **FINALLY DIRECTED** to close this case.

---

[10] Counsel obviously disregarded the opportunities afforded them at the status conference with Judge Burke to discuss (and advocate) how Judge Burke may approach the litigation (*e.g.*, whether to allow *Ladinsky* counsel to file a TRO and whether to consolidate the cases or keep them on separate tracks.)

DONE this 3rd day of October, 2023.

_____
**W. KEITH WATKINS**
SENIOR UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF ALABAMA
(DESIGNATED BY CHIEF JUDGE EMILY C.
MARKS)

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF ALABAMA
(DESIGNATED BY CHIEF JUDGE L. SCOTT
COOGLER)

_____
**JEFFREY U. BEAVERSTOCK**
CHIEF UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF ALABAMA