```
 1            UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
 2    _____

 3            UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ALABAMA
 4    _____

 5            UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF ALABAMA
 6    _____

 7

 8  IN RE:
    AMIE ADELIA VAGUE, et al.      CASE NO.: 2:22-mc-3977-WKW
 9
                      SEALED DOCUMENT
10
                * * * * * * * * * * * *
11
                  EVIDENTIARY HEARING
12
                * * * * * * * * * * * *
13
        BEFORE THE HONORABLE W. KEITH WATKINS, UNITED STATES
14
        DISTRICT JUDGE, THE HONORABLE R. DAVID PROCTOR, UNITED
15
        STATES DISTRICT JUDGE, and THE HONORABLE JEFFREY U.
16
        BEAVERSTOCK, UNITED STATES DISTRICT JUDGE, at Montgomery,
17
        Alabama, on Friday, November 4, 2022, commencing at
18
        8:13 a.m.
19
                * * * * * * * * * * * *
20
                      APPEARANCES
21
    APPEARING ON BEHALF OF CARL CHARLES, TARA BORELLI,
22  JAMES D. ESSEKS:

23  Mr. Barry Alan Ragsdale
    Attorney at Law
24  DOMINICK FELD HYDE, P.C.
    1130 22nd Street South - Suite 4000
25  Birmingham, Alabama
```

```
 1                    APPEARANCES, Continued:

 2   ALSO APPEARING ON BEHALF OF CARL CHARLES, TARA BORELLI,
     JAMES D. ESSEKS:
 3
     Mr. Warren Neil Eggleston
 4   Attorney at Law
     KIRKLAND & ELLIS, LLP
 5   1301 Pennsylvania Avenue, NW
     Washington, DC 20004
 6
     APPEARING ON BEHALF OF KATHLEEN HARTNETT:
 7
     Mr. Christopher B. Driver
 8   Mr. Brannon J. Buck
     Attorneys at Law
 9   BADHAM & BUCK, LLC
     2001 Park Place North, Suite 500.
10   Birmingham, Alabama 35203

11   and

12   Mr. Matthew L. Kutcher
     Attorney at Law
13   COOLEY LLP
     55 Hudson Yards
14   New York, NY 10001

15   APPEARING ON BEHALF OF AMIE VAGUE, JEFFREY DOSS,
     MELODY EAGAN:
16
     Mr. Samuel Holley Franklin
17   Attorney at Law
     LIGHTFOOT FRANKLIN & WHITE LLC
18   400 20th Street North
     Birmingham, Alabama
19
     APPEARING ON BEHALF OF ABIGAIL TERRY, BRENT RAY, MICHAEL
20   SHORTNACY:

21   Mr. Bruce Frederick Rogers
     Attorneys at Law
22   BAINBRIDGE MIMS ROGERS & SMITH, LLP
     600 Luckie Drive, Suite 415
23   Birmingham, Alabama 35223

24

25
```

```
 1                        APPEARANCES, Continued:

 2   APPEARING ON BEHALF OF ASAF ORR, SHANNON MINTER, SCOTT MCCOY,
     DIEGO SOTO, JESSICA STONE, JENNIFER LEVI, SARAH WARBELOW,
 3   CYNTHIA WEAVER:

 4   Mr. Robert D. Segall
     Attorney at Law
 5   COPELAND, FRANCO, SCREWS & GILL
     444 South Perry Street
 6   Montgomery, Alabama 36104

 7                    * * * * * * * * * * * *

 8            Proceedings reported stenographically;

 9             transcript produced by computer

10                    * * * * * * * * * * * *

11      (The following proceedings were heard before the Honorable

12      W. Keith Watkins, United States District Judge, the

13      Honorable R. David Proctor, United States District Judge,

14      and the Honorable Jeffrey U. Beaverstock, United States

15      District Judge, at Montgomery, Alabama, on Friday,

16      November 4, 2022, commencing at 8:13 a.m.:)

17      (Call to Order of the Court)

18           JUDGE PROCTOR:  All right.  Good morning, everyone.

19   Are we ready to proceed?

20           MR. SEGALL:  Yes, Your Honor.

21           JUDGE PROCTOR:  Anything we need to take up before we

22   get started?

23           MR. RAGSDALE:  None from us, Your Honor.

24           JUDGE PROCTOR:  All right.  And would you please

25   pronounce the last name of our next respondent?
```

```
1              MR. SEGALL:  Your Honor, it's Jennifer Levi.
2              JUDGE PROCTOR:  Levi.  We just wanted to make sure we
3    got that right.  All right.  Is Ms. Levi here?
4              All right.  Hello.
5              MS. LEVI:  Your Honor.
6              JUDGE PROCTOR:  How are you doing?
7              MS. LEVI:  I'm okay.  Thank you.  How are you?
8              JUDGE PROCTOR:  Good.  All right.  Well, first, I want
9    to thank you for being here.  And second, I'm going to let
10   Ms. Baxter administer the oath to you.
11       (Jennifer Levi, the witness, was sworn.)
12             JUDGE PROCTOR:  All right.  Ms. Levi, would you please
13   just walk us through kind of your bio, litigation experience?
14   And then I'm going to ask you about where you fit in on the
15   Ladinsky team.
16             MS. LEVI:  Yes, Your Honor.
17             I currently work for an organization called GLBTQ Legal
18   Advocates & Defenders, otherwise know as GLAD.  GLAD is a legal
19   nonprofit that works on issues of discrimination for lesbian,
20   gay, bisexual, and transgender people.  I've worked at GLAD
21   since 1998 and have been involved in a number of small and large
22   litigations representing transgender people.
23             JUDGE PROCTOR:  All right.  And just generally
24   characterize how much federal litigation you've done before.
25             MS. LEVI:  I've done a number of cases at the federal
```

1   district court level.  I've more been involved at the appellate

2   level than at the district court.  I've had a couple of cases,

3   however, in federal district court.

4         JUDGE PROCTOR:  And do you have your declaration with

5   you?

6         MS. LEVI:  Yes, I do.

7         JUDGE PROCTOR:  Okay.  Then you're -- what I wanted to

8   just mention is you're welcome to refer to that or review that

9   at any point.  This is not a memory test to compare what you're

10   saying now to your declaration.  We're just trying to get

11   information.

12         MS. LEVI:  Thank you, Your Honor.

13         JUDGE PROCTOR:  All right.  So how would you

14   characterize your role on the Ladinsky legal team?

15         MS. LEVI:  I was asked to be part of a number of law

16   firms and legal nonprofits' efforts to challenge state law in

17   Alabama should it pass.  My role was to work in a central way to

18   frame the legal claims, to draft and articulate the legal claims

19   that we would bring to challenge that law.

20         As I mentioned, I have an extensive amount of

21   experience on legal claims brought on behalf of transgender

22   people.  The law that passed related to health care for

23   transgender minors, which is an area in which I have a fair

24   amount of experience.  I've worked with medical doctors,

25   families on those issues, and my role was to provide substantive

1    information relating to those core legal issues among other --

2    among other roles in the case.

3           JUDGE PROCTOR:  And so how would you describe for us

4    your role in terms of command and control structure on the

5    litigation team?

6           MS. LEVI:  Let's see.  I mean, I was a part of regular

7    discussions.  I had and expressed views about the ways in which

8    the case would be framed.  I was centrally -- as I said,

9    centrally involved in the decision making, particularly about

10   the core aspects of the litigation, including the legal claims.

11   Yeah, I was certainly a key decision-maker in the case.

12          JUDGE PROCTOR:  So you would have been involved in

13   determining what claims to assert?  I think your declaration

14   said you weren't necessarily involved with determining or

15   finding, locating, associating party plaintiffs, but certainly

16   would have been familiar with their situation, determined

17   whether they were a good fit for the complaint, that type of

18   thing?

19          MS. LEVI:  Yes, Your Honor.  Yes.  I wasn't involved in

20   the direct outreach and those interviews, but, yes, it certainly

21   would have been my role to provide information and, you know,

22   decisions about, you know, appropriate plaintiffs, for example.

23   Yes.

24          JUDGE PROCTOR:  To what degree were you involved in

25   determining where to file, what venue to file in, in terms of

1   the original Ladinsky complaint?

2          MS. LEVI:  I was not very involved in that decision.

3          JUDGE PROCTOR:  So you just had some -- you relied upon

4   others to guide that decision, as you were not as familiar with

5   Alabama as others?

6          MS. LEVI:  Yes, Your Honor.  That's correct.

7          JUDGE PROCTOR:  But what is -- and I know you addressed

8   this in your declaration, but I just want to hear from you.

9   What was your understanding about why the decision was made to

10  file originally in the Northern District of Alabama?

11         MS. LEVI:  The plaintiffs were primarily in the

12  Northern District of Alabama.

13         JUDGE PROCTOR:  Do you remember any discussion about

14  judges or anything along those lines about the decision about

15  where to initially file?

16         MS. LEVI:  Your Honor, to the best of my recollection,

17  I don't have any memory of those discussions.  That's not to say

18  that they wouldn't have taken place, but that wasn't the level

19  of focus that I was involved with prior to the filing of the

20  case.

21         JUDGE PROCTOR:  Totally understandable.  Just asking.

22         MS. LEVI:  Yeah.  No, I understand.

23         JUDGE PROCTOR:  All right.  And so the Ladinskys filed.

24  Were you aware that there turned out to be a little bit of a

25  race to the courthouse with another group?

1              MS. LEVI:  Yes, Your Honor.

2              JUDGE PROCTOR:  And we've been told by virtually

3    everyone on the Ladinsky case that a critical objective on the

4    week that this statute passed and Governor Ivey signed it into

5    legislation was to be first in line in terms of challenging the

6    statute.

7              MS. LEVI:  Yes, Your Honor.  That's correct.  Yes.

8              JUDGE PROCTOR:  All right.  At some point, did you

9    personally become aware that there was another group -- and I

10   think you addressed this in your declaration, but you became

11   aware there was another group contemplating filing?

12             MS. LEVI:  Yes, Your Honor.  As I said in my

13   declaration, I was aware that was going to happen for at least a

14   year before the law was passed.  It well may have been longer

15   than that.  I had had conversations with attorneys that

16   eventually were attorneys that worked on the Walker team about

17   their stated intentions, that if the law were to be filed, that

18   they were interested in filing their case in the Middle

19   District.  And I understood that to be because they wanted to

20   file it as a related case to a case that --

21             JUDGE PROCTOR:  To Corbett.

22             MS. LEVI:  To Judge Thompson.

23             JUDGE PROCTOR:  Right.  So their goal was to relate the

24   case to another piece of litigation that had been before Judge

25   Thompson.

1          MS. LEVI:  Yes.  And I was aware of that, as I said,

2   long before the law passed, at least a year before.

3          JUDGE PROCTOR:  Now, did you hear that from your team

4   in terms of information, from someone in the Walker case

5   directly, or a combination of both?

6          MS. LEVI:  Your Honor, to the best of my recollection,

7   I heard that -- it may have been an attorney who ended up not

8   being on the Walker case.  It's an attorney from the ACLU.  And

9   there may have been more than one attorney that I had heard that

10  from.  But I heard that from the legal nonprofits that were

11  eventually involved in the Walker case.  But, again, that was

12  before there was a Walker case, to my knowledge.

13         JUDGE PROCTOR:  Now, our understanding is that at the

14  time Ladinsky was filed in the Northern District of Alabama,

15  there was still work being done on a motion for a TRO,

16  preliminary injunction.

17         MS. LEVI:  That is absolutely correct, Your Honor.

18         JUDGE PROCTOR:  All right.  And there was some concern

19  because when Walker was filed, it included a motion for a TRO

20  and preliminary injunction.

21         MS. LEVI:  Yes, Your Honor.

22         JUDGE PROCTOR:  Before the -- did you know that before

23  Judge Marks entered her show cause order, that there was this

24  other case with a request for a TRO pending?

25         MS. LEVI:  I'm trying to remember when I learned -- I

1   mean, I learned that the Walker case was filed along with a

2   motion for PI and TRO.  And I don't recall -- let's see.  So I

3   learned that at the time the case was filed, and I learned that

4   there was a show cause order that was issued on the Wednesday, I

5   guess it would have been the 13th of that week.

6          JUDGE PROCTOR:  Right.  Right.  So our understanding is

7   just that, that a show cause order was entered in the Walker

8   case asking the plaintiffs, if not the parties, to show cause

9   why the case should not be transferred to the Northern District

10  under the first-filed rule in light of the filing of Ladinsky

11  the week before.  And our understanding is there was a

12  conference call that afternoon, the 13th, between the Ladinsky

13  team or some component of it and the Walker team or some

14  component of it.  Were you involved in that call?

15         MS. LEVI:  I don't believe I was involved in that call.

16  And the reason, I have -- to the best of my recollection that I

17  wasn't is because I was aware that the lawyers on the Walker

18  team wanted to know if we would have any concerns about them

19  saying something in the show cause order about the Ladinsky

20  case.  And I had a conversation, I believe, that morning -- if I

21  can review my declaration, it will help refresh my

22  recollection --

23         JUDGE PROCTOR:  Feel free.

24         MS. LEVI:  -- about that because I didn't -- because I

25  was -- I had a commitment that day and didn't believe I would be

1   able to be on a call that happened later in the day.

2           JUDGE PROCTOR:  All right.  And please, at any time --

3           MS. LEVI:  Thank you.

4           JUDGE PROCTOR:  -- you can just pause and look at your

5   declaration.

6           MS. LEVI:  Appreciate that.

7           JUDGE PROCTOR:  That's why I led off with that, just

8   saying that that's certainly -- we're very receptive to that.

9   We're just -- like I said, we're not trying to cross-examine

10  you.  We're really just trying to get information.  Now, that

11  doesn't mean we won't drill down trying to get some information

12  if we need to, but --

13          MS. LEVI:  Yeah.  So I learned that -- yes.  I learned

14  that -- and I believe that this was on that Wednesday, the 13th,

15  that I learned that -- I'm sorry.  That's not it.

16          JUDGE PROCTOR:  I'm looking at paragraph nine where it

17  looks like you just learned that there was some attempt to have

18  Ladinsky transferred to the Middle District.

19          MS. LEVI:  Yes, Your Honor.

20          JUDGE PROCTOR:  And I think that was the subject of the

21  phone call.  So that led me to believe you probably were not on

22  that phone call.

23          MS. LEVI:  I believe I wasn't on that phone call,

24  though I did -- I was aware earlier in the day that the Walker

25  team might attempt to have Ladinsky transferred to the Middle

 1   District.  That's correct.  But --

 2          JUDGE PROCTOR:  Were you briefed about the phone call

 3   after it occurred?

 4          MS. LEVI:  I -- yes, I was.  Yeah.

 5          JUDGE PROCTOR:  All right.  What do you recall --

 6   first, who gave you the briefing, and second, what do you recall

 7   about it?

 8          MS. LEVI:  I don't recall who gave me the briefing.

 9   And what I recall is that we didn't want for the Walker team to

10   say anything about our view or our position with respect to any

11   effort that they would make to have the Ladinsky case

12   transferred.

13          JUDGE PROCTOR:  All right.  Did they indicate to you,

14   though, that during that call, the prospect was raised about

15   whether Ladinsky ought to consent to transfer to the Middle

16   District in order to appear with them, with their plan to try to

17   relate the case to the Corbett matter?  Do you remember anything

18   about that?

19          MS. LEVI:  I'm sorry.  Could you clarify the question?

20          JUDGE PROCTOR:  Yes.  Wasn't a very good question.  Let

21   me try again.

22          Our understanding is that during that April 13th call

23   that you were not on, that the prospect of -- it was after the

24   show cause order was entered where Judge Marks was asking what

25   basis there was for not transferring Walker up to the Northern

1   District that the Walker counsel raised the prospect to Ladinsky

2   counsel, hey, instead, why don't you agree to transfer your case

3   here because we're going to try to relate our case to Judge

4   Thompson's case in Corbett, and then we would be before Judge

5   Thompson.  Was anything like that addressed to you after the

6   call about the substance of those discussions?

7          MS. LEVI:  Well, I will say from both before that call

8   and after the call, I was of the very strong view that there

9   wasn't a basis for the case to be related to the prior case that

10  had been in front of Judge Thompson.

11         JUDGE PROCTOR:  One of your colleagues has said we

12  thought that argument was fanciful, the relation argument.

13         MS. LEVI:  I had been -- as I said, I had been involved

14  in discussions even prior to the passage of the law about the

15  fact that that would be the Walker team's effort.  And I

16  never -- I never thought that it was a viable path.  We also --

17         JUDGE PROCTOR:  Are you familiar with the Corbett

18  litigation just generally?

19         MS. LEVI:  I am generally familiar with it, correct.

20  Correct.  But, you know, it was not current at that time before

21  Judge Thompson, I believe.  This is to the best of my

22  recollection.  It was -- it didn't seem related and it didn't

23  seem like there was a basis for that.

24         JUDGE PROCTOR:  All right.

25         MS. LEVI:  But I will also say that our team's interest

1   was in litigating separately from the Walker team.  I mean,

2   there had been, as I said, discussions from a year or more prior

3   to the time that the law passed.  And it was our interest to

4   bring a separate case.  So both because we didn't think that

5   there was, you know, a viable path for relation to Judge

6   Thompson and because we wanted to separately litigate our case,

7   we didn't want them to say anything with regard to transfer of

8   the Ladinsky case to the Middle District.

9           JUDGE PROCTOR:  All right.  Thank you.

10          Now let's go back to Ladinsky in particular, then, the

11  Ladinsky case.  Initially the case was assigned to Judge

12  Manasco, and she recused.  The case then was assigned to Judge

13  Cornelius, a magistrate judge in our court.  And our

14  understanding is there was not unanimous consent for her to

15  handle the case, and then the case went back on the wheel and

16  was assigned to Judge Axon.  Is that your recollection?

17          MS. LEVI:  Yes, Your Honor.

18          JUDGE PROCTOR:  Were you in the courtroom when I, on

19  the very first hearing day, that morning, kind of reviewed with

20  everyone procedurally how these two cases tracked through the

21  federal system?

22          MS. LEVI:  I was, Your Honor.

23          JUDGE PROCTOR:  All right.  Was that news to you, what

24  I explained about how particularly Walker got into the

25  Northeastern Division, northern jury area, and was assigned

1  randomly to Judge Burke and then Judge Axon had the bandwidth

2  conflict since she was in a criminal trial and the two of them

3  just agreed that Burke would take the cases because she was tied

4  up with this criminal trial?

5          MS. LEVI:  That was news to me, Your Honor.  Yes.

6          JUDGE PROCTOR:  But we understand that before that was

7  news to you, there was some trepidation about that whole

8  process.  Was that -- did you have concerns about it?

9          MS. LEVI:  Can you be more specific?

10          JUDGE PROCTOR:  Yes.  And I probably should be.  Our

11  understanding was that it was very concerning to the Ladinsky

12  team in particular when Judge Burke was reassigned Ladinsky

13  rather than Judge Axon being reassigned Walker.

14          MS. LEVI:  I mean, yes, Your Honor.  I could speak

15  to -- I mean, on the Friday, which I believe was April 15th,

16  that was the -- a time when there was a Walker lawyer who

17  reached out to me to let me know that their case had been

18  transferred to the Northern District.  And I had a conversation

19  in which he asked if we would have -- our team would have any

20  objection to their seeking to get the Walker case transferred to

21  the Ladinsky judge that had been assigned.  And I said that I

22  didn't think we would have any objection to that, I would have

23  to connect -- you know, check in with the other lawyers.

24          I learned from a later call that the process to get

25  the Walker case transferred would have to be one that the

1   Ladinsky lawyers would initiate.  It was -- as I set forth in my

2   declaration, that Friday was a particularly difficult day for me

3   for a number of reasons, including the fact that it was the

4   first night of a major holiday for my family, and then

5   complicating it further, my senior high school student was

6   captain of their team, and I had to get to the game before also

7   preparations for the evening's event.  So --

8           JUDGE PROCTOR:  A lot going on.

9           MS. LEVI:  There was a lot going on.  But my point is

10  to say that at -- after I had indicated to the Walker team that

11  I thought we had no objections to their seeking their case to be

12  transferred to the Ladinsky judge, I then learned from them that

13  we had to file a motion in order for that to happen.  And they

14  indicated that they would get us a motion for that to happen.

15          It was then that I stepped away for a couple of hours.

16          JUDGE PROCTOR:  You had a vacuum there away from this

17  case because I think there was an ultimate frisbee game --

18          MS. LEVI:  That's right.

19          JUDGE PROCTOR:  -- and there was a knee injury with

20  your child.

21          MS. LEVI:  Yeah.  But the reason I'm saying all that is

22  it was very surprising and alarming to me later in the day, when

23  I rejoined calls, that a number of very surprising things had

24  happened.  And one is that there had been a hearing set for

25  Monday in front of Judge Burke in the Walker case.  So that was

1  surprising because I was thinking there was going to be a

2  routine filing of motions and that case would be transferred to

3  Judge Axon.

4           But then I also learned that the Ladinsky case had been

5  transferred to Judge Burke, and that -- none of that had been

6  with any motions filed.  So, yes, I had significant concerns

7  because it suddenly -- what seemed like was going to be routine

8  and made sense because the Walker case was transferred to the

9  Northern District -- my understanding was because of the

10 Ladinsky case that had been pending there got sent to Judge

11 Burke, not to Judge Axon, I thought that could be a ministerial

12 issue.  It would just get transferred, then, to Judge Axon.

13          We were asked to do something in order to facilitate

14 that happening, which the last I understood, we were waiting for

15 a draft motion so that we would get it filed and that would

16 happen routinely.  And then within a very short period of time,

17 everything had very significantly changed and none of it made

18 sense to me in terms of the process by which that happened.

19 And, yes, I was very concerned about that.

20          JUDGE PROCTOR:  One of the things -- well, let me back

21 up.  What discussions had you been part of at that point --

22 let's say prior to learning of the status conference set in

23 Walker and the reassignment of Ladinsky to Judge Burke, what --

24 to what extent had you been involved in discussions about

25 predisposition or scouting reports, if you will, of judges in

1  the Northern District?

2         MS. LEVI:  To the best my memory serves, I learned that

3  Friday, I believe, when the Walker case got transferred to Judge

4  Burke, that Judge Burke wasn't considered a good draw for the

5  case.

6         JUDGE PROCTOR:  Who told you that?

7         MS. LEVI:  I -- I can't remember who it was that

8  relayed that information.  I don't remember.

9         JUDGE PROCTOR:  Let me just pause and ask this.  What I

10 understand, if you were out of pocket from 4:15 or so and

11 weren't even aware, real time, of the status conference order or

12 the reassignment order until later that afternoon/evening, you

13 were not on the five o'clock phone call that we've heard about?

14        MS. LEVI:  I was pulled into a phone call or a number

15 of phone calls that would have been after that -- you know, it

16 could have been that call, but it wouldn't have been the

17 entirety of the call.  I was on phone call or calls that

18 evening, but it was hard for me to -- it wasn't at the beginning

19 of those.  I didn't get the notification that there was to be a

20 call.  I'm certain somebody, you know --

21        JUDGE PROCTOR:  Were you on a phone call in which the

22 decision about whether to dismiss Ladinsky was discussed or were

23 you on a phone call later where that decision had already been

24 made and you were being briefed about it?  That's what I'm

25 trying to figure out.

 1          MS. LEVI:  You know, I -- I don't remember.  What I do

 2    remember is that it was -- that I was involved in a phone call

 3    where, you know, our group of lawyers thought that was the

 4    wisest course, was to dismiss the case.  And I agreed with that

 5    assessment.

 6          JUDGE PROCTOR:  Okay.  Why did you agree with that

 7    assessment?

 8          MS. LEVI:  Because I was very concerned about the

 9    procedural ways in which the -- both the -- a number of

10    things -- all those things that had happened.  I was very

11    concerned.  It didn't make sense to me.  I didn't understand how

12    we had gone from what seemed like routinely expecting that the

13    Walker case would get transferred to the Northern District,

14    would be assigned to Judge Ladinsky (sic), it would be

15    consolidated and move forward, the process by which both we --

16    the Ladinsky case was transferred to Judge Burke, that there was

17    a status conference that was scheduled for Monday when we didn't

18    have a preliminary injunction that was even filed in the case.

19    We were -- had been the first filed case.  We were suddenly

20    becoming a tagalong case.

21          JUDGE PROCTOR:  Well, let --

22          MS. LEVI:  And all of the work that we had done to try

23    to become the first filed case was potentially being undermined,

24    and the process by which that happened didn't make any sense to

25    me.

```
 1              JUDGE PROCTOR:  All right.  So --

 2              MS. LEVI:  And so it made sense to me for us to dismiss

 3   the case.

 4              JUDGE PROCTOR:  What I've heard is a couple things

 5   there.  First, we were concerned that we were lead case and were

 6   hoping to have some say about how this case -- how these cases

 7   would proceed in front of a judge.

 8              MS. LEVI:  Yes, Your Honor.

 9              JUDGE PROCTOR:  Second, we were -- you were very

10   concerned about the procedural steps that were unknown to you

11   about how the case was assigned from Axon to Burke rather than

12   vice versa.

13              MS. LEVI:  Yes.  And that it had happened without a

14   motion, which was the anticipated way that the case would be

15   transferred.

16              JUDGE PROCTOR:  And then let me ask you this.  Was the

17   fact that you landed in front of Judge Burke just generally a

18   concern to you?

19              MS. LEVI:  It was -- I mean, it was a factor in all of

20   those discussions.  He -- we -- you know, I had understood at

21   that point in time that he wasn't a good draw for the case.  I

22   do want to say that we filed the case in the Northern District

23   and were prepared to litigate the case in front of any judge to

24   which we were assigned.  So it wasn't exclusively the fact that

25   it was -- that both those cases were in Judge Burke's chambers.
```

1    I mean, we were prepared to litigate the case wherever it had
2    been assigned.  But in combination with all of the procedural
3    irregularities that didn't -- wasn't understandable to me, I
4    agreed with the -- with the decision to dismiss the case.
5            JUDGE PROCTOR:  Did you agree on the back end, after
6    the decision was made, or do you recall being directly involved
7    in making the decision?  That's what I'm trying to figure out.
8            MS. LEVI:  I understand the question, and I realize
9    it's -- there were a lot of attorneys involved in the
10   discussions.  I was involved in those discussions before we
11   dismissed the case.  And as I said, I agreed with the
12   assessment.  Whether the decision had, like, you know, been
13   fully and finally resolved, whether I could have said, hold up,
14   I disagree, I suppose that's possible.  But I didn't -- I did
15   not disagree with that assessment.
16           JUDGE PROCTOR:  All right.  So your best recollection
17   is that you may have given input, but in any event, you did not
18   disagree with the decision if you were not directly involved in
19   it?  Is that fair?
20           MS. LEVI:  I'm sorry.  Could you say that again?
21           JUDGE PROCTOR:  Your best recollection is you don't
22   recall whether you were actually involved in making the
23   decision, but you did not disagree with the decision.
24           MS. LEVI:  That's correct, Your Honor.
25           JUDGE PROCTOR:  Okay.  Now, you said that Judge Burke

1  was a factor.  My understanding is that you were informed by

2  others on the Ladinsky team that Judge Axon was a favorable

3  draw.

4          MS. LEVI:  Yeah.  That -- I was informed of that at the

5  time that the case was assigned to Judge Axon.

6          JUDGE PROCTOR:  Tell me -- do you recall who said that

7  to you?

8          MS. LEVI:  I don't, Your Honor.

9          JUDGE PROCTOR:  Do you recall what was said

10 specifically?

11         MS. LEVI:  I believe that the information that was

12 conveyed was that she is a parent and that she has children.

13         JUDGE PROCTOR:  All right.  You may not know this.

14 Judge Burke is a parent.

15         MS. LEVI:  Your Honor --

16         JUDGE PROCTOR:  Judge Cornelius is a parent.  Judge

17 Manasco is a parent.  You might -- I'm not sure we have anybody

18 on our court who's not a parent.  So that's what I just have

19 been struggling with.  I've heard that before.  I don't

20 understand what that means.

21         MS. LEVI:  Your Honor, I will tell you, as I said, I --

22 you know, I wasn't aware -- I said this in my declaration.  I

23 wasn't aware of information about the judges at the time that I

24 joined the team.  I did very much trust those on the team who

25 had more information than I did.  I was, you know, filing a case

1    that I thought was --

2            JUDGE PROCTOR:  I appreciate that.  What I'm trying to

3    do is get the information that you're aware of that was the

4    basis for this decision --

5            MS. LEVI:  That's --

6            JUDGE PROCTOR:  -- whether it was on the -- real time

7    when the decision was made or what was explained to you after.

8    That's all I'm trying to determine here.

9            MS. LEVI:  That was the information that was conveyed,

10   that was the assessment that others on the team gave, and I

11   heard that information.

12           JUDGE PROCTOR:  Now, you had communications with Carl

13   Charles about the transfer of Walker?

14           MS. LEVI:  Yes, I did.  He called on that Friday, the

15   15th.

16           JUDGE PROCTOR:  All right.  Did you know Mr. Charles

17   professionally before that phone call?

18           MS. LEVI:  Yes, I did.  Yes.

19           JUDGE PROCTOR:  Personally or just professionally?

20           MS. LEVI:  Professionally.

21           JUDGE PROCTOR:  All right.  And worked with him on

22   matters before?

23           MS. LEVI:  We had gone to conferences together.  We had

24   been at discussions about legal issues.  I don't -- I would have

25   to really check to see whether we were formerly on any cases

1    together.  I don't believe we were.  I don't think we were.  But
2    I knew him.  I knew him well.
3             JUDGE PROCTOR:  Did he -- you've kind of relayed what
4    he discussed with you in that April 15 contact or communication.
5    Anything else that you recall Mr. Charles saying about the
6    Walker case in particular?
7             MS. LEVI:  No, not that I can -- not to the best of my
8    recollection.
9             JUDGE PROCTOR:  That's fine.  Was this your first
10   communication with Mr. Charles about the Ladinsky and Walker
11   cases?
12            MS. LEVI:  It's very possible that we had prior
13   communications.  I don't recall of any specifically.
14            JUDGE PROCTOR:  Did he ever indicate to you that he was
15   making efforts to try to draw Judge Thompson's attention to the
16   filing of the Walker case and that they were hoping he would
17   take the case?
18            MS. LEVI:  I may have seen communications that
19   reflected that.
20            JUDGE PROCTOR:  All right.
21            MS. LEVI:  But I don't have a memory of a conversation
22   with him about that.
23            JUDGE PROCTOR:  Okay.  What type of communications
24   would you have seen reflecting that?
25            MS. LEVI:  I imagine that would have been an email.

```
 1              JUDGE PROCTOR:  I'm sorry?

 2              MS. LEVI:  I imagine that would have been an email

 3    communication.

 4              JUDGE PROCTOR:  All right.  Did he ever talk to you

 5    about their theory on relation of Corbett -- relation of Walker

 6    to Corbett?

 7              MS. LEVI:  I don't -- I don't remember a conversation

 8    about their theory.  Well, I'm sorry.  From -- with Carl

 9    Charles?  I actually have -- I mean, this is what I think I

10    suggested earlier in the conversation.  I had conversations with

11    an attorney from the ACLU, Josh Block, who I don't believe was

12    on the Walker case.  And those, as I said, long preceded the

13    filing of that case.

14              JUDGE PROCTOR:  All right.

15              MS. LEVI:  I may have had conversations, but I don't

16    remember a conversation with Carl Charles about that.

17              JUDGE PROCTOR:  Fair enough.

18              MS. LEVI:  I mean, just to say, as I said, I was very

19    dismissive of that.  So if there were any further

20    conversations --

21              JUDGE PROCTOR:  It wouldn't have registered.

22              MS. LEVI:  -- it would not have registered.

23              JUDGE PROCTOR:  I wouldn't have taken it seriously,

24    that's not something I need to process and recall.

25              MS. LEVI:  That's correct.
```

```
 1              JUDGE PROCTOR:  All right.  Well, let me go back and
 2    make sure I have plumbed the well on the question about
 3    assessment of judges in the Northern District in particular.  Do
 4    you remember who you would have -- you said you didn't know the
 5    judges.  You've said that in your declaration.
 6              MS. LEVI:  That's correct.
 7              JUDGE PROCTOR:  I think you said it earlier today.
 8              MS. LEVI:  Yes.
 9              JUDGE PROCTOR:  Who would you have counted on on the
10    team to give those type of assessments?
11              MS. LEVI:  It would have been the local lawyers.  So
12    there were lawyers who seemed to be familiar with the district
13    courts in Alabama from the Lightfoot firm, from -- I think from
14    the King & Spalding firm, as well as the Southern Poverty Law
15    Center, who, at different times, had, you know, experience in
16    Alabama courts.
17              JUDGE PROCTOR:  Right.  And what do you recall being
18    discussed about Judge Manasco?  Do you remember anything being
19    discussed about Judge Manasco?
20              MS. LEVI:  I don't, Your Honor.  That isn't to say that
21    conversations didn't happen, but, again, I wouldn't have been --
22    I would not have -- I wouldn't have focused on those
23    discussions.  It's just as I said, like I was prepared to
24    litigate this case in the Northern District.  It made sense why
25    we were filing in the Northern District.  And I honestly -- I
```

1  never put much stock, to tell you the truth, in those kinds of,

2  you know, assessments of judges, which isn't to say that I

3  don't, you know, consider it like all other lawyers do.  But

4  particularly where I'm not familiar with the judges, I just

5  wouldn't have paid that much attention to it because it -- yeah.

6         JUDGE PROCTOR:  Sometimes it's just best to stick to

7  litigating your case.  Fair?

8         MS. LEVI:  That was the -- that was always the

9  intention.

10        JUDGE PROCTOR:  Well, for example, in this case, the

11 prospects of succeeding in front of Judge Burke were not viewed

12 as particularly high; correct?

13        MS. LEVI:  He was not viewed as a good draw for the

14 case.  I understood that at the time -- you know, after --

15        JUDGE PROCTOR:  Did anybody ever say why?

16        MS. LEVI:  Generally that he was a more conservative

17 judge.

18        JUDGE PROCTOR:  What did that mean to you?

19        MS. LEVI:  It meant that the issue might be new, you

20 know, it might be something that was unfamiliar, and it might,

21 you know, mean that it would be challenging to, you know, make

22 an argument that was heard as a new argument about a new set of

23 issues.  And that would be challenging.

24        JUDGE PROCTOR:  Okay.  And is one of the reasons you

25 don't put a lot of stock in those things is the scouting report

1    is not always accurate?

2          MS. LEVI:  It mostly doesn't change whatever I can do

3    or what I should do, so --

4          JUDGE PROCTOR:  And that's a -- so two points on that.

5    First, I have had maybe a little too much fun during these

6    hearings with comparing the ultimate result where Judge Burke

7    actually ruled in favor of the plaintiffs with all the

8    predictions about how Judge Burke would not be inclined to be

9    receptive to these types of claims.  So that was -- was that

10   another surprise to you when you won on the PI motion?

11         MS. LEVI:  This may be hard to hear, but I've done this

12   work since '98, and in -- I mean, it's been very challenging.

13   It's -- and I've, you know, worked on other cases.  I've worked

14   on marriage equality.  I've worked on, you know, efforts to

15   challenge long-standing criminal prohibitions against LGBTQ

16   people's lives.  And I've tried not to be surprised at outcomes

17   because to be very honest, it would be hard to get up in the

18   morning and do this work every day if I didn't do it with the

19   expectation that the justice system operates in ways that

20   reflect the country's ideals.

21         JUDGE PROCTOR:  All right.  The second interesting

22   point to what you just said was sometimes you've just got to not

23   worry about those things and stick to the plan of litigating

24   your case.  Fair?

25         MS. LEVI:  Yes, Your Honor.  Yeah.

```
 1              JUDGE PROCTOR:  But that's not what y'all did in this

 2    case.

 3              MS. LEVI:  That's correct.

 4              JUDGE PROCTOR:  You didn't stick to the plan of

 5    litigating your case.  You dismissed it.

 6              MS. LEVI:  Yes.

 7              JUDGE PROCTOR:  Time was of the essence in terms of the

 8    filing of this matter and the litigation of this matter, wasn't

 9    it?

10              MS. LEVI:  Yes.

11              JUDGE PROCTOR:  How did you reconcile in your mind your

12    agreement with the decision to dismiss and that concept that we

13    don't have a lot of time, we have a statute that's going to be

14    affecting our clients and those who are in the same position of

15    our clients, and we need to get going on whatever we can do to

16    stop this statute with a dismissal that puts you back at square

17    one in terms of at least filing and getting things kicked back

18    off?

19              MS. LEVI:  Yeah.  I mean, at the time that we agreed to

20    dismiss, we didn't have a preliminary injunction finalized or

21    filed.  I believed that we would very quickly file a new case.

22    And from our perspective, there was nearly no difference in

23    terms of the potential timing of that.

24              I was -- you know, we -- I was surprised that Governor

25    Ivey signed the law as quickly as she did.  We put a tremendous
```

1  amount of resources to get the complaint filed.  We were far

2  along in being prepared to file a preliminary injunction, and I

3  didn't think that the timing would be significant from the

4  Ladinsky case's perspective because we would quickly file a new

5  case along with a PI and a TRO.

6         JUDGE PROCTOR:  All right.  So what was the plan, then,

7  to get things back on track quickly?

8         MS. LEVI:  So the plan to get things back on track

9  quickly was to join forces with the Walker team and quickly file

10  a new case.

11         JUDGE PROCTOR:  What was discussed, to your knowledge,

12  at or before the time of dismissal about refiling with the

13  Walker team or otherwise?

14         MS. LEVI:  I was involved -- well, I know there were a

15  lot of different conversations that happened.  I was involved in

16  a conversation with Kathleen Hartnett where she agreed that the

17  Walker team would also dismiss their case, that our teams would

18  join forces.  We had some conversations about what the

19  composition of that case would look like, about where it was

20  filed.  She represented to me that, you know, that conversation

21  would have to happen among more attorneys from the Walker case,

22  and -- but we would all be quickly moving forward, joining

23  forces to file a new case.

24         JUDGE PROCTOR:  Okay.  When did that conversation take

25  place?

```
1            MS. LEVI:  That was Friday, April 15th.

2            JUDGE PROCTOR:  Later in the --

3            MS. LEVI:  Yes, later.  Yes.

4            JUDGE PROCTOR:  Was that after the decision was -- your

5   understanding, was made to dismiss?

6            MS. LEVI:  Yes.  I mean, yes.  That was made -- I, at

7   that point, understood that we were going to dismiss our case

8   and that it seemed like -- and I don't -- it seemed like that

9   the Walker case was receptive to that as well.  So this was a

10  call that was confirming that and then addressing some of the

11  details, if we could, about the filing of a new case.

12           JUDGE PROCTOR:  What was discussed among the Ladinsky

13  team about requiring Walker to dismiss as a condition of the

14  Ladinsky team's decision to dismiss?

15           MS. LEVI:  You know, that we -- it wouldn't make sense

16  for us to dismiss unless the Walker case also dismissed their

17  case.

18           JUDGE PROCTOR:  What was discussed with the Walker team

19  about Judge Burke in particular related to dismissal of the two

20  cases?

21           MS. LEVI:  I mean, other than -- I mean, at that point,

22  the conversation was more focused on the process of the

23  dismissals, that we would dismiss and, you know, what would the

24  new case look like, how would we -- how would we join forces and

25  move together.  I don't recall that conversation being focused
```

1   on Judge Burke because the decision hadn't --

2          JUDGE PROCTOR:  Well, putting aside what it was focused

3   on, I'm just wondering if there was anything said about it.

4          MS. LEVI:  I don't -- to the best of my recollection, I

5   don't remember what was said, if anything, about Judge Burke in

6   that conversation.

7          JUDGE PROCTOR:  All right.  Was there any discussion

8   about we need to file this in such a way that we would not

9   draw -- when we do file or refile, we need to do this so as not

10  to get Judge Burke?

11         MS. LEVI:  No, Your Honor, not to my recollection.

12         JUDGE PROCTOR:  What if Shannon Minter told us

13  differently, that there was a decision and discussion about

14  avoiding Judge Burke with a new filing?

15         MS. LEVI:  I mean, he had -- he may have had

16  conversations of which I wasn't a part.  I -- that's --

17         JUDGE PROCTOR:  Did you two talk regularly about

18  decisions?

19         MS. LEVI:  Yes, we did.  Very consistently.

20         JUDGE PROCTOR:  Tell me about what Shannon Minter had

21  to say about Judge Burke and Judge Axon and that comparison.

22         MS. LEVI:  Well, I think that Shannon Minter had the

23  similar experience as I did, which is, you know, he accepted the

24  assessment of the judges and was of the view that Judge Burke

25  was not a good draw for the case and that Judge Axon was.

1          JUDGE PROCTOR:  Did anyone ever tell you why Judge Axon

2     was -- other than the parenting thing, do you remember any --

3     I'm just trying to make sure I've closed that loop.

4          MS. LEVI:  I don't, Your Honor.

5          JUDGE PROCTOR:  Did any of the lawyers relate any

6     personal information to you about Judge Axon?

7          MS. LEVI:  Not that I can remember.

8          JUDGE PROCTOR:  Did any of the lawyers say they had

9     appeared before Judge Axon in a particular case and, therefore,

10    thought they understood how she may respond to these claims?

11         MS. LEVI:  It is possible that -- that -- it's possible

12    that -- it is possible that one of the lawyers said that they

13    have appeared before Judge Axon.  I heard that to mean she was

14    open, she was receptive.  I don't recollect that it was relating

15    to any particular case.  I just don't have a memory about that.

16         JUDGE PROCTOR:  Did you ever hear anyone specifically

17    assess the prospect of succeeding on the PI motion before Judge

18    Burke in light of Judge Burke's assignment in both cases?

19         MS. LEVI:  I don't have -- I don't have a recollection

20    of that.

21         JUDGE PROCTOR:  You just generally remember that he was

22    characterized as being conservative and not a good draw.

23         MS. LEVI:  Yes, I do.

24         JUDGE PROCTOR:  Nothing more than that that comes to

25    mind?

1          MS. LEVI:  No, Your Honor.  As I said, I would not have

2     been that focused on any of those kinds of details, although I

3     have, you know, accepted that assessment.  In other words, I

4     wouldn't have questioned that somebody thought what they thought

5     about that.

6          JUDGE PROCTOR:  Right.  All right.  Let's go back to --

7     when do you understand the decision was made in terms of filing

8     Eknes-Tucker?

9          MS. LEVI:  When the decision was made?

10         JUDGE PROCTOR:  Yes.  We're going to file a --

11         MS. LEVI:  A new case?

12         JUDGE PROCTOR:  -- brand new case with new parties in a

13    different district.

14         MS. LEVI:  So as of Friday night, the Ladinsky lawyers,

15    we were committed to filing a new case.  We were very concerned

16    that parents who had reached out would think we were walking

17    away from the issue.  We were concerned, you know, that parents

18    knew they would be facing very serious criminal penalties for

19    continuing to provide medical support for their children, and so

20    we were committed to filing a case.

21         It was -- it was a long day.  It was late in the day.

22    We had had conversations -- I had had conversations with

23    Kathleen Hartnett that made it clear to me that there were going

24    to be some issues and questions that now, in this, you know,

25    joint effort, we would have to address in terms of who the

1  plaintiffs would be, where it would be filed, et cetera.  And so

2  in my view, that wasn't settled Friday night.

3          We had a phone call Saturday morning, I believe, which

4  was -- with the lawyers for the nonprofits across the two teams.

5  And in that call, there were again disagreements about where it

6  would -- a case would be filed, who would be the plaintiffs.

7  And the call was --

8          JUDGE PROCTOR:  That was on that Saturday?

9          MS. LEVI:  That was on that Saturday.  That call was

10  concluded with no agreements.

11          It was after that call that -- and I think I said this

12  in my declaration -- I -- you know, I looked at the law.  I

13  was -- I understood that under Rule 41(a), there's an absolute

14  right for the plaintiffs to dismiss their case, nothing that

15  would prohibit at all the filing of a new case.  And I thought,

16  you know, however we proceeded, that would be unproblematic.

17  But I became of the view that we should have -- find -- include

18  entirely different plaintiffs --

19          JUDGE PROCTOR:  Why?

20          MS. LEVI:  -- in the case.  I thought in -- I thought

21  there would be -- well, I thought there would be no problem with

22  filing the same case with the same plaintiffs.  I thought in an

23  abundance of caution that we should file a case with new

24  plaintiffs.

25          JUDGE PROCTOR:  In a new district?

1          MS. LEVI:  Initially, I didn't -- I didn't -- I

2   actually didn't think a lot about the location.  I think

3   actually on Friday night, we were still thinking we would file

4   in the Northern District.  On Saturday, you know, as there was

5   sort of more time to think, it made sense that we had had all of

6   those procedural concerns.  I still didn't understand what had

7   happened about the transfers and the status conference in one

8   case and not in the other case.  And I thought we should just

9   stay away from the Northern District, file in the Middle

10  District so that we weren't back in the complicated situation

11  that we had just dismissed from.

12          JUDGE PROCTOR:  Well, why would you have been in a

13  complicated situation if you're filing a new case with new

14  plaintiffs and getting it put on the wheel?

15          MS. LEVI:  I understand the question.  And what was in

16  my head was I hadn't understood what had happened previously.

17  So it was very hard for me to think that there weren't -- a

18  chance that we wouldn't have related complications because I

19  didn't understand what had happened procedurally.

20          JUDGE PROCTOR:  Tell me if you disagree with this

21  statement, because this will help us as we move along with this

22  line of questioning.  As it turns out, there was a perfectly

23  reasonable and understandable explanation for how all this

24  happened.  True or false?

25          MS. LEVI:  That is what --

```
 1          JUDGE PROCTOR:  And I'm basing that on what I explained
 2   to y'all at the very first hearing in this case earlier this
 3   year.
 4          MS. LEVI:  I -- I don't have any reason to question
 5   that as I stand here today.
 6          JUDGE PROCTOR:  All right.  But if -- so I guess what
 7   you're saying is I'm not -- I don't have any basis to distrust
 8   what you told me.  But if you could trust what I told you, if
 9   that's exactly what occurred, that's a perfectly good
10   explanation about how all these events occurred that had nothing
11   to do with procedural irregularity or misconduct or any
12   uncharitable motive by the Court; correct?
13          MS. LEVI:  Yeah.  It doesn't -- yes, Your Honor.  I
14   don't have any reason to question it.  It doesn't explain what
15   happened procedurally in terms of like the transfer without a --
16   so the case was transferred by Judge Axon to Judge Burke without
17   consolidation.  It was just -- it was transferred.
18          JUDGE PROCTOR:  Exactly.  There wasn't a motion to
19   consolidate.  That would have been something for Judge Burke to
20   take up.  Judge Burke could have chosen to keep these cases on
21   two separate tracks and maybe combined a preliminary injunction
22   hearing for efficiency.  He could have consolidated the cases.
23   He could have allowed the cases to go on a limited consolidation
24   for discovery and motion practice only and separate trials.  He
25   could have denied class certification to the extent there would
```

1 have been a class sought; correct?

2          MS. LEVI:  Sure.

3          JUDGE PROCTOR:  All these things are things you would

4 have --

5          MS. LEVI:  Yes.

6          JUDGE PROCTOR:  So the other thing I've kind of

7 struggled with is this whole concept of the lawyers deciding how

8 the case ought to be managed and their expectations seemingly

9 not met based upon the reassignment as if the Court and the

10 judge in the case would have no say in Rule 16 procedural

11 matters.  In order to know how the case -- whether you're going

12 to be lead case, what order things would be taken up, you would

13 have to actually get in front of the judge and express counsel's

14 views, and the Court is the one that determines the Rule 16

15 schedule; correct?

16          MS. LEVI:  Yeah.  I don't have any reason to question

17 that, Your Honor.

18          JUDGE PROCTOR:  So explain to me how we had this crisis

19 without any effort to talk to the Court about these concerns and

20 we just flew off to a dismissal.  I'm still seeking to

21 understand this.  I've heard lots of explanations about it, but

22 I'm still trying to understand that.

23          MS. LEVI:  Well, there were a couple of things.  One is

24 there was a scheduling -- so it was basically after Court hours

25 on Friday or nearly close to it before the Ladinsky case got

1 transferred to Judge Burke.  There was a status conference that

2 was set for Monday morning.  The Ladinsky case wasn't

3 consolidated with the Walker case, so there would have been no

4 opportunity to appear in the -- at the status conference that

5 was set.  And on top of it, there had been conversations with

6 the State earlier in the day on the Friday about the State

7 actually, you know, filing a motion to get the Walker case

8 transferred to Judge Axon.  So the same calculation that we had

9 done may well have been done by the State, and I was concerned

10 that they would file an answer very quickly and then we

11 wouldn't -- we would have lost control over the case.

12          JUDGE PROCTOR:  What -- other than -- was there

13 anything other than speculation that led you to be concerned

14 about the State filing an answer or motion for summary judgment

15 and triggering the case outside of Rule 41(a)(1)?

16          MS. LEVI:  No.  That was speculation.  I mean, I

17 thought that was very possible.  I knew this was an important

18 case to them as well.  And just as an example, they filed an

19 appearance before --

20          JUDGE PROCTOR:  They weren't even served at this point,

21 were they?

22          MS. LEVI:  No, but they filed an appearance even before

23 they were served which, again, signaled to me that they were

24 very focused on the case.

25          JUDGE PROCTOR:  Sure.

 1          MS. LEVI:  And there had been communications about the

 2    transfer, I mean, so they were following it rapidly.  Yes.

 3          JUDGE PROCTOR:  Well, in fairness to the State, on the

 4    Walker side of the case that you had nothing to do with, they

 5    were also dealing with this fairly interesting request to have a

 6    case -- the Walker case assigned to Judge Thompson based upon a

 7    case that was on appeal, subject only to the district court

 8    determining attorney's fees, if the plaintiffs remained

 9    prevailing parties under the controlling fee statute; correct?

10          MS. LEVI:  I would not have been focused on that.  And

11    it would not have occurred to me that the State of Alabama's

12    attorneys wouldn't -- you know, would just be not focused

13    because they had other concerning matters.  I don't have any

14    reason to question what you just said, but that is -- I had no

15    familiarity with that.

16          JUDGE PROCTOR:  Well, my point is that the State's

17    involvement, early involvement, in these cases wasn't in a

18    vacuum.  They also had the Walker case where they had these

19    motions being filed to have the case assigned to Judge Thompson.

20    They had a show cause order that I take it, to some extent, they

21    might be expected to respond to about the transfer of the Walker

22    case.  In other words, this -- your -- the Ladinsky case didn't

23    exist in a vacuum is my point.

24          MS. LEVI:  For sure, but I wouldn't have been -- I

25    understand that.  And the point I was making is that I

1  thought and I think the facts that I observed reflected that the

2  State was very focused on the Ladinsky case and may have acted

3  very quickly if it thought there was something appropriate to do

4  that Friday afternoon.

5          JUDGE PROCTOR:  Why would the State want to haul off

6  and file an answer?  What was your thinking there?

7          MS. LEVI:  Well, I thought that they may have assessed

8  what we were assessing about both the irregularities of what was

9  happening in terms of the transfer.  I thought they may have

10 shared the view that Judge Burke wasn't a good draw for the

11 case.  And if they quickly filed an answer, then --

12         JUDGE PROCTOR:  Shared the view that Judge Burke was a

13 good draw for them, not for you?

14         MS. LEVI:  I'm sorry?  Correct.  Correct.  That

15 Judge -- correct.

16         JUDGE PROCTOR:  You were concerned they may have shared

17 the view that Judge Burke was a good draw for them but not for

18 you.

19         MS. LEVI:  Correct.  Yeah.  That they would be looking

20 at the same set of facts, including both the, you know,

21 procedural oddities and the -- where the case had landed and the

22 timing and the Walker case, of the Monday morning status

23 conference, and that if they filed an answer, that would cut off

24 our right to dismiss the case.

25         JUDGE PROCTOR:  Now, would it be fair to say that you

1    were under a lot of time pressure on the 15th and things were

2    moving along fast?

3           MS. LEVI:  That is fair to say.

4           JUDGE PROCTOR:  As you look back, do you think that the

5    focus on judges -- and to be honest with you, my view, can't

6    speak for the panel here, but just my view, as I look at Walker

7    with this motion that I still don't understand to relate it to

8    Corbett, as I look at this jumping to conclusions about an

9    uncharitable motive or effect of the transfer order from Axon to

10   Burke, as I look at all that, I'm wondering if the parties in

11   this case weren't so judge-centric that they just weren't

12   thinking through things and saying, hey, there may be a

13   perfectly reasonable explanation for all this.  Would that be --

14   is that an unfair assessment?

15          MS. LEVI:  I think it's an unfair assessment because

16   there was a lot -- I mean, I've described all of the procedural

17   concerns that, again, seemed very surprising that day.  On top

18   of it, there absolutely was a concern from the Ladinsky team's

19   perspective that we were going to be -- we had worked so hard to

20   be the lead case, that we would be a tagalong case.  There was a

21   Monday morning conference of which we weren't a part.  And all

22   of those were very significant factors in what we did Friday

23   evening.

24          JUDGE PROCTOR:  Well, the fact of the matter is if

25   Judge Marks had not -- at this point the Walker case was not

1   interested, as an initial matter, in being transferred to the

2   Northern District.  Fair?

3           MS. LEVI:  I'm sorry.  At what point?  Oh.

4           JUDGE PROCTOR:  When you talked to Walker counsel,

5   whether it was Block or Carl Charles or whoever, it was not

6   their desire for Walker to be transferred to the Northern

7   District.

8           MS. LEVI:  Correct.

9           JUDGE PROCTOR:  And it was not your desire for Walker

10  to be transferred to the Northern District.

11          MS. LEVI:  That's correct.

12          JUDGE PROCTOR:  That only came about because Judge

13  Marks enters a show cause order, and that forces the issue;

14  correct?

15          MS. LEVI:  That's correct.

16          JUDGE PROCTOR:  Would it matter if you're the lead case

17  if things had proceeded without any first-filed rule transfer?

18  Because you didn't even have a TRO or preliminary injunction

19  motion in place.  They would have necessarily been first out of

20  the box to litigate this case if their PI motion got heard

21  before you even had yours drafted; right?

22          MS. LEVI:  We were working exceedingly hard to get that

23  filed.  I mean, our goal would have been -- like there were

24  conversations on that Friday about, like, let's get the PI

25  filed, get -- you know, we had been working, and that was very

 1   much my focus.  That's really -- was my focus.  Let's get it

 2   filed.

 3           JUDGE PROCTOR:  When were you expecting that would be

 4   filed?

 5           MS. LEVI:  We had talked about getting it filed after

 6   hours on Friday if we could have done it.

 7           JUDGE PROCTOR:  All right.

 8           MS. LEVI:  I don't think we could have done that, but I

 9   think -- I mean --

10           JUDGE PROCTOR:  But the reason it wasn't ready --

11           MS. LEVI:  -- we would have worked around the clock to

12   get it filed.

13           JUDGE PROCTOR:  I'm sorry.  I didn't mean to interrupt

14   you.

15           MS. LEVI:  No, I apologize, Your Honor.

16           JUDGE PROCTOR:  No, I think I interrupted you.  I

17   should be apologizing.

18           My understanding is the reason it wasn't filed with the

19   complaint is there was just a focus on getting the complaint

20   filed first.  Let's get our complaint on file, and then we'll

21   supplement it with a PI motion.

22           MS. LEVI:  We wanted to get it filed first.  We were

23   multitasking to get everything done.  But, yes, we committed

24   resources to get the complaint filed because we couldn't get all

25   of it filed at one time and get filed first.

1          JUDGE PROCTOR:  And also there was the issue of I think

2    you were contemplating an amended complaint to add some

3    claims --

4          MS. LEVI:  Yeah.

5          JUDGE PROCTOR:  -- and realizing, when you filed the

6    complaint, we're going to need to amend this, more than likely.

7          MS. LEVI:  Your Honor, my recollection is that we were

8    going to add plaintiffs.  There --

9          JUDGE PROCTOR:  We've been told you were also going to

10   add a First Amendment complaint -- or claim, I should say.  And

11   I think some of the declarations kind of challenge the State's

12   position that -- about the timing of things about the assertion

13   of the First Amendment complaint in Eknes-Tucker.  I could be

14   misrecollecting it.

15         MS. LEVI:  But we did end up filing a First

16   Amendment -- there were a lot of discussions about what claims

17   we would eventually file or whether that would include a First

18   Amendment claim.  That is true.

19         JUDGE PROCTOR:  But at the time you dismissed, you were

20   committed to refiling the case.

21         MS. LEVI:  Yes.  Yes.

22         JUDGE PROCTOR:  When do you understand the decision was

23   made to refile with new parties in the Middle District?

24         MS. LEVI:  Either Saturday or Sunday.  As I said, I was

25   committed.  I was committed to having all new plaintiffs on

1  Saturday.  And we probably had conversations -- I know we had

2  conversations on Saturday about where to file.  I couldn't tell

3  you as I stand here today whether the decision was made on

4  Saturday or Sunday about where to file.

5          JUDGE PROCTOR:  Now, you said you consulted Rule 41

6  about this.

7          MS. LEVI:  Yes, I did, Your Honor.

8          JUDGE PROCTOR:  And you were concerned that if you

9  didn't exercise the self-executing dismissal on Friday, that the

10 State may serve something that would take it out of Rule

11 41(a)(1); correct?

12         MS. LEVI:  Yes, Your Honor.

13         JUDGE PROCTOR:  And at what point did anybody bring up,

14 hey, we want to make sure this doesn't look like judge shopping?

15         MS. LEVI:  I -- my memory is that was raised on the

16 Saturday call by one of the Walker lawyers.

17         JUDGE PROCTOR:  Who?  Hartnett?

18         MS. LEVI:  No.  She wasn't on the call, I don't

19 believe, on Saturday.

20         JUDGE PROCTOR:  Was it just the organizational lawyers

21 that were on that call?

22         MS. LEVI:  It was just the organizational -- correct.

23         JUDGE PROCTOR:  I couldn't remember if Hartnett -- I

24 knew --

25         MS. LEVI:  No.

```
 1            JUDGE PROCTOR:  I think I remember that King & Spalding
 2    and Lightfoot were not on the call.
 3            MS. LEVI:  Correct.
 4            JUDGE PROCTOR:  I couldn't remember if somebody from
 5    the law firm on the Walker side was on the call.
 6            MS. LEVI:  I don't believe so.  I believe it was
 7    just -- my memory is it was just the lawyers from the nonprofit
 8    organizations.
 9            JUDGE PROCTOR:  Who do you specifically remember being
10    on those Saturday calls?
11            MS. LEVI:  I believe it was James Esseks, Camilla
12    Taylor.  I can't remember if Lynly Egyes was on the call, but
13    may have been.  But I don't remember, Your Honor.
14            JUDGE PROCTOR:  Shannon Minter?
15            MS. LEVI:  Shannon Minter was on the call.  I was on
16    the call.  I believe Sarah Warbelow was on the call, but I don't
17    remember.  I know that one of the nonprofits was not on the call
18    from the Ladinsky team.  It may have been Scott McCoy was not on
19    the call.  You know, we would have tried to have one lawyer from
20    each of the nonprofits from both the Ladinsky and the Walker
21    side.  That -- and it was -- but I know Kathleen Hartnett was
22    not on the call.
23            JUDGE PROCTOR:  And the purpose of that call was to
24    discuss joining teams and filing a single action somewhere and
25    trying to get this litigation back on track.
```

1      MS. LEVI:  Very quickly.  Because my understanding by

2 the end of the conversations on Friday is that the teams were

3 committed to doing that, to filing a new case, joining forces,

4 resolving our differences, and moving forward with one case.

5 And the call on Saturday was to talk about how to do that.

6      It became very quickly apparent that wasn't going to

7 easily happen.  There were differences of views about who the

8 plaintiffs would be.  There were differences in views expressed

9 about where the case would be filed.  There was a discussion

10 about how decisions would be made, and there were very

11 significantly different views about that as well.  My

12 recollection is the call ended without any decision.

13      JUDGE PROCTOR:  Were there different -- was it -- did

14 it mainly come down to how the cases would be managed, or was

15 there disagreement about what claims to file, who to file on

16 behalf of, where to file?

17      MS. LEVI:  I remember there being more disagreement

18 than agreement and that there wasn't even, at that point, at the

19 beginning of the call, a shared understanding from the Walker

20 team that we would have a joint effort going forward.  And I was

21 surprised by that.

22      JUDGE PROCTOR:  Who was the principal spokesperson for

23 the Walker team on those issues?

24      MS. LEVI:  James Esseks.

25      JUDGE PROCTOR:  And who was the principal spokesperson

1  for your team on these issues?

2          MS. LEVI:  It would have been myself and Shannon

3  Minter.

4          JUDGE PROCTOR:  And there was just disagreement about

5  any number of things on that call, then.

6          MS. LEVI:  Yeah, Your Honor.  I will say these are

7  long-standing relationships across organizations that have

8  worked in collaboration.  I think somebody has said sort of

9  like, you know, friendly rivals in some ways.  So they were

10  long-standing relationships that we had.

11          JUDGE PROCTOR:  But at least some subset of the lawyers

12  had worked together on things before; correct?

13          MS. LEVI:  Absolutely.

14          JUDGE PROCTOR:  Southern Poverty had worked with people

15  on the Walker side on things before?

16          MS. LEVI:  Yeah.  There was -- a lot of the attorneys

17  had worked together before.  Absolutely.  That's what I mean.

18  There's long-standing relationships, and we've -- you know,

19  we've worked together in many different contexts, for sure.

20          JUDGE PROCTOR:  What was discussed on Saturday about

21  what to file and where to file it?

22          MS. LEVI:  On that call?

23          JUDGE PROCTOR:  Yes.  And my understanding is -- was it

24  just one call or were there a series of calls?

25          MS. LEVI:  No, there was one call.

```
1              JUDGE PROCTOR:  All right.

2              MS. LEVI:  There was one call.  To my memory, there was

3    one call.

4              JUDGE PROCTOR:  All right.

5              MS. LEVI:  About where to file it?

6              JUDGE PROCTOR:  And what to file.  Let's take it one at

7    a time.  Where to file.  Let's start there.

8              MS. LEVI:  There were questions about, yeah, where we

9    would file it.  It wasn't discussed in depth at that point

10   because there were different views.  And actually --

11             JUDGE PROCTOR:  Well, I'm not -- you're saying it

12   wasn't decided or wasn't discussed?  If there's different views,

13   I take it those views were discussed.

14             MS. LEVI:  That we could file it in the Northern

15   District for all the reasons that our team had filed in the

16   Northern District originally.  That we could file it in the

17   Middle District.  I think there was conversation about whether

18   to file it in the Southern District.

19             JUDGE PROCTOR:  Was there any discussion about a

20   district other than the Northern and Middle Districts?

21             MS. LEVI:  I believe there was.

22             JUDGE PROCTOR:  All right.  Well, there's only -- if

23   you're challenging Alabama law, there's only one district left.

24             MS. LEVI:  Yeah.  Southern District.

25             JUDGE PROCTOR:  So there was some discussion about
```

1  maybe Southern District.

2       MS. LEVI:  There was, yes.

3       JUDGE PROCTOR:  Well, that makes our Southern District

4  judges feel better.

5       MS. LEVI:  Good.  Yeah.  I mean, it was -- we were

6  discussing filing a new case, and everything was on the table

7  for discussion.

8       JUDGE PROCTOR:  Were you involved -- so my

9  understanding was that this legislation was being monitored or

10 the potential of this litigation was being monitored from 2020

11 through 2021 and into 2022 when it actually was passed out of

12 the Alabama Legislature and signed by the Governor.  Variations

13 of it had been considered in the previous two legislative terms,

14 in other words.  Is that your understanding?

15      MS. LEVI:  Yes, Your Honor.

16      JUDGE PROCTOR:  Were you on the team all the way back

17 to 2020 when this was being monitored and litigation was planned

18 if legislation passed?

19      MS. LEVI:  I'm not sure what it means to be on the

20 team.  I was not involved with the -- I mean, I wasn't -- I

21 don't recall being involved in regular calls.  I might have been

22 invited to them and I might have been informed about some of

23 them, but what I want to explain is, like, I knew that if there

24 was a case that was filed, I would be a part of that team.  But

25 I was not -- in the -- it wasn't my role nor -- I had a lot of

 1   other both cases and issues and places where my work was

 2   focused, and so I would not have been involved in that.

 3          Actually, we have a -- GLAD has a public education

 4   department that does more in terms of tracking where laws are

 5   advancing, so I would have generally been aware but not

 6   particularly paying a lot of attention other than when things

 7   were really getting close to the possibility and the eventuality

 8   of passage.  And that was true the year before as well.

 9          JUDGE PROCTOR:  Other folks -- and maybe you weren't

10   involved in this level of detail, but other folks have told us

11   that what would happen is in 2020, there would be a -- what

12   became the Ladinsky team in 2022 or some component of it would

13   be monitoring things, planning, being ready to proceed if

14   legislation passed.  It didn't pass, so then things would kind

15   of, at the end of the session, wind down.  And in 2021, there

16   was again a bill introduced that was monitored.  There was a

17   plan about litigation in place in 2021.  Nothing passed.  And

18   then in 2022 when this -- another bill was introduced, the team

19   reassembled, was monitoring this, and jumped as soon as the

20   Governor signed it.  Is that different than your recollection of

21   things?

22          MS. LEVI:  I have no reason to question that, but I

23   wasn't centrally involved in any of those efforts until it

24   seemed like things were going to pass at different stages.  If

25   it had passed the year prior, I also would have, like, quickly

1   become involved in efforts to draft a complaint and get one

2   filed for sure.

3           JUDGE PROCTOR:  And what I recall you saying earlier is

4   you were not as involved in the initial decision about where to

5   file Ladinsky.

6           MS. LEVI:  That's correct.

7           JUDGE PROCTOR:  What we've been told is that in 2020,

8   the decision was made, if the legislation passes, the Ladinsky

9   team or what became the Ladinsky team was going to file in the

10  Northern District and that they never wavered on that until

11  Ladinsky was filed in the Northern District and dismissed.  All

12  right?  Is that inconsistent with your understanding of how

13  things proceeded?

14          MS. LEVI:  It's not inconsistent at all.  I'm just

15  saying I would not have been aware or focused on where the case

16  would have been filed until we were, like, ready to file it.  As

17  I said, I'm not familiar -- you know, I know there is a Southern

18  District and a Middle District and a Northern District, but I'm

19  not that focused on the districts or the jurisdiction.  So I --

20  that is not inconsistent with anything.  I just would not have

21  been focused on that at all.

22          JUDGE PROCTOR:  All right.

23          MS. LEVI:  I don't have any reason to question that.

24          JUDGE PROCTOR:  Going back to a question I asked

25  earlier, I'm not sure we got to the conclusion of it, just to

1  make sure I got your full response to it.  To what extent was

2  avoiding judge shopping -- the specter or prospect of being

3  accused of judge shopping -- a motive in filing -- in the

4  refiling of Eknes-Tucker?

5          MS. LEVI:  I believed firmly that we could file a new

6  case -- I believed firmly that we had -- the plaintiffs had

7  complete, you know, automatic right under 41(a) to dismiss the

8  case and that we could file a new case or the same case in any

9  district.  But I knew that that -- you know, there would be a

10 lot of attention to this case, and I -- I think I said this in

11 my complaint.  I thought in an abundance of caution we should

12 file a complaint with all new plaintiffs, which is what we did.

13 And to the extent that I didn't want the case to get back into

14 the procedural complexities that I didn't understand, that was

15 the motivation for not filing in the Northern District and for

16 filing in the Middle District.  I was prepared for this case to

17 be assigned to any judge and to litigate the case in front of

18 any judge to which we were assigned.

19         JUDGE PROCTOR:  In paragraph 27 of your declaration on

20 page 12, next to the last sentence, you say, I thought that

21 filing the new case in the Northern District of Alabama created

22 a high risk that the case would be reassigned to the judge to

23 whom the Ladinsky and Walker cases had eventually been assigned.

24 That was Judge Burke; right?

25         MS. LEVI:  Yes, Your Honor.  But, I mean, the context

1   for that is the previous sentence where I say that the reason --

2   that I expressed the view the new case should not be filed in

3   the same district where the Ladinsky case had been filed, and

4   the reason was related to the concerns that our team had about

5   the unusual transfer of the Ladinsky case to the judge presiding

6   over the second-filed case.  And that was -- and that's why I

7   thought that filing the new case in the Northern District

8   created a high risk that what we had just left in terms of those

9   procedural complications would potentially arise again.

10          JUDGE PROCTOR:  Let's say that -- you said you were

11   prepared to litigate in front of any judge.  So let's say

12   Ladinsky had been assigned to Judge Burke and your assessment

13   based upon others' feedback to you was that Judge Burke was

14   conservative and not a good draw.  And let's say that Walker had

15   come into the Northern District and been assigned to Judge Axon,

16   who your teammates have told us was viewed as a very good draw.

17   And let's say that the same thing happened in this case except

18   the names were different.  Judge Burke transfers the first-filed

19   case to Judge Axon with the exact same language in an order that

20   Judge Axon used.  Are you dismissing this action on Friday

21   afternoon if that occurred?

22          MS. LEVI:  I would have been very concerned, Your

23   Honor.  I would have had those --

24          JUDGE PROCTOR:  That's not the question.  Would you

25   have dismissed the action if that had occurred?

1          MR. SEGALL:  I object to interrupting.

2          JUDGE PROCTOR:  Overruled.

3          MR. SEGALL:  I think he was about to explain his

4   answer, and --

5          JUDGE PROCTOR:  I know what her answer was.  I'm asking

6   for a specific answer.  She said --

7          MR. SEGALL:  But --

8          JUDGE PROCTOR:  Mr. Segall.  Mr. Segall.

9          MR. SEGALL:  I can't object, Your Honor?

10          JUDGE PROCTOR:  Mr. Segall, please stop for a second

11   and listen to me.

12          MR. SEGALL:  Yes, sir.

13          JUDGE PROCTOR:  I am in control of asking these

14   questions.

15          MR. SEGALL:  Sure you are.

16          JUDGE PROCTOR:  Not you.  I asked if --

17          MR. SEGALL:  And we get to object, I assume.

18          JUDGE PROCTOR:  I asked -- excuse me.  You're talking

19   over me again.  This isn't going to work.  All right?

20          I reserve the right to drill down, and I reserve the

21   right to stop her if it's unresponsive.  I'm going to give her a

22   chance to explain whatever answer she gives, but I'm asking for

23   a specific yes or no question, and then I will give her a chance

24   to explain.  All right?  And I'm not going to permit you to do

25   what you just did, to talk over me.  And I'm not going to permit

 1   you to try to affect the Court's questioning of the respondent.

 2   Fair enough?

 3            MR. SEGALL:  May I now object?

 4            JUDGE PROCTOR:  I've already overruled your objection.

 5            MR. SEGALL:  I have not expressed it clearly.

 6            JUDGE PROCTOR:  You objected because I interrupted her

 7   answer.  Any other basis for the objection?

 8            MR. SEGALL:  Yes.  I object to asking that particular

 9   question -- I apologize for sitting down.

10            JUDGE PROCTOR:  Overruled.  You've objected to that

11   question before.  And overruled.

12            MR. SEGALL:  I haven't finished the objection, Your

13   Honor.  I object to asking that particular question and

14   requiring a yes or no answer.

15            JUDGE PROCTOR:  Overruled.  You've made that objection

16   before.  I've overruled it before.

17            MR. SEGALL:  I haven't made it before.

18            JUDGE PROCTOR:  I think you have raised it or someone

19   on your side has raised the question about that question, and I

20   think it's a fair question.  All right?

21            So back to you with the answer to the question.  And

22   I'm going to give you a chance to explain whatever your answer

23   is.  Your answer could be yes, no, I don't know.  I don't -- I'm

24   not wedded to what your answer is, but I am wanting an answer to

25   the question.

1          If the case had gone from Burke to Axon under what you

2  viewed as the same procedural irregularity, would there have

3  been discussions about dismissing if the case was proceeding in

4  front of Judge Axon?

5          MS. LEVI:  Yes, there would have been discussions about

6  dismissing the case.  Can I just ask you, and there was same --

7  all the same facts, a Monday morning status conference?

8          JUDGE PROCTOR:  Yes.  Judge Axon had set it for a

9  status conference.

10          MS. LEVI:  Yeah.  I mean, there would have been

11  discussions.  I believe so.

12          JUDGE PROCTOR:  All right.  Do you have a view as you

13  sit here today about whether you would have supported dismissal

14  under those circumstances?

15          MS. LEVI:  I don't mean -- can you restate the

16  hypothetical?

17          JUDGE PROCTOR:  Yeah.  Be glad to.

18          MS. LEVI:  Because with the exchange, I want to make

19  sure that I'm focusing on the --

20          JUDGE PROCTOR:  Yeah.  I know it got confusing with the

21  objection.

22          MS. LEVI:  I just want to make sure I'm really focusing

23  on the question.

24          JUDGE PROCTOR:  All right.  So the question was this.

25  And it is a hypothetical.  I understand that.  Ladinsky is filed

1    and you draw Judge Manasco, who recuses --

2           MS. LEVI:  Yes.

3           JUDGE PROCTOR:  -- and Judge Cornelius, who doesn't get

4    consent, and then the case goes to Judge Burke, who I will

5    represent to you your colleagues have said was not a good draw

6    for us.  I think you've said that.  Judge Burke -- let's say the

7    Walker case is transferred under the first-filed rule to the

8    Northern District and assigned to Judge Axon.  So all we're

9    doing is taking the exact same situation and just reversing Axon

10   and Burke's names.  All right?  And then Judge Burke enters the

11   same order that Judge Axon entered, and Judge Axon sets Walker

12   for a status conference on Monday morning that has a PI motion

13   pending.

14          Do you have a view about what your response to that

15   would have been?  Would you have supported dismissal of the

16   actions then?

17          MS. LEVI:  I think I would have.  We would have had the

18   same questions about the procedure and we would have -- I mean,

19   I just want to make sure.  We would have become the same

20   tagalong case without an opportunity to appear on Monday in a

21   case where a PI had been filed and in front of a judge for whom

22   the assessment was pretty thin about --

23          JUDGE PROCTOR:  Who are you referring to there?

24          MS. LEVI:  Judge Axon.  I mean, as you've pointed

25   out -- I mean, my understanding now, though I will tell you I

1  didn't know this at the time, is that, you know, she's a

2  recently appointed judge as well.  You know, I didn't put that

3  much --

4          JUDGE PROCTOR:  Is this your personal assessment that

5  it was thin or did you hear this from someone else?

6          MS. LEVI:  What I'm saying is I thought the assessment

7  that she was good for the case because she was a parent was

8  thin.  I wasn't -- I didn't question it.  I was fine where we

9  were, but what I'm saying is that wouldn't have carried the day

10 for me, given the same both procedural irregularities and the

11 concern about how our first-filed case had been undermined and

12 overtaken.

13         JUDGE PROCTOR:  All right.  That's all I was trying to

14 do was get your assessment of that situation.

15         MS. LEVI:  Your Honor, is it okay if I pull my phone

16 out just to check the time?

17         JUDGE PROCTOR:  You may.  It is 9:36.

18         MS. LEVI:  Thank you.

19         JUDGE PROCTOR:  Do you need to take a break?

20         MS. LEVI:  I could get a glass of water or a sip of

21 water if that's okay.

22         JUDGE PROCTOR:  Let's take a short break.  Let's take a

23 short break.

24         MS. LEVI:  Okay.  Thank you.

25         JUDGE PROCTOR:  This isn't supposed to be a marathon.

```
1            MS. LEVI:  Good.
2       (Recess was taken from 9:36 a.m. until 10:07 a.m., after
3         which proceedings continued, as follows:)
4            JUDGE PROCTOR:  All right.  I think we've concluded our
5    questions, but I didn't want to pretermit any further
6    information you would like to share with the panel if -- and I'm
7    not expecting there would be, but just want to give that
8    invitation and opportunity.
9            MS. LEVI:  I don't -- no, Your Honor.  If you have
10   any -- I mean, if there are any areas or questions you have
11   additional, I certainly would answer them, but I don't have
12   anything additional --
13           JUDGE PROCTOR:  All right.  Thank you.
14           MS. LEVI:  -- that wasn't included in my declaration.
15           JUDGE PROCTOR:  Yes.
16           MR. FRANKLIN:  May I ask a couple of quick questions?
17           JUDGE PROCTOR:  You certainly may.
18           MR. FRANKLIN:  Is it all right to stand up here?
19           JUDGE PROCTOR:  Wherever you're comfortable, Sam.
20           MR. FRANKLIN:  Ms. Levi, I'm Sam Franklin.  I was
21   introduced to you first thing this morning.  I represent Melody
22   Eagan and Jeff Doss.
23           The status conference in the Walker case was set for
24   Monday morning, ten o'clock, April 18th; is that correct?
25           MS. LEVI:  That sounds correct, yes.
```

1          MR. FRANKLIN:  Okay.  After the dismissal of both

2   Ladinsky and Walker, the Eknes-Tucker case was filed in the

3   Middle District I believe on Tuesday of the following week,

4   which would be like April 19th.

5          MS. LEVI:  I believe that's correct, yes.

6          MR. FRANKLIN:  We now know of an order that was entered

7   by Judge Burke on Monday, April 18, in the Walker case.  Did you

8   know about that order or what it said when Eknes-Tucker was

9   filed?

10          MS. LEVI:  No, sir, we did not.  I was not aware of

11   that order when our case was filed at all.

12          MR. FRANKLIN:  All right.  The other somewhat related

13   point, I believe the status conference in Eknes-Tucker was set

14   in an order by Judge Burke on April 20th, setting it for

15   conference, status conference, two days later, Friday, April 22.

16   That's document number 5 in the Eknes-Tucker case.

17          MS. LEVI:  That sounds correct, yes.

18          MR. FRANKLIN:  Did the Eknes-Tucker team get ready for,

19   prepare, and appear at that status conference?

20          MS. LEVI:  Yes.

21          MR. FRANKLIN:  By Friday, April 22nd, had the motion

22   for preliminary injunction or, alternatively, TRO been filed?

23          MS. LEVI:  I believe so.

24          MR. FRANKLIN:  I'll tell you that the transcript of

25   that status conference says that it had.

 1          MS. LEVI:  Yeah, I believe that's correct.  Yes.

 2          MR. FRANKLIN:  And I was impressed to hear that you've

 3   been involved in these kind of high-profile cases since 1998, at

 4   least, with GLAD.

 5          MS. LEVI:  Yes, sir.

 6          MR. FRANKLIN:  In your opinion, did either the

 7   dismissal of Ladinsky or the refiling of Eknes-Tucker adversely

 8   impact the resolution of the motion for preliminary injunction?

 9          MS. LEVI:  No, sir.

10          MR. FRANKLIN:  One other quick series of questions.

11   Are you aware of any requirement in federal law, the federal

12   rules, or the local rules of either the Northern District or the

13   Middle District of Alabama that were violated by the dismissal

14   of the Ladinsky case?

15          MS. LEVI:  No.

16          MR. FRANKLIN:  Are you aware of any requirement in

17   federal law, federal rules, or local rules of either the

18   Northern District of Alabama or Middle District of Alabama that

19   were violated by the filing of Eknes-Tucker in the Middle

20   District?

21          MS. LEVI:  No, sir.

22          MR. FRANKLIN:  And I guess the last quick question,

23   there have been a number of questions of you and other witnesses

24   about would the information as related by Judge Proctor on May

25   20th about the explanation for the transfer by Judge Axon to

1  Judge Burke of Ladinsky have been important, helpful information

2  to have known at that time.  Do you remember that question?

3          MS. LEVI:  Yes.

4          MR. FRANKLIN:  And just to be clear, no motions had

5  been filed in Ladinsky as of April 15 with regard to

6  consolidation; correct?

7          MS. LEVI:  Correct.  Correct.

8          MR. FRANKLIN:  Was there any call from chambers, from

9  either Judge Burke or Judge Axon, alerting Ladinsky counsel that

10  a transfer or reassignment was even under consideration?

11          MS. LEVI:  Not to my knowledge.

12          MR. FRANKLIN:  Were any of the lawyers in Ladinsky

13  asked to provide any input into Ladinsky counsel's view of such

14  a transfer?

15          MS. LEVI:  No, sir.  Not to my knowledge.

16          MR. FRANKLIN:  And lastly, we know that when

17  Eknes-Tucker was filed in the Middle District, there was some

18  short delay, but it was ultimately assigned to Judge Huffaker.

19  Are you aware of that?

20          MS. LEVI:  Yes.

21          MR. FRANKLIN:  And then almost immediately, or at least

22  very shortly, it was reassigned to Judge Burke.  You're aware of

23  that, obviously.

24          MS. LEVI:  Yes, sir.  Correct.

25          MR. FRANKLIN:  Has anybody, any judge, ever explained

1  to the Eknes-Tucker counsel why that assignment or reassignment

2  or transfer occurred?

3          MS. LEVI:  No, sir.

4          MR. FRANKLIN:  Thank you.

5          JUDGE PROCTOR:  On that last point, paragraph 27 of

6  your declaration, last sentence, you state, I knew, however,

7  that this -- referring to reassignment to the judge who had

8  Ladinsky and Walker, in particular, Judge Burke -- that this was

9  a risk --

10          MS. LEVI:  I'm sorry.  Can I turn to the --

11          JUDGE PROCTOR:  You may.

12          MS. LEVI:  So I can follow?

13          JUDGE PROCTOR:  Take your time.

14          MS. LEVI:  Okay.  I'm there.  Thank you.

15          JUDGE PROCTOR:  The last sentence reads, I knew,

16  however, that this -- and I think "this" refers to the previous

17  sentence.

18          MS. LEVI:  I'm sorry.  You're in paragraph 27?

19          JUDGE PROCTOR:  27, page 12.

20          MS. LEVI:  Yeah.  I don't know if I have this --

21          JUDGE PROCTOR:  Why don't you just read that entire

22  paragraph.  Just make sure I'm not -- I don't want to orient you

23  to one sentence outside of its context, but I'm just trying to

24  make sure I understand what you've told us in your declaration

25  there.

1          MS. LEVI:  The paragraph that says, I was also involved
2     in a number of conversations on that weekend?
3          JUDGE PROCTOR:  All right.  Let me just read it for the
4     record.
5          MS. LEVI:  Okay.
6          JUDGE PROCTOR:  This will help you hear it orally and
7     read along.
8          I was involved in a number of conversations on that
9     weekend, April 16 to 17, about where to file the new case.  I
10    expressed the view that the new case should not be filed in the
11    same district where the Ladinsky case had been filed and
12    dismissed.  The reason for this view related to the concerns
13    that our team had about the unusual transfer of the Ladinsky
14    case to the judge presiding over the second-filed case.  I
15    thought that filing the new case in the Northern District of
16    Alabama created a high risk that the case would be reassigned to
17    the judge to whom the Ladinsky and Walker cases had eventually
18    been assigned.  I knew, however, that this was a risk regardless
19    of where we filed.  I and my entire team committed to move ahead
20    with filing and litigating a new case, regardless of the judge
21    to whom it would be assigned.
22         That's the paragraph I'm referencing.  Okay?
23         MS. LEVI:  Yes.  Thank you.
24         JUDGE PROCTOR:  And I want to focus on that last
25    sentence.  You knew that regardless of where you filed this,

1  there was a chance that it may get reassigned back to Judge

2  Burke; correct?

3           MS. LEVI:  Correct.

4           JUDGE PROCTOR:  Let me make sure I understand your

5  answer to Mr. Franklin's questions before that.  Did you think

6  that a Rule 41 dismissal under 41(a)(1) was not only

7  self-executing but would put any issue of judge shopping outside

8  the purview of a court?

9           MS. LEVI:  I felt we had -- I felt that the parties

10 had an absolute right to dismiss the Ladinsky case under 41(a).

11 Yes.

12          JUDGE PROCTOR:  But did you think that would also

13 protect your team from being questioned or assessed in terms of

14 judge shopping motives with the filing of a new case?

15          MS. LEVI:  Can you ask that question again?

16          JUDGE PROCTOR:  Yeah.  And it wasn't a very good

17 question.  Let me try it again.  My understanding is clearly --

18 I think you're exactly right.  Rule 41(a)(1) gives your

19 clients -- not counsel, but your clients -- the right to dismiss

20 an action --

21          MS. LEVI:  Yes.

22          JUDGE PROCTOR:  -- without any conditions if there's

23 not been an answer or a motion for summary judgment filed.

24 Correct?

25          MS. LEVI:  Yes.

 1              JUDGE PROCTOR:  So you had an -- your clients had an

 2    unfettered right to dismiss the action when you did.

 3              MS. LEVI:  Correct.

 4              JUDGE PROCTOR:  Would you agree, though, that counsel

 5    cannot dismiss an action and refile it to try to avoid a judge?

 6              MS. LEVI:  The case law on that which I have seen is

 7    actually -- suggests that you can -- that clients can --

 8    plaintiffs can dismiss a case and refile even for the purposes

 9    of not having the case heard by the original assigned judge.

10    There's cases that suggest you could do that even within the

11    same -- within the same --

12              JUDGE PROCTOR:  Which cases are those?

13              MS. LEVI:  I'm not prepared to make that legal argument

14    today, but I know we have previously looked at this very

15    closely.

16              JUDGE PROCTOR:  Did you look at it before dismissal

17    very closely along those --

18              MS. LEVI:  Oh, not before dismissal.  No, I did not.

19              JUDGE PROCTOR:  All right.  Did others, to your

20    knowledge?

21              MS. LEVI:  Not -- I -- not to my knowledge.

22              JUDGE PROCTOR:  Did you only look at it once Judge

23    Burke -- you became aware of Judge Burke's order?

24              MS. LEVI:  Which order, sir?

25              JUDGE PROCTOR:  The order of the Monday following in

1  the Walker case.

2      MS. LEVI:  No, I -- no.  It was on Saturday that I

3  looked more closely at the Rule 41(a) law.

4      JUDGE PROCTOR:  All right.  And that's the first time

5  you would have looked to see would we be able to refile our case

6  without being questioned about judge shopping?

7      MS. LEVI:  Yes.  And it was my assessment at the time

8  that we could, that that would not be any violation of -- there

9  were no cases that suggested that would be judge shopping.

10      JUDGE PROCTOR:  How did you, in your mind, assess the

11  difference between a party dismissing under Rule 41 and counsel

12  having the motive to avoid a judge?

13      MS. LEVI:  Well, the assessment was --

14      JUDGE PROCTOR:  Or do you even draw that distinction?

15      MS. LEVI:  Well, the assessment was always made with

16  the parties' interests in mind, and the dismissal was with the

17  authorization of the parties.  And so I always understood the

18  decision to be made by the parties and that we, as lawyers,

19  provide guidance to our clients.

20      Could I say something additional about that?

21      JUDGE PROCTOR:  Certainly.

22      MS. LEVI:  I always also thought that there could be a

23  misperception about lawyers like me, role in these cases.  We

24  represent clients.  And it's -- and that -- we serve as lawyers,

25  even though we are from mission-driven organizations, like other

1   lawyers do.  And so the same -- you know, the same rules apply,
2   even though I think there's a perception that the lawyers are
3   seeking a particular outcome.  The outcome is on behalf of our
4   clients.  So I always looked at this from the perspective of our
5   clients.
6          JUDGE PROCTOR:  I understand that.  Now, this wasn't a
7   case, though, where your organization had a client walk in the
8   door following passage of the statute and bring it to your
9   attention and say, I want you to file a lawsuit on my behalf
10  about this; correct?
11         MS. LEVI:  I was working with other organizations who
12  clients were reaching out to.
13         JUDGE PROCTOR:  Right.
14         MS. LEVI:  And there were, you know, concerned people
15  who have reached out to my organization about this law as well.
16  I --
17         JUDGE PROCTOR:  And there's nothing improper about
18  this, but there's two --
19         MS. LEVI:  I understand.
20         JUDGE PROCTOR:  -- two scenarios, one where a client
21  walks in to a lawyer and informs the lawyer about a potential
22  claim and the other where a lawyer is aware of a potential
23  claim, is concerned about a group of people who have legal,
24  philosophical, personal interests, and litigation is planned and
25  we go determine who the best plaintiffs are to assert that

 1  claim; correct?

 2         MS. LEVI:  Of course, Your Honor.  Yes.

 3         JUDGE PROCTOR:  And you're not saying your clients were

 4  driving any decisions about whether -- which judge you wanted to

 5  be in front of or whether there was some procedural irregularity

 6  that concerned the clients.  These were concerns the lawyers

 7  had.  Fair?

 8         MS. LEVI:  On behalf of our clients.  Correct.

 9         JUDGE PROCTOR:  Yeah.  On behalf of the clients.

10         MS. LEVI:  Of course.  Yeah.  I mean --

11         JUDGE PROCTOR:  That's a fair footnote.

12         MS. LEVI:  I'm suggesting this is -- yes, that that is

13  a fairly typical scenario for many cases.  Yes.  That was our

14  job --

15         JUDGE PROCTOR:  Sure.

16         MS. LEVI:  -- was to assess that for our clients, of

17  course.

18         JUDGE PROCTOR:  All right.  I think that does conclude

19  our examination unless anybody else has some questions.

20         All right.  Thank you.

21         MS. LEVI:  Thank you, Your Honors.  Appreciate it.

22         JUDGE PROCTOR:  All right.  You're excused.

23         MS. LEVI:  Okay.  Can I leave?

24         JUDGE PROCTOR:  Yes.  That's what I said.  You're

25  excused.

```
1            MS. LEVI:  Okay.  I'm sorry.  I just want to make
2    sure I -- and I do have a clarification.  Am I released from the
3    order that was outstanding about not discussing --
4            MR. RAGSDALE:  Sequestration order.
5            MS. LEVI:  The sequestration.
6            JUDGE PROCTOR:  We're going to discuss that just with
7    the lawyers here in a moment.
8            MS. LEVI:  Okay.  Thank you.  Thank you.
9        (Witness excused.)
10           JUDGE PROCTOR:  All right.  Counsel, we are wanting to
11   hear from you next, not now, but in written submissions.
12           Barry, you were ready to go, though.
13           MR. RAGSDALE:  I was ready to go.
14           JUDGE PROCTOR:  I'm going to give you credit for that.
15           MR. RAGSDALE:  Thanks.
16           JUDGE PROCTOR:  We want to hear from you and want to
17   discuss the time frame in which you would like to take to get
18   with us.
19            Here's what we're thinking.  We have now done our
20   interviews of all the people we needed to talk to, and we have
21   released a number of young lawyers from further inquiry in terms
22   of what we're concerned about.  We have a handful of lawyers
23   still left.  We welcome your written submissions about how we
24   ought to proceed from here.  Okay?
25            Now, let me just say I know that one of those
```

1 submissions will say, you ought to end the inquiry and find no

2 violations of any type.  I fully expect that's what we're going

3 to hear from you as advocates.  But we're going to ask you to

4 address a second question; that is, if there is continuing

5 concern of the panel about these matters, then how should we

6 proceed.

7          So what I would suggest to you is do it on two tracks.

8 One, we suggest the panel dismiss the matter -- we expect to

9 hear that argument from you -- as to all remaining respondents.

10 And second, if the panel does have concerns, this is the way we

11 think the panel ought to proceed in resolving those concerns.

12          MR. SEGALL:  Your Honor.

13          JUDGE PROCTOR:  Yes.

14          MR. SEGALL:  I assumed, maybe incorrectly, that the

15 reason none of the -- my clients were dismissed in the general

16 dismissals is because y'all hadn't talked to them.

17          JUDGE PROCTOR:  We expect -- I expect that we'll have

18 some people that are in your group that we've heard from in the

19 last two days that we're going to excuse from any further

20 obligation.

21          MR. SEGALL:  Thank you.

22          JUDGE PROCTOR:  In other words, we'll handle that the

23 same way we have the other groups that we actually have heard

24 from prior to the last two days.  We'll do that -- repeat that

25 process now.  But that's a good point.  Thank you.

```
 1            MR. RAGSDALE:  Thank you for the opportunity to do
 2   written submissions.  Are we going to have access to the
 3   evidence that the Court has, the transcripts and the
 4   declarations?  I would make --
 5            JUDGE PROCTOR:  Are you wanting to get this transcript?
 6            MR. RAGSDALE:  Transcripts and the declarations.  If
 7   we're done with sequestration, it seems to me that counsel --
 8            JUDGE PROCTOR:  I don't think we're done necessarily
 9   with sequestration.
10            MR. RAGSDALE:  Okay.
11            JUDGE PROCTOR:  But you can certainly get the
12   transcripts.  And I guess the question is, are you suggesting we
13   make available to counsel for counsel's eyes only the
14   declarations?
15            MR. RAGSDALE:  I certainly would like that, yes.
16            JUDGE PROCTOR:  Okay.
17            MR. RAGSDALE:  I mean, it seems to me for us to
18   effectively address the facts, we need to be able to have the
19   same access to the facts that the panel does.
20            JUDGE PROCTOR:  All right.  We'll take that under
21   submission.  I understand why you're saying that.
22            MR. RAGSDALE:  Okay.
23            JUDGE PROCTOR:  But the idea would be if you do receive
24   those, you would understand that those are for the lawyers to
25   formulate positions on behalf of the clients, not -- if we're
```

 1  continuing to have some quasi-invocation of the rule and there

 2  may be the need for further inquiry, we would not want people --

 3  we want to still have people who we may need to hear back from

 4  have -- continue to give us their unvarnished recollections of

 5  what occurred.

 6          MR. RAGSDALE:  The follow-up to that is I understood --

 7  and if I misunderstood, I will apologize -- at the end of the

 8  last proceedings, I believed my clients were released from

 9  sequestration.  In fact, you invited them to come hear the rest

10  of the testimony.

11          JUDGE PROCTOR:  Yes.  But not for purposes of receiving

12  the declarations, though.

13          MR. RAGSDALE:  Oh, okay.

14          JUDGE PROCTOR:  Yeah.  We said once we -- once we've --

15  I did say that once we've heard from you, you're welcome to sit

16  in on the hearing if you want to.  Yes.

17          MR. RAGSDALE:  Okay.  I've made my request.  Thank you.

18          JUDGE PROCTOR:  All right.  Yes, Mr. Franklin?

19          MR. FRANKLIN:  And I'm smiling because I really want to

20  say this not in an adversarial way, just as the panel has

21  pointed out several times this is not an adversarial hearing.  I

22  don't know if we're being asked right now to go ahead and brief

23  some issue or we're only being asked to talk about how we should

24  proceed next.  And my concern as to both of those questions

25  is -- and I'm really not saying this in an adversarial way.  I

 1   truly don't understand exactly what the issue is that we are to

 2   address.

 3          I asked that series of questions to Ms. Levi and tried

 4   to ask in a very precise way because subsequent to our being

 5   here on August 3 and 4, I learned about and I read one of the

 6   Federal Rules of Civil Procedure that I had never read before.

 7   And that is Rule 83 and Rule 83(b).  The Court may already have

 8   looked at that in connection with this proceeding.  You may

 9   already be familiar with it.

10          But it basically is talking about rules by district

11   courts and judges' directives.  And it has, in subsection (b),

12   procedure when there is no controlling law.  And I won't quote

13   it because you can look at it if you choose to, but it basically

14   says that no sanction or order or other disadvantage may be

15   imposed -- and I take that to apply to both parties and lawyers

16   to the extent there's been some effort to draw a distinction

17   under Rule 41.  But no disadvantage or sanction may be imposed

18   for noncompliance with any requirement of the federal law,

19   federal rules, or the local rules unless the alleged violator

20   has been furnished in the particular case with actual notice of

21   the requirement.

22          Now, I'll tell you, there's not a lot of law on that

23   section, or at least I haven't found any.  But I struggle with

24   it because the Court has said that we are here originating from

25   Judge Burke's April 18 order.  And I may not be quoting that

1    exactly the way it's phrased in the May 10 order.  And we've

2    been told that we're here under the inherent powers of the Court

3    to determine if there's been some sort of abuse of the judicial

4    process that's adversely affected justice, essentially.  And as

5    I look at those cases, including the Chambers case, which is

6    always cited whenever there's a reference to inherent powers, it

7    says that you can't sanction under inherent power unless there

8    is a finding of subjective bad faith on the part of the lawyer,

9    subjective bad faith on the part of the lawyer.

10         Then we look at Rule 83(b) that says you shouldn't be

11   disadvantaged or sanctioned in any way for noncompliance with

12   any requirement of federal law, federal rules, local rules,

13   unless you have been furnished with actual knowledge of that

14   requirement in the case.

15              And so my question is, if we are going to proceed and

16   if we're going to brief the case further, can we have a clear

17   statement from the Court about just what the issue is?  And,

18   Judge Proctor, I struggled with it when you asked -- I think it

19   was yesterday -- one witness and said the issue for us here is

20   we're at a fork.  One fork is the case was dismissed because of

21   these concerns about irregularities or concerns about the way

22   the case was transferred, or the case was dismissed because it

23   was going to Judge Burke.  I may not be quoting that

24   correctly --

25              JUDGE PROCTOR:  I think that's a fair -- that squares

1  with my recollection of one of the questions I asked yesterday.

2  Sure.

3          MR. FRANKLIN:  And the problem that I have is I

4  don't -- I can't seem to translate that statement of the issue

5  into what I read about a Court's inherent authority, inherent

6  power to sanction some attorney who is subjectively -- not would

7  you have done it different, would it have been a better judgment

8  to do it another way, could you have considered this, but

9  subjectively, did you, in bad faith, somehow abuse the judicial

10  process.  And --

11          JUDGE PROCTOR:  Well, let me ask you this question just

12  to make sure I understand what your question is.  Is it your

13  position on behalf of your clients here that if your clients had

14  gotten up in front of us and said, we dismissed the case because

15  we did not want to be in front of Judge Burke, we didn't trust

16  him, we didn't like him, we thought he would rule against us, so

17  we decided to decamp, dismiss our case, and refile in a district

18  where he didn't preside -- are you saying that federal law

19  doesn't speak to the -- to that issue about an attorney making

20  that decision?

21          MR. FRANKLIN:  Well, let me say that I didn't come here

22  this morning prepared to address that, but --

23          JUDGE PROCTOR:  No, I'm -- but you've raised the

24  question.  I'm asking you --

25          MR. FRANKLIN:  I know.  Well --

1          JUDGE PROCTOR:  The fork in the road was did you

2    dismiss for reasons other than which judge you were going to be

3    in front of or did you dismiss for reasons related to which

4    judge we're now in front of.  And I'm asking you this question.

5          MR. FRANKLIN:  And my recall, Judge Proctor -- and I'm

6    sorry I didn't read it in the last 48 hours or so, but the

7    briefing that we have submitted to the Court in this case under

8    Rule 41 seems to me to say specifically that even a dismissal

9    under Rule 41, if it is for the stated purpose of trying to get

10   a judge that you view more favorably, is permissible.  I mean,

11   that's what those cases seem to say to me.  But --

12         JUDGE PROCTOR:  But I think there's cases that say just

13   the opposite.

14         MR. FRANKLIN:  Well, that would get us back into, I

15   guess, then, the question about -- obviously, a lot of these

16   lawyers said that they did have a certain view about Rule 41 and

17   looked at it and -- I mean, is it saying that that's a basis for

18   a finding of subjective bad faith?

19         JUDGE PROCTOR:  I'm not pretermitting any argument you

20   want to make, here or elsewhere.  But what I am saying is that

21   you -- what we'd like you to do in this -- I think I addressed

22   this earlier.  Give us your arguments, if you don't mind, on two

23   tracks.  Track one is even if we did this, nothing this panel

24   can do about it and this case ought to be dismissed.  Track two

25   might be the evidence simply doesn't add up.  There's not a

1    basis for finding that our clients did this, and you ought to

2    dismiss the case.  Or track three, if the Court continues to

3    have concerns about whether there was a dismissal to avoid a

4    judge and a refiling to avoid a judge, then this is the way we

5    think the Court ought to proceed with that inquiry.

6           So we've left those doors wide open for you.  Not

7    telling you how to address those.  But I will just speak for

8    myself and myself alone:  I am dubious of any argument that a

9    lawyer doesn't know -- and maybe you're going to convince me

10   otherwise, I'm going to keep an open mind, but I am dubious of

11   any argument that a lawyer doesn't realize that you can't try to

12   manipulate the system to try to avoid a judge or to get a

13   particular judge.  And quite frankly, those issues and different

14   factual scenarios have been before the courts many times,

15   particularly in this state, in this circuit, and in the former

16   Fifth Circuit with McEwen.  So make your arguments, but I'm

17   just -- I've got questions about whether you say that 41 makes

18   bulletproof any decision to avoid a judge and refile to avoid a

19   judge.

20          MR. FRANKLIN:  Well, and I apologize.  I didn't intend

21   to try to make the arguments today.  I was trying to --

22          JUDGE PROCTOR:  Yeah.  But I --

23          MR. FRANKLIN:  -- lay out the feeling of almost

24   frustration that I have in not understanding exactly what the

25   issue is or the standard of conduct is.  But I was asking if

1   there were just any way -- not today, but -- or just from the

2   bench, but some better understanding of exactly what the issue

3   is.

4           JUDGE PROCTOR:  Right.

5           MR. FRANKLIN:  And, you know, I will say that if I

6   heard it -- and, again, all due respect, I think you changed the

7   question a little bit when you said something about manipulate

8   the system.  Because, again, when I read the May 10 order --

9   I've gone back and looked at almost every order that the panel

10  has entered since then.  It said this is an inquiry into whether

11  or not there was some attempt to manipulate the random case

12  assignment procedure.  Now, that is a different statement to me

13  than saying --

14          JUDGE PROCTOR:  What are the two scenarios you're

15  comparing and how are they different?  I'm not following you.

16          MR. FRANKLIN:  Well, I believe that a lawyer could

17  dismiss a case under Rule 41 and refile the same case because of

18  a concern about whether the first judge was the right judge for

19  the case and not be found in any way to have manipulated --

20          JUDGE PROCTOR:  Then you should make that argument.  If

21  that's what you think, you should make that argument.

22          MR. FRANKLIN:  Well --

23          JUDGE PROCTOR:  But we're -- Sam, we're not going to

24  debate this right now.  What I am saying, though, is what we're

25  asking you to do is without abandoning any such argument and

1    giving you the full freedom to make any argument you wish to

2    make, we really would appreciate counsel's input about, well, if

3    we disagree with you on that, what are the next steps.  That's

4    all we're saying.  Okay?

5            MR. FRANKLIN:  Well, I appreciate that, Your Honor.

6    And all I was trying to do was to see if -- in order to give you

7    what you want and are asking, if I could try to articulate the

8    confusion, the frustration, the concern, whatever.  I mean, and

9    I say the frustration.  My frustration is I've got two of my law

10   partners that have been caught up in this, in a case they got

11   into pro bono.  It's required enormous amounts of time and

12   effort by the panel, but it has also caused enormous amount of

13   emotional strain, time, and resources by all of us, too.

14           JUDGE PROCTOR:  Sure.

15           MR. FRANKLIN:  And so I was just trying to see if I

16   could get a better understanding of exactly what the standard is

17   that we are ultimately --

18           JUDGE PROCTOR:  Well, and you should, in your

19   submission, address what you think we should be doing in terms

20   of identifying the issues in the case, what the standard is that

21   applies to those issues, and what you think is the right answer

22   for the panel to land on in light of that.  We're leaving the

23   entire oceanfront open for you to come in, but we do want you to

24   address the three things I've asked you about:  one, legally;

25   second, factually; and third, next steps.  Okay?

```
1              MR. FRANKLIN:  Thank you.

2              JUDGE PROCTOR:  Thank you.

3              MR. RAGSDALE:  I apologize, Your Honor, but

4   Mr. Franklin's zealous advocacy caused me to --

5              Obviously, the Court is aware my clients did not file

6   a second lawsuit or refile a second lawsuit.  So is there some

7   thinking -- I'm not trying to get you to show your cards, but is

8   there some thinking that we're vicariously liable for what

9   Ladinsky said, or are we focused primarily on what happened when

10  the case was in the Middle District, for the Walker lawyers?

11             JUDGE PROCTOR:  Well, Middle District, Northern

12  District, dismissal, any -- again, I don't have a view on these

13  things.  I'm not going to get a view on these things until it's

14  time for me to have a view on these things.  It's not that time

15  yet.  But if I were you, I would do the same thing.  I would

16  make the arguments that you think are proper for your clients

17  factually, legally, but also what next steps would be for anyone

18  remaining that you represent.

19             MR. RAGSDALE:  Thank you.

20             MR. SEGALL:  I think you've probably made it clear,

21  Judge, but in other words, we write a brief on the legal and

22  factual issues and then say, but if we're wrong about this, this

23  is what we ought to do next.  Is that correct?

24             JUDGE PROCTOR:  I think that's a good, simple

25  explanation for what we're expecting.  And, panel, weigh in if
```

1  you're thinking differently.

2       MR. SEGALL:  Factually, is it lawyer by lawyer?

3       JUDGE PROCTOR:  Well, we're not judging your clients as

4  a group, so perhaps that would be appropriate for you to address

5  what you understand the evidence was about each lawyer, what the

6  legal analysis should be as to each lawyer, and what next steps

7  would be for whoever is left in at the conclusion.  Sure.  I

8  would have no problem with you doing that if that's what -- and

9  that makes sense to me that you would do that.

10       MR. SEGALL:  Okay.

11       JUDGE PROCTOR:  I can only recognize you because you've

12  been so quiet.  Go ahead.

13       MR. ROGERS:  What is the sense of urgency in terms of

14  getting the briefs?

15       JUDGE PROCTOR:  I was going to ask y'all what time

16  frame you would like, how much time you would prefer to have to

17  do this.  I know you want to do some thinking about it, so --

18       MR. ROGERS:  We do, but we also want to be -- you know,

19  we want to accommodate whatever your sense of urgency is.

20       JUDGE PROCTOR:  You know, our sense of urgency is just

21  what Sam said.  We realize that there are people who are, you

22  know, under a strain because of our inquiry.  And, believe me,

23  we wish we weren't doing this.  I think I said this early on in

24  this process.  I think I would rather be held down and beaten

25  than have to do this.  This has not been fun for any of us, but

1   it is something that each court asked us to do.  So that's why

2   we're leaving to you balancing out how much time you need to

3   effectively present a position statement compared to your

4   clients' interest in having this matter conclude as quickly as

5   possible.  And we think you should be heard, for the most part,

6   about those time frames -- that time frame.

7          MR. ROGERS:  We appreciate that.  Is it possible that

8   we could consult with counsel before we start making

9   commitments?

10          JUDGE PROCTOR:  Why don't we just expect a report from

11   the parties by, say, Tuesday of next week about what you would

12   think a briefing schedule ought to look like?  Does that work

13   for everyone?

14          MR. RAGSDALE:  It does.  And as I understand it, Your

15   Honor, y'all are going to talk about transcripts and -- have you

16   already given me the transcripts?  I can't remember exactly what

17   you said.  Now that I think about it, I think you said I get the

18   transcripts.

19          JUDGE PROCTOR:  I think you -- have you not -- have you

20   seen the transcripts up to --

21          MR. RAGSDALE:  I have not seen -- the only ones we have

22   seen are bits and pieces where people testified in front of

23   Judge Harwood or witnesses that you called back.  So we've only

24   seen limited parts of it.

25          JUDGE WATKINS:  Give us a minute to talk about it.

1          MR. RAGSDALE:  Sure.

2      (Brief pause in the proceedings)

3          JUDGE PROCTOR:  All right.  Counsel, I don't want to --

4   if y'all want to finish up discussions, feel free, but we're

5   ready to answer the questions you've put before us on this last

6   matter.

7          So, look.  We're balancing out wanting to make sure

8   that you can fairly and adequately and well represent your

9   clients versus just making sure that we don't have clients

10  looking at each other's testimony or declarations and trying to

11  answer questions -- even further questions accordingly.  And I

12  think we reached a good balance of that.  We want to equip you

13  well to represent your clients.  We know you have a job to do.

14         What we're going to do is make all transcripts and all

15  declarations available to every lawyer with the singular

16  understanding, though, that you would not provide any transcript

17  or declaration to one of your clients other than their own

18  testimony and declaration.  So that way, you would be able to

19  talk to your client about the testimony and inform yourself

20  about -- each client separately and inform yourself about how to

21  represent that client well, but you can't cross-pollinate with

22  sharing declarations and testimony that we've received from one

23  witness with another witness.  And we think that's a fair way to

24  navigate that path.

25         That being said, one of the things you might want to do

1  is say, our briefing schedule ought to be triggered for when we

2  have the transcripts and declarations available to us and a

3  reasonable time for us to review and assess those and take

4  proper positions based upon those.  So one of the things you

5  might consider doing is saying to us on Tuesday, briefs due

6  within 21 days or 28 days, whatever you decide, from the time

7  we've received all the information discussed at the hearing

8  today.

9          Yes.  Mr. Segall.

10          MR. SEGALL:  Your Honor, I need to make a confession.

11          JUDGE PROCTOR:  Okay.

12          MR. SEGALL:  Based on exactly what Barry said, y'all

13  made the transcript available to me.  And I read at the end that

14  I believe you said to the people they could come to this

15  hearing.

16          JUDGE PROCTOR:  Yes.

17          MR. SEGALL:  People who had already testified.  When my

18  people left last night, they said -- and I can get back to them,

19  but I was asked, are we -- can we talk to each other?  I said,

20  well, I think you can because the judges said --

21          JUDGE PROCTOR:  That's fair.  That's a different issue.

22  And we don't have any questions about that advice you gave the

23  clients.  But appreciate you bringing that to our attention.

24  Yeah.  No concerns there.

25          But it's one thing to talk about and it's another

 1    thing to have the actual testimony of someone else.  So that's
 2    kind of the line we're drawing.
 3            Mr. Rogers?
 4            MR. ROGERS:  We'll submit something Tuesday.
 5            JUDGE PROCTOR:  Okay.  Great.
 6            MR. ROGERS:  Yes, sir.
 7            JUDGE PROCTOR:  And, look, it may be that when y'all
 8    have had more time to think about this and confer, there is
 9    something that we've addressed that you think we ought to ask
10    you to address.  Just tell us that.
11            Look, we have excellent lawyers across the board here.
12    We want to -- we have a problem.  We have to solve our problem.
13    Judge Fallon in the Eastern District says American lawyers are
14    the greatest problem-solvers in the world, and judges do well
15    when they incorporate the lawyers into problem-solving.  And
16    that's what we're doing.  We want y'all to help us with next
17    steps here.
18            All right.  Thank you.  And, look, regardless, we just
19    want you to know how much we appreciate each one of you and your
20    representation of your clients.  All right?
21            MR. RAGSDALE:  Thank you, Your Honor.
22        (Proceedings concluded at 10:53 a.m.)
23                    * * * * * * * * * * * *
24
25

1                   COURT REPORTER'S CERTIFICATE

2           I certify that the foregoing is a correct transcript

3    from the record of the proceedings in the above-entitled matter.

4           This 10th day of October, 2023.

5

6                               /s/ Patricia G. Starkie
                                Registered Diplomate Reporter
7                               Certified Realtime Reporter
                                Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25