<pre>
 1              UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
 2    _____

 3              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ALABAMA
 4    _____

 5              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF ALABAMA
 6    _____

 7

 8  IN RE:  AMIE ADELIA VAGUE,       CASE NO.: 2:22-mc-3977-WKW
        et al.
 9
                    SEALED DOCUMENT
10
               *  *  *  *  *  *  *  *  *  *  *  *
11
                  EVIDENTIARY HEARING
12
               *  *  *  *  *  *  *  *  *  *  *  *
13

14      BEFORE THE HONORABLE W. KEITH WATKINS, UNITED STATES

15  DISTRICT JUDGE, THE HONORABLE R. DAVID PROCTOR, UNITED STATES

16  DISTRICT JUDGE, and THE HONORABLE JEFFREY U. BEAVERSTOCK, UNITED

17  STATES DISTRICT JUDGE, at Montgomery, Alabama, on Friday, May

18  20, 2022, commencing at 9:39 a.m.

19

20                      APPEARANCES

21  APPEARING ON BEHALF OF ACLU, ACLU IN ALABAMA,
    LAMBDA LEGAL, TRANSGENDER LAW CENTER,
22  COOLEY LLP:

23  Mr. Barry Alan Ragsdale
    Attorney at Law
24  DOMINICK FELD HYDE, P.C.
    1130 22nd Street South - Suite 4000
25  Birmingham, Alabama
</pre>

```
 1                   APPEARANCES, Continued:

 2   APPEARING ON BEHALF OF COOLEY LLP:

 3   Mr. Russell Capone
     Attorney at Law
 4   COOLEY LLP
     55 Hudson Yards
 5   New York, NY 10001


 6
     APPEARING ON BEHALF OF NATIONAL CENTER FOR
 7   LESBIAN RIGHTS, GLBTQ LEGAL ADVOCATES AND DEFENDERS,
     SOUTHERN POVERTY LAW CENTER, and HUMAN RIGHTS
 8   CAMPAIGN FOUNDATION:

 9   Mr. Robert D. Segall
     Attorney at Law
10   COPELAND FRANCO SCREWS & GILL
     444 South Perry Street
11   Montgomery, Alabama

12   APPEARING AS REPRESENTATIVES OF LIGHTFOOT FRANKLIN:

13   Ms. Melody Hurdle Eagan
     Mr. Mark Christian King
14   Attorneys at Law
     LIGHTFOOT FRANKLIN & WHITE LLC
15   400 20th Street North
     Birmingham, Alabama
16
     APPEARING AS REPRESENTATIVES OF KING & SPALDING:
17
     Mr. Michael B. Shortnacy
18   Attorney at Law
     KING & SPALDING LLP
19   644 West 5th Street
     Los Angeles, California
20


21

22              Proceedings reported stenographically;

23                 transcript produced by computer

24


25
```

```
 1        (The following proceedings were heard before the Honorable
 2         W. Keith Watkins, United States District Judge, the
 3         Honorable R. David Proctor, United States District Judge,
 4         and the Honorable Jeffrey U. Beaverstock, United States
 5         District Judge, at Montgomery, Alabama, on Friday, May 20,
 6         2022, commencing at 9:39 a.m.:)
 7     (Call to Order of the Court.)
 8            JUDGE PROCTOR:  Good morning, everyone.  We're actually
 9  here on behalf of all three district courts of the state.  I
10  want to make a few opening remarks and kind of explain a few
11  things about how we're going to proceed, and then we will
12  proceed.
13            Judge Burke forwarded his April 18 dismissal order in
14  Walker versus Marshall to the chief judge of each district of
15  the state.  In that order, Judge Burke referenced certain
16  actions taken by counsel in Walker and in Ladinsky versus Ivey
17  as well as comments made to media representatives immediately
18  following the dismissal of those two actions.  In part Judge
19  Burke said, at the risk of stating the obvious, plaintiffs'
20  course of conduct could give the appearance of judge shopping, a
21  particularly pernicious form of forum shopping, a practice that
22  has the propensity to create the appearance of impropriety in
23  the judicial system.
24            Each district judge in the state has been consulted.
25  Each district judge has agreed that it is appropriate to look
```

```
1   into these matters and do an inquiry into these matters.  The
2   chief judge of each district, either sitting or has designated
3   someone to sit on this panel, and that's how we are here.
4        I think the next thing we're going to do is have a roll
5   call.  We did grant three excusals.  For the record, I think
6   Mr. Ragsdale requested excusal of two lawyers in his group, and
7   there was also -- Judge Watkins granted an excusal of a lawyer
8   who needed to have a family travel that could not be put off.
9   And we were glad to grant those excusals.  We'll determine what,
10  if any, follow-up with those three individuals should take place
11  at the conclusion of the proceedings today.
12        I'm going to ask the clerk to call the roll in terms
13  of the lawyers who have been asked to attend this hearing.
14        THE COURTROOM DEPUTY:  Meagan H. Eagan.
15        MS. MELODY EAGAN:  Here.  Melody.
16        THE COURTROOM DEPUTY: Jeffrey P. Doss.
17        MR. JEFFREY DOSS:  Here.
18        THE COURTROOM DEPUTY:  Amie Vague.
19        MS. AMIE VAGUE:  Good morning.  It's Amie Vague.
20        THE COURTROOM DEPUTY:  James Andrew Pratt.
21        MR. ANDY PRATT:  I'm here.
22        THE COURTROOM DEPUTY:  Misty L. Peterson.
23        MS. MISTY PETERSON:  Present.
24        THE COURTROOM DEPUTY:  Adam Reinke.
25        MR. ADAM REINKE:  Present.
```

```
 1              THE COURTROOM DEPUTY:  Gilbert Oladeinbo.

 2              MR. GILBERT OLADEINBO:  It's Oladeinbo.  Present.

 3    Thank you.

 4              THE COURTROOM DEPUTY:  Brent P. Ray.

 5              MR. BRENT RAY:  Good morning.  Present.

 6              THE COURTROOM DEPUTY:  Abigail J.M. Hoverman.

 7              MS. ABIGAIL HOVERMAN TERRY:  It should be Hoverman

 8    Terry, but present.  Good morning.

 9              THE COURTROOM DEPUTY:  Michael B. Shortnacy.

10              MR. MICHAEL SHORTNACY:  Good morning.  Present.

11              THE COURTROOM DEPUTY:  Asaf Orr.

12              MR. ASAF ORR:  Good morning.  Present.

13              THE COURTROOM DEPUTY:  Jennifer L. Levi.

14              MS. JENNIFER LEVI:  Good morning.  I'm here.

15              THE COURTROOM DEPUTY:  Scott D. McCoy.

16              MR. SCOTT MCCOY:  Present.

17              THE COURTROOM DEPUTY:  Jessica Stone.

18              MS. JESSICA STONE:  Present.

19              THE COURTROOM DEPUTY:  Sarah Warbelow.

20              MS. SARAH WARBELOW:  Good morning.  Present.

21              THE COURTROOM DEPUTY:  Cynthia Weaver.

22              MS. CYNTHIA WEAVER:  Good morning.  Present.

23              THE COURTROOM DEPUTY:  Latisha Gotell Faulks.

24              MS. LATISHA FAULKS:  Present.

25              THE COURTROOM DEPUTY:  Kaitlin Welborn.
```

```
 1              MS. KAITLIN WELBORN:  Present.

 2              THE COURTROOM DEPUTY:  L. Nolin-Sohl.

 3              MS. LISA NOLIN-SOHL:  Present.

 4              THE COURTROOM DEPUTY:  Malita Picasso.

 5              MS. MALITA PICASSO:  Present.

 6              THE COURTROOM DEPUTY:  Chase Strangio.

 7              MR. CHASE STRANGIO:  Present.

 8              THE COURTROOM DEPUTY:  James D. Esseks.

 9              MR. JAMES ESSEKS:  Present.

10              THE COURTROOM DEPUTY:  Carl Charles.

11              MR. CARL CHARLES:  Present.

12              THE COURTROOM DEPUTY:  Tara Borelli.

13              MS. TARA BORELLI:  Present.

14              THE COURTROOM DEPUTY:  Sruti Swaminathan.

15              MS. SRUTI SWAMINATHAN:  Present.

16              THE COURTROOM DEPUTY:  Lynly E. Egyes.

17              MS. LYNLY EGYES:  Egyes.  Present.

18              THE COURTROOM DEPUTY:  Milo Inglehart.

19              MR. MILO INGLEHART:  Present.

20              THE COURTROOM DEPUTY:  Dale Melchert.

21              MR. DALE MELCHERT:  Present.

22              THE COURTROOM DEPUTY:  Kathleen R. Hartnett.

23              MS. KATHLEEN HARTNETT:  Present.

24              THE COURTROOM DEPUTY:  Zoe W. Helstrom.

25              MS. ZOE HELSTROM:  It's Zoe.  Present.
```

```
1              THE COURTROOM DEPUTY:  Andrew Barr.

2              MR. ANDREW BARR:  Present.

3              THE COURTROOM DEPUTY:  Adam Katz.

4              MR. ADAM KATZ:  Present.

5              THE COURTROOM DEPUTY:  Elizabeth Reinhardt.

6              MS. ELIZABETH REINHARDT:  Present.

7              THE COURTROOM DEPUTY:  Katelyn Kang.

8              MS. KATELYN KANG:  Present.

9              THE COURTROOM DEPUTY:  Robby L.R. Saldana.

10             MR. ROBBY SALDANA:  Saldana.  Present.  Thank you.

11             THE COURTROOM DEPUTY:  Have I missed anyone?

12             (No response.)

13             JUDGE PROCTOR:  Anyone here who thinks their name

14   should have been called but wasn't and is willing to say so?

15             (No response.)

16             JUDGE PROCTOR:  Fair enough.  Thank you.

17             I'm going to ask everyone, if you just answered that

18   call, to please stand, and we are going to have the clerk of

19   court administer the oath.

20             (All sworn.)

21             JUDGE PROCTOR:  You may have a seat.  All right.

22             There are a couple of preliminary matters that we will

23   need to take up.  And the panel discussed the best way to do

24   this.  Everything is going to be on the record, but there are

25   some things that we think it's appropriate to take up in
```

```
 1    Courtroom 2-E with representatives from each of the groups here.
 2          So what I understand is that Mr. Ragsdale --
 3          Mr. Ragsdale, you're here representing a group; is that
 4    correct?
 5          MR. RAGSDALE:  I represent a number of groups, Your
 6    Honor.
 7          JUDGE PROCTOR:  Would you identify those.
 8          MR. RAGSDALE:  American Civil Liberties Union, the
 9    American Civil Liberties Union in Alabama, Lambda Legal, the
10    Transgender Law Center, and the law firm of Cooley LLP.
11          JUDGE PROCTOR:  All right.  Thank you.  And as I read
12    the lineup card, that is essentially the groups that were
13    involved in the Walker litigation; correct?
14          MR. RAGSDALE:  Correct.
15          JUDGE PROCTOR:  All right.
16          MR. RAGSDALE:  Your Honor, may I just also say, Russell
17    Capone is here as well.
18          JUDGE PROCTOR:  Also representing the Cooley lawyers.
19          MR. RAGSDALE:  Correct.
20          JUDGE PROCTOR:  And there is a joint representation for
21    the Cooley lawyers, but otherwise you represent the lawyers in
22    the other groups.
23          MR. RAGSDALE:  Correct.
24          JUDGE PROCTOR:  Thank you.
25          MR. CAPONE:  Good morning, Your Honor.
```

```
 1              JUDGE PROCTOR:  Good morning.  Mr. Capone, thank you
 2      for being here.
 3              And I think we also have Mr. Segall here representing
 4      some groups.  Can you please identify yourself for the record
 5      and the groups that you are representing today.
 6              MR. SEGALL:  Yes, Your Honors.  Bobby Segall.  I
 7      represent the National Center for Lesbian Rights, the GLBTQ
 8      Legal Advocates and Defenders, Southern Poverty Law Center, the
 9      Human Rights Campaign Foundation, and the lawyers with those
10      groups, Your Honor.
11              JUDGE PROCTOR:  All right.  So those would be the
12      lawyers and respective groups involved in the Ladinsky and the
13      Eknes-Tucker matters, with the exception of the Lightfoot
14      Franklin firm, the King & Spalding firm, and Southern Poverty
15      Law Center?
16              MR. SEGALL:  Yes, Your Honor.
17              JUDGE PROCTOR:  Thank you.  Oh, you've got Southern
18      Poverty Law Center.  I misunderstood.
19              MR. SEGALL:  Right.
20              JUDGE PROCTOR:  So basically, all non-law firm
21      organizations in the Ladinsky and Eknes-Walker cases.
22              MR. SEGALL:  Yes, sir.
23              JUDGE PROCTOR:  Is that correct?
24              MR. SEGALL:  Yes, sir.
25              JUDGE PROCTOR:  All right.  Thank you for that.
```

```
 1              Is there a representative for Lightfoot today?

 2              MS. EAGAN:  Your Honor, we have with us my law partner

 3    Chris King, who is just here with us, but we do not have legal

 4    counsel.

 5              JUDGE PROCTOR:  Okay.  Will he be the spokesperson for

 6    the group, though?

 7              MS. EAGAN:  We will speak.  Mr. Doss and I are co-lead

 8    counsel.

 9              JUDGE PROCTOR:  I need you to designate, though,

10    someone to go into the room and speak on behalf of Lightfoot

11    Franklin.

12              MS. EAGAN:  I will, Judge.

13              JUDGE PROCTOR:  Thank you, Ms. Eagan.  All right.

14              Then that leaves King & Spalding.

15              MR. SHORTNACY:  Yes.  Good morning, Your Honor.

16    Michael Shortnacy of King & Spalding.  I'll be speaking on

17    behalf of the firm, and we do not have outside counsel.

18              JUDGE PROCTOR:  All right.  Thank you.

19              JUDGE WATKINS:  Some of the parties have already raised

20    issues of attorney-client privilege and work product, and we

21    feel like we should go ahead and just address those issues at

22    the beginning of the hearing.  So we're going to adjourn into an

23    in camera session with the lawyers who identified they're

24    representing parties and with the representatives of the law

25    firms that have been identified.  If you'll join us in five
```

 1  minutes in Courtroom 2-E, right next door, and we'll address

 2  those issues before we get started.

 3          JUDGE PROCTOR:  And our court reporter and clerk of

 4  court will accompany us for that.

 5          MR. RAGSDALE:  I don't mean to be dense.  Am I invited

 6  to that?

 7          JUDGE PROCTOR:  Yes.  That's the point of identifying

 8  all --

 9          JUDGE WATKINS:  You're speaking for your clients.

10          MR. RAGSDALE:  Okay.  Thank you, Your Honor.

11          JUDGE PROCTOR:  You and Mr. Segall and the other

12  persons who identified themselves as speaking for a firm.  And

13  of course, Mr. Capone is welcome to come along, too.

14          MR. RAGSDALE:  But not our clients.

15          JUDGE PROCTOR:  Right.  This is just representatives.

16  We're trying to sort out procedurally the best way to protect

17  your clients' interests but also be able to ask some questions

18  regarding these matters.

19          MR. RAGSDALE:  I understand.

20          JUDGE PROCTOR:  All right.  And we will be in recess

21  and meet counsel in 2-E in just a few moments here.

22      (After a brief recess, proceedings continued in 2-E.

23       Counsel present were Mr. Ragsdale, Mr. Segall, Mr. Capone,

24       Ms. Eagan, and Mr. Shortnacy.)

25          JUDGE PROCTOR:  All right.  Folks, we have three things

1    generally we want to cover with you as representatives.

2        The first is we realize we're asking about -- we're

3    going to be asking about things that could implicate work

4    product and attorney-client privilege perhaps.  Certainly work

5    product.  But we're not doing this in an adversarial proceeding,

6    we're not doing this in litigation, so the question in our mind

7    is, what is the best way to navigate through that?  We certainly

8    expect that any answers to our questions involving work product

9    matters would be in a situation where the State of Alabama is

10   not party or not present in those conversations, and it may be

11   that we have to take those up on the record but somewhat in

12   camera in Courtroom 2-F.

13       The second matter we want to take up is we want to

14   introduce Justice Harwood, retired, who we've asked to sit in on

15   the hearing just in case there's any follow-up that the Court

16   needs to make on these matters.  We're not expecting there will

17   be, but it seemed prudent for us to at least have a contingency

18   plan if we need to do that.

19       And then the third thing, I want to make some remarks

20   about what we expect going forward, and I'll make those at the

21   conclusion of this conference.

22       And so let's start off with privilege or work product

23   matters.  I think -- Mr. Ragsdale, did you address that in your

24   written position statement?

25       MR. RAGSDALE:  I did, Your Honor.  We included a

1    footnote to that effect.

2          JUDGE PROCTOR:  Why don't you, for everybody's benefit,

3    in case they haven't seen your position statement, explain what

4    you said.

5          MR. RAGSDALE:  Okay.  May I --

6          JUDGE PROCTOR:  Yes.  Please do.

7          MR. RAGSDALE:  Obviously, as we began to analyze the

8    issues in this, we recognized that we're talking about strategic

9    decisions as lawyers and filing and pursuing litigation, the

10   decision to dismiss.  But more importantly, frankly, from our

11   standpoint, there are attorney-client communications.  So all we

12   attempted to do with our filing was say, we stand ready,

13   willing, and able to answer any questions that the Court has.

14   We are not going to use either of those privileges to refuse to

15   answer questions that the Court has.  But we wanted the Court,

16   obviously, to at least flag those issues so that they could be

17   presented in an in camera type setting where the Court gets its

18   answers, but we don't have to necessarily share that.

19          And I would simply add this, Judge.  There are two

20   separate plaintiffs' groups.  I hope I communicated that with my

21   filing.  Those plaintiffs' groups are sometimes -- I don't know

22   how to call it other than in competition with one another.  So

23   to the extent that we're asked to disclose strategic decision

24   making, we would respectfully request we do that only amongst

25   our own group, with the Court and whoever else the Court

1   designates, not including the Attorney General's office and,

2   frankly, although I love all these lawyers, without them also

3   present.

4          But I do want to make clear, Judge, we raised that

5   issue only to flag it so we didn't -- it didn't happen in the

6   middle of the hearing.  Our lawyers are prepared to answer any

7   questions that you have.

8          The one exception, of course, is there may be some

9   direct communications with our clients that are implicated by

10  the answer, and we can't waive that privilege.  Our clients,

11  obviously, only have the ability to do that.  I firmly recognize

12  we can be told by a Court to answer those questions, and we're

13  prepared to do that, obviously, but we don't want to waive it or

14  be appearing to waive it until the Court makes that inquiry.

15         That's probably a little bit longer answer than you

16  wanted.

17         JUDGE PROCTOR:  No, that's a perfectly sufficient

18  answer.  Any follow-up from the panel on that question or that

19  point?

20         JUDGE BEAVERSTOCK:  No, sir.

21         JUDGE PROCTOR:  All right.  Anyone who wishes to

22  proceed in a different manner than that as outlined by

23  Mr. Ragsdale?

24         All right.  That seems like a fair way to navigate the

25  road.

```
 1              MR. SEGALL:  Your Honor, my only question -- and I
 2   just, frankly, don't know the answer to this legal question.
 3   But is the law clear that in this context -- and, again, I don't
 4   think there's one word between these lawyers and their clients
 5   that anybody's concerned about.  But is it clear that the
 6   Court -- the attorney-client privilege does not apply in a
 7   proceeding like this?
 8              JUDGE PROCTOR:  So I don't know that we're going to be
 9   asking questions that necessarily implicate the attorney-client
10   privilege.
11              MR. SEGALL:  Okay.
12              JUDGE PROCTOR:  There could be some Venn diagram
13   overlap between that and the work product doctrine.  I think
14   what we're really asking about is why you did certain things.
15   Why the lawyers did certain things.  Not why their clients did
16   things or --
17              MR. SEGALL:  Okay, Judge.
18              JUDGE PROCTOR:  And I don't think we're necessarily
19   interested at this point, although the circumstances could
20   dictate otherwise, asking about what communications you had with
21   your clients.  We're actually more interested in understanding
22   why the lawyers did what they did in these circumstances.
23              MR. SEGALL:  Yes, sir.
24              JUDGE PROCTOR:  Okay?  So I think to be --
25              So there's three things I would say.  First, this is
```

1    not an adversarial proceeding.  This is an inquiry.  All right?

2            Second, since it's not an adversarial proceeding, it's

3    not -- we're making a record of this case just so there will be

4    a record, but it's an MC case.  It's not related to any of the

5    dockets that we are -- we've received this inquiry from.

6            And third, I agree completely with Mr. Ragsdale and

7    your point, I think, and that is this can't be used in any

8    litigation for purposes of a party's substantive position in

9    that litigation.  That's not what our intent in conducting this

10   hearing is.  This is simply -- there was enough raised by these

11   matters as we looked at the record to call everyone and make

12   inquiry.  It's not being done in any of the cases.

13           MR. SEGALL:  Yes, sir.

14           JUDGE PROCTOR:  Okay?  Makes sense?

15           MR. SEGALL:  Yes, sir.

16           MR. RAGSDALE:  Yes, sir.

17           JUDGE PROCTOR:  And just so you'll know, the three of

18   us have had multiple and some extensive discussions, just to

19   make sure that we are trying to navigate that road the proper

20   way, both for us and for all the lawyers involved in this case

21   and the parties that those lawyers represent.  So this has

22   nothing to do with the underlying issues, nothing to do with the

23   underlying ruling or rulings, nothing to do with anything other

24   than what did officers of this court, either directly admitted

25   or pro hac vice admitted, do and why, and was there any

1   impropriety there.

2        We don't presume impropriety.  Let me be clear about

3   this.  We're not presuming that there was any incorrect,

4   inappropriate, problematic behavior.  But I think for

5   transparency reasons and -- again, I'm serious.  I think every

6   district judge in the state was consulted on this, and everyone

7   agreed there needed to be an inquiry, and we just drew the short

8   straws being here.  All right?  And I drew the shortest straw by

9   asking to preside.

10       All right.  So anything else we need to take up before

11  we have this last point I wanted to make or that we wanted to

12  make?  Do we have a clear understanding of how we're going to

13  proceed on work --

14       JUDGE WATKINS:  Yeah.  If I could just add that I think

15  what we -- the first thing we would like to accomplish over

16  there is to get anybody who has nothing to do with this, who's

17  associated with your firms or your client, out of the --

18  basically, out of the room.  And everybody's under oath.  They

19  can stand up.  They'll probably be asked to do an affidavit

20  later.  But we have some -- we want to frame the issues that

21  we're -- that we want to address and then have them stand up and

22  identify themselves, and we basically can excuse them, send them

23  back over here or somewhere out.

24       JUDGE PROCTOR:  Yes.  That was the last two things I

25  was going to cover, and that's great.  Judge Watkins has very

1  well described that process.  We need your help and the help of
2  everyone else to get you into some categories.
3        The categories are persons who have no knowledge and no
4  input into any of these decisions we're inquiring about.
5        The second category would be people who have knowledge
6  but no input.  They might have been present during
7  conversations.
8        The third category would be knowledge and input.  They
9  were on the team that was guiding and strategizing the tactics,
10  the decisions that we're inquiring about.
11        And then fourth, who were the decision makers.
12        We're going to do that in the other room, not here,
13  because we need everybody's input about that.
14        The last thing I'll say doesn't need to be said, but we
15  felt like it's just a good reminder.  We are not here presuming
16  anything.  And even in what we view as kind of a worst-case
17  scenario, this is not a capital offense case.  We're not
18  thinking at this point that anyone is in such trouble that a law
19  license or jail time or anything like that.  You know, what a
20  lawyer gets trained in law school to think of worst-case
21  scenario, that's not what we're looking at, unless there is a
22  cover-up and there's a lack of candor with us.  In that case,
23  all bets are off.  Okay?  We're going to say this again, but I
24  just felt like we needed to tell you in advance what we're
25  talking about here.

1          The other thing is candor and transparency will help us
2    greatly and, we suggest, would help you and your lawyers
3    greatly.  All right?  That's all we're expecting here.  We don't
4    expect a certain outcome.  We don't expect a certain result.  We
5    don't expect a certain set of facts.  We do absolutely expect
6    candor and transparency.  And we'll address this in the next
7    room, but I just thought, since you're the leaders and/or
8    representatives, you needed to hear that first.  And to the
9    extent you can help us with that by talking to your groups, that
10   would be greatly appreciated.  Any thought to that?
11         JUDGE WATKINS:  I do have one other thing.  I've asked
12   Debbie to identify several rooms.  I believe there are four
13   rooms behind this courtroom.  There's a jury room; there are two
14   rooms behind the big courtroom and a jury room.  And if we
15   needed them, there are rooms in the next courtroom.  We've got
16   rooms all over the place.  So if at any point y'all feel like
17   you need to break out with your group for one reason or another,
18   just your group, ask us, and Debbie will direct you to a room.
19         JUDGE PROCTOR:  All right.
20         MR. CAPONE:  Your Honor, can I ask one question?  I
21   took down the categories that you mentioned.  So we have nine
22   lawyers in this case.  I think a lot of them, eight of them,
23   will fall into the knowledge-but-no-input category.  In other
24   words, 20, 25-person meetings, presumed that they're in the
25   background on.  Are those folks that you want to be around all

1  day?

2          JUDGE PROCTOR:  Yes.  No one is excused until they're

3  excused.  And even the persons who have no knowledge, we

4  might -- since they're here, we might have them camp out in a

5  certain place in the courthouse in case their name comes up.

6          MR. CAPONE:  Got it.  Thank you, Your Honor.

7          JUDGE PROCTOR:  And so we understand it could be that

8  many of the lawyers fall into those first two categories I

9  referenced.  You know, someone with no knowledge and no input

10 would be an associate who just simply drafted the complaint,

11 worked on any motions that were filed other than the motions

12 we're going to ask about, about assigning the case, or just

13 interacted with clients.  Held clients' hands; got information

14 from clients.

15         Those persons, if they don't have knowledge of the

16 areas we're going to inquire in -- and we'll do this in the next

17 room, but just to give you a heads up.  Here are the categories

18 of the things that I think we're going to be asking about,

19 discussions and/or decisions about these areas:  Where to file.

20 Who to represent; in other words, which plaintiffs to name in

21 the various complaints.  Who to sue; in other words, which

22 defendants to name in the various complaints.  Related case

23 requests.  Transfer of cases, of Walker.  Dismissal of Walker

24 and Ladinsky.  Refiling of Eknes-Tucker.  Where to refile

25 Eknes-Tucker.  Coordination of the cases.  Discussions or

 1   decisions about judge assignments.  Discussions or decisions

 2   about intentions or efforts to get a judge or avoid a judge.

 3   Association of counsel in the various cases; communication with

 4   others not in the courtroom about these subject matters, and

 5   communication about these subject matters from group to group.

 6          So I think I did -- but I think Judge Watkins is

 7   wanting -- and I think this is correct -- to laser focus this a

 8   little bit:  Any activity that would be directed toward getting

 9   a judge assigned to a case or getting a judge recused or

10   disqualified from a case, front end or after the case is filed;

11   before and after filing.

12          Again, I think if we can address those things candidly

13   and fairly, this will be a shorter day.  I think if there's a

14   lack of candor, quite frankly, from anyone, it's going to be a

15   longer day.  We certainly expect the former.

16      (Brief pause in the proceedings.)

17          JUDGE PROCTOR:  That's a good question.  We don't

18   require opening statements.  We're not necessarily going to

19   pretermit opening statements.

20          Here's what we can't do.  An opening statement can't be

21   designed to get into the details of any of these matters so that

22   it would suggest what anybody else's position is going to be in

23   these matters.  In other words, you can't use your opening

24   statement to send a signal to everybody in the room, here's the

25   position we're taking, get in line.

1          I'm just cutting to the chase.  I don't expect that

2    from any of y'all, but I think as you -- if you want to make an

3    opening statement, think about how your opening statement would

4    be perceived along those lines.

5          MR. SEGALL:  Your Honor, I think one of the opening

6    statements, as I understand it, was to be given by somebody --

7    by Jeff Doss of the Lightfoot firm, who's one of the lawyers

8    required to be here.  And I think that what he planned to do was

9    answer some of your --

10         JUDGE PROCTOR:  Well, we would prefer that he answer

11   those at the time we ask them.  But if he just wants to give us

12   an overview of things, that's fine.  You understand the

13   distinction I'm drawing?

14         MS. EAGAN:  Your Honor, just for clarification, for

15   example, I think Mr. Doss -- clearly we are prepared and ready

16   to talk about why we made these decisions that you've outlined

17   here.

18         JUDGE PROCTOR:  Right.

19         MS. EAGAN:  It is my understanding that if Jeff were --

20   Mr. Doss were to give a brief opening, you would not want him to

21   go into or even touch on, for example, why it was that we made

22   the decision to dismiss the Ladinsky action?  You would not want

23   him to go into anything about why that was done or --

24         JUDGE PROCTOR:  What we don't want is a young lawyer

25   sitting in the audience, hearing an opening statement, and being

```
 1   sent a subtle signal:  That's what I need to say when it's my
 2   turn to talk.  Okay?  I'm just being perfectly candid.
 3            We're trying to cabin in -- first, we're trying to get
 4   your younger lawyers out of here.  Okay?  And that's probably
 5   the group we'll start off with first in terms of some inquiries.
 6            But to be honest with you, we don't expect that there
 7   would be any signals sent in opening statements.  What we're
 8   saying is just double check what you're going to say and make
 9   sure it wouldn't be perceived that way.  We're not trying to
10   inoculate poor behavior.  What we're trying to make sure is
11   measure twice, cut once on what you're going to say, to make
12   sure there's not that unintended consequence.
13            MS. EAGAN:  Yes, sir.  I understand.
14            One last question, if you don't mind, on the
15   clarification -- for clarification on, for example, where
16   associates would fit.  So if we have an associate, for example,
17   who was not involved in the decision making but may have been on
18   a call where some of these decisions were made, such as the
19   dismissal, would that --
20            JUDGE PROCTOR:  That would be the second category.
21   Knowledge but no input.
22            MS. EAGAN:  Thank you, sir.
23       (Brief pause in the proceedings)
24            JUDGE PROCTOR:  All right.  Mr. Ragsdale?
25            MR. RAGSDALE:  Only thing I wanted to say, Your Honor,
```

1   I was, of course, prepared to make an opening statement.  And as

2   much as I like the sound of my own voice, I think our brief

3   covered what I would have said in that.  So I'm going to forego

4   that, as beautiful as it was.  But I do want it clear that the

5   Court has already indicated to us -- I mean, I've got 21 lawyers

6   who want to make sure that I'm advocating on their behalf,

7   obviously.  Please consider that advocacy to be done.

8           JUDGE PROCTOR:  Absolutely.

9           MR. RAGSDALE:  And we also, obviously, Judge, have a

10  number of young lawyers who will have knowledge but weren't

11  decision makers.  We have identified, a little bit anticipating

12  how the Court was going to proceed, people who we think were the

13  key decision makers.  Obviously, the Court can ask questions of

14  any of the 19 lawyers of our 21 that are here.

15          Thank you, by the way, for excusing those two young

16  lawyers.

17          But there are people with more knowledge about the

18  decision making.  Are we going to have an opportunity to

19  designate those people for you?  Obviously, with you being able

20  to ask anybody you want to, but --

21          JUDGE PROCTOR:  I think we'll designate that.  That

22  will be the first thing we take up when we step into the next

23  room, and that way we get everyone in agreement with your

24  designation.  Not that you would get anything wrong, but

25  somebody might -- I feel like they ought to have some input into

1   how they get designated before we designate them.

2          MR. RAGSDALE:  Thank you.

3          JUDGE PROCTOR:  If that's a fair way to proceed --

4          MR. RAGSDALE:  That does.  That answers my question.

5          And I will tell you, that was a group decision made

6   amongst everybody when it was done.

7          JUDGE PROCTOR:  Right.  Well, I think those are pretty

8   clearly demarked categories.

9          MR. RAGSDALE:  I think so.

10          JUDGE PROCTOR:  So why don't we do this?  You're

11   welcome to tell us who the decision makers were.

12          MR. RAGSDALE:  Maybe that's -- yes.

13          JUDGE PROCTOR:  And maybe we'll just take care of that

14   category here and confirm that in the next room, but that might

15   help us a little bit in that respect.

16          MR. RAGSDALE:  Sure.  We believe that the clear

17   decision makers were Mr. Esseks from the American Civil

18   Liberties Union, who was seated at counsel table with me, and

19   Kathleen Hartnett from Cooley, who was also seated at counsel

20   table with me.  So that is Esseks and Hartnett were the primary

21   decision makers.

22          JUDGE PROCTOR:  Okay.

23          JUDGE WATKINS:  That would be for the entire Walker

24   side?

25          MR. RAGSDALE:  Correct.

```
 1              JUDGE PROCTOR:  And Mr. Capone, you're in agreement
 2   with that?
 3              MR. CAPONE:  I am.  Yes, Your Honor.
 4              JUDGE PROCTOR:  I figured you would be, but just
 5   confirming that.
 6              JUDGE WATKINS:  Give you a chance to talk.
 7              JUDGE PROCTOR:  All right.  Ms. Eagan?
 8              MS. EAGAN:  Your Honor, from Lightfoot Franklin the
 9   decision makers were Jeff Doss and I as co-lead counsel.
10              JUDGE PROCTOR:  All right.
11              MR. SHORTNACY:  Your Honor, for King & Spalding, the
12   decision makers were myself and Brent Ray, my co-lead counsel.
13              JUDGE PROCTOR:  All right.  And last but not least.
14              MR. SEGALL:  Your Honor, from the Southern Poverty Law
15   Center, Scott McCoy would have been the decision maker.  And the
16   other two would fall in either your first or second category.
17   For the Human Rights Campaign Foundation, Sarah Warbelow would
18   be the decision maker.  For GLBTQ Legal Advocates and Defenders,
19   Jennifer Levi would be the decision maker.
20              And, Judge, I'm a little unclear about the National
21   Center for Lesbian Rights.  There's one lawyer who was on the
22   pleadings who is here.  There was another lawyer in the National
23   Center for Lesbian Rights who was like the director.  I'm not
24   sure.  You know, I'm sure these two people probably discussed
25   it, but I'm really not positive.
```

```
 1              JUDGE PROCTOR:  So the director did not make an

 2    appearance --

 3              MR. SEGALL:  Exactly.

 4              JUDGE PROCTOR:  -- but could have had input into some

 5    of these decisions?

 6              MR. SEGALL:  Yes.  The legal director.

 7              JUDGE PROCTOR:  What's the director's name?  What is

 8    the director for the National Center of Lesbian Rights' name?

 9              MR. SEGALL:  I think he's the legal director.  His name

10    is Shannon Minter, M-I-N-T-E-R.

11              JUDGE PROCTOR:  All right.  That's helpful.  Thank you.

12              JUDGE WATKINS:  Mr. Ragsdale, did you for the Walker

13    side just identify two decision makers, and didn't include

14    anybody from Lamda Legal or the Transgender Law Center, or did I

15    miss that?

16              MR. RAGSDALE:  You're correct.  I did not include

17    anybody.  I think I know who those folks are.  We just had not

18    directly talked about them.  But I will find out and designate

19    somebody who was the decision maker for them.  As you can

20    imagine, these decisions were made in a group setting, and these

21    two individuals that I did identify were the primary decision

22    makers for the group.  But I will identify -- and I apologize

23    that I can't do that right now for you for Lambda and for the

24    TLC.  But I will do that before we get back together.

25              JUDGE WATKINS:  All right.
```

```
 1            JUDGE PROCTOR:  All right.  Thank you.  We'll ask you
 2   to do that as we start the next session back in Courtroom 2-F.
 3            All right.  Is there anything that we haven't covered
 4   that you would like to say to us in this setting?
 5       (No response.)
 6            JUDGE PROCTOR:  Not expecting anything.  Just wanted to
 7   give that you opportunity.  All right.
 8            MR. SEGALL:  Your Honor, I don't think I plan to make
 9   an opening statement either.  I mean, I don't really see the
10   value of it to you to do that.
11            JUDGE PROCTOR:  Does anybody want to make an opening
12   statement?  Mr. Ragsdale wants to, but he's surrendered that
13   right.
14            MR. RAGSDALE:  Begrudgingly.
15            MS. EAGAN:  Your Honor, I'm inclined not to, but if you
16   don't mind, I would like to talk with Mr. Doss before I --
17            JUDGE PROCTOR:  Why don't you talk with Mr. Doss and
18   see what you two decide.  And just tell him of the parameters
19   and what we expect.  It's a road map about events, not specific
20   details about discussions or decisions.
21            MS. EAGAN:  Yes, sir.
22            JUDGE BEAVERSTOCK:  And I just want to emphasize that
23   this is not an adversarial proceeding, so we don't expect the
24   lawyers to lawyer as much as just have an honest and forthright
25   discussion about what happened so that we can just conduct the
```

1  inquiry.

2        JUDGE PROCTOR:  All right.  If nothing further, we will

3  recess this session, and we will adjourn in about five minutes

4  or so back in Courtroom 2-F.

5        What we'll ask you to do as we navigate through this

6  first issue we took up today, and that is work product matters,

7  please communicate with us when you think we're getting into

8  those areas and allow us to implement the plan we have in that

9  area.  All right?

10        MR. RAGSDALE:  Yes, sir.

11        JUDGE PROCTOR:  Thank you.

12     (Recess was taken from 10:44 a.m. until 10:47 a.m., after

13      which proceedings continued in Courtroom 2-F, as follows:)

14        JUDGE PROCTOR:  All right.  So here's how we're going

15  to proceed.  We're going to do three things in this next segment

16  of the hearing.

17        First, I'm going to review some procedural history,

18  realizing there may be questions about exactly how we got here

19  from the Court's standpoint.  And we're going to be asking all

20  manner of questions about what you did, so I think it's fair for

21  you to understand how these cases worked through the court

22  system.  Okay?

23        Second, we're going to invite our colleagues from the

24  State of Alabama to present to the Court anything that they have

25  that would be factual information about this inquiry.  Not a

 1   legal argument.  We're not going to retry or rehear Judge

 2   Burke's matter.  We're not going to get into legal positions.

 3   We read your response to motions filed in these cases, so we

 4   don't want to get into the legal position.  Just is there any

 5   factual information.  And we want you to present that right here

 6   in front of everyone and us.

 7          And then the third thing we're going to do -- and I

 8   think the representatives from each group indicated to your

 9   different groups we're going to proceed this way -- is put you

10   into some categories.  We had outlined four categories coming

11   in.

12          The first is I have no knowledge about these matters

13   and certainly had no input.  We're not sure there's many people

14   in that category, because what we've been told is chances are

15   most of you, if not all of you, were on phone calls about these

16   things, even if you weren't speaking.  So you would have

17   knowledge.

18          Now, if you were simply a young lawyer drafting a

19   complaint or talking to a witness or talking to your client

20   about matters related to this and have no knowledge about the

21   categories that we'll cover in a moment after these first two

22   things, you need to tell us that.  Okay?  And what we'll do with

23   you is tell you, you can go sit out the rest of the hearing and

24   wait to hear from us, just in case your name comes up.

25          If you have knowledge -- you were on phone calls, you

 1   saw memoranda, you saw emails, any way you could acquire

 2   knowledge -- but had no input, that's the second category.

 3          The third category is I wasn't a decision maker, but I

 4   gave direct input.  I was part of giving advice or weighing in

 5   on tactical decisions.  So that is knowledge and input.  And I

 6   think we've already identified who the decision makers were in

 7   the other room, but at the appropriate time, we'll get counsel

 8   just to repeat that for everybody's benefit.  All right?

 9          Counsel who were in Courtroom 2-E, consistent with

10   what we talked about?

11          MR. RAGSDALE:  Yes, sir.

12          MS. EAGAN:  Yes, Your Honor.

13          JUDGE PROCTOR:  All right.

14          Okay.  The Walker procedural history is pretty

15   straightforward and easy, I think they're actually

16   straightforward and easy, but I'm going to start with Walker.

17          Walker was the second filed case in the state.  It was

18   filed in the Middle District.  Judge Marks received the

19   assignment.  She became aware of Ladinsky that was the first

20   filed case that was filed in the Northern District of Alabama.

21   She entered a show cause order having the parties explain if

22   there's any objection or position on transferring to the

23   Northern District of Alabama the case.  My understanding and our

24   understanding is there was no opposition to that, and the case

25   was transferred to the Northern District.

 1                There were six parties in Walker initially when it was

 2       transferred, three from Lee County and three from Limestone

 3       County.  The way our clerk's office would have handled this is

 4       it would have identified the parties -- and those are the

 5       plaintiffs, and then there was a defendant from -- there was the

 6       Attorney General in Montgomery; the Limestone County DA, Jones,

 7       and the Lee County DA, Ventiere.

 8            The way our clerk's office would have identified this and

 9       did identify it, since those are Limestone parties -- Limestone

10       County parties, it would have gone into the northern jury area,

11       the Northeastern Division.  Even though it was first filed

12       reference, our clerk does not directly assign cases to judge on

13       first filed references, civil cover sheets or anything else.  It

14       would just go into the division and jury area under our plan.

15       And that's how -- and the case was randomly assigned within the

16       northern jury area to Judge Burke.

17                All right?  Any questions about that?  All right.

18                Ladinsky had more movement, but Ladinsky was the first

19       filed case.  Ladinsky was filed directly in our central jury

20       area.  In Ladinsky the case was originally assigned to Judge

21       Manasco.  She had a recusal issue based upon the parties.  The

22       case then was randomly reassigned to Judge Cornelius, our

23       magistrate judge.

24                By the way, I guess you understand the difference

25       between a magistrate judge and a district judge, both in terms

1  of assignment and qualifications.  District judges get hired on

2  politics.  Magistrate judges get hired on merits.  So Judge

3  Cornelius had the case, but she quickly determined that there

4  would not be consent, and therefore the case went back on the

5  wheel.  It was assigned to Judge Axon.

6          In the meantime Walker enters our district and is

7  assigned to Judge Burke.  Judge Axon was on day four of what was

8  scheduled to be a two-plus-week criminal trial, an 18 defendant

9  case with four defendants at trial, and quite a lot of moving

10 parts in that criminal case.  And based upon judicial efficiency

11 and economy, Judge Burke took the case.  Judge Axon would not

12 have had the judicial resources to start the case right away --

13         JUDGE WATKINS:  And there was a TRO.

14         JUDGE PROCTOR:  -- and there was a TRO actually in

15 Judge Burke's case, not in Judge Axon's case.  So there was a

16 simple determination that we would have the judge who could

17 handle the case and wasn't in a long criminal trial to handle

18 that case.

19         Any questions about that?  All right.

20         Very well.  All right.  Who is here on behalf of the

21 State of Alabama?

22         MR. LACOUR:  Edmund LaCour, Your Honor.

23         JUDGE PROCTOR:  Welcome.  Anyone else with you?

24         MR. LACOUR:  Two of my colleagues from the AG's office.

25         MR. BOWDRE:  Barrett Bowdre, Your Honor.

```
 1              JUDGE PROCTOR:  Mr. Bowdre.  How are you?

 2              MR. WILSON:  Thomas Wilson, Your Honor.

 3              JUDGE PROCTOR:  Thank you.

 4              MR. SEISS:  Benjamin Seiss, Your Honor.

 5              JUDGE PROCTOR:  Who will speak for Alabama, if anyone?

 6  You don't have to speak.

 7              MR. LACOUR:  I will, Your Honor.

 8              JUDGE PROCTOR:  Please come to the podium.

 9          Now, I think you appreciate the way we cabined you in.

10              MR. LACOUR:  Yes.

11              JUDGE PROCTOR:  This is not your opportunity to state

12  all the opinions or views you might have about all this.  This

13  is just a question of if you have information that we need to

14  consider, factual information, this is your opportunity to share

15  that with us.  And the reason we're doing it right off the bat,

16  I think it's fair not just for the panel but for everyone else

17  here to know whether you do have such information.

18              MR. LACOUR:  I do have some, Your Honor, that I think

19  could be useful.  Obviously, we're not here to relitigate the

20  preliminary injunction motion; but one of the arguments we

21  raised in response to the Eknes-Tucker preliminary injunction

22  motion was the equities and the delay, so we had developed some

23  evidence related to what we thought appeared to be judge

24  shopping.

25              I have some documents.
```

 1           JUDGE PROCTOR:  Let me make sure I understand what

 2   you're saying.  You're saying that in relationship to one of the

 3   factors that a Court has to consider in granting a temporary

 4   restraining order or preliminary injunction is exigencies of

 5   time.

 6           MR. LACOUR:  Yes, Your Honor.

 7           JUDGE PROCTOR:  And so the reason you looked into these

 8   matters was because you were trying to develop arguments on

 9   behalf of the State as to why time was not of the essence based

10   upon conduct of opposing counsel?

11           MR. LACOUR:  Yes, Your Honor.

12           JUDGE PROCTOR:  All right.  So please proceed.

13           MR. LACOUR:  If it's helpful to have the documents up

14   on the Elmo, I can provide some of that, or I can simply discuss

15   what we have and I can file things with the Court.

16           JUDGE PROCTOR:  I think what you can do is make

17   proffers on documents.  And if there's a question that we have

18   or if there's a question from representatives, or any of the

19   lawyers, for that matter, we can drill deeper into those

20   matters.

21           MR. LACOUR:  Because there are a few documents and then

22   a couple of You Tube videos.  I can simply describe them, or I'm

23   happy to plug in my computer and show some clips.  But I've got

24   the quotes ready to the extent --

25           JUDGE PROCTOR:  All right.

 1          MR. LACOUR:  Or the ones we think would be relevant

 2   here.

 3          So I'm just going to work chronologically, and starting

 4   not in 2022 but back in April of 2021.  There was a law somewhat

 5   similar to SB 184, the law that was challenged by the Ladinsky

 6   plaintiffs, the Walker plaintiffs, and then later the

 7   Eknes-Tucker plaintiffs that had been introduced to the Alabama

 8   Legislature in 2021.  The ACLU and I believe Lambda Legal

 9   announced that they were ready to challenge that law in 2021

10   that had been pending in the Alabama legislature that year.

11   That law did not pass, and thus there was no challenge filed to

12   that law by those particular groups.

13          Next up, moving forward to 2022, couple of relevant

14   dates.  April 7th was the day the legislature passed the law.

15   April 8th was the day that Governor Ivey signed the law into --

16   signed the law and made it an act.  So sometime before April

17   7th, and before SB 184 had been enacted, it appears that the

18   Department of Justice was coordinating with lawyers.  It was not

19   clear at the motion to intervene hearing on May 4th in front of

20   Judge Burke exactly which lawyers they had been coordinating

21   with.  But at that hearing on May 4th on the motion to intervene

22   into the Eknes-Tucker case, John Powers, who is a lawyer from

23   the Civil Rights Division of the U.S. Department of Justice,

24   made the following representations to the Court.  So this is

25   docket entry 103 in the Eknes-Tucker case, page 9 of the May 4th

1  transcript.  So the Court asked:  "Would it be correct to say --

2  and you tell me.  I don't know the answer to this.  Would it be

3  correct to say that the United States has been in contact with

4  counsel for the original plaintiffs and has been coordinating to

5  some degree with them?"

6        Mr. Powers then responded:  "Your Honor, I don't want

7  to go too far in terms of internal deliberations, but of course

8  we have been in touch with the counsel for the plaintiffs."

9        Moving on to page 12 through 13 of that transcript,

10  Mr. Powers continued:  "The United States did start analyzing

11  Senate Bill 184 and started investigating before the statute was

12  signed into law by the governor.  I don't have the precise date,

13  but before the law was enacted, the United States had begun

14  reaching out to groups who had spoken out in opposition to the

15  law."

16        And then moving down, page 13 on to page 14,

17  Mr. Powers continued:  "But frankly, attorneys for the United

18  States were working around the clock during the entire time, you

19  know, coordinating with folks not only in the Middle District

20  but in the Northern District."

21        Also on April 7th counsel for the Walker plaintiffs

22  announced their plans to file a legal challenge to SB 184 if it

23  was enacted.  That's an ACLU press release that I would be happy

24  to provide the Court if you would find it useful.

25        April 8th was when the law was signed.  There was that

1  same day an interesting online press conference that was hosted

2  by the Human Rights Campaign, who represents the Ladinsky

3  plaintiffs and now the Eknes-Tucker plaintiffs in lawsuits one

4  and three.

5          Shannon Minter, who's the legal director of the

6  National Center for Lesbian Rights, spoke.  The National Center

7  for Lesbian Rights represents the Ladinsky plaintiffs and the

8  Eknes-Tucker plaintiffs.  I do not think Shannon Minter has

9  appeared in the case, but one of his colleagues has.  Also on

10 that video was Dr. Ladinsky, who filed the Ladinsky lawsuit.

11         JUDGE PROCTOR:  This is the same Mr. Minter who I think

12 Mr. Segall referenced as being the legal director?

13         MR. LACOUR:  Yes.

14         JUDGE PROCTOR:  Am I remembering that, Mr. Segall?

15         MR. SEGALL:  Yes, sir.

16         JUDGE PROCTOR:  All right.  Thank you.

17         MR. LACOUR:  So on that same press conference -- during

18 that same video, with hand offs from one speaker to another --

19 it's all happening over Zoom or basically an online press

20 conference -- Dr. Ladinsky spoke in opposition to Senate Bill

21 184, and then she introduced Jeff Walker as the father of one of

22 Dr. Ladinsky's patients.  And that's the same Jeff Walker who

23 challenged SB 184 in the Middle District of Alabama.  So if

24 you're looking at the You Tube video, which we can provide, it's

25 around the 11 minute 33 second mark.  So it's clear from the

1   video that Dr. Ladinsky and Mr. Walker had at least some contact

2   in the lead up to each of them filing similar lawsuits at

3   similar times.

4       I would also direct the Court to a few potentially

5   pertinent things that Shannon Minter said.  First, if you start

6   around the 19 minute 42 second mark, Minter introduces himself

7   and addresses SB 184, stating, quote, "I'm here on behalf of

8   NCLR, HRC, Southern Poverty Law Center, and LGBTQ Advocates and

9   Defenders to make very clear that if this dangerous bill is

10  signed into law, we will file a federal court challenge seeking

11  an immediate injunction."

12      Now, literally that day those organizations did file a

13  complaint on behalf of Dr. Ladinsky and other plaintiffs in the

14  Northern District of Alabama.  Notably, however, they never

15  sought a TRO or preliminary injunction as promised.  They never

16  did during that entire week that their lawsuit was pending

17  before they dismissed it on April 15th.

18      The other interesting comment came around the 21 minute

19  10 second mark where Mr. Minter stated that if Alabama, quote,

20  "Puts this law into effect, we will challenge it.  We will have

21  the full support of the United States Department of Justice, and

22  I'm confident that it will be enjoined."

23      So the statement lines up with DOJ statements about

24  coordination that they made at the May 4th motion to intervene

25  hearing.  It also, again, calls attention to the fact that

1    Ladinsky plaintiffs never did request a preliminary injunction.

2            So as noted, Ladinsky did file a complaint in the

3    Northern District on April 8th.  And as Your Honor recounted, it

4    was assigned to Judge Manasco, then to Magistrate Judge

5    Cornelius, and finally to Judge Axon.

6            Then on April 11th Jeff Walker's complaint was filed

7    in the Middle District and assigned to Chief Judge Marks.

8    There's one other You Tube video I will note.  That same day on

9    April 11th Alabama State Representative Neil Rafferty, who has

10   been a very vocal opponent of SB 184, appeared on ABC News.

11   When asked how he plans to fight the law, he responded, quote,

12   that's going to be up to the courts now, close quote.  Then

13   added, quote, the HRC, the SPLC, Center for Lesbian Rights, and

14   Lambda Legal, who the Walker plaintiffs -- filed on behalf of

15   the Walker plaintiffs, quote, have all teamed up.  All have

16   plaintiffs and are ready to go.

17           So HRC, SPLC, and the Center For Lesbian Rights

18   represented Ladinsky.  Lambda Legal represented the Walker

19   plaintiffs.  That was on April 11th.

20           April 12th, the Walker plaintiffs requested that their

21   case be transferred to Judge Thompson on the ground that he had

22   ruled on a case more than a year ago related to Alabama Law

23   Enforcement Agency's policy for changing sex designations on

24   driver's licenses.  That's docket entry 8 in the Walker case.

25   They did not cite a single case where any new case that had been

1  filed had been deemed to be related to a closed case.  So that

2  same day, Walker plaintiffs moved for their TRO and their

3  preliminary injunction in the Middle District.

4          I apologize for repeating some of the procedural

5  history Your Honor noted, but it was the next day, April 13th,

6  that Chief Judge Marks entered the show cause order as to why

7  the Walker case shouldn't be transferred to the Northern

8  District to, quote, be decided with Ladinsky, close quote.

9  That's ECF number 3.

10         Shortly after 9 p.m. the next day, April 14th, the

11 Walker plaintiffs told Chief Judge Marks that they did not

12 "Oppose transfer to the Northern District so this matter can be

13 adjudicated alongside Ladinsky.  Plaintiffs' interest is in the

14 expeditious injunction of the unconstitutional law they

15 challenge, and plaintiffs will seek to pursue their motion for

16 this preliminary relief expeditiously in the Northern District,

17 assuming transfer."  And less than 24 hours later, they would

18 voluntarily dismiss their lawsuit.

19         So it does bring us to April 15th.  That day Chief

20 Judge Marks transferred Jeff Walker's case to the Northern

21 District where it was assigned to Judge Burke.  State defendants

22 prepared a motion to consolidate, which we intended to file with

23 Judge Axon because Judge Axon had the first filed case.  We

24 communicated with counsel for both Ladinsky and Walker

25 plaintiffs who stated that they did not oppose consolidation,

1   which was consistent with what they had told -- what the Walker

2   plaintiffs had told Chief Judge Marks just the day before.

3           At 4:07 p.m., at least the ECF notice I received

4   indicated that was the time that Judge Burke set a status

5   conference in the Walker case to discuss the status of the case.

6           At 4:20 p.m., I received the following email from

7   Ms. Eagan, who represented the Ladinsky plaintiffs.  She stated,

8   quote, "I spoke with counsel for the Walker plaintiffs, and they

9   consent to consolidation.  So you probably want to phrase your

10  motion as an unopposed motion and also put in there that counsel

11  for the Walker plaintiffs also consent to consolidation."

12          We received a similar email from Kaitlin Welborn of

13  ACLU, who represented the Walker plaintiffs, around 4:32 p.m.,

14  and about 25 minutes after Judge Burke had already set the

15  status conference.

16          Then at 4:41 p.m., Judge Axon transferred the Ladinsky

17  case to Judge Burke.

18          Finally, at 6:24 p.m., the Walker plaintiffs dismissed

19  and dropped their request for that preliminary injunctive

20  relief.

21          At 6:33 p.m., nine minutes later, Ladinsky plaintiffs

22  also dismissed, despite never having filed any motion for

23  preliminary injunctive relief.

24          Dr. Ladinsky on May 5th -- that's the transcript,

25  docket entry 104 in the Eknes-Tucker case -- Dr. Ladinsky

1  testified that while she strongly opposed SB 184, she dropped

2  her challenge to the law on April 15th, quote, under advisement

3  of counsel, close quote.

4         April 16th, the next day, al.com reported that

5  Ms. Eagan had told the website via email, "We do plan to refile

6  imminently to challenge this law."

7         And then a couple days later, on May 18th -- so this

8  is the following Monday after the dismissal Friday night --

9  lawyers who had dismissed Dr. Ladinsky's case reached out to

10  Reverend Eknes-Tucker.  He recounted this at the PI hearing.  If

11  you look at docket entry 104 from that case around pages 199 and

12  200 through 201, he discusses having received a call that Monday

13  and having agreed to participate to -- I may be paraphrasing,

14  but "to make a difference."

15         Finally -- Eknes-Tucker was the plaintiff who raised

16  the First Amendment claim that had not been present in either

17  the Walker or the Ladinsky cases.  I think his theory is that he

18  counsels children, families who are dealing with gender

19  dysphoria or transgender issues more broadly, and was concerned

20  that his First Amendment rights might be caught up in the law.

21         On that You Tube video from April 8th, there was

22  another reverend who spoke out against the law who never joined

23  either of those two lawsuits that were filed earlier in April.

24         JUDGE PROCTOR:  Do you have a position as to why the

25  presence of Reverend Eknes-Tucker would in any way have affected

1  any issues that we're looking at?

2          MR. LACOUR:  Potentially, Your Honor, in that at least

3  from his testimony, it appears that he was not someone concerned

4  with being held liable under the law, but instead was sought out

5  to allow another chance to bring a case, not in the Northern

6  District, again, but this time in the Middle District, and

7  perhaps to argue that this is a different lawsuit because

8  there's a new --

9          JUDGE PROCTOR:  He is in the Northern District, though?

10          MR. LACOUR:  He is.  He is in Birmingham, but his suit

11  was filed in the Middle District.

12          So the day after Reverend Eknes-Tucker had been cold

13  called, the same 17 lawyers who had filed the Ladinsky case

14  filed a very similar lawsuit that became the Eknes-Tucker case.

15  There are patients or prospective patients who are plaintiffs.

16  Each of them -- well, each of them is either a patient or

17  prospective patient of Dr. Ladinsky.

18          Dr. Ladinsky is not a plaintiff in this case anymore,

19  despite her continued opposition to SB 184.  Instead she has

20  been slotted in as an expert witness.  She submitted a

21  declaration in support of the new plaintiffs' preliminary

22  injunction motion, which they filed on Thursday, April 21st.

23          And while the Walker plaintiffs did not refile, it

24  appears that at least some of their work was not lost because on

25  Friday, April 29th, the United States finally got around to

1   seeking to intervene in the Eknes-Tucker case.  They filed a

2   preliminary injunction motion late that Friday night that

3   attached the declaration of Dr. Armand Antommaria.  That

4   declaration closely tracked the declaration that Dr. Antommaria

5   had provided in support of the Walker plaintiffs' preliminary

6   injunction motion just a couple of weeks earlier.

7          So that is the factual evidence we have, Your Honors.

8          JUDGE PROCTOR:  All right.  Any questions from the

9   panel?  All right.  Thank you.

10          You and your attorneys are welcome to -- you and your

11   colleagues are welcome to be in the courtroom during any public

12   matter.  There may be matters related to work product and/or

13   privilege that we will exclude you and others from, but we're

14   going to stay in public sessions.  It's just that if we're

15   dealing with work product matters, it's appropriate to do that

16   in a way that would not prejudice any party or any lawyer's

17   position in actual litigation.

18          MR. LACOUR:  Absolutely we understand, Your Honor.

19   Thank you.

20          JUDGE PROCTOR:  Thank you.

21          Next segment, as I indicated, will be to see if we can

22   categorize properly each person who's here.  We have already

23   been -- it's already been indicated to us that there are certain

24   decision makers and/or leaders who were involved in the actual

25   decision making.  And I know, counsel, you've already done this

 1   in the other room, just to give us a heads up so that we can be

 2   thinking about the next step, but I'm going to ask you to do it

 3   again.

 4            I'll call on Mr. Ragsdale and/or Mr. Capone to provide

 5   that information that you provided to us in Courtroom 2-E.  And

 6   that would be helpful to us and everyone here.  So the question

 7   is who were the decision makers in the Walker case.

 8            MR. RAGSDALE:  Okay.  And for the American Civil

 9   Liberties Union, James Esseks.  For the Cooley LLP group, that

10   was Kathleen Hartnett.  For Lambda Legal, that is Tara Borelli.

11   And for the Transgender Law Center, that was Lynly Egyes.

12            JUDGE PROCTOR:  All right.  Thank you.  And now for --

13            And Mr. Capone, you're still in agreement with all

14   that?

15            MR. CAPONE:  I agree.  Thank you, Your Honor.

16            JUDGE PROCTOR:  Thank you.  Now let's go to the

17   Ladinsky and Eknes-Tucker -- and I'm referring to those together

18   because it looks like we have a similar lineup of counsel who

19   appeared in those matters.  Fair?  All right.  So let's start

20   off with Lightfoot Franklin & White.

21            MS. EAGAN:  Your Honor, for Lightfoot Franklin & White,

22   the decision makers were Jeff Doss and then myself, Melody

23   Eagan.

24            JUDGE PROCTOR:  Thank you.  King & Spalding?

25            MR. SHORTNACY:  Your Honor, on behalf of King &

 1   Spalding, the decision makers were myself, Michael Shortnacy,

 2   and my colleague, Brent Ray.

 3           JUDGE PROCTOR:  Thank you.

 4           And Mr. Segall?  You're already at the podium.  Thank

 5   you.

 6           MR. SEGALL:  Your Honor, for the Human Rights Campaign

 7   Foundation, it would be Sarah Warbelow.  For the Southern

 8   Poverty Law Center, it would be Scott McCoy.  For the GLBTQ

 9   Legal Advocates and Defenders, it would be Jennifer Levi.  And,

10   Judge, for the National Center for Lesbian Rights, it would have

11   been Shannon Minter, legal director, who's not on the pleadings.

12           JUDGE PROCTOR:  All right.  Let me just do some

13   catching up.

14           Mr. Ragsdale, one follow-up question on the Walker

15   case.  You did not identify anyone from ACLU of Alabama

16   Foundation.  Is that because Esseks would have taken the lead

17   for both organizations?

18           MR. RAGSDALE:  Yes.  We do have a representative here

19   who, obviously, will answer any questions that the Court has for

20   ACLU Alabama.

21           JUDGE PROCTOR:  That was a question I had after we

22   reviewed that.  I just wanted to make sure that I understood

23   that.

24           All right.  I'm transferring notes from one page to

25   another, so I'm going to go back and make sure I understand the

1   decision maker for Cooley.  Tell me that one more time.

2              MS. HARTNETT:  Kathleen Hartnett, Your Honor.

3              JUDGE PROCTOR:  Thank you.  All right.

4              So what we want to do next is, starting with the Walker

5   case, get a list of individuals with knowledge but no input.

6   So, you know, typically I would think this would be younger

7   attorneys or attorneys that were not involved in the actual

8   decision making process, but who may have been on emails, phone

9   calls, any other digital or paper or any other communication

10  they would have been aware of regarding these subjects.

11             And I'm going to review these subjects for everyone's

12  benefit.  All right?  These are the things we're wanting to see

13  if you have knowledge about but perhaps no input about these

14  things:  Where to file a lawsuit.  Who to name as a plaintiff in

15  a complaint of a lawsuit.  Who to name as a defendant in a

16  lawsuit.  Any discussion about making a related case request.

17  Any discussion about or communication, I should say, about

18  transfer of a case.  Dismissal of a case.  Whether and/or where

19  to refile a case, even with a different party lineup or

20  different claims.  Coordination between the groups prosecuting

21  these cases and others.  Justice Department, any other

22  organization or people within your organization.  Any

23  discussions about judge assignments to these cases.  Any

24  discussions or communications or documents about intentions

25  and/or efforts to get a judge on a case or avoid a judge on a

 1  case.  Any communication about any of these subject matters with

 2  media or others outside of your organization, again, including

 3  the DOJ and/or other groups that were involved or input --

 4  having input in these matters.  And any discussions with -- and

 5  this is trying to broaden it out a little bit more -- other law

 6  firms, other lawyers, other advocacy groups about any of these

 7  matters.

 8          All right.  So understand that when I am listing these

 9  categories, these are in the broadest sense you can imagine.  If

10  you have a question about whether something is in or outside the

11  category, presume it's in.  All right?

12          Now, those are the categories we're asking about.  And

13  if you have no knowledge whatsoever about any of those

14  categories, and you took the oath earlier this morning, please

15  stand.

16     (No response)

17          JUDGE PROCTOR:  Okay.  Very well.

18          How about in the -- and that's in Ladinsky,

19  Eknes-Tucker, or Walker.  I'm going to put those together for

20  right now.  Anyone in either one of those cases, any of those

21  cases, who just, I have no knowledge about that.  I got sent to

22  the law library, and I did a legal memo.

23     (No response)

24          JUDGE PROCTOR:  Okay.  Not that we have law libraries

25  anymore, but you get my point.

 1          Okay.  Stand up in the Walker case.  If you're involved
 2  in the Walker case, you took the oath, and you had knowledge
 3  about those things but you had no input whatsoever into any of
 4  those decisions.  All right.  I'm going to ask each of you to
 5  come to the microphone.  Step on up, form a line.  And this is
 6  Walker only; correct?

 7          MS. MALITA PICASSO:  Yes, that's correct.

 8          JUDGE PROCTOR:  One group at a time.  All right.  So
 9  here's what I would like you to do.  I would like you to state
10  your name and tell us which of these subject matters that you
11  have knowledge about.  And please proceed in a way that we can
12  not only get it on the record, but get it in our notes so we'll
13  know how to treat you going forward.

14          MR. RAGSDALE:  I'm going to jump to defend only to say,
15  Judge, I wrote down those topics, but I'm not sure everybody
16  else has an effective list.

17          JUDGE PROCTOR:  All right.  Fair.  Fair.  Everyone
18  understands this.  We're looking into a number of decisions made
19  in this case that we have questions about; okay?  And
20  Mr. Ragsdale is, I think, on point, as he almost always is --
21  almost -- and that is, we're looking at where to file.  These
22  cases were filed in either the Northern District or the Middle
23  District.

24          Who to represent.  Each one of the cases had a slightly
25  different plaintiff lineup or maybe a substantially different

1  plaintiff lineup.

2       Who to sue.  Different defendants were sued in

3  different cases.  We're aware that there was a related case

4  designation in Walker.  We want to know about that, but we also

5  want to know whether there were any other discussions about

6  trying to list a related case in any of the other cases.

7       Discussions or information about dismissal of the

8  cases.

9       Refiling of a case, even if in a slightly or even

10 substantially different form.

11      Aware of any information about coordination between

12 these cases.  And when I mean coordination, I mean

13 communications about what's going on in our case, what's going

14 on in another case, and comparing notes.

15      Discussions about judge assignments, whether generally

16 or specifically.

17      Information about any intent or effort, any action

18 taken toward securing or trying to get assigned a certain judge

19 to a case or trying to avoid or miss the assignments of a judge

20 to a case.  And that would be prefiling or postfiling.

21      Any discussion about other groups that might have been

22 reached out to to join and be involved in these cases that for

23 whatever reason did not end up making an appearance in these

24 cases.

25      Any information about communications with the media

1  about any of these subject matters or discussions with other

2  lawyers, other firms, other entities, other advocacy groups,

3  including Department of Justice -- not that they're an advocacy

4  group but they're an entity -- about these matters.  And then I

5  would -- part of that also, being aware of any discussions or

6  information with people who did not make an appearance from your

7  organization but who were involved in any of these decisions.

8  All right?

9         That's what we're -- that's a pretty broad list of

10  things we're looking for.  We're not going to -- we're just

11  basically -- we would ask you in your own words to tell us your

12  name, your organization, and what you think you may have

13  information about.  And did we get a list up --

14         MS. MALITA PICASSO:  Yes.

15         THE COURT:  All right.

16         MS. MALITA PICASSO:  Thank you, Your Honor.  My name is

17  Malita Picasso.  I'm a staff attorney with ACLU National.  And

18  having just listened to the topics that you covered, I would say

19  I have knowledge about -- I don't --

20         How about this?  I can say what I don't have knowledge

21  about of those topics -- that might be a shorter list -- and did

22  not have input in any of the decisions.  But who to sue is a

23  topic that was made prior to my joining the case in March of

24  2022, which I guess was before it was even filed.

25         And I don't have any personal knowledge of any

 1  communications that occurred between any of our organizations

 2  and external organizations among the lists that you provided

 3  near the end of the list of the topics.  Any information that I

 4  have about that would have been received second or even third

 5  hand during large group meetings.

 6          JUDGE PROCTOR:  But that would be knowledge of what

 7  others -- how others characterized it; correct?

 8          MS. MALITA PICASSO:  Yes, I suppose that is accurate.

 9          JUDGE PROCTOR:  Yes.  And we're not -- at this point,

10  we're not applying specifically the Federal Rules of Evidence,

11  just to be clear.  If you have knowledge about it, we need to

12  know that.

13          MS. MALITA PICASSO:  Okay.

14          JUDGE PROCTOR:  Okay?  So what you're saying is you

15  have knowledge about everything else, or just knowledge about

16  those two things?

17          MS. MALITA PICASSO:  No, I don't have knowledge about

18  those two things.

19          JUDGE PROCTOR:  Everything else you have knowledge

20  about?

21          MS. MALITA PICASSO:  I would say yes.  There was

22  nothing that stood out as something that I --

23          JUDGE PROCTOR:  So you would have no specific knowledge

24  about who to sue, and no firsthand knowledge but perhaps some

25  second-hand or third-hand knowledge about coordination with

 1  external organizations.  Am I summarizing that correctly?

 2          MS. MALITA PICASSO:  To the extent that by the time I

 3  joined the team, there was, I guess -- yes.

 4          JUDGE PROCTOR:  You came in on the second --

 5          MS. MALITA PICASSO:  Yes.

 6          JUDGE PROCTOR:  All right.  Fair enough.  Any follow-up

 7  for --

 8          MS. MALITA PICASSO:  Malita Picasso.

 9          JUDGE WATKINS:  Ms. Picasso, exactly when did you join

10  the team?

11          MS. MALITA PICASSO:  Probably near the end of March of

12  2022.

13          JUDGE PROCTOR:  Thank you.  Appreciate that.

14          MS. SRUTI SWAMINATHAN:  Good morning, Your Honor.  I'm

15  Sruti Swaminathan.  I'm a staff attorney at Lambda Legal.  And I

16  am in a similar position as my cocounsel.  I have knowledge but

17  no input as to any of the topics that you listed, but definitely

18  have some knowledge as to where to file, who to name, related

19  case requests, transfer cases.

20          What I have no knowledge of is the decision to dismiss

21  the case.  I will be very transparent with the Court.  I was on

22  vacation during that weekend of Friday, Saturday, Sunday, so I

23  was not part of any conversations with my own counsel or with

24  the plaintiffs regarding dismissal.  What I also don't have

25  knowledge about is conversations with the other teams' legal

 1  counsel.  I also only joined Lambda Legal in the past year, so I
 2  have no personal relationships with any of the other
 3  organizations that were challenging this law, and so would not
 4  have been a part of any of those discussions or coordination
 5  attempts.  I have knowledge of judge assignments, but I do not
 6  have knowledge of communication with the media and have not
 7  myself spoken to anyone in the media.
 8          And please let me know if I've missed any of the topics
 9  that you've listed, but I think that about sums it up.
10          JUDGE PROCTOR:  All right.  Thank you.  Anything -- I'm
11  counting on my colleagues to jump in if they have questions.
12  Okay.
13          MS. SRUTI SWAMINATHAN:  Thank you so much.
14          MR. ANDREW BARR:  Good morning, Your Honors.  Andrew
15  Barr from Cooley LLP, an associate with the firm.  I understand
16  the general question to be what my role was in a broad sense.
17  And as the State mentioned, there was efforts about a year ago
18  to bring a lawsuit had that law been passed, and I was much more
19  directly involved there with drafting, legal research, things of
20  that nature.
21          When the law came back up this past year, I stayed on
22  the team, but it overlapped quite significantly with another
23  very fast-moving matter that I was on.  So I did have email
24  communication and was on some of the calls that the team had;
25  but in terms of day-to-day involvement with this most recent

1   effort, it was extremely limited.  I would have liked to have

2   been more involved with the team, of course, but just didn't

3   have the ability, given the other case.

4          JUDGE PROCTOR:  And so on those -- in that limited

5   involvement and limited emails and phone conferences, which of

6   these categories would you say you had information about

7   either -- any type of communication related to?

8          MR. ANDREW BARR:  Yes, Your Honor.  So decisions on who

9   to name, because that was largely discussed in the prior year's

10  effort.  Discussions about --

11         JUDGE PROCTOR:  Who to name in terms of defendants?

12         MR. ANDREW BARR:  Yes, Your Honor.

13         JUDGE PROCTOR:  Okay.

14         MR. ANDREW BARR:  And along with that was where to

15  file.  I was on one call where there was a discussion about

16  transfers of the case.  Beyond that, I have no knowledge of

17  communications with the media, DOJ, or other groups.  I,

18  frankly, wasn't aware of the other case until we were

19  consolidated with them.

20         JUDGE PROCTOR:  And you don't have any knowledge,

21  discussions, or emails about judge assignments or judge

22  assignment issues?

23         MR. ANDREW BARR:  There's a chance that there's emails

24  about it, but it's not anything that I was --

25         JUDGE PROCTOR:  Nothing that stands out in your mind as

1   you think about it today?

2           MR. ANDREW BARR:  No, Your Honor.

3           JUDGE PROCTOR:  All right.  Thank you.  And what was

4   your name again?

5           MR. ANDREW BARR:  Andrew Barr from Cooley.

6           JUDGE PROCTOR:  That's what I thought you said.

7           MR. ANDREW BARR:  Thank you.

8           JUDGE PROCTOR:  I know this is a little time consuming,

9   but I think this is actually going to save us time.  All right.

10  So thank you for your patience.  Everyone, thank you for your

11  patience on this.  Next.

12          MS. ELIZABETH REINHARDT:  Your Honor, my name is

13  Elizabeth Reinhardt.  I'm a second year associate with Cooley

14  LLP.  I was -- I attended calls that discussed where to file.  I

15  was a part of conversations about who to name as plaintiffs.  I

16  was not a part of any conversations or calls about who to name

17  as defendants.  I was a part of conversations and emails about

18  related case requests; conversations around transfer of a call.

19  Dismissal, kind of secondhand knowledge of conversations about

20  where to refile, if at all, and the consolidation efforts if at

21  all.  Slight -- I guess I would say very minimal conversations

22  around the judge assignments that we were given.  And then I

23  certainly wasn't a part of any media, DOJ, or conversations with

24  any of the other groups.

25          JUDGE PROCTOR:  So you say minimal information about

 1  judge assignments in general.  Would that include any efforts to

 2  have a judge assigned to a case or have a judge not to be

 3  assigned to a case?

 4          MS. ELIZABETH REINHARDT:  No, Your Honor.  As far as

 5  what we had put as the related matter, I was a part of

 6  conversations around Judge Thompson and then conversations about

 7  that we had been assigned to Judge Marks and we were being

 8  consolidated.  Just general who we might appear in front of.

 9          JUDGE PROCTOR:  That's helpful.  Thank you.

10          MS. ELIZABETH REINHARDT:  Thank you.

11          (Ms. Elizabeth Reinhardt excused.)

12          (Ms. Katelyn Kang present.)

13          MS. KATELYN KANG:  Good morning, Your Honor.  Katelyn

14  Kang, an associate from Cooley LLP.  I think similar to my

15  colleagues, I have knowledge about several of these issues but

16  no input on any of them.  I do not have direct knowledge on who

17  to name as plaintiffs.  I believe I may have been on vacation

18  when those discussions were happening.  But I do have knowledge,

19  I believe, on the other issues, with the exception of statements

20  to the media and communications with DOJ.

21          JUDGE PROCTOR:  All right.  That's helpful.  Thank you.

22          MS. ZOE HELSTROM:  Good afternoon, Your Honor.  My name

23  is Zoe Helstrom.  I am a first-year associate at Cooley LLP.

24          Similar to my colleagues, I have knowledge on many of

25  these matters but no input on any of them.  The matters I do not

 1  have any knowledge on were who to name as defendants and no

 2  knowledge on communication with other organizations, the DOJ, or

 3  any other firms.

 4          JUDGE PROCTOR:  That's helpful.  Thank you.

 5          MR. ADAM KATZ:  Thank you, Your Honor.  Adam Katz, I'm

 6  a fourth-year associate with Cooley.

 7          I joined the case team I believe two to three weeks

 8  before the lawsuit was filed.  I have some knowledge about many

 9  of these topics, but, again, no input on final decisions.  The

10  topics I have no knowledge on, direct or indirect, were who to

11  name as plaintiffs or defendants, coordination with the DOJ, and

12  communications with the media, DOJ, or any other groups.

13          JUDGE PROCTOR:  Thank you.

14          MR. ROBBY SALDANA:  Hello, Your Honors.  My name is

15  Robby Saldana.  I'm an associate with Cooley LLP.

16          I joined the Walker team at the end of March 2022, so a

17  few weeks before the Walker complaint was filed.  In terms of

18  knowledge, I have knowledge around the related case requests,

19  transfer of a case, some minimal knowledge around communications

20  with DOJ, communications, conversations around judge

21  assignments.  And those are my categories of knowledge.

22          JUDGE PROCTOR:  All right.  So the others would be you

23  have no present recollection of the other matters, then.

24          MR. ROBBY SALDANA:  Correct.

25          JUDGE PROCTOR:  All right.  Fair enough.  Thank you.

1          MR. MILO INGLEHART:  Good afternoon, Your Honors.  My

2    name is Milo Inglehart.  I'm a staff attorney with the

3    Transgender Law Center.  I had no knowledge of discussions of

4    where to file and who to name as plaintiffs and defendants.  The

5    Transgender Law Center joined about a month or so before the

6    bill passed and became a law that we're challenging.

7          JUDGE PROCTOR:  If you could speak a little more

8    directly.  I know you're wearing a mask, but you don't -- you

9    can leave it on, but just make sure you're getting all the way

10   into the microphone.

11         MR. MILO INGLEHART:  That's much better.

12         JUDGE PROCTOR:  Repeat what you just said, if you

13   wouldn't mind.

14         MR. MILO INGLEHART:  The Transgender Law Center joined

15   this case about a month before the bill passed in 2022, so I was

16   not part of the discussions about who to name as plaintiffs or

17   defendants.  I had some knowledge of the transfer of a case, the

18   related case request.  I was out of the office on the Friday

19   when dismissal was discussed, so I do not have knowledge of

20   that.  I have some secondhand knowledge of a discussion about

21   whether to refile.  I have some secondhand knowledge about

22   coordination between other groups and DOJ.  I have some

23   knowledge of general discussions of judge assignments; who we

24   had gotten.  I have no knowledge of intentions or efforts to get

25   or avoid a judge.  I have some knowledge of communication with

1   media, DOJ, or other outside groups.  Thank you.

2           JUDGE PROCTOR:  All right.  But to be clear, you do

3   have minimal knowledge about discussions regarding judicial

4   assignments, but no information about any efforts or intent to

5   take actions to have a certain judge assigned to a case or

6   judges not assigned to the case, to avoid certain judges?

7           MR. MILO INGLEHART:  I know that we checked off a

8   certain judge on the cover sheet.

9           JUDGE PROCTOR:  Yes.

10          MR. MILO INGLEHART:  Beyond that --

11          JUDGE PROCTOR:  All right.  Thank you.

12          MR. DALE MELCHERT:  Good afternoon, Your Honors.  I'm

13   Dale Melchert.  I'm a staff attorney at the Transgender Law

14   Center.

15          My involvement in the case began approximately the

16   first week of April.  While TLC had joined the case a few weeks

17   prior, my immediate involvement didn't begin until then.  I do

18   not have knowledge about who to name as defendants in the case.

19   That was already decided when I joined.

20          JUDGE PROCTOR:  Same with plaintiffs?

21          MR. DALE MELCHERT:  With plaintiffs I believe there

22   were some discussions in meetings that I participated in around

23   potential plaintiffs, but it was -- there was not much

24   discussion.  I do not have firsthand knowledge about the

25   dismissal.  I was out of the office on Friday the 15th, and my

1  supervisor informed me after the fact.  I also had secondhand

2  knowledge of coordination with the other groups but not

3  firsthand knowledge, and I have no knowledge of any discussions

4  with the media.

5       JUDGE PROCTOR:  Any knowledge about judicial

6  assignments or efforts to draw or have assigned or avoid judges?

7       MR. DALE MELCHERT:  To the extent that we believed our

8  case to be related and checked off the related box with Corbett,

9  and there were -- I also am aware of some emails that went

10 around when we did receive assignments and our alarm at that

11 because we were surprised and hadn't fully understood the

12 process of relating a case.  And so it was unexpected for us.

13 So there was minimal email --

14      JUDGE PROCTOR:  What was unexpected for you?

15      MR. DALE MELCHERT:  I believed that there are no -- no

16 rules on how to relate a case.  And I learned secondhand through

17 a meeting that somebody on our team called the clerk and was

18 instructed that what we should do is check it as related to

19 Corbett and file a motion accordingly.  And so that's how we

20 proceeded.

21      JUDGE PROCTOR:  All right.  Thank you.

22      All right.  So we have 10 lawyers in the Walker case

23 that we've just identified.  Let's go through the same process

24 in the Ladinsky, Eknes-Tucker cases.  We've already learned that

25 everyone here has some knowledge, but perhaps you had no input.

 1    And so we're going to do the same thing in the Ladinsky-Walker

 2    case, and then we'll come back to who had input in both sides of

 3    the cases in a moment.

 4         But we're going to start off with Ladinsky,

 5    Eknes-Tucker.  If you had knowledge about any of these subject

 6    matters but no input about the decisions to be made in those

 7    areas, please stand.

 8         All right.  And let's follow the same protocol.  Please

 9    come to the microphone.  And you will, as just occurred,

10    announce yourself, tell us your organization, and tell us what

11    information you have and do not have.

12         MR. ANDY PRATT:  Good morning, Your Honors.  My name is

13    Andy Pratt with King & Spalding.  I'm a partner.

14         As context for my level of involvement, I have not been

15    as actively involved in this matter as I had hoped because I've

16    been dealing with an ill family member.  So I've been on emails

17    and limited calls.

18         With respect to the subjects, I would say I have some

19    knowledge about where to file, who to name as a plaintiff, who

20    to name as a defendant.  No discussions about related case

21    requests.  That didn't occur in any of our cases.  Same with

22    transfer.  Some knowledge about dismissal.  Some knowledge about

23    whether and where to refile.  Some knowledge about coordination

24    with other organizations in that, you know, there are many

25    organizations on our cases.  Beyond that group of lawyers that

1  was on the pleadings, not much knowledge about that.  Judge

2  assignment, I have knowledge about the judges that were assigned

3  to the various cases.  Intentions or efforts to get a judge on a

4  case or avoid a judge, no knowledge of that.  Communication with

5  media or others outside the organization, very little knowledge.

6  Aware that statements had been made but very little knowledge

7  beyond that.

8            JUDGE PROCTOR:  All right.  Thank you.

9            MS. JESSICA STONE:  Hello.  I'm Jessica Stone.  I'm a

10 staff attorney at Southern Poverty Law Center.  I am -- along

11 with the other people, I have knowledge of some of these

12 matters, mostly secondhand, and no input on any decision making.

13 To the extent that I am copied on emails that tend to go to the

14 whole team of all the lawyers that are on the pleadings, and I

15 attend some -- most internal calls.  I was never on any calls

16 with anyone -- any attorneys -- anyone from the Walker team, and

17 I believe I was on one call with DOJ after the filing of

18 Eknes-Tucker.  Actually, I believe it might have even been after

19 they filed their motion to intervene in Eknes-Tucker, so nothing

20 prior to that.  Regarding plaintiffs and defendants, I have

21 knowledge of one plaintiff in the Eknes-Tucker case.  I have no

22 knowledge of any -- other than -- no firsthand knowledge of any

23 other plaintiffs in the Ladinsky case or any of the --

24            JUDGE PROCTOR:  Which plaintiff was that?

25            MS. JESSICA STONE:  The plaintiff Cathy Noe and her son

1   Christopher Noe.

2          JUDGE PROCTOR:  Those are pseudonyms?

3          MS. JESSICA STONE:  Those are pseudonyms.  Yes.

4          JUDGE PROCTOR:  Where -- without revealing their

5   identity, where do they reside?

6          MS. JESSICA STONE:  I believe Lee County.  They are

7   plaintiffs in Eknes-Tucker.  So I have participated in calls

8   with that plaintiff.

9          JUDGE PROCTOR:  That's all I need.  Thank you.

10          MS. JESSICA STONE:  Regarding who to name as

11   defendants, I might have been on emails, just about the -- just

12   identifying who is properly corresponding with the counties that

13   we have plaintiffs in, but no decision making.  No plans around

14   those defendants.  I have no knowledge of a related case or

15   request or transfer of a case, which I don't believe happened in

16   our matter.

17          Regarding dismissals, I would be copied on emails

18   regarding that decision, but I would have only read them after

19   the fact, and I was not on any calls.  I stopped working

20   early -- I'm based on the east coast, and I stopped working

21   early on that Friday the 15th, probably around three, four p.m.

22   east coast time, so this all happened afterwards.  And so I was

23   copied on those emails, but I only read about the decisions

24   after the fact.  And I was not on anything -- same thing with

25   anything that happened over the weekend.  I didn't find out

 1    about it until Monday morning.  So that would include the

 2    whether and where to refile.  All of those decisions I believe

 3    happened over the weekend, and so I found out about them after

 4    the fact, though I have been concurrently -- contemporaneously

 5    copied on emails.

 6              Regarding coordination between groups and the DOJ --

 7              JUDGE PROCTOR:  You just said you were on that one call

 8    with DOJ?

 9              MS. JESSICA STONE:  I was on one call with DOJ I

10    believe after they filed the motion to intervene in the

11    Eknes-Tucker case.

12              JUDGE PROCTOR:  Did judges come up at all during

13    that --

14              MS. JESSICA STONE:  No.  This was after -- this was

15    already after we were -- filed our -- I think the PI hearing had

16    already been scheduled.

17              JUDGE PROCTOR:  Fair enough.  That's helpful.  Thank

18    you.

19              MS. JESSICA STONE:  And judge assignments, only -- I

20    think I might have been present on calls where people discussed

21    thoughts on the judges we had been assigned, but I have no

22    knowledge of any efforts to avoid or get a particular judge.

23    And communications with media or other groups, I may have been

24    copied on emails just on general media strategy, but nothing

25    specific to any particular press releases or statements.

```
1              JUDGE PROCTOR:  Thank you.

2              MS. AMIE VAGUE:  Good morning, Your Honors.  My name is

3   Amie Vague.  I'm an associate at Lightfoot Franklin & White.  I

4   have knowledge on some of these topics but no input on them.

5   And I'll run through the topics that I do have some knowledge

6   on.  I have some knowledge on where to file, who to name as

7   plaintiffs, who to name as defendants, discussions about

8   dismissals and refiling, judge assignments in general.  And very

9   little knowledge but was probably copied on some emails about

10  media communications.

11             JUDGE PROCTOR:  Okay.  And you went quick there, so let

12  me --

13             MS. AMIE VAGUE:  Okay.

14             JUDGE PROCTOR:  Where to file, who to name, both

15  plaintiff and defendant?

16             MS. AMIE VAGUE:  Yes, Your Honor.  Discussions about

17  dismissals and refiling.

18             JUDGE PROCTOR:  Right.

19             MS. AMIE VAGUE:  I also have some knowledge about judge

20  assignments and discussions around that.

21             JUDGE PROCTOR:  Okay.

22             MS. AMIE VAGUE:  And I have some knowledge around

23  communications regarding media strategy.

24             JUDGE PROCTOR:  Okay.  And when you say judge

25  assignments, would that be the two categories?  One, we're
```

 1   curious about discussions about judge assignments; but also,

 2   drilling down a little bit more, discussions about efforts to

 3   draw or have a certain judge assigned to a case or efforts to

 4   avoid a certain judge.  Anything in those areas?

 5        MS. AMIE VAGUE:  No, Your Honor.  I have no knowledge

 6   of an effort to draw a particular judge or avoid a particular

 7   judge.  I just mean that I have knowledge about judge

 8   assignments in general.

 9        JUDGE PROCTOR:  That's the distinction we're trying to

10   draw.  Thank you.

11        MS. AMIE VAGUE:  Understood.

12        JUDGE PROCTOR:  All right.  Thank you.

13        MS. AMIE VAGUE:  Thank you.

14        MS. MISTY PETERSON:  Good morning, Your Honors.  My

15   name is Misty Peterson.  I'm an attorney at King & Spalding in

16   Atlanta, Georgia.

17        Like the others that have preceded me, I have some

18   knowledge but had no input into the decisions made in these

19   matters.  The subjects in which I do have some limited

20   knowledge --

21        And if I may, for context, my role in this matter has

22   primarily dealt with working on the preliminary injunction and

23   working with experts.  So I do have some knowledge about where

24   to file the lawsuit, who to name as plaintiffs, who to name as

25   defendants.

1        The day that the cases were dismissed, I was actually

2   handling an emergent matter for a nonpro bono client, so I

3   mostly learned about that after the fact.

4        I may have some knowledge about whether or if to refile

5   the case.  Possibly coordination between the groups.  And was

6   aware of the general discussion about judge assignments but not

7   aware of any efforts to get or avoid any judge.  No knowledge of

8   any communications about any -- well, I guess I was aware that

9   there may be some media statements, because it's a high-profile

10  matter, but I was not involved in any of that and not involved

11  in any discussions with any outside groups about any of these

12  matters.

13       JUDGE PROCTOR:  Okay.  Thank you.  That's helpful.

14       MR. ADAM REINKE:  Good morning, Your Honors.  Adam

15  Reinke from King & Spalding.

16       Construing these subjects broadly and construing

17  knowledge broadly, I probably have knowledge about all or

18  virtually all of the categories, but I will provide a little

19  more context on some of the categories where I don't have as

20  much knowledge.

21       First is the related case request.  We did not do a

22  related case request -- we did not designate a related case, to

23  my knowledge, in Eknes-Tucker or the Ladinsky matter.  I am

24  aware that the Walker case, the civil cover sheet indicated that

25  there was a related case.  And I do recall about two years ago,

1  in 2020, when the Alabama Legislature was first considering

2  passing a similar bill, doing some research on the related case

3  doctrine at that time.  But, again, that was in 2020.

4         As to the events that occurred on April 15th, I

5  received emails on that day that probably relate to these

6  subject matters.  I was taking a deposition in another matter on

7  that day in Florida and then traveling back from Florida to

8  Atlanta where I live, and so I didn't participate in any

9  discussions with cocounsel on April 15th that I can recall at

10  this time.  And I don't recall specifically responding to any of

11  those emails.  I think I read them at some point, but that may

12  have been after the events in question already occurred.  With

13  respect to the media communications, I'm aware that those

14  communications occurred, but I have not personally spoken with

15  the media and I was not personally involved in any decisions or

16  any discussions that took place prior to any statements being

17  made to the media.  And with respect to discussions with other

18  firms or advocacy groups, I don't recall ever participating

19  personally in any discussions or communications with any firm or

20  attorney other than the groups that have appeared in the

21  Ladinsky and Eknes-Tucker cases.  So I don't believe I

22  personally participated in any discussions with the DOJ or

23  anybody associated with the Walker case.

24         JUDGE PROCTOR:  Thank you.

25         MR. GILBERT OLADEINBO:  Good morning, Judges.  My name

1   is Gilbert Oladeinbo, and I'm an associate at King & Spalding's

2   Atlanta office.

3          I do have some knowledge but no input on the following

4   subjects:  Where to file a lawsuit, who to name as a plaintiff

5   in a lawsuit, who to name as a defendant, any discussion about

6   related case requests, dismissal of the case, whether or where

7   to refile a case, coordination between groups, excluding the DOJ

8   communication, judge assignments generally to these cases, and

9   some information -- secondhand information about media

10  engagement.

11         But I do not have any knowledge about the following:

12  About any discussion on transfer of a case, about any intentions

13  or efforts to get a judge or to avoid a case, any discussions

14  with other law firms, advocacy groups, etc., about these issues.

15  Thank you.

16         JUDGE PROCTOR:  Thank you.  Very succinct.

17         MS. ABIGAIL TERRY:  Good afternoon, Your Honors.  My

18  name is Abigail Terry.  I believe I was Abigail Hoverman on the

19  original Ladinsky case.  I've since been married and changed my

20  name, so I apologize for that confusion.

21         I have been involved --

22         I'm an associate at King & Spalding.  Excuse me.

23         I've been involved with this matter since the Alabama

24  Legislature was considering the bill in 2021, so I have some

25  very broad secondhand knowledge about virtually all of the

1  topics, like Adam discussed, my colleague.  However, I had no

2  input or decision making authority on any of those issues.  My

3  primary focus on the case has been the legal arguments and the

4  preliminary injunction motion.  I was a part of a phone call

5  on -- you know, when the issue of dismissal came up.  I, again,

6  had no input on that call.  And I was involved in the same call

7  that I believe my colleague Jessica mentioned with DOJ after

8  the -- DOJ had already moved to intervene in the case.

9          JUDGE PROCTOR:  Thank you.  And give me your last name

10  again.

11          MS. ABIGAIL TERRY:  It's Terry.  T-E-R-R-Y.

12          JUDGE PROCTOR:  Thank you.  And congratulations.

13          MS. ABIGAIL TERRY:  Thank you.

14          MR. SCOTT MCCOY:  Good afternoon, Your Honors.  My name

15  is Scott McCoy.  I'm the interim deputy legal director at the

16  Southern Poverty Law Center.

17          I don't fall into this category.  I just want to

18  apprise you of the fact that my colleague Diego Soto, who has

19  been excused today, would fall into this category.  And I can't

20  speak to his knowledge on any of the particular categories, but

21  I just wanted you to at least know that he falls into this

22  category.

23          JUDGE PROCTOR:  All right.  Thank you.  Hope

24  everything's well with his family.

25          MR. CAPONE:  Your Honor, I would proffer the same as to

 1  the two associates who were excused who also have knowledge --

 2          JUDGE PROCTOR:  Veroff and Del Toro?

 3          MR. CAPONE:  Yes, Your Honor.

 4          JUDGE PROCTOR:  Okay.  I think that's helpful to us.

 5          MR. ESSEKS:  Just retrieving the list, Your Honor.

 6  List retrieved.

 7          JUDGE PROCTOR:  All right.  We're going to break for

 8  lunch for about 30 minutes.  I know that challenges everyone.

 9  We understand if you're providentially hindered, but let's try

10  to be back in 30 minutes; all right?  And we will resume the

11  hearing at that point.

12      (Recess was taken from 12:05 p.m. until 12:53 p.m., after

13        which proceedings continued, as follows:)

14          JUDGE PROCTOR:  Have a seat.  All right.  We're going

15  to proceed on to what we view as the next segment of the

16  hearing, and that is actually obtaining information from people

17  about these issues that we've assembled to inquire about.  We

18  have a process we're going to use I'll describe in more detail

19  in a moment.

20          The first thing I want to make sure everyone

21  understands is this:  This is a serious matter, but it's not so

22  serious that anyone is -- and I'm using this colloquially, no

23  one is going to jail, no one is losing a law license over this,

24  unless you mislead us.  Okay?  So we're just making sure

25  everyone understands that that's our view.  Our view is these

1  are serious matters.  They need to be inquired about.  If things

2  occurred, we will deal with those fairly and appropriately.  But

3  the worst thing you could do is mislead us and not be candid

4  with us.

5          We're going to invoke a modified version of the rule,

6  which means that if you're in the -- we're only going to have

7  people in the courtrooms who will be answering questions, and

8  you are not to reveal the questions you're asked or the answers

9  you give to anyone else, period.  Everyone understand that?

10 Okay.

11         And we're going to -- I said courtrooms intentionally,

12 because we're going to run two tracks.  Justice Harwood is going

13 to take the young lawyers -- or I shouldn't say young lawyers,

14 not all of you are young, but the ones who just identified

15 themselves as having knowledge but no input into these -- and

16 he's going to interview you with a court reporter in whatever

17 format he deems appropriate.  Everyone else will stay here, and

18 we'll give you directions about how we're going to proceed in

19 this courtroom.

20         Justice Harwood, anything that I did not cover that you

21 would just like to cover with the entire group?

22         JUSTICE HARWOOD:  Well, based on the -- and I assume

23 I'm functioning basically -- I understand --

24         And I think you can all hear me.  That was one thing on

25 all of my reports going through school:  He talks loud in class.

1  So if you can't hear me and need to have something repeated, let

2  me know.

3           But my charge as a special master that the Court has

4  asked me on very short notice if I could come in and be involved

5  in this, would be this:  The Court has asked me as I interview

6  each of you who earlier identified yourself as someone with

7  knowledge of varying degrees but no decision making input, that

8  cohort of people, we will all go separately into here.  We'll

9  have you quarantined off out in the hall in little separate

10  rooms to the side, and I'll bring you in one at a time or the

11  clerk will bring you in one at a time.

12           My charge from the Court is to first instruct you or

13  admonish you that the Court has asked me with respect to each of

14  you that among other things, I am to report back my impression

15  of your candor and your forthrightness in answering questions.

16  That is what the Court has asked me to look into, among other

17  things.  This is not a lie detector test process, but it is a

18  situation where I'll try to gauge how forthcoming and forthright

19  are you being in giving me the response to the questions that I

20  am going to ask, based on what the Court has asked me to probe

21  into.

22           The next thing I'll be asking, if any of you received

23  any instructions or special coaching on what you're supposed to

24  say in this hearing today.  That is, you're a subordinate lawyer

25  perhaps or a younger lawyer; old lawyers may have gotten with

1  you; there may have been a prep session of some sort.

2  Regardless of how that may have unfolded, were you told certain

3  things you should say or coached about what you should or should

4  not say.

5          The third thing -- and this will be the critical

6  question that I'll be asking -- what information or knowledge do

7  you have from any source whatsoever, second hand, third hand,

8  whatever, what information do you have that relates to evidence

9  or decisions to try to get or draw a particular judge for a case

10  or to try to avoid having a particular judge sit on the case,

11  whether filed or refiled.  And, again, those are not original

12  cases, meaning that is what the Court has asked me to inquire

13  into, so that's what I'll be trying to do.  And that last

14  question, of course, is the most important; that is, what

15  information do you have or knowledge do you have about any

16  efforts, decisions, or activities that were designed or aimed at

17  either drawing or getting a particular judge assigned to a case

18  or avoiding or eliminating through any means a particular judge

19  sitting on a case.

20          Judge, if that covers the waterfront, fine.

21          JUDGE PROCTOR:  Yes.

22          Mr. Cooley?  I'm sorry.  Mr. Capone from Cooley.

23          MR. CAPONE:  Your Honor, I'll just say, we didn't

24  expect that all of the junior lawyers would be put under oath

25  and individually questioned today.  And it's totally

1  appropriate, but there aren't -- they might have prepared more

2  to be here, sought counsel if they thought they needed counsel.

3  I don't think they do, but we didn't consider any of that

4  because we weren't necessarily expecting this process today.  In

5  fact, I had been told nobody would be put under oath.

6         JUDGE PROCTOR:  Who told you that?

7         MR. CAPONE:  I think --

8         MR. RAGSDALE:  Thanks, Russell.

9         I had a brief discussion with one of the Court's law

10  clerks in which I said, does the Court anticipate sworn

11  testimony?  And at that point, I was told that they did not

12  anticipate that.  Frankly, I did not -- I'm not relying on

13  that --

14         JUDGE PROCTOR:  That was probably one of my law clerks

15  that you talked to.

16         MR. RAGSDALE:  It was.

17         JUDGE PROCTOR:  And she's not been involved in this.

18         MR. RAGSDALE:  I understand.  And this process is as

19  the Court directs it, and --

20         JUDGE PROCTOR:  That's right.

21         Mr. Capone, I'll be quite candid with you, as I expect

22  you to be candid with us.  I don't understand why you had any

23  expectation or why anybody would have any expectation that they

24  would come in here and not have to give candid responses to the

25  Court's questions.  The whole point was we're making an inquiry.

1          Now, could we have done this as officers of the Court?
2     Well, not everyone here is necessarily an officer of our court.
3     Some are here on a pro hac vice admission.  They don't take the
4     same oath that our officers take, and they may or may not have
5     the same obligations our officers have.  So that -- the oath was
6     not to do anything other than just to make sure there's candor;
7     okay?
8          The second thing I would say to you is we are
9     proceeding as best we can with the circumstances that have been
10    presented to us.  And I probably should have emphasized this at
11    the beginning of the hearing and did not, so let me be clear.  I
12    would rather be held down and be beaten with an aluminum bat
13    than sit here doing this with lawyers who I greatly respect.
14    Greatly respect because they have the honor of being respected
15    unless they disabuse that privilege.  All right?  So none of us
16    are taking any type of satisfaction or joy in this, but we do
17    have a job.
18         And I think I did say earlier, every district judge in
19    the state agrees that an inquiry needed to be made, and to some
20    degree they've largely left it to us about how to perform that
21    inquiry.  We're doing the best we can.  All right.  Any other
22    questions?
23         MR. CAPONE:  I understand that, Your Honor.  Can I be
24    present with the associates as they're --
25         JUDGE PROCTOR:  Nope.

1           MR. SEGALL:  Your Honor, I just want to make certain.

2    As with any client I've ever had in my lifetime, I've had

3    attorney-client privileged communications with every one of --

4           JUDGE PROCTOR:  We're not going to be asking about any

5    of the communications with anyone who's appeared in a

6    representative capacity.

7           MR. SEGALL:  Okay.  Well, that -- Justice Harwood just

8    mentioned, I'm going to ask whether you've had any conversations

9    about facts and testimony, and I've discussed facts with every

10   lawyer I represent.

11          JUDGE PROCTOR:  I expect you would.  No.  But what

12   we're -- I think what Justice Harwood -- and I listened to him,

13   and I think he appropriately made this point.  It's not what

14   counsel have discussed, it's what colleagues have discussed.

15   We're more concerned with what --

16          MR. SEGALL:  Thank you, Judge.

17          JUDGE PROCTOR:  Look, you understand why we would ask

18   that question.  These are young lawyers, and we want to make

19   sure we're just getting the unvarnished, transparent, candid

20   responses to these questions.

21          MR. SEGALL:  I'm fine with that, Your Honor.

22          JUDGE PROCTOR:  And, you know, I would say this.  They

23   are probably held to a lower standard than senior lawyers in

24   these areas, but they still have -- they have no difference in

25   the duty of candor.  There's no difference there.

1          MR. SEGALL:  Yes, sir.

2          JUDGE PROCTOR:  Okay?  So to be clear, Justice Harwood

3    has no intention of asking about any communications anyone has

4    had with your lawyer or your firm or organization's lawyer.

5          MR. RAGSDALE:  And just so the record is clear, I also

6    talked to my clients about what we anticipated in terms of

7    questions that would be asked and what those facts were.  And we

8    did that both in an effort to make sure that we had all the

9    facts and that there were not some discrepancy that we didn't

10   know about.

11         JUDGE PROCTOR:  Sure.

12         MR. RAGSDALE:  In addition to that, that was done

13   collaboratively --

14         JUDGE PROCTOR:  Here's the advantage you have.  All

15   three of us practiced law before we did this.  We understand

16   what your responsibilities and activities would have been, and

17   we're not trying to get into the middle of those.

18         MR. RAGSDALE:  I just wanted to make sure Mr. Segall

19   wasn't the only one who said he prepared his clients.

20         JUDGE PROCTOR:  No, not at all.

21         But, again, this is a nonadversarial -- and I'm

22   emphasizing that when it comes to young lawyers, they ought to

23   understand this.  They're not in any way going to be held to the

24   same standard as senior lawyers if there was some type of

25   inappropriate behavior.  We've all been young lawyers, too.  I

1  can even remember back that far.  But there is no distinction,

2  no variation, in the responsibility to tell the truth and be

3  transparent.  And that -- there is no distinction between senior

4  and junior lawyers, very involved lawyers and less involved

5  lawyers when it comes to telling what you know and doing it

6  candidly, forthrightly, and honestly.

7           MR. RAGSDALE:  Thank you, Your Honor.

8           JUDGE PROCTOR:  Okay.  All right.  Everyone understand

9  how we're going to proceed?  All right.

10          If you identified yourself as being in this category of

11 knowledge but no input, then you can go to Courtroom 2-E, and

12 Justice Harwood will give you instructions from there.

13          JUDGE WATKINS:  Mr. Segall, we had a question.  Is

14 Mr. Minter -- I think -- I don't remember getting the first

15 name.  Is Shannon Minter in the courtroom today or hearing

16 today?

17          MR. SEGALL:  He's not, Your Honor.  If you need him

18 available at some point, I can get him available.

19          JUDGE WATKINS:  Thank you.

20          MR. SEGALL:  May I raise one other point?

21          JUDGE PROCTOR:  You may.

22          MR. SEGALL:  I don't believe I've ever been in a court

23 proceeding where my client gets questioned and I'm not present

24 at the time my client is questioned.  Is that appropriate?

25          JUDGE PROCTOR:  Well, let me ask you this:  Can you be

1    in two places at one time?

2          MR. SEGALL:  That was the exact problem I was thinking

3    of.

4          JUDGE PROCTOR:  Yes.

5          MR. SEGALL:  No, obviously, I can't.

6          MR. RAGSDALE:  We can.  We have two lawyers.  I have

7    the same concerns Mr. Segall does.  Not about these young

8    lawyers being forthright and candid, but the fact that they will

9    be questioned without their counsel present.  And I understand

10   this is not an adversarial proceeding, I understand this is

11   unlike many proceedings I've been involved in, but we do have a

12   lawyer who would like to be present.  Not to say anything, not

13   to coach anybody, but to --

14         JUDGE PROCTOR:  Well, what role would the lawyer have

15   if he's not going to say anything, not going to coach anyone, or

16   in any way insert himself into the questioning?

17         MR. RAGSDALE:  We have talked previously about the fact

18   that some of these questions may impinge on the attorney-client

19   privilege.  That to me would be a legitimate objection for

20   Mr. Capone to be able to interject on behalf of our clients if a

21   question is posed, probably inadvertently, by Justice Harwood

22   that would produce an attorney-client privilege communication.

23   Those lawyers may be able to do it themselves, but I, frankly,

24   think that's -- that should be the role of counsel, to be able

25   to say --

```
1              JUDGE PROCTOR:  Isn't that concern addressed by this?
2    That there's going to be a record made of this proceeding, it's
3    not going to be available to anyone else, and counsel will have
4    a chance to review it and ask to redact any such question or
5    answer that you think invades on an attorney-client privilege?
6    And the fact that we have Justice Harwood, who understands the
7    attorney-client privilege, and we've just said in front of him
8    that he's not going to go into attorney-client privilege
9    matters.  Wouldn't that be a double protection against your
10   concern?
11             MR. RAGSDALE:  It is certainly some protection, yes.  I
12   don't think anything replaces, frankly, a lawyer sitting there
13   protecting your interests and having the ability to object.  I'm
14   responding primarily to the fact that you were able to blunt
15   Mr. Segall by the fact that he's only one.  We have two.  So,
16   you know -- I mean, this, obviously, is a very unusual
17   proceeding.
18             JUDGE PROCTOR:  It is.
19             MR. RAGSDALE:  I am not afraid of any answer that those
20   young lawyers are going to give.  But by the same token, once
21   they answer a question that might be privileged, that cat's out
22   of the bag.
23             JUDGE PROCTOR:  No, it's not.
24             MR. RAGSDALE:  Okay.  Because it's a special bag?
25             JUDGE PROCTOR:  Because it's a special bag, among other
```

1   things.

2          MR. RAGSDALE:  Okay.  I personally would rather get on

3   with the process than argue about this anymore, so I appreciate

4   your time.

5          JUDGE PROCTOR:  Well, I appreciate you stepping up for

6   your client, both of you.

7          MR. SEGALL:  Your Honor, one last matter.  I very much

8   appreciate your speaking into the microphone.

9          JUDGE PROCTOR:  Oh, absolutely.

10          MR. SEGALL:  That's why I'm standing over here.

11          JUDGE PROCTOR:  Barry and I used to practice together,

12   and he's surprised that -- he and the other people I practiced

13   with would be surprised that I'm not hurt, because they used to

14   tell me I had to close my door and they had to close their

15   doors, or else they'd bill my file because they couldn't think

16   about anything else.

17          MR. RAGSDALE:  You've gotten a little quieter as you've

18   gotten on the bench, I think.  Thank you, Your Honor.

19          JUDGE PROCTOR:  Thank you.

20          All right.  What we're going to do next is a

21   continuation of the exercise we've already begun, but this time

22   we're going to have you stand if you were not a decision maker

23   but have knowledge and input into the matters we've been

24   inquiring about.

25          Okay.  I see six people standing, if I'm counting

1 correctly.  Same direction.  Please come to the microphone.  And

2 as we walk through this process, identify yourself, your

3 organization, and tell us what topics -- and do we have the

4 topic list there handy?  What topics that you have given input

5 about, and then tell us the topics that you do not have any

6 knowledge about.  We'll go at it that way.

7           MR. CARL CHARLES:  Thank you, Your Honor.  Could you

8 repeat that instruction again for me, please?

9           JUDGE PROCTOR:  I'll be glad to.

10           Because you have had input and knowledge on some of

11 these matters, it seems to me a logical way to approach this

12 would be tell us your name, your organization, and then two

13 categories:  What did you have input on and what do you not have

14 knowledge about.  So that way we can quickly get to what you

15 have knowledge about and what you gave input about.

16           MR. CARL CHARLES:  If you'll forgive me, the follow-up

17 question, Your Honor, provided that we have knowledge about each

18 of these matters --

19           JUDGE PROCTOR:  Then you would say, I have knowledge

20 about all the matters, and I had input into the following.

21           MR. CARL CHARLES:  Thank you.  So to begin, my name is

22 Carl Charles.  I'm a senior attorney with Lambda Legal.  I was

23 part of the Lambda Legal contingent that was looking into

24 potentially filing this matter in 2021 for a differently

25 numbered and named senate bill.  So I had knowledge of and input

 1   about where to file; about who to name as plaintiffs.  I had

 2   knowledge of who to name as defendants but not input into the

 3   decision --

 4          JUDGE PROCTOR:  This is going to make it easier on us.

 5          MR. CARL CHARLES:  Yes, sir.  I'm sorry.

 6          JUDGE PROCTOR:  Divide those up.  What did you have

 7   input into?  Let's start there.

 8          MR. CARL CHARLES:  Okay.  So I had input into where to

 9   file, who to name as plaintiffs, discussions about relating our

10   case, the transfer of the case, the dismissal of the case,

11   discussions of whether or where to refile.

12          Your Honors, can I make sure I have the question list

13   right?  What do you have written down as the next subject?

14          JUDGE PROCTOR:  Coordination of cases.

15          MR. CARL CHARLES:  As between our case, Walker --

16          JUDGE PROCTOR:  As between your case and the other case

17   or cases.

18          MR. CARL CHARLES:  Okay.  So --

19          JUDGE PROCTOR:  You're in the Walker case?

20          MR. CARL CHARLES:  Yes, sir.

21          JUDGE PROCTOR:  So what coordination occurred with

22   Ladinsky and perhaps with Eknes-Tucker?

23          MR. CARL CHARLES:  So input there as well.  I did have

24   input into communications with the media to the extent that I

25   was quoted in Lambda Legal's press release when we filed Walker,

1   but not direct knowledge about which media outlets quoted that

2   press release.  No knowledge of discussions with other law

3   firms, advocacy groups, or lawyers about these matters.

4          I believe I'm missing a couple, Your Honor, so I

5   apologize.

6          JUDGE PROCTOR:  Just a couple of the major ones.  How

7   about information or input into judge assignments or any attempt

8   to steer the case to or away from a certain judge?

9          MR. CARL CHARLES:  Input into judge assignments and

10  into efforts to mark the case as related.

11         JUDGE PROCTOR:  Okay.  Thank you.  Anything else?

12         MR. CARL CHARLES:  That's all I have on this list,

13  but --

14         JUDGE PROCTOR:  That's helpful.  Thank you.

15         MR. CARL CHARLES:  Okay.

16         (Mr. Carl Charles excused.  Mr. Chase Strangio

17  present.)

18         MR. CHASE STRANGIO:  Good afternoon, Your Honors.

19  Chase Strangio.  I am an attorney at the American Civil

20  Liberties Union.

21         I'm going to use two of these lists in the hopes that I

22  can cover everything.  So with the understanding that I was part

23  of discussions around prospective litigation in 2020, 2021, and

24  then 2022, combining those time periods, I was not necessarily

25  involved in all of the discussions in 2022.  But covering the

1  full period of time where this litigation was discussed in

2  various iterations, the topics that, as I understand them, I had

3  input into included who to name as plaintiffs, discussions about

4  marking a case as related, dismissal of the case, whether to

5  refile a case, coordination between groups and DOJ.  I had input

6  into conversations about judge assignments as they were made.  I

7  have no knowledge about intentions or efforts -- I'm sorry --

8  inputs.  Excuse me.  So I had input into communication with

9  media to the extent it involved press releases related to

10  prospective litigation in 2022.  I have not personally spoken to

11  the media related to the Walker litigation to my knowledge.  And

12  then I have no knowledge --

13          JUDGE PROCTOR:  You have knowledge --

14          MR. CHASE STRANGIO:  I have no knowledge about

15  intentions or efforts to get or avoid a judge, with the

16  exception of what I previously stated about discussions about

17  marking a case as related if that is to be construed in relation

18  to that topic.

19          JUDGE PROCTOR:  All right.

20          MR. CHASE STRANGIO:  I don't think -- I think that

21  covers all the topics unless Your Honors have other questions.

22          JUDGE PROCTOR:  No, that's helpful.  Thank you.

23          MS. LISA NOWLIN-SOHL:  Good afternoon, Your Honors.

24  Lisa Nowlin-Sohl with the ACLU.  I'm a senior staff attorney

25  with the national group.

 1          Broadly construing these, I would say I have knowledge

 2    kind of just generally on all the topics, with the caveat that I

 3    joined the ACLU in February of this year and the Walker case in

 4    March.  So to the extent that discussions about where to file,

 5    who to name as a plaintiff and defendant occurred before that in

 6    kind of the prior iterations of the bill, I was not involved in

 7    those.

 8          As far as input, I, you know, had input on most of

 9    these, so the topics of the transfer of a case, dismissal,

10    whether and where to refile, coordination between groups, judge

11    assignments.  No knowledge or input on intentions or efforts to

12    get or avoid a judge.  Communications with media on these

13    matters to the extent that the ACLU prepared a press release

14    regarding the filing of the Walker case.  And I had input --

15    well, I guess I had knowledge of discussions with other law

16    firms, advocacy groups, and lawyers on these matters after

17    consolidation, but not kind of in the initial forming of the

18    groups that would work on these cases.  And to the extent --

19    yeah, I think that's everything.

20          JUDGE PROCTOR:  You might have said this and I missed

21    it, but how about the relatedness designation?

22          MS. LISA NOWLIN-SOHL:  Yes.  So I was not involved in

23    kind of the initial marking of the case as related or that

24    conversation.  But to the extent that we later learned that a

25    motion was required, I was involved and had input on those

1    conversations.

2            JUDGE PROCTOR:  Thank you.

3            MS. KAITLIN WELBORN:  Good afternoon, Your Honors.

4    Kaitlin Welborn.  I am the reproductive rights staff attorney

5    from the ACLU of Alabama.  There are only two lawyers at the

6    ACLU of Alabama, so by default, I have knowledge and input about

7    pretty much everything.

8            I can tell you the things that I don't have knowledge

9    or input into.  I would say trying to get another judge,

10   something like that, no knowledge and no input other than the

11   relatedness discussion.  And I was not involved in the

12   communications with DOJ but was with the media and other

13   advocacy groups.  And that includes some context to some of the

14   statements that Solicitor General LaCour mentioned.  And I

15   believe that that is everything.

16           JUDGE PROCTOR:  Thank you.

17           MR. ASAF ORR:  Good afternoon, Your Honors.  Asaf Orr,

18   senior staff attorney at the National Center for Lesbian Rights,

19   counsel in the Ladinsky and Eknes-Tucker matters.

20           With regards to this list, I believe I have knowledge

21   and input into each of the topics listed, with some --

22           JUDGE PROCTOR:  So were you in the Ladinsky,

23   Eknes-Taylor case?

24           MR. ASAF ORR:  I was counsel in the Ladinsky case as

25   well as currently counsel in the Eknes-Tucker.  Yes, Your Honor.

1          JUDGE PROCTOR:  All right.  Thank you.

2          MR. ASAF ORR:  So with the following caveats, I was

3    aware that the Walker case was making a related case motion but

4    was not involved in any discussions there or with regards to or

5    had any input regarding transfer of a case.  I did have

6    discussions with the media and was interviewed in connection

7    with the filing of the Ladinsky case but did not have any

8    discussions with the media both before and after the -- I guess

9    prior to the dismissal or since the dismissal, I have not had

10   any conversations with the media.  Have not had discussions with

11   other lawyers or advocacy groups regarding either matter.

12         JUDGE PROCTOR:  All right.  Would you please -- and,

13   again, you said something that threw me off at the beginning, so

14   I missed your name and your organization.

15         MR. ASAF ORR:  Sure.  Asaf Orr, and I'm a senior staff

16   attorney for the National Center of Lesbian Rights.  Thank you.

17         JUDGE PROCTOR:  That's what I thought you said, but I

18   just wanted to make sure.  Thank you so much.

19         (Mr. Asaf Orr excused.)

20         (Ms. Cynthia Weaver present.)

21         MS. CYNTHIA WEAVER:  Good afternoon, Your Honors.  My

22   name is Cynthia Weaver.  I started as the Human Rights Campaign

23   Foundation's litigation director in January of this year.  The

24   HRC Foundation joined the Ladinsky case in early April.

25         My primary involvement based on this list of topics

1   with my input is the selection and naming of plaintiffs.  In

2   response to a second category of subject matter areas, I was

3   aware of the marking cases related in the Walker case but was

4   not involved in any of the discussions.  I was aware of the

5   transfer, again, not involved in any discussions.  I was not

6   aware of any efforts to get a particular judge or around getting

7   another judge.  I was not aware of any discussions with other

8   law firms, lawyers, advocacy groups involved in any other

9   decision making processes.

10          JUDGE PROCTOR:  Thank you.  What was your last name

11   again?  It was Cynthia Weaver; right?

12          MS. WEAVER:  Yes.

13          JUDGE PROCTOR:  We're just making sure we are making

14   correct notations.  Cynthia Weaver.

15          (Ms. Cynthia Weaver excused.)

16          (Ms. Latisha Faulks present.)

17          JUDGE PROCTOR:  All right.  We are trying to compare

18   notes with what we were told about leadership in this category.

19   Ms. Faulks.  Is she in the courtroom?  Where do you fall?  We

20   didn't have you down as a decision maker, but we also didn't see

21   you stand up on this category, so I'm just curious.

22          MR. RAGSDALE:  I'm going to interrupt just to say,

23   that's my fault.  I'm sorry.  I should have identified her

24   previously.  And I did not mean to slight you.

25          JUDGE PROCTOR:  Well, you may have and I just missed

 1   it.

 2          MR. RAGSDALE:  I did not.  I'm sorry.

 3          JUDGE PROCTOR:  Okay.  So you would be a decision maker

 4   for ACLU of Alabama; correct?

 5          MS. LATISHA FAULKS:  Yes, Your Honor.

 6          JUDGE PROCTOR:  Thank you.  That's all I need to know.

 7   Appreciate that.

 8          And Mr. Ragsdale, we're having a tough enough time

 9   keeping the score card, so we understand why that could have

10   occurred easily.  No questions about that.

11          All right.  So let's take a five-minute recess, let us

12   discuss the next step, and we will be back in one moment.

13      (Recess was taken from 1:27 p.m. until 1:38 p.m., after

14       which proceedings continued, as follows:)

15          JUDGE PROCTOR:  All right.  Everyone have a seat,

16   please.  All right.  We're going to give you a similar

17   instruction.  In fact, you should understand it's the exact same

18   instruction we gave the lawyers with knowledge but no input.

19   We're going to proceed into some questioning at this point.

20   It's going to be a lawyer at a time.

21          We're going to start with the folks in the Walker case.

22   The rule is invoked, the modified version rule we talked about,

23   and that is if there is anything that is discussed in this

24   courtroom with you in it, you're not to reveal that to anyone

25   who is also under the oath until you're released to do so by the

 1  Court.

 2        We don't presume any wrongdoing, but we have serious

 3  concerns, as I've already said, about what's occurred.  We

 4  expect total and complete candor from everyone, transparency,

 5  and we will -- as I said, we don't think that anything has

 6  occurred here that's irreparable.  We just don't.  What would be

 7  problematic and what may be irreparable is if you mislead us.

 8  Okay?  And we say that only because it's fair to give the

 9  warning, not because we presume that there's a need to give that

10  instruction to you.  All right?  We just don't want to be in a

11  position where someone says, you didn't tell me.  "I forgot" is

12  not an answer unless you truly forgot.

13        All right.  Anything else?  Does counsel have any

14  questions about how we're proceeding?

15        MR. RAGSDALE:  A lot, but I'm going to limit it to a

16  few.  Are we going to do lawyers one at a time?

17        JUDGE PROCTOR:  Yes.

18        MR. RAGSDALE:  So everybody else is going out of the

19  courtroom except that one lawyer?

20        JUDGE PROCTOR:  Everybody who is under oath except that

21  one lawyer.  If we get into a privileged or work product matter,

22  and we expect that you'll help us with that, then you have the

23  right to have others leave the courtroom who are not court

24  staff.

25        MR. RAGSDALE:  Okay.

 1          JUDGE PROCTOR:  In other words, if you think we're

 2  getting into something that Alabama or just the public doesn't

 3  need to know about, work product matters or work product

 4  privilege matters, please help us.

 5          Now, we didn't have that over there because there's

 6  nobody in the room except Justice Harwood and the lawyers with

 7  knowledge but no input.  But here we have other people in the

 8  room, so please -- I'm sure we can count on everyone to guide us

 9  as appropriate.

10          MR. RAGSDALE:  This time Mr. Cooley and I do get to

11  stay in the room?

12          JUDGE PROCTOR:  Yes.

13          MR. SEGALL:  For all witnesses, Your Honor?

14          JUDGE PROCTOR:  Yes.

15          JUDGE WATKINS:  The only people to leave the room are

16  those who are under oath and not being questioned.

17          MR. RAGSDALE:  And lastly, is there a feed outside this

18  room to the media?

19          JUDGE PROCTOR:  No.  No feed to the media.  We have --

20  some of the judges have decided that they wish to see what's

21  going on.

22          MR. RAGSDALE:  Sure.

23          JUDGE PROCTOR:  There is a feed back to Birmingham and

24  Huntsville in particular, just to be perfectly candid.  And I

25  think that is just more along the lines of every judge in all

 1   three districts, every active district judge in all three

 2   districts, some senior judges, had input about how this ought to

 3   proceed.  And, quite frankly, it's a matter that involves all

 4   three districts, we believe, because it's lawyers who appear

 5   before us, and I think it was appropriate for our colleagues to

 6   have the option, and we offered them the option of observing the

 7   hearing.  Now, I don't know that all of them, any of them, or

 8   some of them have taken advantage of doing that.  We also

 9   probably have some law clerks watching.  Okay?  But nothing

10   outside of the court family.

11          MR. RAGSDALE:  I think that's --

12          JUDGE PROCTOR:  Is that a fair statement, folks?

13          MR. RAGSDALE:  Thank you, Your Honor.

14          JUDGE PROCTOR:  Okay.  And, again, we're here not as

15   three judges.  We're here as representatives of our three

16   districts.  This is the way we've chosen to proceed on this.

17          All right.  Everyone clear on how we're going to

18   proceed?

19          MR. RAGSDALE:  Yes, sir.

20          JUDGE PROCTOR:  All right.  I think Judge Watkins will

21   indicate -- if you're in Ladinsky or Eknes-Tucker and you're

22   under oath, this would be the time for you to step out of the

23   courtroom.  And is there a place they should go?

24          JUDGE WATKINS:  There are rooms at either end, or they

25   could go out into the hall.  But there's rooms on either side of

 1    the outside doors there if y'all would like to take advantage of

 2    that.  We also need the -- the only one under oath who needs to

 3    stay in at the moment is Ms. Nowlin-Sohl.  I'm just going to

 4    start with her.  And then we'll go from there and try to make it

 5    quickly if we can.  Everybody else under oath would need to

 6    leave.

 7            You said you're senior --

 8            MR. RAGSDALE:  Your Honor, although they're not under

 9    oath, we have representatives of the Attorney General's office

10    here, and we really would like them to leave.  Excuse me.  They

11    not only add nothing, but they literally are our competition in

12    these cases.  I don't think there's any reason for them to be in

13    this courtroom.  So we would ask that they be excused.

14            JUDGE PROCTOR:  Your request is granted.

15            MR. RAGSDALE:  Thank you.

16            JUDGE PROCTOR:  And I'm sure our friends from Alabama

17    understand that we're probably -- it will probably be very

18    difficult to examine a witness on things that are not work

19    product related, and you really don't have an interest in

20    hearing that.  Might have an interest, but you don't have a

21    right to hear that.  So we're going to excuse you.  You're

22    welcome to stay here or go back to your office.  We'll leave

23    that up to you.

24            Chances are much of what's going to occur in the rest

25    of the hearing today you would not be invited to hear, if that

1    helps you make a decision.

2            MR. SEGALL:  For hearing purposes, can I stand here?

3            JUDGE PROCTOR:  You may.  No Judge Probst rule here.

4            Please give your attention to Judge Watkins.

5            JUDGE WATKINS:  You said you're ACLU senior staff

6    attorney, and you just came on board in February or March?

7            MS. LISA NOWLIN-SOHL:  Yes.  I joined the ACLU National

8    Project in February, mid February of this years, and then joined

9    the case sometime in March.  I don't recall exactly when.

10           JUDGE WATKINS:  What were you doing before that?

11           MS. LISA NOWLIN-SOHL:  I was a staff attorney with the

12   ACLU of Washington State, so doing work limited to cases in the

13   state of Washington.

14           JUDGE WATKINS:  When you joined this case in March, the

15   legislation was still pending.  The governor signed it on April

16   the 8th.  Between the time March and April 8th, who else were

17   you coordinating with on the plaintiffs' side?

18           MS. LISA NOWLIN-SOHL:  All of the Walker team.  So I

19   joined the Walker team, so my colleagues at the ACLU, ACLU

20   Alabama, Cooley team, and the Lambda Legal team.

21           JUDGE WATKINS:  All right.  How about the Department of

22   Justice?

23           MS. LISA NOWLIN-SOHL:  I never spoke with the

24   Department of Justice.  I heard at one point, I think it might

25   have been Sharon McGowan with Lambda Legal had received a call

 1  from them, and I think just kind of let some of us know that she

 2  had received a call, but that was kind of the extent of the

 3  communications that I'm aware of with DOJ.

 4      JUDGE WATKINS:  Okay.  Any communications with the

 5  Ladinsky team since you've been in the case -- until April the

 6  8th, did you have any coordination at all with the Ladinsky

 7  team?

 8      MS. LISA NOWLIN-SOHL:  I did not have coordination.  I

 9  had not spoken with them.  I knew we had informed them that we

10  were still planning to file in the Middle District and that we

11  had learned from them that they were still planning to file in

12  the Northern District, but that was the extent --

13      JUDGE WATKINS:  How were they informed?

14      MS. LISA NOWLIN-SOHL:  Somebody had a phone call with

15  them.

16      JUDGE WATKINS:  Do you know who?

17      MS. LISA NOWLIN-SOHL:  I do not recall.  I'm sorry.

18      JUDGE WATKINS:  You were not on that phone call?

19      MS. LISA NOWLIN-SOHL:  I was not on that phone call.

20      JUDGE WATKINS:  All right.  Were you involved in the

21  decision -- and I didn't get the note on that -- whether this

22  case was related or not?  I believe you said you were not

23  involved in the marking of it?

24      MS. LISA NOWLIN-SOHL:  I was not.  So when I joined the

25  case, I think the decision had already been made to mark it as a

1   related case.  That was the plan.  I think, you know, that had

2   been kind of the plan in 2020 and 2021 and then, you know, that

3   was kind of still the plan.

4           JUDGE WATKINS:  That had been the plan for a year?

5           MS. LISA NOWLIN-SOHL:  Yes.

6           JUDGE WATKINS:  Your understanding was that that had

7   been a plan in the previous legislative session where the bill

8   didn't pass or the similar bill didn't pass?

9           MS. LISA NOWLIN-SOHL:  Correct.  In the 2021

10  legislative sessions.

11          JUDGE WATKINS:  When it turned out that -- obviously,

12  the team's choice was Judge Thompson if they could get it for a

13  related case.  All right.  When it came -- when you learned

14  that -- when did you learn that Judge Thompson did not get the

15  case?

16          MS. LISA NOWLIN-SOHL:  I'm not sure we learned

17  definitively, and this was part of the issue.  There was some

18  confusion about how the marking of the related case would work.

19  So we thought, you know, we would mark it as related on the

20  cover sheet.  It would either be assigned to Judge Thompson or

21  it wouldn't.  And then so I think we had -- somebody had called

22  the clerk's office, and we were told to file the motion.  And we

23  filed that motion, but I believe it was at some point in there

24  assigned to Judge Marks, but we still weren't sure how that kind

25  of interacted with our motion to relate the case.

```
 1        JUDGE WATKINS:  The motion you filed was to reassign,

 2   not to assign.  So you must have known at the time when you

 3   filed a motion to reassign that it had been assigned to Judge

 4   Marks.

 5        MS. LISA NOWLIN-SOHL:  Yes.  I think that had happened

 6   already, but in our minds we were still I think kind of

 7   envisioning it as this was the motion necessary to mark it as

 8   related.  So it was reassigned because it had been assigned to

 9   Judge Marks, but it was part of the related case process as we

10   understood it.

11        JUDGE WATKINS:  All right.  Did you or anyone on your

12   behalf call the chambers of any judge about the reassignment or

13   about the filing of the case?

14        MS. LISA NOWLIN-SOHL:  I did not.  I don't -- I don't

15   recall -- I know there was the call before we filed the motion

16   where somebody informed us to file the motion.  I think somebody

17   called to kind of just figure out when we would hear something,

18   because we had filed the TRO and were hoping that would move

19   quickly.  So I think we wanted to kind of just see what to

20   expect from a timing perspective, but that was my understanding

21   of the content of the conversation.

22        JUDGE WATKINS:  Judge Marks entered a show cause order

23   on the 13th.  Plaintiffs filed a response, I think, late on the

24   14th is my understanding.  Did you see that response -- it's doc

25   number 18.  Did you see that response before it was filed?
```

```
 1                MS. LISA NOWLIN-SOHL:  I did.

 2                JUDGE WATKINS:  Did you agree with the statement in the

 3     response, and I assume you did, that "Although this case was

 4     properly filed in the Middle District, plaintiffs do not oppose

 5     transfer to the Northern District so that this matter can be

 6     adjudicated alongside Ladinsky.  Plaintiffs' interests is in the

 7     expeditious injunction of the unconstitutional law they

 8     challenge, and plaintiffs will seek to pursue their motion for

 9     this preliminary relief expeditiously in the Northern District,

10     assuming transfer.  In light of plaintiffs' consent to transfer,

11     plaintiffs withdraw their pending motion to reassign."

12                I assume you agreed with that statement in that

13     response?

14                MS. LISA NOWLIN-SOHL:  I did.

15                JUDGE WATKINS:  Okay.  Within 24 hours, you-all were

16     filing a dismissal after having represented to Judge Marks that

17     you didn't have any problem with the case being in the Northern

18     District.  Were you involved in that decision to file a

19     dismissal of this case?

20                MS. LISA NOWLIN-SOHL:  I was.

21                JUDGE WATKINS:  All right.  Have I misstated any facts

22     so far that you know of?

23                MS. LISA NOWLIN-SOHL:  Not that I'm aware of.

24                JUDGE WATKINS:  Right.  All right.  You say you were

25     involved.
```

1          MS. LISA NOWLIN-SOHL:  Yes.

2          JUDGE WATKINS:  All right.  That was your reasoning for

3    dismissing the case, having represented to Judge Marks and in

4    essence to both districts that you were fine with the case being

5    in the Northern District of Alabama?

6          MS. LISA NOWLIN-SOHL:  Yes.  So just a little bit more

7    context on that response is that, you know, we had initially

8    kind of prepared a response opposing the transfer and kind of

9    laying out those reasons.  And kind of over the course of the

10   day, and in response to the State's response, we realized that

11   that was probably not likely to happen and also would

12   potentially slow down the process.  So that's -- that kind of

13   was a shift in strategy on Thursday.

14         JUDGE WATKINS:  I think that's reasonable, and I think

15   that's what your lawyer put in his report.  What I don't get is

16   you were okay with the case, and then 24 hours later you're

17   filing a Rule 41 to dismiss the case.  So how did that decision

18   come about?

19         MS. LISA NOWLIN-SOHL:  So to be clear, we were okay.

20   We weren't 100 percent okay with that; right?  So that was kind

21   of an evaluation of the competing interests, and so we went

22   along with that.  And then on Friday, it felt like -- and just

23   more context, we had been working around the clock for a week at

24   this point and really struggling to understand all the different

25   pieces that were happening.  Our hope had been to get that TRO

1  heard much earlier.  So then when Friday --

2         JUDGE WATKINS:  You wanted the TRO to be heard

3  expeditiously.  That's what you say.

4         MS. LISA NOWLIN-SOHL:  Yes.  Yes, we did.

5         JUDGE WATKINS:  All right.

6         MS. LISA NOWLIN-SOHL:  And so Friday when we got to the

7  order that, you know, it was transferred and then moved to

8  Burke, we were a little bit confused because we thought we were

9  going to be consolidated with the first filed case.  That was

10 the plan.  That was everybody's understanding.

11        JUDGE WATKINS:  When did you learn that Judge Burke was

12 getting your case?

13        MS. LISA NOWLIN-SOHL:  I don't remember when I learned

14 that.  I think it was in the afternoon.  So my recollection is

15 that we heard that there was going to be -- he scheduled the

16 hearing on Monday.

17        JUDGE WATKINS:  He entered an order about 4:11 that

18 afternoon scheduling a hearing for the following Monday.  Just a

19 status conference, as I understand it.

20        MS. LISA NOWLIN-SOHL:  Right.  Yes.  And so I think

21 shortly before that.  I was not admitted, so I wasn't getting

22 the -- kind of the notices, so there was a bit of a delayed

23 learning of that, and I don't remember exactly what time that it

24 was.

25        JUDGE WATKINS:  Isn't it true that as long as Judge

PATRICIA G. STARKIE, RDR, CRR, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, AL  36104   334.322.8053

1  Axon had the case, you-all were satisfied.  But when Judge Burke

2  got the case, all of a sudden everybody wanted to drop it.

3      MS. LISA NOWLIN-SOHL:  I wouldn't say we were

4  satisfied.  I think we thought that that was what was going to

5  happen, and we were still trying to figure out how do we work

6  with these groups.  Because, you know, we had not really been in

7  touch with the Ladinsky team, so we were trying to figure out

8  how this is going to work.  I think we thought that --

9      JUDGE WATKINS:  You met with the Ladinsky team on

10 Saturday.  It was Easter weekend, but you met with them on

11 Saturday.  What's the hurry?  Why couldn't you wait until Monday

12 and hear what the judge had to say about it?  What made you

13 change your mind?

14     MS. LISA NOWLIN-SOHL:  I'm not sure --

15     JUDGE WATKINS:  What made you change your mind within a

16 two-hour span, basically, as to why you wanted to dismiss the

17 case rather than submit to the judge who now had it assigned?

18     MS. LISA NOWLIN-SOHL:  Right.  So I think what I was

19 trying to say is we were still figuring it out, even on Friday,

20 like, what is this going to look like to work together?  So, you

21 know, that's why I was saying we weren't 100 percent --

22     JUDGE WATKINS:  Are you trying -- are you telling me it

23 had nothing to do with the judge being changed?

24     MS. LISA NOWLIN-SOHL:  I'm not saying it has nothing to

25 do.  I'm trying to explain what it does have things to do with.

1  So there was a lot of factors.  That Monday hearing caught us a

2  little bit off guard.  We were not prepared to be there on

3  Monday in Huntsville, to fly there over the holiday weekend.  We

4  had concerns about kind of our plaintiffs.  And then we also had

5  concerns -- we didn't know, really, anything about the judges.

6  We hadn't researched any of the judges.

7          JUDGE PROCTOR:  Why would that matter?

8          MS. LISA NOWLIN-SOHL:  Why would that matter?

9          JUDGE PROCTOR:  Why would it matter?

10          So let me explain the concern I have with what you're

11  telling me.

12          MS. LISA NOWLIN-SOHL:  Okay.

13          JUDGE PROCTOR:  Before you got there, you're aware that

14  your agency had been gearing up for this litigation for two plus

15  years and ready to pounce whenever Alabama passed this statute.

16          MS. LISA NOWLIN-SOHL:  Uh-huh.

17          JUDGE PROCTOR:  Correct?

18          MS. LISA NOWLIN-SOHL:  Yes.

19          JUDGE PROCTOR:  All right.  And time was of the

20  essence.  And you said, we had a lot of factors to balance about

21  whether we agreed to a transfer, but it came down to we didn't

22  think we were going to get what we were hoping for in the Middle

23  District to stay there.  We thought we were more likely to be

24  transferred to the Northern District.  And we could waste time

25  arguing and debating that, or we could just go ahead and pack

1    our bags and go to the Northern District.  Fair?

2           MS. LISA NOWLIN-SOHL:  Essentially, right.  I wouldn't

3    say we were 100 percent on board with going, but we also didn't

4    see that there was strategic benefit in opposing it.  We were

5    hoping to keep the cases separate.

6           JUDGE PROCTOR:  But the issue -- but the cases involved

7    essentially the same statute.

8           MS. LISA NOWLIN-SOHL:  The same statute, yes.

9           JUDGE PROCTOR:  Same facts are going to largely be

10   presented in terms of challenging the constitutionality or

11   statutory violations that you alleged?

12          MS. LISA NOWLIN-SOHL:  Same facts, different claims, so

13   there is some differences in the facts as they relate to

14   different claims.

15          JUDGE PROCTOR:  All right.  But very -- a Venn diagram

16   large overlap of facts.

17          MS. LISA NOWLIN-SOHL:  Yes.

18          JUDGE PROCTOR:  All right.  But your -- what you've

19   told us that I heard was, we were hoping to get this TRO heard

20   very soon.  That's why we had been calling the clerk's office to

21   try to find out, when are we getting our TRO heard.

22          MS. LISA NOWLIN-SOHL:  Yes.

23          JUDGE PROCTOR:  You looked at the Ladinsky case.

24          MS. LISA NOWLIN-SOHL:  Yes.

25          JUDGE PROCTOR:  It didn't have -- they didn't have a

1   motion for a TRO in that case.

2          MS. LISA NOWLIN-SOHL:  Correct.

3          JUDGE PROCTOR:  All right.  So you get sent to the

4   Northern District of Alabama, and you want to have your TRO

5   heard just as soon as possible.

6          MS. LISA NOWLIN-SOHL:  Yes, but --

7          JUDGE PROCTOR:  But when the judge sets a status

8   conference on Monday, you're not ready for that?

9          MS. LISA NOWLIN-SOHL:  We were not.  And not ready as

10  two consolidated groups.  There's now -- I think -- is it seven

11  or eight organizations, different claims, different attorneys,

12  different personalities.  We were not ready to do that.

13         JUDGE WATKINS:  But you knew all that when you filed

14  this document number 18.  You knew all of that.  And you say

15  your interest is in the expeditious injunction of an

16  unconstitutional law, and you wanted to be alongside Ladinsky.

17         MS. LISA NOWLIN-SOHL:  Well, we had to file that

18  response by five p.m., so we -- I believe it was five p.m.  I

19  don't remember the exact time.

20         JUDGE PROCTOR:  Your response could have been, we

21  oppose the transfer.

22         MS. LISA NOWLIN-SOHL:  It could have and was

23  initially -- am I allowed say?  Initially was our position.  And

24  so, you know, we were shifting but still figuring it out.  So we

25  needed to file something, but we didn't have it figured out at

1  the time of that filing.

2       JUDGE PROCTOR:  Did you let a turf war over direction

3  of the case get in the way of getting a TRO heard as soon as

4  possible?  Is that what I'm hearing?

5       MS. LISA NOWLIN-SOHL:  I would not characterize it as a

6  turf war.  I think it is -- you know, there are a lot of

7  organizations, a lot of priorities, a lot of personalities.  And

8  it wasn't about turf, but there is elements of figuring out, how

9  do we all work together?  What does the structure look like?

10 Who are the decision makers on these cases?

11      JUDGE PROCTOR:  Who made the decision on the Walker

12 case to dismiss?

13      MS. LISA NOWLIN-SOHL:  We have a pretty collaborative

14 team relationship, so there's all of the organizations.  We had

15 kind of meetings.  You know, each organization probably had

16 maybe internal conversations and then came together, but it was

17 I think a group decision to kind of hit pause to figure out what

18 was happening.

19      JUDGE PROCTOR:  What role did Judge Burke's assignment

20 to the case have in that decision?

21      MS. LISA NOWLIN-SOHL:  I mean, it was a factor, but it

22 was a -- you know, it wasn't the factor.  It was something that

23 we were not sure of.  We were not sure why that had been not

24 consolidated with the first filed case.  And that wasn't

25 specific to Judge Burke, but just kind of unsure why -- what was

 1  happening; right?  So we understood we were going to be

 2  consolidated with the first filed.  That wasn't what happened.

 3          JUDGE PROCTOR:  Well, if you had questions about that,

 4  you could have asked those at the Monday hearing; correct?

 5          MS. LISA NOWLIN-SOHL:  But we had concerns about making

 6  it to the Monday hearing.  That was part of the problem.

 7          JUDGE PROCTOR:  And I'm having trouble with that.  TROs

 8  are usually heard as soon as practicable in a case.  This is not

 9  like a motion for preliminary injunction.

10          MS. LISA NOWLIN-SOHL:  Right.

11          JUDGE PROCTOR:  This is a TRO.

12          MS. LISA NOWLIN-SOHL:  Yes.

13          JUDGE PROCTOR:  And what date was Monday?

14          MS. LISA NOWLIN-SOHL:  I don't remember the date.

15          JUDGE PROCTOR:  Okay.

16          MS. LISA NOWLIN-SOHL:  I think it was approximately six

17  days after we filed the TRO.  So I think we had been planning

18  that it would be heard that week, but we were not prepared to be

19  in Huntsville in particular -- you know, we were expecting to be

20  in the Middle District, but we were not prepared to be in

21  Huntsville on Monday.

22          JUDGE PROCTOR:  You had a statute that was going to

23  become effective fairly soon.

24          MS. LISA NOWLIN-SOHL:  Yes.

25          JUDGE PROCTOR:  And your interest was stopping the

1   application and the effect of that statute before it went into

2   effect; correct?

3          MS. LISA NOWLIN-SOHL:  Yes.  And at that time, we still

4   had I think approximately three weeks, so we thought that that

5   was still very possible.

6          JUDGE PROCTOR:  When you hit pause, what were the

7   discussions about the alternatives to just showing up Monday and

8   talking with Judge Burke about a schedule?

9          MS. LISA NOWLIN-SOHL:  Could you repeat the question?

10         JUDGE PROCTOR:  You dismissed the case, saying we hit

11   pause because we were concerned about going forward.

12         MS. LISA NOWLIN-SOHL:  Yes.

13         JUDGE PROCTOR:  Okay.  Couple subsidiary questions.

14   Did you ask to be available by Zoom or telephonically because of

15   travel concerns with Judge Burke?

16         MS. LISA NOWLIN-SOHL:  We did not, but it was also

17   quite late on a Friday, and so we weren't sure that we could

18   even get that sorted out.

19         JUDGE PROCTOR:  You had counsel in the state who were

20   perfectly able to go and attend the hearing, the status

21   conference?

22         MS. LISA NOWLIN-SOHL:  At that time, I believe we only

23   had one counsel located in the state.

24         JUDGE PROCTOR:  Okay.  You had counsel in Atlanta that

25   were two hours away?

```
1              MS. LISA NOWLIN-SOHL:  We do have counsel in Atlanta.
2    Yes.
3              JUDGE PROCTOR:  Just making sure I have my lineup card.
4    It seems like you had other --
5              What if Judge Thompson had set you for a Monday
6    hearing?  Would you have had a problem with that?
7              MS. LISA NOWLIN-SOHL:  I don't know.  It didn't come
8    up, and we didn't consider that.
9              JUDGE PROCTOR:  Let's be very fair.  Judge Thompson
10   sets -- he has the case.  He sets you for a Monday hearing on a
11   Friday.  Are you suggesting that you might have hit pause then
12   because of concerns about being able to get to Montgomery for a
13   hearing?
14             MS. LISA NOWLIN-SOHL:  I really don't know.  It didn't
15   come up, so it's really hard to say what that would have been in
16   kind of that confluence of factors.  Again, you know, had the
17   cases been consolidated before Judge Thompson, I think there is,
18   you know, a decent chance that -- like that was also a large
19   concern of, like, how do we get all of these groups to work
20   together in a cohesive way over a holiday weekend.
21             JUDGE PROCTOR:  How was it in your client's interest,
22   though, to dismiss the action and start over from scratch when
23   you were days away from the effective date of the statute?
24             MS. LISA NOWLIN-SOHL:  I mean, we were seven days away
25   from the signing of the statute and three weeks away from the
```

1   effective date.  So we had been working around the clock, as

2   quickly as possible, and still had some time.  But it's in our

3   client's interest to have kind of, you know, the best case

4   possible and cohesive team that's leading that.  And so we did

5   feel that hitting pause was the right answer, and we did not

6   refile a case.

7          JUDGE WATKINS:  Now your clients are out.  What

8   happened to your clients?

9          MS. LISA NOWLIN-SOHL:  They are, I believe, still

10  living in the state of Alabama.  They were --

11         JUDGE WATKINS:  They're not parties to this suit or any

12  suit, are they?

13         MS. LISA NOWLIN-SOHL:  They are not parties to the

14  suit.

15         JUDGE WATKINS:  Who are you --

16         MS. LISA NOWLIN-SOHL:  The Eknes-Tucker injunction

17  helps them; right?  That law is currently enjoined.

18         JUDGE PROCTOR:  That hadn't occurred yet when you made

19  this decision.

20         MS. LISA NOWLIN-SOHL:  That had not occurred.

21         JUDGE PROCTOR:  That case hadn't even been filed yet

22  when you made this decision.

23         MS. LISA NOWLIN-SOHL:  No, but I think the decision was

24  made with the understanding that something would be done to

25  challenge this law; that it wasn't us walking away; that, you

 1  know, there would still be something happening that challenged

 2  that law and that helps our clients.

 3          JUDGE BEAVERSTOCK:  So what was the understanding of

 4  that?

 5          MS. LISA NOWLIN-SOHL:  I mean, we didn't have the

 6  details of it at the time; right?  I don't think anyone was

 7  going to just let the law go into effect.  But we didn't know

 8  what the shape of the lawsuits or who the clients would be or

 9  who the attorneys would be at the time that we hit pause.  And

10  that was things that we needed to figure out and did try to

11  figure out that weekend.

12          JUDGE PROCTOR:  Were there things discussed that you're

13  aware of about reasons why you would not want this case assigned

14  to Judge Burke?

15          MS. LISA NOWLIN-SOHL:  There were not.  So my

16  recollection is that we had a call with the Ladinsky team after

17  it was clear that we were going to the Northern District, and I

18  think they had not been reassigned a judge yet.  And the kind of

19  conversation was, like, here are the judges in the Northern

20  District, because we were not familiar with them, and kind of

21  just brief, kind of like, here's who they are, you know, here's

22  who appointed them, here's how long they've been on the bench.

23  And Judge Burke was mentioned as someone who was not the first

24  choice, but unlikely to be assigned, I think, based on the

25  geography of how the district courts in Alabama work.  I

1  don't --

2       JUDGE PROCTOR:  How's that?  You were having a case

3  transferred with Limestone County plaintiffs and defendants and

4  no other plaintiffs or defendants from the Northern District of

5  Alabama.

6       JUDGE WATKINS:  They were the only parties -- the only

7  parties who resided in the Northern District is one plaintiff

8  and one defendant, and it was in the Northern Division,

9  Northeast division.

10       MS. LISA NOWLIN-SOHL:  So this wasn't about the Walker

11  case, this was the Ladinsky case, because the judge had been

12  recused and there was a magistrate.  So they were just talking

13  about who they might pull.  And it was just kind of like, here's

14  who the judges are.  And, you know, at that point, again,

15  because they were the first filed case, we just assumed we would

16  be consolidated with whoever they were assigned to.

17       JUDGE PROCTOR:  At the time that you agreed to the

18  transfer or at least stated you didn't object to the transfer,

19  you knew Judge Axon was assigned the Ladinsky case.

20       MS. LISA NOWLIN-SOHL:  Yes.

21       JUDGE PROCTOR:  You knew that it was designated as the

22  first filed case by Judge Marks.

23       MS. LISA NOWLIN-SOHL:  Yes.

24       JUDGE PROCTOR:  And so you expected the case to go to

25  Judge Axon.

1        MS. LISA NOWLIN-SOHL:  That was the understanding, yes.

2        JUDGE PROCTOR:  And you knew you would be working

3  together with the Ladinsky folks, who already had their case

4  assigned to Judge Axon.

5        MS. LISA NOWLIN-SOHL:  We knew we would be trying to

6  figure out how to work together.  That was kind of -- that was

7  the next step in the conversation, yes.

8        So by the time we had to file, it was either we object

9  to the transfer or we don't.  And we didn't object, but we still

10 hadn't figured out those details of how to work together.  So it

11 wasn't, you know, like we were a hundred percent in with how

12 that was going to look.  We were still trying to figure it out

13 but had a filing deadline.

14        And if you'll recall, it's a very short kind of filing

15 that we scrambled to put together that says, okay, we don't

16 object.  And then the next day we tried to figure out what this

17 looks like and to have these conversations.

18        JUDGE PROCTOR:  What strikes me is it's appropriate for

19 Judge Marks to give a short deadline, because she's dealing with

20 a TRO in a case that she's thinking about transferring.

21        MS. LISA NOWLIN-SOHL:  It was an appropriate deadline.

22 Yes.

23        JUDGE PROCTOR:  But by Friday, 24 hours later, you

24 decide, we're not going to go forward with our case.  And

25 eventually you decide, we're going to let the Ladinsky group go

1   forward with their case by refiling Eknes-Tucker; correct?

2          MS. LISA NOWLIN-SOHL:  That was decided over the

3   weekend.  Yes.

4          JUDGE PROCTOR:  And you're standing down.

5          MS. LISA NOWLIN-SOHL:  Yes.

6          JUDGE PROCTOR:  Why not just stand down when you

7   arrived in the Northern District and let them take the lead on

8   the two cases?

9          MS. LISA NOWLIN-SOHL:  I mean, I think we just didn't

10  have time to kind of have that conversation.  I think everyone

11  wanted to hit pause.  It wasn't understood that we would be

12  standing down.  That became clear later.

13         JUDGE PROCTOR:  When you made the decision to stand

14  down, an option would be, we can just stand down and let

15  Ladinsky go forward.

16         MS. LISA NOWLIN-SOHL:  But Ladinsky had also been

17  dismissed by the time the decision was made to stand down.  So

18  everyone hit pause because no one knew what it was going to look

19  like going forward; who was going to be involved.

20         JUDGE PROCTOR:  We'll ask Ladinsky counsel about that.

21         MS. LISA NOWLIN-SOHL:  Okay.

22         JUDGE PROCTOR:  But do you have any information about

23  why they hit pause in particular?

24         MS. LISA NOWLIN-SOHL:  No, I do not.

25         JUDGE PROCTOR:  You did not have a discussion with

1   Eagan or Doss about that?

2          MS. LISA NOWLIN-SOHL:  We talked about it, and my

3   understanding was that they were going to dismiss as well, but

4   that wasn't something that we decided together.

5          JUDGE PROCTOR:  Did they say why they were going to

6   dismiss?

7          MS. LISA NOWLIN-SOHL:  I actually really don't recall.

8   Yeah.

9          JUDGE PROCTOR:  You heard but just don't recall, or you

10  don't think you heard?

11         MS. LISA NOWLIN-SOHL:  I'm not sure that they gave us

12  much of an explanation from -- I'm trying to remember.  It was a

13  pretty hectic time.

14         So I know we had a call.  I know we were planning to

15  dismiss.  We let them know.  At one point, we kind of shared a

16  very near final draft of our dismissal.  I believe Ms. Eagan

17  gave us a correction on kind of one citation, and then we filed

18  it.  But it was not kind of a swapping of drafts or --

19         JUDGE PROCTOR:  Drafts -- what, now?

20         MS. LISA NOWLIN-SOHL:  The dismissal.

21         JUDGE PROCTOR:  And stepping back to Walker before when

22  it was filed, are you aware of any steps that anyone took to

23  have this case assigned to Judge Thompson other than the

24  following:  Marking this related case on a civil cover sheet,

25  calling the clerk's office to find out information about that,

1  and filing the motion to have it reassigned to Judge Thompson

2  based upon what you say was input from the clerk's office.  Any

3  other steps that you're aware of that anyone took to try to have

4  the case assigned to Judge Thompson?

5          MS. LISA NOWLIN-SOHL:  No.

6          JUDGE PROCTOR:  And were you aware -- did you read the

7  instructions on the civil cover sheet for the Middle District at

8  the time that was filed?

9          MS. LISA NOWLIN-SOHL:  I did not.

10          JUDGE PROCTOR:  Is it your general experience that for

11  cases to be related, both cases have to be currently on the

12  court's docket and actually active?

13          MS. LISA NOWLIN-SOHL:  I actually have very little

14  experience with related cases.

15          JUDGE PROCTOR:  All right.  Was it your position --

16  meaning your, as we say in southern America, y'all's position --

17  that Judge Thompson was a subject matter expert that could more

18  quickly get to this?

19          MS. LISA NOWLIN-SOHL:  Yes.

20          JUDGE PROCTOR:  Was there anything else discussed about

21  Judge Thompson that would motivate you to try to get the case

22  assigned to him?

23          MS. LISA NOWLIN-SOHL:  No.

24          JUDGE PROCTOR:  All right.

25          JUDGE WATKINS:  I had one other question.  Who in your

1  team was assigned to coordinate with the clients?  Whose clients

2  were they actually?  Where did they come from?

3          MS. LISA NOWLIN-SOHL:  Yes.  So I believe Kaitlin

4  Welborn was in communication with at least one of the clients,

5  and I think members of the Lambda team were in communication

6  with the other clients.

7          JUDGE WATKINS:  Do you have any information, the

8  shortness of this decision you-all made to cut them out of this

9  lawsuit, that they were consulted before you dismissed the case?

10          MS. LISA NOWLIN-SOHL:  Do I -- I don't.

11          JUDGE WATKINS:  You don't know whether --

12          JUDGE PROCTOR:  No personal knowledge whether they were

13  consulted or not?

14          MS. LISA NOWLIN-SOHL:  I don't have personal knowledge,

15  no.  My understanding is that they were consulted, but maybe

16  immediately after, but I don't know that for certain.

17          JUDGE WATKINS:  But it's also your understanding that

18  they're now not a party to any suit directly?

19          MS. LISA NOWLIN-SOHL:  Correct.

20          JUDGE PROCTOR:  And it's your position that's in the

21  best interests of your clients?

22          MS. LISA NOWLIN-SOHL:  Yes.

23          JUDGE WATKINS:  Okay.

24          JUDGE PROCTOR:  One last question from me.  Can you

25  state as you stand here today --

```
1            You understand what judge shopping is.

2            MS. LISA NOWLIN-SOHL:  I believe so.

3            JUDGE PROCTOR:  Do I need to define that term for you?

4            MS. LISA NOWLIN-SOHL:  I don't think so.

5            JUDGE PROCTOR:  Can you tell us that this just wasn't

6    judge shopping, and that you're not aware of anybody in the

7    Walker case who was judge shopping?

8            MS. LISA NOWLIN-SOHL:  I can say that.  Yes.

9            JUDGE PROCTOR:  All right.  Mr. Ragsdale?

10           MR. RAGSDALE:  Can I either ask two questions or

11   suggest two questions to the Court that I think are --

12           JUDGE PROCTOR:  We trust you to ask the questions, and

13   we can always object to them.

14           MR. RAGSDALE:  Fair enough.

15           Were there concerns about the way in which the case

16   went from Judge Axon to Judge Burke?

17           MS. LISA NOWLIN-SOHL:  Yes.  I think just that we

18   didn't understand.

19           JUDGE WATKINS:  Talking about the other case?

20           MS. LISA NOWLIN-SOHL:  That they were consolidated in

21   front   of --

22           JUDGE PROCTOR:  The Walker case went directly to Judge

23   Burke --

24           MS. LISA NOWLIN-SOHL:  Correct.

25           JUDGE PROCTOR:  You're talking about concerns with
```

```
 1    Ladinsky and how it was handled.

 2              MS. LISA NOWLIN-SOHL:  Correct.

 3              JUDGE PROCTOR:  What were the concerns?

 4              MR. RAGSDALE:  And that the cases would be consolidated

 5    in front of Judge Burke.

 6              JUDGE PROCTOR:  Yes.  What were the concerns?

 7              MS. LISA NOWLIN-SOHL:  That that seemed kind of out of

 8    the ordinary; that, you know, we were being pulled to the

 9    Northern District because of Ladinsky was the first filed, and

10    that the first filed ruled.  And then to be pulled up there, and

11    then to be the one pulling the case instead of kind of sticking

12    with that first filed case.  And so I think that was concerning.

13              JUDGE PROCTOR:  Wait a minute.  Mr. Ragsdale's question

14    did not have to do with the cases.  It had to do with the

15    judges.  You said you had a concern about the assignment between

16    Judge Axon and Judge Burke, as to how that worked.  Is that what

17    I understood you to say?

18              MS. LISA NOWLIN-SOHL:  Yes.

19              JUDGE PROCTOR:  What was that concern?

20              MS. LISA NOWLIN-SOHL:  That that seemed kind of out of

21    the ordinary; out of what we -- the case law or kind of what the

22    procedure typically is, is that the first filed case is the one

23    that kind of anchors the other case.

24              JUDGE PROCTOR:  What conversations did you have with

25    the Ladinsky team about that?
```

1          MS. LISA NOWLIN-SOHL:  I mean, I think -- I don't

2    recall having conversations with them.

3          JUDGE PROCTOR:  Well, wait a minute.  You had a concern

4    about it, but you didn't ask the lawyers whose case actually was

5    assigned to Axon and then you understood went to Burke?  You had

6    a concern about that but didn't talk to the team --

7          MS. LISA NOWLIN-SOHL:  I don't remember that

8    specific --

9          JUDGE PROCTOR:  -- involved in the case?

10         MS. LISA NOWLIN-SOHL:  I don't remember that specific

11   conversation.  That's not to say it didn't come up in the

12   conversation, but I don't remember going through that or kind of

13   what the reasoning was.

14         And you've explained it today, that, you know, Judge

15   Axon had --

16         JUDGE PROCTOR:  Well, Lightfoot Franklin's in

17   Birmingham.

18         MS. LISA NOWLIN-SOHL:  Okay.

19         JUDGE PROCTOR:  Right?

20         MS. LISA NOWLIN-SOHL:  I actually don't know, but I

21   believe that you are probably correct.

22         JUDGE PROCTOR:  Have you talked to Ms. Eagan or

23   Mr. Doss?

24         MS. LISA NOWLIN-SOHL:  I think we've been on one phone

25   call together after the consolidation, I believe that Friday.

```
 1            JUDGE PROCTOR:  You didn't know that that firm was two

 2   blocks from the federal courthouse?

 3            MS. LISA NOWLIN-SOHL:  I did not.

 4            JUDGE PROCTOR:  Do you think that the people who filed

 5   Ladinsky and chose to file it in the Northern District of

 6   Alabama would have information about what's occurring in the

 7   Northern District of Alabama and how procedures operate there?

 8            MS. LISA NOWLIN-SOHL:  Yes.

 9            JUDGE PROCTOR:  If you had concerns, why wouldn't you

10   have reached out and asked them?

11            MS. LISA NOWLIN-SOHL:  I mean, I was not kind of the

12   main point of contact with the Ladinsky team, and so that wasn't

13   kind of my role to reach out to them.  So, again, I'm not saying

14   that that conversation didn't happen.  I just don't recall

15   having that conversation.

16            JUDGE WATKINS:  Who was the main point of contact?

17            MS. LISA NOWLIN-SOHL:  Not necessarily with the

18   Lightfoot team.  I'm recalling that Carl Charles would kind of

19   touch base with Asaf, kind of occasionally, but usually kind of

20   short emails that he would then forward.  But I don't believe

21   that there were calls with the larger Ladinsky team of

22   representatives until the consolidation stuff came up.

23            JUDGE PROCTOR:  If Judge Axon had set you for a hearing

24   on Monday, would you have dismissed the case?

25            MS. LISA NOWLIN-SOHL:  Again, I don't know.  There was
```

1   still so -- like I said, a lot of these factors we were still

2   trying to sort out.  Even when we hadn't objected to the

3   transfer to the Northern District, we were still trying to

4   figure all of this out.

5          And we might have.  There were still the concerns about

6   that hearing.  There were still the concerns about how we were

7   going to work together.  And so it's very possible that we

8   would have, but it's kind of just conjecture on my part at this

9   point.

10          MR. RAGSDALE:  Can I do one follow-up question?

11          JUDGE PROCTOR:  You may.

12          MR. RAGSDALE:  When Judge Proctor, to start this

13   hearing, gave the explanation of how the case got from Judge

14   Axon, who had the first filed case, to Judge Burke, who did not

15   have the first filed case, is that the first time you've heard

16   that explanation?

17          MS. LISA NOWLIN-SOHL:  Yes.

18          JUDGE PROCTOR:  Exactly -- tell me exactly what you

19   recall about the Friday afternoon phone call with Lightfoot

20   Franklin that you were on the line with; correct?

21          MS. LISA NOWLIN-SOHL:  Yes.

22          JUDGE PROCTOR:  Tell me as much information you recall

23   about that conference as you can.

24          MS. LISA NOWLIN-SOHL:  So I just remember us kind of

25   all agreeing that we needed to hit pause; that we needed more

1    time to sort this out.  And then kind of planning for a call the

2    next day that was going to be with just kind of the decision

3    makers of each group to kind of figure out what would happen

4    next.

5            JUDGE PROCTOR:  Is that all you can recall about it?

6            MS. LISA NOWLIN-SOHL:  It is.

7            JUDGE PROCTOR:  So there were two events that caused

8    you to want to hit pause.  One was you're confused about the

9    assignment to Judge Burke, and the second one that Judge Burke

10   had set you for a Monday status conference.  And you understood

11   it was a status conference?

12           MS. LISA NOWLIN-SOHL:  Yes.

13           JUDGE PROCTOR:  Not a TRO hearing?

14           MS. LISA NOWLIN-SOHL:  Yes.

15           JUDGE PROCTOR:  Not any type of matter other than a new

16   judge getting everybody together to discuss how to proceed.

17   That's what you understood.

18           MS. LISA NOWLIN-SOHL:  I understood it to be, yes, a

19   status conference.  I would say that those were not the only two

20   considerations, though; right?  That also the consolidation and

21   how the groups were going to work together was a huge factor.

22   And that was present on Thursday as well; even though we did not

23   oppose the transfer, that that was still an issue that we were

24   trying to sort out at that time.

25           JUDGE PROCTOR:  You still had the weekend to sort it

 1   out.  Was there any discussion with Lightfoot Franklin about we

 2   need to sort this out, what are the steps?

 3          MS. LISA NOWLIN-SOHL:  I believe that conversation

 4   happened on Saturday with the decision makers.

 5          JUDGE PROCTOR:  That was after the case had been

 6   dismissed, though.

 7          MS. LISA NOWLIN-SOHL:  Right.

 8          JUDGE PROCTOR:  I'm talking about predismissal.

 9          MS. LISA NOWLIN-SOHL:  Right.

10          JUDGE PROCTOR:  The conference call on Friday afternoon

11   was before dismissal.

12          MS. LISA NOWLIN-SOHL:  Yes.

13          JUDGE PROCTOR:  And after everybody hung up from that

14   conference call, the dismissals were made within minutes of each

15   other.

16          MS. LISA NOWLIN-SOHL:  Yes.

17          JUDGE PROCTOR:  And can you say as a lawyer and someone

18   who we have to count on that Judge Burke's being assigned the

19   judge in those cases -- or what you expected, that he would be

20   assigned the judge in both cases -- was not a factor in that?

21          MS. LISA NOWLIN-SOHL:  I'm not saying it's not a

22   factor.  And at that point, we had very little information on

23   Judge Burke.  So him being unknown was one of many factors, but

24   a small one and not the main one.

25          JUDGE PROCTOR:  What work did you do on Judge Marks

1   before you filed?

2           MS. LISA NOWLIN-SOHL:  None.  Well, but I wasn't part

3   of that decision, so I don't know --

4           JUDGE PROCTOR:  Did you know anything about Judge

5   Marks?

6           MS. LISA NOWLIN-SOHL:  I do not, but, again, I came

7   later.  When I joined the case, it was already the understanding

8   that it would be related.  So I was not part of the

9   conversations.

10          JUDGE PROCTOR:  You knew this was going to be related,

11  and you were going to get Judge Thompson.

12          MS. LISA NOWLIN-SOHL:  Or that he would reject it.

13  Yes.

14          JUDGE PROCTOR:  But you knew it was a binary choice.

15  Either Judge Thompson's getting the case in the Middle District

16  when it's filed, or he's not getting the case.

17          MS. LISA NOWLIN-SOHL:  Yes.

18          JUDGE PROCTOR:  Did you do any -- were you aware of

19  anybody doing any homework on Judge Huffaker, Judge Marks, or

20  any other judge?  The best judge on the Court, Judge Watkins?

21          MS. LISA NOWLIN-SOHL:  I am not aware, but that doesn't

22  mean it didn't happen.  Again, I feel like those decisions were

23  made before I join joined the case, so I don't know.  But that

24  doesn't mean that it didn't happen.

25          JUDGE PROCTOR:  But here's where I'm having a

 1   disconnect in what you're telling me.  Judge Burke threw you for

 2   a loop because he's new, and you didn't know much about him;

 3   right?

 4          MS. LISA NOWLIN-SOHL:  I mean, I didn't -- I personally

 5   did not know much about any of the judges, but, yes, that was my

 6   understanding.

 7          JUDGE PROCTOR:  But it didn't sound like Judge Marks

 8   threw you for a loop.  When you found out that Judge Marks was

 9   going to have the case, you were contemplating fighting the

10   transfer so you could stay in front of Judge Marks.

11          MS. LISA NOWLIN-SOHL:  To stay in the Middle District

12   where we -- our chosen forum.

13          JUDGE PROCTOR:  Well, that would have been in front of

14   Judge Marks.

15          MS. LISA NOWLIN-SOHL:  Yes.  But my point is that it

16   wasn't just because of Judge Marks.  This is the forum that we

17   chose for a multitude of reasons.

18          JUDGE PROCTOR:  Where do you live?

19          MS. LISA NOWLIN-SOHL:  I live in Seattle, Washington.

20          JUDGE PROCTOR:  Do you think it's easier to fly to

21   Birmingham or Montgomery from Seattle, Washington?

22          MS. LISA NOWLIN-SOHL:  At the time, I did not know.  As

23   of now, coming here for this, they seem equally challenging.

24          JUDGE PROCTOR:  I would suggest it's a little easier to

25   get to Birmingham.  A few more flights.

1          All right.  Anything further?

2          But you can't remember anything else about the

3    Lightfoot Franklin --

4          You don't remember what the Ladinsky counsel said about

5    their reasons for dismissal?

6          MS. LISA NOWLIN-SOHL:  I really don't.  And my

7    apologies that I don't, but that day was quite blurry.  I'm

8    going to be perfectly honest.  I also had COVID and was really

9    struggling.  So I know that the conversation happened, I know

10   that we kind of dismissed, but, like, the actual details of that

11   and kind of who was involved are a blur.  And -- yeah.

12         JUDGE PROCTOR:  Thank you.  You're excused.

13         MS. LISA NOWLIN-SOHL:  Thank you, Your Honors.

14         MR. SEGALL:  Before y'all call somebody else, could I

15   mention something?

16         JUDGE PROCTOR:  You may.  Let's let the -- she may be

17   subject to recall, so we're going to ask her to step out.

18         MR. RAGSDALE:  Okay.  So she needs to stay here?

19         JUDGE PROCTOR:  Yes.  She's subject to recall, so we're

20   going to keep the rule in place as to her.

21         JUDGE WATKINS:  Are you trying to tell us she has a

22   flight to catch?

23         MR. RAGSDALE:  I was probably going to get to that, but

24   really, I was thinking about other witnesses who do have flights

25   to catch.  But nobody's asking to leave early.  I just wanted to

1   see what the Court's view of that was, and your view is she

2   needs to stay here.

3        THE COURT:  The good news for everyone else is you're

4   the first person, and you gave us some information to think

5   about, and we may be able to be a little bit more surgical with

6   some of our questions now.  We were having to cast a little bit

7   of a wider net.  So I can't make any representations to you, but

8   this may have been one of the longer ones in terms of this

9   category of folks.

10        MS. LISA NOWLIN-SOHL:  Okay.

11        MR. RAGSDALE:  Your Honor, may I say something?

12        JUDGE PROCTOR:  Let's let her get out of the room

13   first.

14        (Ms. Lisa Nowlin-Sohl excused.)

15        MR. RAGSDALE:  Okay.  It has now occurred to me that I

16   have some information that I would like to at some point share

17   with this Court, and I would like to go under oath if necessary.

18        JUDGE PROCTOR:  You need not do that.

19        MR. RAGSDALE:  Can I just say what it is?

20        JUDGE PROCTOR:  Sure.

21        MR. RAGSDALE:  That afternoon when all this is

22   happening --

23        JUDGE PROCTOR:  Now, you know this secondhand.  You

24   weren't firsthand involved in it.

25        MR. RAGSDALE:  Right.

```
 1            JUDGE PROCTOR:  You're just reporting something you're
 2    aware of.
 3            MR. RAGSDALE:  Yes.  It's actually a phone call I got.
 4    I got a phone call from Sam Franklin of the Lightfoot Franklin
 5    firm.  I don't believe he's been involved in this case; had
 6    anything to do with this case.  It was before I got involved in
 7    the case or I was even thought about being in this case.
 8            And Sam said, you know about these cases, the
 9    transgender law cases?
10            I said, I read about them in the paper.
11            He said, well, we just had the weirdest thing happen.
12    We had a case that got assigned to the second filed judge, not
13    the first filed judge.  What do you think about that?
14            And I said, well, that's out of the ordinary.  Is
15    there -- did the judge recuse herself or what happened?
16            And all he was doing was asking another old war horse,
17    frankly, what I thought of that.  And I told him it looked
18    suspicious that a case would get transferred with no order, no
19    notation on the record, nothing, but now had been transferred to
20    a judge who wouldn't have got it in the normal course of events.
21            And I share that only because I shared that with the
22    Lightfoot Franklin folks, and I assume Sam shared that for
23    whatever it was worth.
24            JUDGE PROCTOR:  We can find that out when we talk to
25    the Lightfoot Franklin folks.
```

1          MR. RAGSDALE:  Okay.  But I do want to tell you, I

2    think that's an important fact.  The way you explained how that

3    case got moved from Judge Axon to Judge Burke, I don't think

4    anybody in this courthouse knew that until you said it.

5          JUDGE PROCTOR:  Well, here's --

6          MR. RAGSDALE:  And you can decide whether it's --

7          JUDGE PROCTOR:  Obviously, you're aware of our question

8    related to all that.

9          MR. RAGSDALE:  I understand.

10          JUDGE PROCTOR:  So what?

11          MR. RAGSDALE:  Well, because I think --

12          JUDGE PROCTOR:  Why does that make a difference?

13          MR. RAGSDALE:  I'll tell you.  And I'm an advocate.

14    I'm not fooling anybody.  It scared people.  It looked to me and

15    to others like Judge Burke had reached out to get the case.

16          Now, you can say that was a ridiculous assumption on

17    our part; but you've got to remember, there's a black box that

18    we don't see into about how those cases get moved.  Those

19    lawyers, who were already dealing with a very sensitive subject,

20    saw something out of the ordinary.  Here's -- we thought we were

21    going in front of Judge Axon --

22          JUDGE PROCTOR:  I don't want to take more of your time

23    or more of their time on this, but that's a double-edged sword.

24    And here's why:  You only get suspicious about behavior when you

25    have a reason to be suspicious.

1        And I would tell you this:  No one's entitled to have a

2   particular judge assigned to their case, first filed, second

3   filed.  This case has already moved three times at that point.

4        MR. RAGSDALE:  Right.

5        JUDGE PROCTOR:  Why?  Because of who your clients sued,

6   because of a magistrate judge going on the wheel, and then it

7   lands in the lap of a judge who's doing a four-defendant

8   criminal trial under the Speedy Trial Act and can't suspend a

9   trial for two or three days to get up to speed and hold a

10  hearing or a status conference or even get ready for a TRO

11  later.

12        So there are many natural reasons why that could occur,

13  and I think you know that.

14        MR. RAGSDALE:  Sure.

15        JUDGE PROCTOR:  I think you've been around Acker and

16  Proctor and the others.  I'll be honest with you, this is -- and

17  I'm not speaking of the panel, I'm just speaking for Dave

18  Proctor.  I can only imagine what would happen if Sam Pointer

19  had given you a call, not Sam Franklin, about all this.  You

20  might have gotten much more of an earful.

21        MR. RAGSDALE:  Well, my only point is this, Judge:

22  Every other time the case moved, it followed the law and there

23  was something entered in the record that said, I'm recusing

24  myself or there wasn't a consent.  This last transfer got done

25  with nothing in the record.

1          And although you guys may have known that Judge Axon

2     had this four-day criminal trial, none of these other

3     lawyers --

4          JUDGE PROCTOR:  It was a two-week criminal trial.

5          But here's the thing.  Refresh my recollection.  Judge

6     Burke sets this for a status conference.

7          MR. RAGSDALE:  I think that's --

8          JUDGE PROCTOR:  Was that in a text order?  A paper

9     order?  A phone call?  How did that occur?

10         MR. RAGSDALE:  I think it was an order entered on the

11    record.  I, frankly --

12         JUDGE PROCTOR:  All right.  And was it entered in both

13    cases or in Walker?

14         MR. RAGSDALE:  I'm pretty sure it was in both cases,

15    because at that point what had happened is the case that they

16    thought --

17         And let me say this.  I'm not speaking for the Ladinsky

18    lawyers, and I don't mean to be doing that.  But their case had

19    already been assigned to Judge Axon.  When my group consented to

20    it, we thought we were going to Judge Axon.  And suddenly,

21    without a piece of paper --

22         JUDGE PROCTOR:  Two-edged sword.  Judge Axon and Judge

23    Burke are judges number five and six in the seniority of our

24    Court.  They were both sponsored by the same senator.  They both

25    got appointed by the same president within weeks of each other?

```
 1   I don't remember the timing.
 2           MR. SEGALL:  You're exactly right.  And that
 3   supports -- and what I was going to suggest before Barry spoke,
 4   and what Barry said I was going to say also, but --
 5           We talked about opening statements over there.  I
 6   really think hearing a short opening statement now would help --
 7   I mean, Barry's done a lot of it, but it will help train your
 8   thoughts and your questions.
 9           Because what you just asked about Judge Axon, you're
10   right.  She was --
11           JUDGE PROCTOR:  Look, here's what we would like to do,
12   though.  You're going to give us an opening statement about what
13   you expect, as a road map, we're going to hear from your
14   clients.  I'd rather just hear it from your clients, in all
15   respect.
16           MR. SEGALL:  No, no.
17           JUDGE PROCTOR:  They're going to have to say it anyway,
18   so why would we hear it twice?
19           MR. SEGALL:  Only because I think it would help target
20   your questions.
21           JUDGE PROCTOR:  Do it in three sentences, then.
22           MR. SEGALL:  Excuse me?
23           THE COURT:  Do it in three sentences.  Be Mark Twain.
24   Write a short letter.
25           MR. SEGALL:  I'll try that.
```

```
 1           What you'll see is you're correct that Judge Axon and
 2   Judge Burke, both appointed by the same senator, both appointed
 3   by the same president, absolutely no effort of any kind to
 4   change away from Judge Axon.  None.  Because nobody --
 5           Do you want me to stop?
 6           JUDGE PROCTOR:  No, keep going.
 7           MR. SEGALL:  Because nobody was trying to deviate or
 8   circumvent the random selection system.  They were going to stay
 9   with Judge Axon.  That was -- no thought of leaving Judge Axon,
10   despite whoever may have appointed her, et cetera.
11           These people were competing to be first filed.  The
12   reason the preliminary injunction hadn't been filed yet in
13   Ladinsky is they wanted to be the first filed so in the event
14   there ever became a consolidation, they would be the lead case.
15   They would be the ultimate decision maker.
16           JUDGE PROCTOR:  Who's they?  You're using pronouns.
17   I'm not sure who you're referring to as they.
18           MR. RAGSDALE:  Ladinsky.
19           JUDGE PROCTOR:  Ladinsky.
20           MR. SEGALL:  Yeah.  So Ladinsky --
21           JUDGE PROCTOR:  Ladinsky wanted to be first in line.
22           MR. SEGALL:  Yes.
23           JUDGE PROCTOR:  Was first in line.
24           MR. SEGALL:  Yes.
25           JUDGE PROCTOR:  Yet didn't final a TRO.
```

 1          MR. SEGALL:  They were preparing a TRO.  During that

 2   week that Eddie LaCour was talking about, they were preparing

 3   it.  And you'll hear testimony about it if you ask, but it had

 4   to do with service of process and all of that.  But all that was

 5   in the works before Judge Axon.

 6          And then, you know, this case gets consolidated.

 7   Nobody particularly wanted them consolidated, but everybody

 8   recognized that was a possibility.  My clients were fine with it

 9   because they were going to still be the lead case.  It still was

10   going to Judge Axon.

11          And I'll tell you one other thing, because it goes to

12   the heart --

13          JUDGE PROCTOR:  You're past three sentences, but go

14   ahead.  Finish up.

15          MR. SEGALL:  One thing you're going to want to hear.

16   But then it goes, as you know, in reverse order of first filed.

17   Which seemed not only strange, the way Barry said it, but there

18   are two cases, one with Judge Marks --

19          JUDGE PROCTOR:  Let me just stop you and tell you what

20   my question is about all this.  You're suggesting that your

21   lawyers are such procedural rule followers, and so imbedded into

22   the random assignment process ought to be where everybody falls

23   here, and we had a big question when, all of a sudden, a judge

24   who was not first, with the first case, gets the case, that it

25   blew our minds --

1          MR. SEGALL:  Yes.

2          JUDGE PROCTOR:  -- and we just had to hit pause.

3          MR. SEGALL:  No.  Pause was --

4          JUDGE PROCTOR:  That's what your client said.

5          MR. SEGALL:  That's what the Walker witness said.  Not

6     my client.

7          JUDGE PROCTOR:  Well, that's the only thing we've got.

8     She said both sides decided to hit pause.

9          MR. SEGALL:  Well, my clients were -- and this is --

10    and I'm trying to get to your question --

11         JUDGE PROCTOR:  Let me get to my question before you

12    answer what I'm not asking.  Here's my question:  Then why

13    didn't you just follow the random assignment and not try to

14    relate this to Judge Thompson?

15         MR. RAGSDALE:  That's not --

16         MR. SEGALL:  That's them.

17         JUDGE PROCTOR:  Okay.  But you understand --

18         MR. SEGALL:  We had no interest in coming to the Middle

19    District.  We didn't try to get to Judge Thompson.

20         JUDGE PROCTOR:  Well, we haven't asked anybody in the

21    Ladinsky case any questions yet.

22         MR. SEGALL:  Right.  I know that.  But the point is,

23    Judge -- and let me just finish these last two points.

24         When it gets transferred the wrong way, and Ladinsky is

25    no longer the lead case and it goes to Judge Burke with no

 1   explanation.  Nothing in the order suggests that.  Everybody

 2   is --

 3          Barry doesn't even know that.  I also got a call

 4   from --

 5          JUDGE PROCTOR:  How much time expired between your

 6   lawyers learning the case had gone to Judge Burke and the

 7   decision to dismiss?

 8          MR. SEGALL:  I think --

 9          MR. RAGSDALE:  Hours.

10          MR. SEGALL:  Two hours.

11          JUDGE WATKINS:  Two hours.

12          JUDGE PROCTOR:  So there wasn't really an opportunity,

13   if there was an explanation coming, like an order that would be

14   more formal --

15          MR. SEGALL:  Right.  There was no time.  And they

16   were --

17          But let me get this point out because I want to say it.

18   There was at that point, I believe, some discussion about why in

19   the world this would have gotten to Judge Burke; that having

20   perception of Judge Burke, who they thought -- as Barry said,

21   maybe somebody reached out.

22          Sam Franklin also called me, you know, just saying,

23   how --

24          JUDGE PROCTOR:  Is there any factual basis you're aware

25   of, other than the fact that Judge Burke entered an order, to

1    suggest that Judge Burke reached out and grabbed this case?

2         MR. SEGALL:  I have no -- I'm not suggesting anybody

3    did anything wrong.

4         JUDGE PROCTOR:  But you understand -- and I want to

5    move you along, because we're going to get to your side.  We're

6    not going to get to them if we let you keep talking.

7         But what I'm going to suggest to you, since we're on

8    your side of the case right now, is that doesn't make any sense

9    to me.

10        MR. RAGSDALE:  You know what?  It does if you'll do

11   what you said you did earlier, which is put yourself back in the

12   place of a practicing lawyer.  And you're a lawyer who can't

13   pick up the phone and say, hey, how did this case get to Judge

14   Burke?  You may think we can do that, but we can't.  Lawyers, in

15   a black box, suddenly saw the normal rules not followed in a

16   high-profile, controversial case.

17        I understand we tried to game the system --

18        JUDGE PROCTOR:  Let me back up.  Let me back up,

19   because I think it goes beyond what you're suggesting.  And not

20   saying you're misleading.  I'm just saying it goes beyond what

21   you're suggesting.

22        Am I to believe that your clients, if they had not

23   marked a related case, and they filed and drew Judge Marks as

24   they did with Walker, and then immediately got a notice from

25   Judge Thompson to show up here on Monday, we're having a status

 1  conference in this case, without any explanation, would have had

 2  their minds blown and dismissed the case?

 3        MR. RAGSDALE:  Obviously, we would have loved to have

 4  had Judge Thompson.  I don't think anybody --

 5        JUDGE PROCTOR:  And that's the issue we're dealing

 6  with.  It seems like we're on a spectrum.  And we're going to

 7  call our next witness in, but we're on a spectrum where at least

 8  the appearance -- I'm not saying this is what happened, but the

 9  appearance is there's a judge you really, really wanted and a

10  judge you really, really didn't.  And that's what we're trying

11  to grapple with here.

12        MR. RAGSDALE:  Let me just say this:  There is one

13  judge in all three districts we wanted, was Judge Thompson.  I'm

14  not telling you anything you don't know.  There's not a lot of

15  judges in the three districts who have experience with what he

16  has experience with, and guess what?  He is also more inclined

17  to help a plaintiff.  I'll admit that.  I don't think there's

18  anything mysterious about that.  It happens in my cases all the

19  time with civil cases who want to get in front of you because

20  you're perceived as being a defense oriented judge, which I

21  would disagree with.

22        JUDGE PROCTOR:  That's actually different than what

23  I've heard.

24        MR. RAGSDALE:  Judge, as long as you're following the

25  rules, you're advocating for your client when you try to make

1  sure that you're with a more favorable judge.  And we followed,

2  I believe, the rules.

3        Now, let me say this.  I think this is important.

4  These folks, at least my folks, didn't know anything about Judge

5  Burke any more than they knew about anybody else.  If they had

6  called me and said, is Judge Axon good for us, you know what I

7  would have said?  Probably not.  Probably not good for you.

8        But the decision was in part made because of the speed

9  in which it was done; those cases being thrown together.  And

10 then, frankly, the fact that it looked weird to us.  I mean, I

11 just --

12        JUDGE PROCTOR:  We get your point.

13        MR. RAGSDALE:  Please don't lose sight of that fact.

14 That's all.  I'm sorry.

15        JUDGE PROCTOR:  We have your point.

16        MR. RAGSDALE:  Okay.  Thank you, Judge.

17        MR. SEGALL:  It never would have happened -- if they

18 had gotten Burke on the first -- that was the random selection,

19 we wouldn't be here today.  That's the point I want to make.

20        JUDGE PROCTOR:  I guess that's why we're here today.

21        MR. SEGALL:  If we had gotten Burke on the first --

22 instead of Axon we had gotten Judge Burke, we would have still

23 been with Judge Burke without any issue of any kind.

24        MR. RAGSDALE:  Thank you for your indulgence.  Thank

25 you.

```
 1              JUDGE PROCTOR:  Thank you.  We'll talk about the

 2    defense lawyer implications later.

 3              MR. RAGSDALE:  Okay.  I knew I was going to hear about

 4    that.  Who would you like next?

 5              JUDGE WATKINS:  Kaitlin Welborn.

 6              (Ms. Kaitlin Welborn present.)

 7              JUDGE WATKINS:  Hi, Ms. Welborn.  How long have you

 8    been with ACLU of Alabama?

 9              MS. KAITLIN WELBORN:  Since May 1st, 2020.

10              JUDGE WATKINS:  2020?

11              MS. KAITLIN WELBORN:  Just over two years.

12              JUDGE WATKINS:  All right.  Were you involved in the

13    activities of ACLU when this type legislation was pending in

14    2021?

15              MS. KAITLIN WELBORN:  Yes.

16              JUDGE WATKINS:  Who did y'all coordinate with in 2021?

17    Generally, was it the same -- the other folks in this space who

18    are involved in this case, these cases?

19              MS. KAITLIN WELBORN:  With regard to the litigation as

20    opposed to policy and lobbying.  With regard to litigation, it

21    was the same groups except for the Transgender Law Center, who

22    only joined recently, this year.

23              JUDGE WATKINS:  All right.  And so in 2021, you-all

24    were preparing to litigate if that act had passed in 2021?

25              MS. KAITLIN WELBORN:  Yes.
```

 1           JUDGE WATKINS:  Okay.  Now, when 2022 came around and

 2   it was time to file, were you involved in the decision to put

 3   Judge Thompson down as a related -- as having a related case?

 4           MS. KAITLIN WELBORN:  Yes.

 5           JUDGE WATKINS:  Do you know the rules about related

 6   cases?

 7           MS. KAITLIN WELBORN:  I mean, there are no rules, to my

 8   understanding in -- there are no local rules.

 9           JUDGE WATKINS:  There's no local rule.  Correct.  But

10   ordinarily is it your understanding that a related case is

11   related to a pending case?  And you-all actually framed this as

12   Judge Thompson had experience in these kinds of cases.

13           MS. KAITLIN WELBORN:  Yes.  Well, yes, I am aware of

14   that, the pending nature.  Although Corbett, which I am also

15   counsel in, is technically closed by the district court --

16           JUDGE WATKINS:  Yes.  We understand it's on appeal.

17           MS. KAITLIN WELBORN:  Right.  Yes.  It's on appeal.

18   And remand is a considerable possibility.  In fact --

19           JUDGE WATKINS:  We get that.

20           MS. KAITLIN WELBORN:  Right.  So -- and there's also a

21   motion for attorney's fees that will have to be dealt with after

22   the appeal.  So there's still goings on of sorts with Corbett,

23   even if the case is closed on -- marked as closed on the docket.

24           JUDGE WATKINS:  Is Ms. Faulks your supervisor?

25           MS. KAITLIN WELBORN:  Yes.

```
 1            JUDGE PROCTOR:  Was she involved in the decisions
 2   regarding this case as to bringing the case in the Middle
 3   District and then to consent to the transfer of the case --
 4            MS. KAITLIN WELBORN:  Yes.
 5            JUDGE WATKINS:  -- to Birmingham, to the Northern
 6   District?
 7            MS. KAITLIN WELBORN:  Sorry.  Yes.
 8            JUDGE WATKINS:  All right.  Was she the decision maker
 9   with respect to that?
10            MS. KAITLIN WELBORN:  Yes.
11            JUDGE WATKINS:  Are you aware of any activities by
12   anybody on your team to try to have a judge disqualified on that
13   case or any subsequent case?
14            MS. KAITLIN WELBORN:  Related to this matter?
15            JUDGE WATKINS:  Related to this matter.
16            MS. KAITLIN WELBORN:  No.  None whatsoever.
17            JUDGE WATKINS:  All right.  That's all I have for right
18   now.
19            JUDGE PROCTOR:  Do you regularly practice in this
20   district?
21            MS. KAITLIN WELBORN:  Yes.
22            JUDGE PROCTOR:  Are you aware that there are
23   instructions the Middle District has about related cases, at
24   least electronic instructions for that case civil action form?
25            MS. KAITLIN WELBORN:  On the civil action form, it just
```

1   has a box to be checked to say a related case.

2        JUDGE PROCTOR:  Have you ever seen the instructions

3   about how to complete the civil action form that the Middle

4   District of Alabama maintains?

5        MS. KAITLIN WELBORN:  I'm sure I have at one point in

6   time, but I cannot say that I looked at them before --

7        JUDGE PROCTOR:  You didn't look at them before this

8   case was -- the Walker case was filed here and the Corbett case

9   was put as a related case.

10       MS. KAITLIN WELBORN:  That's correct.  We were

11  following -- the ACLU of Alabama has filed many cases in the

12  past and related them to other cases, and so we were going off

13  of our experience.

14       JUDGE PROCTOR:  How often had you done that in a case

15  that did not involve Judge Thompson?

16       MS. KAITLIN WELBORN:  I do not know.

17       JUDGE PROCTOR:  Can you think of a time you've done

18  that in a case that did not involve Judge Thompson?

19       MS. KAITLIN WELBORN:  No.  I've only worked there for

20  two years, so that's why we consulted people who have been doing

21  this for a very long time, including people at the National

22  ACLU.  But I cannot recall any specific instance.

23       JUDGE PROCTOR:  So there's a metaphysical possibility

24  that the Corbett case could come back to Judge Thompson at some

25  point in time?

1          MS. KAITLIN WELBORN:  I would not characterize it as

2    metaphysical.  It definitely will come back to Judge Thompson

3    because we have to deal with attorneys' fees.

4          JUDGE PROCTOR:  I'm talking about in terms of managing

5    the actual litigation, not a postjudgment attorneys' fee

6    petition.

7          MS. KAITLIN WELBORN:  I think there's actually a

8    significant likelihood.  Judge Thompson only ruled on one cause

9    of action, and so if the appeal is remanded, there are a variety

10   of other causes of action that Judge Thompson never ruled on.

11   So it's not a slim chance, I would say, at all.

12         JUDGE PROCTOR:  Other than Corbett and Judge Thompson's

13   involvement with Corbett, is there any other motivation that you

14   had to have this case related and assigned to Judge Thompson?

15         MS. KAITLIN WELBORN:  No.  It's purely based on Judge

16   Thompson having considerable experience handling these novel and

17   complicated issues that do intersect.

18         So to give you an example, in Corbett the State's

19   position is that you must undergo gender conforming surgery in

20   order to change the sex designation on your driver's license.

21   Under SB 184, people under the age of 19 can never get that

22   exact same surgery.  So when you are 18 years old and 364 days,

23   you cannot get that surgery.  And then the day that you turn 19,

24   the State mandates that you get that surgery in order to have a

25   driver's license that reflects that.

```
1            JUDGE PROCTOR:  I understand.
2            MS. KAITLIN WELBORN:  So these issues are actually very
3   intertwined.
4            JUDGE PROCTOR:  I understand your point on that.
5            Were you involved in the phone conference on the Friday
6   afternoon before dismissal of the Walker case?
7            MS. KAITLIN WELBORN:  Which phone conference are you
8   referring to?
9            JUDGE PROCTOR:  The phone conference with the Walker
10  counsel and the Ladinsky team.
11           MS. KAITLIN WELBORN:  No.
12           JUDGE PROCTOR:  All right.  Did anyone tell you
13  anything about that phone conference?
14           MS. KAITLIN WELBORN:  We -- yes.  I believe that either
15  Tish or someone from our team relayed some information about
16  what happened.
17           JUDGE PROCTOR:  What information did they relay?
18           MS. KAITLIN WELBORN:  That the plan was to -- and plan
19  I say very loosely -- plan on our end was to --
20           JUDGE PROCTOR:  The decision was.
21           MS. KAITLIN WELBORN:  Yes.  To dismiss the case, work
22  together with both cases to have one united front of all of
23  these organizations, and refile.  But there were -- there was a
24  lot of ambiguity there, and so nothing absolutely was certain.
25           JUDGE PROCTOR:  What did they say about where the case
```

1  would be refiled or how the case would be refiled?

2         MS. KAITLIN WELBORN:  I don't recall hearing about

3  that.

4         JUDGE PROCTOR:  Did you hear anything about it being

5  refiled in the Middle District based upon what was reported to

6  you from that phone conference?

7         MS. KAITLIN WELBORN:  From that phone conference, no.

8         JUDGE PROCTOR:  I'm sorry?

9         MS. KAITLIN WELBORN:  From that phone conference, no.

10        JUDGE PROCTOR:  When was the first time you heard of

11 the plan to refile in the Northern District?

12        MS. KAITLIN WELBORN:  Refile in the Middle District.

13        JUDGE PROCTOR:  Yes.  Refile in the Middle District.

14 Excuse me.  Thank you.

15        MS. KAITLIN WELBORN:  Now that I think about it, I

16 don't think that I knew that the Ladinsky team was going to

17 refile in the Middle District until I saw the complaint.

18        JUDGE PROCTOR:  Until it was filed?

19        MS. KAITLIN WELBORN:  Uh-huh.

20        JUDGE PROCTOR:  All right.  And if you would, say yes

21 or no.

22        MS. KAITLIN WELBORN:  Sorry.  Yes.

23        JUDGE PROCTOR:  What was discussed on your side about

24 not going forward with the Walker plaintiffs any further?

25        MS. KAITLIN WELBORN:  My understanding was that there

 1  were conversations between the decision makers of the Walker and

 2  Ladinsky teams to try to work together and file one case.  Those

 3  conversations did not result in having one unified front.  There

 4  were some disagreements about strategy.  And so the decision was

 5  made that it would not be one case, at which point the various

 6  organizations in the Walker case decided, each on their own,

 7  whether they thought the Walker team should bring a new case or

 8  file again.

 9         We decided -- and Tish and I discussed this after

10  hearing from the other teams -- that it was not a smart use of

11  limited resources to file a second case.  That the Ladinsky team

12  is more than capable of vindicating the rights of transgender

13  people, as we saw with the preliminary injunction being granted,

14  and that the ACLU of Alabama in particular is well situated to

15  work with the community in ways outside of litigation.

16         JUDGE PROCTOR:  All right.  All that may be true.  Why

17  wasn't it true on the Friday that these cases were dismissed?

18  Do you have any understanding about why one side just didn't

19  yield if there couldn't be an agreement to collaborate and go

20  forward with one of the cases in the Northern District?

21         MS. KAITLIN WELBORN:  I do not have any specific

22  understanding of that.

23         JUDGE PROCTOR:  What did you hear about it?

24         MS. KAITLIN WELBORN:  I heard that there were

25  philosophical differences in what claims we would bring and that

1   in general not everyone from the various groups got along all

2   that well.  So, you know, it's really difficult to have

3   cocounsel if there are not only differences in philosophy, but

4   maybe differences in style as well.  So we -- if we had been

5   able to work together, I think we absolutely would be this

6   united front that we wanted.

7          JUDGE PROCTOR:  But you understand my concern.

8          MS. KAITLIN WELBORN:  Yes.

9          JUDGE PROCTOR:  Is that's what you decided on Saturday

10  or Sunday or Monday, but you didn't decide that on Friday.  You

11  decided to -- both sides decided just to dismiss the cases and

12  figure it out later.  How did that help your clients, who wanted

13  to stop the application of this statute to them?

14         MS. KAITLIN WELBORN:  So first of all, all of this is,

15  you know, secondhand information.  Second, we -- I know that

16  there was an agreement to make a good faith effort to work

17  together, and that actually happened.  There were lots of

18  discussions that I was not involved with with the decision

19  makers of all of the various organizations.  I think everyone

20  wanted that to work.  It didn't work.  That happened over the

21  weekend.

22         On Friday -- part of the reason why the dismissal

23  occurred on Friday rather than waiting several days was because

24  Judge Burke had issued an order setting a status conference for

25  9:30 in the morning on Monday in Huntsville over Easter weekend.

1  Tish, my boss, our legal director, who would be best positioned

2  as one of the lawyers in the state to attend that status

3  conference, was out of state.  She was visiting family in South

4  Carolina.  She would not have been able to get back for that.

5  So we thought if we are going to dismiss, we need to do it now,

6  because we cannot make this status conference.  It's just not

7  going to happen.

8          JUDGE PROCTOR:  Did you ask to be available remotely?

9          MS. KAITLIN WELBORN:  I believe that there was -- I

10  take that back.  I do not know if there was a specific request

11  to Judge Burke.  I do know that it was our understanding that

12  in-person hearings had resumed in the Northern District, in

13  various courthouses in the Northern District.

14          JUDGE PROCTOR:  But we're rolling out of COVID where we

15  did a lot of remote conferences.  You're not aware of any

16  inquiry or decision to make inquiry about whether counsel could

17  be available on such short notice remotely?

18          MS. KAITLIN WELBORN:  There may well have been, but --

19          JUDGE PROCTOR:  You're not aware.

20          MS. KAITLIN WELBORN:  I am not aware of that, no.

21          JUDGE PROCTOR:  All right.  Can you tell us that you're

22  not aware of any fact, other than the civil cover sheet's

23  reference, that was an attempt to either steer one of these

24  cases to a particular judge or avoid a judge with any of these

25  cases?

1          MS. KAITLIN WELBORN:  The only other thing that I would

2    mention is that there was a conversation with the Attorney

3    General's office once we were assigned Judge Burke and the

4    Ladinsky case was in front of Judge Axon.  We were going to move

5    to consolidate the cases because that's what we thought was

6    originally going to happen, and that was the whole point of us

7    moving up to the Northern District.  So I was on the phone with

8    Solicitor General LaCour, asking if he would consent to

9    consolidation.  He said, yes, we were actually going to call you

10   and do the same thing.

11         And actually, on that phone call was when the order

12   came down with Judge Axon transferring the case to Judge Burke.

13   But the decision to try to consolidate the cases was purely for

14   judicial efficiency and going with the first filed case, not for

15   any other reason.

16         JUDGE PROCTOR:  All right.  Thank you.

17         MS. KAITLIN WELBORN:  Could I mention one other thing?

18   Solicitor General LaCour mentioned two things that -- two facts

19   that he considered alluded to some form of collusion, and I just

20   want to give you some context around those.

21         The first was that there was a press conference in

22   which Dr. Ladinsky and Jeff Walker, plaintiffs in separate

23   cases, appeared together.  That press conference was not

24   organized by us, and it's no surprise that they would appear

25   together.  Dr. Ladinsky is one of only a handful of doctors in

1  the state that work on these issues, and she certainly is the

2  most prominent and outspoken.

3          Same thing with Mr. Walker.  There are very few

4  families that are willing to openly talk about their transgender

5  children because of a variety of fears of harassment, which is

6  why in the Eknes-Tucker case, many of the plaintiffs are

7  proceeding under pseudonyms.  So Jeff Walker is one of the very

8  few people that can actually give interviews.

9          JUDGE PROCTOR:  Thank you.

10          MS. KAITLIN WELBORN:  The second thing is that

11  Solicitor General LaCour mentioned that Representative Rafferty

12  lumped the various organizations in together.  I believe he

13  mentioned SPLC, some other organizations, and Lambda.  We never

14  spoke to Neil Rafferty.  I am the one who is covering the

15  legislature, if you will, and I am the expert on the legislative

16  machinations.  So if anyone would have talked to Representative

17  Rafferty, it would have been me, and I did not.

18          JUDGE PROCTOR:  You did not.

19          MS. KAITLIN WELBORN:  No.  So anything that

20  Representative Rafferty says was gleaned from some other source,

21  not from the Walker case.

22          JUDGE PROCTOR:  Thank you.

23          MS. KAITLIN WELBORN:  That's all.

24          JUDGE PROCTOR:  You're excused.

25          MS. KAITLIN WELBORN:  Great.  Thank you.

```
 1              JUDGE PROCTOR:  Stay in the courthouse.

 2              MR. RAGSDALE:  By excused you mean she can go in the

 3    hall.

 4              JUDGE PROCTOR:  You're excused from the courtroom.

 5    Please stay in the courthouse because if your name comes up on

 6    something, we may need to call back.

 7              MS. KAITLIN WELBORN:  Well, I mean, I don't blame you

 8    if you want to have me back, so that's okay.

 9              JUDGE PROCTOR:  Fair enough.

10              (Ms. Kaitlin Welborn excused.)

11              JUDGE WATKINS:  Do we need to take a break?  We've been

12    going for two hours.  Reporter might need a break.  Anybody need

13    a break?

14              MR. RAGSDALE:  I actually don't, but I don't want to

15    stand in anybody's way.

16              MR. CAPONE:  We, obviously, will take a break.  But

17    because people have flights, we're interested in going.

18              JUDGE WATKINS:  Well, we'll keep going.  It will be

19    fine.  Did you say Chase Strangio?

20              (Mr. Chase Strangio present.)

21              JUDGE WATKINS:  Good afternoon.

22              MR. CHASE STRANGIO:  Good afternoon.

23              JUDGE WATKINS:  Where do you practice?

24              MR. CHASE STRANGIO:  I am based in New York City.

25              JUDGE WATKINS:  New York City.  In the time frame of
```

1    April the 8th through the 15th, were you physically in New York

2    City or were you in Alabama or where were you when all of these

3    decisions were being made?

4        MR. CHASE STRANGIO:  I definitely was not in Alabama.

5    To the best of my recollection, I was in New York City for that

6    entire period of time.

7        JUDGE WATKINS:  Okay.  So any communications would have

8    been electronic or by phone --

9        MR. CHASE STRANGIO:  Correct.

10       JUDGE WATKINS:  -- or in writing.  Electronically in

11   writing.

12       MR. CHASE STRANGIO:  Yes.  Correct, Your Honor.

13       JUDGE WATKINS:  Right.  Right.  Were you involved in

14   the decision, specifically the decision to put Judge Thompson

15   down as having a related case to the Walker case?

16       MR. CHASE STRANGIO:  So I was involved from the ACLU in

17   2020 and 2021 on these cases, and during those periods of time I

18   was part of the discussions to mark the Walker case as related

19   to the Corbett case.  During the period of time that that was

20   discussed, to the best of my recollection, in 2022, I was

21   involved in an intensive evidentiary hearing and was not part of

22   those discussions in 2022.

23       JUDGE WATKINS:  Not related to this case at all.

24       MR. CHASE STRANGIO:  It was related to the previous

25   iterations of the case, but I do not recall having any of those

 1  discussions related to the actual Walker litigation.  But it had

 2  previously been discussed in 2020 and 2021.

 3       JUDGE PROCTOR:  When you say iterations of the case,

 4  you mean iterations of the statute and what --

 5       MR. CHASE STRANGIO:  Yes.  Yes.  Yes.  Exactly.  So the

 6  previous versions of the bill that had been considered in the

 7  Legislature in 2020 and then in 2021, we had also discussed

 8  preparing litigation very similar to what was ultimately filed

 9  in 2022.  And I had been involved in those discussions, which

10  included discussions about marking any potential litigation as

11  related to the Corbett case, which had been pending during that

12  time.

13       JUDGE WATKINS:  All right.  So this lineup of entities

14  and counsel for the 2021 case, did it involve anyone in 2021

15  that was not involved in the case that was ultimately filed?

16       MR. CHASE STRANGIO:  No, Your Honor, it did not involve

17  anyone who was not involved.  There were additional people who

18  became involved in 2022.

19       JUDGE WATKINS:  Right.  Okay.

20       MR. CHASE STRANGIO:  Yes.

21       JUDGE WATKINS:  But they had not been involved --

22       MR. CHASE STRANGIO:  Yes.  Correct.

23       JUDGE WATKINS:  In 2021, were you coordinating with the

24  Department of Justice?

25       MR. CHASE STRANGIO:  No, Your Honor.

```
 1          JUDGE WATKINS:  When did they get involved?  What was
 2  your first recollection of their being involved?
 3          MR. CHASE STRANGIO:  I'm trying to recall
 4  conversations.  I am also part of litigation in the state of
 5  Arkansas over a bill that was passed in Arkansas in 2021 and had
 6  ongoing conversations with the Department of Justice.  They had
 7  filed an amicus brief in that case and then again in the Eighth
 8  Circuit on the appeal of the preliminary injunction in that
 9  case.  So my conversations in 2022 with the Justice Department
10  about issues comparable to the issues presented in this case
11  were largely about the Arkansas litigation.  And I don't recall
12  having any direct conversations with the Department of Justice
13  until at some point I believe in April of 2022, I did have a
14  conversation with members of the --
15          Do we have any water?  Thank you.  I shouldn't have had
16  those peanut M&Ms.
17          Members of the Civil Rights Division from the
18  Department of Justice reached out to ask us about whether or not
19  we would be filing and when.
20          JUDGE WATKINS:  In 2022?
21          MR. CHASE STRANGIO:  Uh-huh.  Yes.  I do recall having
22  that -- I was on one phone call with the Department of Justice
23  about the timing of potential litigation.
24          JUDGE WATKINS:  All right.  Earlier when we were
25  listening to your representations as to what you were involved
```

1  in, did you say that you had an input about the judge assigned?

2  Would that have been Judge Thompson or Judge Burke or Judge Axon

3  or who?

4          MR. CHASE STRANGIO:  So my -- the extent of the

5  conversation that I had -- conversations that I had about judges

6  included conversations in 2021 about marking the case as related

7  to Corbett.  And then --

8          JUDGE WATKINS:  Corbett was still in the district at

9  that time, was it not?

10          MR. CHASE STRANGIO:  I believe that it was still in the

11  district at that time.  I was not counsel in Corbett, but I

12  understand that to be true.

13          In 2022 -- and the two -- to the best of my

14  recollection, based on the conversations, I do remember having

15  conversations about whether or not the case had been assigned to

16  Judge Marks or Judge Thompson at the time that we were

17  considering -- or trying to file our motion for preliminary

18  injunction and temporary restraining order and trying to figure

19  out where the case was.

20          And then I remember having conversations about -- when

21  the case was being moved to the Northern District, conversations

22  about who the judge assigned to the Ladinsky case had been,

23  because at that point I don't think I knew whether it was Judge

24  Manasco or Judge Axon.  And then I had conversations -- on that

25  Friday afternoon at the time that Judge Burke issued the order

1  to appear on Monday morning, I remember having conversations

2  about how to prepare for that, given that almost none of us were

3  admitted pro hac vice at that time.

4          JUDGE WATKINS:  Where do you fall in -- is

5  Ms. Nowlin-Sohl your supervisor or Ms. Picasso?

6          MR. CHASE STRANGIO:  Mr. Esseks is my supervisor.

7          JUDGE WATKINS:  Oh, okay.  Mr. Esseks is your

8  supervisor.

9          MR. CHASE STRANGIO:  That's correct.

10          JUDGE WATKINS:  All right.  Did you call the clerk's

11  office here at our court about Judge Thompson being appointed?

12          MR. CHASE STRANGIO:  I did not.

13          JUDGE WATKINS:  Did you call any judge's chambers at

14  any time during this period?

15          MR. CHASE STRANGIO:  I did not.

16          JUDGE WATKINS:  All right.

17          JUDGE PROCTOR:  Are you aware of anyone who did?

18          MR. CHASE STRANGIO:  I am aware -- I am aware that

19  calls were made.  I am not aware of who made them.  And I was on

20  emails during that time.  And early in that week I was still

21  recovering from COVID, and I missed some of those conversations

22  from around the 8th and the 9th and was more actively involved

23  on the 14th and 15th if that's later in the week, if I recall.

24  But I was not -- I was not part of any conversations about

25  calling the clerk's office.

1          JUDGE PROCTOR:  What I'm asking is do you have a

2     recollection as you sit here today of hearing from others about

3     any such phone call being made to the clerk's office, a judge's

4     chambers, or anyone else about relatedness or directing a case

5     be assigned to a particular judge?

6          MR. CHASE STRANGIO:  Yes.  Sorry, Your Honor, for the

7     lack of clarity.  I recall that when we were filing the motion

8     for the temporary restraining order and for the preliminary

9     injunction, a question was raised about where the case had been

10    and whether or not it had been properly marked as related and

11    that a call was made to the clerk's office about that question.

12    That is the only recollection I have about the calls to the

13    clerk's office and what they concerned.

14          JUDGE PROCTOR:  Thank you.

15          JUDGE WATKINS:  Who made that call?

16          MR. CHASE STRANGIO:  I don't know.

17          JUDGE WATKINS:  All right.

18          MR. CHASE STRANGIO:  To clarify, it is possible that I

19    received an email about who received that call, but I don't

20    know.

21          JUDGE PROCTOR:  Were you on the phone call on the

22    Friday afternoon before dismissal of the cases, the Ladinsky

23    dismissal and the Walker dismissal in the Northern District of

24    Alabama?

25          MR. CHASE STRANGIO:  I was on a phone call with the

1    Walker team only.

2            JUDGE PROCTOR:  Not on a joint call with the Ladinsky

3    team and the Walker team?

4            MR. CHASE STRANGIO:  I have never been on a joint call

5    with the Ladinsky team and the Walker team.

6            JUDGE PROCTOR:  That saved you a few minutes.  Did you

7    ever hear about such a call?

8            MR. CHASE STRANGIO:  I heard about -- I didn't know if

9    there was a call that included multiple people.  I had heard

10   that there were conversations about some members of our team

11   speaking with some members of the Ladinsky team.  I was aware

12   specifically about a call about a motion to consolidate and

13   getting -- or consenting to the AG's motion.  And I believe that

14   that is the extent of my knowledge at that time, although I

15   think that there was -- I'm trying to recall that Friday

16   afternoon because I also -- I left at a certain point because I

17   had my child with me, so I missed a period of time.  To the best

18   of my recollection, I recall the conversation about the

19   consolidation before Judge Axon, and I didn't know if there were

20   formal calls scheduled with Ladinsky about dismissal.

21           JUDGE PROCTOR:  All right.  Did you ever hear or

22   participate or hear about any discussions about a concern about

23   Judge Burke having the case or the cases?

24           MR. CHASE STRANGIO:  I did not know anything about

25   Judge Burke until Friday afternoon.  I was aware of

1   conversations as soon as the status conference was scheduled

2   about Judge Burke having the case and having to appear and some

3   conversations about whether or not -- you know, how hospitable a

4   forum for transgender litigants the case would have before Judge

5   Burke.

6           As someone who does this litigation frequently on these

7   matters, I'm always concerned about advocating for my clients

8   and whether or not I'll be able to adequately explain what it

9   means to be transgender.  So I do often have those concerns.

10  And I was concerned about having to appear within one business

11  day where I personally had not yet been admitted pro hac vice

12  and could not appear.  But the extent of that conversation --

13          JUDGE PROCTOR:  You're talking about the status

14  conference he set at 9:30 that Monday morning?

15          MR. CHASE STRANGIO:  Sorry, Your Honor.  I didn't hear

16  you.

17          JUDGE PROCTOR:  Are you referring to the status

18  conference --

19          MR. CHASE STRANGIO:  Yes.

20          JUDGE PROCTOR:  -- that Judge Burke set at 9:30 on

21  Monday morning?

22          MR. CHASE STRANGIO:  Yes, Your Honor.

23          JUDGE PROCTOR:  You understood that you would have to

24  move quickly in this case and expected and hoped to move quickly

25  in this case because of the approaching date of the -- the

1   effective date of the statute, and you wanted to get a TRO

2   hearing on the books as soon as possible; correct?

3          MR. CHASE STRANGIO:  Yes, Your Honor.  That is

4   accurate.  And I was -- I had a lot of concerns the entire time.

5   I thought we were moving very quickly.  And then the prospect

6   of, in all candor, coordinating with the Ladinsky team was

7   something that concerned me greatly.  So my concerns were

8   partially about appearing before Judge Burke, and also

9   significantly about working across eight organizations.

10          I've been at the ACLU for ten years.  I've had

11   nightmare experiences trying to coordinate large litigation

12   teams, particularly from movement organizations, and I had very

13   significant concerns about our ability to effectively represent

14   our clients under those circumstances.

15          JUDGE PROCTOR:  All right.  And you expressed those

16   concerns to others?

17          MR. CHASE STRANGIO:  I expressed the concerns to my

18   supervisor, Mr. Esseks, at various points, that I was very

19   anxious about the prospect of having to participate in a

20   significant and unwieldy litigation that involved many lawyers.

21          JUDGE PROCTOR:  The decision was made ultimately just

22   to dismiss the action and let the Ladinsky lawyers go forward

23   with the Eknes-Tucker case; correct?

24          MR. CHASE STRANGIO:  I did not know what case or

25   whether they would go forward.  The decision was made to

1  dismiss, and I was not directly involved in any of the

2  conversations about refiling.  It was my personal view that it

3  would be impossible to coordinate such a large group, and my

4  recommendation had been that we not refile.

5          JUDGE PROCTOR:  How did that leave your clients?  Did

6  you think your clients would be protected by any filing that

7  would be made in another action or by another group?

8          MR. CHASE STRANGIO:  You know, it was my hope that we

9  could find a way to protect our clients; but, you know, in all

10 candor, I also thought that inadequately preparing and

11 coordinating a hearing was not at that time going to protect

12 them.  And I was -- you know, what I recall in those moments

13 were things were moving very quickly.  I was very concerned

14 about our ability to adequately represent our clients at that

15 time.  And I have been doing this work and continue to do this

16 work, and I'm trying to find all the ways to support trans youth

17 that I can.  And that includes nonlitigation methods of support,

18 and that was something else that I considered.

19         JUDGE PROCTOR:  Any specific actions that you took in

20 the nonlitigation track regarding the Alabama statute or this

21 litigation, whatever forum it was existing in?

22         MR. CHASE STRANGIO:  The only other actions that I took

23 were fund raising actions for local organizations in Alabama

24 that advocate on these issues.

25         JUDGE PROCTOR:  All right.  Thank you.  You're excused

 1   from the courtroom, and we'll let you know when you're excused

 2   from the proceeding.

 3          MR. CHASE STRANGIO:  Thank you, Your Honors.

 4          (Mr. Chase strangio excused.)

 5          JUDGE WATKINS:  I think Ms. Faulks.

 6          (Ms. Latisha Faulks present.)

 7          JUDGE WATKINS:  Hi, Ms. Faulks.

 8          MS. LATISHA FAULKS:  Good afternoon, Your Honor.

 9          JUDGE WATKINS:  Good afternoon.  How long have you been

10   with the ACLU foundation?

11          MS. LATISHA FAULKS:  I joined the ACLU of Alabama in

12   April of 2020.

13          JUDGE WATKINS:  Okay.  Were you with another ACLU

14   branch before then?

15          MS. LATISHA FAULKS:  I was not.

16          JUDGE WATKINS:  Okay.  Were you involved in the

17   discussions about litigation in 2021 had that bill passed?

18          MS. LATISHA FAULKS:  I was tangentially involved.  As

19   the legal director, I oversee all of the litigation that comes

20   through the affiliate.  However, my reproductive rights fellow,

21   Kaitlin Welborn, is usually my lead attorney on reproductive

22   rights and what we call gender justice, which includes the trans

23   litigation docket.

24          JUDGE WATKINS:  All right.  Well, so, let's take it,

25   then, to April the 8th.  She would have been your lead attorney

1  in the filing of the Walker suit in the Middle District of

2  Alabama?

3       MS. LATISHA FAULKS:  That is accurate, Your Honor.

4       JUDGE WATKINS:  Were you involved in any of the

5  meetings and decisions yourself, or did she report to you how

6  decisions were coming?

7       MS. LATISHA FAULKS:  I was participatory in numerous

8  calls.  I cannot say that I attended every call.  If there was a

9  conflict, I believe that it was appropriate that my staff

10 attorney could take those calls and read me in at a later time.

11      JUDGE WATKINS:  All right.  Did you sign the related

12 litigation sheet when it was filed?

13      MS. LATISHA FAULKS:  Yes, Your Honor, I believe that I

14 did.  I believe that my signature is the only wet signature on

15 the documentation in its entirety.

16      JUDGE WATKINS:  And why would not Ms. Welborn have done

17 that?

18      MS. LATISHA FAULKS:  Ms. Welborn is supervised by me.

19 She has just received her admission to practice in the state of

20 Alabama and, indeed, today put in her documents to be admitted

21 to appear in this district.

22      JUDGE WATKINS:  Oh, okay.  All right.  Well, were you

23 involved in the decisions the next Friday -- or Friday of that

24 week -- let's see.  Your case was filed on the 11th.

25      MS. LATISHA FAULKS:  Yes, Your Honor.

 1          JUDGE PROCTOR:  Friday of that week, were you involved

 2  in those decisions to drop this case?

 3          MS. LATISHA FAULKS:  No, Your Honor.

 4          JUDGE WATKINS:  All right.  And were you the client

 5  contact for any of these plaintiffs in the Walker case?

 6          MS. LATISHA FAULKS:  No, Your Honor.  I believe that

 7  Kaitlin Welborn would have been the ACLU of Alabama

 8  representative.  And to my knowledge and understanding, she was

 9  primarily responsible for specific plaintiffs, not all of the

10  plaintiffs.

11          JUDGE WATKINS:  Do you know which ones she was

12  responsible for?

13          MS. LATISHA FAULKS:  I do not recall, Your Honor.

14          JUDGE WATKINS:  All right.  When did you hear that

15  there was a plan to dismiss your case on that Friday afternoon?

16          MS. LATISHA FAULKS:  Your Honor, I did not become aware

17  that the case was being considered --

18          JUDGE WATKINS:  You were in South Carolina.

19          MS. LATISHA FAULKS:  Yes, sir, I was.

20          JUDGE WATKINS:  It was Easter weekend.

21          MS. LATISHA FAULKS:  Well, it was Good Friday.  I

22  recall receiving a message or a text message or a phone call

23  from Kaitlin, asking if I had seen the order for the status

24  conference.  I had not because I had been traveling, and then I

25  was with family.

```
 1          I looked at the order and immediately began trying to
 2    figure out how I was going to fly to Huntsville on Easter Sunday
 3    to be able to make the conference on that following Monday.  It
 4    was -- I don't think that it was several hours, but it was a
 5    time period later that I saw come over the ECF that we had
 6    voluntarily dismissed the cause of action.
 7          JUDGE WATKINS:  Did anyone ever explain to you how that
 8    came about so quickly?
 9          MS. LATISHA FAULKS:  I was informed that there was an
10    interest and concern with smoothly moving the case forward in
11    light of our being consolidated.  I understood that there would
12    be work over that weekend in an attempt to figure out how we
13    could more smoothly move forward and refile the litigation if
14    that was appropriate.
15          JUDGE WATKINS:  You think it was in the best interest
16    of your clients that that litigation was dropped on that Friday
17    afternoon after only a couple hours of consideration?
18          MS. LATISHA FAULKS:  Your Honor, I don't know.  Part of
19    the reason that I was not more intimately involved in the
20    litigation was because I do not have the subject matter
21    expertise.  And so when I spoke with cocounsel and my colleague
22    from ACLU National, what I understood was that it was less
23    damaging to dismiss while we still had the option under the
24    rules.  Otherwise, we were in danger of moving forward in the
25    litigation with a great deal of potential disagreement and
```

1    animosity between the plaintiff groups.

2         JUDGE WATKINS:  Okay.  Were you aware -- did you

3    yourself call the clerk's office here with respect to this case

4    at any time?

5         MS. LATISHA FAULKS:  I did not call the Court.  I did

6    receive several calls from the Court which I answered as they

7    were coming in.

8         I'm sorry.  Let me correct that.  There is at least one

9    time when the Court called, and I did not recognize the number

10   coming in, and I called back once I heard the voice mail

11   requesting my attention.

12        JUDGE WATKINS:  And what was that about?

13        MS. LATISHA FAULKS:  I was the person responsible for

14   doing the overnight drop filing of our case.  At the time it was

15   my first time filing in the Middle District, and I had neglected

16   to provide a wet signature, as is required under our rules,

17   because we do not provide -- at that time, I think we're getting

18   ready to provide for electronic filing.

19        JUDGE WATKINS:  Okay.  I don't have any other

20   questions.

21        JUDGE PROCTOR:  Regarding the relatedness box checked

22   indicating Corbett was related, did you understand that --

23   what's your understanding of why you designate a case as

24   related?

25        MS. LATISHA FAULKS:  I understood in these

1   circumstances that we were concerned with moving with some

2   degree of speed.  I understand that the science and all of the

3   intricate background of transitioning is very technical.  I also

4   knew that Judge Thompson had previously worked on a case that

5   the ACLU of Alabama brought along with ACLU National, and that

6   he had been steeped in some of that education over the course of

7   that case.

8           JUDGE PROCTOR:  And that was Corbett?

9           MS. LATISHA FAULKS:  Yes, sir, it was.

10          JUDGE PROCTOR:  But in Corbett, the issue was that in

11  order to change your gender on a driver's license, the state's

12  policy was to require some surgical intervention as opposed to

13  other transitioning events; correct?

14          MS. LATISHA FAULKS:  That is my understanding.  Yes,

15  Your Honor.

16          JUDGE PROCTOR:  And Corbett didn't involve the

17  technical aspects of surgery, but, rather, whether there was

18  surgery and the fact that Alabama required there to be a

19  surgical event that changed gender.

20          MS. LATISHA FAULKS:  Well, Your Honor, as I understand,

21  part of the record that we created in that case was to immerse

22  the Court in an understanding of the physiological changes that

23  one goes through in the transition process so that he would be

24  familiar with the different range of things that someone might

25  do in the process of their transition, depending upon their

 1 economic resources, their access to medical support and

 2 assistance, their age, et cetera.

 3          JUDGE PROCTOR:  All right.

 4          MS. LATISHA FAULKS:  For a lay person, that knowledge

 5 and information is not intuitive.

 6          JUDGE PROCTOR:  All right.  So would it be fair -- and

 7 I'm not trying to put words in your mouth, I'm just trying to

 8 get this categorized -- that your side viewed Judge Thompson as

 9 a subject matter expert that could more expeditiously move

10 through some of those issues that were going to have to be

11 litigated in the case?

12          MS. LATISHA FAULKS:  That was the advice that I

13 understood from my predecessor, and that was, in fact, the

14 advice that I gave to the litigation team in 2021 when we were

15 going through the process of bringing back the preparation that

16 had occurred the year prior about which I had very little

17 knowledge other than what was passed on to me.

18          JUDGE PROCTOR:  And in 2021, though -- it was early

19 2021 when Corbett was still active and closed at some point; is

20 that correct?

21          MS. LATISHA FAULKS:  Well, Your Honor, as I recall,

22 first, Corbett is on the gender justice docket, so that would

23 have been a case that I was supervising Kaitlin and her work on.

24 We also had a change in the staffing of that case.  The attorney

25 who at the time that we started the litigation was with ACLU

1  National moved to a different organization but remained on the

2  record.  I also understood that if we prevailed in the Eleventh

3  Circuit appeal, we would go back to the district court and

4  potentially seek some clarification of some technical issues,

5  and we would be filing for attorneys' fees.  So although the

6  case was closed, my understanding was that there was still

7  potentially an opportunity for us to have to appear before Judge

8  Thompson, or if he was no longer on the bench, whoever had been

9  designated to take over that particular case.

10       JUDGE PROCTOR:  Let me ask you two questions that are

11  just straightforward.  Any discussions that you're aware of on

12  your team or with the Ladinsky team -- or anyone else, for that

13  matter -- as to reasons other than subject matter expertise you

14  may want to draw Judge Thompson?

15       MS. LATISHA FAULKS:  Your Honor, I will tell you

16  candidly that for the ACLU, we are always thrilled when we

17  discover that a case has been assigned to Judge Thompson.  We

18  find him to be a jurist whose philosophy is consistent with many

19  of the cases we opt to bring.  However, as we were going through

20  this process of discussion, as I understood it, the concern was

21  having a jurist who would be knowledgeable and understanding

22  about the science that we were discussing.

23       JUDGE PROCTOR:  All right.  Fair enough.

24       And then the other side of the spectrum is this:  Any

25  discussions about a jurist you didn't want to draw here or in

1  the Northern District of Alabama that you were a party to or

2  aware of?

3          MS. LATISHA FAULKS:  Your Honor, as I understand and as

4  I recall, my primary focus was getting the case before Judge

5  Thompson, with the understanding that he was on senior status,

6  that he may actually stop taking cases at some point, although I

7  had not heard gossip as to when.  I am not familiar enough with

8  the broader judiciary here in Alabama to have made any

9  recommendation.

10         JUDGE PROCTOR:  I'm not asking you recommendations.

11  I'm asking if you're aware of any such discussions or

12  information about people being concerned about a jurist in the

13  state.

14         MS. LATISHA FAULKS:  I am.

15         JUDGE PROCTOR:  You are.

16         MS. LATISHA FAULKS:  I am.

17         JUDGE PROCTOR:  All right.  What is that?

18         MS. LATISHA FAULKS:  As we were finding out we were

19  assigned to Judge Marks, the question was, is Judge Marks a good

20  judge for us or a bad judge?  I know that as we were watching

21  and listening to what was occurring in the Northern District

22  with the Ladinsky litigation, we were trying to dig up and find

23  out information, good, bad, or otherwise, as to each jurist

24  about whom we became aware.

25         JUDGE PROCTOR:  Scouting reports on the judges in the

1  Northern District.

2          MS. LATISHA FAULKS:  That's it.

3          JUDGE PROCTOR:  Okay.  And was there any discussion

4  you're aware of or participated in, either way, about efforts to

5  avoid a judge in the Northern District?

6          MS. LATISHA FAULKS:  No, Your Honor.

7          JUDGE PROCTOR:  All right.  Thank you.  Anything

8  further?  Thank you so much.

9          MR. RAGSDALE:  You don't have to stay here, but you

10  can't go home.

11          JUDGE PROCTOR:  That's right.  We're going to excuse

12  you from the courtroom but not from the courthouse, just in case

13  we have a follow-up.

14          MR. RAGSDALE:  Those instructions are making the

15  rounds.

16          JUDGE PROCTOR:  Thank you.

17          (Ms. Latisha Faulks excused.)

18          JUDGE WATKINS:  Carl Charles.

19          (Mr. Carl Charles present.)

20          JUDGE WATKINS:  Good afternoon, Mr. Charles.

21          MR. CARL CHARLES:  Good afternoon, Your Honors.

22          JUDGE WATKINS:  You're a senior attorney with Lambda

23  Legal?

24          MR. CARL CHARLES:  Yes, Your Honor.

25          JUDGE WATKINS:  Where do you reside?  Where do you

1  practice?

2          MR. CARL CHARLES:  I reside in Atlanta, Georgia, Your

3  Honor.  And I was recently admitted to the Georgia bar as well,

4  though I am licensed in two other states.

5          JUDGE WATKINS:  What other states are you licensed in?

6          MR. CARL CHARLES:  Massachusetts and New York, Your

7  Honor.

8          JUDGE WATKINS:  How long have you been practicing?

9          MR. CARL CHARLES:  Approximately six years, Your Honor.

10          JUDGE WATKINS:  Tell me what your involvement was in

11  the decision to mark this case as related to the other case that

12  Judge Thompson had handled.

13          MR. CARL CHARLES:  I would like to contextualize my

14  answer to your question, Your Honor, by saying that we had

15  discussed doing so the previous year in 2021.

16          JUDGE WATKINS:  And that's basically the same

17  litigation team.  Were you involved in the -- this team here?

18          MR. CARL CHARLES:  Yes, Your Honor.  From '21 to '22,

19  the team remained roughly the same, with a few changes in

20  attorneys who left organizations or no longer were on various

21  cases.  So on some level, that decision to mark that case as

22  related was one that we discussed in '21 and confirmed that we

23  would do so again in '22.

24          JUDGE WATKINS:  Okay.  Were you involved in the actual

25  filing -- I don't know -- the paper filing that occurred in the

1   Walker case?

2         MR. CARL CHARLES:  No, Your Honor.  Tish Gotell Faulks

3   did the paper filing.  If I'm understanding your question

4   correctly, she did, as I understand, come here to the courthouse

5   with copies of the filings and, over the course of a couple of

6   hours on April 11th, filed our complaint.

7         JUDGE WATKINS:  All right.  And to be clear, April 11th

8   is one business day after April the 8th when the Ladinsky case

9   was filed; correct?

10        MR. CARL CHARLES:  Yes, Your Honor.

11        JUDGE WATKINS:  All right.  Did you have any contact

12   with the clerk's office about who the case was being assigned

13   to?  Did you receive a call or did you make a call?

14        MR. CARL CHARLES:  No, Your Honor, I did not make a

15   call.  No, Your Honor, I did not receive a call.

16        JUDGE WATKINS:  All right.  And at this time is it fair

17   to say you would be sitting in Atlanta and your involvement

18   would be by telephone, or were you in Montgomery for some

19   reason?

20        MR. CARL CHARLES:  No, Your Honor, I was not physically

21   present in Montgomery.

22        JUDGE WATKINS:  All right.  So all of your

23   communications, then, in any, quote, meetings, would be virtual

24   meetings and virtual communications --

25        MR. CARL CHARLES:  Yes, Your Honor.  That's correct.

1          JUDGE WATKINS:  -- or telephonic, I guess.

2          MR. CARL CHARLES:  Excuse me.  Yes.  Yes, Your Honor.

3          JUDGE WATKINS:  Were you concerned that Judge Thompson

4   might not get the case?

5          MR. CARL CHARLES:  I wouldn't say, Your Honor, that we

6   were concerned, or that I was concerned.  Excuse me.  We marked

7   it as related in a good faith -- in what we understood at the

8   time to be appropriate procedure and understood that that may

9   not have been granted by the Court.

10         JUDGE WATKINS:  Did you call anyone's chambers about

11  the assignment of the case?

12         MR. CARL CHARLES:  No, Your Honor.

13         JUDGE WATKINS:  You didn't call any judge's chambers?

14         MR. CARL CHARLES:  I did not make any telephones calls

15  about this matter on the day we filed, Your Honor.

16         JUDGE WATKINS:  I'm not asking about the day you filed.

17  I guess I'm asking about any day.

18         MR. CARL CHARLES:  My pause is only because I am

19  endeavoring to be as candid as possible.  I do not recall ever

20  calling any chambers with this request, Your Honor, at any

21  point.

22         JUDGE WATKINS:  Were you involved in the decision to

23  drop the case, or did you just find out about it?

24         MR. CARL CHARLES:  I was present for the discussion

25  about dismissal, Your Honor.

 1          JUDGE WATKINS:  When you say present, it must have been

 2   either a Zoom call -- do you recall what kind of a conference it

 3   was?

 4          MR. CARL CHARLES:  It was, I believe, a Zoom call, Your

 5   Honor.

 6          JUDGE WATKINS:  All right.  Do you remember that there

 7   were six or seven different people on that call?

 8          MR. CARL CHARLES:  Approximately, Your Honor.  I can't

 9   be certain.

10          JUDGE WATKINS:  Were you the client contact for any of

11   these clients at all?

12          MR. CARL CHARLES:  There were a number of attorneys

13   involved in client contact.

14          JUDGE WATKINS:  Were you one of them?

15          MR. CARL CHARLES:  I was at times, Your Honor, yes.

16          JUDGE WATKINS:  Which clients?

17          MR. CARL CHARLES:  Predominantly, Your Honor, the White

18   family.

19          JUDGE WATKINS:  Is the White family the ones who reside

20   in Lee County or the ones who reside in north Alabama?

21          MR. CARL CHARLES:  They are the ones in north Alabama,

22   Your Honor.

23          JUDGE WATKINS:  Right.  Okay.  Did you consult with

24   them before you-all agreed to dismiss the case?

25          MR. CARL CHARLES:  We spoke with them immediately after

1   that decision, Your Honor.

2          JUDGE WATKINS:  You told them after?

3          MR. CARL CHARLES:  Immediately after.  Yes.

4          JUDGE WATKINS:  Did you have authority to dismiss the

5   case without their approval?

6          MR. CARL CHARLES:  We had been -- we had been in talks

7   in the day immediately preceding about how the case had been

8   moving.

9          JUDGE WATKINS:  Immediately preceding the day the case

10  was with Judge Axon?

11         MR. CARL CHARLES:  Yes, Your Honor.  And communicated

12  with them that --

13         JUDGE WATKINS:  I'm sorry.  Let me be clear about that.

14  We're talking about the Walker case.

15         The Ladinsky case, the first filed case, was with Judge

16  Axon.

17         MR. CARL CHARLES:  Oh.  It would have been Judge Marks,

18  then, Your Honor.

19         JUDGE WATKINS:  Yes.  You were still with Judge Marks.

20         MR. CARL CHARLES:  Yes, Your Honor.

21         And the plaintiffs -- we explained that at that time

22  that we were -- you know, we had updated the clients on what was

23  happening.  And we explained to them that we were not certain

24  what would happen the following day but communicated what we

25  expected would happen.

 1          JUDGE WATKINS:  Well, your report -- your response to

 2  Judge Marks' show cause indicated that you were all fully

 3  engaged in being moved to the -- basically, to the Northern

 4  District, and you were going to cooperate and were happy to be

 5  with the Ladinskys there to get prompt attention to your motion

 6  for restraining -- temporary restraining order and preliminary

 7  injunction; is that right?

 8          MR. CARL CHARLES:  I'm sorry, Your Honor.  Could you

 9  please repeat that question?

10          JUDGE WATKINS:  That's a bad question.  That's on me.

11  Just a second.

12          Judge Marks filed on the 13th or 14th a motion to show

13  cause why the case should not be consolidated or at least

14  transferred to the Northern District of Alabama because there

15  was a first filed case there.  And after some consultation, I

16  understand, from other witnesses, and maybe with some

17  reservation, your side of the case filed document number 18,

18  which says that although this case is properly before the Middle

19  District, plaintiffs do not oppose transfer to the Northern

20  District so that the matter can be adjudicated alongside

21  Ladinsky.

22          Now, this is 24 hours before you dismiss the case.

23  That's our problem.

24          MR. CARL CHARLES:  Yes, Your Honor.

25          JUDGE WATKINS:  We don't understand a dismissal 24

1  hours after you've said that plaintiffs' interest is in the

2  expeditious injunction of unconstitutional law they challenge,

3  and plaintiffs will seek to pursue their motion for this

4  preliminary relief expeditiously in the Northern District,

5  assuming transfer.

6        And then expeditiously you-all dismissed it instead of

7  pursued it, and that's what confuses us.  Why did you do that?

8        MR. CARL CHARLES:  Well, Your Honor, as you identified,

9  a number of things happened very quickly.  We had anticipated

10 being before Judge Axon.  And in a matter of hours we were moved

11 to a different district, which we had not intended to be in, had

12 not -- had no knowledge of.

13       JUDGE WATKINS:  You mean a different division?

14       MR. CARL CHARLES:  Yes.  Thank you.

15       JUDGE WATKINS:  You understand, though, now -- so that

16 we're all on the same page, you understand now that the only two

17 parties in the case in the Northern District were actually in

18 the Northern Division of the Northern District, one plaintiff

19 and one defendant.  You understand that?

20       MR. CARL CHARLES:  I apologize, Your Honor.  I wasn't

21 sure -- were you talking about Walker?

22       JUDGE PROCTOR:  Yes.  The Walker case.

23       JUDGE WATKINS:  Yes.  In the Walker case.  Yes.

24       MR. CARL CHARLES:  Yes, we were aware of that, Your

25 Honor.

1          JUDGE WATKINS:  That's why it would have landed with
2    the Huntsville court instead of with the Birmingham court.
3          MR. CARL CHARLES:  Yes.
4          JUDGE WATKINS:  And, of course, Judge Axon is -- she's
5    in the central?
6          JUDGE PROCTOR:  Yes.
7          JUDGE WATKINS:  So she's in central.  She had one.  And
8    were you-all aware at the time that she was -- and I know the
9    answer to this, but that she was involved in a criminal trial
10   that was supposed to take basically two weeks of trial time?
11         MR. CARL CHARLES:  No, Your Honor, we were not aware of
12   that, and I appreciated the Court's explanation of that because
13   that fact was unknown to us at any time point, until today, that
14   is.
15         JUDGE PROCTOR:  Now, are you aware of any efforts by
16   anybody on your litigation team to -- any action that would
17   require a sitting federal district judge in the state of Alabama
18   to be recused from your case?  Are you aware of anyone on your
19   team having any activity of that nature?
20         MR. CARL CHARLES:  No, Your Honor.
21         JUDGE WATKINS:  Okay.  That's all right now.
22         All right.  So I've asked you the question.  I'm going
23   to ask you point blank:  Are you telling us that you did not
24   speak to any law clerk of any judge in the Middle District of
25   Alabama concerning the Walker case and the assignment of the

1  case to that judge?

2          MR. CARL CHARLES:  That is correct, Your Honor.  I did

3  not.

4          JUDGE WATKINS:  Okay.

5          JUDGE PROCTOR:  Have you litigated in the Middle

6  District before this Walker case?

7          MR. CARL CHARLES:  No, Your Honor.

8          JUDGE PROCTOR:  All right.  Are you familiar generally

9  with form JS 44, which is the civil cover sheet?

10         MR. CARL CHARLES:  In a very general way, Your Honor,

11 yes.

12         JUDGE PROCTOR:  You're familiar it has instructions

13 that come with it?

14         MR. CARL CHARLES:  Generally, yes, Your Honor.

15         JUDGE PROCTOR:  You're aware that generally

16 instructions say for something to be related, it's got to be a

17 pending case for you to list it as related on a civil cover

18 sheet?

19         MR. CARL CHARLES:  Yes, Your Honor.

20         JUDGE PROCTOR:  But Corbett was not pending at the

21 time; correct?

22         MR. CARL CHARLES:  Your Honor, our understanding of

23 Corbett was that -- and in some way, it was pending.  That it is

24 on appeal, and that appeal may result in a remand to the same

25 district court for resolution.

```
 1            JUDGE PROCTOR:  You understand -- how long have you

 2   practiced law?  Six years?

 3            MR. CARL CHARLES:  Yes, Your Honor.

 4            JUDGE PROCTOR:  You understand how federal courts work.

 5   Courts of limited jurisdiction.

 6            MR. CARL CHARLES:  Yes, Your Honor.

 7            JUDGE PROCTOR:  Judge Thompson didn't have jurisdiction

 8   over anything in Corbett other than attorneys' fees at the time

 9   that notice was filed; correct?

10            MR. CARL CHARLES:  That is correct, Your Honor.

11            JUDGE PROCTOR:  Other than perfunctory matters that

12   pro -- admitting or withdrawing a lawyer, there's nothing to

13   coordinate with Corbett at the time Walker was filed; is that

14   correct?

15            MR. CARL CHARLES:  I'm sorry.  Can you repeat your

16   question, Your Honor?

17            JUDGE PROCTOR:  There was nothing that Walker could --

18   there's nothing in Corbett that could be coordinated with your

19   Walker filing.

20            MR. CARL CHARLES:  We understood, Your Honor -- again,

21   I appreciate your question.  We understand that it was related

22   in a way that we could make a good faith argument, as we did,

23   that it would be appropriately heard.  And, again, as I

24   explained to Judge Watkins, I believe, at the time that was our

25   understanding, that we would make a good faith effort to so
```

1    argue.

2          JUDGE PROCTOR:  All right.  Speaking of good faith, I

3    want you to think very carefully about this next question and

4    answer you're about to give.  Are you telling us that you did

5    not call a judge's chambers and speak to a law clerk about the

6    potential for a TRO in the Walker case?

7          MR. CARL CHARLES:  I apologize, Your Honor.  Could

8    you -- I'm not sure I'm understanding your question.  When you

9    say potential of a TRO, I'm not sure what you mean.

10         JUDGE PROCTOR:  About the potential filing of a TRO or

11   intent to file a TRO or the handling of a TRO.  You're saying

12   that you have never had a communication with a judge's law clerk

13   allowing for -- discussing the filing of Walker and the

14   potential for a TRO being filed in Walker?

15         MR. CARL CHARLES:  No, Your Honor.

16         JUDGE PROCTOR:  All right.  Fair enough.

17         Were you involved in any of the discussions with the

18   Ladinsky group about dismissal of the two actions?  Were you on

19   that phone conference we've heard about on that Friday afternoon

20   with the Ladinsky group?

21         MR. CARL CHARLES:  No, Your Honor.

22         JUDGE PROCTOR:  Did you hear anyone explain to you or

23   characterize what occurred in that phone conference at any

24   point?

25         MR. CARL CHARLES:  Yes, Your Honor.

1          JUDGE PROCTOR:  What did you hear?

2          MR. CARL CHARLES:  In a general way, Your Honor, that

3   in light of the consolidation, there were discussions about

4   trying to see if we could work together as a

5   multiorganizational -- I believe eight organizations, three law

6   firms.  That was the crux of the discussion as it was relayed to

7   me.

8          JUDGE PROCTOR:  And was there anything relayed to you

9   about the decision to dismiss the action after that phone

10  conference?  Dismiss the Walker action?

11         MR. CARL CHARLES:  I apologize, Your Honor.  Would you

12  repeat the beginning of your question?

13         JUDGE PROCTOR:  Was there anything that was discussed

14  with you or told to you, an email or verbally, orally, about

15  dismissal of the Walker action at the conclusion of that phone

16  conference or during that phone conference?

17         MR. CARL CHARLES:  No, Your Honor.  There was no

18  information that was conveyed to us about that.  We had our own

19  internal discussions, but I was not at any point made aware of

20  what the Ladinsky team was contemplating.

21         JUDGE PROCTOR:  Thank you.  Are you aware of any action

22  that anyone has taken, including you but anyone else also, other

23  than the filing of the civil cover sheet and the motion to

24  assign the case to Judge Thompson --

25         JUDGE WATKINS:  Reassign.

1          JUDGE PROCTOR:  -- reassign the case to Judge Thompson

2    to steer any of these cases to a particular judge or away from a

3    particular judge?

4          MR. CARL CHARLES:  No, Your Honor.

5          JUDGE PROCTOR:  Were you privy to any scouting report

6    done on the judges in the Northern District of Alabama?

7          MR. CARL CHARLES:  No, Your Honor.

8          JUDGE PROCTOR:  Did you ever hear anybody discussing

9    avoiding Judge Burke?

10         MR. CARL CHARLES:  No, Your Honor.

11         JUDGE PROCTOR:  Are you aware of any decision that was

12   made to dismiss the case in whole or in part because of Judge

13   Burke having the Walker case in the Northern District?

14         MR. CARL CHARLES:  I'm sorry, Your Honor.  Can you

15   repeat your question?

16         JUDGE PROCTOR:  Yes.  It wasn't a great question.  Let

17   me try again.

18         Are you aware of the fact of Judge Burke being assigned

19   to the Walker case being a factor in any way in the decision to

20   dismiss Walker while it was pending in the Northern District of

21   Alabama?

22         MR. CARL CHARLES:  Only to the extent, Your Honor, that

23   he was unknown to us; that we had not done any research and

24   were, as I said earlier, unaware of any of the judges in the

25   Northern District, to be completely frank, Your Honor.  Our

1   intention, as I said and as Your Honors have repeated, was to

2   mark the cases related for the purposes of being in the Middle

3   District and accepted that should that not succeed, we would be

4   in the Middle District.

5           JUDGE PROCTOR:  Well, the fact that he's an unknown --

6           Do you know why we wear these robes?

7           MR. CARL CHARLES:  I mean, many reasons, Your Honor,

8   but --

9           JUDGE PROCTOR:  We don't wear them for fashion.

10          MR. CARL CHARLES:  No, sir.  I mean, no, Your Honor.

11          JUDGE PROCTOR:  The idea is to block out the judge's

12  personality and apply the rule of law; correct?

13          MR. CARL CHARLES:  Yes, Your Honor.

14          JUDGE PROCTOR:  All right.  So why would it be

15  necessary for you to know something about your judge in order to

16  continue with your case in the Northern District?

17          MR. CARL CHARLES:  I didn't mean to imply, Your Honor,

18  that that was a necessary component of our decision making.

19  Only that it wasn't not a factor.  I think that in my limited

20  experience, we do understand at the very basic level a little

21  bit of biographical information about a judge in preparing a

22  lawsuit, but nothing beyond that.

23          JUDGE PROCTOR:  And I don't want to turn this into a

24  deposition, but I want to return to one thing.  If you did make

25  a call to a judge's chambers and talk to a law clerk about the

1  Walker case, you would remember that?

2        MR. CARL CHARLES:  I am incredibly certain I would,

3  Your Honor.

4        JUDGE PROCTOR:  All right.  What's your phone number?

5  Is it (770)309-1733?

6        MR. CARL CHARLES:  Yes, Your Honor.

7        JUDGE PROCTOR:  Now, you didn't have any concern about

8  a 9:30 Monday morning status conference with Judge Burke, as you

9  reside in Atlanta, did you?

10        MR. CARL CHARLES:  I had concern, Your Honor, to the

11  extent that I am one of many of our team and would not be able

12  on my own to represent our full -- to represent on my own the

13  interests of our clients.  So if I'm understanding Your Honor's

14  question to be if I had concerns about my physical appearance,

15  no, Your Honor.

16        JUDGE PROCTOR:  You could have gotten there, but you

17  would have like to have had more support.

18        MR. CARL CHARLES:  I just -- I don't think it would be

19  an appropriate order, charge -- I don't think I would be

20  fulfilling my duties as a zealous representative to be the only

21  lawyer there, Your Honor.

22        JUDGE PROCTOR:  All right.  You're aware, though, that

23  others had concerns that they couldn't get to Huntsville for a

24  9:30 status conference on that Monday?

25        MR. CARL CHARLES:  Yes, Your Honor.

 1          JUDGE PROCTOR:  Did you suggest to them or did anyone

 2   else suggest, ask to appear remotely?  It's a status conference.

 3          MR. CARL CHARLES:  I'm sorry, Your Honor.  I am -- may

 4   I return to some previous questions that you asked me and amend

 5   my testimony?

 6          JUDGE PROCTOR:  You may.

 7          MR. CARL CHARLES:  Okay.  I did call Judge Thompson's

 8   clerk.  I am now remembering.  I want to apologize for any

 9   impression I gave that I was trying to obfuscate that fact.

10   That was not my intention.  And in candor, I am very nervous,

11   and I am trying to be as forthright with Your Honors as

12   possible.  So I want to --

13          JUDGE PROCTOR:  Now you are.  Let's be fair.  Now you

14   are.

15          MR. CARL CHARLES:  Yes, Your Honor.

16          JUDGE PROCTOR:  You're coming clean.

17          MR. CARL CHARLES:  Well, if I may, Your Honor, those

18   moments of pause were really me trying to contemplate and

19   remember.  And not by way of excuse, but by way of explanations,

20   Your Honor, things were moving extremely quickly over those

21   three days, and it was a very high-stress situation.  Again, not

22   an excuse, but there were many things that happened which I have

23   in preparation for this hearing endeavored to recollect and

24   write down.  And I do sincerely apologize.

25          JUDGE PROCTOR:  It's better you did it now than us

 1   having to do it for you later.

 2           MR. CARL CHARLES:  Yes, Your Honor.  Thank you.

 3           JUDGE PROCTOR:  But let me ask you this:  Why were you

 4   hesitant to tell us that?

 5           MR. CARL CHARLES:  Oh, Your Honor, I was not hesitant

 6   at all.  I genuinely couldn't recall the conversation.  And

 7   then --

 8           JUDGE PROCTOR:  What sparked your recollection?  The

 9   phone number?

10           MR. CARL CHARLES:  My phone number.  Yes, Your Honor.

11   And so I thought -- I was replaying --

12           JUDGE PROCTOR:  It seems to me -- I'm going to be

13   unfair with you.  I'm just telling you what I'm thinking here.

14   This is not -- this is Proctor being cards up.  The phone number

15   doesn't spark a recollection.  The phone number sparks a

16   realization that I have some information that you didn't think I

17   had.

18           MR. CARL CHARLES:  Your Honor, I did find it unusual

19   that you had that.  But then I tried to think about what we had

20   to submit to this Court and had I listed that on other filings.

21   And while you were asking -- while Your Honors were asking me

22   other questions, I was trying to think in my mind about the

23   events of those two days.

24           JUDGE PROCTOR:  Is it appropriate to call a judge's

25   chambers about a case in a way that almost invites the judge to

1   want to take the case?

2         MR. CARL CHARLES:  I will speak for myself, Your Honor,

3   that that was not my intention whatsoever, an invitation, at

4   all.  I was -- I had reached out to the clerk to indicate that

5   we would shortly be filing or had shortly filed -- I do

6   apologize.  I am not clear on the day, whether this was -- our

7   preliminary injunction motion was imminently to be filed.  But I

8   wanted to, as a representative of our team, ensure that we were

9   notifying the Court of that urgent filing.

10         JUDGE PROCTOR:  All right.  So you wanted to -- did you

11  alert chambers that you had marked it related to Corbett?

12         MR. CARL CHARLES:  Yes, Your Honor, I believe I did.

13  Yes.

14         JUDGE PROCTOR:  And did you reference the potential for

15  filing a TRO?

16         MR. CARL CHARLES:  Yes, Your Honor.  I believe I did,

17  yes.

18         JUDGE PROCTOR:  Anything else that you can recall that

19  we need to revisit in what you told us?

20         MR. CARL CHARLES:  No, Your Honor.  Again, I do

21  appreciate your allowing me to reanswer those questions.

22         JUDGE PROCTOR:  All right.  While we're in this fit of

23  recollection and candor, can you tell us that you're not aware

24  of any other fact besides what we discovered in your previous

25  statements to us of an attempt to steer a case to Judge

1  Thompson, away from Judge Burke, or to or away from any other

2  judge in either the Northern or Middle District of Alabama?

3          MR. CARL CHARLES:  No, Your Honor.  And if I may just

4  be clear for the record that my testimony is that the call to

5  the clerk's office was only to alert chambers and not to attempt

6  any of the due processes of the Middle District or any other

7  court in the state of Alabama.

8          JUDGE PROCTOR:  You didn't personally have any concern

9  about the Judge Burke versus Judge Axon assignment of those

10  cases?

11          MR. CARL CHARLES:  Your Honor, I was aware in a general

12  way that, as I said, Judge Burke was unknown to us.

13          JUDGE PROCTOR:  Was Judge Axon unknown to you?

14          MR. CARL CHARLES:  To a lesser degree, Your Honor.

15          JUDGE PROCTOR:  You mean to a greater degree you knew

16  Judge Axon compared to Judge Burke?  You knew more about Judge

17  Axon than Judge Burke is maybe the common English way to say it.

18          MR. CARL CHARLES:  I don't know that that's correct

19  either, Your Honor.  I think at that point we were grappling

20  with the reality of having to figure out how we were going to

21  work together, if at all, with the other team on an eight

22  organization, three law firm single case.  And so that was sort

23  of the primary concern.

24          JUDGE PROCTOR:  Fair.

25          Going back, though, to this call to Judge Thompson,

1    I've just got a follow-up.

2         MR. CARL CHARLES:  Yes, Your Honor.

3         JUDGE PROCTOR:  What you're telling us is that you just

4    wanted to alert Judge Thompson to the fact that the Corbett case

5    was related to the Walker case in the civil cover sheet, and

6    wanted to make sure that Judge Thompson was aware that there may

7    be some urgency to deal with a TRO or preliminary injunction

8    hearing that had not yet been filed.  Fair?

9         MR. CARL CHARLES:  Again, with apologies, Your Honor, I

10   cannot remember, but I -- I cannot remember if that phone call

11   took place after we had filed the PI or before.  The PI/TRO.

12   Excuse me.

13        JUDGE PROCTOR:  All right.

14        JUDGE WATKINS:  Anyone else on your team know that you

15   made that call?  Did anyone on your team tell you to make that

16   call?

17        MR. CARL CHARLES:  I know I did not make that call on

18   my own.  I do not recall if anyone directed me to do it.

19        JUDGE PROCTOR:  Did you call Judge Marks and alert her

20   or her chambers to the fact that a TRO and/or preliminary

21   injunction may be coming soon?

22        MR. CARL CHARLES:  I did not, Your Honor.

23        JUDGE PROCTOR:  Why not?  She was the one assigned to

24   the case at the moment; right?

25        MR. CARL CHARLES:  I think at that point, Your Honor,

1  yes, she was.

2         JUDGE PROCTOR:  So if your interest was to make sure

3  the judge was going to understand this was coming and be able to

4  give it proper care and attention on a timely basis, wouldn't

5  you have called Judge Marks' chambers?

6         MR. CARL CHARLES:  Well, I think our -- the lack of

7  call to Judge Marks' chambers, again, Your Honor, reflected our

8  good faith belief that the case would eventually be marked as

9  related or -- excuse me -- that we had marked it as related and

10  had a good faith belief that it would be assigned to Judge

11  Thompson.  Not that we did not want Judge Marks to be aware of

12  the urgent situation.

13         JUDGE PROCTOR:  All right.  You're excused from the

14  courtroom but not the courthouse, unless Mr. Ragsdale has a

15  question.

16         MR. RAGSDALE:  I do have a question, Your Honor, if I

17  might.

18         JUDGE PROCTOR:  You may.

19         MR. RAGSDALE:  And I'm treading a little bit into

20  attorney-client privilege, but maybe if we could just get a yes

21  or no.  Are you aware, Carl, of any discussions with the clients

22  about litigating in Huntsville as opposed to Birmingham or

23  Montgomery, for that matter.  Any discussions with the clients,

24  concerns about litigating in Huntsville?

25         MR. CARL CHARLES:  Yes.

```
 1          MR. RAGSDALE:  This will be attorney-client

 2   conversation.  I would like you to hear it.  I don't, frankly,

 3   have much -- I don't want to waive anything, but I do want the

 4   Court to hear this.

 5          JUDGE PROCTOR:  All right.  What's your proposal for

 6   how we accommodate both those interests?

 7          MR. RAGSDALE:  They can step out.

 8          JUDGE PROCTOR:  I guess we need -- everyone except

 9   Court staff, and that includes my -- I guess some of my Court

10   staff has already gone back.

11          MR. SEGALL:  Do we have time to run to the restroom?

12          JUDGE PROCTOR:  That's probably a good time -- let's

13   all take a restroom break, and we'll let these be at the end of

14   the line for the restroom.  We'll take a ten-minute break.

15          (Other court participants excused.)

16          JUDGE WATKINS:  We're going to hear this first.

17          JUDGE PROCTOR:  All right, Mr. Ragsdale.  I think the

18   three of us can rule that you can go into this matter without

19   waiving the privilege.  Just as an accommodation to the Court,

20   you're not waiving the privilege as anyone other than the Court.

21   Is that a fair way to approach it?

22          MR. RAGSDALE:  Yes, sir.

23          JUDGE WATKINS:  And the background of this is that his

24   clients live in Limestone County, which is the county adjoining

25   Madison County, which is in north Alabama.
```

```
 1              MR. RAGSDALE:  Right.
 2              JUDGE PROCTOR:  Now, there's a footnote that I'm going
 3    to put on, and that is unless there's something here that
 4    requires further attention -- in other words, if there's
 5    anything here that turns out to be an answer that would defraud
 6    the Court -- then privilege may be off the table.
 7              MR. RAGSDALE:  Sure.
 8              JUDGE PROCTOR:  I'm not suggesting you are doing that.
 9              MR. RAGSDALE:  No, sir.
10              Carl, did you have -- are you aware of discussions or
11    concerns of one or more of our clients about having the case be
12    in Huntsville?
13              MR. CARL CHARLES:  Yes.
14              MR. RAGSDALE:  Can you share those with the Court,
15    please.
16              MR. CARL CHARLES:  Yes.
17              Your Honors, the White family consists of Jeffrey White
18    and Christa White and their daughter, minor Callie White.
19    Christa White is an escort at, as I understand it, the only
20    abortion clinic there in Huntsville.  She is there multiple
21    times a week, and she is well known to entities who are in
22    opposition to her work.  And the family had serious safety
23    concerns about providing testimony and being seen in and around
24    the courthouse because Christa is so well known.
25              JUDGE PROCTOR:  Christa -- what's the relationship of
```

1  Christa and Jeff White?

2          MR. CARL CHARLES:  Jeffrey White and Christa White.

3  Yes, Your Honor.

4          JUDGE PROCTOR:  And what is the relationship?

5          MR. CARL CHARLES:  Oh, they are married.  I apologize,

6  Your Honor.

7          JUDGE PROCTOR:  I thought so.

8          MR. CARL CHARLES:  Yes.

9          JUDGE PROCTOR:  Jeffrey White has been on a You Tube

10  video announcing support for this initiative?  That's what

11  Mr. LaCour told us a little while ago.

12          MR. CARL CHARLES:  If I may, Your Honor -- and, again,

13  with due respect, my recollection of the State's testimony

14  earlier was that Jeffrey Walker -- and I will confess, Your

15  Honor, it has been somewhat confusing to have two plaintiffs

16  with the same --

17          JUDGE PROCTOR:  That's someone different.  That

18  clarifies it.

19          MR. CARL CHARLES:  Yes, sir.

20          JUDGE PROCTOR:  Thank you.  All right.  So was there

21  any consideration given to either asking Judge Burke for an

22  accommodation, whether that be accommodating the Whites' privacy

23  concerns or even asking Judge Burke to conduct the hearing in

24  Birmingham where he has visiting judge's chambers, for

25  accommodation of all involved?

1         MR. CARL CHARLES:  Your Honor, I was not privy to those

2    conversations, so I can't represent that they did not happen.

3    What I can say to you is that the -- as I said, this was a

4    multifactor consideration for ultimate decision not to refile.

5    And the threshold issue for us at that time was consolidating

6    multiple parties who were, frankly, very -- had very different

7    contemplations and understandings of the cases and the claims to

8    be brought and the respective parties.

9         And so that was -- again, only for my part, Your Honor.

10   I don't think we got to that part, but I appreciate Your Honor's

11   suggestion of those alternative options.  But I can't represent

12   to you that I was involved in conversations where that happened.

13        JUDGE PROCTOR:  Would you go so far as to agree with me

14   that those are commonsense ideas that you might --

15        MR. CARL CHARLES:  With respect, Your Honor --

16        JUDGE PROCTOR:  -- with reference to the status

17   conference on that Monday?

18        MR. CARL CHARLES:  Again, with respect, Your Honor, it

19   would depend, first, on your definition of commonsense, which I

20   would be happy to entertain and discuss with you.  But again, as

21   I say, we were moving very quickly.  The status conference was

22   scheduled immediately.  And I can't say --

23        What I can say to Your Honors is this:  That had the

24   decision been made to continue, I think we would have had those

25   discussions with Judge Burke.  There are very -- as you probably

 1  have heard today, very smart and thoughtful lawyers who have

 2  protected clients in pernicious and dangerous situations, and I

 3  think they would have raised that.  So I don't want to suggest

 4  they wouldn't have.

 5          JUDGE PROCTOR:  Fair enough.

 6          All right.  We'll be in recess for whatever is

 7  remaining of the ten minutes.

 8      (Recess was taken from 4:05 p.m. until 4:47 p.m., after

 9       which proceedings continued, as follows:)

10          JUDGE PROCTOR:  You may be seated.  Folks, we have

11  talked about this, and we are not going to conclude this hearing

12  today.  I don't think that surprises anyone here.  And to be

13  honest, I think what we're going to do is the three of us are

14  going to talk next week about next steps.  We're not finished.

15  You will hear from us about how we proceed.

16          I'm going to remind everyone of the rule.  It continues

17  to apply.  You're not to discuss anything that occurred in the

18  courtroom with anyone else who is under oath, directly or

19  indirectly.  And you'll probably make your next appearance

20  before us easier and your job easier if you just don't discuss

21  it with anybody, period, except for legal counsel if you feel

22  like you need to do that.  Okay?

23          We had hoped we would move along more quickly, but this

24  was a pretty big undertaking.  The more we thought about it, the

25  number of people that have information, an orderly way to go

1    about getting the information provided to us, we do appreciate

2    all of you who participated.  And, again, we were -- we want --

3    the main thing, we want to make sure everybody gets on a flight

4    tonight and gets home for the weekend.

5            I want to thank Justice Harwood for being available.

6    That really did expedite things for him to be able to run a

7    second track in the courtroom next to us.

8            Any questions?  I hesitate to say that, but I think

9    it's fair.

10           MR. RAGSDALE:  I assume whenever we hear from the

11   Court, there will be some discussion about when we reconvene?

12   Obviously, these aren't normal clients.  They've got their own

13   dockets they've got to be able to manage.

14           JUDGE PROCTOR:  We're going to accommodate schedules to

15   the extent we can with plenty of notice.  I don't want to go

16   into too much detail about what we're thinking, but we do have a

17   few thoughts about how we can go about the orderly wrapping up

18   of this.  So you will be hearing from us about our thoughts on

19   that.  And we will give plenty of notice to everyone to make

20   sure that if and when we get back together, we can accommodate

21   that.

22           MR. RAGSDALE:  Thank you, Your Honor.

23           JUDGE PROCTOR:  All right?  If there's nothing further,

24   we'll be adjourned for now, but we will resume as appropriate.

25       (Proceedings concluded at 4:50 p.m.)

1                    COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3    from the record of the proceedings in the above-entitled matter.

4            This 10th day of October, 2023.

5

6                              /s/ Patricia G. Starkie
                               Registered Diplomate Reporter
7                              Certified Realtime Reporter
                               Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25