UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
_____

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
_____

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
_____

IN RE:  AMIE ADELIA VAGUE,        CASE NO.: 2:22-mc-3977-WKW
et al.

**SEALED DOCUMENT**

* * * * * * * * * * * * *

STATUS CONFERENCE

* * * * * * * * * * * * * *

BEFORE THE HONORABLE W. KEITH WATKINS, UNITED STATES

DISTRICT JUDGE, THE HONORABLE R. DAVID PROCTOR, UNITED STATES

DISTRICT JUDGE, and THE HONORABLE JEFFREY U. BEAVERSTOCK, UNITED

STATES DISTRICT JUDGE, at Montgomery, Alabama, on Friday, June

17, 2022, commencing at 1:05 p.m.

* * * * * * * * * * * *

APPEARANCES

(All appearances via Zoom)

APPEARING ON BEHALF OF ADAM KATZ, ANDREW BARR, CARL CHARLES,
CHASE STRANGIO, DALE MELCHERT, ELIZABETH REINHARDT, JAMES
ESSEKS, JULIE VEROFF, KAITLIN WELBORN, KATELYN KANG, KATHLEEN
HARTNETT, LATISHA FAULKS, LISA NOWLIN-SOHL, LYNLY EGYES,
MALITA PICASSO, MILO INGLEHART, ROBBY SALDANA, SRUTI
SWAMINATHAN, TARA BORELLI, VALERIA DEL TORO, ZOE HELSTROM:

```
 1                    APPEARANCES, continued:

 2  Mr. Barry Alan Ragsdale
    Mr. Robert Smith Vance III
 3  Attorney at Law
    DOMINICK FELD HYDE, P.C.
 4  1130 22nd Street South - Suite 4000
    Birmingham, Alabama
 5
    Mr. Matthew L. Kutcher
 6  Mr. Ian Shapiro
    Attorney at Law
 7  COOLEY LLP
    55 Hudson Yards
 8  New York, NY 10001

 9  APPEARING ON BEHALF OF ASAH ORR, CYNTHIA WEAVER, DIEGO SOTO,
    JESSICA STONE, SARAH WARBELOW, SCOTT MCCOY, JENNIFER LEVI:
10
    Mr. Robert D. Segall
11  Attorney at Law
    COPELAND FRANCO SCREWS & GILL
12  444 South Perry Street
    Montgomery, Alabama
13
    APPEARING ON BEHALF OF AMIE VAGUE, JEFFREY DOSS,
14  MELODY EAGAN:

15  Mr. Samuel Holley Franklin
    Mr. Mark Christian King
16  Attorneys at Law
    LIGHTFOOT FRANKLIN & WHITE LLC
17  400 20th Street North
    Birmingham, Alabama
18
    APPEARING ON BEHALF OF ABIGAIL TERRY, ADAM REINKE,
19  BRENT RAY, GILBERT OLADEINBO, J. ANDREW PRATT,
    MICHAEL SHORTNACY, MISTY PETERSON:
20
    Mr. Bruce Frederick Rogers
21  Ms. Jennifer Hanson Wheeler
    Attorneys at Law
22  BAINBRIDGE MIMS ROGERS & SMITH, LLP
    600 Luckie Drive, Suite 415
23  Birmingham, Alabama 35223

24             Proceedings reported stenographically;

25              transcript produced by computer
```

```
1        (The following proceedings were heard before the Honorable
2         W. Keith Watkins, United States District Judge, the
3         Honorable R. David Proctor, United States District Judge,
4         and the Honorable Jeffrey U. Beaverstock, United States
5         District Judge, at Montgomery, Alabama, on Friday, June 17,
6         2022, commencing at 1:05 p.m.:)
7    (Call to Order of the Court.)
8              JUDGE PROCTOR:  Good afternoon, everyone.
9              MR. RAGSDALE:  Good afternoon.
10             JUDGE PROCTOR:  We are here for a conference.
11             I have a question before we get started.  One person in
12   the waiting room is CH42Huddle26747guest.  Any idea who that
13   might be?
14             MR. RAGSDALE:  I know that there is a Cooley LLP
15   lawyer, Matt Kutcher, who has recently been admitted who is
16   joining us.  I don't know whether that is their -- is that -- if
17   that's Matt -- I don't --
18             JUDGE PROCTOR:  This is one of the things we learn in
19   Zoom etiquette, is make sure your handle reflects who you are.
20             Does anybody want to text Matt and see if that's him
21   waiting to come in?
22             MR. RAGSDALE:  Let me try.
23             (Brief pause.)
24             MR. RAGSDALE:  Sorry, Your Honor.  I'm still waiting on
25   a response.
```

```
1              JUDGE PROCTOR:  I don't mind letting him in, but if
2    it's somebody who's not invited, we'll just let them right back
3    out, and I would just as soon not put them through that.
4              MR. RAGSDALE:  Sure.  I got a response that says
5    they're in a huddle room.
6              JUDGE PROCTOR:  Okay.  It says huddle.
7              MR. RAGSDALE:  Okay.
8              JUDGE PROCTOR:  Let's see if this is them.
9              MR. RAGSDALE:  42008 maybe?
10             JUDGE PROCTOR:  About to find out.  All right.  That
11   looks like a huddle room.
12             MR. RAGSDALE:  It does.
13             JUDGE PROCTOR:  Gentleman, it would be helpful when you
14   sign in to a Zoom call to give an indication of who you are,
15   because we saw Channel 42.
16             MR. KUTCHER:  We apologize for that, Your Honor.
17             JUDGE PROCTOR:  You're on the 42nd floor?
18             MR. KUTCHER:  We're on the 42nd floor.  You're right.
19             JUDGE PROCTOR:  See how quick I put that together?
20             All right.  We're here.  Counsel have requested by
21   letter a status conference in this matter, and we're here in
22   In Re Vague, 2:22mc3977.
23             The three judges on the panel are each present and
24   interested to hear what you have to say.  We're actually going
25   to let you take charge of the conference since you've requested
```

1    it.  What I would ask is that you identify yourself and who you

2    represent at any point during the conference in which you make

3    remarks or ask questions.  Okay?

4         MR. RAGSDALE:  Yes, sir.

5         JUDGE WATKINS:  David, can we get the names of the two

6    in the huddle?  I don't think we have those names.

7         JUDGE PROCTOR:  All right.  Sure.

8         MR. KUTCHER:  Matthew Kutcher and Ian Shapiro from

9    Cooley LLP.

10        JUDGE PROCTOR:  All right.  And you're representing the

11   Cooley lawyers in this matter?

12        MR. KUTCHER:  Yes, Your Honor.

13        JUDGE PROCTOR:  Are you pinch hitting for Mr. Capone,

14   or are you substituting in the lineup for him?

15        MR. KUTCHER:  No, we're just pinch hitting today.

16        JUDGE PROCTOR:  Very well.  Thank you, Judge Watkins.

17        Who wants to lead us off?

18        MR. RAGSDALE:  I will, Your Honor.  This is Barry

19   Ragsdale.  I represent the Walker plaintiffs.  Is that enough

20   identification for you, Judge?

21        JUDGE PROCTOR:  It is.  Counsel in the Walker case.

22        MR. RAGSDALE:  Sure.

23        First, I do want to thank the panel for giving us this

24   opportunity and granting us this status conference.  We

25   collectively, obviously, discussed that it would -- we think it

1  would be helpful, we hope, to the Court to offer some

2  suggestions perhaps about how we proceed and to make it as

3  efficient and as productive for the Court to resolve the issues

4  that are before them.  And we do have suggestions, Your Honor,

5  and would like to offer those to you.

6        I would preface all that by saying we all collectively

7  believe that a strong case can be made that the Court already

8  has enough information to resolve this matter, having heard

9  substantial testimony from the lawyers involved on some very

10  salient points.  And I'm only going to hit on a couple of those

11  before I talk specifically about what our suggestions are.

12        You've heard testimony that there was no collusion

13  between the two groups to try to file multiple actions and then

14  dismiss the ones we didn't like, like Geoffrey Fieger did in one

15  of the cases that the Court relies on and other cases that have

16  been cited.  These groups actually, you know, in a strange way

17  compete with one another and competed with one another to get

18  cases filed.  That evidence and testimony is already before the

19  Court.

20        In addition to that, the Court has heard about our

21  counsels' concerns about the undisclosed manner in which the

22  case got transferred from Judge Axon to Judge Burke.  And we

23  think that's a relevant consideration as well.

24        JUDGE PROCTOR:  Let me stop you there and just ask a

25  question.  When you say undisclosed, Judge Axon did enter an

1  order.

2          MR. RAGSDALE:  Yes.  No, I'm sorry --

3          JUDGE PROCTOR:  At the hearing there was this unmoored

4  suggestion that this just occurred without any order.  There was

5  an order.

6          MR. RAGSDALE:  You're absolutely correct.  And I may

7  have been guilty of making that suggestion.  What I meant to

8  say, Your Honor, is we did not -- what was not disclosed to us

9  at the time was why the case got transferred from the first

10  filed judge to the second filed.  We knew that the transfer had

11  taken place, obviously, with Judge Axon's order, but that

12  appeared out of the ordinary practice.

13          JUDGE PROCTOR:  Why would -- I guess my question also

14  would be, why would you jump to any assumption or even a concern

15  that there was something untoward going on, just based upon

16  that?

17          MR. RAGSDALE:  Well, I don't think we jumped to the

18  conclusion that it was untoward.  What concerned us in a very

19  compressed time frame was the fact that normal -- what appeared

20  to be the normal procedures were not followed in this instance.

21  And that, along with some other factors that I think we've

22  talked about with the Court, in that very compressed time frame,

23  there were -- you know, less than two hours passed.  We didn't

24  know why that had happened.

25          It concerned us primarily because we didn't know why it

1  had happened, and there was a risk -- I think a small risk,

2  certainly probably a very small risk, with hindsight -- that it

3  had occurred because Judge Burke had reached out for the case.

4  Now, we now know that's not true.

5        JUDGE PROCTOR:  But, again, my question -- that was

6  said at the hearing in Montgomery on that particular Friday when

7  we met.  But there's no basis in fact, no basis in procedure, no

8  basis whatsoever for anyone to conclude that Judge Burke reached

9  out and grabbed a case, when Judge Axon's the one who entered

10  the order, not Judge Burke, transferring the case.  Is that not

11  just a straightforward, logical proposition?

12        MR. RAGSDALE:  It may be with the comfort of hindsight,

13  Your Honor, but also add this factor in.  And I think it's

14  significant that Judge Burke set it for a status conference

15  before Judge Axon transferred her case to him.  That seemed

16  strange.

17        Now, keep in mind, I'm speaking on behalf of a bunch of

18  lawyers who were in the midst of trying to litigate this issue

19  very quickly.  I don't think anyone reached the conclusion, and

20  certainly now everyone knows that it was not an action by Judge

21  Burke that had any connection to being improper.  But because

22  the reasoning for Judge Axon, being the first filed judge,

23  transferring it to the second filed judge, after that judge had

24  already set it for a status conference, it caused our lawyers,

25  as I think you heard the testimony, to hit pause and say, let's

1    dismiss while we can and start over if we can.

2         Judge, I absolutely agree with you that nobody jumped

3    to the conclusion that Judge Burke had done something nefarious.

4    But the fact that there was a small risk that a judge, in fact,

5    had reached out for a case, and our group in particular had to

6    make that decision on the fly quickly, we were not willing to

7    subject our clients to even that tiny risk that there was a

8    judge who had reached out for the case, particularly, Judge, in

9    light of the fact that we, obviously, did not understand why the

10   first-filed rule had not been followed in this case.  We now

11   know why, but we didn't at the time.

12        And, Judge, the only reason I bring that up is because

13   I think it is a fact that this Court already knows about.  It

14   can give whatever weight to it it wants to, obviously, but we

15   believe that the information that has already been garnered from

16   the Walker lawyers that have been examined by this Court puts us

17   in a posture where we think we can make a very strong and

18   compelling legal argument that no rules were violated.

19   Certainly Rule 41 was not violated.  And certainly we believe no

20   local rules of any of the Middle District or the Northern

21   District were violated by the conduct of these lawyers.  And

22   from that standpoint, we believe there is enough information

23   before the Court to be able to at least address those

24   preliminary issues.

25        Having said that, Judge, we recognize that this Court

1  may still want some additional information and may still want to

2  make further inquiries.  And so what we have put together -- and

3  I'm speaking on behalf of the Walker lawyers, obviously -- is a

4  proposal that would essentially suggest to this Court that what

5  we should do going forward is to have the lawyers be given

6  access to the transcripts.  I'm going to talk about the

7  sequestration rule in just a minute.  And after being given

8  access to the transcripts, Your Honor, that we then be given an

9  opportunity, as we believe is proper, to submit briefs to this

10 Court setting forth what we believe to be the important, salient

11 facts and the relevant law, both under Rule 41 and, frankly,

12 under an area that we haven't briefed for this Court yet, which

13 is the issue that the Court raised with us about us designating

14 a case in front of Judge Thompson as related to the case that we

15 filed.  We don't believe we've briefed that issue to the Court

16 and would like that opportunity after being given an opportunity

17 to review the transcripts, and that we then have a hearing in

18 which traditional arguments are made by the lawyers about why

19 the facts and the law support our position that no rules were

20 violated here.  No ethical rules, no rules of civil procedure,

21 certainly no local rules of the Middle District were violated,

22 and that there is no misconduct worthy of any kind of sanction

23 or even rebuke by this Court.

24         I think this is a proposal that would allow the Court

25 to hear the important facts and the law in context, which I,

 1  frankly, don't think this Court yet has had that opportunity

 2  because of the way that we proceeded in May.  We would suggest

 3  that that be done before the Court make any decision about

 4  whether it needs any additional testimony or statements or

 5  factual matter from the lawyers involved.

 6          And, Judge, we would respectfully suggest that even

 7  prior to that, that this Court consider dismissing those lawyers

 8  that are not individual decision makers, who were not the

 9  lawyers who decided either to file the case, where to file it,

10  when to file it, et cetera.

11          And I need to tell the Court something that I don't

12  know that you're aware of, but at least one lawyer in this case,

13  who continues to be in the *Tucker* case, which is on appeal to

14  the Eleventh Circuit, was recently denied admission to the

15  Eleventh Circuit because he disclosed this investigation.  And

16  this is a lawyer who is trying to represent his clients in the

17  Eleventh Circuit, and just the pendency of these proceedings --

18  which I think were properly disclosed by the lawyer in applying

19  for admission to the Eleventh Circuit -- is already having

20  professional impacts on the careers and the ability of these

21  lawyers to represent clients around the country.  So we think

22  that it is important that the Court get to this conclusion as

23  efficiently and quickly as possible, obviously, but more

24  importantly that it be done in a way that affords these lawyers

25  adequate due process protections.

1          JUDGE PROCTOR:  I don't have a full understanding of

2    what you just referenced.  Are you saying that a lawyer asked to

3    be admitted pro hac vice for a case and was denied that

4    opportunity?

5          MR. RAGSDALE:  It was actually -- it's the appeal from

6    Judge Burke's injunction to the Eleventh Circuit.  A lawyer who

7    is not a member of the Eleventh Circuit Bar applied for

8    admission to the Eleventh Circuit and was denied admission to

9    the Eleventh Circuit based on the pendency of this

10   investigation.

11         Now, in full disclosure, they then turned around and

12   applied for pro hac admission, and my understanding is they have

13   either gotten that or at least it has not been denied for pro

14   hac admission.

15         And I point that out only because, Judge, the mere

16   pendency of these proceedings, particularly in the context in

17   which they have been described both in the press and in some of

18   the orders, are having a deleterious effect and will continue to

19   have a deleterious effect on these lawyers' ability to practice

20   law the way they do around the country.  As I said, I think that

21   is significant.

22         I don't think it's the only problem.  There are -- and

23   we cited, I think, to this Court in the letter that was sent to

24   you an opinion by Judge Pryor in which Judge Pryor discussed at

25   length the due process protections that must be and should be

1  afforded to lawyers who are potentially facing sanctions.  It is

2  my belief and it is our belief that if we are to proceed with

3  the additional proceedings, if there are going to be additional

4  proceedings, certainly that involve testimony, that it will have

5  to be done and should be done in such a way that it complies

6  with those due process requirements.

7          JUDGE PROCTOR:  So let me make sure I understand what

8  you're arguing.  Would your preference have been that rather

9  than pull everyone in and explain as we did, that there is at

10 least a question about whether the circumstances involving these

11 three cases raised the spectre of the potential of an intent to

12 circumvent the practice of random assignment in the northern and

13 middle districts -- would your preference have been that we take

14 that information and go straight to a show-cause hearing and let

15 everybody come in and show cause why they did not violate that

16 rule -- and I think it's a pretty clear rule -- and why they

17 should not be sanctioned?  Because that is not the way this

18 panel decided to proceed.  What we decided to do was to have

19 everybody come down and hear about what's going on.  Now, that

20 was -- the problem was we had 30 some-odd lawyers.  We didn't

21 know which categories everyone fit into at that point.

22          And if you think about it, if you go back and read that

23 transcript, we did three things at the first hearing:  One, we

24 heard from y'all; second, we walked through procedurally where

25 we are and answered, I think, your question about this pregnant

 1   assertion or maybe silent assertion that there's some nefarious

 2   behavior in the Northern District of Alabama among the judges;

 3   and third, we got everybody in categories.

 4         In addition to that, we had Justice Harwood start

 5   talking to young lawyers who we told you were not targets of

 6   this in any way.  Nobody's a target, but of all the people that

 7   weren't targets, it was the young lawyers.  We understood they

 8   were not decision makers.  And we asked them just to sit down

 9   and tell what they understood about what happened with Justice

10   Harwood.

11         MR. RAGSDALE:  To be fair, Judge, I'm not sure that

12   entirely accurately describes what happened.  Because they were

13   all put under oath --

14         JUDGE PROCTOR:  Yes.

15         MR. RAGSDALE:  -- which, frankly, I found unusual for

16   lawyers to be put under oath.

17         JUDGE PROCTOR:  Well, I'm going to address that with

18   you, Mr. Ragsdale.  Because what I found unusual was your

19   assertion that you talked to my career law clerk and were told

20   that no one would be put under oath.  She tells me that is not

21   in any way, shape, or form anything related to what was

22   communicated to you.

23         MR. RAGSDALE:  Can I make it clear, Judge, I did not

24   make that assertion.  I did not.  Let me be forthright about

25   what happened.  I called Sally to ask -- this proceeding, Judge,

1    was so unusual that I thought maybe I could get some guidance as

2    to what the Court had in mind.  And I said, I can't imagine that

3    they're going to put these lawyers under oath.

4          Now, I knew that Sally had no direct information.  I

5    knew she was not working on the case.  I knew none of -- I mean,

6    I knew she didn't have any authority to say that, even if you

7    had expressly told her that.  I knew all of that, Judge.

8          And that's why, in the hearing, when it was brought up

9    by one of the lawyers for Cooley, against everything that I

10   would have instructed that lawyer to do, I said, look, we didn't

11   rely on that.  Nobody relied on that discussion that I had with

12   Sally.  Nobody -- and Sally made no promises or representations.

13         And, Judge, I think if you go back and look at that

14   transcript, I made it very clear that I was not suggesting that

15   we had relied on something that Sally had said to me informally.

16   My mistake, frankly, was telling a lawyer from outside the

17   Northern District about an informal conversation that I was

18   trying to get some guidance for my clients.  But I promise you,

19   Judge, nobody believes that Sally made any statement about --

20         JUDGE PROCTOR:  As long as we have that cleared up.

21         MR. RAGSDALE:  Okay.

22         JUDGE PROCTOR:  Because I think that -- what

23   Mr. Capone's remarks did was impugn the good name and character

24   of my law clerk.

25         MR. RAGSDALE:  And let me say, Mr. Capone and I have

1   had a few words about that.

2         JUDGE PROCTOR:  I suspect you did.

3         MR. RAGSDALE:  Okay.  And I apologize, Judge, for that

4   distraction.

5         JUDGE PROCTOR:  All right.  I just wanted to clear that

6   up, since you opened that door about under oath.

7         MR. RAGSDALE:  Sure.

8         JUDGE PROCTOR:  All right.  Let me ask you this.  And I

9   don't want to pretermit your -- I'm just trying to get a handle

10  on the concerns.

11        MR. RAGSDALE:  Sure.

12        JUDGE PROCTOR:  Do you think it was improper for a

13  panel of three judges, informed by all our colleagues in each

14  district, every colleague in each district, to look into this?

15        MR. RAGSDALE:  No.

16        JUDGE PROCTOR:  All right.  Do you think it was

17  improper for us to look into this in a way that communicated

18  that we were looking into it and expected candid responses to

19  our questions?

20        MR. RAGSDALE:  No.

21        JUDGE PROCTOR:  All right.  You say -- I think you're

22  saying it may have been unnecessary for us to put all the

23  lawyers, not just the young lawyers but all the lawyers, under

24  oath; correct?

25        MR. RAGSDALE:  Correct.

1          JUDGE PROCTOR:  And yet in the courtroom, one of the

2    lawyers misled us, at least initially, about a very key point in

3    this case.

4          MR. RAGSDALE:  And, Judge, can I speak to that?  I

5    think that may be a distraction as well.  But I was in the

6    courtroom when a young lawyer I believe misremembered what had

7    happened.  Not in an effort to lie to you, Judge.

8          And let me tell you -- can I just tell you one quick

9    fact about that?  Because I feel very strongly about this.  That

10   young lawyer, when he made that phone call to chambers, did an

11   e-mail to our entire group, reporting on that phone call.  In

12   other words, Mr. Charles called and spoke with someone he

13   thought was Judge Thompson's law clerk and told them -- told

14   that law clerk certain things, and then came and gave

15   essentially a verbatim report of what had been said to the law

16   clerk.  And the last line of that e-mail says, the law clerk

17   repeated back to me verbatim what I had said; wrote down my name

18   and my cell phone number.  That's in his e-mail to the group.

19          I will tell you, Judge, that young lawyer was not

20   lying.  That young lawyer forgot about the phone call.  It was

21   memorialized in documents that we have.  We knew -- I, frankly,

22   think there was nothing wrong with that phone call being made.

23   And I don't think there was any reason for Mr. Charles to lie,

24   and I don't think he did lie, Judge.  I think he was panicked.

25   I think I need to say, that's the first time he has ever spoken

1  out loud in a federal court.  He was petrified of standing in

2  front of this court.  Now, I only say that because I think that

3  explains why he forgot what, at least in my opinion and in our

4  opinion in preparing for this hearing, was a relatively

5  innocuous phone call.

6         Now, I agree with you, Judge, that there was a

7  miscommunication with him.  But here's what I make a point

8  about, Judge:  It is not that there was necessarily something

9  wrong with these lawyers being put under oath, but this Court

10 let the Solicitor General get up and make a presentation, which

11 was essentially an advance conspiracy theory, without having to

12 be under oath.  I was allowed to make factual statements to this

13 court without being under oath, I think properly, because the

14 Court afforded due respect to officers of the Court and assumed

15 lawyers would tell the truth.  That assumption was reversed with

16 my clients.  And that is that you have to be put under oath in

17 order for us to trust what you're going to say.

18        Now, I don't think that -- let me be very quick, Judge.

19 I don't think the fact that the lawyers were put under oath is

20 necessarily a due process violation.  I do think there were some

21 due process violations in the way in which we proceeded on that

22 day.

23        JUDGE PROCTOR:  What are those?  Can you specify what

24 those are?

25        MR. RAGSDALE:  How about I tell you the ones I think

1  are most significant, and then maybe we can talk about those?

2  But first of all, Judge, I will start with the fact that I think

3  it was a due process violation to sequester these witnesses,

4  because they are parties to these proceedings.  However you call

5  it, if there are any parties, it's these lawyers.  And they

6  should not have been, in my opinion, in the opinion of the

7  Walker counsel, sequestered.

8           You know, the rule of sequestration is a rule of

9  evidence.  It is Rule 615.  And Rule 615(a) expressly says it

10  doesn't apply to parties.  You don't sequester parties from

11  their own proceedings.  And in fact, the commentary to Rule 615

12  specifically says that -- I'm quoting -- exclusion of persons

13  who are parties would raise serious problems of confrontation

14  and due process.  Under accepted practice, they are not subject

15  to exclusion.

16           So I do believe that the sequestration of these

17  witnesses under these -- excuse me -- these parties under these

18  circumstances violated the confrontation clause and violated due

19  process.

20           I also believe, Judge, that we were not provided with

21  the required due process notice that is required under the

22  Eleventh Circuit's decision in *Shaygan*.  And by that I mean I do

23  not believe -- we knew generally, obviously, the topic, the

24  subjects that were going to be raised by the factual matters set

25  out both in front of Judge Burke's order and in this Court's

1  order, but we were not given what I think *Shaygan* and Judge

2  Pryor specifically require, which is a delineation of exactly

3  what rules we potentially violated; how we potentially violated

4  those rules.

5          And let me, if I can, speak to that specifically.  We

6  understood, based on Judge Burke's order and this Court's order,

7  that the Court was concerned about the fact that the cases were

8  dismissed under Rule 41, and then the *Ladinsky* plaintiffs

9  refiled a case in the Middle District, and that there was

10  concern about whether that was the result of judge shopping.

11  Once the case got to Judge Burke, that it was dismissed, and

12  then ultimately --

13          JUDGE PROCTOR:  Let me clarify.  It's not merely judge

14  shopping.  There's all sorts of forms of judge shopping.

15          MR. RAGSDALE:  Sure.

16          JUDGE PROCTOR:  We specified an order was manipulation

17  of the random assignment system.  And that is an important

18  distinction.  And I think that's why your first point is off the

19  mark, because I think you and your clients were squarely on

20  notice of what the concern was as far as their behavior.  But

21  keep going.

22          MR. RAGSDALE:  Okay.  But I would also say, Judge, for

23  example, if this Court thinks there was something improper about

24  us calling Judge Thompson's chambers, I think we should have

25  been given notice of that before the hearing.  I don't think

1   there was anything improper.  I think we would have been in a

2   better position to answer your questions and provide the

3   evidence in response to that if that was a concern of this

4   Court.

5          JUDGE PROCTOR:  Well, let me ask you, then.  I hear

6   what you're saying.  I'm not sure it squares up with what we

7   heard at the hearing.  One, I thought Mr. Charles was a senior

8   attorney at that group.  That's what his title was.

9          Second, Judge Watkins asked him a number of times:  Did

10  you call chambers and talk with anybody in chambers?  He said no

11  multiple times.

12         I then asked him.  He said no a couple more times.  And

13  then I asked him specifically, look, I don't want to turn this

14  into a deposition, but I'm just trying to make sure I understand

15  what you're saying.  Are you saying you don't remember calling

16  or you did not call?  And I think his answer was, I didn't call,

17  I would remember it if I did, or words to that effect.  I don't

18  have the exact phrase in my mind.  And then when I gave him the

19  cell phone number, he suddenly came clean.

20         Now, you're right.  We'll probably need to explore this

21  more.  I'm not ready to make a finding.  I doubt anybody else on

22  the panel is ready to make a finding of whether that was a

23  simple lapse of memory or an intentional falsehood or something

24  in between.

25         But I don't think your characterization of that is

1   what's going to win the day for you if you're going to make that

2   argument.  I think we've got to follow back up and see why that

3   statement was made, what else was involved with that, who else

4   was aware of that, and what the intention was of that phone

5   call.

6          MR. RAGSDALE:  And I think the Court, obviously, has

7   concerns about that.  I sat there, knowing that he had forgotten

8   about that phone call, as you asked him 11 times.

9          JUDGE PROCTOR:  Or knowing that he didn't disclose it.

10  That's what you knew.

11         MR. RAGSDALE:  I knew he had forgotten, Judge.  Because

12  I'm sorry.  The little bit I know about Mr. Charles -- who's

13  only been practicing six years.  He may be a senior lawyer in a

14  new organization.  He's only been practicing six years.  This is

15  only the second time he's ever even been in federal court.

16          So I understand what you're saying.  But I will tell

17  you that you -- we're going to go round and round on this, I

18  guess; but I think the fact that -- if he would have had notice

19  of the fact that there was concern about that phone call and

20  gone back and reviewed his e-mails, he clearly would have

21  recalled the phone call and then been in a position to answer

22  Judge Watkins' questions about what did you say, et cetera.

23         JUDGE PROCTOR:  Okay.  One thing we're not going to do

24  is go round and round about this.  You've made your point.

25         MR. RAGSDALE:  Thank you.  Thank you, Judge.

1          There are other examples, Judge, I believe, where we

2     contend that notice was not proper because it did not tell each

3     one of these lawyers what conduct they engaged in that was,

4     apparently, violative of the rule, and that's required by

5     *Shaygan*.  So that --

6          JUDGE PROCTOR:  Let me clarify.  If we had said that

7     concerns are raised about counsel in this case and whether

8     they -- these events that Judge Burke outlined in his order

9     raised the question of whether someone was involved in an

10    intentional manipulation of the random assignment system, how is

11    that not notice of what we're concerned about?  And to be clear,

12    I think I speak for myself.  That's what I was concerned about.

13         MR. RAGSDALE:  And I will just tell you, the only thing

14    I can start with, Judge, is that I focused and I think our

15    clients focused exclusively on what, apparently, had triggered

16    Judge Burke's concern, which was the dismissal of the case once

17    it got assigned to him.  I did not think there was a focus on

18    the fact that we had checked a box on the JS 44 form cover sheet

19    when the case was originally filed.  This Court, obviously, had

20    concerns about that.  I did not get that notice from this

21    Court's order or Judge Burke's order, that that was a separate

22    concern.

23         Had we done that, I think we would have briefed for

24    this Court, for example, what the law is regarding a case being

25    marked as related and whether or not there is a standard.  I

1  mean, you know that the Eleventh Circuit has said there's a

2  pretty low standard for whether or not a case gets marked as

3  being related.  It merely has to be plausible that it's related.

4  And under those circumstances, I think we would have been in a

5  position to argue that.

6        We did not believe that was a focus of the Court's

7  attention.  We've learned that only as the process went through,

8  that there was some concern about the designation and I guess

9  also the subsequent filing of the motion to reassign.  We don't

10  believe we got notice that that was subject to being

11  sanctionable conduct.

12        Let me leave notice, because I think I've beaten that

13  enough.  We believe, Judge, it was a violation of due process to

14  have lawyers put under oath and questioned by the special master

15  without having the opportunity to have counsel.  We made that

16  objection at the time.  You will recall that discussion with the

17  Court.

18        JUDGE PROCTOR:  What if there was no possibility that

19  those lawyers -- it was already acknowledged those lawyers did

20  not make any decisions and had no input into any decisions made.

21  How was that in any way violating anyone's due process rights if

22  they are simply witnesses and are not looking at any type of

23  repercussions for what their involvement is?

24        MR. RAGSDALE:  I would say two things, Judge.  First of

25  all, that I don't believe was clear during the proceedings.  I

1  understand you're now saying that nobody, apparently, said

2  anything that got them in trouble in front of Judge Harwood,

3  but --

4         JUDGE PROCTOR:  I did not say that.  I did not say that

5  at all.  That's a different issue.  If you said --

6         MR. RAGSDALE:  But --

7         JUDGE PROCTOR:  Hold on.  Let me finish.

8         MR. RAGSDALE:  Okay.

9         JUDGE PROCTOR:  What we said was we asked you to tell

10  us which category each lawyer in the courtroom fit into.  Okay?

11  We understood that the lawyers who were excused from the general

12  proceeding and sent to go talk with Justice Harwood were those

13  who fell into a no input, no decision-making category.  Doesn't

14  that suggest to you or anyone else with a reasonable, prudent

15  view of this matter that they are not implicated in the

16  proceeding any longer, unless they lie?

17         And remember, we warned y'all about that, too.  We

18  said, look.  We don't know how this is going to turn out.  We're

19  not making any presumptions.  But one thing that's going to get

20  you in trouble in this matter is if you don't tell us the truth

21  and are not transparent.

22         So this was not a hearing to determine whether

23  disciplinary sanctions should take place.  This was a matter

24  trying to figure out exactly what happened.

25         Now, I'm not going to speak any further because I don't

1  have my colleagues' input into this.  But I think that's a

2  pretty important distinction, at least in my mind.

3          MR. RAGSDALE:  I would very, very respectfully disagree

4  with you, Your Honor.  Particularly now --

5          JUDGE PROCTOR:  That doesn't surprise me.

6          MR. RAGSDALE:  And I think I've said enough.  But we do

7  feel like the combination of denying those lawyers an

8  opportunity for counsel when they had counsel there, and the

9  sequestration of parties from hearing the testimony that could

10 potentially be used against them, potentially be used against

11 them, were also violative.

12         JUDGE PROCTOR:  It seems to me your argument would

13 sound less hollow if any of those people actually get in trouble

14 based upon what they said to Justice Harwood.  Because

15 otherwise, there's no sanction, there is no -- there's just not

16 an issue there.  But you might disagree with me.  That's fine.

17         I would say this.  And I'm speaking, again, only for

18 myself.  I'm a little surprised, in light of how that hearing

19 went and the things that came out in it, that we're getting this

20 type of approach from them.  I'm just surprised by that.

21         MR. RAGSDALE:  Would you care to tell me why you're

22 surprised?

23         JUDGE PROCTOR:  I would think that you would want --

24 you would understand that we were there, trying to just inquire

25 about what happened.  No, we didn't --

1          And look.  If there's any lawyer who's going to be
2    disciplined, there will be process.  We're not assuming that
3    we're going to end up there in any way, shape, or form.  I think
4    we made that very clear on that day.  Okay?
5          But I think it's appropriate -- in light of what we
6    were presented with, it was appropriate to have folks come in
7    and explain, okay.  What happened here?  A lot of that was just
8    getting organized.  All right?  Who do we ask the right
9    questions to?
10          Nobody who's a decision maker has in any way even been
11    questioned at this point; right?
12          MR. RAGSDALE:  I think that's correct.
13          JUDGE PROCTOR:  All right.  So what does that tell you?
14          MR. RAGSDALE:  I hate to guess what that tells me, but
15    it tells me that you still want to ask questions to the decision
16    makers.
17          JUDGE PROCTOR:  Well, we don't -- we're going to hear
18    you out before we decide anything.  This is your opportunity.
19          MR. RAGSDALE:  Okay.  Can I say one thing about the
20    nature of the process, Judge?  And that is this:  *Shaygan* was
21    also just an inquiry.  As Judge Pryor writes, the District Court
22    conducted an inquiry, not an adversarial hearing.  And as a
23    consequence, I don't think it matters that this Court envisions,
24    if there's going to be something further down the road, then
25    that's when we apply due process.  Due process, according to

 1  *Shaygan*, has to be applied and presented during the course of

 2  the inquiry; during the course of the fact finding.

 3        I don't think it makes any difference that these young

 4  lawyers -- that we can now say maybe these young lawyers didn't

 5  really face any jeopardy.  They still were entitled to counsel.

 6        Now, having said that, Judge, there are other aspects

 7  of the proceedings that we believe violated due process, but we

 8  don't -- I don't want to dwell on that more than I already have.

 9  I already have dwelled on it more than anybody on this call

10  wanted me to.

11        We do think, Judge, that if we proceed with additional

12  fact finding, that it makes sense to do it in a proceeding in

13  which we're allowed, first of all, to present to you, to this

14  Court, what we believe are the salient facts.  And although you

15  say you heard from us, if you will recall, we wanted to start by

16  having Mr. Doss of the Lightfoot firm, who was involved in all

17  of those decisions, lay out for you what we believe all the

18  facts are going to show and why those decisions were made.  And

19  this Court decided they did not agree --

20        JUDGE PROCTOR:  We did not pretermit him from doing

21  that.

22        MR. RAGSDALE:  No, you're right.

23        JUDGE PROCTOR:  Hold on.  You're interrupting me again.

24        MR. RAGSDALE:  I'm sorry.

25        JUDGE PROCTOR:  We said Mr. Doss could make an opening

1    statement.  You could make an opening statement.  We invited

2    that if you wanted to.  What we said is you can't make an

3    opening statement that signals to other people what the party

4    line is.  That's all we said.  So we could have easily cleared

5    the courtroom or had an understanding about how opening

6    statements would be made, so long as there wasn't an improper

7    motive in making the opening statement.

8              MR. RAGSDALE:  All I will say, Judge, is at least this

9    lawyer got the impression the Court didn't want to hear a

10   recitation of what the salient facts were.

11             JUDGE PROCTOR:  Well, you got the wrong impression,

12   then.  And I'll be honest with you, that's a little bit of a

13   common theme in this case, from my standpoint, again.  I think

14   your clients got the wrong impression and jumped to some pretty

15   sinister conclusions if what you're telling me is true; that

16   they immediately jumped to the conclusion that an Article III

17   judge on my court, who had taken an oath, was engaging in some

18   type of misbehavior to get a case away from another judge;

19   reaching out and grabbing a case.  I think your clients jumped

20   to the wrong conclusion, if I hear you correctly and you're

21   correctly characterizing their view of things, that this is a

22   judge that was engaging in shenanigans with respect to our

23   assignment system.

24             And I'm going to tell you, Mr. Ragsdale, it just simply

25   is -- I've looked at the record.  There's no basis whatsoever,

1   other than machinations of minds, to say that that's what was

2   going on.  By the time they reached this conclusion, they need

3   to dismiss this case, they had Judge Axon's order in hand when

4   she explained the basis for her reassignment of her case to

5   Judge Burke.  I don't think she's required to put in the order,

6   I'm in a four-week criminal trial in an 18-defendant case that

7   is scheduled to go for the next two to three weeks.  Okay?  I'll

8   be honest, I've got concerns about what was presented that day.

9           MR. RAGSDALE:  Judge, can I say two things about that?

10  First of all, I don't think any of our clients jumped to the

11  conclusion that Judge Burke had done something improper.  And we

12  all -- I'm just saying --

13          JUDGE PROCTOR:  Well, what you said in that hearing

14  will speak for itself.

15          MR. RAGSDALE:  Fair enough.

16          I think what I would like to reiterate is there were

17  concerns about the fact that it had happened in an irregular

18  fashion; that it is not the normal process that collectively the

19  lawyers, including me, are used to when a case gets transferred

20  and consolidated.  That usually goes to the first filed judge.

21  And with all due respect --

22          JUDGE PROCTOR:  Was the case consolidated?

23          MR. RAGSDALE:  I'm sorry?

24          JUDGE PROCTOR:  Was the case consolidated?

25          MR. RAGSDALE:  We assumed it was going to be because --

```
 1              JUDGE PROCTOR:  But it wasn't consolidated.  You said

 2    consolidated in the past tense.  I'm making the point that at

 3    the point you dismissed, you didn't even know if the cases were

 4    consolidated, were going to be -- they were not consolidated at

 5    that point because that would require a judicial order, and

 6    there's no judicial order consolidating the cases.  There was a

 7    status conference set on the following Monday where your client

 8    could have asked a lot of these questions, sought clarification,

 9    but there was a dismissal that night and a statement to the

10    media that the cases would be refiled.

11              Now, that's what we were dealing with when we received

12    this in Judge Burke's order.  All right?  So let me ask you

13    this.  You've raised these due process questions.  Don't view

14    this question as one in which I agree with your position, but I

15    just want to explore it.  What specifically should we have told

16    counsel who were coming in to answer questions about this that

17    the Court was concerned about in terms of their behavior, other

18    than the conduct described in Judge Burke's order could be

19    viewed as evidencing an intent to circumvent the practice of

20    random case assignment in the district courts for the northern

21    and middle districts of Alabama?  What should we have done that

22    would have more clearly focused your lawyers in on what the

23    Court's concern was that they were coming in to answer questions

24    on?

25              MR. RAGSDALE:  I think at a minimum, Judge, that that
```

 1    should have indicated that the Court was concerned that there
 2    was impropriety with marking the cover sheet in the fashion in
 3    which it was marked.  That the Court was concerned that there
 4    was impropriety with the subsequent motion to reassign to Judge
 5    Thompson.  That there was concerns about a phone call that was
 6    made to the judge's chambers.
 7           And frankly, I don't know whether there are other
 8    concerns that the Court may have about communications with the
 9    clerk's office in the Middle District.  I mean, all of those
10    things, in our minds, were not the focus of what the Court was
11    focused on, so we felt, frankly, some comfort in the fact that
12    we did not make any statement to the press.  The Walker counsel
13    did not make any statement to the press about refiling or having
14    the case, you know, filed again.
15           We, that is, Walker counsel, did not file a new case or
16    refile a case or whatever it was that, to me, is a necessary
17    component of the judge shopping charge or the attempt to
18    circumvent.  The mere dismissal of the case under Rule 41 can't
19    possibly be a violation of the random assignment of cases.  It's
20    just a dismissal.  It makes the case go away.
21           It's what happens after that that the courts have
22    looked at.  And what happened with us was we made the decision
23    that we could not work coherently or effectively with *Ladinsky*
24    counsel, and so we stood down.  That's what we thought the
25    Court's focus was on, was, did we file a case, get a judge we

1  didn't like, and then refile another case?  We didn't do that.

2  We didn't do any of those things.

3         Now, I will say, I think we, that is, Walker counsel,

4  were entitled to more specific notice about the conduct prior to

5  the case going to the Northern District that was causing concern

6  to this Court.  For one thing, we could have, as I said,

7  addressed legally, for example, concerns that this Court

8  expressed about whether or not we did something wrong by calling

9  it a pending case.  I would have loved to have had the

10  opportunity to present the law to this Court on the definition

11  of pending.  But I didn't recognize, my clients didn't

12  recognize, that that was a focus of or at least part of the

13  focus of the Court's attention.

14         So I think both telling us that the Court felt like

15  Walker counsel had violated or had attempted to violate the

16  rules for random assignment of cases in the middle district, and

17  that making a phone call to the clerk's office was also

18  violative of some rule or part and parcel of that, I think we

19  were entitled to have notice that that was something that the

20  Court was concerned enough about that it was conducting an

21  inquiry.

22         There may be other things, Judge, in terms of notice.

23  But I will say that the way in which these proceedings

24  unfolded -- part of it was, of course, none of the lawyers knew

25  how these proceedings were going to unfold.  And I think part of

1   that is because this panel was trying to figure and struggle

2   with how to deal with it and what was the best way to do it.

3   And so as a consequence, all of these things were unfolding in

4   real time in that courtroom in Montgomery that I wish, in

5   hindsight, we had taken the time to explain to the Court in more

6   detail both the context of what had occurred and why we believe

7   under the established law nothing that Walker counsel did

8   violated any rule of the Northern District, the Middle District,

9   the rules of professional conduct, or anything else.

10         JUDGE WATKINS:  Mr. Ragsdale, have you finished your

11   proposal?

12         MR. RAGSDALE:  I think I have, Your Honor.  I just want

13   to make sure I covered everything, other than, as I said, we

14   would like -- we believe we're entitled to and would like access

15   to the transcripts.  We would like the sequestration rule

16   modified so that it does not apply to the parties to the case.

17   We would like the opportunity to submit briefs, and we would

18   like the nondecision makers or the noncontrolling lawyers to be

19   let loose.

20         JUDGE WATKINS:  Okay.

21         MR. KING:  Your Honors, this is Chris King.  May I

22   supplement Mr. Ragsdale's requests on behalf of the *Ladinsky*

23   folks?

24         JUDGE PROCTOR:  You may.

25         MR. KING:  Thank you.

```
1          What makes sense to us is, well, first of all, we agree

2    that -- we think the Court's heard enough about -- I know what

3    the Court thinks of the conclusions or at least the concerns

4    that folks have, but they were -- those were the concerns.  And

5    the Court can say shouldn't have had them, but those were the

6    concerns that folks had.  And Judge Axon's order simply said in

7    the interest of justice, and there was really no way for the

8    parties to figure out what had happened.

9          But going forward, here's what makes sense to me.  The

10   Court has heard from a number of lawyers.  We agree that the

11   next step should be briefing.  And from our perspective, if the

12   Court wants to hear from the decision makers, we would propose

13   that we submit declarations to Your Honors from these lawyers

14   that sort of walk you through what their thinking was.

15         And after that, if the courts -- y'all may still have

16   questions because, you know, we're not sure exactly what -- you

17   haven't questioned any of the Ladinsky folks.  We're not exactly

18   sure what your interests are there.  If we don't cover

19   something, or if you have questions about what is covered, what

20   would make sense to me is then have the Court review the

21   briefing, review the declarations, and then decide, do we need

22   to ask additional questions?  At which point the Court could

23   then convene a hearing, whether in person or in some other

24   manner that's convenient to the Court, to sort of get the

25   evidence across the goal line so that y'all can then make a
```

1  decision.

2         JUDGE PROCTOR:  All right.  That's helpful.  Thank you.

3  Anyone else want to speak?

4         MR. SEGALL:  Your Honor, this is Bobby Segall.  Can you

5  hear me?

6         JUDGE PROCTOR:  Yes, Mr. Segall.  Thank you.

7         MR. SEGALL:  First, I just wanted to correct one thing,

8  Your Honor.  It was one of my clients who was denied admission

9  to the Eleventh Circuit.  That's, apparently, the way -- and

10  others of my clients were going to apply before this happened.

11  The only thing I want to correct is in the denial letter where

12  he or she was denied the admission to the Eleventh Circuit, the

13  Court sua sponte granted pro hac, so there was not a separate

14  application.

15         JUDGE PROCTOR:  Thank you.

16         MR. SEGALL:  The only other thing that I would like to

17  have the opportunity to do, not necessarily now because I think

18  Barry argued it well and I think Chris supplemented it to some

19  extent, but I would like to be given the opportunity to argue to

20  the Court -- and, again, absolutely no one jumped to any

21  conclusions, as Barry has pointed out.  But I would like to be

22  able to argue to the Court why suspicions were not unreasonable

23  under these circumstances.

24         Your Honor has pointed out a couple of things that

25  there are good answers to.  The case wasn't consolidated, for

1   example.  The whole reason Judge Marks sent the case to the

2   Northern District was to consolidate with the first filed case.

3   All of a sudden, a third judge is introduced to it.  And that

4   judge -- and, again, Your Honors need to, in my opinion, look at

5   it from their perspective.  Not based on your knowledge of the

6   way Article III judges behave in federal court in the Northern

7   District, but look at it from the standpoint of the lawyers who

8   were involved at that time.

9        Judge Marks transfers it for consolidation, obviously,

10  is what she intended, with the first filed case because of

11  the -- and all of our folks thought it was going to be sent

12  directly to Judge Axon.  Instead, through the Northern

13  District's procedures, it goes to a third judge.  I mean,

14  there's a first filed, a second filed, and all of a sudden,

15  there's a third judge.  That judge had had access -- and, again,

16  nobody's saying any judge did anything wrong.  But that judge,

17  who obviously had access to Judge Marks' order, knew exactly,

18  precisely why she had transferred the case to the Northern

19  District:  Clear intent to consolidate with Axon -- Judge Axon's

20  case.

21       That judge -- and I'm just talking about appearances.

22  Our folks acted on appearances.  What does Judge Burke do?  He

23  doesn't sua sponte transfer it, as Judge Marks intended.  He

24  doesn't wait for a motion to consolidate, which the Attorney

25  General was going to do.  Eddie LaCour had already agreed, this

1  case needs to be consolidated.  All the parties agreed to that,

2  and the Attorney General was going to file the motion.

3          But instead of waiting even to the end of that day,

4  April 15, and before there was a transfer that everybody knew

5  was the purpose of going through the Northern District, it gets

6  set for a status conference in the case to be transferred.  It

7  was suspicious to our folks.

8          And then, out of the blue, before the -- and it was the

9  Attorney General who was going to file the motion.  Before that

10  could be done, out of the blue, there is an order -- and, Your

11  Honor, with all due respect, it was unexplained.  It was totally

12  unexplained.

13          The language in that order would have been the exact

14  language one would use if one were not deviating from the

15  first-filed rule.  Of course, you do it -- you're transferring

16  it to the first filed case for efficiency, convenience, and all

17  that.  The same thing that was in the --

18          JUDGE PROCTOR:  To be fair, it was efficiency and

19  judicial economy.

20          MR. SEGALL:  Right.  Of course.  And if it had gone to

21  the first filed case, it would have been for those reasons.

22  That wasn't --

23          JUDGE WATKINS:  Mr. Segall, do you have a proposal for

24  how to get the argument before us that you're now making?

25          MR. SEGALL:  Your Honor, I apologize.

```
1              JUDGE WATKINS:  What's your proposal?

2              MR. SEGALL:  My proposal, Your Honor, is very similar

3    to what you have already heard from both Barry Ragsdale and as

4    modified by Chris King.

5              JUDGE WATKINS:  Anything you want to add to it?

6              MR. SEGALL:  Be permitted to file briefs; that we argue

7    those -- because we think as a matter of law, I don't see how in

8    the world -- and I'm sure there is some way, but I don't see how

9    Ladinsky got around the random selection of judges.  I don't see

10   it at all.  I don't see how it was judge shopping, and I don't

11   see how it's getting around the random selection when their

12   random selection was Judge Axon, and where they never would have

13   dismissed this case.

14             Had this case, Your Honor, gone to Judge Burke

15   originally, no motion for dismissal under 41 would have ever

16   been filed.  Or if Ladinsky had been the second filed case and

17   that case was transferred to Judge Burke, this never would have

18   happened.

19             So I think we ought to be able to file a brief -- and

20   they didn't jump to any conclusions.

21             JUDGE WATKINS:  Don't argue your case.  You want to

22   file a brief?  Is that what you're trying to say?

23             MR. SEGALL:  Brief and declarations if the Court finds

24   it necessary.  And then the Court -- if the declarations don't

25   satisfy the Court, if the Court wants testimony, the Court can
```

 1   then set it for testimony with due process applied.

 2          JUDGE WATKINS:  So you agree with Mr. King, then,

 3   entirely.

 4          MR. SEGALL:  Yes.  And I think Mr. Ragsdale said very

 5   similar things.

 6          JUDGE WATKINS:  Sure.  No, I get it.

 7          MR. SEGALL:  Thank you, and excuse me.  I really didn't

 8   plan to argue it.  I would like an opportunity to do that.

 9          JUDGE PROCTOR:  I always enjoy your arguments,

10   Mr. Segall.

11          MR. SEGALL:  Thank you, Judge.

12          MR. ROGERS:  May I speak?

13          JUDGE PROCTOR:  Yes.

14          MR. ROGERS:  Thank you.  Bruce Rogers and Jennifer

15   Wheeler.  We represent seven lawyers with the King & Spalding

16   law firm in *Ladinsky, Tucker*.  And thank you to the judges for

17   the opportunity to speak.

18          I really want to address Judge Watkins' question in a

19   more direct way.  I think it's been said, but I want to

20   underscore that a Rule 41 dismissal should not trigger a hearing

21   with a threat of sanctions or rebukes or reprimands.  If that

22   threat were not in the case, then we have an entirely different

23   situation.  But the circuit courts have said that the Court

24   should not go behind a Rule 41 dismissal and find a basis for

25   some kind of a sanction or a rebuke.

1        The *Fieger* case that I noted was cited in the Court's

2   May 10 order, he pled guilty to filing 13 cases.  He was a

3   frequent flier, a controversial lawyer in Michigan.  That case

4   was about the use of the term reprimand in the order that

5   accepted his apology and was fined.  Completely different from

6   the facts here.

7        So respectfully, when I look at this -- and I've come

8   in late; but when I look at this, it seems to me as a matter of

9   fact, the Court is free to do everything you're doing, and in no

10  way am I arguing about the lack of your power and jurisdiction.

11  But respectfully, Rule 41 dismissal should not be a basis for

12  sanctions.  So that's --

13        And I think it's in the brief that Barry has filed.  I

14  believe it's been articulated earlier.  And that's our request

15  of the judges.  Get to the bottom of it; but these lawyers that

16  I represent, and my colleagues that are also here on this call,

17  these are not Fieger type lawyers.  And this was a very

18  important matter, and they are acting professionally, and they

19  should not be subjected to this -- for sanctions for making a

20  Rule 41 dismissal that is an absolute right.  Thank you.

21        JUDGE PROCTOR:  Thank you.

22        All right.  Anyone else want to be heard?  What I'm

23  going to suggest is that we hold y'all in a conference and let

24  the three judges talk and see if we have any questions to follow

25  up or points to follow up with.  But before we go into our own

1   conference and come back to you in this Zoom call, I'm curious

2   if there's anything else that you would like to say to us.

3            MR. RAGSDALE:  At the risk of gilding the lily, I would

4   like to say one -- maybe it's too late.  Maybe the lily's dead.

5            But I've known Judge Burke since he was a state court

6   judge in north Alabama.  I never meant to imply that I thought

7   or any of my clients thought that he had done something improper

8   or nefarious or evil or any of those things.  He is -- and I

9   have known him to be an honest judge from day one.  So I don't

10  want my words about the concerns, again, in a very compressed

11  time frame on Good Friday, to be misinterpreted as somebody

12  casting aspersions.  Certainly not me casting any aspersions on

13  Judge Burke's good name and character, because that is not at

14  all what I meant to communicate.

15           JUDGE PROCTOR:  I think that's fair.  Thank you.

16           MR. SEGALL:  Your Honor, we all agree that our

17  suspicions turned out to be not accurate, so no one is

18  suggesting that anyone on the bench did anything wrong.

19           JUDGE PROCTOR:  Thank you.  All right.

20           Why don't I do this?  I'm going to put each of you in

21  the waiting room.  I'm going to mute, and I'll -- I think we're

22  going to have a separate phone conference.  Judge Beaverstock,

23  we'll just use the call-in number that you had.

24           Is everyone satisfied with just staying in the waiting

25  room for a few moments while we confer?

```
 1            MR. RAGSDALE:  Yes, sir.

 2            JUDGE PROCTOR:  And let me just say this.  I've asked

 3   some questions, probing, particularly of Mr. Ragsdale -- you

 4   might have noticed that -- but that's what we're doing is

 5   probing.  We're just trying to make sure we understand what your

 6   concerns are, and we're certainly going to take those into

 7   account in the manner in which we proceed with this matter.

 8   Okay?  I never blame lawyers for being lawyers.  All right?

 9            MR. RAGSDALE:  Thank you, Judge.

10       (Brief pause in the proceedings)

11            JUDGE PROCTOR:  All right.  Everybody ready to get back

12   started?

13            MR. RAGSDALE:  Yes, sir.

14            JUDGE PROCTOR:  Look to your left, look to your right,

15   make sure everybody is in the room who is supposed to be.  I

16   think my participants tab says we do.  Nobody's still in the

17   waiting room.

18            Okay.  So first, counsel, we want to thank you.  The

19   conference has proved very helpful to us to understand your

20   positions.  You've made some proposals, and we certainly

21   appreciate the fact that you've come, not just with criticism,

22   but with proposals about how this ought to proceed.

23            What we would be interested in having you do by next

24   Friday at 4 p.m. is to file, in a consolidated motion or

25   position statement, however you want to characterize it, about
```

1   the things you've just said to us, with any fine points you want

2   to put into it.  In other words, here's our plan, proposal, for

3   how this matter should proceed.

4          Does that give everyone enough time to accomplish that?

5          MR. KING:  Yes, sir.  Let me just warn the Court that

6   there's a possibility that all the parties may propose something

7   maybe a little different.  We'll try to agree to everything,

8   but --

9          JUDGE PROCTOR:  We're not trying to enforce unanimity

10  in any way.  Just give us your proposal.

11         MR. KING:  Yes, sir.  But we'll do as much as we can by

12  agreement.

13         JUDGE PROCTOR:  Try to have it be one document.  For

14  example, if there is a disagreement, just reflect that these

15  lawyers and their counsel think X; these lawyers and their

16  counsel disagree and think Y.

17         MR. KING:  Yes, sir.

18         JUDGE WATKINS:  Now, I think we're not asking for

19  briefing.  We're just asking for a proposal to take us to the

20  end of this process; what you propose to get us to the end of

21  the process.

22         Am I clear -- is that right, David?

23         JUDGE PROCTOR:  That is exactly right.  You said it

24  better than I did.

25         The point being that we've heard you out in your

1  various presentations today, and we would just like to have that

2  in writing so we can better digest it and make decisions

3  accordingly.

4          MR. ROGERS:  You want an action plan, less argument.

5          JUDGE PROCTOR:  Exactly.

6          MR. ROGERS:  That's going to be hard.

7          JUDGE WATKINS:  Well --

8          JUDGE PROCTOR:  Not for you.

9          JUDGE WATKINS:  It shouldn't be hard, because we just

10  want -- just lay out the process you want us to follow.  I'm not

11  interested in your briefing right now, because when we get all

12  the facts and we can -- and we get -- if we get the procedure

13  down and everybody is satisfied with it, and then we finish it

14  up, then we'll get all the facts and then we will gate all the

15  arguments and we can resolve it.

16          MR. ROGERS:  Yes, sir.

17          JUDGE PROCTOR:  All right.  Judge Watkins will put an

18  order out indicating this to you hopefully by the end of the

19  day, if not, Monday.  But we'll just simply say everybody's to

20  propose what their procedure would be to get us through the end

21  of this matter in terms of resolving the concerns the Court has.

22          JUDGE WATKINS:  I'll try to get it filed today.

23          MR. RAGSDALE:  Thank you, Judge.

24          JUDGE PROCTOR:  Anything else, counsel?  We do

25  appreciate you being available today.  Appreciate your input.

```
1    It has been very helpful.  Anything further from any of you?
2           MR. RAGSDALE:  No, sir.
3           JUDGE PROCTOR:  All right.  Y'all have a great weekend.
4       (Proceedings concluded at 2:31 p.m.)
5                     * * * * * * * * * * * *
6
7                     COURT REPORTER'S CERTIFICATE
8            I certify that the foregoing is a correct transcript
9    from the record of the proceedings in the above-entitled matter.
10           This 10th day of October, 2023.
11
12                             /s/ Patricia G. Starkie
                               Registered Diplomate Reporter
13                             Certified Realtime Reporter
                               Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25
```