```
 1              UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF ALABAMA
 2   _____

 3              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
 4   _____

 5              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ALABAMA
 6   _____

 7   IN RE:
     AMIE ADELIA VAGUE, et al.        CASE NO.: 2:22-mc-3977-WKW
 8

 9                      SEALED DOCUMENT

10           *  *  *  *  *  *  *  *  *  *  *  *  *

11                   EVIDENTIARY HEARING

12           *  *  *  *  *  *  *  *  *  *  *  *  *

13     BEFORE THE HONORABLE W. KEITH WATKINS, UNITED STATES

14      DISTRICT JUDGE, THE HONORABLE R. DAVID PROCTOR, UNITED

15      STATES DISTRICT JUDGE, and THE HONORABLE JEFFREY U.

16      BEAVERSTOCK, UNITED STATES DISTRICT JUDGE, at Montgomery,

17      Alabama, on Wednesday, August 3, 2022, commencing at

18      10:02 a.m.

19              *  *  *  *  *  *  *  *  *  *  *  *  *

20                      APPEARANCES

21   APPEARING ON BEHALF OF CARL CHARLES, TARA BORELLI,
     JAMES D. ESSEKS:
22
     Mr. Barry Alan Ragsdale
23   Attorney at Law
     DOMINICK FELD HYDE, P.C.
24   1130 22nd Street South - Suite 4000
     Birmingham, Alabama
25
```

```
 1                    APPEARANCES, Continued:

 2   ALSO APPEARING ON BEHALF OF CARL CHARLES, TARA BORELLI,
     JAMES D. ESSEKS:
 3
     Mr. Warren Neil Eggleston
 4   Attorney at Law
     KIRKLAND & ELLIS LLP
 5   1301 Pennsylvania Avenue, NW
     Washington, DC 20004
 6
     APPEARING ON BEHALF OF KATHLEEN HARTNETT:
 7
     Mr. Brannon Jeffrey Buck
 8   Mr. Christopher B. Driver
     Attorneys at Law
 9   BADHAM & BUCK LLC
     2001 Park Place North, Suite 500
10   Birmingham, Alabama 35203

11   Mr. Matthew L. Kutcher
     Attorney at Law
12   COOLEY LLP
     55 Hudson Yards
13   New York, NY 10001

14   APPEARING ON BEHALF OF AMIE VAGUE, JEFFREY DOSS,
     MELODY EAGAN:
15
     Mr. Samuel Holley Franklin
16   Mr. Mark Christian King
     Attorneys at Law
17   LIGHTFOOT FRANKLIN & WHITE LLC
     400 20th Street North
18   Birmingham, Alabama

19   APPEARING ON BEHALF OF ABIGAIL TERRY, BRENT RAY, MICHAEL
     SHORTNACY:
20
     Mr. Bruce Frederick Rogers
21   Ms. Jennifer Hanson Wheeler
     Attorneys at Law
22   BAINBRIDGE MIMS ROGERS & SMITH, LLP
     600 Luckie Drive, Suite 415
23   Birmingham, Alabama 35223

24                    * * * * * * * * * * * * * *

25
```

```
 1                 Proceedings reported stenographically;

 2                 transcript produced by computer

 3                 *  *  *  *  *  *  *  *  *  *  *  *  *

 4       (The following proceedings were heard before the Honorable

 5        W. Keith Watkins, United States District Judge, the

 6        Honorable R. David Proctor, United States District Judge,

 7        and the Honorable Jeffrey U. Beaverstock, United States

 8        District Judge, at Montgomery, Alabama, on Wednesday,

 9        August 3, 2022, commencing at 10:02 a.m.:)

10       (Call to Order of the Court.)

11            JUDGE PROCTOR:  Good morning, everyone.  We are

12    continuing our hearing which began on May 20 today.  We are

13    interested in hearing from you.

14            I think at our May 20 hearing, and in advance of that

15    and since then, it's been pretty clear that the lawyers who have

16    been -- lawyers who have been summoned here today, but also

17    other lawyers have indicated that they wanted to be heard on

18    some of these matters and explain themselves, and we are glad to

19    hear that.

20            In advance of this, as you know, we ordered -- and this

21    is in part based upon a status conference we had with counsel.

22    We thought the more efficient way to handle this would be to

23    have declarations filed that would help us be more efficient in

24    terms of getting to some of the questions we have, but also

25    hearing from you in that respect, too.  So we've reviewed those
```

 1    declarations.  Appreciate that.

 2          I'm going to have everyone identify themselves in terms

 3    of who's here.

 4          I wanted to address one thing, though, that is just a

 5    comment that we would like to make at the beginning.  The panel

 6    is not a party opponent in this case.  We are not opposed to

 7    you.  We're not opposing your positions in this case.  We're a

 8    neutral.  And I think I told you on May 20 that as of May 20,

 9    the judges unanimously -- uniformly, I should say -- throughout

10    the state, federal judges throughout the state, thought there

11    ought to be some inquiry about this, and each chief judge asked

12    us to serve.  Judge Beaverstock is serving on behalf of his

13    district, Judge Coogler asked me to serve, and Judge Watkins is

14    the one to serve from the Middle District.  So that's what we're

15    here for.  We're not here to oppose your litigation position;

16    oppose any other position.  We're here as neutrals.  I hope you

17    will treat us as neutral in this case.  All right?

18          With that, I think we ought to first identify counsel

19    who are here representing lawyers.  All right?  So would you

20    please identify yourselves for the record and who you represent.

21          MR. FRANKLIN:  If it pleases the Court, my name is Sam

22    Franklin, and I represent Ms. Eagan, Mr. Doss, and Ms. Vague.

23          JUDGE PROCTOR:  Thank you.

24          MR. KING:  And I'm Chris King, and I represent the same

25    three defendants.

```
 1              JUDGE PROCTOR:  Thank you.

 2              MR. ROGERS:  Good morning, Your Honors.  Bruce Rogers

 3    and my partner, Jennifer Wheeler.  We represent three lawyers

 4    from King & Spalding who are here present in the courtroom, as

 5    well as other lawyers who are not here.  Their names are Michael

 6    Shortnacy, Brent Ray, Abigail Terry.

 7              JUDGE PROCTOR:  Thank you.

 8              MR. RAGSDALE:  I'm Barry Ragsdale, Your Honor.  I

 9    represent lawyers from three organizations:  The ACLU National

10    Foundation, ACLU of Alabama -- actually, four organizations, I'm

11    sorry -- Transgender Law Center and Lambda Legal.

12              JUDGE PROCTOR:  All right.  And so you would represent

13    Esseks, Borelli, and Charles for purposes of today?

14              MR. RAGSDALE:  That is correct, Your Honor.

15              The Court, I think, is aware that I have asked for

16    leave to withdraw in lieu of the hiring of Mr. Buck, and so

17    those --

18              JUDGE PROCTOR:  On behalf of the Cooley lawyers, in

19    particular Ms. Hartnett today?

20              MR. RAGSDALE:  Correct.

21              JUDGE PROCTOR:  All right.  Thank you.

22              MR. RAGSDALE:  I'm sorry.  I should have introduced my

23    cocounsel.  I apologize.  This is Neil Eggleston from the

24    Kirkland & Ellis firm who represents the same parties.

25              I didn't meant to speak for you.
```

1          JUDGE PROCTOR:  All right.  Thank you.

2          MR. EGGLESTON:  Yes, Your Honor.  Neil Eggleston, as

3   Mr. Ragsdale just said, cocounsel with him for the same parties

4   that he just articulated.

5          JUDGE PROCTOR:  All right.  Thank you.

6          MR. BUCK:  Your Honors, I'm Brannon Buck from the

7   Badham & Buck law firm.  Along with Chris Driver from my firm

8   and Matt Kutcher from the Cooley firm, we represent nine lawyers

9   from the Cooley firm.  The two lawyers who I think have been

10  asked to provide testimony today are Kathleen Hartnett and Julie

11  Veroff.

12         JUDGE PROCTOR:  Thank you.

13         JUDGE WATKINS:  Who is your cocounsel?  You said

14  Brannon Buck and --

15         MR. BUCK:  Christopher Driver from my firm, and this is

16  Matt Kutcher.

17         JUDGE WATKINS:  I missed Driver.  I didn't hear that.

18  Thank you.

19         MR. KUTCHER:  Matthew Kutcher from the Cooley law firm

20  for the Cooley attorneys.

21         JUDGE PROCTOR:  Mr. Driver, good having you in Court.

22         Anyone else who needs to make an oral appearance on the

23  record of this matter who's representing lawyers?  Okay.  All

24  right.

25         So let's do this, then.  I'm going to just call the

1  roll of the people that we've asked to be here today who haven't

2  been excused for some reason.  And I'll start with Ladinsky

3  counsel, and I guess this is to some degree Ecknes-Tucker

4  counsel.

5          Ms. Eagan is here.

6          MS. EAGAN:  Yes, Your Honor.

7          JUDGE PROCTOR:  All right.  Mr. Doss?

8          MR. DOSS:  Here.

9          JUDGE PROCTOR:  All right.  Ms. Vague?

10          MS. VAGUE:  Yes, Your Honor.

11          JUDGE PROCTOR:  All right.  Mr. Shortnacy?

12          MR. SHORTNACY:  Here, Your Honor.

13          JUDGE PROCTOR:  Did I pronounce that correctly?

14          MR. SHORTNACY:  That's correct.

15          JUDGE PROCTOR:  Mr. Ray?

16          MR. RAY:  Good morning, Your Honor.

17          JUDGE PROCTOR:  And Ms. Terry.

18          MS. TERRY:  Good morning.

19          JUDGE PROCTOR:  I think that's the folks we're

20  expecting to hear from on that side, from that particular case.

21          And then on the Walker case, Mr. Esseks?

22          MR. ESSEKS:  Here, Your Honor.

23          JUDGE PROCTOR:  Ms. Hartnett?

24          MS. HARTNETT:  Here, Your Honor.

25          JUDGE PROCTOR:  Ms. Borelli?

```
 1              MS. BORELLI:  Present.

 2              JUDGE PROCTOR:  And Mr. Charles.

 3              MR. CHARLES:  Good morning, Your Honor.

 4              JUDGE PROCTOR:  All right.  Thank you.  I think that's

 5    everyone.

 6              Anybody here who thinks they're going to be talking to

 7    the Court who I didn't call?

 8         (No response)

 9              JUDGE PROCTOR:  We may be interested in hearing from

10    you.  All right.  Very well.

11              We're going to continue to observe the modified rule

12    that we imposed on the May 20 hearing.  Obviously, we've made

13    some modifications to that in terms of certain matters in the

14    orders we've put out since the May 20 hearing.  But for purposes

15    of this hearing, we're going to be hearing from one lawyer at a

16    time.  All the other lawyers who were invited to speak today or

17    requested to come today will be outside the courtroom so as not

18    to influence any testimony.  And we don't mean that -- we're not

19    suggesting that there would be some intentional manipulation,

20    but we are suggesting, though, we want the unvarnished testimony

21    from each person.

22              And as I said, we'll at least start off -- just so

23    you'll be thinking about this, we'll start off with hearing from

24    you about what you think we need to hear about this matter.  All

25    right?  So we're going to start with Ms. Hartnett.  Are we ready
```

1  to excuse everyone else?

2       Mr. Franklin.

3       MR. FRANKLIN:  If it please the Court, one concern that

4  we have, and I believe we raised it in our transmittal

5  submission with the declarations, and that is, the declarations

6  were submitted in camera.  Our understanding or our hope is that

7  that means to the three of you who comprise the panel, and as we

8  go through this today, if there's going to be delving into those

9  matters that have been submitted in camera, we would ask that

10 that protection be afforded to what happens --

11      JUDGE PROCTOR:  What specifically are you asking?

12      MR. FRANKLIN:  That any questions that pertain to the

13 declarations or otherwise that call for work product, mental

14 operations, the opinions, thought processes of any of these

15 declarants, should be taken only by the Court in camera -- by

16 the panel in camera.

17      JUDGE PROCTOR:  Well, we have other court staff in the

18 courtroom, and full disclosure, we do have a couple judges in

19 the Northern District who wanted to monitor this.  Again, I am

20 here on behalf of the Northern District.  I'm not sitting as

21 Dave Proctor.  And quite frankly, I think I told you this on the

22 May 20 hearing, there are court personnel around the state who

23 have a concern and question about what happened here.  I think

24 they're entitled to know what's happening here.

25      We're not doing this in the conjunct of any particular

 1  case.  This is not bringing you together in the Walker case, the

 2  Ladinsky case, or the Eckness-Tucker case.  This is the judges of

 3  the -- in the federal system in this state have had concerns

 4  about this.  So to the extent you're asking that they be

 5  excluded from watching this, I think they're perfectly capable

 6  of keeping the confidences that you're concerned about, and it's

 7  not my -- and I don't think it's the panel's -- inclination to

 8  exclude them from observing what's happening today.

 9          MR. FRANKLIN:  May I supplement on one point, Your

10  Honor.

11          JUDGE PROCTOR:  Yes.

12          MR. FRANKLIN:  And that is on behalf of the Lightfoot,

13  Franklin lawyers that are here in the Eckness-Tucker case, we

14  still have a pending case before Judge Burke.

15          JUDGE PROCTOR:  I don't think Judge Burke's

16  participating.

17          MR. FRANKLIN:  Thank you.

18          JUDGE PROCTOR:  Sorry.  I certainly understand why that

19  makes sense, because Judge Burke is not participating.

20          Yes, Mr. Ragsdale.

21          MR. RAGSDALE:  I don't think there are, but I would ask

22  that any observers from the Attorney General's office be

23  excluded.  I don't know everyone in the Attorney General's

24  office, although it kind of feels like I do, but --

25          JUDGE PROCTOR:  Is anybody here from -- is there anyone

 1   here who's not connected to the court or a counsel for a lawyer

 2   who's been asked to appear or a lawyer who's been asked to

 3   appear?

 4           And who are you, sir?

 5           MR. WADSWORTH:  Steven Wadsworth, Middle District of

 6   Alabama U.S. Attorney's office.

 7           JUDGE PROCTOR:  What's your interest here?

 8           MR. WADSWORTH:  We just have an interest in the other

 9   case, and I'm just here, Your Honor, monitoring.

10           JUDGE PROCTOR:  That's Department of Justice?

11           MR. WADSWORTH:  Yes, Your Honor.

12           MR. RAGSDALE:  And to the extent I didn't make myself

13   clear, I don't have any objection to Mr. Wadsworth being here

14   because his interests are aligned, I think, in the Ecknes-Tucker

15   case.  Obviously, part of my concern is we're not aligned with

16   the Attorney General's office.

17           JUDGE PROCTOR:  Yes.  If you recall, in our last

18   hearing we heard from them and excused them.  That's how we're

19   proceeding here.

20           MR. RAGSDALE:  One other point, Your Honor.  Ms. Egyes,

21   who you excused by order, was already on her way here.  I assume

22   she will be sequestered out of the courtroom as well?  Just

23   wanted to clarify.

24           JUDGE PROCTOR:  That's correct.

25           MR. RAGSDALE:  Okay.

```
1              JUDGE PROCTOR:  And, you know, part -- so let me just
2    apologize to the extent that there were late excusals.  But we
3    needed to get information, and we gave extra time because of the
4    request for transcripts before we could get everything in, and
5    we made excusal decisions based upon who we think we needed to
6    hear from, but also based upon circumstances in lawyers' lives
7    and conflicts, that type of thing.  So sorry if anybody traveled
8    here unnecessarily, but we did our best.
9              MR. RAGSDALE:  No.  And please understand, I was not
10   complaining about it.  I just wanted to explain why Ms. Egyes
11   ended up here.  And I'm happy to have her here, but I wanted to
12   at least alert the Court that she needs to be sequestered.
13             JUDGE PROCTOR:  Yes, please.  Is she here?
14             MR. RAGSDALE:  She is.
15             MS. EGYES:  Good morning, Your Honor.
16             JUDGE PROCTOR:  Thank you.
17             MS. EGYES:  I will be going out.
18             JUDGE PROCTOR:  Yes.  So I think the clerk of the
19   Middle District has assigned some rooms or made some rooms
20   available.  We've got about six different rooms.
21             Look, we trust each lawyer who's going into one of
22   those rooms that you're just not going to discuss testimony.  We
23   don't have to enforce that.  We're not going to try to police
24   that.  We just know that that's the thing you'll do.  All right?
25             MR. RAGSDALE:  Thank you.
```

```
1              JUDGE PROCTOR:  So if you end up in a room, there's
2  lots of other subjects to talk about.  Again, our interest here
3  is only to get, as I said, not just the unrehearsed testimony,
4  but the unvarnished testimony of each person who needs to
5  explain your position and answer our questions.  All right?
6              With that, I'm going to excuse everyone but
7  Ms. Hartnett, who is one of the ten folks who we've asked to
8  come in today.
9              MR. ROGERS:  May I ask a clarification question?
10             JUDGE PROCTOR:  Sure.
11             MR. ROGERS:  Are Ladinsky counsel's counsel permitted
12 to remain, or are we excluded also?
13             JUDGE PROCTOR:  Yes.  I think one of the protections
14 we're giving to each of your clients is your counsel can be in
15 here.
16             MR. ROGERS:  Just wanted to clarify that.
17             JUDGE PROCTOR:  So if you think about it, this is not
18 discovery, so Rule 26 wouldn't apply, but this is analogous to
19 your interest represented, even though you're not in the room,
20 because your counsel is there to evaluate and assess and hear
21 the proceedings.  So, yes, all counsel are welcome here.  And
22 again, we're trusting you that you're not going to coach your
23 clients, and we don't have any issues with that.
24             MR. ROGERS:  I trust Chris King, but I wanted to verify
25 with the panel.
```

```
 1              JUDGE PROCTOR:  Chris, that means you're the most
 2  honorable person in the room because otherwise, he wouldn't have
 3  selected you as an example.
 4              MR. KING:  I'll take it that way.  Thank you, Your
 5  Honor.
 6              MS. HARTNETT:  Should I sit until Mr. Rogers comes
 7  back?
 8              JUDGE PROCTOR:  Yes.  Let's let Mr. Rogers get back in
 9  the room before we get started here.
10              (Brief pause in the proceedings.)
11              (Ms. Hartnett present.)
12              JUDGE PROCTOR:  All right.  I should have said this
13  with everybody in the room, Ms. Hartnett.  We're not going to
14  make you retake the oath.  You understand the oath you're
15  taking -- that you took on May 20 carries today, but we don't
16  see the need to reswear you in.
17              MS. HARTNETT:  I understand, Your Honor, and I will
18  continue to abide the oath.
19              JUDGE PROCTOR:  All right.  First, thank you.  I know
20  this is a difficult exercise for us and for you, but we really
21  wanted to hear from you to start.  We may have some questions.
22  In fact, I'm pretty certain we'll have some questions.  But I
23  would like to hear from you to start, and the panel would, too,
24  just about what's on your mind about this, what you think we
25  need to know as we assess through these issues.
```

1          MS. HARTNETT:  Thank you, Your Honor.  And may it
2    please the Court.

3          I hope that my declaration was helpful.  I tried to be
4    complete in that declaration and give you the information in
5    context you would need.

6          I certainly don't want to displace or shirk any
7    responsibility for the actions I took.  I was the partner at the
8    Cooley firm who was in charge of the representation from the
9    Cooley side.  I had several associates, some of whom, you know,
10   already addressed the panel, who worked with me on that.  We
11   worked together on other cases, including a challenge in West
12   Virginia.

13         I gave the context -- again, I don't want to just
14   filibuster, but the context was that we had been asked to help
15   in 2021.  There was some initial thinking in that period where
16   the challenge would be brought and how, and then when the law
17   did not pass in 2021, we went back to the other many matters
18   that we handle.  And then when it resurged in 2022, the
19   cocounsel group came together again, joined by Transgender Law
20   Center, and the events unfolded as they did.

21         I think important for me, and I think I conveyed it in
22   the declaration, to the extent there was sense of some
23   coordinated effort between the Ladinsky group and our group to
24   do something untoward, that wasn't how it played out in
25   practice.  It was actually sort of a chaotic week of a bill

1  passing that we actually didn't expect to pass, and then it did

2  at the last minute, and sort of trying our best -- and I

3  certainly did try my best throughout the representation -- to do

4  well by my clients.  And we just faced a very challenging set of

5  events on Friday, and I can talk about that in more detail, in

6  which I tried to make a judgment that I thought was appropriate.

7          But I do take responsibility for that.  I was happy and

8  proud to come to Alabama.  I've been here before, I've enjoyed

9  time in Birmingham, my college friend is in Montgomery, so I was

10  happy to come here and be part of the process.  It was a

11  disappointment in the end when we didn't end up being able to

12  see that through.

13          But, again, for reasons I discuss in my declaration,

14  and I can speak to them more here today, that was a judgment we

15  made because we thought we didn't need all these lawyers in the

16  end to be doing the case, and we were happy for them to go off

17  and continue to litigate that after it was clear that that

18  wasn't going to work as a joint effort.

19          JUDGE PROCTOR:  All right.  Anything else that just

20  comes to your mind?  Again, I don't want to pretermit anything

21  you would like to say.  We may have some follow-up questions, as

22  I said.

23          MS. HARTNETT:  I appreciate you hearing from us, and I

24  appreciate you taking my declaration under consideration.

25  Hopefully you saw from my -- I'm very proud and happy to be a

 1  lawyer.  I like doing my corporate work, my government service,

 2  and my pro bono work.  I take it very seriously.  My integrity

 3  and my reputation are very important to me.  At all times I try

 4  to conduct myself appropriately.

 5          This was a very challenging matter for reasons we can

 6  discuss, and at the end of the day, I tried to make the best

 7  judgment I could based on my understanding of the law at all

 8  times.  So I appreciate the chance to be here, and I do just,

 9  you know, want to make clear to the Court that I consider myself

10  an ethical and hardworking person who was trying their best

11  throughout this case to do the right thing.

12          Just to be really clear about it, although it's clear

13  and I think you've seen that, when we came to this Middle

14  District, that we did check the case as related, and we can talk

15  about that.  I was prepared to litigate this case before any

16  judge of this district.  I think the problem was we expected to

17  litigate the cases separately.  That may not have -- that may

18  have been shortsighted, not seeing the inevitable consolidation

19  that was coming.  But I was prepared to litigate before any

20  judge in this court, and I appreciate being before the panel to

21  say that.

22          JUDGE PROCTOR:  Well, that's one question I had.  When

23  you learned there was another case being filed in the Northern

24  District -- at some point I think in your declaration you said

25  you learned that was true -- did anyone analyze the first filed

1    rule and how it may come into play?

2         MS. HARTNETT:  Your Honor, I think this isn't -- I

3    appreciate that we've not waived work product.  So in candor, we

4    were so busy getting our self to the courthouse that we had --

5    in 2021, and again had thought, because we had plaintiffs that

6    were here, we understood they would generally be filing in the

7    Northern District.  We were -- I think we were the law firm

8    helping, so we basically had the people drafting everything.

9    And I think at some point we were like, why is this moving so

10   quickly?  Well, it's moving quickly because each of the groups

11   wants to be the first to -- I had several associates that were

12   just confused.  I eventually over the weekend realized, okay.

13   We're actually kind of doing a race to the courthouse here, but

14   not for the purpose of getting a judge or not.  It was more

15   these, like, are nonprofit groups trying to vindicate justice

16   and also be the one that's first filed.

17        But to be totally candid, we were just trying to get it

18   filed as soon as we could.  We had some challenges with our

19   local apparatus being -- it was not as built out as we had

20   thought, and so even just getting the complaint filed on Monday

21   was a challenge, and it wasn't until we actually got to Monday

22   that we even had realized that they filed on Friday.

23        So, again, this was one -- if anything, it was an

24   absence of coordination that may have led to some of this rather

25   than any sort of plan or coordination.

```
1            JUDGE PROCTOR:  Right.  So you said you were ready to

2    discuss the related case reference --

3            MS. HARTNETT:  Yes, sir.

4            JUDGE PROCTOR:  -- on the Corbett case, on the civil

5    cover sheet.  Tell me what you understand unfolded about that

6    decision and the discussions surrounding it.

7            MS. HARTNETT:  Thank you, Your Honor.  So as I

8    mentioned in my declaration, in 2021 when we first were asked

9    would we help if this law were challenged, at that point my --

10   and I'm not shifting blame to anyone, but my cocounsel at the

11   ACLU and Lambda, but ACLU in particular, had been litigating

12   Corbett, the ACLU local and national.  So they had an

13   understanding of that case.

14           At that time, in 2021, they had told us that the notion

15   was -- again, without -- the groups didn't really want to have

16   to deal with each other, so there are some groups that might be

17   doing this in the Northern District, we were thinking, so we

18   basically do our own thing.  We're going to be in the Middle

19   District.  And if we do that, we would mark the cases related to

20   Corbett.  Because to be clear, Judge Thompson would be seen as a

21   likely favorable judge for our cause.  That's not a surprise.

22   But the reason for the relatedness marking in particular was

23   that there were overlapping legal and factual issues.  They're

24   not identical, but they were overlapping.  That was a due

25   process and equal protection challenge to a transgender alleged
```

1   discrimination.

2          So I, kind of relying on my cocounsel's knowledge of

3   Corbett at the time, accepted that, that there was factual and

4   legal overlap.  What I did in 2021 was I had associates on our

5   team investigate what was the standard for relating a case in

6   the Middle District to make sure I understood, was there a local

7   rule?  Was there any local case law on point?  So that was sort

8   of the part of the investigation that I did in 2021.

9          We determined there was not a local rule on point.  The

10  civil cover sheet is essentially the rule.  And we looked at the

11  case law and did not find -- I hope we didn't miss something --

12  any Middle District case law.  We did see that there was a --

13  Southern District, I believe, has a rule, and there is Northern

14  District case law.  At the time we concluded that if the

15  Northern District standard applied in the Middle District, that

16  we likely would not be deemed related.  But because there was

17  not a controlling standard in the Middle District, we believed

18  it was reasonable to mark it.  So that would have been what we

19  did in 2021.

20          I also did at the time understand that Corbett was on

21  appeal before the Eleventh Circuit, and I understood that it was

22  likely to come back.  If there was a win, there was a pending

23  attorney's fee motion that Judge Thompson had let the parties

24  defer until after the appellate resolution.  And so I understood

25  from the ACLU at that point that it was likely to come back to

 1  Judge Thompson one way or the other after the Eleventh Circuit
 2  resolved the appeal.
 3        And then in 2022, we kind of picked up where we left
 4  off and just kind of hit the ground running.  And we did,
 5  though, at that point -- I believe that the case was still on
 6  appeal when we filed in 2022.  Accordingly, essentially, nothing
 7  had changed in terms of what its status was from 2021 to 2022.
 8        JUDGE PROCTOR:  I guess one question we have is if the
 9  Corbett case had been ruled upon by a judge other than Judge
10  Thompson, would you have related your case to the Corbett case
11  in that event?  For example, let's say it had been assigned to
12  Judge Marks, who had ruled against what you -- what your due
13  process equal protection position would have been.  Would you
14  still say it's related such that you would have asked to have it
15  assigned to the judge who handled Corbett then?
16        MS. HARTNETT:  I don't want to -- under the -- yes.  I
17  mean, if we had known what we knew, like if it has overlapping
18  legal -- the whole point of a relatedness determination, from my
19  understanding, is to let the Court know that there's a case out
20  there that is a potentially similar enough quality that a judge
21  would want to know that this is happening.
22        And so my understanding is, again, it doesn't, like,
23  dictate that the judge gets it.  It's more for the judges to
24  know that and figure it out.  And so I don't want to, like,
25  self-servingly say of course I would, but I would think that we

 1   would have known about this case, the ACLU was doing it, the

 2   Court would know about it.  I would think we would.  But I -- I

 3   do think it's an obligation to disclose cases where -- I think

 4   it's also ambiguous under this district what the standard is,

 5   though.  So you could imagine someone coming in and saying we're

 6   in that position and thinking, okay, well, we have a reasonable

 7   argument for not marking it because the Northern District

 8   standard could apply in making that choice.  And I don't want

 9   to -- it would be kind of self-serving to totally predict what I

10   would do, but I do think we wanted to fully disclose to the

11   Court cases that might be of overlap.

12            JUDGE PROCTOR:  One of the things I was impressed with

13   with your declaration is its clarity, its organization, and its

14   candor.  So I want to give you that compliment as we stand here.

15   And the reason I'm asking this question is I'm asking you to

16   really give us your candid response to this question.  Was

17   marking Corbett related driven by the overlapping legal and

18   factual issues, or because Judge Thompson, who I think your

19   cocounsel and you have all said you viewed as a favorable draw

20   if you could get Judge Thompson on your Walker case -- was it

21   driven by who the judge was in Corbett?  That's a question we

22   have.

23            MS. HARTNETT:  Your Honor, we also didn't give it a

24   great deal of thought, to be totally honest with Your Honor.

25   This was not some sort of plot to try to undermine the

1    relatedness thing.  We thought we had a reasonable basis for

2    noting it as related, but we didn't really even do that kind of

3    counterfactual analysis.

4         What I can say is as I was doing the declaration, I can

5    distinguish between two things.  Why did we want, hope that we

6    got Judge Thompson?  We thought he would be a good draw.  He had

7    just resolved the transgender discrimination case in a way that

8    was favorable to the plaintiff.  Why did we mark the cases

9    related?  Because we believed that we had a good-faith basis for

10   marking it as related under the rule.

11        So in my mind, that -- I'm not denying that we were

12   hoping that that would be a good draw, there might be other good

13   draws, but that -- the relatedness was not something we thought

14   we could sneak that in or something.  It was that we actually

15   looked at the rule, looked at the law and facts, and thought

16   this would actually be efficient for this --

17        It's a not unobscure topic.  Of course, Judge Burke was

18   able to learn it and deal with it, so I appreciate that.  But

19   it involves issues of complex scientific issues about, like,

20   what gender is and all these things, so it certainly seemed

21   efficient for someone who had handled the case before to have it

22   again.

23        JUDGE PROCTOR:  All right.  And let's move on, then.

24        Any other questions about that subject area?  All

25   right.

```
 1              Let's move on, then, to the call to Judge Thompson's
 2    chambers --
 3              MS. HARTNETT:  Yes, Your Honor.
 4              JUDGE PROCTOR:  -- that I think you're aware of.
 5              MS. HARTNETT:  I am.
 6              JUDGE PROCTOR:  And I think your declaration indicates
 7    that.  Walk me through just your -- the scope of your knowledge
 8    about that call, why it occurred, and what occurred on the call.
 9              MS. HARTNETT:  Okay.  So kind of as brief context, on
10    Monday we kind of barely made it to the filing bin.  And I don't
11    mean to be rude to our local counsel, ACLU of Alabama.  I think
12    that was her first -- she just had taken that position.  This
13    was her first complaint and PI filing.  There was, apparently, a
14    typo in the caption, and we were trying to get that fixed.  She
15    said she couldn't be sure one way or the other.  So I would say
16    from my perspective as Cooley and the associate team, we were
17    working really hard to have -- what we like to have is perfect
18    work product, and it kind of didn't go down as we hoped.  So I
19    think on the night before, I said, we'll take care of in the
20    morning calling to follow up with the clerk and just see what
21    the situation is.
22              In the morning, it was unclear what the status of our
23    case was in terms of -- I think what we expected and believed,
24    just based on the experience of the ACLU cocounsel that had
25    litigated in this district before, that the case likely would go
```

```
 1  to Judge Thompson -- sorry.  I should say consistent with the
 2  practice in some other districts in which we practice, but
 3  apparently, you know, not here, that the case would go to the
 4  judge who had the related -- who had the arguably related case,
 5  and that judge would make the determination.
 6          So that's kind of a default in our mind of the day that
 7  the call was made, was that that was likely with him, but that
 8  we didn't officially have a case number because we hadn't yet
 9  filed our Rule 5.2 motion, which is the motion to treat one of
10  the plaintiffs or families as pseudonymous.  And until we
11  actually had that motion on file, we wouldn't be officially
12  assigned a judge.
13          So there was some discussion -- I was actually in
14  deposition prep or something that day, but I was following the
15  email traffic, so I'm not taking responsibility for it -- of,
16  what should we do?  There was just a lot of anxiety.  We have a
17  TRO/PI motion that we've been working on all night to file the
18  next day.  We had hoped to file them both Monday, but we didn't
19  get it together.  And so we wanted to let the Court know that's
20  coming.
21          So I think we did let the -- I'm not sure exactly what
22  the nature of the discussions were with the clerk of court's
23  office, but I do know at some point someone on the chain said,
24  should we just call chambers and let them know it's coming, too?
25  And that's something, again, that I would normally do in my
```

1   practice.  If you knew what judge had the case, you could call

2   the chambers, not to talk about the case, but to alert them that

3   a motion was coming.

4           So I believe that our cocounsel at ACLU National --

5   somebody suggested it, and then we checked, and then the ACLU

6   local people from our local affiliate said, oh, yeah, that seems

7   like a good idea.  You should call chambers.  And I think people

8   were either in meetings -- I think Tish was in a meeting -- and

9   so then Carl kindly said, I'll call.  And so he made the call,

10  and then he reported back to our group that he had made a call.

11  He believed --

12          JUDGE PROCTOR:  When you say Carl, Carl Charles?

13          MS. HARTNETT:  Carl Charles.  Yes.

14          So he basically did it because Tish recommended it but

15  was too busy.  So Carl -- this is my understanding, at least.

16  Carl called.  He spoke to someone that he thought was but wasn't

17  sure was a law clerk, he told them that we had filed the case,

18  that we were going to be filing a TRO/PI, and my understanding

19  of the conversation at the time was -- and we -- he said that he

20  left his number, and the person said thank you.

21          So thereafter, maybe in the next hour or so, someone

22  else on our team said, oh, somebody else said Judge Marks has

23  been assigned.  So when I saw that, I was, like, okay, that's

24  good to know, so now we know what we're doing.  And I went on

25  PACER and checked.  Judge Marks was assigned.  I think I told

 1   everyone, Judge Marks is assigned.  And I believe one of our

 2   associates or someone else on our team called the clerk of court

 3   to make sure that was true.  And thereafter, our attention was

 4   on kind of making sure we were on file in front of Judge Marks

 5   and getting our substantive papers in order.

 6             JUDGE PROCTOR:  So you now know, I think, as you sit

 7   here today, that when a case is filed in the Middle District --

 8   and for that matter, I think every district, all the 94

 9   districts -- when it's filed, it's assigned to a judge

10   generally.  There may be some exceptions, but the general rule

11   is when a case is filed, it's assigned by the clerk's office at

12   its inception; right?

13             MS. HARTNETT:  That's -- I guess, yes, generally,

14   although I know sometimes when you, like, file on a night and

15   you're kind of just looking, because you're getting ready to

16   file the next day or something, the PACER doesn't say who your

17   judge is.  So I actually don't personally know what the

18   interworking is, of whether they have to -- in that case, I

19   didn't know whether the 5.2 motion had to be filed for it to

20   actually go into the queue or being processed or not, so I did

21   not at the time -- I guess I don't know what exact amount of

22   documents need to be before the Court for it to actually be

23   deemed filed, and it wasn't clear to us that without our 5.2

24   motion the case could even be sort of processed.

25             JUDGE PROCTOR:  All right.  So before you disclosed to

1  the Court who may have potential conflicts, you thought maybe

2  there would be an assignment to the judge until that occurred?

3  Is that what you're thinking?

4        MS. HARTNETT:  Well, maybe I'm confused -- I thought we

5  had a pseudonymous motion that was the issue, and so basically

6  the clerk's office -- what I was understanding from our --

7  because we're kind of like an anxious bunch, so our associates

8  were just, like, wanting to know where to file and when to file,

9  and we are nervous that Tish was going to be able to file.  I

10  think we were checking in with the clerk's office, asking -- and

11  I think the idea was we couldn't actually have our case getting

12  a number until we filed the 5.2 motion, which I think is a

13  motion for pseudonymous treatment, which makes sense because the

14  caption would have to be reflective of whether the pseudonymous

15  treatment was granted or not.

16        JUDGE PROCTOR:  Right.  Okay.

17        MS. HARTNETT:  That was my understanding.  And

18  actually, at some point another associate said, let's not overly

19  bother the clerk's office.  So I think we were just a little

20  confused.

21        And frankly, at this point, the fact that we had maybe

22  somewhat of an unusual filing, but also because we had a person

23  that was on the ground helping us who had not filed in this

24  district before was making it a challenge, even though she was

25  resident here and admitted to practice here.  And she was trying

1  her best.  It's just that it was not working the way we would

2  hope.

3          JUDGE PROCTOR:  All right.  That's helpful.

4          Were you on any conference calls when the idea of

5  calling Judge Thompson's chambers was discussed?

6          MS. HARTNETT:  I was not on any call where that was

7  discussed.  It was an email exchange that was being had where I

8  saw the whole thing unfold of, like, maybe we should call over

9  there to let them know it's coming so they're ready for it, and

10 then Tish saying, I've talked to Kaitlin, and that makes sense,

11 and then Carl saying -- but Tish saying, I'm busy, and then Carl

12 saying, I'll do it.

13         JUDGE PROCTOR:  And I understand, so they're not

14 conference calls per se, but email traffic that you saw about

15 this subject?

16         MS. HARTNETT:  Yes.

17         JUDGE PROCTOR:  Would you tell us every reason you're

18 aware of that that call was made?  In other words, is there any

19 reason, other than just alerting Judge Thompson that a TRO was

20 likely to be filed?

21         MS. HARTNETT:  When I was reviewing the traffic at the

22 time, that was my -- that is my understanding of why we were

23 calling, because we were nervous.  We had a TRO/PI motion.

24         I also know there was a sense -- I don't think this is

25 a problem, but this is something that was in the ether or in the

 1  mix, was that the clerk's office, someone said, had said that

 2  the case was being worked on.  And so I think we were confused

 3  because we didn't have a case assignment, and we were actually

 4  just worried that it was being worked on without the relatedness

 5  determination being processed.

 6          JUDGE PROCTOR:  All right.  The case was filed on April

 7  11, and the phone call to Judge Thompson's chambers was the next

 8  day, on April 12.  Is that your understanding?

 9          MS. HARTNETT:  Yes, Your Honor.

10          JUDGE PROCTOR:  At the time the call was made, did you

11  know that the case had been assigned to Judge Marks?

12          MS. HARTNETT:  No, Your Honor.

13          JUDGE PROCTOR:  Do you know, now that you're looking

14  back on what you understand, any information that suggests that

15  others might have known the case had been assigned to Judge

16  Marks, even though you didn't know it at the time?

17          MS. HARTNETT:  Based on the email -- at least the

18  people on our team, the way we learned about the Judge Marks

19  assignment was that after Carl had made the call and reported

20  back to us, saying that he had had this conversation and that

21  they said, you know, thank you -- you know, he left his

22  information -- then it was a person at the ACLU who was not on

23  this team -- he's actually -- originally was but isn't

24  anymore -- one of our people on the team said, hey, Josh just

25  said we're assigned to Judge Marks.  And then that's what

1  prompted me to immediately look at PACER and confirm that.

2  Because once I knew that, then I knew our efforts needed to be

3  directed at Judge Marks' chambers.

4      JUDGE PROCTOR:  What do you recall Carl Charles

5  communicating to the Walker team about the phone call?

6      MS. HARTNETT:  That he had made the call.  That he had

7  spoken to someone.  That he thought it might be the clerk, but

8  he wasn't sure.

9      He wasn't calling -- he was just calling -- I think he

10  called the chambers number, so he wasn't -- he doesn't -- I

11  don't think he knows the people in the chambers.  He called the

12  number, spoke to someone, thought it might be the clerk, told

13  them that we had filed the case and that we were -- probably

14  said that we marked it related.  I would need to look back.  But

15  I think the main gist of it was that he told them that the PI

16  and TRO was coming, and I think something about they would check

17  with the clerk's office or something like that.  And then he

18  left his number, and he documented this back to us.  So this was

19  not like a -- this was just a kind of part of the normal

20  business of the morning.

21      And so I saw that, and then I think the next material

22  thing that happened was Josh, the person not on our team,

23  flagging for our team member that Judge Marks, in fact, had been

24  assigned.  And then at that point, we confirmed that and then

25  directed at trying to get our papers on file with the judge that

1  had the case.

2       JUDGE PROCTOR:  Your declaration indicates that on

3  March 3, well before the filing and before the statute passed,

4  you learned from Lambda Legal counsel that there was at least a

5  plan to file what turned out to be the Ladinsky case in the

6  Northern District.

7       MS. HARTNETT:  Yes.  I knew that I knew that at some

8  point earlier than the actual, like, filing of the case.  Yes.

9       JUDGE PROCTOR:  And who was the Lambda Legal counsel

10  that informed you of that?

11       MS. HARTNETT:  I believe it was -- it could be -- I

12  don't know.  I think it was Sharon McGowan because she seemed to

13  be -- to the extent -- I was never -- I never talked to anyone

14  from, like, SPLC or these other -- I don't believe I talked to

15  anyone directly, other than once we all were joined together on

16  the 15th.  But Sharon McGowan was generally the kind of -- the

17  couple of times we had had a go-between between the two groups

18  to see what was happening, it was often Sharon McGowan that

19  would do that.

20       JUDGE PROCTOR:  All right.

21       MS. HARTNETT:  I could be wrong about that exact date,

22  but just the couple of times we had data coming in, it was

23  Sharon.

24       JUDGE PROCTOR:  There was no reason to remember the

25  date at the time it occurred.

```
1              MS. HARTNETT:  Yes.

2              JUDGE PROCTOR:  Just you knew at some point.

3              MS. HARTNETT:  Because we already knew that from 2021.

4   It wasn't surprising information.  It was more -- I think,

5   frankly, they probably were hoping we would go away.

6              JUDGE PROCTOR:  The Walker case team?

7              MS. HARTNETT:  Yeah.  But we had the ACLU -- our local

8   people had worked with these families for now two years, and so,

9   you know, we kind of felt like we were going to see that

10  through, but we were going to try to do it in a way that

11  wasn't -- you know, just kind of keeping it separate so we

12  weren't on their turf.

13             JUDGE PROCTOR:  You also indicated in your declaration

14  that at some point you learned from Lambda Legal counsel of a

15  DOJ contact inquiring about the case.

16             MS. HARTNETT:  Yes.

17             JUDGE PROCTOR:  Do you remember who from Lambda Legal

18  had informed you about that?

19             MS. HARTNETT:  I'm almost certain that would be Sharon,

20  too, because she also used to -- and, again, this is -- it was

21  really -- DOJ had reached out, just to say, hey, I see you have

22  two cases.  We're trying to figure out what we're doing.  They

23  didn't know yet, from what I understand from that communication,

24  and so just trying to check in with the parties to try to figure

25  out what the status is so they knew where to file.
```

 1          JUDGE PROCTOR:  So how much email traffic was there

 2  about this call to Judge Thompson's chambers?  Was that an

 3  emphasis that we probably need to get -- do this because we're

 4  working on this motion, we want it heard quickly?

 5          MS. HARTNETT:  It was really not a huge -- until this

 6  has all come to past, it was more of a routine part of the day

 7  of just trying to figure out where are we and what is our

 8  situation.  And then we quickly turned to -- then we were told

 9  by the clerk's office -- not the law clerk but the clerk's

10  office -- in order to actually have it related in this district,

11  it's not enough to check the box.  You have to file a motion to

12  reassign.  Which we weren't expecting to do, and so we already

13  were doing our best to just get our -- I mean, our PI papers

14  were extensive, and so we were already working on that.  At that

15  point, we decided to do what the clerk indicated we had to do to

16  perfect our relatedness designation, which was to file the

17  motion to reassign.

18          And I would like to thank you for that -- we weren't

19  coming here with, like, some aggressive strategy of, like, you

20  know, enjoin and restrain and reassign, so I didn't like the

21  idea of having to do the motion to reassign because it made it

22  seem more aggressive than, frankly, we were trying to be.

23  I mean, we checked the box as related, we thought we had a

24  good-faith basis for doing so, but we also didn't want to, like,

25  come in here with guns blazing that we have to have Judge

 1   Thompson.  So the reason why we filed the motion was because we
 2   were told that that was how it worked here.
 3          But I will tell you that the optics of that is not what
 4   we were -- you know, we weren't trying to come in with that as
 5   our -- kind of our -- how we wanted to be appearing here.  But
 6   that is what we were told to do, so we did it.  We put together
 7   what we thought was the basis.  We kind of explained what we had
 8   been thinking to the Court, and that became our focus right
 9   after -- as soon as we were before Judge Marks.
10          Sorry.  So in answer to your question, there was not
11   extensive traffic on the call.  The call had been made, duly
12   noted, and now we're off to deal with the case that we have.
13          JUDGE PROCTOR:  All right.  But there was a report back
14   by Mr. Charles about the substance of the communication with
15   Judge Thompson's chambers to the Walker team?
16          MS. HARTNETT:  Yes, Your Honor.  And that was kind of
17   how we -- it was just nothing unusual in the sense that it was
18   just kind of consistent with everyone was reporting back
19   everything that they were getting.  So the clerk said this or
20   Tish said that.  There was this -- that was how we were
21   communicating with each other because we have these several --
22   four groups and one firm.  That was how we were communicating
23   with each other.
24          JUDGE PROCTOR:  Are you aware of any other
25   communication or reach out, if I can put that in quotes, to

 1 | Judge Thompson, directly or indirectly, about the pendency of
 2 | this matter or trying to get Judge Thompson's attention to this
 3 | matter?
 4 |      MS. HARTNETT:  I am now, but --
 5 |      JUDGE PROCTOR:  All right.  Tell me what you know about
 6 | that.  I understand you didn't know it at the time is what
 7 | you're --
 8 |      MS. HARTNETT:  Yes.  And I want to be careful about --
 9 | we were, obviously, being extraordinarily mindful of Your
10 | Honor's sequestration orders, but my attorneys were also -- we
11 | also were kind of having our chronology of what happened, so I
12 | want to make sure I'm just making clear to the Court, I'm doing
13 | this only as appropriate.  But I know now --
14 |      JUDGE PROCTOR:  Look, you're looking over at your
15 | lawyers.  Y'all are not potted plants.  You can step in at any
16 | point if you think there's a concern about a question.
17 |      I know we already have had lawyers who know this, but
18 | y'all are -- this is the first time you've been involved.  We
19 | expect you to be heard when you want to be heard.
20 |      MR. BUCK:  Thank you, Your Honor.  I think the only
21 | thing we would say is -- and she'll, obviously, speak to this.
22 | But we think that the extent of her knowledge about this is
23 | because she was asked, you know, whether she knew of any other
24 | contacts.
25 |      MS. HARTNETT:  That's correct.  I recently, in the

1  course of making sure that my submission to the Court was

2  complete, was asked by counsel.

3         JUDGE PROCTOR:  Well, let me start this before you even

4  answer that question.  Did you learn this as part of your role

5  as counsel in the case, or did you learn this subject matter

6  that you're about to be asked about only after our inquiry began

7  as part of our inquiry?

8         MS. HARTNETT:  I believe only after the inquiry began.

9  And I don't want to -- there was a call that I was on where this

10 may have -- I understand this topic may have been discussed.  I

11 was finishing -- I'm not trying to take away responsibility.  I

12 was finishing a deposition --

13        JUDGE PROCTOR:  That's fine.  Look, I think you're

14 doing fine.  I know this is --

15        MS. HARTNETT:  Okay.  But I also --

16        JUDGE PROCTOR:  I know this is --

17        MS. HARTNETT:  And my colleagues are -- I just really

18 want to be careful here because I really believe at all times my

19 team was doing everything they could to do this properly.

20        THE COURT:  Right.

21        MS. HARTNETT:  I was walking from a deposition to the

22 hotel to be able to get my flight out of Texas when the call

23 happened, so I was on a call where I believe this topic was

24 discussed.  But the thing I do remember --

25        JUDGE PROCTOR:  What time frame are we talking about?

```
 1            MS. HARTNETT:  This was -- so this would have been --
 2    I'm not -- either Wednesday or Thursday.  I think it was
 3    Wednesday.
 4            JUDGE PROCTOR:  When you say Wednesday, you're talking
 5    about the Wednesday --
 6            MS. HARTNETT:  The 13th.
 7            JUDGE PROCTOR:  -- 13th of April?
 8            MS. HARTNETT:  Yes.  I think this is the context --
 9    sorry.  I'm being a little bit cryptic because I don't want
10    to -- at some point -- I think at that point -- there was some
11    point where we were all trying to figure out what to do about
12    the opposition to the -- sorry -- the order to show cause.  So
13    we had the motion to reassign on file, and then the next morning
14    Judge Marks issued the order to show cause.  I believe that was
15    the sequence of events on Wednesday morning.
16            At that point, we had to make a decision.  We have now
17    a motion to reassign on file, and the motion to show cause gives
18    a pretty strong signal -- I mean, she's now detected that
19    there's two cases.  She's saying to us, what do we want to do,
20    and I think we had to figure out, do we try to -- how do we
21    respond to that?
22            So I think our initial notion of kind of seeing through
23    what we were doing was to say, we actually have a good argument
24    that we were first filed.  The other side filed at like
25    whatever -- they dropped it in the box after hours on Friday.
```

1    We filed as soon as we could on Monday.  We already have a

2    TRO/PI motion.  We have a good argument for relatedness.  This

3    could officially be resolved here more quickly.  So we were --

4            JUDGE PROCTOR:  The Ladinsky case did not have an

5    accompanying TRO?

6            MS. HARTNETT:  Correct.  They never -- they hadn't

7    filed one by the time that it was voluntarily dismissed.

8            So we actually initially had thought, should we do that

9    and say this actually makes more sense than anything to have

10   everything here before Judge Thompson?  Although we didn't

11   necessarily want to go that far because, again, we were mostly

12   just trying to do our own thing.

13           In the course of that day, the reason why this came up

14   was I think there was some sense of, like, is this pointless if

15   we're doing that?  Because I think someone else was

16   speculating -- again, because we had no good local intel -- is

17   Judge Thompson even still taking cases?  Someone was, like, he's

18   on the edge of retirement.  So I think there was just a lot of

19   speculation without anyone actually knowing what was happening.

20           So hopefully you understand that if we're going to kind

21   of double down and say, no, no, no, we have to stay here and try

22   to perfect the relateness determination, that would be kind of a

23   pointless --

24           JUDGE PROCTOR:  You've got to pick a horse at that

25   point --

```
1              MS. HARTNETT:  Yes.

2              JUDGE PROCTOR:  -- and decide, are we going to oppose

3    the motion to transfer to the Northern District?  And then on

4    top of that, how strong are we going to come on our motion to

5    assign this to Judge Thompson?

6              MS. HARTNETT:  I want to be credible, especially if

7    we're doing it and it's, like, no, Judge Thompson is in Europe

8    for the year.  Why am I wasting time doing that?

9              So we basically -- I think at that point people on our

10   team were -- so the thing I did know at the time was that people

11   were reaching out to contacts they had that might know more

12   about what's happening here.  Is Judge Thompson taking cases?

13   Is he retiring?

14             That was the context in which I believe the 13th, there

15   was some -- whatever day it was, there was some discussion about

16   trying to understand better what Judge Thompson's status was in

17   terms of whether he was taking cases.  But by the end of that

18   whole -- maybe it was the 14th.  It was maybe that Thursday.

19             By the time we had actually filed the opposition to the

20   show cause order, I had made the judgment, particularly once I

21   saw the State's opposition to our motion to reassign and the

22   order to show cause, that even if we had the best arguments in

23   the world, Judge Marks, assuming she's a reasonable jurist,

24   would likely transfer the case.  And so I just decided that it

25   wasn't --
```

1          JUDGE PROCTOR:  You determined there was some

2    inevitability to the granting of that motion.

3          MS. HARTNETT:  I did.  And, frankly, I didn't want to

4    be in this district making arguments that, even if I thought

5    they were reasonable, were not viewed well.  So I just decided,

6    in light of the tone of the State's motion and my sense that it

7    was inevitably going to be transferred in light of the fact that

8    Judge Marks had kind of taken it upon herself to even propose it

9    in the first place -- in my experience, usually when a judge

10   issues an order to show cause, they often, although not always,

11   are asking you to justify why something shouldn't happen.  So I

12   assumed that she thought it would unless I had a good reason not

13   to.  And at that point, seeing the State's filings, I felt like

14   the best thing to do was just to accept it.

15         JUDGE PROCTOR:  So was there any specific information,

16   though, that you would have from that context of an attempt to

17   draw Judge Thompson's attention to this case or cause Judge

18   Thompson to want to accept the case?

19         MS. HARTNETT:  That's the thing that's kind of

20   interesting about whatever outreach -- it may be kind of a --

21   the two parts weren't all working together, because by that

22   point I made the judgment that we can't -- so it would have been

23   pointless at that point to do that.

24         It was also just beside the point because Judge Marks

25   was going to be deciding.  We now have to make a motion to

 1  reassign to Judge Marks.  So what matters from my perspective as

 2  the decision maker was, do we have -- what argument are we going

 3  to present to Judge Marks here?

 4        So I actually -- so it was -- the thing I didn't want

 5  to do was file a motion doubling down on saying we need Judge

 6  Thompson if he's no longer accepting cases.  But by that point,

 7  that had kind of left the barn because we already had the

 8  State's oppositions.  And as soon as I saw that, it didn't

 9  matter because I just felt like we didn't have -- it was just

10  going to not be the way I wanted to be litigating in this

11  district.

12        JUDGE PROCTOR:  I think you've given me a good picture

13  of what you're thinking and what your motivations were and what

14  your decisions were.  I'm asking you what you know about

15  others --

16        MS. HARTNETT:  Sorry.  Yeah.  No.

17        JUDGE PROCTOR:  Any others who were taking steps in the

18  Judge Thompson area.

19        MS. HARTNETT:  No.

20        JUDGE PROCTOR:  This is a good point maybe to ask this

21  question.  I'm still trying to understand the relationship

22  between the Cooley lawyers and the different organizations in

23  terms of what the responsibility was.  My sense is that they

24  reached out to Cooley, the organizations, to help and give

25  litigation support to this?

1          MS. HARTNETT:  Yes, Your Honor.  And we had at this

2    point litigated one case in Idaho with them to some success so

3    far -- we'll see -- and then in West Virginia we had just come

4    off --

5          Part of understanding the dynamics, we had just come

6    off a period of a lot of depositions.  We're litigating against

7    a transgender sports ban in West Virginia that so far has been

8    successful.  And so much of the same core Cooley team had worked

9    with some of the folks in the other orgs, because we just came

10   off this really busy period.

11         In fact, almost -- we weren't sure we had it in us to

12   do the Alabama case on top of that, but because we had agreed to

13   do it the year before, decided to see it through.

14         But, yes, Cooley is kind of like the engine for, like,

15   you know, just preparing the documents, getting all the filings

16   ready, but with all -- we are a very collaborative team.  So at

17   the end of the day, everyone kind of -- it's a pretty

18   collaborative team.

19         JUDGE PROCTOR:  Where did responsibility fall for such

20   things as which parties were representing, signing up

21   plaintiffs, making determinations about who we're representing

22   and who we're suing?

23         MS. HARTNETT:  It was -- I would say in the first

24   instance, the ACLU -- the ACLU, ACLU of Alabama, and to some

25   extent Lambda.  I'm not sure -- they kind of -- I was less -- I

1  did not really talk to the plaintiffs.  That wasn't my role.  I

2  think we usually tried to have a Cooley person on the call just

3  so we could make sure the plaintiff was someone that seemed to

4  us to be an appropriate plaintiff.  But I believe that -- and

5  Transgender Law Center came in later, but they also were kind of

6  more of a client services org.  So the orgs kind of took more of

7  the role of communicating directly with the plaintiffs, figuring

8  out who would be a good plaintiff, but then we also would vet

9  that.

10         And when I say good plaintiff, I really mean for

11  things, like, is the person going to age out of the law?  Do

12  they have some sort of a family situation that's going to be

13  messy if we start getting into discovery?

14         So we weren't picking -- we were looking for -- I mean,

15  there are many transgender people in the state that were

16  affected by this, but there aren't that many, so we really were

17  just looking for people that were coming to us and that we're

18  not going to have some sort of family problem that was going to

19  be part of the case.

20         JUDGE PROCTOR:  And the question becomes -- in my mind

21  also relates to what your understanding was about the Northern

22  District of Alabama parties -- people residing in the Northern

23  District, in other words -- in the Middle District in the Walker

24  case.  Did you understand geographically where they were from

25  and how that may affect the transfer to the Northern District?

1  Any thought given to that?

2         MS. HARTNETT:  For better or worse, not that much.  I

3  mean, I read the complaint, I revised the complaint, so I knew

4  we had plaintiffs in the Middle District, a plaintiff in the

5  Northern District, and a defendant in both because we sued the

6  DA.  And we also had the state officers here.  So I just knew

7  that we basically had the option in our case to file in either

8  place, but this made sense because the other group, my

9  understanding was, was likely to file in the Northern District,

10  and so we were filing here.

11         But I actually did not at that point -- and with

12  apologies for not knowing more about your state, like, I didn't

13  know that there was a Huntsville Division of the Northern

14  District or that we were in Judge Burke's part of the Northern

15  District.  That wasn't part of my understanding or awareness

16  until everything happened --

17         JUDGE PROCTOR:  You hadn't really focused on divisions

18  in the Northern District at that point.

19         MS. HARTNETT:  Not at all.

20         JUDGE PROCTOR:  You heard me explain on May 20 kind of

21  the chronology from the court process of why the case went to

22  our Northeastern Division of our northern jury area for purposes

23  of judicial assignment.  That's how Judge Burke got the case

24  randomly assigned.

25         The clerk's office would have made a determination of

1   which Northern District parties there are when this comes in.

2   And the clerk's office doesn't get involved in -- just as now

3   you learned in the Middle District is the case, the clerk's

4   office isn't the one that determines which judge gets a case,

5   other than the random assignment process.  The judges can make

6   those decisions later based upon related-case references,

7   first-filed rule, things like that.  You hadn't really given any

8   thought to any of those issues, though, when the case was

9   transferred to the Northern District?

10          MS. HARTNETT:  I believe that Judge Marks may have had

11   a footnote in her order to show cause, just saying that this

12   could have been brought in the Northern District.  But I, again,

13   at that point wasn't at all focused on the fact that there were

14   different parts to the Northern District.  To the point of when

15   we actually finally acceded to the transfer on the night of

16   Thursday night, on Friday morning we got the notice we had been

17   assigned to Judge Burke, and we were all confused because we

18   thought we were being sent up to be joined with Ladinsky before

19   Judge Axon.

20          So appreciate that I did not understand the Northern

21   District's process sufficiently, but at that point I was

22   surprised because I had expected that we had just -- you know,

23   she had said in her order, this is to be efficiently resolved

24   with Ladinsky.  So when I woke up, I guess I would have just

25   figured we were there, and so we ended up spending a lot of time

1    that day just trying to figure out, okay, let's get the cases

2    together like they're supposed to be.

3             JUDGE PROCTOR:  All right.  Well, and then that's what

4    led to the discussions with Ladinsky counsel and the State about

5    a motion to consolidate Ladinsky and Walker in the Northern

6    District; correct?

7             MS. HARTNETT:  Yes, Your Honor.

8             JUDGE PROCTOR:  Tell me what you know about that.

9             MS. HARTNETT:  So we, I think, thought that no such

10   motion would be required because we would just end up being

11   joined, because the order kind of was giving us that push.  When

12   we realized that morning that that didn't happen, our team, kind

13   of ever diligent -- I think one of my colleagues, either Julia

14   or Adam, immediately worked on doing a motion to consolidate so

15   that we could put the cases together.  And we did not --

16            We were, meanwhile, investigating where do we file

17   that.  And at some point -- and I can get into more how the

18   contact was made -- it became clear that a motion to consolidate

19   actually needed to be filed, not in Walker but in Ladinsky, the

20   first-filed case.  So at that point, we turned our work product

21   over to Ladinsky counsel because we had already hit the ground

22   running, and then they were going to adapt that for filing in

23   Ladinsky.

24            But then at some point, it took another turn where I

25   think Melody or somebody who I did not really know until that

 1   day said, actually, the State would like to file the motion.

 2   They're going to file it in Ladinsky, so you need to give your

 3   consent to the State to that motion.

 4           So it was at that point where I had a communication

 5   with the State, saying that we would consent, but it was during

 6   the call that I was on the phone with Mr. LaCour and Mr. Bowdre

 7   that the Ladinsky case got transferred to Judge Burke.  So that

 8   motion never got filed because as we were about -- I think the

 9   State was about to push send, the transfer happened in the other

10   direction.

11           JUDGE PROCTOR:  My sense from reviewing your

12   declaration is that you were not one of the principals involved

13   in those discussion.  Am I correct there?

14           MS. HARTNETT:  Well, I -- you mean in terms of --

15           JUDGE PROCTOR:  About the motion to consolidate and --

16   I think you're aware of that, but --

17           MS. HARTNETT:  I don't want to -- you know, sorry if I

18   didn't -- I ended up being -- I wasn't the one, like, kind of

19   doing the elbow grease on it, but I ended up becoming sort of a

20   conduit between the groups that day.

21           THE COURT:  Okay.

22           MS. HARTNETT:  And I really think it's important to

23   understand, because I'm just a mere law partner from California,

24   but the groups really did not work well together.  So even in

25   the morning when we were going to have our organizational call

 1   between Walker and Ladinsky on which a couple of our folks were

 2   kind of, like, you know, scared to deal with their people, they

 3   asked me to be on the call.  I guess I -- so it just --

 4   basically, I was the -- I ended up becoming the conduit for some

 5   information between the two sides during the day, but most of it

 6   was done over an email chain where we were just saying, here's

 7   the motion; oh, no, revise this; oh, you have a typo.  That was

 8   most of the generic traffic between the two teams.  But the

 9   couple of times we had to actually make contact, I ended up

10   becoming -- you know, I'll readily admit to the panel, I ended

11   up becoming --

12           JUDGE PROCTOR:  Were you talking with the state of

13   Alabama, then, during the course of that day about the motion to

14   consolidate?

15           MS. HARTNETT:  Just the once -- I think Ms. Eagan or

16   somebody from her office had talked to them at first.  And she

17   understood from them that, no, no, no, they were going to file

18   it in Ladinsky, and you're going to need to consent.

19           And I remember saying to her, oh -- she said, I can let

20   them know you consent, but if you want to talk about what to do

21   with your status conference on Monday, you should call them

22   directly because it would be kind of weird if I'm calling --

23           JUDGE PROCTOR:  Call them.  Who's them?

24           MS. HARTNETT:  The State.  Because we were -- just to

25   really help you -- I mean, I think you may have gleaned this,

1  but, like, at that point, we had a -- Judge Burke had set a

2  status conference for ten a.m. on Monday.  And so we thought,

3  oh, this is all going to be going to Ladinsky.  You know, we're

4  finalizing the motion before Judge Axon, and so we just need to

5  let him know that, because otherwise he's going to think he has

6  a status conference on Monday in a case that actually is all

7  going to Judge Axon.  That was our thought.

8          JUDGE PROCTOR:  Okay.  Are you aware of anyone who

9  reached out to any of the judges or their chambers or the

10  clerk's office in the Northern District about that issue?

11          MS. HARTNETT:  No.

12          JUDGE PROCTOR:  You don't have any personal knowledge

13  of that?

14          MS. HARTNETT:  Again, I was like -- by this point, I'm

15  in far from my comfort zone territory wise.  I wouldn't have --

16  yeah.  I did call the AG's office, and that was even -- but I

17  was -- because at that point, our local counsel -- I just was

18  like, I'll call them and make sure we're very clear on what

19  we're doing here.  So that's why I talked to the --

20          JUDGE PROCTOR:  So when you're the lead-off witness at

21  a hearing like this, you get asked a lot of questions just so we

22  can get a context.  And you may not be the best person to answer

23  this, but you may be someone to give us some light through the

24  window of this.

25          We have heard in a number of declarations how the two

1   groups didn't really want to work together.

2           MS. HARTNETT:  Yes.

3           JUDGE PROCTOR:  And there were tensions between those

4   based upon some history or circumstances.  What can you tell us

5   about that that would help us understand that issue better?

6           MS. HARTNETT:  First of all, that there's a -- groups

7   at the end of the day have the same goal, and everyone's trying,

8   so I feel like there's a desire among the groups to try to not

9   publicly do that.  So just so you have a sense of why there

10  was -- you know, so there's -- on the other hand, there's just a

11  lot of -- my understanding from -- I work with some of the --

12  NCLR, Shannon Minter's group, I have worked with them before.

13  We've provided some pro bono help to them.

14          In some other configurations, the groups can work

15  together; but in this situation, this is a trans rights case.  I

16  think that those groups, Jennifer and Shannon in particular, are

17  part of organizations that kind of do things one way, and then

18  we have kind of -- there's like a -- I don't know if it's an old

19  guard and a new guard or whatever, but there's just like some

20  long standing -- I don't know the details, and they probably can

21  speak to it more, of just, like, differences in philosophy,

22  approach.

23          I can give you a couple of examples here, which is

24  like, for example --

25          JUDGE PROCTOR:  Please.

1          MS. HARTNETT:  Just on legal theories.  I think we

2   thought we had the due process parental rights thing, which

3   ended up working before Judge Burke.  That seemed like a good

4   theory.  My understanding is that they were -- kind of had more

5   of a statutory Affordable Care Act claim.

6          So even that -- I don't even know the details, but my

7   sense is there's often a difference of, like, what's going to

8   work.  There's also just a difference in decision-making

9   structure.  I remember in the brief time I was consulting with

10  them on the 15th, they were like, you know, we have a very small

11  group that makes all the decisions.  Who are your two people?

12  And I was like, we have a collaborative group that we don't --

13  we try to make decisions together if at all possible.

14         So I could tell already as we were just having these

15  initial reactions on the 15th that this was like oil and water

16  in terms of command and control versus collaboration.  And then

17  I also just get a sense of there's personalities.  Like one of

18  our people was like an intern for one of them a long time ago,

19  and now he's like a, you know, up and coming transgender

20  activist.

21         Again, it's like -- these are people that are from a

22  marginalized and a repressed generally community, so I don't --

23  it's having their business be aired I feel bad about, but I feel

24  like there's just the interpersonal dynamics that we all have,

25  of sometimes other groups of plaintiffs' counsel if you're a

1  plaintiffs' lawyer, that you just kind of -- it's better to go

2  do your own thing.  I think that's the way the configuration

3  happened here.  With some other situations, the groups may have

4  been able to work together better, but here --

5        Also *Bostock*.  There was a Supreme Court case where

6  people had a very kind of different view about -- that was that

7  transgender rights opinion by Justice Gorsuch, Title VII

8  decision.  They had some history from prepping for that Supreme

9  Court argument.  So there was just -- it ran deep.  And I didn't

10 totally appreciate it at all because we weren't focused on it

11 until Friday, when I'm the one having to be -- why am I talking

12 between Shannon Minter and James Esseks?  Can't they talk to

13 each other?  Well, I guess not.

14       JUDGE PROCTOR:  Fair enough.

15       But there was -- at least when the case looked like it

16 was going to be consolidated in front of Judge Axon, there was a

17 plan for the two cases to go forward in front of Judge Axon.

18       MS. HARTNETT:  Well, this is where I really -- this has

19 been helpful as I prepared this, because I thought about this

20 question.

21       I think it was kind of like the inevitable train wreck

22 that was coming.  We were just at that point like, okay.  We

23 have a five p.m. order to show cause deadline.  What is my best

24 decision here?  Let's get in the Northern District.  Okay.  We

25 have to consolidate.  We're here separately.  We're supposed to

1    be together.  Let's do that.

2         And then I think what really happened in the end is

3    that by having that ten a.m. status conference as the forcing

4    mechanism and seeing what was happening that day, this is not

5    going to get -- we're not going to get our acts together in time

6    for Monday.  So in terms of, like, if we ended up having to

7    still be in front of Judge Axon, even from things like, who's

8    going to be the person that would stand up first or, like --

9    there was already some inklings on Friday that this was not

10   going to work out very well if we have to all be together.

11        But you're right, the plan was at that point to try to

12   be together, but we also didn't have, like, a time -- we had yet

13   to even have one strategic conversation together.  That happened

14   Saturday morning because we were just in triage mode of trying

15   to figure out how to get the cases before the same judge on

16   Friday.  That's the truth.

17        So in other words, I believe that now that I know what

18   I know, if we all had to be together in front of Judge Axon and

19   she set a status conference for Thursday, we might have been

20   gone on Wednesday because it was just not working.

21        JUDGE PROCTOR:  But there was never a decision or a

22   discussion of a decision about that, or are you just saying that

23   that may -- we may end up at the same spot because that's the

24   spot we ended up in ultimately?

25        MS. HARTNETT:  Right.  When the groups finally had

 1  their discussion on Saturday morning that I wasn't part of when

 2  we said, well, let's try to see what we can -- if we actually

 3  can work together, it came out of that that everyone still is

 4  the same person they were before the call.

 5         JUDGE PROCTOR:  Well, that was post dismissal of the

 6  two cases.

 7         MS. HARTNETT:  Correct, but I'm just -- my only point

 8  is just when you say -- it's really important to kind of point

 9  out -- I feel like now that I know what I know and not -- I

10  realize that the reason why they were keeping separate was

11  because they actually weren't going to work well together, if we

12  have to be in a case together -- we have clients.  We obviously

13  need to make sure we're doing right by them.  But it may have

14  ended up being one of those things where if it was all before

15  Judge Axon and we were having a hard time coordinating -- we had

16  different experts, we had different philosophies -- maybe it

17  would have unfolded that way, too, if there were time pressure.

18  I don't know.

19         JUDGE PROCTOR:  If you had -- this is a hypothetical,

20  and it may be an unfair hypothetical.  Tell me if it is.  We're

21  just trying to figure out a couple of things here.

22         What if your motion to relate the case to Corbett had

23  been successful -- you would have been the first filed or at

24  least the one with the TRO -- and there had been a show cause

25  order in the Northern District saying, why shouldn't we transfer

1 this case to the Middle District, the Ladinsky case in the

2 Middle District, because there's a TRO in that case that's going

3 to be heard imminently by Judge Thompson?  Can you tell us that

4 you think there still would have been a train wreck of not being

5 able to work with counsel in dual dismissals for that reason, if

6 you were heading toward a TRO before Judge Thompson that next

7 week?

8          MS. HARTNETT:  That's a good hypo.  I mean, I think it

9 goes into the mix of things that led us to dismiss, which I did

10 try to be as completely --

11          JUDGE PROCTOR:  And that's why I'm asking the question.

12          MS. HARTNETT:  Yes.  It was a mix of factors, which was

13 being in front of a judge that we -- you know, that was part --

14 to not minimize that, we didn't -- I had not investigated Judge

15 Burke.  I didn't really know who that was.  So we had more --

16          I'm just saying that that one thing that would be

17 different was we would have had a better sense of what we were

18 going in for.  And if you're going to have a train wreck, if

19 you're going to have it in front of a judge that you don't know

20 or could be not open to your claim, maybe we would have been

21 willing to have the train wreck in front of Judge Thompson.  I

22 don't know.  Just being candid.

23          But I just -- now that I see what happened, I don't --

24 it's almost -- looking back, the groups were going to have a

25 really hard time once they got together because of this two

 1   years of history of both doing their separate thing and not

 2   having to deal with each other.  So I can't be sure what would

 3   happen, but it does seem like there was going to be some moment

 4   at this case, either the one that happened or some other moment,

 5   where there was going to have to be -- I don't know what the

 6   right word is, but some sort of a summit to figure out how are

 7   we going to actually deal with each other for this case.

 8              JUDGE PROCTOR:  It looked to me in your declaration as

 9   if -- and you've already indicated this -- that in March 2021,

10   you were thinking you may have to litigate this case in Alabama

11   if the Legislature passed the statute that year.

12              MS. HARTNETT:  Yes.

13              JUDGE PROCTOR:  And there was certain preparation done

14   in advance of that litigation potentially being filed pretty

15   quickly.

16              MS. HARTNETT:  Yes.

17              JUDGE PROCTOR:  And the idea is when a statute like

18   this goes into place, your interest would be to immediately try

19   to stop the statute from going into effect because it would

20   affect your clients --

21              MS. HARTNETT:  Had a 30-day -- pardon me.  It has a

22   30-day effective date.  And this was like a medical treatment,

23   so it would have prevented -- it would have criminalized ongoing

24   medical care.

25              JUDGE PROCTOR:  Right.  So there would be interest in

1    immediately going into action.

2         MS. HARTNETT:  To the extent --

3         JUDGE PROCTOR:  Whether it was 2020, 2021, or

4    ultimately in 2022.

5         MS. HARTNETT:  We were moving as quickly as we could.

6         JUDGE PROCTOR:  I think your declaration also indicated

7    that in 2021 particularly, if I'm remembering, you had your team

8    do some research into the judges in the Middle and the Northern

9    Districts.

10        MS. HARTNETT:  Yes, Your Honor.

11        JUDGE PROCTOR:  Tell me about that.

12        MS. HARTNETT:  It was part of the same -- I mentioned

13   before the research project of, like, figure out what the -- is

14   there a local rule?  What is the relatedness standard?  And then

15   adjunct to that part, the process was, like, who are the -- can

16   someone just quickly look at the judges in the Northern and

17   Middle districts to know who they are?  Who are people that we

18   might get?

19        And there was a very short response to that where --

20   again, we're not, you know, people that practice regularly in

21   this district.  But we had an associate just kind of looked up

22   and said, this judge has been on the bench -- I think they did a

23   quick search for any cases they had had about transgender rights

24   or civil rights, and I think there were a couple of notations

25   about this judge had this case.  This judge is new.  He doesn't

1  have -- he or she doesn't have a record on this.

2  And I look back, and at that point I think Judge Burke,

3  again, was -- I didn't even note it at the time because we

4  weren't really thinking about the Northern District, but

5  probably was among the judges that were just noted as to whether

6  or not they had had a case in this area.

7  JUDGE PROCTOR:  Is that your recollection, though, that

8  it was limited to just related cases and not judicial philosophy

9  or more -- a more thorough bio on the judges?

10  MS. HARTNETT:  Sorry.  It was not -- it was in that

11  same request, it was like the same assignment for our firm to

12  take back, but it was a separate -- it was more about just a

13  quick check, like, who are the -- drop you into the Southern

14  District of Iowa.  Who are the ten judges here?  Do we know

15  anything about how they might view a case like this?  So I think

16  it was probably a very short --

17  I think we already had a sense of what we were doing

18  because everyone -- we came on the case when they already had

19  the notion of let's file in the Middle District, we'll not be in

20  the same place as them, and we'll relate to Corbett, but are we

21  missing something?  Is there some other decision or -- is there

22  some judge that's been doing something in this area that we

23  should know about?

24  JUDGE PROCTOR:  Would that have been a review of all

25  the judges in the Middle and Northern Districts?

```
 1          MS. HARTNETT:  I don't know if it was comprehensive.
 2    It was a quick -- like a really quick turn project.  But it was
 3    more like, just get a snapshot of the districts that are at
 4    issue here to make sure we understand the context in which we're
 5    filing.
 6          JUDGE PROCTOR:  All right.  But you don't have a
 7    recollection -- so I take it that would have been -- Axon and
 8    Burke would have been in that group of the Northern District
 9    judges that you looked at?
10          MS. HARTNETT:  But it was -- I think it was like
11    probably a very short -- it was not even -- it was not a deep
12    dive.  It was not go figure out their philosophy.  It was like,
13    are there any cases on point that could be -- just -- if you had
14    two hours to go quickly figure this out, what do you find?  And
15    it was mostly as a due diligence to make sure we understood --
16    I mean, we might be in the Middle District.  If we're not
17    assigned to Judge Thompson, who are the judges that we'll be
18    before, to make sure we understood that.  And then we're not
19    going to likely be in the Northern District, but who are the
20    judges there?  And then a quick take on that.
21          JUDGE PROCTOR:  Did you have any -- did your team have
22    any perceptions of at that point judges you wanted to -- what
23    you thought would be more favorable or less favorable based upon
24    that research?
25          MS. HARTNETT:  No, it didn't really affect us.  I think
```

 1   it was -- there was nothing so notable in it to change what our

 2   thought had been, which was to file in the Middle District and

 3   mark it as related.  And then if it's not related, then we'll

 4   litigate in the Middle District.

 5        JUDGE PROCTOR:  And in fairness, that's one thing you

 6   did understand, is Judge Thompson had experience with what you

 7   thought was a case that you ultimately said was related?

 8        MS. HARTNETT:  Yes.

 9        JUDGE PROCTOR:  And you thought his judicial philosophy

10   would be favorable to your clients' claims?

11        MS. HARTNETT:  Well, it's not just in the philosophy,

12   but generally, also, he had just ruled that transgender

13   individuals were subject to protection under the equal

14   protection and due process clauses, and so that's a kind of

15   specific -- some people might generally be open to a civil

16   rights claim, but that would be a newer version of that.  So it

17   was -- we had recent understanding that he was kind of -- he had

18   ruled -- he had accepted the same arguments we would be making

19   in a general level in our case, with some complications

20   presented by the medical context.

21        JUDGE PROCTOR:  And as I understand it, the Corbett

22   case really dealt with what a person had to show to the State in

23   order to change their gender on the identification, driver's

24   license.

25        MS. HARTNETT:  Yes.  So it went into -- to understand

1  and be able to adjudicate that case, you had to be familiar with

2  transgender versus cisgender people; the general kind of what is

3  entailed when you change your -- when you do a gender

4  transition.  So that -- which is, again, something people are

5  becoming more familiar with, but it's not always a topic that

6  even -- when I started doing these cases, you know, you have to

7  learn it.

8        So he clearly, by having ruled in Corbett, understood

9  the general notion of what gender transition means when you

10 change your gender marker, that type of thing.  Which is not --

11 again, it's more background to our case.  I'm not at all

12 contending that Corbett went into the deep science that would be

13 more at issue in the medical case.

14       JUDGE PROCTOR:  All right.  Were you -- from what I

15 recall from your declaration, on April 15 when all these

16 conversations were occurring throughout that day, you had

17 depositions or deposition prep?

18       MS. HARTNETT:  Well, I was actually back from -- sorry.

19 The day -- the Friday was my day back in California.  I came

20 back from El Paso, and I was waking up to another full day.

21       JUDGE PROCTOR:  El Paso.

22       MS. HARTNETT:  Yes.

23       JUDGE PROCTOR:  Interesting city.

24       MS. HARTNETT:  I've seen a lot of our country in the

25 last few months.

1            JUDGE PROCTOR:  My son was at Fort Bliss for four

2   years.

3            All right.  What do you recall about the events of that

4   day?

5            MS. HARTNETT:  I think it kind of started -- it just --

6   it was a little bit chaotic, frankly.  It started out with,

7   like, more of I'm having my coffee and I'm at home, and we're

8   going to wait to see what happens now that our case is going up

9   there.  And I think we actually had another regularly scheduled

10   meeting in our other case, the West Virginia team, that

11   overlapped somewhat.  So I wasn't expecting it to become the day

12   it did with all the -- I mean, obviously, we had a PI/TRO on

13   file, so I was expecting at some point we were going to have to

14   jump to it.  But it just --

15            So what happened was we got the assignment to Judge

16   Burke.  Someone noted that on our team.  It was confusing to us,

17   not because of anything about Judge Burke, but because we had

18   thought the whole point of getting us up there was to go with

19   Judge Axon.

20            We quickly, like I mentioned, ascertained what we had

21   to do was file a motion to consolidate.  And then at some point

22   we realized we're going to have to talk to the other groups.

23            So at that point, I believe it -- I mean, I think Carl,

24   being generally nice and someone that people can deal with,

25   said, we should reach out to Jennifer Levi.  And then they were

1  kind of nervous about that call because of past history between

2  the groups, and so we even had, like, a prep for the call:  How

3  are we going to deal with them?

4         We got on the call with -- I think it was maybe

5  Jennifer.  Shannon.  I'm not sure if Melody or somebody else was

6  on there, but maybe just -- and that was our first thing of,

7  like, nice to, you know, connect with you-all.  We're going to

8  have to figure out how to get this consolidated.

9         We then agreed that we would then send them our work

10  product on the consolidation.  They were waiting for it because

11  we had taken the pen first, but they were the ones that were

12  going to have to do it.  They took it and ran with it.

13         We had some back and forth about what the timing was.

14  And then it became -- the wrinkle came, oh, no, no, no.

15  Actually, the State is going to file it.  And then there was a

16  question of, we have to make sure we let the State know we all

17  consent to the filing before Judge Axon.

18         And this is now getting later in the day, because I'm

19  on -- this is kind of getting in, you know, early afternoon

20  Central.  And then as I'm --

21         Then that's when I picked up the phone because -- a

22  little bit after four Central, I think, because it was getting

23  toward close of business.  That's when Judge Burke ordered the

24  status conference in Walker on Monday.  And, again, I'm not

25  criticizing that, he's -- you know, it's a TRO/PI, but then we

 1    thought, oh, that's going to have to change because we're all

 2    going to Axon, so we wanted to make sure we knew what to do with

 3    that.

 4          So that's why I picked up the phone to call the State,

 5    to make sure they knew, A, we consented and that they were

 6    filing the motion in front of Judge Axon, but B, what's our plan

 7    to let Judge Burke know that this is what's happening?  We just

 8    assumed -- and, again, not to assume disarray -- he may not have

 9    known this was actually all headed to Judge Axon.

10          Then at that point, on the call with the AG's Office,

11    is when the notice came through about quarter of five that

12    actually, Judge Axon had transferred the case to Judge Burke.

13    And then, essentially, I said, oh, the case just got transferred

14    to Judge Burke.  And then the person on the AG's line said, yes.

15    And then we said, have a nice day.  So we ended -- you know,

16    that was the end of that call because there was nothing left to

17    do.  We're going to now all be before --

18          JUDGE PROCTOR:  There's no reason to file a motion to

19    consolidate in front of Judge Axon if she had transferred the

20    case to Judge Burke.

21          MS. HARTNETT:  Correct.  So it became -- and we also

22    now had a -- it was -- Judge Burke didn't need to be informed

23    about the status conference that he was now going to be holding

24    in two cases on Monday.

25          JUDGE PROCTOR:  Was there any thought to asking for a

1  continuance with Judge Burke?  Just, Judge, we're happy to come

2  in for a status conference.  We've got to coordinate travel from

3  around the country.  We just landed in your court.  Can we have

4  some more time to do that or even do it by telephone?

5         MS. HARTNETT:  That's a fair question.  So his order

6  did say, you know, ten a.m. in the courthouse.  Again, I'm not

7  trying to over read it, but when I saw it, it didn't give, like,

8  a dial-in option or anything.  I couldn't -- and I also am just

9  not familiar with that district.  Our local people, to the

10 extent that we had any local presence, was in Montgomery.  They

11 don't know the district.  So the first thing that crossed my

12 mind was not to call and ask for more time, but believe that he

13 knew what he was doing when he decided to set -- I mean, he

14 chose to do that, which is fine, at 4:15 on a Friday.  So he

15 made the choice, and I wasn't in a position to -- I just

16 didn't --

17        JUDGE PROCTOR:  On that point, it's not surprising that

18 a judge, facing a case with a TRO just transferred in from

19 another district, would want to get the lawyers together and

20 just --

21        MS. HARTNETT:  It's not a criticism of it.  It's more I

22 would assume he meant what he said, and I didn't have a good

23 reason at this point to call and delay.  Basically, at that

24 point, we're at 4:45 Central.  I'm just thinking, we're getting

25 to the -- you know, it's the Easter -- it's Easter weekend, it's

1    Passover starting, which we had some people on our team that

2    were going to drop off.  We were just at a point of getting to

3    the wire.

4            JUDGE PROCTOR:  Give me a micro timeline.  I just want

5    to make sure I understand the timing of things on April 15th.

6            MS. HARTNETT:  Yes.

7            JUDGE PROCTOR:  You said you had gotten on a call with

8    Ladinsky counsel.  Would that have been the two p.m. Central

9    time call you referenced in your declaration?

10           MS. HARTNETT:  Yes.  And that was the one where we kind

11   of -- that was back when we were in mode of, like, let's just

12   get these cases consolidated --

13           JUDGE PROCTOR:  You knew the cases were probably going

14   to go before Judge Axon, and the question is how do we get

15   Walker in front of Judge Axon, because that was what we

16   understood the transfer to the Northern District intended to

17   accomplish.

18           MS. HARTNETT:  Yes, Your Honor.

19           JUDGE PROCTOR:  Okay.  And so over the next hour or so,

20   there was discussions back and forth about how to present that

21   motion.  At first you thought it would be Ladinsky counsel who

22   were the plaintiffs' counsel before Judge Axon filing the

23   motion.  You learned from Ladinsky counsel that, in fact, the

24   State would file that and plaintiffs would consent to it.

25           MS. HARTNETT:  Yes, Your Honor.

```
 1            JUDGE PROCTOR:  All right.  And while you were on the

 2  phone call with the State later that afternoon, almost 5:00 --

 3            MS. HARTNETT:  Correct.

 4            JUDGE PROCTOR:  -- you learned that Judge Axon had

 5  consolidated -- or actually, that she had transferred her case

 6  to Judge Burke.

 7            MS. HARTNETT:  Yes, Your Honor.

 8            JUDGE PROCTOR:  But there wasn't a --

 9            You're standing.

10            MR. BUCK:  I'm sorry to interrupt, Your Honor.  It may

11  be apparent who this person is to everyone else in the room, but

12  someone just joined us, and I just wanted to make sure it wasn't

13  somebody who --

14            JUDGE PROCTOR:  I think he's inviting you to identify

15  yourself.

16            UNIDENTIFIED MALE SPEAKER:  I'm a law clerk for Chief

17  Judge Marks.

18            JUDGE PROCTOR:  All right.  Court personnel, so no

19  issues, I take it?

20            MR. RAGSDALE:  No issues.

21            JUDGE PROCTOR:  Thank you.  And counsel, I appreciate

22  you -- that's what you should do.  When you're not sure about

23  something, call a time out, and let's make sure we have

24  certainty.

25            Didn't mean to break your stride.
```

 1          MS. HARTNETT:  Oh, I think you were doing a good job.

 2  Then the transfer -- right.  So then Judge Axon had transferred

 3  it to Judge Burke.

 4          JUDGE PROCTOR:  Would you say it again?  I was doing a

 5  good job?  Is that what --

 6          MS. HARTNETT:  You were summarizing my declaration, but

 7  you were at the point of me being on the phone call with the

 8  Attorney General's office, and that they were then telling me

 9  that it was being transferred.

10          JUDGE PROCTOR:  All right.  And at that point, as you

11  said, it was, okay.  Oh, well.

12          MS. HARTNETT:  I actually did confirm with them that

13  they were planning to file it in front of Judge Axon instead of

14  Judge Burke, just in case I had misunderstood something.  And

15  they said, yes, we had been planning to file that in front of

16  Judge Axon --

17          JUDGE PROCTOR:  But not anymore.

18          MS. HARTNETT:  -- but not anymore.  Which it wasn't

19  acrimonious.  It was just simply that that was not necessary,

20  which I agreed --

21          JUDGE PROCTOR:  More matter of fact.

22          MS. HARTNETT:  Yes.

23          JUDGE BEAVERSTOCK:  But the cases still hadn't been

24  consolidated at that point.  It was just transferred.

25          MS. HARTNETT:  Right.  So it would have to be -- well,

1    I guess it had been transferred to Judge Burke, so you're right.

2    It may have raised the question of then having to actually file

3    the consolidation motion later if that had kept going.

4            But at that point, at least we knew where they were,

5    home, and we knew that -- we assumed then there would be a

6    status conference on Monday for both cases because he now has

7    both cases.

8            JUDGE PROCTOR:  Was there any discussion about filing

9    the motion to consolidate then in front of Judge Burke?

10           MS. HARTNETT:  No.

11           JUDGE PROCTOR:  Why?  Why do you understand that was

12   not discussed?

13           MS. HARTNETT:  It was a very perfunctory -- it was

14   just, like, we're not filing it anymore.  I'm not trying to

15   accuse them of anything.  It was more that we just kind of now

16   knew where the case's home was, and kind of -- I think the

17   urgency had been more about just getting them to where they were

18   going, and so it didn't actually --

19           JUDGE PROCTOR:  Well, wasn't there still a need to do

20   that?  If you were wanting to have these cases proceed together

21   and the parties were discussing them getting in a position where

22   they would proceed together, that avoids duplication of effort,

23   all sorts of things that make sense; right?

24           MS. HARTNETT:  Yeah, I think -- in theory, yes.  I

25   agree.  It's a good -- it's just more of -- what actually

1    happened is that we're now five p.m. Central, so we're kind of

2    at closing time, and so -- and we have a status conference on

3    Monday, and so this is where we need to figure out what we're

4    doing.

5           So, yes, in the normal course of things, if there had

6    been no status conference, I think the next step would have been

7    to talk to the other group.  It was a triage all day.  We had

8    never yet had a call -- we had never talked about actual

9    philosophy or how are we going to do this together or whose

10   witnesses are going to be there; which experts are we using.  We

11   had had no substantive conversations, other than that they make

12   decisions with a very small group, and we are collaborative.

13   Like that was the main thrust of that day.

14          JUDGE PROCTOR:  Right.

15          MS. HARTNETT:  And so I -- and I also wasn't in a

16   position to speak for all of my groups.  So I was the one, kind

17   of the conduit just to get this accomplished, to get the

18   consolidation accomplished, but I couldn't speak for how this

19   was going to work going forward.

20          JUDGE PROCTOR:  From your perspective, what would have

21   been your plan if Judge Axon had set this for a status

22   conference at ten a.m. before her, and Judge Burke had

23   transferred his case to Judge Axon?  Would you still have had

24   discussions that day and over the weekend about dismissal?

25          MS. HARTNETT:  That's a good question.  I think part of

 1    what was -- I think it hopefully came through in my declaration,

 2    it was a little unusual.  I'm not suggesting a bad motive.  I

 3    really mean to say this:  It was not what -- nothing was

 4    happening like we expected.

 5            So we expected to go before Judge Axon.  She hadn't

 6    issued any order that day setting a conference.  So it was the

 7    combination, I think, of being before a judge that we didn't

 8    know and weren't expecting to be in front of.  I had not been to

 9    Huntsville.  I don't know where that is -- I mean, I know

10    generally where it is.  We had local counsel that were not --

11    you know, they were not really competent to practice in the

12    Northern District.  We had brought the case in the Middle

13    District where they are located.

14            So I guess the point is -- I've thought, myself, a lot

15    about this.  If Judge Axon had said suddenly at 4:55, we're

16    going to have a status conference at ten on Monday, what would

17    we do?  A lot of the same concerns would have been in play, but

18    some of the things that were causing concern wouldn't have been

19    in play.

20            JUDGE PROCTOR:  But you've litigated for 20 years.

21            MS. HARTNETT:  Yes.

22            JUDGE PROCTOR:  And you've litigated TROs or

23    preliminary injunctions at the beginning of important cases

24    before this one.

25            MS. HARTNETT:  Yes, Your Honor.

```
 1              JUDGE PROCTOR:  You fully expect a judge to come in
 2     with both feet and hope the judge will come in with both feet --
 3              MS. HARTNETT:  Yes.
 4              JUDGE PROCTOR:  -- when you have something that's this
 5     time critical.
 6              MS. HARTNETT:  I do.  And I just -- also, you have --
 7     the whole week had gone by without us having -- being --
 8              I was ready to come to Alabama.  I'm here.  I know how
 9     to come to Alabama.  It was just we had had a week of no one
10     coming to Alabama.
11              And honestly, seeing our local counsel on the ground
12     not being able to -- I could not have -- I look back through my
13     records from that day, and I see the first person that says "I
14     can be there" is Tish.  I'm sorry.  She's a lovely person.  She
15     has not litigated in this -- she doesn't know the issues in this
16     case.  And then other people know -- but the key people that
17     probably needed to be there for that first substantive hearing,
18     it was going to be very hard for them to get there by Monday.
19     We weren't barred.
20              So if Judge Axon had set a hearing on Monday, I'm not
21     sure -- it's the honest answer, I'm not a hundred percent sure
22     what would have happened.  The unusualness of us thinking we're
23     going one place, and we end up in another place, and then the
24     quick setting of the conference for a time that was going to be
25     hard to get -- we maybe would have had the similar feeling or
```

 1  not, but it really was not meant as offense to anyone.  It was

 2  more like, I cannot -- I'm thinking about, how do I get this

 3  case in the right posture?  And I just -- and at that point

 4  feeling like, I can't go in on Monday and do this right.

 5        JUDGE PROCTOR:  Help me understand what your

 6  decision-making role was here.  Were you deciding whether Cooley

 7  was in or out, or were you in the position to decide whether

 8  your clients were in or out?  I'm trying to understand how the

 9  collaboration worked in terms of dismissal versus withdrawal.

10        MS. HARTNETT:  Thank you.  Just to be really clear, I

11  also really -- I didn't kick the tire as much as I could in the

12  exigency on Friday.  I understood that when we voluntarily

13  dismissed, that we had a right to refile the case, so I didn't

14  think I was prejudicing my clients.  I mean, I knew it wasn't

15  going to --

16        Also the transgender people in Alabama were counting on

17  people that had a case, so I was aware of taking that off the

18  books and not saying anything was going to be troubling to some

19  people.  But when I think about my ethical obligation, I knew

20  that we still had the right to bring the case back.  And I felt

21  like we weren't in a position to do it right on Monday, but we

22  could maybe be in a position to do it right later.

23        Sorry.  You asked a different question.

24        JUDGE PROCTOR:  Yeah.  And I'm going to follow up on

25  that, but just to go back to my question.

```
1            MS. HARTNETT:  Sorry.

2            JUDGE PROCTOR:  I'm trying to make sure I understand

3    what your role was in terms of were you authorized to decide

4    dismissal of your client's claims, or was that the

5    organization's?

6            MS. HARTNETT:  It was our collective.  So we had a

7    generally collaborative viewpoint.  The way it kind of ended up

8    going down is after -- we didn't have this continued discussion

9    with the State of, like, okay, let's go file the motion in the

10   other case.  It was just, have a nice day.

11           And then at that point, we had -- I think everyone was

12   just kind of like, okay.  We're kind of down a path that we

13   didn't expect to be on.  It's 5:00.

14           I get outreach from Ladinsky counsel saying, we're

15   thinking of dismissing.  And I said, okay.  I'm talking to my

16   team now.  I'll get back to you.

17           And then our team was meanwhile on our call together,

18   just saying, okay, what are we going to do now?  And this is

19   where people are saying, oh, I could go.  I can't go.  We have

20   to leave for Passover.  So that's all happening.  And so we

21   have -- but we have representatives of all the organizations

22   here.

23           So I said, maybe we should -- at some point that

24   discussion leads to, should we just dismiss?  And then we have

25   to get agreement among all of our people to make that decision.
```

1   So I would say it was informed by our understanding that the

2   Ladinsky folks were likely to, too, so we wouldn't be like one

3   group was still litigating and one wasn't.

4        But at that point, we had -- it wasn't like I could

5   just unilaterally dismiss the case.  It was more that I was -- I

6   also just was trying to help, you know, herd cats or whatever.

7   So we were just trying to make sure we had the right people on a

8   Friday night to make that important decision.

9        We did have the ability to do that.  I mean, our

10  client -- we had -- our client gave us the -- we have authority

11  to generally make litigation decisions in their best interest,

12  and particularly because here we weren't, like, settling their

13  claim or something.  We were just voluntary dismissing it.  I

14  think we felt like we had the authority as the counsel group to

15  do that.

16        JUDGE PROCTOR:  All right.  As you're assessing that

17  during the course of the day, I understand it was a

18  collaborative decision.  Everybody weighed in.

19        MS. HARTNETT:  Yes.

20        JUDGE PROCTOR:  Were there discussions among the Walker

21  team to dismiss before you heard that the Ladinsky team was

22  considering dismissal?

23        MS. HARTNETT:  I can't be -- I can't be -- I think so.

24  I can't really honestly be a hundred percent sure.  Like it was

25  all happening very quickly because I got -- I think we were all

 1   like, what just happened?  And we were all sitting there on the

 2   Zoom on a Friday night and then thinking -- and then I got the

 3   outreach pretty soon.  I said -- I remember muting that and just

 4   saying, oh, that's going on?  And so then they said, oh, we're

 5   just deliberating over here, too, what to do, but we're thinking

 6   it might be better to just dismiss now, and we can talk over the

 7   weekend and see if we can do something together, but this isn't

 8   going like we expected.

 9        JUDGE PROCTOR:  And that was the discussion within the

10   Walker team?

11        MS. HARTNETT:  Sorry.  That was more the Ladinsky

12   people telling me -- they were saying, oh -- I didn't get into

13   their decision making, so I'm not -- you know, I don't mean to

14   speak for any of them.  It was just more that the thing I

15   understood was they were thinking of dismissing, you know, but

16   they were worried about also the message that that would send to

17   trans people.  And then we would -- the idea would be, well, why

18   don't we just talk over the weekend and see if there's some way

19   we can kind of bring this together and do this together?

20        JUDGE PROCTOR:  Was it clear to you at the time the

21   decision was made to file the Rule 41 voluntary dismissal that

22   your clients were not going to go unprotected?  That some claim

23   was going to be filed somewhere challenging this statute?

24        MS. HARTNETT:  Yes, Your Honor.

25        JUDGE PROCTOR:  This wasn't a decamp, walk away, and

 1  tell your clients, we're just not going to litigate this.

 2          MS. HARTNETT:  Absolutely not, Your Honor.

 3          JUDGE PROCTOR:  All right.

 4          MS. HARTNETT:  I was hoping I would be able to help

 5  them, and it was very disappointing in the end that it didn't

 6  work out that way.  But no, we were committed to having someone

 7  do this challenge in the state.

 8          JUDGE PROCTOR:  So your -- you've already said that

 9  this statute's going in place within 30 days.

10          MS. HARTNETT:  Yes.

11          JUDGE PROCTOR:  That you understood this was a time

12  sensitive, time critical mission you were taking on behalf of

13  your clients.

14          MS. HARTNETT:  I did.

15          JUDGE PROCTOR:  How does dismissal and refiling by

16  someone somewhere at some later time help with that issue?  How

17  do you reconcile those two things?

18          MS. HARTNETT:  No, I appreciate that they're in

19  tension.  I said, we need to have the conversation tomorrow

20  morning.  I think I'm the one that said, we need to have the

21  calls to the groups.  If you-all want to talk, do it tomorrow

22  morning.  This needs to move forward.  I was worried about the

23  idea of delay.

24          But at the end of the day, it's better to bring a

25  properly baked case, even if it's a couple of days later, than a

1  case that's not going to go well earlier.  So I think that was

2  the idea, was that we're not going to just wait for some other

3  group to go in.

4       I think the hope had been on Friday that we somehow

5  miraculously could all work together.  I was not -- I didn't

6  have the pleasure of being on the call on Saturday, but I got a

7  report right after it that that's not going to work.

8       JUDGE PROCTOR:  Why weren't you on the call on

9  Saturday?  You said you were not -- were you not invited?

10       MS. HARTNETT:  I actually wasn't invited, which is

11  fine.  I don't -- I was going to swimming lessons or whatever,

12  but I -- not mine, my children's.  But --

13       JUDGE PROCTOR:  Well, you know, everybody does what

14  they need to do.

15       MS. HARTNETT:  Maybe after this week I'll do a swimming

16  lesson.

17       I think it's more -- it was a group -- there's a

18  sensitivity to the group.  It's a group dynamic thing.  So they

19  just needed to have it out.  Just like a bunch of plaintiffs

20  lawyers may go do it without whoever the interloper was, I think

21  they just needed to clear -- it was like a family discussion.

22       JUDGE PROCTOR:  Okay.  Going back to Friday, though.

23  And thank you for your patience.

24       MS. HARTNETT:  Oh, I appreciate the opportunity.

25       JUDGE PROCTOR:  I really appreciate the way you're

1  tackling this, and I just want to affirm that as we're going

2  along.

3          MS. HARTNETT:  I appreciate that.

4          JUDGE PROCTOR:  Who did you talk with on the Ladinsky

5  team about potential dismissal?

6          MS. HARTNETT:  Shannon Minter was the person I was

7  talking to on the phone, who was -- it was very -- these were

8  brief conversations, but I think he was kind of -- again, I

9  don't know how I ended up in this position, but I was the

10  person -- I've dealt with him on other matters, and I think

11  probably was just seen as a rational person who could help us

12  run this to ground by COB.

13          JUDGE PROCTOR:  Was anybody from Lightfoot or King &

14  Spalding on that call?

15          MS. HARTNETT:  I don't believe so.  I think Shannon was

16  kind of the person that was going to, like, make contact with

17  me, to just say, we're thinking about this.  And I said, okay.

18  Thank you for letting me know.  We're having our own discussions

19  to figure out what to do now, given where we sit, and then we

20  ended up -- I forget if I talked to him once or twice.  And then

21  at some point, there was actually -- once the decision was that

22  we were going to -- we knew they were going to dismiss and we

23  weren't, then we did have an email back to the email chain.

24          JUDGE PROCTOR:  We'll get back to that in one second.

25          MS. HARTNETT:  Okay.  Yeah.  But no discussions.

1          JUDGE PROCTOR:  Let's go back to where you were telling

2    me earlier, like, why can't Esseks and Minter just have this

3    call?  Why do I have to be involved?

4          MS. HARTNETT:  You know, I wasn't even -- I was kind of

5    honored -- I felt awkward because it's a lot riding on this

6    movement and I'm -- again, I care, I support them, but I don't

7    want to make some big decision.  But for whatever reason, they

8    saw me as somebody who could be the conduit that evening, so I

9    was happy to -- what I tried to do was be a good messenger and

10   say, you know, they're saying they're thinking about this.  We

11   could talk over the weekend and see if we can do a joint case.

12   I'm on my team.  My concerns are maybe different than theirs.  I

13   see that Tish wants to drive up and be in front of Judge Burke,

14   and I'm wondering what that is going to be like.

15         JUDGE PROCTOR:  Based upon what I have learned of you,

16   I can see why they would think that.  But that's the point --

17         MS. HARTNETT:  So I was just trying to be a good-faith

18   messenger.

19         JUDGE PROCTOR:  Normally this would have been ACLU and

20   Shannon Minter on the call as opposed to you, but you're --

21         MS. HARTNETT:  Yes.  I'm not like -- I'm not the

22   linchpin, I'm not normally -- normally there would be a process.

23   But I think just because -- I mean, we had had that earlier call

24   in the day where, like, some of the people on our team were kind

25   of, like, scared of the person on their team, not because --

1   they just -- intimidated.

2          JUDGE PROCTOR:  Did your team and Esseks in particular

3   give you kind of marching orders or collaborative instructions,

4   however you want to characterize it, about what you should and

5   shouldn't say and agree to on the call with Minter?

6          MS. HARTNETT:  Not like -- again, it was just very -- I

7   forget if James was on the Zoom.  It might have been another

8   person who was talking to James, because it was Friday night so

9   people -- some people weren't even around.  But it was more

10  making sure we had buy in from everyone in our group, no matter

11  what we did.  So it was more just like, let's make sure.

12         I think the idea was, from our perspective, we don't

13  need to make a public statement.  Let's just regroup tomorrow

14  and try to get our act together as soon as we can.

15         JUDGE PROCTOR:  I'm trying to inform myself about when

16  the decision to dismiss Walker was made.  Was that made on the

17  Zoom call, and then you communicated that to Minter, or was it

18  we're leaning toward dismissal, and the decision was made while

19  you were on the call with Minter, or at some other time?

20         MS. HARTNETT:  It's like some -- I think they were

21  saying we're thinking about it.  At first I think they said,

22  wait until we know more of what we're thinking before you tell

23  your folks.  So I just came back and I said, oh, I just had a

24  call from Shannon.  They're thinking about what they're doing.

25         And then we were probably saying, who can go?  Can we

1  do this?  Whatever -- I don't actually remember the exact thing,

2  but just kind of, like, what are we going to do?  Maybe it makes

3  sense to do a Rule 41 dismissal because -- can we be ready?

4  Then someone looked and said, oh, I'm pretty sure you can do

5  that.  And we also talked about if the State answered, then we

6  would -- that would be the case we had --

7         JUDGE PROCTOR:  Summary judgment motion.

8         MS. HARTNETT:  Right.  So we went back, and I think

9  Carl looked at the rule.  So we were just trying to do whatever

10 diligence.  We also were just mindful, like, if we file a

11 voluntary dismissal after 5:00, does that actually count?  Like

12 so we just had a kind of quick -- we were just working through

13 all that.

14        At some point I got word back from Ladinsky, I think, I

15 guess we're inclined to do it.  And I said, can I socialize that

16 here now?  And then I went back to my group and said, I think

17 they're going to do it.  You know, maybe we should -- that makes

18 sense to me, too.  Now that we knew we could do it, we weren't

19 going to have prejudice, and the idea was, like, don't prejudge

20 anything that's going to happen, other than we are all going to

21 talk as soon as possible to figure out if we can do something

22 together.

23        JUDGE PROCTOR:  Was there discussion about one of us

24 going forward, we'll figure that out tomorrow?  If not both of

25 us, one of us at least will go forward?  We'll figure that out

1  tomorrow?

2        MS. HARTNETT:  I think the hope was, yes.  I think -- I

3  mean, I don't know if that was expressly stated, but it was

4  never, like, no one's going to do this.  The question is, can we

5  all do this together?  And I think at that point it wasn't clear

6  if one had dropped, who would it be, although, again, I think

7  they probably saw themselves as more of the ones that were first

8  there and that we were sort of the second.  So it's not

9  surprising to me that our group stepped back, because there was

10 just some sort of sense that they were there first.

11       JUDGE BEAVERSTOCK:  Was there any kind of discussion

12 about who would dismiss first?

13       MS. HARTNETT:  Not -- it was more just I think we

14 wanted -- and I don't think it was, like, a game of chicken, but

15 it was more like, let's make sure we do it and do it an orderly

16 fashion.  I think they didn't want to look like one was reacting

17 to the other.  I didn't really question it at the time.  It was

18 more just make sure we both dismiss together.  It was more just

19 a professional courtesy, I think, just like any other case.

20       It wasn't like -- I don't know -- even know why we had

21 it be exactly on the same moment.  I was just kind at that point

22 listening -- you know, just implementing the decision, and I

23 think it was like, let's have one file, and then the other one

24 will file.

25       JUDGE PROCTOR:  From your team's perspective and your

1  perspective, was a condition of dismissal the fact that the

2  Ladinsky case would also dismiss?  In other words, you weren't

3  willing to step out of the room and leave them in it.

4          MS. HARTNETT:  It wasn't even like that as much as

5  just, like, we all -- since everyone -- yeah.  No, there wasn't

6  a condition.  It was more -- by that point, I think I had

7  already figured out that we should dismiss, but the fact that --

8  we didn't have to face the question of, like, they're not

9  dismissing, but should we?  I think it was just, if you're going

10 to do it, we also were inclined to do that.  Given what we're

11 facing, let's just do that.

12         JUDGE PROCTOR:  But you knew they were dismissing when

13 your team made the decision to dismiss.

14         MS. HARTNETT:  We either -- like I said, we kind of

15 independently -- I also agreed to that.  But it was informed by

16 the notion that they likely were, and I think we kind of both

17 confirmed that we were around the same time.

18         JUDGE PROCTOR:  In other words, that was a factor in

19 your decision.

20         MS. HARTNETT:  Yes.

21         JUDGE PROCTOR:  But also a factor was that there was

22 some assurance that regardless of what happened on Saturday or

23 thereafter, the parties would reach some summit that this case

24 was going to go forward somewhere, and your clients weren't

25 going to be unable to litigate.

```
1              MS. HARTNETT:  Absolutely.
2              JUDGE PROCTOR:  They were going to see the benefits of
3  litigation.
4              MS. HARTNETT:  Yes.  I would never -- if someone had
5  said, this is your last chance, and if you dismiss now, you
6  can't proceed, then I guess we would have --
7              JUDGE PROCTOR:  How to make it work.
8              MS. HARTNETT:  -- seen how Tish would do.
9              I'm kidding.  We would have --
10             JUDGE PROCTOR:  Or you would have found other ways.
11             MS. HARTNETT:  Yes.  We could have -- we could have --
12  yes.  I'm not trying --
13             I mean, we filed the TRO/PI.  I've litigated for a long
14  time.  I could make it work.  But we just -- I don't think we
15  ever thought we would -- the consequence of that would be, you
16  know, something horrible.
17             JUDGE PROCTOR:  All right.  On Saturday, you were not
18  involved in those discussions.
19             MS. HARTNETT:  No.
20             THE COURT:  You've already said that.  But you were
21  informed about the discussions?
22             MS. HARTNETT:  Yes.
23             JUDGE PROCTOR:  Tell me what you were informed about as
24  to those discussions on that Saturday.
25             MS. HARTNETT:  I am pretty sure I talked to James
```

1    afterwards, because he's -- you know, he's --

2          THE COURT:  Esseks?

3          MS. HARTNETT:  James Esseks, who's the -- you know,

4    he's, like, a contact of mine in all these cases and someone I

5    know and trust.  And he just reported back that, somewhat

6    unsurprisingly, I guess, that at the end of the day, there was

7    acrimony -- I didn't get into the details, but just that at the

8    end of the day, it didn't look like we were all going to be able

9    to work together, and that he was at that point thinking it

10   probably made sense for the ACLU to step back and let them -- if

11   they wanted to rebring a case, they can do that.  And then I

12   think Lambda --

13         The people I talked to, I believe, were James.  I may

14   have talked to Chase briefly.  We also were all -- like, we were

15   gung ho and excited, and this is all, like, not how we hoped

16   this would go.  So I talked to Chase, I believe -- I'm not

17   sure -- and I probably talked to Carl, just to check out how

18   Lambda was thinking.  Because in order to inform my folks at

19   Cooley, who had sunken a lot of their time and energy into this,

20   I wanted to make an informed decision.  So I teed that up for

21   our pro bono folks on Saturday night after I had an

22   understanding of what ACLU and Lambda would do.

23         JUDGE PROCTOR:  Was there any general plan on Saturday

24   if -- whether Walker was going to get refiled somewhere and, if

25   so, where?

```
 1              MS. HARTNETT:  I would say no, although I would -- to
 2   be -- I think there was some discussion on our -- because I
 3   think what -- the Ladinsky folks were saying, oh, maybe we would
 4   refile in the Northern District, and then I think we were
 5   saying, oh, well, we would maybe think of refiling in the Middle
 6   District because that's where we wanted to be in the first
 7   place, and then we just never got -- we basically agreed --
 8   there's kind of a -- right before everything shuts down on
 9   Friday night, let's just not -- we're not prejudging anything.
10   We'll talk tomorrow about when, where, if, who.  We just didn't
11   make any -- something will happen, but we didn't make any
12   decisions about that on Friday night.
13              JUDGE PROCTOR:  But there were discussions.
14              MS. HARTNETT:  Yes.  And I believe that it was talked
15   about at the Saturday meeting, too.  I don't know the details.
16              JUDGE PROCTOR:  Who was on the call on Saturday, to
17   your knowledge, with the Ladinsky team?
18              MS. HARTNETT:  I really am not -- I'm pretty sure it
19   was at least James --
20              THE COURT:  James Esseks.
21              MS. HARTNETT:  -- Esseks.  Sorry.  Camilla Taylor from
22   Lambda, who's, like, maybe a higher level at Lambda.  People
23   that -- because they needed to have the decisionmakers from
24   their orgs on.  I'm assume -- I think Jennifer Levi from GLAAD,
25   Shannon, and I don't -- I'm assuming a representative of all the
```

1   groups, but I actually don't know for sure.

2        JUDGE PROCTOR:  All right.  You do know of certain

3   people that you know were on there or at least told were on

4   there, and is that the list that you just gave?

5        MS. HARTNETT:  I would say the ones that I -- James and

6   Camilla I'm sure of.  I'm almost positive Shannon and Jennifer

7   would be on that, too.  I'm not sure about -- I could guess, but

8   I'm not a hundred percent sure about the rest.

9        JUDGE PROCTOR:  All right.  Thank you.

10        We're going to take a short five-minute break.  We may

11   or may not have any more questions.  I just want to consult with

12   my -- we want to consult with each other just to see where we

13   are.

14        And counsel, I think this is probably one of the longer

15   sessions we're going to have; but as I said, there's certain

16   consequences of being first up.

17        MS. HARTNETT:  I don't mind.  I appreciate the

18   opportunity.  And I really do just hope you -- I thank you for

19   letting me address you.  If you have any other concerns about

20   any of my intentions or actions, I really hope you give me the

21   chance to address them.

22        JUDGE PROCTOR:  I thank you for the way you've

23   approached this.

24        MS. HARTNETT:  Thank you.

25        (Recess was taken from 11:42 a.m. until 11:58 a.m., after

 1        which proceedings continued, as follows:)

 2             THE COURT:  Ms. Hartnett, we have concluded that we are

 3   finished up with you.  I wouldn't want to deprive you of the

 4   opportunity, though, to say anything to us that you think we

 5   ought to hear before we conclude your discussion with us.

 6             MS. HARTNETT:  I appreciate you hearing me today and

 7   receiving my declaration.  And if you have any further

 8   questions, I'd be prepared to answer them at any time.

 9             I also want to formally apologize to the court reporter

10   on the record for my speed of talking.

11             JUDGE WATKINS:  For your what?

12             MS. HARTNETT:  Speed of talking.  If you didn't detect,

13   I'm not from here.

14             JUDGE PROCTOR:  Thank you.

15             (Ms. Hartnett excused.)

16             JUDGE PROCTOR:  All right.  I think next we'd like to

17   hear from Ms. Borelli.

18             (Ms. Borelli present.)

19             JUDGE PROCTOR:  Good morning.

20             MS. BORELLI:  Good morning.

21             JUDGE PROCTOR:  We're not going to require that you --

22   you've already taken an oath at the May 20 hearing.  No reason

23   for you to retake that.  Just remember you are still under oath

24   in terms of the proceeding.

25             MS. BORELLI:  Yes, sir.

1          JUDGE PROCTOR:  Tell us what you know about marking the

2    Walker case related to Corbett.

3          I'm sorry.  Thank you.  I think, actually, first,

4    anything you'd like to say to us before we begin asking a few

5    questions?  We told you -- and I apologize.  I cut right to the

6    chase on that first question.  Anything you would like to say to

7    us before we ask some questions?

8          MS. BORELLI:  No, Your Honor.  I don't have anything

9    affirmatively to add, and I'm happy to begin with questions.

10          JUDGE PROCTOR:  And that's fine.  And I'm sorry, I

11    should have given you that opportunity.  If there's anything on

12    your mind that you just think we ought to know before we even

13    start questioning, we're glad to hear that.

14          MS. BORELLI:  Thank you.  I can't think of anything at

15    the moment.

16          JUDGE PROCTOR:  All right.  Then in that case, just

17    tell us what you know about the civil cover sheet being

18    marked -- the Walker case being marked related to Corbett.

19          MS. BORELLI:  We originally began work on this matter

20    in 2020, and that was when we first identified that we believed

21    the case would be related to Corbett, and we continued with that

22    plan as we began preparations in 2021.

23          JUDGE PROCTOR:  Bring the mic a little closer to you.

24          MS. BORELLI:  Yes, Your Honor, I will also try to speak

25    up.

1          JUDGE PROCTOR:  Thank you.

2          MS. BORELLI:  So we originally formulated the belief

3   that the cases were related when we began our work in 2020.  The

4   bill did not pass that year.  We began preparations again in

5   2021 and continued with that plan, and the same is true for

6   2022.

7          JUDGE PROCTOR:  In 2020, Corbett was actually being

8   litigated in the district court; is that correct?

9          MS. BORELLI:  That's correct.

10         JUDGE PROCTOR:  By '21, was it on appeal at that point?

11         MS. BORELLI:  I think that's true.  I don't recall the

12  precise timing, but that sounds correct.

13         JUDGE PROCTOR:  But it was clearly on appeal for some

14  time by the time the '22 litigation was actually filed; true?

15         MS. BORELLI:  Yes, Your Honor.

16         JUDGE PROCTOR:  All right.  Why did you -- why did you

17  think Walker was related to Corbett?

18         MS. BORELLI:  I understood that there wasn't any

19  specific standard in this district for how to define whether a

20  case is pending.  And it's also been my experience that even

21  after cases are disposed at the district court level, that there

22  can be any number of even substantive proceedings.

23         As one example, I am involved in another case right now

24  that has been on appeal and has a briefing schedule, and we're

25  only just now doing substantive stay briefing that will involve

 1    discussion of the merits in the district court.  So without any

 2    clear standard suggesting that it would not be related, we

 3    believed that it would count as related.

 4            JUDGE PROCTOR:  All right.  What discussions occurred

 5    surrounding that that you can recall?

 6            MS. BORELLI:  Let's see.  I'm sure we had discussions

 7    about it in 2020.  I don't recall how deep the discussion may

 8    have been in subsequent years.  We simply continued with the

 9    plan that we had originally formulated.

10            I'm not sure I'm answering the Court's question.

11            JUDGE PROCTOR:  Well, just best recollection you have

12    of discussions among the Walker team about marking that related.

13    Why was that done?

14            MS. BORELLI:  We believed it was related because there

15    appeared to be significant overlap in both underlying facts and

16    science and also the legal issues that would have been involved

17    in both cases.

18            So, for example, this case, obviously, was going to

19    involve a focus on the science and the medical standards for

20    treatment of gender dysphoria for transgender people, but there

21    were also legal issues involved in cases involving government

22    defendants and discrimination against transgender people,

23    significantly the level of review under the Constitution,

24    including what level of review should apply to transgender

25    status distinctions made by the government; whether the

 1  discrimination is sex discrimination such that it is also

 2  entitled to heightened scrutiny for that additional reason.  And

 3  there may have been other legal issues, but those are the ones

 4  that come to mind at the moment.

 5          JUDGE PROCTOR:  All right.  Thank you.

 6          What discussions do you recall, if any, about the fact

 7  that Judge Thompson was assigned to Corbett and that being a

 8  reason for relating Walker to Corbett?

 9          MS. BORELLI:  I recall general themes.  I don't know

10  that I recall specific discussions.  But one of the themes was

11  that the decision issued and the fact of having presided over a

12  case that involved a similar record surrounding the science of

13  treatment for gender dysphoria; that, obviously, work on that

14  case would have involved acquiring a deep knowledge of those

15  underlying facts, and we thought that would be a benefit to a

16  case that we hoped would get a quick ruling on a preliminary

17  injunction to address the law, hopefully before it took effect.

18          JUDGE PROCTOR:  All right.  So that was, obviously, one

19  thing that was important to counsel and the Walker team in

20  particular, and that was a quick ruling on some type of

21  injunction, TRO, so that your clients could continue to receive

22  care with respect to this matter; correct?

23          MS. BORELLI:  Absolutely.

24          JUDGE PROCTOR:  All right.  What do you recall -- what

25  do you know, if anything, about the call to Judge Thompson's

1  chambers?

2  MS. BORELLI:  My recollection is that I believe

3  Mr. Esseks asked if someone on the team would make what I

4  understood to be a procedural call.  I understood the purpose of

5  the call to be to alert chambers that a request for emergent

6  relief would be coming, just in the nature of a courtesy, and

7  that's something that I've understood chambers sometimes

8  appreciates if a request for quick action is coming.

9  I recall that Mr. Charles volunteered to make that

10  call, and I recall that he reported back to the team after he

11  had done so and reported the content of the conversation.  My

12  recollection of the content is that he said he had called the

13  clerk; alerted the clerk that a motion seeking quick relief

14  would be coming; that the clerk had repeated that back to him to

15  ensure the message was correct, and that that was the end of the

16  call.

17  JUDGE PROCTOR:  At the time that call was made, what

18  was your understanding about the assignment of the Walker case

19  to any particular judge in the Middle District?

20  MS. BORELLI:  I don't recall if it was yet assigned to

21  Chief Judge Marks, although it may have been.  But I believe

22  that happened shortly after we had filed, as I recall, and we

23  believed that our suggestion to the Court that the cases were

24  related hadn't yet been adjudicated or considered.  And my

25  belief certainly was that they were properly marked related, and

1  so I thought there might be a good chance that Judge Thomas

2  might be the one presiding over it.

3             JUDGE PROCTOR:  Judge Thompson?

4             MS. BORELLI:  I apologize.  Judge Thompson.  Thank you,

5  Your Honor.

6             JUDGE PROCTOR:  Just trying to keep the record clear,

7  but I think I knew who you were referring to.

8             MS. BORELLI:  Thank you, Your Honor.

9             JUDGE PROCTOR:  So how is this -- I think you said that

10  someone suggested that a call be made to Judge Thompson's

11  chambers.  Did you say who you understood that was?

12            MS. BORELLI:  That was Mr. Esseks, Your Honor.

13            JUDGE PROCTOR:  Was that made in a phone conference or

14  an email or both?

15            MS. BORELLI:  I recall email traffic.  I don't know if

16  it was also raised in a phone conference.

17            JUDGE PROCTOR:  All right.  How much email traffic was

18  there surrounding the potentiality of a contact with Judge

19  Thompson's chambers?

20            MS. BORELLI:  I think I recall several emails that were

21  related to timing of when it would make sense to make that call.

22  And I now cannot remember why there was a question of when in

23  the day it might make sense to make that call, but I feel like I

24  recall emails that were about timing.  I don't have -- I just

25  want to be careful to say I don't have a deep recollection of

1    those emails, but that's what I recall.

2            JUDGE PROCTOR:  Fair enough.

3            Are you aware of any other communications or efforts to

4    try to bring the Walker case's existence and filing to Judge

5    Thompson's attention or to otherwise involve Judge Thompson in

6    the matter?

7            MS. BORELLI:  I'm not aware of any other efforts that

8    were intended to do so.

9            JUDGE PROCTOR:  Any that would have had the effect of

10   doing so?

11           MS. BORELLI:  So if the Court is referring to

12   communication that came from, apparently, a current clerk of

13   Judge Thompson -- am I understanding the --

14           JUDGE PROCTOR:  I'm just seeking what your knowledge

15   is.  I'm not trying to suggest here, but tell me what you know

16   about that.

17           MS. BORELLI:  So I am aware that on a phone call, it

18   was reported by Ms. Veroff that she had received indirectly

19   information suggesting that Judge Thompson might have liked to

20   preside over the case.  I heard that indirectly, and I was not

21   on the phone call on which that was discussed.

22           JUDGE PROCTOR:  All right.  Who told you of that?

23           MS. BORELLI:  Mr. Charles.

24           JUDGE PROCTOR:  Okay.  And did he say how he knew that?

25           MS. BORELLI:  He knew that because Ms. Veroff was

1  reporting it verbally on a telephone call in which he was

2  participating.

3        JUDGE PROCTOR:  But you were not?

4        MS. BORELLI:  Correct.

5        JUDGE PROCTOR:  So you got this secondhand, in other

6  words.

7        MS. BORELLI:  That's correct.

8        JUDGE PROCTOR:  How would you characterize your role in

9  this Walker case?  What was your function, responsibility, level

10  of authority, however you want to characterize it?

11        MS. BORELLI:  It was very different from what I wished

12  it could have been.  So I would describe --

13        JUDGE PROCTOR:  You mean at this point or then?

14        MS. BORELLI:  Then certainly.  And I'll explain what I

15  mean by that.

16        But let me answer directly the question about my

17  authority.  I was the most senior person from Lambda Legal on

18  the papers in the case, so I am ultimately responsible for the

19  actions of all Lambda attorneys on the case.

20        I would have liked to have had a deeper day-to-day

21  involvement in the case.  Unfortunately, the intensive work,

22  once we realized that the bill was indeed going to pass -- there

23  was a moment where we didn't think that was going to happen, and

24  it caught us a bit by surprise, so the work ramped up very

25  quickly.  I was within a couple of weeks of a close of discovery

1  in another matter where the only staffing on that case was

2  primarily me and a very junior lawyer doing all of the work for

3  the very first time without much observation even to help them

4  perform the work.  So that meant often back-to-back depositions

5  or deposition prep sessions with clients and with experts.

6           So I had a more removed role.  I wasn't on every phone

7  call in this matter.  But key decisions were run by me, and I'm

8  ultimately responsible for the lawyers from Lambda Legal.

9           JUDGE PROCTOR:  All right.  So you would have been on

10 certain calls, not all of them?

11          MS. BORELLI:  Correct.

12          JUDGE PROCTOR:  Been receiving most emails?

13          MS. BORELLI:  Yes, I believe so.

14          JUDGE PROCTOR:  Except one offs or individual

15 communications?

16          MS. BORELLI:  Yes.

17          JUDGE PROCTOR:  All right.  What do you recall about

18 the motion to assign the case to Judge Thompson, the Walker

19 case?

20          MS. BORELLI:  So my recollection is that we checked the

21 related box on the civil cover sheet.  I have always understood

22 that to operate in at least two ways:  One, it's a mere

23 suggestion to the Court.  Obviously, parties don't have any role

24 in judicial assignments, so I understood it to be a suggestion

25 to the Court that the cases were related.

 1          Number two, I have understood in at least some other

 2   jurisdictions that the submission of the civil cover sheet and

 3   the checking of the box alone prompts consideration of the

 4   suggestion that the case may be related to another.  We learned

 5   I believe in a call to the clerk that in this jurisdiction, the

 6   civil cover sheet doesn't prompt any consideration by anyone and

 7   that if we wished to have our suggestion considered, we would

 8   need to file a motion to prompt that consideration by the Court.

 9   And that is what I understand to have led to the preparation of

10   our motion to reassign.

11          JUDGE PROCTOR:  All right.  Is that your -- what's

12   your -- have you had the experience before of marking a case

13   related in a federal court initial filing?

14          MS. BORELLI:  I have.  I don't recall that it has come

15   up very often for me, but I feel like I must have.  I'm not sure

16   I can recall a specific example.

17          But I have never been in a jurisdiction where we

18   learned that the civil cover sheet itself did not have,

19   apparently, any effect in terms of causing consideration of the

20   relatedness suggestion.  So that was a new experience for me.

21          JUDGE PROCTOR:  All right.  So what is your

22   understanding -- what was your understanding about who would

23   decide this?  The clerk's office?  A judge?  Judge Thompson?

24          MS. BORELLI:  I have never understood, to be candid,

25   Your Honor, and it's one of the moments where I wish I had done

1   some clerking and might have a better understanding if that

2   would lend to it.  I've never been clear whether a clerk looks

3   at these things when a civil cover sheet is considered.  I

4   didn't give any consideration to who might rule on the motion.

5   I didn't know who that would be.

6          JUDGE PROCTOR:  Who, to your knowledge, actually filled

7   out the civil cover sheet and filed it?

8          MS. BORELLI:  I would be guessing, Your Honor.  I don't

9   know for sure.  I think it may have been the Cooley team because

10  they were doing such extensive work to prepare our filing, but I

11  don't know for sure.

12         JUDGE PROCTOR:  Did you actually look at the cover

13  sheet and its instructions before it was filed?

14         MS. BORELLI:  I did not.

15         JUDGE PROCTOR:  Have you seen the instructions in

16  connection with any other litigation you've been involved in?

17         MS. BORELLI:  I have, Your Honor.

18         JUDGE PROCTOR:  The civil cover sheet?

19         MS. BORELLI:  I have, Your Honor.

20         JUDGE PROCTOR:  All right.  So, for example, one of the

21  instructions that accompanies the civil cover sheet with respect

22  to JS 44 says, related cases, "This section of the JS 44 is used

23  to reference related pending cases, if any.  If there are

24  related pending cases, insert the docket numbers and the

25  corresponding judge names for such cases."  You're aware of

1  that?

2          MS. BORELLI:  Yes, Your Honor.

3          JUDGE PROCTOR:  All right.  What do you understand

4  "pending" means?

5          MS. BORELLI:  My understanding is that it wasn't

6  defined particularly.  And because of my experience of seeing

7  cases, even after they are designated as closed, have subsequent

8  proceedings, whether on remand or this other current experience

9  I'm having right now, for example, where we're doing substantive

10 stay briefing in a cases that is currently on appeal, I've

11 understood that not to be a rigid designation of whether a case

12 is pending or not.

13         JUDGE PROCTOR:  All right.  So what discussions do you

14 recall occurring once you learned that Judge Marks had the case

15 and that the clerk's office said you would have to actually file

16 something to draw this to the attention of the Court to make a

17 determination on your related case reference?

18         MS. BORELLI:  I don't have a deep recollection of those

19 discussions, and they may have occurred while I was in

20 deposition or in preparation sessions.  What I generally recall

21 is, for example, I don't know how we determined that the way to

22 style the motion would be "Motion to Reassign."  I don't know if

23 that was a suggestion from the clerk or if that was a styling

24 that the team devised, but I understood that the team had

25 identified that as the vehicle that seemed most sensible to try

1  to draw attention to our suggestion that the case was related.

2          JUDGE PROCTOR:  All right.  And do you recall any

3  discussions that were related to Judge Marks' order to show

4  cause about the transfer of the case to the Northern District?

5          MS. BORELLI:  I do, Your Honor.  I recall participating

6  in a call -- it would have occurred, I believe, on April 14th.

7  It was one of at least two calls that occurred that day.  We

8  were still trying to make a final decision about whether to

9  file -- I don't know if it would have been an opposition, but a

10  brief that would have suggested that we thought that the case

11  shouldn't be transferred, or whether to acquiesce in the

12  transfer.  And the decision on that call was to wait to see what

13  the State's position was and to see what they said in their

14  briefing in case that would help inform our decision.  So we

15  ended that call, and a short time afterwards the State filed its

16  papers saying that it agreed with transfer.

17          I did not at the time and I have not since reviewed

18  those papers.  I was not able to join the second call in which

19  the decision was made to acquiesce and to withdraw our motion to

20  reassign, but we finalized that decision after seeing that the

21  State's position was that transfer made the most sense.

22          JUDGE PROCTOR:  Did anyone describe that call to you,

23  even though you weren't on it?

24          MS. BORELLI:  Yes, Your Honor.

25          JUDGE PROCTOR:  What did you hear about the call?

1          MS. BORELLI:  Mr. Charles reported on that call to me.

2    The portion of the discussion during which the decision was made

3    I recall focusing on two things.  One was that if the State

4    agreed that transfer made the most sense, that that in

5    combination with the Court's order to show cause made it seem

6    all but inevitable that the case would be transferred, and so it

7    didn't make sense to resist.

8          Let's see.  I said there were two things.  I'm now

9    having trouble recalling the second one.  I think it may have

10   been further consideration of the strength of the pending

11   designation, although, again, we were aware prior to having made

12   that designation, as I understand, that there was no standard

13   for it, so we didn't believe there was any standard that had

14   been violated and believed we had a good-faith argument but did

15   not believe it would carry the day.

16         JUDGE PROCTOR:  Good-faith argument but not a winning

17   argument?

18         MS. BORELLI:  Correct.

19         JUDGE PROCTOR:  That's what you're saying?

20         MS. BORELLI:  Correct.

21         JUDGE PROCTOR:  Was there any discussion among the

22   Walker team about what does pending mean and is Corbett really

23   pending?

24         MS. BORELLI:  I don't recall any significant discussion

25   about it.  It's possible that there was and that it occurred on

1   a call that I didn't participate in, but I don't have any

2   recollection of any significant discussion.

3           JUDGE PROCTOR:  Okay.  So the decision is made that

4   it's inevitable this is most likely to be transferred.  There's

5   no reason to put up a fight here.  We're going to the Northern

6   District of Alabama.

7           MS. BORELLI:  Correct.

8           JUDGE PROCTOR:  All right.  At that point was there any

9   discussion about judges in the Northern District of Alabama that

10  you're aware of?

11          MS. BORELLI:  Let's see.  Judges in terms of the judge

12  assigned to Ladinsky?

13          JUDGE PROCTOR:  Who had the case, who may get the case,

14  who you wanted to get the case, who you didn't want to get the

15  case.

16          MS. BORELLI:  Yes.  So I recall that I believe there

17  started to -- that there was some research into trying to learn

18  what we could about Judge Axon.  I don't know whether that

19  research happened before or after we determined that transfer

20  just seemed inevitable, but I recall that we did some looking

21  into to try to understand if she had issued any rulings in cases

22  involving transgender people, for example, and from other

23  publicly available sources anything that might help us

24  understand, you know, anything we should know about framing the

25  case.

1     JUDGE PROCTOR:  All right.  Was there any discussion

2 about the composition of the plaintiffs and defendants in your

3 case that were Northern District of Alabama residents at the

4 time of potential transfer?

5     MS. BORELLI:  I don't recall that discussion at the

6 time of potential transfer.  I do recall learning after we were

7 assigned to Judge Burke that one of our plaintiff families that

8 I, unfortunately, did not have a direct or close relationship

9 with -- one of our plaintiff families that was located in that

10 jurisdiction had serious concerns about a case being decided so

11 close to where they lived; that they were concerned about their

12 safety during a time of severe harassment of transgender people

13 in different contexts.  And I understood that concern when I

14 learned it.

15     JUDGE PROCTOR:  All right.  But there was no discussion

16 about what effect this would have on which division the case

17 would go to in the Northern District of Alabama?

18     MS. BORELLI:  Let me make sure I understand the Court's

19 question.

20     JUDGE PROCTOR:  I didn't do a very good job.  Let me

21 clarify.

22     I think you were in the courtroom on May 20 when I said

23 we're going to be asking plenty of questions to you

24 collectively.  I think we ought to be transparent of what

25 occurred on our side transparently.  Remember that?

```
 1            MS. BORELLI:  Yes, Your Honor.

 2            JUDGE PROCTOR:  And I walked through and explained

 3    procedurally how the case got moved to the Northern District,

 4    why it would have gone randomly assigned to a judge in our

 5    Northeastern Division, our random jury area, and therefore, it

 6    was randomly assigned to Judge Burke.  That was news to you when

 7    you heard that; correct?

 8            MS. BORELLI:  Yes, Your Honor.

 9            JUDGE PROCTOR:  But it answered some questions.

10            MS. BORELLI:  It did, Your Honor.

11            JUDGE PROCTOR:  All right.  So that's the point, is

12    you -- there was no discussion that you're aware of about, what

13    does this mean if it goes -- everybody just assumed it would

14    automatically go to Judge Axon somehow?

15            MS. BORELLI:  Yes.  At the point that we made the

16    decision to acquiesce and transfer and withdraw our motion to

17    reassign, we understood that we were acquiescing to be

18    consolidated with the Ladinsky case before Judge Axon.  And I

19    don't remember any discussion of the -- I don't remember anyone

20    having the idea that we might be assigned somewhere else.

21            JUDGE PROCTOR:  All right.  In the Middle District,

22    though, the clerk's office had told you the clerk's office can't

23    assign a case to a judge on a related reference.  You understood

24    that?

25            MS. BORELLI:  I'm so sorry.  Could you repeat that?
```

1          JUDGE PROCTOR:  When you filed Walker and related it to

2    Corbett, I think you indicated that -- I think this was in your

3    declaration -- that you understood that the clerk's office told

4    you, that doesn't automatically go to the judge you've related

5    it to.  You would have to file a motion for that to occur.

6    That's not a clerk's office function, the judge would have to

7    make that -- a judge would have to make that determination.

8          MS. BORELLI:  What I understood is that the clerk had

9    said not necessarily; that this doesn't automatically go to the

10   judge.  And I've never understood that to be an outcome of

11   checking the case as related, regardless.  I've always

12   understood that judicial assignments are in the sole control of

13   the courts.

14         JUDGE PROCTOR:  And particularly the judges, not the

15   clerk's office.

16         MS. BORELLI:  Yes, Your Honor.

17         JUDGE PROCTOR:  Except for on the random assignment by

18   a computer.

19         MS. BORELLI:  Right.

20         JUDGE PROCTOR:  And full disclosure, we have certain

21   decs that get assigned just to the next judge in line.  Death

22   penalty cases might just go to whoever is up next.

23         MS. BORELLI:  I see.

24         JUDGE PROCTOR:  But generally, there's a random

25   assignment system.  You understood that?

```
 1            MS. BORELLI:  Yes.

 2            JUDGE PROCTOR:  All right.  So was it a surprise to

 3   you -- did anybody discuss, well, this is going to -- we're

 4   going to have to go through a process in the Northern District

 5   to steer this case back to Ladinsky -- to the Ladinsky case?

 6            MS. BORELLI:  Yes.  We were surprised by the

 7   assignment.  I now understand, based on the information the

 8   Court has shared, why that assignment occurred; but at the time,

 9   we just puzzled over it.  We didn't understand it.

10            JUDGE PROCTOR:  And when you say the assignment, you're

11   talking about the original assignment of the Walker case when it

12   was first transferred to the Northern District?

13            MS. BORELLI:  To Judge Burke specifically.

14            JUDGE PROCTOR:  Yes.

15            MS. BORELLI:  Yes, Your Honor.

16            JUDGE PROCTOR:  Okay.  Because there was also some

17   puzzlement, I think you've told us, about when Judge Axon

18   transferred Ladinsky to Judge Burke.  But we're talking about

19   two different things that you're surprised about here?

20            MS. BORELLI:  Yes.  I mean, I primarily remember at

21   least a focus for me being surprise at our assignment to Judge

22   Burke, when based on my understanding of the OSC, I understood

23   that the reason we were being transferred was for the judicial

24   efficiency that would flow from consolidation with Ladinsky.  So

25   I didn't understand why we were in front of a different judge.
```

1          JUDGE PROCTOR:  Okay.  Were you involved in the

2     discussions about filing the motion to consolidate that was

3     planned, to consolidate Walker with Ladinsky in the Northern

4     District?

5          MS. BORELLI:  I was aware of those discussions.  I was

6     not involved in them, but I recall seeing email traffic about

7     it.

8          JUDGE PROCTOR:  All right.  Did anyone describe those

9     discussions to you in a way that you understood what was being

10    discussed and who was discussing it?

11         MS. BORELLI:  My recollection of what I read is that we

12    were puzzled by the assignment.  Wanted to figure out how to

13    effectuate the consolidation that we thought we were acquiescing

14    to.  That there was communication with Ladinsky team and with

15    the clerk about how consolidation would work in such a

16    circumstance, because I don't think we knew or understood.  I

17    believe we began preparing papers for consolidation and learned

18    at some point that they would not be properly filed in our case;

19    that they would be more properly filed in Ladinsky.  I believe

20    there was communication about that.

21         At some point I also recall reading that the Attorney

22    General's office told somebody that they were also preparing to

23    move to consolidate our case with Ladinsky before Judge Axon.

24    And that's what I recall.

25         JUDGE PROCTOR:  Okay.  And, in fact, there was

1  discussions you're aware of that there would be a motion filed

2  by someone, and it turned out to be the State was going to take

3  the lead on filing the motion, and the Walker and Ladinsky

4  counsel were going to consent to consolidation?

5      MS. BORELLI:  That rings a bell.  Yes.

6      JUDGE PROCTOR:  Okay.  Was the interest to get the

7  cases together so that they could proceed together?

8      MS. BORELLI:  Yes, Your Honor.  Even though I,

9  candidly, had reservations about how it might work to knit the

10 cases together, at that point it was the only thing that made

11 sense to me if we were both in the Northern District.  It didn't

12 make sense that we would be proceeding in the same district in

13 front of different judges.  And so at that point, we were

14 focused on trying to figure out how to consolidate them.  That's

15 what we thought we were acquiescing to.

16     JUDGE PROCTOR:  In your mind, what was the distinction

17 between being in front of different judges in the same district

18 where you found yourself after transfer of Walker to the

19 Northern District and being in front of different judges in the

20 same state, which is where you were before transfer?

21     MS. BORELLI:  I assumed that consolidation was

22 inevitable; however, it might be effectuated after we had been

23 assigned to the Northern District.  It just did not strike me as

24 realistic that two judges would want to proceed with two cases

25 in the same district.

1          JUDGE PROCTOR:  And I guess that's what I'm asking

2     about, is why would two judges in different districts want to

3     proceed with essentially the same case?

4          MS. BORELLI:  I understand that there have been

5     occasions where that has happened with work in our movement

6     previously.  I don't have --

7          JUDGE PROCTOR:  I'm sorry.  I didn't hear you.

8          MS. BORELLI:  I understand there have been occasions

9     where that has happened in our movement previously.  I don't

10    have the kind of deep knowledge that some others do, but there

11    was a long chapter of marriage litigation, and I understand that

12    that occurred at least once during that time.

13         There's always a chance that cases might be

14    consolidated; but based on our communications up to that point

15    with Ladinsky team, we thought that it would be preferable to

16    see if we could litigate them separately.

17         JUDGE PROCTOR:  All right.  Is part of that if we have

18    two bites at the apple, we double our chances of succeeding?

19         MS. BORELLI:  No, Your Honor.  It really had to do with

20    interpersonal and professional disagreements among the teams

21    that we were not able to iron out before the cases were both

22    filed.

23         JUDGE PROCTOR:  May not surprise you that we have heard

24    some things about this subject.  Can you enlighten us a little

25    bit about the tensions that existed between these two teams,

 1   what caused them, how they manifested here?

 2          MS. BORELLI:  I can, Your Honor.  It is not easy to

 3   discuss, because I do believe that everybody at all the

 4   organizations is a caring professional who takes their

 5   organizational mission very seriously, and that we do all share

 6   the ultimate goals, the same ultimate goals, but there are a lot

 7   of very big personalities in the room and very strong views

 8   about how things should be done.  And this is an experience that

 9   was not new or unique to this case.  It's an experience that has

10   existed for as long as I've been in the movement, which is about

11   16 years.  And that is just I think a product of the fact that

12   the stakes always feel incredibly high, particularly when you're

13   doing impact litigation, which means that you are taking the

14   rights of a great number of people into your hands.  And so you

15   have an obligation to exercise the greatest strategic care you

16   can to try to get the best result for them, and people feel

17   passionately as a result.  So there have been disagreements

18   across a variety of different cases in a variety of different

19   dimensions, including disagreements about which claims are

20   strategic to bring; proper ordering of claims; the emphasis in a

21   brief; whether an appeal should be taken and when and on what

22   grounds.

23          JUDGE PROCTOR:  Command and control?

24          MS. BORELLI:  Yes.

25          JUDGE PROCTOR:  All right.  So not only how to decide

1    those things, but who's making the decision.

2             MS. BORELLI:  That's correct.

3             JUDGE PROCTOR:  All right.

4             JUDGE WATKINS:  In paragraph 12 of your declaration,

5    you said that Lambda Legal did not desire to work with NCLR and

6    GLAAD to file litigation in Alabama.  Is that the crux of it?

7    Are those the identities involved?

8             MS. BORELLI:  Yes.  That was --

9             JUDGE WATKINS:  The organizational identities?

10            MS. BORELLI:  I apologize for interrupting the Court.

11            Yes.  That was how we felt as we initiated litigation.

12            JUDGE WATKINS:  And as you were discussing continuing

13   the litigation after the joint dismissal -- actually, two

14   dismissals.  Was that still driving the discussion in some

15   fashion?

16            MS. BORELLI:  Yes.  I would say -- speaking for myself,

17   that was determinative and the reason that I supported having

18   Lambda Legal step back from the next chapter of litigation.  I

19   mean, there were a variety of considerations, including it was

20   very difficult to see how 11 organizations and law firms could

21   effectively litigate one case together, but particularly as it

22   became clear after those dismissals that issues of control and

23   decision making were not going to be easily hammered out.

24   Variety of reasons, including those, that it just made sense for

25   us to step back and let others formulate, we hoped, a more

1   efficient and more effective team.  Because the most important

2   thing was to have the best possible chance of stopping this bill

3   from taking effect.

4          JUDGE WATKINS:  I assume there was some coordination

5   with the Cooley attorneys on that Saturday session?

6          MS. BORELLI:  I don't have direct knowledge of that

7   coordination.  There was a Saturday call that I assume the Court

8   has heard about that was convened with the most senior

9   leadership.  So that involved a representative senior to me at

10  Lambda Legal, among other representations of the organizations,

11  to see if we could come up with a common understanding of things

12  like decision-making structure and authority.  And that call did

13  not produce any agreement on those issues.

14         JUDGE WATKINS:  I understand that Lambda in the context

15  of your case was the client contact?

16         MS. BORELLI:  Yes.

17         JUDGE WATKINS:  And did you have authority from your

18  clients to determine to make a decision to drop all litigation

19  efforts on that Saturday?

20         MS. BORELLI:  It would have been a conversation that we

21  would have had with them.  I don't know that we spoke with our

22  clients before we had the exploratory call with the other groups

23  to see if we could work out a structure that seemed sensible to

24  the lawyers.  I believe we would have spoken to all the clients

25  that weekend with our recommendation.

 1          JUDGE WATKINS:  Well, do you believe that you had

 2  spoken to your clients before you filed the Rule 41 dismissal?

 3          MS. BORELLI:  We did not speak with the clients before

 4  filing that dismissal because that dismissal was without

 5  prejudice, and at the time my hope, albeit a short-lived one,

 6  was that we were dismissing without prejudice for the purpose of

 7  trying to formulate a coherent and unified presentation of

 8  claims and plaintiffs and defendants.  I understood that to be

 9  in the realm of the kind of strategic decision that is within

10  lawyer decision-making authority.

11          JUDGE WATKINS:  Who in your organization was on the

12  ground in touch with your clients?

13          MS. BORELLI:  Let's see.  Well, and I should say, there

14  were others from other organizations who did also join calls

15  with them.  So we were not exclusively and only in touch with

16  them, but we did have significant relationships with them.

17          The client contact ranged from -- at the very, very

18  beginning of our preparation, when we were putting the case

19  together and updating declarations, some of that was done

20  through our paralegals, and then Mr. Charles and Sruti

21  Swaminathan took over communication from that point as

22  substantive things were discussed with the clients.

23          JUDGE WATKINS:  At what point in the process were your

24  clients informed that there would not be a renewal of any

25  litigation on the Walker side?

 1          MS. BORELLI:  Because I didn't participate in those

 2    phone calls, I don't have firsthand knowledge of what was shared

 3    during those calls, but my understanding is that calls were made

 4    to the clients that weekend -- I don't know when exactly during

 5    the weekend -- to discuss the events that had occurred; our view

 6    of how things should proceed after our communications with the

 7    other team.  That occurred that weekend.

 8          JUDGE WATKINS:  Okay.  Thank you.

 9          JUDGE PROCTOR:  Was it clear to you at the time that

10    Walker was dismissed that Ladinsky was also going to be

11    dismissed?

12          MS. BORELLI:  I think I understood they would both be

13    dismissed so that we could try to unify them, including, for

14    example, in one complaint.

15          JUDGE PROCTOR:  So you understood that there was a

16    decision for both sides to dismiss and have a discussion about

17    how this litigation should go forward the next day?

18          MS. BORELLI:  Yes, Your Honor.

19          JUDGE PROCTOR:  That was pretty timely because it

20    needed to get back on track.

21          MS. BORELLI:  Yes, Your Honor.

22          JUDGE PROCTOR:  But at the time that dismissal occurred

23    on the Walker side, your team was satisfied that whether Walker

24    was refiled in some form or fashion or Ladinsky was refiled in

25    some form or fashion or another case was refiled in some form or

1   fashion, your clients' interests would be litigated?

2          MS. BORELLI:  Yes.  It was inconceivable to me, Your

3   Honor, that somebody would not proceed with litigation

4   challenging this ban, given the felony penalties at issue, which

5   were petrifying for the families we were working with.

6          JUDGE PROCTOR:  And that makes this somewhat different

7   than the usual 41 dismissal where the parties dismissing just

8   dismiss their case without any particular plan to refile.  Fair?

9          MS. BORELLI:  Sure, Your Honor.

10          JUDGE PROCTOR:  Do you know of any specific discussions

11   or agreements, either one, about what would be discussed on

12   Saturday and how the refiling could or would occur?

13          MS. BORELLI:  I was aware that one of the things that

14   we needed to resolve was trying to make clear that any

15   participating organization would need to have meaningful input

16   and decision-making authority in the case.  And we were anxious

17   about that, based on the communications that we had had --

18          JUDGE PROCTOR:  You needed to clear up the command and

19   control issue.

20          MS. BORELLI:  Correct.  And do it in a way that

21   satisfied ourselves that we could meet our professional

22   responsibilities, which meant that we could not, for example,

23   provide automatic and total deference to anyone else.

24          JUDGE PROCTOR:  Was there any discussion at that point

25   about what claims would be refiled?  Because there was some

1    variation in the emphasis of the claims in the two cases;

2    correct?

3              MS. BORELLI:  That is correct, Your Honor.

4              JUDGE PROCTOR:  Any discussion about that?

5              MS. BORELLI:  Not that I would have been party to, Your

6    Honor.

7              JUDGE PROCTOR:  Any discussion that you're aware of

8    about where a case may be refiled?

9              MS. BORELLI:  I am not familiar with -- let me put it

10   this way.  I suspect that at the time of the Saturday call that

11   a variety of options were being considered, but I don't know the

12   content of that discussion.  I also don't have any idea how a

13   decision was made to file the subsequent Eckness-Tucker

14   litigation in the Middle District.

15             JUDGE PROCTOR:  You talked with Camilla Taylor

16   concerning the conference call?

17             MS. BORELLI:  I did, Your Honor.

18             JUDGE PROCTOR:  And you understood that Camilla Taylor

19   was on the conference call?

20             MS. BORELLI:  Yes, Your Honor.

21             JUDGE PROCTOR:  Did she describe for you anything about

22   the subject I just asked about, either of the subjects I just

23   asked about?

24             MS. BORELLI:  I think I recall that she had views about

25   where a case should be refiled or who it should be refiled with.

 1          JUDGE PROCTOR:  And what were those views?

 2          MS. BORELLI:  Those views were that any refiling should

 3   take into account that the case had last been assigned to Judge

 4   Burke.

 5          JUDGE PROCTOR:  What does that mean?  What did you

 6   understand that meant?

 7          MS. BORELLI:  That it wouldn't make sense to take any

 8   steps that might appear as if we were trying to evade review by

 9   Judge Burke, because he had been assigned the case.  That was

10   her specific view.  It was a very short discussion, however,

11   because the majority of the report back was focused on the

12   inability to reach agreement on decision-making authority and

13   control and also some discussion about some of the other

14   priorities that we had set aside in order to participate in this

15   and whether it was more sensible, given the number of

16   organizations who could continue to carry forward the

17   litigation, to have us refocus organizational resources on other

18   things that we had neglected.

19          JUDGE PROCTOR:  And Ms. Taylor was on the call with the

20   Ladinsky counsel or the Ladinsky team or some subset of them?

21          MS. BORELLI:  Correct.

22          JUDGE PROCTOR:  Did she indicate that was her view to

23   you, or did she indicate whether she had communicated that to

24   the Ladinsky counsel in that conference call?

25          MS. BORELLI:  I don't know if she communicated that on

1    the conference call.

2         JUDGE PROCTOR:  Okay.  Help me understand -- and I

3    think you've addressed this, but I just want to ask this more

4    clearly and get your response to it.

5         Walker counsel reports -- the Walker team reports to us

6    that the reason that Judge Thompson's chambers was contacted was

7    that you had a TRO that needed immediate attention and wanted to

8    alert Judge Thompson and his staff of that fact.  When you

9    transferred your case to the Northern District -- when your case

10   was transferred to the Northern District, I should say -- the

11   TRO went along with it.  So you still have a TRO and a

12   preliminary injunction motion ready for attention.  Now you have

13   a judge assigned to that case who sets a status conference for

14   ten a.m. on Monday the 18th of April, but the decision is made

15   to dismiss rather than go litigate your preliminary injunction

16   motion.  How do you square those two decisions?

17        MS. BORELLI:  Two significant things had changed.  One

18   was we understood that one way or another, that we were going to

19   be consolidated with Ladinsky.  And I believed that it was very

20   important for the teams to try to have a unified view of the

21   framing of the case, the claims in the case, et cetera, in order

22   to be effective in litigating a preliminary injunction or TRO.

23   Having two teams with divisions and strategy did not seem like a

24   recipe to me for effective representation.

25            The second issue was precisely the scheduling of that

1  conference.  I don't recall what time it was, but I believe it
2  was late Friday afternoon that the order was issued for
3  appearance in person Monday morning.  And that made me uneasy
4  because I had not seen quite that turn of event or that handling
5  of preliminary injunctions or TROs previously.
6         JUDGE PROCTOR:  It was just set for a status
7  conference, not a hearing on the TRO or preliminary injunction
8  motion; correct?
9         MS. BORELLI:  Even procedural discussions I've
10  generally seen scheduled differently and in a way that would
11  help ensure that counsel who might be best suited to argue or to
12  participate in that status conference could do so.  And one of
13  the reasons that I primarily supported dismissal is because I
14  was very, very concerned about who might be able to appear for
15  that first appearance, which I think is always an important one,
16  procedural or not, before Judge Burke.  I felt very strongly
17  that we needed to ensure that in a case like this, with the
18  stakes as high as they were, that somebody who was very
19  experienced, knew the science very well, could handle that
20  procedural conference, including -- because I'm not sure if I've
21  actually ever had a procedural conference that didn't stray to
22  some degree into the merits, because the merits and the expert
23  presentation often determine the scope of the evidentiary
24  presentation, the timing that might be required, the number of
25  witnesses if there will be an evidentiary hearing.  So most

1   frequently my experience has been that even procedural calls

2   involve some important discussion of substance.

3            JUDGE PROCTOR:  As you sit here today, do you have a

4   judgment about what would have occurred if the following facts

5   were true:  The case was not transferred to the Northern

6   District, the Walker case.  The case was assigned to Judge

7   Thompson, and Judge Thompson set a ten a.m. hearing in

8   Montgomery for either a status conference or even a motion on a

9   TRO.

10           MS. BORELLI:  I have a strong view about that, Your

11   Honor.

12           JUDGE PROCTOR:  What would -- what is your view?

13           MS. BORELLI:  I want to make sure I am saying that this

14   is not to be critical in any way of our cocounsel's expertise,

15   but the truth is that we had one lawyer on the ground in the

16   state, and that lawyer, I believe, had joined the ACLU affiliate

17   maybe a year earlier.  I was not aware that she had any

18   experience, let alone deep experience, litigating transgender

19   related cases and certainly cases involving the science and the

20   medicine at issue in this case.  And the conflicts that

21   prevented the few of us who fit that bill, who have handled oral

22   arguments before, who are not junior lawyers, who know the

23   science, who have done arguments about the science, there are

24   only a few of us that fit the description on the case, and we

25   all had immovable conflicts.  That is certainly true for me.

1          JUDGE PROCTOR:  What was your conflict?

2          MS. BORELLI:  So my conflict was related to this

3    deposition schedule and close of discovery.  I had a series of

4    preparation sessions that were scheduled for just before the

5    depositions were to happen --

6          JUDGE PROCTOR:  You mentioned that.  Thank you.

7          Would you have trusted your colleague, Mr. Charles, to

8    handle such a status conference?

9          MS. BORELLI:  I would have preferred that that not be

10   his -- I don't know if that would have been his first appearance

11   in court, but he has, unfortunately, gotten an uneven level of

12   experience and training at Lambda Legal.  He transferred from an

13   office at Lambda where there were fewer opportunities to in

14   particular handle hearings and do argument.  I don't know the

15   exact extent of his argument experience, but it is not

16   extensive.  And I've -- I would have felt more comfortable with

17   either myself or somebody like Mr. Strangio, somebody who has

18   litigated these issues at length and argued them previously,

19   handling the hearing.

20         JUDGE PROCTOR:  You're in a better position, to me,

21   since you work with him, to know those things, but I do note

22   that he's admitted to practice in Massachusetts, New York, and

23   Georgia.  He's been admitted to the southern, northern, and

24   eastern districts of New York.  He's been admitted to the

25   Second, Fourth, Ninth, and Eleventh circuits, and he's been

1    admitted through pro hac vice motions to practice in several

2    additional federal courts.  Generally you don't do that unless

3    you're appearing in court; correct?

4         MS. BORELLI:  That has not translated to argument

5    experience.  And that is, unfortunately, a failing of our

6    organization, I will say, and one that I am trying to rectify,

7    but we're trying to do it in a way that is sensible.

8         JUDGE PROCTOR:  And that answers my question.  I've got

9    a second area of questions.  Isn't this why you brought Cooley

10   in, for their expertise in handling these things?

11        MS. BORELLI:  So they have deep expertise in many

12   things.  The science surrounding the treatment of transgender

13   people is not something that I understand that they have deep

14   knowledge of.  And I will just say, candidly, that I think the

15   world of Cooley, to be clear.  But we have had private counsel

16   handle arguments in the past, and it did not go well.  It's

17   something I would --

18        JUDGE PROCTOR:  Who was going to handle this thing?

19   Who was going to handle -- let's say it was set a week out, two

20   weeks out.  Who was going to take lead on the Walker side from

21   your perspective?

22        MS. BORELLI:  I understood that the ACLU -- as between

23   our two nonprofits -- obviously, Transgender Law Center is also

24   a nonprofit partner in the case, but they joined the effort

25   later.  As between our two nonprofits, ACLU was doing lead work,

1    although everyone was working very hard.

2          JUDGE PROCTOR:  ACLU National?

3          MS. BORELLI:  ACLU National.  Yes.  Thank you.

4          And I had received some communication from Mr. Esseks

5    inquiring about how Lambda Legal and ACLU might apportion

6    substantive argument and expressing interest that the project

7    would -- would be interested in taking the lead on that.  And we

8    hadn't -- I don't think we had made any final decisions, but we

9    were amenable to that because they had been doing lead work on

10   the case.

11         JUDGE PROCTOR:  But you understood, you personally and

12   the team understood, that when you file an action like this and

13   seek to enjoin a statute from going into effect, things are

14   going to move very fast if you have your way; right?

15         MS. BORELLI:  That's correct.  And what I've

16   experienced previously is that when emergent hearings have been

17   scheduled, often there's been outreach from the clerk, for

18   example.  One of two things has happened.  Either a

19   teleconference option was made available -- and this was even

20   prior to the pandemic -- because that can often make it more

21   accessible for more counsel to participate, and/or it's not

22   uncommon that I might receive communications from clerks saying,

23   the Court will set a hearing, the following dates are available,

24   please respond to counsel's availability.

25         JUDGE PROCTOR:  Was there any discussion about

1  contacting Judge Burke to see if lead or key counsel could

2  remotely appear by Zoom, telephone?

3         MS. BORELLI:  Because the order was issued late on a

4  Friday afternoon, I don't believe that anybody thought that we

5  would be able to reach chambers in order to make such a request.

6  I also had a bit of a concern because the order was so specific

7  on that point, and so I didn't know how a request to, you know,

8  do something different would be received.

9         But at the point that I -- because I was in an expert

10  deposition while the decision to dismiss was made.  I was

11  informed of it afterwards, and it was certainly well past any

12  hour that one would expect chambers to be answering the phone.

13         JUDGE PROCTOR:  Are you aware of any communications

14  from the Ladinsky case about the refiling of the case in the

15  form of Ecknes-Tucker?

16         MS. BORELLI:  Sorry.  Communications with whom?

17         JUDGE PROCTOR:  With anyone.  Any communications about

18  the subject of Ecknes-Tucker being filed.

19         MS. BORELLI:  I don't believe so.  I don't recall much

20  if any at all communication happening after that Saturday call

21  during which it was determined that we would not be able to work

22  together.

23         JUDGE PROCTOR:  Was it your understanding, though, that

24  the Ladinsky counsel were going to go forward and Walker counsel

25  were not?

```
1              MS. BORELLI:  Correct.

2              JUDGE PROCTOR:  But you didn't know the specifics of

3    what that would look like on the Ladinsky side is what you're

4    saying?

5              MS. BORELLI:  That's correct.

6              JUDGE PROCTOR:  Thank you.

7              MS. BORELLI:  Thank you very much, Your Honor.

8              (Ms. Borelli excused.)

9              JUDGE PROCTOR:  All right.  We're going to break for

10   lunch.  What's the local rule, Judge Watkins, for lunch breaks

11   in the Middle District?

12             JUDGE WATKINS:  We usually do an hour.  And we have

13   pretty good -- until 2:00, we have a good snack bar downstairs,

14   pretty good hamburgers and sandwiches, and they're open until

15   2:00.  Do you want to do 45 minutes or an hour?

16             JUDGE PROCTOR:  Let's say an hour, because I think if

17   we say 45 minutes, that's going to turn into an hour.

18             Mr. Ragsdale, were you about to ask a question?

19             MR. RAGSDALE:  No, I was not.  I was just going to

20   escort my client out of the courtroom.

21             JUDGE PROCTOR:  Fair enough.  You stood and looked like

22   you were trying to get our attention.

23             MR. RAGSDALE:  Sometimes I just look like I don't know

24   what's going on.

25             JUDGE PROCTOR:  All right.  We'll be in recess until
```

```
 1   2:00.
 2      (Recess was taken from 12:58 p.m. until 2:01 p.m., after
 3       which proceedings continued, as follows:)
 4          JUDGE PROCTOR:  Have a seat.  All right.  I think we're
 5   ready to proceed, and I think next on our docket is Carl
 6   Charles.
 7          MR. RAGSDALE:  Your Honor, before we call Mr. Charles,
 8   can I make a request?
 9          JUDGE PROCTOR:  You may.
10          MR. RAGSDALE:  And I heard you again make reference to
11   the Court's desire for transparency, and I appreciate that.
12          I assume that there is some written notation of the
13   call that he made to chambers, some note or message.  Could we
14   see that?
15          JUDGE PROCTOR:  I don't have it, but --
16          MR. BUCK:  Your Honor, while you're -- Judge Proctor,
17   while he's looking for that, just one housekeeping question.
18   The witnesses that have already testified, are they released, or
19   would you like them to stay here for today and tomorrow?
20          JUDGE PROCTOR:  I'd like them to stay.  I don't know
21   that we're going to have any follow up and, quite frankly, doubt
22   we would, but you don't want them invited back on another plane
23   ticket, do you?
24          MR. BUCK:  Understood.  Understood.
25          MR. RAGSDALE:  While I'm making requests, just along
```

1    those --

2            JUDGE PROCTOR:  While you're on a roll.

3            MR. RAGSDALE:  While I'm on a roll, Mr. Esseks' elderly

4    father is currently hospitalized with COVID.  If it is possible

5    to release him at the end -- if we get --

6            JUDGE PROCTOR:  We'll get to him today.  He's next.

7            MR. RAGSDALE:  Thank you.

8            JUDGE PROCTOR:  He's next.  You probably figured that

9    out.

10           MR. RAGSDALE:  I was trying to break the code.  I was

11   running out of people to be worried about.

12           I guess here's my question.  Would it be appropriate to

13   show that note to Mr. Charles?

14           JUDGE PROCTOR:  No, that's fine.  We're not -- this is

15   not "gotcha."  We're trying to just ask -- and hopefully you've

16   seen that our questions have been generally pretty narrowed,

17   like, tell us what you know.

18           MR. RAGSDALE:  Yes, sir.  To the extent I have not been

19   complimentary of that, I should be.

20           JUDGE PROCTOR:  We obviously have some more precise

21   questioning when we hear what you know, but we're just trying to

22   figure out what you know.

23           MR. RAGSDALE:  Sure.  I promise, I appreciate that,

24   Your Honor.

25           THE COURT:  And I take it you would like to have him

1  review that before we start, so we'll just take a moment to have

2  that take place.

3       MR. RAGSDALE:  Thank you.  I appreciate that, Your

4  Honor.

5     (Brief pause in the proceedings)

6     (Mr. Charles present.)

7       MR. RAGSDALE:  Is it all right if he brings that with

8  him?

9       JUDGE PROCTOR:  Of course, so he could have access to

10 it and use it.

11      Should we make that an exhibit for the hearing, Judge

12 Watkins?

13      JUDGE WATKINS:  Let's decide that later.  Let's see

14 where we go.

15      JUDGE PROCTOR:  We may make that an exhibit.  We may

16 not.  Everybody knows what it is.

17      All right.  Mr. Charles, thank you, first, for being

18 here.  You're not going to be required to take another oath

19 today, but you understand you're still under oath from the May

20 20 hearing.

21      MR. CHARLES:  Yes, Your Honor.

22      JUDGE PROCTOR:  And the main thing -- the first thing,

23 we want to start by asking this question.  Is there anything you

24 think we need to know about this matter that you haven't already

25 told us on May 20?

```
 1            MR. CHARLES:  No, Your Honor.

 2            JUDGE PROCTOR:  Anything you would alert us to, point

 3    us to, just make sure we want to understand?

 4            MR. CHARLES:  No, Your Honor.

 5            JUDGE PROCTOR:  All right.  I probably -- I do have a

 6    few follow-up questions, I think the panel might also, the other

 7    judges on the panel.

 8            I would like to start with the -- and I know you've

 9    already -- I'm not -- let me be clear about something.  If I ask

10    you a question, I'm not testing you to compare your answers to

11    May 20.  That's not the purpose of this.  It's just that as we

12    went through and prepared for this, we saw some gaps that we

13    would like to fill in, just to make sure we understand what

14    happened.  So it's perfectly fine for you to say, you know,

15    consistent with what I've already said on May 20.

16            I think this was addressed in your declaration and the

17    May 20 hearing, but just to be clear, was there a particular

18    person that made the actual decision to mark Walker related to

19    Corbett?

20            MR. CHARLES:  Not a distinct individual to my

21    recollection, Your Honor.

22            JUDGE PROCTOR:  That was more of a collaborative

23    decision?

24            MR. CHARLES:  That's correct, Your Honor.

25            JUDGE PROCTOR:  Did anybody disagree with it?
```

1          MR. CHARLES:  Not that I recall, Your Honor.

2          JUDGE PROCTOR:  Do you remember -- you said in your

3  declaration that this was the plan since 2020 when the bill was

4  first being considered by the legislature:  That there would be

5  a suit, it would be filed in the Middle District, and the plan

6  was to mark it related to Corbett.

7          MR. CHARLES:  That's correct, Your Honor.

8          JUDGE PROCTOR:  All right.  At that time, Corbett was

9  actually pending before Judge Thompson.  It was an active

10 litigation that he had not at that point made a ruling on; is

11 that correct?

12         MR. CHARLES:  That's my understanding, Your Honor.

13         JUDGE PROCTOR:  All right.  Then in 2021, again, the

14 Alabama Legislature is considering this type of legislative

15 activity, statute or bill, and the same plan is in place.  If we

16 get a bill passed, we will challenge it in the Middle District,

17 and we will relate it to Corbett.

18         MR. CHARLES:  In the 2021 period, yes, Your Honor.

19         JUDGE PROCTOR:  Yes, the 2021 period.  That's what I'm

20 referring to.

21         But in 2021, the decision -- and Corbett had already

22 been issued by Judge Thompson and an appeal had been taken from

23 that; correct?

24         MR. CHARLES:  I believe that's correct, Your Honor.

25         JUDGE PROCTOR:  Was there any discussion then about

1  whether Corbett was pending in the Middle District of Alabama?

2        MR. CHARLES:  I believe I stated in my declaration,

3  Your Honor, that there was a question raised by an attorney

4  about whether or not Corbett was still pending, and the response

5  was that there was a fees motion that both parties had agreed to

6  leave pending before Judge Thompson.

7        JUDGE PROCTOR:  All right.  And that's -- is your

8  experience that that's not uncommon when there's an appeal of a

9  civil rights decision favorable to a plaintiff and a

10 fee-shifting statute in place, that the district court may hold

11 off on ruling on fees to make sure that the judgment stays in

12 place and the plaintiff is, in fact, prevailing within the

13 meaning of the statute?

14       MR. CHARLES:  Again, acknowledging my experience is not

15 as vast as some of my colleagues, Your Honor, I have seen that

16 happen and not seen it happen.  But that number is quite small

17 in terms of the cases that I would be referring to.

18       JUDGE PROCTOR:  All right.  Fair enough.  Small

19 sampling is what you're saying.

20       MR. CHARLES:  Yes, Your Honor.

21       JUDGE PROCTOR:  All right.  Who was the lawyer that

22 raised the question in 2021 about whether Corbett was still

23 pending in light of its procedural posture?

24       MR. CHARLES:  I believe that was Josh Block, Your

25 Honor.

1        JUDGE PROCTOR:  All right.  Did anything stand out to

2    you about what Josh Block said about that?

3        MR. CHARLES:  I don't remember any additional context

4    other than the question that was raised, Your Honor.

5        JUDGE PROCTOR:  All right.  Was that something that was

6    discussed and resolved at that time the question was raised, or

7    was it something that you or others went back and actually

8    researched to make a determination?

9        MR. CHARLES:  So as to the first part of your question,

10   Your Honor, there was a response on the email chain, as I

11   remember, that there was the fees motion pending.  I don't

12   recall any other instances of discussion on that point.  And if

13   Your Honor wouldn't mind, please, repeating the second part of

14   your question.

15       JUDGE PROCTOR:  Was that something there was any

16   follow-up on, let's go research that and take a look at what the

17   law is on that?

18       MR. CHARLES:  I don't recall specifically, but that

19   does not mean there was not.

20       JUDGE PROCTOR:  All right.  Fair enough.

21       Had you had any experience in other districts with

22   respect to marking and a new, newly filed lawsuit related to an

23   older case?

24       MR. CHARLES:  No, Your Honor.

25       JUDGE PROCTOR:  This is a question I've just -- you --

```
 1   you've raised the question about your experience.  I'm just
 2   wondering.  You're admitted to four different circuits:  The
 3   Second, the Fourth, the Ninth, and the Eleventh.  You're
 4   admitted to all the districts in New York, federal courts in New
 5   York, and I think your declaration said you had been admitted
 6   pro hac vice to other districts.
 7           MR. CHARLES:  Yes, Your Honor.
 8           JUDGE PROCTOR:  Do you have a best -- know how many
 9   districts you're actually admitted to pro hac vice?
10           MR. CHARLES:  No, Your Honor, I do not.
11           JUDGE PROCTOR:  What's your best estimate?
12           MR. CHARLES:  Perhaps somewhere between five and seven,
13   but that is -- that could be wrong.
14           JUDGE PROCTOR:  All right.  And I'm not holding you to
15   an exact number.
16           MR. CHARLES:  Thank you.
17           JUDGE PROCTOR:  Just curious.
18           What was your role?  How would you define your role on
19   the Walker team?  What was your responsibility, level of
20   authority, level of decision making?
21           MR. CHARLES:  Sure.  I was -- I would describe my role,
22   Your Honor, as a point person for the Lambda group.  Ms. Borelli
23   is more senior to me as at the time counsel and then later
24   promoted to senior counsel, and there was someone more junior to
25   me as well, Sruti Swaminathan.
```

1          JUDGE PROCTOR:  Who was the more junior lawyer?

2          MR. CHARLES:  Sruti Swaminathan.

3          So I was the person sort of coordinating and

4   communicating the Lambda team's work and decisions, both

5   internally and then to the larger Walker group.

6          JUDGE PROCTOR:  All right.  That defines your role

7   within the Lambda segment of the team.  How would you define

8   your role as it relates to the overall Walker team?

9          MR. CHARLES:  I would describe it as middle management,

10  Your Honor.  Not the most senior decision maker, but also not

11  the most junior team member.

12         JUDGE PROCTOR:  All right.  Would you have had occasion

13  to be involved, though, in the decisions -- what we've been told

14  is those were collaborative.  This was not a command and control

15  with just one or two people making decisions.  It was more of a

16  collaborative effort.  Would you agree with that to start?

17         MR. CHARLES:  That it was collaborative effort, the

18  decision making?

19         JUDGE PROCTOR:  Yes.

20         MR. CHARLES:  Yes, Your Honor.

21         JUDGE PROCTOR:  So would you have been part of that

22  collaboration on the team?  Decisions such as whether to mark

23  Walker related to Corbett, where to file, who to file on behalf

24  of, who to sue, those type of things?

25         MR. CHARLES:  Yes, Your Honor.  And I would just

 1  include an additional piece of information, which is that though

 2  I was collaboratively involved, there was not always a

 3  substantive discussion if the Lambda team, for example, didn't

 4  feel there needed to be one.

 5         So let's say, for example, Cooley did research about

 6  the proper defendants.  I wouldn't necessarily chime in on the

 7  decision of those defendants to name if I didn't see that there

 8  was an issue or there wasn't something I raised for discussion.

 9         JUDGE PROCTOR:  There were certain things you may defer

10  to others on.

11         MR. CHARLES:  Correct, Your Honor.

12         JUDGE PROCTOR:  And what was Cooley's role?  Are they,

13  for want of a better team, the legal beagles?

14         MR. CHARLES:  As long as there's no negative

15  connotation of that, Your Honor --

16         JUDGE PROCTOR:  No, positive connotation.

17         MR. CHARLES:  Yes.

18         JUDGE PROCTOR:  The litigation gurus.

19         MR. CHARLES:  They really truly were, Your Honor.

20  Approximately six to eight associates were involved over the

21  three-year period, doing a variety of legal research, supporting

22  us in preparing motions, you know, as pro hac vices or what have

23  you, all the way up to the very substantive pieces of the

24  complaint and the preliminary injunction motion.

25         JUDGE PROCTOR:  All right.  Let's move on to another

```
 1   area that you have already told us about both on May 20 and in

 2   your declaration.  That is the call to Judge Thompson's

 3   chambers.  You've already indicated you made that call?

 4           MR. CHARLES:  Yes, Your Honor.

 5           JUDGE PROCTOR:  Was there someone who decided that call

 6   should be made, some person in particular?

 7           MR. CHARLES:  There was -- I believe the request

 8   originated with Mr. Esseks.

 9           JUDGE PROCTOR:  All right.  So Mr. Esseks said, I think

10   we may need to call Judge Thompson's chambers?

11           MR. CHARLES:  Not quite in that phrasing is my

12   recollection.

13           JUDGE PROCTOR:  What was the phrasing you recall?

14           MR. CHARLES:  It was along the lines of we are

15   preparing to file a very substantive motion, and I'd like

16   someone to call Judge Thompson's chambers to alert chambers that

17   this motion is forthcoming.

18           JUDGE PROCTOR:  Okay.  But at that -- as I recall, was

19   the preliminary injunction/TRO motion filed contemporaneous with

20   the complaint?

21           MR. CHARLES:  No, it was not.

22           JUDGE PROCTOR:  It was filed later?

23           MR. CHARLES:  Yes, sir.

24           JUDGE PROCTOR:  Sorry.  I couldn't recall the timing on

25   that.  What I do recall is you actually filed the first -- the
```

1  Walker team filed the first of those motions.  Ladinsky team had

2  not yet filed a motion.

3          MR. CHARLES:  Just to make sure I understand you, Your

4  Honor, the Ladinsky team had not yet filed a preliminary

5  injunction.

6          JUDGE PROCTOR:  Right.  You were the first of the --

7  they were the first to the finish line on filing a lawsuit.  You

8  were the first to file the motion seeking preliminary relief.

9          MR. CHARLES:  That's correct, Your Honor.

10          JUDGE PROCTOR:  Okay.  All right.  What -- who else was

11  in the communication about the call to Judge Thompson besides

12  you and Mr. Esseks?

13          MR. CHARLES:  So the communication went out to the

14  full -- we had an internal ListServe for that large --

15          JUDGE PROCTOR:  Who would be on that?

16          MR. CHARLES:  The people who were involved from each

17  organization:  The Lambda Legal attorneys, the ACLU attorneys,

18  the ACLU of Alabama attorneys, the Cooley attorneys, and at that

19  point also the Transgender Law Center attorneys.

20          JUDGE PROCTOR:  All right.  And how would you

21  characterize the purpose of that call?  And I know you already

22  testified about this, but this is more foundational.  I've got a

23  few follow-up questions.  Again, not trying to distinguish what

24  you said earlier, but how would you characterize the purpose of

25  that call?

1          MR. CHARLES:  My understanding, Your Honor, was that it

2     was a call to alert in a procedural way of the motion that was

3     forthcoming; to give the judge notice.  Because at that time, we

4     were not aware and did not know that the case -- the case, in

5     our understanding at that time, had not been assigned to Chief

6     Judge Emily Marks.  And so we --

7          JUDGE PROCTOR:  And this is the day after the case was

8     filed when you made the call?

9          MR. CHARLES:  That's correct, Your Honor.  It was

10    approximately -- well, more than 12 hours but less than 24.

11         JUDGE PROCTOR:  Right.  So your understanding -- and it

12    turns out the case -- you later learned the case was assigned to

13    Judge Marks, but you didn't know it at the time you made the

14    call.

15         MR. CHARLES:  That's correct, Your Honor.

16         JUDGE PROCTOR:  Did you learn that during the course of

17    the call, though?

18         MR. CHARLES:  No, not during the course of the call,

19    Your Honor.

20         JUDGE PROCTOR:  When did you learn that the case had

21    actually been assigned to Judge Marks upon filing?

22         MR. CHARLES:  I don't remember the exact timing, but I

23    remember that I made the phone call, I reported out to the team

24    about what I had said to the chambers staff I spoke with, and a

25    short time thereafter we learned, I believe from a Cooley

 1  attorney, that we had been -- the case had been assigned to

 2  Chief Judge Marks.

 3         JUDGE PROCTOR:  Which Cooley attorney?

 4         MR. CHARLES:  I believe his name is Adam Katz, Your

 5  Honor, but I believe that's in my declaration.

 6         JUDGE PROCTOR:  All right.  Thank you.  And if I ask a

 7  question, maybe I just don't remember your particular statement

 8  or declaration compared to all the others.

 9         MR. CHARLES:  Oh, yes, Your Honor.  I don't mean to

10  imply you should, just to ease your reference.

11         JUDGE PROCTOR:  I'm just explaining, if I ask something

12  that asks you to repeat something, it's probably because I don't

13  remember what you said in your declaration.  I've got it here

14  and I'm trying to scan it, though.

15         All right.  But at some point, you did -- after you

16  made the call to alert Judge Thompson's chambers of the likely

17  filing of this motion, was that in part because it was going to

18  be necessary to move quickly on the motion?  You wanted to be

19  heard as soon as possible?

20         MR. CHARLES:  Yes, Your Honor.  And we understood at

21  that time that the case had been marked as expedited.

22         JUDGE PROCTOR:  All right.  What did that mean to you?

23         MR. CHARLES:  To me, Your Honor, I did not have any

24  context for that term as it relates to Middle District of

25  Alabama rules.  I only had the sort of layman's context of what

1  I thought that might mean.

2        JUDGE PROCTOR:  Did you have any discussions with other

3  Walker team counsel about this case being -- the Walker case

4  being marked expedited?

5        MR. CHARLES:  Not that I recall, Your Honor.

6        JUDGE PROCTOR:  I think Judge Watkins has shared with

7  you a document before you began discussing this with us;

8  correct?

9        MR. CHARLES:  That's correct, Your Honor.

10        JUDGE PROCTOR:  Does that document seem to -- or appear

11  to accurately summarize what you recall about the discussion you

12  had with Judge Thompson's staff?

13        MR. CHARLES:  It does, Your Honor.

14        JUDGE PROCTOR:  Anything that you remember coming up

15  during that phone conference with Judge Thompson's staff that's

16  not in the document that's been shared with you?

17        MR. CHARLES:  No, Your Honor.  This reflects my

18  contemporaneous memorialization of the call.

19        JUDGE PROCTOR:  All right.  And you reported back to

20  the Walker team about the call; correct?

21        MR. CHARLES:  I did, Your Honor.

22        JUDGE PROCTOR:  And gave them kind of a summary of what

23  was discussed during the call?

24        MR. CHARLES:  I did, Your Honor.

25        JUDGE PROCTOR:  Was there any conclusion or

1  determination made about any action to be taken following the

2  call?

3          MR. CHARLES:  Not that I recall, Your Honor.  I believe

4  Mr. Esseks thanked me for making the call.

5          JUDGE PROCTOR:  All right.  You did inform Judge

6  Thompson's staff that the complaint was marked as related to

7  Corbett?

8          MR. CHARLES:  I did, Your Honor.

9          JUDGE PROCTOR:  And you stated that it was the Walker

10  team's intent to file a motion for TRO and/or preliminary

11  injunction later that day?

12          MR. CHARLES:  I did, Your Honor.  I said, I believe, it

13  was going to be filed within an hour or two of when I had made

14  the call.

15          JUDGE PROCTOR:  Was there any discussion or

16  determination that a reason to make that call would be to

17  influence Judge Thompson to take the case, the Walker case,

18  because it was related to Corbett?

19          MR. CHARLES:  No, Your Honor.  My understanding was

20  that we were merely alerting Judge Thompson to that forthcoming

21  motion.  Our understanding of the process at that time, based on

22  the research we had done, was that the judge was going to be

23  able to consider the relation, the box we had checked on the

24  civil cover sheet.

25          JUDGE PROCTOR:  And explain what you understand to mean

 1   the judge.

 2         MR. CHARLES:  I'm sorry, Your Honor.  Our understanding

 3   of the process was that the judge for whom we had marked case

 4   relation, that is, Judge Thompson, would have the opportunity

 5   to make an analysis about that and decide whether or not to

 6   accept it.

 7         JUDGE PROCTOR:  Was there any other effort or activity

 8   which would have been related to effectuating or causing Judge

 9   Thompson to take the Walker case that you're aware of?

10         MR. CHARLES:  Not that I'm aware of, Your Honor.

11         JUDGE PROCTOR:  All right.  So one of the things we

12   noted in your declaration is in paragraph 26, in case you have

13   that before you.

14         MR. RAGSDALE:  May I give it to him, Your Honor?

15         JUDGE PROCTOR:  You may.  I'm sorry.  I misspoke.  It's

16   not there.

17         I don't have -- I'm sorry, I don't have the paragraph

18   number, but it's --

19         This may refresh your recollection of what I'm asking

20   about.  There was some remark in your declaration about

21   Ms. Veroff having a communication about Judge Thompson's -- or

22   hearing of a communication about Judge Thompson's interest level

23   in the Walker case.

24         MR. CHARLES:  Yes, Your Honor.  That's at paragraph 77

25   on page 21.

1          JUDGE PROCTOR:  Thank you.  Let's go to that.  Tell me
2     everything you can recall about that information.
3          MR. CHARLES:  Yes, Your Honor.  So as stated in the
4     declaration, I was on a Zoom call on the evening of April 14th
5     with other members of the Walker team.  Ms. Veroff shared that
6     she had information that she received through a friend of a
7     friend at EJI --
8          JUDGE PROCTOR:  Equal Justice Initiative?
9          MR. CHARLES:  Yes.  I'm sorry, Your Honor.  The Equal
10    Justice Initiative.  Had heard from a current clerk of Judge
11    Thompson that Judge Thompson had wanted to accept assignment of
12    the Walker case.
13         JUDGE PROCTOR:  Now, on the 14th of April, what was the
14    procedural posture of the Walker case?
15         MR. CHARLES:  At that time, Your Honor, we had a
16    response to Chief Judge Emily Marks' order to show cause due by
17    11:59 p.m. that evening.  We had had a previous call that day to
18    discuss the order to show cause response.
19         JUDGE PROCTOR:  How did you understand this information
20    came to Ms. Veroff?  Was there any inquiry that you're aware of
21    or any attempts to inquire about Judge Thompson's interest level
22    in the case?
23         MR. CHARLES:  There was no active inquiry that I was
24    aware of, Your Honor.
25         JUDGE PROCTOR:  Did anyone ever explain to you how this

 1    information came about other than what's in your paragraph 77 of

 2    your declaration?

 3            MR. CHARLES:  No, Your Honor.

 4            JUDGE PROCTOR:  And you don't know who the friend of

 5    the friend was?

 6            MR. CHARLES:  No, Your Honor.

 7            JUDGE PROCTOR:  Who besides Ms. Veroff might have

 8    information about this?

 9            MR. CHARLES:  I don't know that anyone besides

10    Ms. Veroff would have information about the details of that

11    information.

12            JUDGE PROCTOR:  All right.  Now, you say that that

13    really didn't move the needle because there had already been a

14    determination that transfer was inevitable based on the

15    show-cause order; is that correct?

16            MR. CHARLES:  Yes, Your Honor.

17            JUDGE PROCTOR:  And just before we close this line of

18    inquiry, I just want to make sure.  You're not aware of any

19    other circumstances like this where there had been any

20    communication or attempt to determine a judge's interest level

21    in taking a case?

22            MR. CHARLES:  No, Your Honor.

23            JUDGE PROCTOR:  And nothing that would suggest that

24    there was an attempt to steer a case to a particular judge?

25            MR. CHARLES:  No, Your Honor.

 1          JUDGE PROCTOR:  All right.  Did you hear anything about

 2  any attempts to steer the case away from a particular judge or

 3  judges?

 4          MR. CHARLES:  No, Your Honor.

 5          JUDGE PROCTOR:  To avoid a judge that might not be

 6  favorable to the Walker team's position?

 7          MR. CHARLES:  No, Your Honor.

 8          JUDGE PROCTOR:  All right.  To your knowledge, was the

 9  information -- who had access -- who was this information shared

10  with and what was the medium about Veroff's report about this?

11          MR. CHARLES:  Can you --

12          JUDGE PROCTOR:  Yeah.  That was a bad question.  Let me

13  back up.

14          Was this in an email or a conversation that you learned

15  about this?

16          MR. CHARLES:  It was in a conversation on a Zoom call,

17  Your Honor.

18          JUDGE PROCTOR:  I think you said that.  There was no

19  email traffic that you saw about it, though.

20          MR. CHARLES:  No, Your Honor.

21          JUDGE PROCTOR:  Just that single Zoom call on April

22  14th?

23          MR. CHARLES:  Yes, Your Honor.

24          JUDGE PROCTOR:  Who else was on that Zoom call?

25          MR. CHARLES:  The other members of the Walker team I

 1   can remember being on that call were Kathleen Hartnett, Chase

 2   Strangio, myself, and Julie Veroff.

 3            JUDGE PROCTOR:  So you said that it didn't move the

 4   needle -- and I'm putting words in your mouth -- in other words,

 5   it didn't make a difference in what position you were going to

 6   take.  But was there discussion about it other than the fact

 7   that it was reported?

 8            MR. CHARLES:  No, Your Honor.

 9            JUDGE PROCTOR:  All right.  So the case then was -- the

10   Walker case was then transferred to the Northern District.

11   You're aware that -- and you were in the courtroom on May 20

12   when I reviewed procedurally how things worked through the

13   Middle District and the Northern District with respect to the

14   Walker case?

15            MR. CHARLES:  Yes, Your Honor.

16            JUDGE PROCTOR:  Was that news to you when you heard it,

17   that this would have automatically in court procedures gone to

18   the clerk's office that would have made a determination about

19   which division to assign it to, and then it would be left to the

20   judges about whether the case should be assigned to a

21   first-filed case judge?

22            MR. CHARLES:  That was news to me, Your Honor.  Yes.

23            JUDGE PROCTOR:  But you understand it now?

24            MR. CHARLES:  I do understand it.

25            JUDGE PROCTOR:  Did anybody discuss before transfer,

1  during transfer, or after transfer, before you learned this on

2  May 20, that all the parties -- Northern District of Alabama

3  parties that you had represented or sued were in the

4  Northeastern Division or the northern jury area?

5          MR. CHARLES:  We did not discuss that, to my

6  recollection, Your Honor.

7          JUDGE PROCTOR:  And it didn't dawn on you the

8  significance of that?

9          MR. CHARLES:  No, Your Honor.

10          JUDGE PROCTOR:  Now, you then arrived in the Northern

11  District of Alabama, your case.  Explain to me as best you can

12  what you recall about the events from the transfer of the case

13  through its dismissal.  Just walk me through what you understand

14  to be the key points related to that.

15          MR. CHARLES:  Sure, Your Honor.  So I recall early on

16  the morning of the 15th receiving a notification -- I can't

17  remember if it was through ECF or some other way -- that the

18  case had, in fact, been transferred per Judge Marks' order.  And

19  I believe there were initials marked on the order that came

20  through ECF that represented Judge Burke's initials.

21          JUDGE PROCTOR:  LCB.

22          MR. CHARLES:  Yes, Your Honor.  That's right.  Thank

23  you.

24          I believe then the time line was that someone from

25  Cooley, I believe Ms. Veroff, sometime in the morning of the

 1   15th called a clerk in the Northern Division.  I don't recall if

 2   it was -- actually, I'm sorry.  I do recall.  I believe it was

 3   the deputy clerk, she described, of Judge Burke's to ask what

 4   the procedure was for consolidating the Ladinsky case and the

 5   Walker case.  And the clerk informed her that the first filed

 6   case -- that is, the Ladinsky case -- would need to file a

 7   motion to transfer the Walker case to the court where Ladinsky

 8   was currently held.  Would you like me to continue, Your Honor?

 9            JUDGE PROCTOR:  Yes, please.  Yes.  I'm just trying to

10   hear -- we're just trying to hear what you recall.

11            MR. CHARLES:  Okay.  So we set about drafting that

12   motion.  And I believe contemporaneously, someone reached out,

13   and I don't recall whom, but someone reached out to the Ladinsky

14   counsel about setting up a phone call to discuss this procedural

15   development because we did not know what they knew, and we were

16   the ones who had received the information, and so since the

17   motion to consolidate relied on their participation, we needed

18   to speak with them.

19            JUDGE PROCTOR:  Did you understand that you could file

20   a motion in the Ladinsky case?  The Walker team could file a

21   motion in the Ladinsky case to consolidate that case with

22   Ladinsky?

23            MR. CHARLES:  No, Your Honor.  We did not understand

24   that.  And if that is true, that's the first I'm hearing of

25   that.

 1          JUDGE PROCTOR:  I guess that's what I'm getting at.  I

 2   know Ms. Veroff would be the best source of this, but did you

 3   understand that she was told that Ladinsky counsel had to file

 4   the motion or that the motion had to be filed in Ladinsky?

 5          MR. CHARLES:  Excuse me.  She was told Ladinsky

 6   counsel, the Ladinsky plaintiffs, had to file that motion; that

 7   we could not sua sponte do it.

 8          JUDGE PROCTOR:  That was her understanding --

 9          MR. CHARLES:  Correct, Your Honor.

10          JUDGE PROCTOR:  -- that she reported to you.  You were

11   not part of the conversation, but that's what she reported to

12   you --

13          MR. CHARLES:  Yes, Your Honor.

14          JUDGE PROCTOR:  -- and others?

15          MR. CHARLES:  And others.

16          JUDGE PROCTOR:  Keep going.  I'm sorry.  Didn't mean to

17   break --

18          MR. CHARLES:  No, that's -- no problem.

19          So we started working on that motion.  We contacted the

20   Ladinsky counsel to make the request that they file this motion.

21   There was a bit of back and forth.  It was difficult to get

22   people on the phone because of the holiday weekend.  I believe

23   it was both Good Friday and the eve of Passover or soon to be

24   Passover, so various members of the team were already sort of

25   leaving for vacation or for time off for the holiday.

1          I was on a conference call sometime the afternoon of

2 the 15th with a few members of the Walker team and one member of

3 the Ladinsky team, Jennifer Levi.  The members of the Walker

4 team who were on that call were myself, Lynly Egyes, Lee

5 Nowlin-Sohl, and Kathleen Hartnett.

6          We proceeded in that conversation to explain the

7 information we had received from Judge Burke's clerk about that

8 the Ladinsky counsel needed to file that motion.  We offered to

9 them to write it, that we would draft it, that they could review

10 the draft, but that the filing needed to come from them.

11          Ms. Levi consented to that plan, contingent upon their

12 ability to review the draft and ensure that it was in their

13 clients' interest and didn't run afoul of their views of the

14 procedure, but she did also say to us that we needed to get it

15 to her quickly because, as I said, members of her team had

16 already left for the holiday weekend, and she was soon to be

17 leaving for the holiday weekend.

18          So I believe Cooley took the pen first and put

19 together the draft.  We reviewed it very quickly, and then I

20 believe I transmitted it to Ladinsky counsel to review.

21          JUDGE PROCTOR:  All right.  Any other instances at that

22 point that would indicate that there was coordination or

23 communications between the Ladinsky team and the Walker team

24 about this new landscape that you were in?

25          MR. CHARLES:  Can you repeat that again?

```
 1           JUDGE PROCTOR:  Yeah.  And, again, I might have been
 2   too colloquial.  You've just landed and now you've agreed to a
 3   transfer order that Judge Marks ultimately entered transferring
 4   you to the Northern District of Alabama to be joined, as you
 5   understood it, with the Ladinsky case that was first filed;
 6   right?
 7           MR. CHARLES:  Yes, Your Honor.
 8           JUDGE PROCTOR:  Did you know about the first-filed rule
 9   at the time that show cause order went out?
10           MR. CHARLES:  Yes, Your Honor.
11           JUDGE PROCTOR:  So that wouldn't have been a big
12   surprise to you that that's a question that comes up when you've
13   got two significant pieces of litigation and one is first filed.
14           MR. CHARLES:  Yes, Your Honor.
15           JUDGE PROCTOR:  So at that point, you and the Walker
16   team understood, you're going to the Northern District once you
17   consented to it.  You're the last linchpin to go into place;
18   right?  Alabama is going to file the motion.  You understood
19   Ladinsky was going to agree to it and Walker was going to agree
20   to it, too?
21           MR. CHARLES:  Oh, yes.  I'm sorry, Your Honor.  I left
22   out that at some point that afternoon, we learned that
23   defendants were working on a motion to consolidate the cases.
24           JUDGE PROCTOR:  We knew that.
25           MR. CHARLES:  Okay.
```

 1          JUDGE PROCTOR:  I didn't think you'd left that out.

 2   You just -- you knew that was occurring.

 3          MR. CHARLES:  Yes.

 4          JUDGE PROCTOR:  But that's the point, is the defendants

 5   were filing a motion to consolidate the case.  But even before

 6   that, what I'm getting at is this:  At the time you're being

 7   transferred from the Middle District to the Northern District,

 8   your anticipation is we're now going to be joined with the

 9   Ladinsky case and have to handle our cases in front of a

10   Northern District of Alabama judge; correct?

11          MR. CHARLES:  Yes, Your Honor.

12          JUDGE PROCTOR:  And who was the judge that you

13   understood was assigned to the case, the Ladinsky case, at the

14   time of the transfer to the Northern District, to the Walker

15   cases?

16          MR. CHARLES:  Judge Axon, Your Honor.

17          JUDGE PROCTOR:  All right.  So your anticipation was

18   that your case would go to the Northern District, end up with

19   Judge Axon, and she would then handle the two cases?

20          MR. CHARLES:  Yes, Your Honor.

21          JUDGE PROCTOR:  Was there any discussion that you're

22   aware of on the Walker team that questioned whether that could

23   take place?

24          MR. CHARLES:  I think at that point, most of us were

25   grappling with what was happening in the moment, and I don't

1    think we had yet properly considered the reality that was facing

2    us of having --

3              JUDGE PROCTOR:  What was the reality facing you?

4              MR. CHARLES:  The difficult reality of having to work

5    with the other group, Your Honor.

6              JUDGE PROCTOR:  So we've heard a little bit about the

7    tensions between the two groups.

8              MR. CHARLES:  Yes, Your Honor.

9              JUDGE PROCTOR:  And I don't want to -- you may have a

10   perspective on that that we haven't heard, or it may be similar

11   to what we've heard, but what's your understanding about the

12   tension between the two groups?

13             MR. CHARLES:  So this precedes my time at Lambda Legal

14   considerably, but it has long been my understanding that it is

15   generally very difficult to cocounsel with NCLR, particularly

16   Shannon Minter, and often Jennifer Levi at GLAAD.

17             JUDGE PROCTOR:  What is your understanding of why there

18   was a difficulty there?

19             MR. CHARLES:  To put it diplomatically and lightly,

20   Your Honor, there are personality conflicts.

21             JUDGE PROCTOR:  When you say a personality conflict,

22   does that mean -- is it as simple as who's in charge, or is it

23   also beyond that in terms of just difficulty in getting along

24   with people?

25             MR. CHARLES:  It's both, Your Honor.  It's who's in

 1  charge; who gets to make ultimate decisions for the outcome of

 2  the litigation; how those decisions are made; how cocounsel

 3  should speak to one another about how those decisions are made;

 4  when and how communications should happen; who should get last

 5  pen on a draft that is to be filed.  Really, all the way from

 6  the minutiae to the very significant, Your Honor.

 7         JUDGE PROCTOR:  Okay.  Are you aware of any

 8  communications prior to the actual transfer being accomplished

 9  by Judge Marks in which the Walker and Ladinsky teams talked

10  with each other about these cases?

11         MR. CHARLES:  Yes, Your Honor.  In my declaration, as I

12  stated, Mr. Asaf Orr, who is a senior attorney, I believe, at

13  NCLR, reached out to me.  I believe it was on Monday, the 11th,

14  sometime after we had filed our complaint.  He informed me of

15  their judge assignment.  I think their initial judge assignment

16  was Judge Manasco in the Northern District, and he also told me

17  that she recused due to a conflict.  He shared with me that they

18  had been assigned a magistrate judge, but I --

19         JUDGE PROCTOR:  Judge Cornelius.

20         MR. CHARLES:  Thank you.

21         But that defendants had to consent to that assignment,

22  and so he wasn't sure that it would stick.

23         And then finally --

24         JUDGE PROCTOR:  He implied or stated that the decision

25  was up to the defendants about whether to consent to magistrate

1   judge jurisdiction?

2         MR. CHARLES:  He said it required the consent of both

3   parties, that jurisdiction.

4         JUDGE PROCTOR:  But stated that the defendants had

5   not -- the State had not consented to that?

6         MR. CHARLES:  Not as of the time of that communication

7   with me.

8         JUDGE PROCTOR:  You later learned that.

9         MR. CHARLES:  Yes, Your Honor, I did.

10         JUDGE PROCTOR:  Thank you.

11         MR. CHARLES:  And then he also shared with me when the

12   case was later moved to Judge Axon.

13         JUDGE PROCTOR:  All right.  Now, at some point in 2020

14   and 2021, I think your declaration indicates that there had been

15   research done on the various judges in the two districts.

16         MR. CHARLES:  Yes, Your Honor.

17         JUDGE PROCTOR:  Tell me what you understand about that.

18         MR. CHARLES:  So my recollection of that research was

19   at a very high level, information about every sitting judge in

20   the Northern District and the Middle District.  I believe the

21   time period this research took place was 2021, and my

22   recollection is that the research was interesting but did not

23   inform our plan ultimately.

24         JUDGE PROCTOR:  Okay.  I'm tempted to ask how it was

25   interesting, but since it didn't inform your plan, I won't go

1   into that.

2           So there's research done on Judge Thompson?

3           MR. CHARLES:  Yes, Your Honor.

4           JUDGE PROCTOR:  There was research done on Judge Marks?

5           MR. CHARLES:  As I recall, yes, Your Honor.

6           JUDGE PROCTOR:  Judge Huffaker?

7           MR. CHARLES:  I knew you were going to ask me the other

8   judges, and I will confess I don't -- there were many of them,

9   and I cannot confirm all of them for you, unfortunately.

10          JUDGE PROCTOR:  Fair enough.

11          Let's go Northern District.  Research done on Judge

12  Axon?

13          MR. CHARLES:  Possibly.

14          JUDGE PROCTOR:  Judge Burke?

15          MR. CHARLES:  I believe so.

16          JUDGE PROCTOR:  All right.  What do you recall the

17  research was regarding Judge Axon and Judge Burke in particular?

18  And take those one at the time.

19          MR. CHARLES:  Again, my recollection is from a very

20  high level, so I believe it was a very brief description of

21  overall perception that Judge Axon was tough but fair.  And it

22  noted, I believe, the former president who had nominated her.  I

23  believe it was President Trump.  And Judge Burke I do not

24  recall, other than who had appointed him, what was researched.

25          JUDGE PROCTOR:  What discussions do you recall after

1    the case was transferred with Ladinsky counsel?

2           MR. CHARLES:  So other than the conversation I shared

3    on the 15th, Your Honor?

4           JUDGE PROCTOR:  Other than that.

5           MR. CHARLES:  You know, at that point, Your Honor, the

6    conversations had sort of stopped because of the holiday.  So we

7    had transmitted the motion for them to review, and then there

8    was a brief period of sort of a lull before we all received the

9    news that both cases had been transferred to Judge Burke.

10          And then my understanding is that -- yes, Your Honor?

11          JUDGE PROCTOR:  I was just listening attentively.

12          MR. CHARLES:  Okay.  And then my understanding was that

13   at some point in that evening, there was discussions between

14   Ladinsky and Walker representatives about that development.  And

15   then the following --

16          JUDGE PROCTOR:  Were you involved in those?

17          MR. CHARLES:  No, I was not, Your Honor.

18          JUDGE PROCTOR:  You just heard about them.

19          MR. CHARLES:  Yes, Your Honor.

20          And then the following day, the morning of April 16th,

21   Saturday, there was a phone call with I would call them upper

22   management, the leaders of the various organizations, to discuss

23   the viability of moving forward together.

24          JUDGE PROCTOR:  Who do you understand was on that April

25   16th phone call?

```
1          MR. CHARLES:  My recollection is that it was Shannon

2   Minter from NCLR, Jennifer Levi from GLAAD, Camilla Taylor from

3   Lambda Legal, James Esseks from the ACLU, Lynly Egyes from

4   Transgender Law Center.  And it may have also been Kathleen

5   Hartnett, but I don't recall.

6          JUDGE PROCTOR:  Full disclosure, I think Ms. Hartnett

7   has told us that she was not on that call.

8          MR. CHARLES:  Oh, okay.  It may just have been the

9   nonprofit organization heads who were on that call, Your Honor.

10          JUDGE PROCTOR:  All right.  But you're not aware of any

11   law firm counsel on that call?

12          MR. CHARLES:  No, Your Honor.

13          JUDGE PROCTOR:  Other than you might have thought

14   Hartnett was on it, but you're not aware of King & Spalding,

15   Lightfoot Franklin, or any other Cooley attorney being on that

16   call?

17          MR. CHARLES:  No, Your Honor.

18          JUDGE PROCTOR:  Who told you about that call?

19          MR. CHARLES:  I think the first person to tell me about

20   that call was Camilla Taylor from Lambda Legal.

21          JUDGE PROCTOR:  Which makes sense.  That's your

22   organization.

23          MR. CHARLES:  Yes, Your Honor.

24          JUDGE PROCTOR:  She would be your two up supervisor?

25          MR. CHARLES:  Yes, Your Honor.
```

1          JUDGE PROCTOR:  What did she say?

2          MR. CHARLES:  She said it went as most of those calls

3    with Shannon and Jennifer tend to go, which was that Lambda

4    Legal and ACLU, particularly Mr. Esseks, who began the call,

5    from her vantage point opened the call with a generosity of

6    spirit and collegiality, and within moments the call had already

7    disintegrated into shouting and other unpleasantries.

8          JUDGE PROCTOR:  Okay.  At that point the cases had

9    already been dismissed; correct?

10         MR. CHARLES:  Yes, Your Honor.

11         JUDGE PROCTOR:  Under Rule 41, without prejudice,

12   voluntarily?

13         MR. CHARLES:  Yes, Your Honor.

14         JUDGE PROCTOR:  Were you one of the collaborators on

15   that decision about dismissing the two cases?

16         MR. CHARLES:  On dismissing the Walker case.  Yes, Your

17   Honor.

18         JUDGE PROCTOR:  But there was discussions between the

19   two sides about whether the cases should be dismissed; correct?

20         MR. CHARLES:  I understand there was a call between a

21   couple of representatives from Ladinsky, and I believe at least

22   Kathleen Hartnett.

23         JUDGE PROCTOR:  Were you on any calls that day with

24   Ladinsky and Walker counsel in a broader group?

25         MR. CHARLES:  Not in a broader group, Your Honor.  Just

1   the one I noted with Jennifer Levi and the four members of the

2   Walker team.

3           JUDGE PROCTOR:  All right.  I think your declaration

4   says you supported the decision to dismiss under Rule 41 the

5   Walker case.

6           MR. CHARLES:  That's correct, Your Honor.

7           JUDGE PROCTOR:  Tell me what your thought process was

8   in supporting that decision.

9           MR. CHARLES:  So I think at that point, Your Honor, as

10  I believe I also testified at the May 20 hearing, things were

11  moving so rapidly at that point, and we were faced with a status

12  conference hearing in Huntsville at ten a.m. on Monday.  And

13  while it is true that we filed a PI TRO and wanted our case to

14  be heard expeditiously, we were very concerned about our ability

15  to work with this other group in a division of a district that

16  we did not plan to be in.

17          JUDGE PROCTOR:  All right.  What about a judge in front

18  of whom you did not plan to be?

19          MR. CHARLES:  That as well, Your Honor.

20          JUDGE PROCTOR:  All right.  Well, tell me, how did that

21  play into the decision?

22          MR. CHARLES:  Well, I won't say it was the primary

23  driver, Your Honors, but I will say it was not not a factor.  We

24  understood in a very general way that Judge Burke is more

25  conservative, and we were concerned about his openness to our

1  plaintiffs' claims.

2        JUDGE PROCTOR:  What led you to those concerns?

3        MR. CHARLES:  Just general information we had about him

4  that was publicly available.

5        JUDGE PROCTOR:  Publicly available?

6        MR. CHARLES:  I believe so, Your Honor.

7        JUDGE PROCTOR:  So give me -- can you give me an

8  example?

9        MR. CHARLES:  Unfortunately, I don't recall any

10  examples.

11        JUDGE PROCTOR:  All right.  Was that your personal view

12  or is that just something that others told you about, that they

13  had looked into this and thought Judge Burke was not a good

14  draw?

15        MR. CHARLES:  Can you say that one more time, Your

16  Honor?

17        JUDGE PROCTOR:  Sure.  I'm wondering -- you said it was

18  a factor.  Maybe not the primary factor.  You've told me that

19  you thought that Judge Burke was not a good draw for your case.

20  Fair?

21        MR. CHARLES:  That's fair, Your Honor.

22        JUDGE PROCTOR:  That's not your exact words, but that's

23  my interpretation --

24        MR. CHARLES:  That's fair.

25        JUDGE PROCTOR:  And I'm just wondering what the basis

 1   was for that.  If you yourself had researched that and concluded

 2   that, or you were relying upon others' reports to make that

 3   determination.

 4          MR. CHARLES:  I had not performed my own research, Your

 5   Honor.  I took that on what others had said.

 6          JUDGE PROCTOR:  All right.  And who are those others,

 7   and what did they report to you?

 8          MR. CHARLES:  I believe that Asaf Orr mentioned that

 9   that was a judge that they did not want.

10          JUDGE PROCTOR:  Did he say why?

11          MR. CHARLES:  No.

12          JUDGE PROCTOR:  Anybody else that you recall commenting

13   on that?

14          MR. CHARLES:  Not that I recall, Your Honor.

15          JUDGE PROCTOR:  At the time that you collaborated with

16   others and the decision was made to dismiss the Walker case,

17   were you aware the Ladinsky case was also going to be dismissed?

18          MR. CHARLES:  I did not know that it was going to be,

19   but it had been communicated to us that that team was

20   contemplating that as a possibility.

21          JUDGE PROCTOR:  All right.  Were you aware that -- did

22   anybody report that they were likely to dismiss Ladinsky?

23          MR. CHARLES:  I think there did come a point where my

24   understanding was that they were likely to.

25          JUDGE PROCTOR:  Okay.  Now, were you involved in

 1   communicating with clients about progress in the case, updates

 2   in the case?

 3           MR. CHARLES:  I was, Your Honor.

 4           JUDGE PROCTOR:  To your knowledge, did you --

 5           Well, first of all, did you consult with clients before

 6   the decision to dismiss was made?

 7           MR. CHARLES:  I did not, Your Honor.

 8           JUDGE PROCTOR:  To your knowledge, did anyone else do

 9   so?

10           MR. CHARLES:  Not to my knowledge, Your Honor.

11           JUDGE PROCTOR:  All right.  Was that discussed about,

12   hey, we need to get with our clients and tell them what's going

13   on and make this decision?

14           MR. CHARLES:  Not in a discussion that I recall, Your

15   Honor.

16           JUDGE PROCTOR:  One way or the other?  That just didn't

17   come up?

18           MR. CHARLES:  Again, not that I was privy to on that

19   day as I recall.

20           JUDGE PROCTOR:  I realize you're midlevel management,

21   but you're not aware of anyone having that concern or

22   discussion?

23           MR. CHARLES:  Not from my standpoint, Your Honor.

24           JUDGE PROCTOR:  Were you confident, though, that your

25   clients' interests were going to be litigated either directly or

1    indirectly if you did dismiss the action?

2         MR. CHARLES:  We did believe that someone would

3    challenge SB 184, Your Honor.

4         JUDGE PROCTOR:  All right.  Were there any concrete

5    discussions about what that would look like or how that would

6    occur once you determined and were aware that Ladinsky was being

7    dismissed and Walker was being dismissed?

8         MR. CHARLES:  Concrete discussions, I'm not sure

9    what -- could Your Honor describe what you mean?

10        JUDGE PROCTOR:  Yeah.  Any specific plans or proposals

11   put in place, like, hey, we need --

12        So I understand -- and I'm not trying to put words in

13   your mouth.  I'm just trying to guide us along to the point of

14   my real question.  My understanding is both sides agreed, this

15   statute needs to be challenged.

16        MR. CHARLES:  Yes.

17        JUDGE PROCTOR:  And our clients' interests depend upon

18   a timely challenge to this statute.

19        MR. CHARLES:  Yes, Your Honor.

20        JUDGE PROCTOR:  But now we've agreed that we're just

21   both going to voluntary dismiss these actions; correct?

22        MR. CHARLES:  Correct, Your Honor.

23        JUDGE PROCTOR:  So that means the moment after we

24   dismiss these actions, there's no longer on the books or in

25   reality any challenge to this statute.

1          MR. CHARLES:  At that time, yes, Your Honor.

2          JUDGE PROCTOR:  But your understanding was there was

3    definitely an understanding that the statute would be challenged

4    after that on a timely basis?

5          MR. CHARLES:  If I may clarify, Your Honor.  I assumed

6    it would be.  I didn't know of a concrete plan.  I just -- given

7    the posture of our organizations and what I knew, as you said,

8    we were both committed to doing, I just assumed that even if we

9    decided not to move forward, someone would.  So it's not to say

10   that I knew or someone had said, oh, we're going to do X, Y, and

11   Z in such and such district.  I just assumed that it would be

12   challenged.

13         JUDGE PROCTOR:  All right.  Did anyone -- is there any

14   information you had about that other than the assumption that

15   you just referenced?

16         MR. CHARLES:  I think there was an extremely tentative

17   discussion between Kathleen Hartnett and Shannon Minter and

18   Jennifer Levi about possibly moving forward.  And the way that

19   Ms. Hartnett described that to us on a later call was, I didn't

20   agree to anything.  I didn't agree to work with them.  They

21   thought maybe we should work together.

22         JUDGE PROCTOR:  Who is they?

23         MR. CHARLES:  Shannon Minter and Jennifer Levi.  And

24   Kathleen's response to them was, I am one person from the Walker

25   group.  I can't commit us to that.

 1          JUDGE PROCTOR:  Okay.

 2          MR. CHARLES:  But I think she did say, I can commit us

 3    to discussing that, which then led to the call on April 16th.

 4          JUDGE PROCTOR:  I guess this is what I'm trying to

 5    discern from you, is this is not a case where you agreed to

 6    dismissal of the Walker claim without any understanding that

 7    your clients' interests were either going to be litigated

 8    directly or indirectly by someone else.

 9          MR. CHARLES:  Did Your Honor say this isn't a case?

10          JUDGE PROCTOR:  Right.

11          MR. CHARLES:  I'm sorry.  Could you say that again?

12          JUDGE PROCTOR:  You were not saying, we're going to

13    dismiss this action, walk away, and no one's going to challenge

14    this statute.

15          MR. CHARLES:  No, we were not saying that.

16          JUDGE PROCTOR:  You understood someone would challenge

17    the statute in some form or fashion after we've dismissed it?

18          MR. CHARLES:  Again, I think I assumed and hoped.

19          JUDGE PROCTOR:  All right.  Fair enough.

20          Are you aware of any discussions about what that

21    challenge might look like, even if they were tentative?

22          MR. CHARLES:  Not -- nothing even approaching concrete,

23    Your Honor.

24          JUDGE PROCTOR:  All right.  And am I to understand,

25    then, that that would have been above your pay grade?  You were

1    not involved in those type of discussions?

2         MR. CHARLES:  That's correct, Your Honor.

3         JUDGE PROCTOR:  So even if you had heard anything along

4    those lines, it would have been kind of secondhand related to

5    you.

6         MR. CHARLES:  That's correct, Your Honor.

7         JUDGE PROCTOR:  All right.  All right.  Thank you.

8         Did you have anything further?  I mean, I didn't want

9    to pretermit your opportunity to -- if there's something maybe

10   that's come to your mind that you think we need to know that we

11   haven't asked about.

12        MR. CHARLES:  No, Your Honor.  I would just like to

13   note again, as I did in my declaration, my apologies to Your

14   Honors for my forgetfulness at the May 20 hearing.

15        JUDGE PROCTOR:  All right.  Thank you.

16        MR. RAGSDALE:  May I have a minute to talk to my

17   co-counsel before Mr. Charles is dismissed?

18        JUDGE PROCTOR:  You may.

19      (Brief pause in the proceedings)

20        MR. RAGSDALE:  May I ask a couple of questions, if it's

21   all right?

22        JUDGE PROCTOR:  You may.  You're not a potted plant

23   either.

24        MR. RAGSDALE:  It's a close call.

25        Mr. Charles, you testified and you told the panel your

1  recollection of who was on that call when Ms. Veroff reported

2  the friend of the friend report.  Do you recall that?

3          MR. CHARLES:  I do.

4          MR. RAGSDALE:  And you listed amongst those

5  Ms. Hartnett.

6          MR. CHARLES:  I did.

7          MR. RAGSDALE:  Are you certain that Ms. Hartnett was on

8  the call when Ms. Veroff made that report?

9          MR. CHARLES:  Oh, no, I'm not.

10          MR. RAGSDALE:  That's all I have.

11          JUDGE BEAVERSTOCK:  Mr. Charles, these various Zoom

12  conferences that you've told us about, do you know if anyone had

13  selected the function that makes a transcript of those calls?

14          MR. CHARLES:  I don't know, Your Honor.

15          JUDGE BEAVERSTOCK:  But you didn't?

16          MR. CHARLES:  I did not, Your Honor.

17          JUDGE BEAVERSTOCK:  Do you know who organized those

18  calls, who was the originator?

19          MR. CHARLES:  It varied between ACLU and Cooley and

20  sometimes -- well, no.  It was mostly on Zoom, so I believe it

21  was ACLU or Cooley.

22          JUDGE BEAVERSTOCK:  Thank you.

23          JUDGE PROCTOR:  Any follow up from anyone?

24          MR. RAGSDALE:  None here, Your Honor.

25          MR. BUCK:  No, Your Honor.

```
1              JUDGE PROCTOR:  All right.  Thank you, sir.

2              MR. CHARLES:  Thank you, Your Honors.

3              (Mr. Charles excused.)

4              MR. RAGSDALE:  Ready for Mr. Esseks?

5              JUDGE PROCTOR:  Yes.  Give us one moment.

6         (Brief pause in the proceedings)

7              MR. RAGSDALE:  Is that your minute?  Do you want me to

8    get Mr. Esseks?

9              JUDGE PROCTOR:  Yes, please.  I know you're interested

10   in getting him on the road today, and we are, too.

11             (Mr. Esseks present.)

12             JUDGE PROCTOR:  Good afternoon, Mr. Esseks.  Thank you

13   for being here.  Where do you office and where do you reside?

14             MR. ESSEKS:  My office is in New York City, and I live

15   there as well.

16             JUDGE PROCTOR:  All right.  We've been giving everyone

17   an opportunity to begin just to tell us what you think we ought

18   to hear from you about this matter.  We're not requiring anyone

19   to reaffirm the oath in open court, just understand you're still

20   under oath.

21             MR. ESSEKS:  I do understand that.

22             JUDGE PROCTOR:  All right.  Is there anything you would

23   like to say to us before we have perhaps some questions?

24             MR. ESSEKS:  Sure.  Two things, Your Honor.  The first

25   is just that I wanted to express to the panel my regret that the
```

1    actions that I and my colleagues have taken have caused, first

2    Judge Burke and the chief judges of the districts and this

3    panel, concern over our actions and concern that we were trying

4    to evade the rules.  That was not our intent.  But clearly

5    that's the impression that we left, and I apologize for that.

6            JUDGE PROCTOR:  Okay.

7            MR. ESSEKS:  The second thing I'd like to focus on,

8    Your Honor, because I think it could be helpful, is just to talk

9    for a minute about what was going on in my head from Wednesday,

10   April 13th, when we got the order to show cause, through Friday,

11   the 15th of April, when we dismissed the Walker case.  And there

12   were --

13           I was sort of grappling with two different and

14   competing concerns.  One was a deep desire that I felt myself

15   and that the team felt, I know, to continue to be part of trying

16   to take down what we saw as a terrible law that was going to

17   cause immense harm both to our clients and to other people,

18   trans people and their families in Alabama.  I myself and the

19   team, having put in an enormous amount of energy, it was awful

20   hard to turn on a dime and be like, we're just going to not do

21   anything.  We're just going to walk away.  So there was a lot of

22   impetus to continue to be involved.

23           At the same time, the competing concern that I had was

24   that I was very worried about whether it was actually going to

25   be viable for these two already large teams to come together and

1    work together as one, especially in the compressed time frame

2    that we were facing.  And that was not a new concern that I had

3    just in those few days; it was a concern that I had going back

4    to 2020 when the Alabama Legislature was first considering a

5    similar law and we were first putting together litigation in

6    anticipation of having to challenge that law.

7            And so over the course of that Friday especially, I

8    became more concerned about the viability of working together.

9    And so the way to try to explore whether we could go forward

10   together was to take a break and give ourselves, both teams,

11   some space to figure that out.

12           JUDGE PROCTOR:  All right.  And I understand the

13   tension you're referring to there, realizing that you're under

14   the gun to have this statute addressed judicially, but at the

15   same time wanted to, as you said, make sure that you had a

16   functional team to do that.

17           MR. ESSEKS:  Yes.

18           JUDGE PROCTOR:  All right.  My impression from -- let

19   me just cut to the chase on one question that kind of goes to

20   what you've just told us.  My impression from the May 20

21   hearing, as I walked out of there, was there was a lot of alarm

22   and concern about the transfer by Judge Axon of the Ladinsky

23   case to Judge Burke.  Did you have that concern?

24           MR. ESSEKS:  I did have that concern, Your Honor.  It

25   was not a primary concern for me.  The primary concern, the

1   primary driver for me of the decision to dismiss Walker was the

2   concern about whether we would be able to put these cases

3   together and have a functional team.  There were several other

4   factors that were a part of the decision but were not main

5   drivers, for me at any rate, and the for-us-unexplained transfer

6   of Ladinsky from Axon to Burke was one of those.

7               JUDGE PROCTOR:  When you say unexplained -- because

8   that -- I do remember that coming up in the May 20 hearing.

9   There was an order that Judge Axon entered -- maybe I have a

10  judicial perspective and not a lawyer perspective, it's been a

11  long time since I've been a lawyer -- that explained why that

12  was occurring.

13              MR. ESSEKS:  I'm unaware --

14              JUDGE PROCTOR:  You didn't see the order?

15              MR. ESSEKS:  No, Your Honor, I didn't.

16              JUDGE PROCTOR:  To this day, have you seen that order?

17              MR. ESSEKS:  I have not.  The first time I learned -- I

18  think, Judge Proctor, you explained at the May 20th hearing

19  that -- I think you said Judge Axon had an ongoing criminal

20  trial and didn't have the space on her docket to deal with the

21  PI.  And that --

22              JUDGE PROCTOR:  Didn't have the bandwidth and time to

23  jump right on the case as Judge Burke -- as you know Judge Burke

24  did.

25              MR. ESSEKS:  And Judge Burke absolutely did.  Your

1   Honor, that makes sense.  I did not know that then.  I did not

2   know that until the May 20th hearing.

3           JUDGE PROCTOR:  Well, was there ever any discussion

4   that you're aware of among the Walker team -- let's start

5   there -- about, hey, we need to -- we need a couple answers

6   here.  We need to find out what's going on about that.

7           MR. ESSEKS:  There was not discussion -- Your Honor,

8   there was not discussion about, well, we need to find out what's

9   going on, because it did not seem to me then or to me now that

10  it would be appropriate for us to call up Judge Axon and say,

11  excuse me, Your Honor.  Why did you do that?  I didn't think we

12  were in a position to do that.  We did have discussions about

13  this seems unusual; I don't understand what's going on here.

14          JUDGE PROCTOR:  And I guess this goes to this -- I

15  guess I would -- and I've taken this a little bit out of order

16  of what I expected to kind of walk you through.  Is it your view

17  that -- was it your view or others' view that you're aware of

18  that Judge Axon or Judge Burke were in some way acting

19  inappropriately in terms of this transfer?

20          MR. ESSEKS:  Your Honor, I did not have the view that

21  they were acting inappropriately, but I did not understand what

22  was going on.

23          JUDGE PROCTOR:  Now that you've heard, perfectly good

24  explanation; fair?

25          MR. ESSEKS:  It's a perfectly good explanation, and I

1  accept it, that that is what was going on.  I did not understand

2  that at the time.

3         JUDGE PROCTOR:  What would you say your level of

4  litigation experience is over the years?

5         MR. ESSEKS:  I have been litigating since 19 -- well, I

6  got out of law school in '91 and started litigating in probably

7  '93.  I've tried a lot of cases.  So I am not a newby.

8         JUDGE PROCTOR:  And you know judges work together in

9  terms of dockets.  That's not a surprise to you; correct?

10        MR. ESSEKS:  I understand that.

11        JUDGE PROCTOR:  When Walker was transferred, did you

12  understand the import of how that transfer would occur

13  procedurally, clerk's office to clerk's office?

14        MR. ESSEKS:  That makes sense to me, Your Honor.  I did

15  not know the specific mechanism.

16        JUDGE PROCTOR:  So it sounds like there's three or four

17  things that were realities that you just weren't aware of:  One,

18  that a clerk's office doesn't decide which judge gets a case

19  other than through the random assignment is the general rule;

20  correct?

21        MR. ESSEKS:  I think that's the general rule.  In this

22  case, I will say that I assumed, obviously mistakenly, that

23  since Walker was transferred from the Middle District to the

24  Northern District, especially in order to be consolidated with

25  Ladinsky, that Walker would be assigned to Judge Axon because

1  Judge Axon had Ladinsky because this is not the normal transfer.

2  This is a transfer for a purpose.

3           JUDGE PROCTOR:  Based on the first-filed rule.

4           MR. ESSEKS:  Yes.

5           JUDGE PROCTOR:  So whether consolidated or just simply

6  litigated along with, you understood those would be coupled in

7  some way?

8           MR. ESSEKS:  Yes.

9           JUDGE PROCTOR:  All right.  But you understand that

10  that's a judge making that decision about where the case goes,

11  and then another judge has to make the decision about how the

12  case gets assigned, not the clerk's office.

13          MR. ESSEKS:  I do understand that, Your Honor.  I

14  understand that in general.  At that time I assumed, I think

15  along with my colleagues, that Walker would have gone directly

16  to Judge Axon.

17          JUDGE PROCTOR:  All right.  Was your -- when you agreed

18  to the -- your side, the Walker team, agreed to the transfer

19  after the show cause order was entered; correct?

20          MR. ESSEKS:  Yes, we did.

21          JUDGE PROCTOR:  And you did that, one, I believe we've

22  been told, it was kind of -- you thought it was inevitable.

23          MR. ESSEKS:  Yes, Your Honor.

24          JUDGE PROCTOR:  So we can fight it if we want to,

25  but --

 1          MR. ESSEKS:  It's going to happen.

 2          JUDGE PROCTOR:  -- we're wasting time if we do that,

 3   and we don't want to waste our clients' time by fighting

 4   something that's inevitable.

 5          MR. ESSEKS:  Yes, sir.

 6          JUDGE PROCTOR:  Did you view it as inevitable because

 7   you looked at the case law, looked at the other parties'

 8   positions, and thought this is probably the way the Court is

 9   going to decide it?

10          MR. ESSEKS:  Your Honor, I thought -- we -- we had

11   developed a brief in opposition to the -- a brief in response to

12   the order to show cause that explained why we thought that the

13   first-filed rule should not be applied here to force a transfer.

14          JUDGE PROCTOR:  Did that ever get filed?

15          MR. ESSEKS:  It did not.  We decided not to file that.

16   So I felt like we had a decent argument to make.

17          JUDGE PROCTOR:  What was that argument?

18          MR. ESSEKS:  That the -- you're testing my memory here,

19   Your Honor.  That the Walker case was materially further along

20   than the Ladinsky case was.  The primary metric for that is that

21   we had filed a motion for preliminary injunction, and the

22   Ladinsky folks had not yet done that.

23          JUDGE PROCTOR:  And you would say that was just an

24   objective factor that showed you were further along the finish

25   line than they were?

 1          MR. ESSEKS:  Yes.  Especially when the finish line, so

 2    to speak, was 30 days from signing.

 3          JUDGE PROCTOR:  And in fairness to the Walker team, you

 4    were concerned that Ladinsky would say we're first filed, we

 5    take the lead.

 6          MR. ESSEKS:  Well, so that's an aspect of the question

 7    that was weighing on my mind, Your Honor, about how was the --

 8    how were the two teams going to work together.  Yes.

 9          JUDGE PROCTOR:  Were you concerned in particular that

10    they would say, we're first filed, we're here already, we're in

11    front of Judge Axon first, we ought to take the lead?

12          MR. ESSEKS:  That was one of a range of flavors of ways

13    that this could have come out, Your Honor.  I definitely thought

14    about that.

15          JUDGE PROCTOR:  Did the Ladinsky side ever articulate

16    that to you, that we ought to take the lead, we're first filed?

17          MR. ESSEKS:  I don't remember them saying that.  But we

18    also had -- we had -- I had very little conversation with the

19    Ladinsky counsel about --

20          JUDGE PROCTOR:  Who would have had those discussions,

21    to your knowledge?

22          MR. ESSEKS:  I believe that on the -- on Friday -- so

23    on Friday the 15th, I was on the road.  I was traveling to

24    St. Louis, seeing family.  And I was in touch with the team by

25    email and keeping track of things by that way, but there was a

1  call that afternoon that involved several people from my team,

2  definitely Lee Nowlin-Sohl, and I'm not sure who else, but there

3  were other people from the Walker team.

4         JUDGE PROCTOR:  I'm sorry.  I didn't hear who you said.

5         MR. ESSEKS:  Lee Nowlin-Sohl.  And people from the

6  Ladinsky team.  I'm not sure who.  And so there was discussion

7  then about a path forward.

8         One of the things that concerned me was that I saw some

9  email traffic that relayed information about how the teams were

10  communicating that made me concerned about whether we were going

11  to have serious problems going forward.

12         JUDGE PROCTOR:  Was there ever any thought to just

13  simply going to see Judge Burke and telling Judge Burke, Judge,

14  there's nothing for you to do in the Ladinsky case, they just

15  filed a complaint, we have a motion that needs to be heard, we'd

16  like to prosecute our motion?

17         MR. ESSEKS:  Your Honor, I suppose we could have done

18  that.

19         JUDGE PROCTOR:  I asked if there was any discussion

20  along those lines.

21         MR. ESSEKS:  Not that I was a party to.

22         JUDGE PROCTOR:  Did that never occur to you?

23         I'm just being candid.  If I'm you, and I'm the Walker

24  team, and we've got a TRO motion and we are uprooted and

25  delivered over to the Northern District and plopped down, and

1   all of a sudden we're thinking we're going to be in front of

2   Judge Axon and we end up in front of Judge Burke, and Judge

3   Burke sets our case, Walker, for a status conference, I'm

4   thinking this is an opportunity for us to go in and take the

5   bull by the horns and say, great.  Let's set our -- Ladinsky

6   counsel isn't prosecuting its motion.  We are.  Let's set our

7   motion for TRO for as soon a hearing as possible.

8           MR. ESSEKS:  My understanding was that the Ladinsky

9   counsel was prepared to file their PI motion that Monday.

10          JUDGE PROCTOR:  All right.

11          MR. ESSEKS:  And so we were about to be in the same

12  position.

13          JUDGE PROCTOR:  Okay.  How did you understand that?

14          MR. ESSEKS:  A report out from that cross team

15  conference call that Friday the 15th.

16          JUDGE PROCTOR:  All right.  And who told you --

17  particularly told you that?  I'm just trying to trace back what

18  information you had about this.

19          MR. ESSEKS:  I think it was Ms. Nowlin-Sohl.

20          JUDGE PROCTOR:  Okay.  Well, let's go back to Walker.

21  You made a couple of comments that made me want to jump ahead a

22  little bit there, but maybe be a little more orderly and walk

23  through this chronologically.

24          Walker gets filed on April 11th, and the TRO was not

25  filed contemporaneously.  The motion for TRO was not filed

1  contemporaneously with the complaint; you were still working on

2  that.

3          MR. ESSEKS:  Correct.  We filed it on the afternoon of

4  the 12th.

5          JUDGE PROCTOR:  And in full fairness to you and your

6  team, the statute was just passed on --

7          MR. ESSEKS:  It was passed by the Legislature the

8  Thursday before, which I think was the 7th.  Was signed by the

9  governor on the 8th, Friday.  We filed on Monday.

10          JUDGE PROCTOR:  So this is three days later -- really,

11  one business later, you're filing a complaint, and you're still

12  working on the TRO, which is perfectly understandable.  But you

13  did file it the next day.

14          MR. ESSEKS:  Yes, we did.

15          JUDGE PROCTOR:  At the time the Walker case was filed,

16  it was on the civil cover sheet marked related to a case that

17  previously had been in front of Judge Thompson, Corbett;

18  correct?

19          MR. ESSEKS:  Correct.

20          JUDGE PROCTOR:  What did you know about the Corbett

21  action at that time?

22          MR. ESSEKS:  So I was counsel in Corbett.  I was not --

23          JUDGE PROCTOR:  I thought you might know a little bit

24  about it.

25          MR. ESSEKS:  Yes.  So to be clear, the primary folks

 1   litigating that case were other people on my staff, but I was --

 2          JUDGE PROCTOR:  Were you supervising them?

 3          MR. ESSEKS:  I was very loosely supervising them.

 4          JUDGE PROCTOR:  Monitoring them?

 5          MR. ESSEKS:  Monitoring.  Yes.  So I knew about

 6   Corbett.  I knew its status.

 7          JUDGE PROCTOR:  Did you have any role in the decision

 8   to mark the civil cover sheet in Walker related to Corbett?

 9          MR. ESSEKS:  Yes, I did.

10          JUDGE PROCTOR:  All right.  Take me through what you

11   understand that process was.

12          MR. ESSEKS:  Your Honor, those discussions started in

13   2020, the first time that we were pulling together a potential

14   litigation to challenge a potential law like this.  And we

15   had -- we were focused on filing in the Middle District, and we

16   had a discussion as a team about whether it would make sense to

17   mark Walker as related to Corbett.  The reason for that is that

18   as far as we knew, Corbett was the only transgender civil rights

19   case that was pending anywhere, been litigated in federal

20   district court in Alabama.

21          (Alarm sounding outside.)

22          JUDGE PROCTOR:  I have been reliably informed that

23   that's a drill that we're hearing.

24          JUDGE WATKINS:  Every first Wednesday at 3:30.

25          MR. ESSEKS:  So we can calm down.

1          JUDGE PROCTOR:  I just didn't want that to distract you

2  or concern you or anyone else.

3          MR. ESSEKS:  Thank you.

4          The basis for it being related is that we felt that

5  there was a significant factual and legal overlap between the

6  issues that any judge assigned to the case would have to grapple

7  with in Walker as compared to Corbett.  For the last ten plus

8  years, I and my team have been filing lawsuits about the civil

9  rights of transgender people in many courts around the country,

10  both federal and state.  In each one of these cases, there is a

11  big learning curve that we have to help the judges get up about,

12  what is gender identity?  What is gender dysphoria?  What are

13  the medical treatments for gender dysphoria?  When are they

14  appropriate?  When are they not appropriate?  What is the role

15  of surgery?

16          And that was information a bunch of which was relevant

17  in Corbett and that Judge Thompson had learned, and we

18  thought -- we knew that those issues would be important and

19  material and relevant in Walker, and that Judge Thompson would

20  have a material advantage compared to other judges in the Middle

21  District in terms of having a head start in understanding the

22  factual issues here.

23          JUDGE PROCTOR:  All right.  In 2020, Judge Thompson had

24  not yet issued an order on the merits in your case in Corbett;

25  correct?

1          MR. ESSEKS:  That's correct.

2          JUDGE PROCTOR:  By 2021, he had.  By the time this

3     statute was discussed again in 2021 and your team was gearing up

4     about a potential challenge --

5          MR. ESSEKS:  Yes.

6          JUDGE PROCTOR:  -- legislation passed the Alabama

7     Legislature and was signed by the governor; right?

8          MR. ESSEKS:  Yes.

9          JUDGE PROCTOR:  And by 2022, you're then more than a

10    year beyond the decision on the merits, and it was -- been on

11    appeal for about a year; correct?

12         MR. ESSEKS:  Correct.

13         JUDGE PROCTOR:  Was there any discussion about whether

14    the action was pending, whether the Corbett action was actually

15    pending in the Middle District at that time?

16         MR. ESSEKS:  So, Your Honor, I certainly remember

17    discussion in April of 2022 about whether the case qualified as

18    pending or not.  I don't recall a specific discussion earlier

19    than that.

20         JUDGE PROCTOR:  I'm sorry.  I should have said.  I'm

21    talking about April 2022 when you actually did mark -- not when

22    you had a plan to do so, but when you actually marked this civil

23    cover sheet related to Corbett.

24         MR. ESSEKS:  So I don't recall a specific discussion

25    with the team prior to filing the complaint and marking the case

1   as related about whether Corbett qualified as pending or not.

2   We had looked at the local rules for the Middle District of

3   Alabama to see if they provided guidance about what related

4   means or what pending meant, and there was nothing in there.

5            JUDGE PROCTOR:  Okay.  Did you, yourself, consult JS 44

6   and the instructions about marking a case pending?

7            MR. ESSEKS:  And JS 44 is the civil cover sheet, Your

8   Honor?

9            JUDGE PROCTOR:  That's the civil cover sheet form.

10           MR. ESSEKS:  Yes, I looked at that.  I know what it

11   says.

12           JUDGE PROCTOR:  Did that inform you about the pending

13   question that was -- the term pending as a term of art --

14   actually come up in 2022?  Can we say this is pending?

15           MR. ESSEKS:  So, Your Honor, the reason I'm hesitating

16   is it definitely was something we discussed once the Attorney

17   General's office argued in papers that they filed that Corbett

18   was not pending.  Prior to that, my understanding was that it

19   seemed to me like it's pending.  The case is not over.  There

20   was no final -- you know, it's on appeal, and there was also --

21   so cases aren't over, and so --

22           JUDGE PROCTOR:  Is that distracting you?  I just want

23   to -- I want to be fair to you.

24           MR. ESSEKS:  No, I'm okay.

25           JUDGE PROCTOR:  It's almost distracting me.  I just

 1  sent Judge Watkins a note, it sounds like a wounded animal out

 2  there.

 3          All right.  Just making sure you're getting a fair

 4  hearing here.

 5          MR. ESSEKS:  Thank you, Your Honor.

 6          JUDGE PROCTOR:  All right.  Keep going.

 7          MR. ESSEKS:  I'm sorry, Your Honor.

 8          JUDGE PROCTOR:  Just discussion about pending.  I'm

 9  just curious if you took head on in your discussions with the

10  Walker team, do we have a colorable argument this case is

11  actually -- the Corbett case is actually still pending in this

12  district?

13          MR. ESSEKS:  So I believe that we did have more than a

14  colorable argument, but I do not remember having discussions

15  with the team prior to filing.  I do remember discussions once

16  the AG raised that question.

17          JUDGE PROCTOR:  Okay.  Here's the next question.  It's

18  a little bit of a hypothetical, but I think it's a fair

19  hypothetical.  Tell me if you disagree.  What if, instead of

20  Judge Thompson having Corbett, a different judge -- pick a judge

21  in the Middle District -- and you had gotten that judge up to

22  speed.  They understood gender dysphoria, they understood the

23  need for medical treatment, they understood the holistic care

24  for this area, but they ruled against you and you were

25  appealing.  Would you still have marked that case, on appeal for

1    over a year, related to this Walker litigation?

2         MR. ESSEKS:  Your Honor, I think I would have.  I think

3    I would have felt obligated to based on my understanding of what

4    related means.

5         JUDGE PROCTOR:  All right.  At some point in time, we

6    understand that there was a decision about calling -- or the

7    prospect of calling Judge Thompson's chambers about the Walker

8    case.  What do you recall about that?

9         MR. ESSEKS:  I think it was the morning of the 12th of

10   April, the day after we had filed the complaint, the case was --

11   the papers were being processed by the clerk's office, and to

12   our knowledge, we had not been assigned to a judge.

13        Someone on the Walker team, I believe a lawyer from

14   Cooley, was in touch with the clerk's office about motions to

15   deal with using initials for the minor plaintiffs and was told

16   by the clerk's office that the clerk's office was expediting the

17   case because there was a motion -- there was a request for

18   preliminary injunction in the complaint.

19        I saw that information come to the team.  I was not

20   clear what that meant.  And I was concerned that potentially the

21   Court was going to set a briefing schedule for a PI motion that

22   we had not yet filed, and I wanted the Court to know that we

23   were going to file that motion that afternoon.  Because I didn't

24   want the Court to, for example, give us as plaintiffs until that

25   Friday of that Monday to file a brief, when we were about to

1  deliver it to the Court.  And given the short time frame, I

2  wanted to make sure that the Court understood that we were going

3  to file a motion.

4         And at that point in time, I did not know that my

5  understanding of how the related case process works in the

6  Middle District was wrong, because I understood that what was

7  going to happen is the complaint was going to go to Judge

8  Thompson for him to decide whether he agreed that it was related

9  to Corbett or not.

10         JUDGE PROCTOR:  Have you filed cases before in other

11  districts besides the Middle District of Alabama in which you

12  had, either directly or your team, marked a civil cover sheet to

13  include a related case?

14         MR. ESSEKS:  Your Honor, I'm sure we have.  A specific

15  instance is not coming to mind.  But I was -- I have done that.

16  I've been involved in doing that, likely at the ACLU, and

17  definitely in private practice before that.

18         JUDGE PROCTOR:  Are you aware -- and I know it's 94

19  districts, and they may have different procedures, and many of

20  them do.  But are you aware of any district that would just --

21  the clerk's office would automatically send a case not to the

22  judge who's assigned to it, but to the judge on a related case

23  referenced in the civil cover sheet to have that second judge

24  decide the relation?

25         MR. ESSEKS:  Your Honor, I believe that is the process

1    in the Southern District of New York, which is where I clerked

2    many years ago.  At least it was then.

3              JUDGE PROCTOR:  Of course, in the Southern District of

4    New York, you're not allowed to file a discovery motion.  You

5    have to ask -- file a letter asking to file a discovery motion.

6              MR. ESSEKS:  Indeed.

7              JUDGE PROCTOR:  I practiced there, too.

8              So that was your understanding of how the Southern

9    District handles this?  The clerk's office would in some way --

10             MR. ESSEKS:  Send the complaint and the civil cover

11   sheet to the judge that has the related -- the assertedly

12   related case.  And then that judge says, yes, it's related, I'll

13   take it, or no, it's not related, I'm not taking it.  And if the

14   judge doesn't take it, it goes back to the wheel and gets

15   randomly assigned.

16             JUDGE PROCTOR:  All right.  But in most districts, I

17   understand that a judicial assignment is made when a complaint

18   is filed; correct?

19             MR. ESSEKS:  So that is -- so that's not my

20   understanding of the general practice.  And I'll add that my

21   general understanding could be wrong, but I believe that the

22   process that I've described in the Southern District of New York

23   is what's followed in other districts as well.  Not all other

24   districts, but some good number of them.

25             JUDGE PROCTOR:  All right.  Was there anyone on your

1   team that was responsible for monitoring the docket?

2           MR. ESSEKS:  I know it wasn't me.

3           JUDGE PROCTOR:  Fair answer.

4           MR. ESSEKS:  There probably was, Your Honor.  I'm not

5   sure.

6           JUDGE PROCTOR:  Do you know of anybody who actually

7   consulted the docket or looked at the docket between April 11

8   and April 12 when this phone call to Judge Thompson's chambers

9   was made?

10          MR. ESSEKS:  I know that there were lawyers on the team

11  from the Cooley firm who were talking with the clerk's office

12  about the status of the papers, because the papers had been

13  filed, I think, in the drop box the night before.  And, you

14  know, at a point after the call that Mr. Charles made at my

15  direction to Judge Thompson's chambers, after that was

16  completed, we heard first from a colleague of mine at the ACLU

17  who is not on the Walker team but who seems to be able to track

18  things all the time --

19          JUDGE PROCTOR:  Who's that?

20          MR. ESSEKS:  Joshua Block.  And so he was not on the

21  case, but he e-mailed another member of the team and said the

22  case has been assigned to Chief Judge Marks.

23          JUDGE PROCTOR:  All right.  Do you know how he made

24  that determination or discovered that?

25          MR. ESSEKS:  I don't.

1        JUDGE PROCTOR:  Could it have been the docket?

2        MR. ESSEKS:  It could indeed have been the docket.  And

3   I think shortly after that, Ms. Hartnett circulated information

4   from the docket sheet showing that the case had been assigned to

5   Chief Judge Marks.

6        JUDGE PROCTOR:  Was that -- now, that was before -- I

7   mean, that was after the call to Judge Thompson's chambers had

8   been made.

9        MR. ESSEKS:  Correct.

10       JUDGE PROCTOR:  Do you know what the time frame was,

11   how long after that?  That same day?

12       MR. ESSEKS:  It was that same day.  It was half an

13   hour, an hour, hour and a half after Mr. Charles called Judge

14   Thompson's chambers.

15       JUDGE PROCTOR:  What was the purpose of contacting

16   Judge Thompson's chambers?

17       MR. ESSEKS:  As I said earlier, to apprise the judge

18   that we were going to be filing a motion for PI that afternoon.

19       JUDGE PROCTOR:  And because you wanted that to be

20   expedited and understood it was going to be expedited; fair?

21       MR. ESSEKS:  Yes.  And because I assumed, wrongly, that

22   the case was at least going to him for him to decide whether it

23   was related or not.

24       JUDGE PROCTOR:  Did you have any different

25   understanding about that once you learned from Block that the

1  case actually had been assigned to Judge Marks?

2          MR. ESSEKS:  Yes.  After we learned that, another

3  person from the Cooley team called the clerk's office and

4  confirmed that the case had been assigned to Chief Judge Marks.

5  Asked about the related case procedure and learned from the

6  clerk's office that the case was randomly assigned to Chief

7  Judge Marks, and that if we wanted to transfer the case to Judge

8  Thompson based on it being related to Corbett, we needed to make

9  a motion to that effect, and we filed that motion I believe

10 later that day.

11         JUDGE PROCTOR:  All right.  So tell me everything you

12 understand about that revelation and discussion.

13         MR. ESSEKS:  About --

14         JUDGE PROCTOR:  About learning that you were going to

15 actually have to file a motion to seek the designation you were

16 wanting as opposed to just simply filing the civil cover sheet

17 and letting the process work from there.

18         MR. ESSEKS:  So the clerk's office conveyed that

19 information.

20         JUDGE PROCTOR:  To?

21         MR. ESSEKS:  To a lawyer at Cooley.

22         JUDGE PROCTOR:  Do you know which one?

23         MR. ESSEKS:  I think it's Mr. Katz, but I'm not sure.

24         JUDGE PROCTOR:  All right.

25         MR. ESSEKS:  He or they relayed that information to the

1  team, and we started discussing the contents of that motion.

2  Then folks on the team -- some folks on the team started working

3  on that motion and then reviewing that motion.  And at the same

4  time, we were finalizing the preliminary injunction motion that

5  afternoon and working on getting it filed.

6  JUDGE PROCTOR:  Was there a gap between the time that

7  your team filed the complaint and the conflict disclosure

8  statement?

9  MR. ESSEKS:  I don't know, Your Honor.

10  JUDGE PROCTOR:  The next day there was a motion to

11  proceed using initials or pseudonyms; correct?

12  MR. ESSEKS:  I know that motion was filed, Your Honor.

13  I don't remember whether it was the 12th or the 13th.

14  JUDGE PROCTOR:  I'll represent to you the docket says

15  it was filed on the 12th.

16  MR. ESSEKS:  Okay.

17  JUDGE PROCTOR:  So on the 12th, the decision is made to

18  call Judge Thompson.  Let me just ask you about that.

19  MR. ESSEKS:  Yes.

20  JUDGE PROCTOR:  Was there any discussion or intent to

21  cause Judge Thompson -- to alert him to the case or make him

22  want to take the case as part of that decision to call Judge

23  Thompson's chambers?

24  MR. ESSEKS:  No, Your Honor.  I believed -- mistakenly,

25  but I believed -- that the case was going to go to Judge

1   Thompson's desk, regardless of what we did.  And all I thought
2   we were doing was telling him, hey, we're filing a PI motion
3   this afternoon.  Just want you to know that as you figure out
4   the schedule going forward.  And this was, again, triggered off
5   of what we learned, what we heard from the clerk's office, that
6   the Court was expediting the process, given the request for
7   preliminary injunction.
8              JUDGE PROCTOR:  You think this is going to Judge
9   Thompson, you want to alert him to the motion, you want to be
10  heard on the motion as soon as possible, and it's going to be
11  filed imminently.
12             MR. ESSEKS:  Correct.
13             JUDGE PROCTOR:  But then you learned from the clerk's
14  office that Judge Marks had the case.
15             MR. ESSEKS:  Yes, Your Honor.
16             JUDGE PROCTOR:  And Judge Thompson is not the one who's
17  going to have the case unless you file a motion to have the case
18  assigned to him.
19             MR. ESSEKS:  Yes, Your Honor.
20             JUDGE PROCTOR:  And the decision is made to file that
21  motion; correct?
22             THE DEFENDANT:  Yes.
23             JUDGE PROCTOR:  Did anyone call Judge Marks' chambers
24  after learning that Judge Marks is the one who actually had the
25  case and alert her staff to the fact that you're filing a motion

 1   for preliminary injunction and want to be heard on that as soon

 2   as possible?

 3              MR. ESSEKS:  Your Honor, we did not make that call.  My

 4   memory of that afternoon is we were scrambling to finish the PI

 5   motion and now to write this motion to transfer to Judge

 6   Thompson.  And also the afternoon was progressing, and we were

 7   getting closer to time when the PI motion was going to be on

 8   file, and I assumed that Chief Judge Marks would hear about it

 9   that way.

10              JUDGE PROCTOR:  Well, why wouldn't you assume Judge

11   Thompson would hear about it without the phone call to Judge

12   Thompson's chambers?

13              MR. ESSEKS:  A difference in the time of day is all I

14   can say, Your Honor.

15              JUDGE PROCTOR:  I'm not following that.

16              MR. ESSEKS:  Just that the call to Judge Thompson's

17   chambers was in the morning, and then we're into the afternoon

18   before we learn that Chief Judge Marks has been assigned to the

19   case.

20              JUDGE PROCTOR:  You knew Chief Judge Marks had been

21   assigned to the case before the actual filing of the motion for

22   TRO and preliminary injunction?

23              MR. ESSEKS:  Yes, we did.  A few -- yes, a few hours.

24              JUDGE PROCTOR:  Well, why wouldn't there be just as

25   much concern about making sure she's prepared as you were taking

1  the concern to make sure that Judge Thompson was prepared since

2  it's all the same day?

3       MR. ESSEKS:  Your Honor, I understand the point.  All I

4  can say is it was a hectic afternoon.

5       JUDGE PROCTOR:  All right.  It was a hectic morning

6  when the decision was made to call Judge Thompson's chambers,

7  though; right?

8       MR. ESSEKS:  It was not as hectic as the afternoon,

9  Your Honor.

10      JUDGE PROCTOR:  You're working on a preliminary

11 injunction motion that's not been filed yet, you know Ladinsky

12 has been filed in the Northern District, you're trying to beat

13 them to the punch on getting your motion filed; correct?

14      MR. ESSEKS:  We were trying to get the motion filed.

15 It wasn't -- we were not -- I did not experience it as a race

16 with Ladinsky to get the motion filed, but, yes, we were focused

17 on getting the motion filed.

18      JUDGE PROCTOR:  Did others view that as a race?  Maybe

19 I'm misrecollecting, but I thought we had heard that that was a

20 concern.  Both teams were positioning and jockeying to see who

21 could be first, and they didn't want to work together.  That's

22 what we understood.

23      MR. ESSEKS:  Definitely there were concerns, certainly

24 on our side, about the viability of working together.  And we

25 definitely on the Walker team were trying to file quickly after

1   the law was signed.  I did not experience it as a race against

2   them in terms of who was filed first.

3          JUDGE PROCTOR:  But it was a race against the clock.

4          MR. ESSEKS:  Yes, it was, Your Honor.

5          JUDGE PROCTOR:  Thirty-day period where this was going

6   to be going into effect.  Thirty days in April, so you're

7   looking at -- it goes into effect on May 8th?

8          MR. ESSEKS:  Yes.

9          JUDGE PROCTOR:  Was there any discussion about calling

10  Judge Marks' chambers?  Whether or not it occurred, was there

11  any discussion, we might want to call Judge Marks' chambers and

12  alert her to this because same reason -- rationale that we

13  alerted Judge Thompson's chambers?

14         MR. ESSEKS:  I do not remember that discussion

15  happening, Your Honor.

16         JUDGE PROCTOR:  All right.  But you didn't think of

17  that?

18         MR. ESSEKS:  Correct.  Yes.  Correct.

19         JUDGE PROCTOR:  So this is your opportunity to explain

20  to us what we've heard about from others, but give us your

21  perspective on what's this tension between the two camps?  Why

22  couldn't these two -- both of you had the same goals.  You

23  wanted the statute to be dead on arrival; right?

24         MR. ESSEKS:  Yes.

25         JUDGE PROCTOR:  Both of you had clients who were

1  desperately wanting you to litigate to a successful conclusion

2  an interim motion to stop the stat from going into effect.

3           MR. ESSEKS:  Yes, Your Honor.

4           JUDGE PROCTOR:  All the organizations line up goalwise

5  in that respect, at least, the same way; fair?

6           MR. ESSEKS:  Yes.

7           JUDGE PROCTOR:  Tell us from your perspective why

8  everybody couldn't put away the swords and beat them into

9  plowshares and just get together and work together as a team.

10           MR. ESSEKS:  Your Honor --

11           JUDGE PROCTOR:  A big team.  Ladinsky team, Walker team

12  equals challenge the statute team.

13           MR. ESSEKS:  Yes.  So, Your Honor, two reasons.

14           One is simply a matter of numbers.  Eight nonprofit

15  organizations, three law firms, 11 entities would have to agree

16  on everything we did.  That's a larger team than I have worked

17  with.  And the team that we already had was already large, and

18  we had spent time working out a decision-making structure, and

19  there was a lot of trust across the organizations and with the

20  law firm that allowed a team that was as large as the Walker

21  team was to work together relatively efficiently.

22           And the second issue is tensions between some of the

23  organizations.  There's a bunch of history there.

24           JUDGE PROCTOR:  Tell us about that.

25           MR. ESSEKS:  Well, as you said, Your Honor, the

1  organizations that litigate in the LGBTQ space, there are not a

2  lot of us, and we do share goals and work together in many

3  different contexts.  And I have litigated cases together with

4  most of the organizations.

5       That said, there are also people both at the ACLU and

6  at other organizations that are very smart; enormously

7  experienced.  Some of these folks have been doing this work in

8  this movement for a decade or more longer than I have, and I've

9  been doing it 21 years.  They come, both people at the ACLU,

10  myself included, and people in these other organizations, with

11  strongly held views.  Views about strategy.  Views about, this

12  is the claim to make.  This is not the claim to make.

13       And so I knew where there was a greater degree of trust

14  and where there was a greater degree of friction between

15  organizations and between particular individuals at the other

16  organizations, and particularly individuals on my team, and knew

17  that there -- not that any of this would be impossible, but that

18  it would be a challenge.

19       And this, again, was not an issue that arose for the

20  first time once Walker was transferred to the Northern District,

21  but it's an issue that we started discussing back in 2020 when

22  we first started putting together potential litigation.  Because

23  we had a discussion.  I was not party of the discussion then,

24  but I was part of the discussion in '21 when we had a

25  discussion -- there was a discussion across organizations in '20

1    about whether to do these cases together, and we decided that we

2    didn't want to do that.  It was just too many.

3          At that point it would have been NCLR, GLAAD, ACLU,

4    ACLU of Alabama, and two firms -- a firm or two firms because I

5    think each group had already signed up a firm.  And we revisited

6    the question I think in '21 and learned at that point the NCLR

7    and company team wasn't just NCLR and GLAAD, but that the

8    Southern Poverty Law Center had joined them as well.  So at that

9    point, it was just, like, that's too many.  Can't do it.

10         JUDGE PROCTOR:  We've been told by another person who's

11   spoken to us that there was a difference between management

12   structure between the Ladinsky side and the Walker side.  And I

13   don't want to characterize it incorrectly, but what I understood

14   them to be saying is Walker was more collaborative.  All their

15   organizations worked together.  Ladinsky was more dictatorial.

16   There were one or two people making decisions, and everybody

17   else got in line.  Was that your understanding?

18         MR. ESSEKS:  So --

19         JUDGE PROCTOR:  And that wasn't the exact words they

20   used.  That's just my impression of what they were saying.

21         MR. ESSEKS:  Understood, Your Honor.

22         So my concern in advance of dismissal was that it was

23   going to be very challenging to find a way, with this many

24   organizations and with these particular organizations and

25   individuals, both on my team and on other teams, to make it

 1 │ work.

 2 │         The Saturday morning after we dismissed, I was on a

 3 │ call with the legal directors of the national orgs, so seven

 4 │ orgs, not the ACLU --

 5 │         JUDGE PROCTOR:  I'll have more questions about this,

 6 │ but go ahead.  Make your point.

 7 │         MR. ESSEKS:  Yes.  So in that -- a primary topic of

 8 │ conversation in that call was decision-making structure.  If

 9 │ we're all going to be here together, how do we figure out how to

10 │ go forward?  And it was in that context that the Ladinsky

11 │ counsel folks were -- they had a very different view about how

12 │ we would come together and make a decision.  I think there were

13 │ two individuals who felt like they were in significant control

14 │ of that litigation.

15 │         JUDGE PROCTOR:  Who were those?

16 │         MR. ESSEKS:  Ms. Levi and Mr. Minter.

17 │         JUDGE PROCTOR:  Okay.

18 │         MR. ESSEKS:  And I'll say, they are excellent

19 │ litigators and the most senior people on that team.

20 │         JUDGE PROCTOR:  Did you already know this?  Was this a

21 │ concern you had about --

22 │         MR. ESSEKS:  I have -- yes.  I have worked with

23 │ Mr. Minter and Ms. Levi for a few decades, and I respect them

24 │ very highly, and I also know that they have strong opinions.

25 │         JUDGE PROCTOR:  Yes.  In other words, this wasn't a

1  revelation --

2          MR. ESSEKS:  No.

3          JUDGE PROCTOR:  -- on the eve of going to see Judge

4  Burke.  This was something you knew, this was going to be

5  challenging.

6          MR. ESSEKS:  Yes.

7          JUDGE PROCTOR:  That's what you were signing up for

8  when you agreed to the transfer to the Northern District.  You

9  knew that there would be a first-filed designation and you

10 expected you would be in front of Judge Axon at that time?

11         MR. ESSEKS:  Yes, Your Honor.

12         JUDGE PROCTOR:  And that the two camps were going to

13 have to work together and figure this out?

14         MR. ESSEKS:  Yes.  And that circles us back, Your

15 Honor, to where I started this afternoon, which is I both felt

16 like we've got all this momentum and I want to keep going and I

17 know my team wants to keep going, so we'll just have to find a

18 way to figure this out, and I also felt and had felt for a long

19 time that this was not going to be easy, and I wasn't sure it

20 was going to be workable.  And that Friday afternoon I saw the

21 communication happening in a way that was challenging,

22 disturbing to me, and so that helped me get to a place of, like,

23 we need some space to figure out if we can come up with a

24 decision-making structure in a sense of, like, okay, who's

25 really going forward with this case and who's not?

1          JUDGE PROCTOR:  Fair.  Now, you said that the

2     organizations, these number of organizations that can have

3     philosophical conflicts, leadership conflicts, organizational

4     conflicts, still work together from time to time.

5          MR. ESSEKS:  Absolutely.

6          JUDGE PROCTOR:  At the time, in April of 2022, earlier

7     this year, was there any litigation nationwide in which the

8     groups were working together?

9          MR. ESSEKS:  I don't think so.  That is, the ACLU and

10    Lambda Legal, who were both on the Walker team, we have several

11    other cases where we are co-counsel.

12         JUDGE PROCTOR:  I'm talking about Minter and Levi's

13    organizations and your organization or Lambda Legal in

14    particular.

15         MR. ESSEKS:  Not in 2022.

16         JUDGE PROCTOR:  How about in 2021?

17         MR. ESSEKS:  So, Your Honor, the last time that I

18    remember the national ACLU co-counseling with the National

19    Center for Lesbian Rights is a case in the New Mexico state

20    court system that ended in December of 2014.

21         JUDGE PROCTOR:  So it had been quite a while.

22         MR. ESSEKS:  It has been a while.  And we have not

23    managed to do that on transgender rights issues.

24         JUDGE PROCTOR:  What role, if any, did Judge Burke's

25    setting the Walker case for a ten a.m. conference in Huntsville

 1  have on your decision, at least as you contributed to it, to

 2  voluntarily dismiss?

 3          MR. ESSEKS:  So, Your Honor, I know that it was a

 4  factor for other members of the team.  For me it was not -- it

 5  was not a factor at least -- the simple fact of having to appear

 6  for a status conference that Monday in Huntsville was not by

 7  itself a reason --

 8          JUDGE PROCTOR:  Would you say you're more experienced

 9  in this type of litigation than some of the others --

10          MR. ESSEKS:  I think that is fair.

11          JUDGE PROCTOR:  -- in fairness?

12          MR. ESSEKS:  Yes.  Yes, Your Honor.

13          JUDGE PROCTOR:  You knew when you signed up for this,

14  you might have to get on a plane on a moment's notice.  You

15  might have to just drop what you're doing.  This isn't a

16  marathon, it's a sprint, at least at this stage of the

17  litigation.

18          MR. ESSEKS:  Yes.  And we were plaintiffs and we chose

19  to sue, and we asked for a preliminary injunction, and a status

20  conference is something that happens and something we should

21  welcome.

22          JUDGE PROCTOR:  Did you express that view to the others

23  when this concern about the ten a.m. conference call came up?

24  Conference.  Not conference call, but conference.

25          MR. ESSEKS:  I did.  I will say that I was not on all

1   of the discussions that Friday afternoon.  And the piece of

2   showing up for this status conference on Monday that was

3   relevant to me was that I was confident that we could show up on

4   Monday, and we could have, you know, people with the right

5   knowledge in Judge Burke's courtroom.  What I wasn't confident

6   of was that we could show up and say, Judge, here we are.  We

7   have a vision for how these cases get melded.  And that was --

8   that's the only context in which the Monday status conference

9   was part of my decision to say, we need a break here for a

10  second.

11          JUDGE PROCTOR:  Okay.  So let's tackle that next, the

12  break.  Take me through what you understand the discussions

13  that, first, you're a party to, your team and the Ladinsky team,

14  about whether to dismiss the actions.

15          MR. ESSEKS:  Okay.  So I was not part of any

16  conversations with anyone from the Ladinsky team directly about

17  dismissal.  I had discussions with some people on my team.

18          JUDGE PROCTOR:  Did you ask Ms. Hartnett to handle

19  those discussions?

20          MR. ESSEKS:  I know that Ms. Hartnett was involved in

21  those discussions.  I believe that Mr. Minter and Ms. Levi

22  reached out to Ms. Hartnett, and they had discussions.  I did

23  not assign it to her.

24          JUDGE PROCTOR:  I'm not suggesting you assigned it to

25  her.  I'm just wondering if you asked her to --

 1          MR. ESSEKS:  I didn't.  Again, I was not a full

 2   participant -- I'm not distancing myself from the decision, I

 3   agreed with the decision, but I was not a full participant in

 4   all the discussions.

 5          JUDGE PROCTOR:  I think a diplomatic way of saying this

 6   is I think Ms. Hartnett's view was your team thought it would go

 7   better if she was having those discussions with them as compared

 8   to you.  Would that be a fair characterization?

 9          MR. ESSEKS:  I'm sure that is correct.  And I'm sure

10   that was -- I'm sure that I assumed that that was something --

11   that was a choice made by Mr. Minter and Ms. Levi.

12          JUDGE PROCTOR:  All right.  Fair enough.  That may be

13   the spin I didn't quite catch, but that makes sense.

14          But anyway, you were at least speaking into your team's

15   views about these things; correct?

16          MR. ESSEKS:  I was.

17          JUDGE PROCTOR:  Tell me what your team discussed, then,

18   about this whole issue of should we dismiss, what are the

19   factors, what's the consequence.

20          This is your narrative question.  Just take it from

21   there.

22          MR. ESSEKS:  Yes.  Understood.

23          And so, Your Honor, here's what I'm remembering from

24   that Friday.  I remember having a conversation with

25   Mr. Strangio, a senior lawyer on my staff, and I remember having

1   at least one conversation, probably more, with Ms. Hartnett.

2   And it's very likely that I was on a call with a larger group of

3   the team, but I'm not sure.  I don't have a clear memory of

4   that.

5            I remember talking with Mr. Strangio and separately

6   with Ms. Hartnett about the range of factors we've discussed.

7   The challenges in working together and the range of challenges

8   in trying to put the cases together in terms of which plaintiffs

9   raising which factual issues; which claims.  There are

10  differences in the claims between the two cases.  Some of those

11  are claims that they felt strongly should be in there and that

12  we felt strongly should not be in there.  We had different

13  experts.  There was a whole lot of stuff that needed to be

14  worked.  We talked about that.

15           I'm sure we talked about the initial assignment of

16  Walker to Burke and then the move of Ladinsky from Axon to

17  Burke.  I'm sure we talked about the assignment -- the fact that

18  both cases were now in front of Judge Burke and also talked

19  about a concern from one of our plaintiff families.

20           And I'm sure we also talked about the concern that

21  we've just discussed, about the status conference on Monday and

22  concerns that other folks on the team had about whether we could

23  responsibly show up there.

24           JUDGE PROCTOR:  What was your assessment or your team's

25  assessment -- take those one at a time -- about any differences

1    between Judge Axon and Judge Burke in terms of the draw?

2         MR. ESSEKS:  So, Your Honor, I knew and still know very

3    little about either one.  Our team had not done any significant

4    research prior to those couple of days about judges in the

5    Northern District, because that's not where we were headed.  And

6    this is -- this kind of information and intelligence is what we

7    and many folks rely on local counsel for.  Our local counsel in

8    this case was the ACLU of Alabama.  And one of the wonderful

9    things about the ACLU is that we have a structure where we have

10   a national office, and then we have a local office in every

11   state.  And the typical situation in ACLU litigation is that the

12   ACLU of whatever the state is is co-counsel, and they bring very

13   significant and very deep knowledge of the local practice and

14   the local judges.

15        JUDGE PROCTOR:  They take a grassroots view, the

16   situation on the ground, so to speak.

17        MR. ESSEKS:  Yes.  And so the ACLU of Alabama team did

18   not have that level of knowledge and expertise that I was used

19   to and that I was expecting, and I figured that out as we went

20   along and realized too late that we did not have the knowledge

21   that we needed.

22        JUDGE PROCTOR:  So you did not have in your mind a

23   material distinction between Axon and Burke as far as their

24   judicial philosophy, their approach to what your case would be?

25        MR. ESSEKS:  Well, Your Honor, so I did not have

 1  specific information.  And my team -- I know that there was some

 2  research being done, certainly about Judge Axon when we were

 3  still in the Middle District and thought that a transfer to the

 4  Northern District would land us in front of her.  I did learn

 5  some information about Judge Axon and Judge Burke from Ladinsky

 6  counsel.

 7          JUDGE PROCTOR:  What did they say?

 8          MR. ESSEKS:  So we heard from Ladinsky counsel that

 9  Judge Axon was in their view a good draw, and that Judge Burke

10  would not be a good draw.

11          JUDGE PROCTOR:  Who told you that?

12          MR. ESSEKS:  So I believe the information about Judge

13  Axon came through Asaf Orr by email to Mr. Charles, but I don't

14  believe that Mr. Orr's -- he did not have that information

15  himself.  I believe he got it from their local law firm.

16          JUDGE PROCTOR:  And which firm is that?

17          MR. ESSEKS:  Lightfoot Franklin.

18          JUDGE PROCTOR:  All right.  And you don't know a

19  specific lawyer?  Because we need to ask some questions.  I'm

20  trying to figure out what was the source of this information.

21          MR. ESSEKS:  So I don't know where that information

22  about Judge Axon came from, that is, where Mr. Orr got that

23  information.

24          JUDGE PROCTOR:  But your understanding is that somebody

25  at Lightfoot communicated in such a way that Mr. Orr discovered

1    and then passed along to you that Axon was a good draw.

2              MR. ESSEKS:  Correct.

3              JUDGE PROCTOR:  And that Burke was not a good draw.

4              MR. ESSEKS:  Not -- so that email that I'm remembering

5    did not discuss Judge Burke.

6              JUDGE PROCTOR:  That was a separate source of

7    information?

8              MR. ESSEKS:  Separate conversation.

9              JUDGE PROCTOR:  Tell me about that.

10             MR. ESSEKS:  So the evening I think it was of Wednesday

11   the 13th of April -- so this is at a point where judge -- Chief

12   Judge Marks has issued the order to show cause, and we're

13   preparing a response to that.  As mentioned earlier, one of the

14   things -- one of the arguments we were preparing to make was

15   that our case was materially further along because we had filed

16   a PI motion.

17             And given the sort of -- given the complicated

18   relationship between some of the organizations, I wanted to flag

19   for the Ladinsky team that we were going to be filing a document

20   in federal court saying in some sense that our case was further

21   along than theirs and our case was better than theirs, and I did

22   not want them to have a negative reaction to that.  So I asked

23   for a call with people from the Ladinsky team to be set up for

24   that evening.

25             JUDGE PROCTOR:  Who was on that call?

```
 1              MR. ESSEKS:  I was on that call.  Ms. Nowlin-Sohl was
 2   on the call.  I believe Mr. Charles was on the call but I'm not
 3   sure.  From the Ladinsky team, Mr. Orr, someone from SPLC,
 4   and --
 5              JUDGE PROCTOR:  Do you know who that was?
 6              MR. ESSEKS:  I can't remember the name, Your Honor.
 7              JUDGE PROCTOR:  Okay.
 8              MR. ESSEKS:  And I believe that Ms. Eagan was on the
 9   phone call as well.
10              JUDGE PROCTOR:  Was there any documentation about this
11   call?  An email follow-up or anything like that?
12              MR. ESSEKS:  I don't think so, no.
13              JUDGE PROCTOR:  So we have some people that were
14   made -- was it someone in the Ladinsky case who made an
15   appearance -- all these people made appearances, I guess, is my
16   question.
17              MR. ESSEKS:  If I could see the list --
18              JUDGE PROCTOR:  Mr. Minter wasn't on this call?
19              MR. ESSEKS:  No.
20              JUDGE PROCTOR:  Okay.
21              JUDGE WATKINS:  Mr. McCoy?
22              JUDGE PROCTOR:  Mr. McCoy?
23              MR. ESSEKS:  No.  It's -- could I see the list of --
24              JUDGE PROCTOR:  Yes.  Whatever you need to refresh your
25   recollection.  And all we're trying to do is figure out who, if
```

 1  anyone, we need to follow up and ask questions about this,

 2  because it's important.

 3          MR. ESSEKS:  Diego Soto, Your Honor.

 4          JUDGE PROCTOR:  All right.  Mr. Soto.  Thank you.

 5          MR. EGGLESTON:  Your Honor, I just showed him the

 6  original order in the case.

 7          JUDGE PROCTOR:  Thank you.

 8          So there's this call.  And you're not wanting to catch

 9  them flat footed with this position that you're contemplating

10  taking, that we're further along, our motion ought to be heard

11  first, we ought to be heading out first, we don't need to wait

12  on them.

13          MR. ESSEKS:  Yes, Your Honor.

14          JUDGE PROCTOR:  All right.  And what occurred in this

15  call that's germane to what you're telling us about, about Judge

16  Burke?

17          MR. ESSEKS:  Someone from the Ladinsky team said in

18  that context that they did not think that Judge Burke would be a

19  good draw.

20          JUDGE PROCTOR:  Do you remember who said that?

21          MR. ESSEKS:  I believe it was Ms. Eagan.

22          JUDGE PROCTOR:  Do you remember what she said about

23  that?

24          MR. ESSEKS:  Further than -- my memory is that it

25  was -- that he would not be a good draw.  I don't remember --

1  I'm not saying those were her words, but that's the substance,

2  the gist of what she said.

3          JUDGE PROCTOR:  Okay.  So let me give you an analogy.

4  I'm talking to a colleague on the bench who tells me, so and

5  so -- I've had problems with this lawyer.  I don't accept that

6  at face value.  I make my own judgment about a lawyer.  There

7  could have been a one off; it could have been a bad day for the

8  judge or the lawyer.  What did that mean to you, and what did

9  you do about that information, if anything?

10          MR. ESSEKS:  Well, at the time, Your Honor, the

11  information was kind of irrelevant to me because we were still

12  in the Middle District, and so we --

13          JUDGE PROCTOR:  You said it was irrelevant to you?

14          MR. ESSEKS:  At that time, that Wednesday evening, it

15  didn't make any difference to me because I thought two things:

16  We were still trying to stay in the Middle District, and I

17  believe it's true that by that point, Ladinsky had been assigned

18  to Axon, although perhaps that didn't happen until the next day.

19  I'm not sure.

20          JUDGE PROCTOR:  So how did Burke come up if you're

21  still in the Middle District and the case hadn't even gone over?

22          MR. ESSEKS:  Yes.  And so, Your Honor, I totally get

23  that question, and I don't remember.

24          JUDGE PROCTOR:  Did other judges from the Northern

25  District come up besides Burke and Axon?

 1          MR. ESSEKS:  I don't remember.  It's possible.  I don't

 2   remember.

 3          JUDGE PROCTOR:  And your best recollection is this

 4   occurred before April --

 5          MR. ESSEKS:  It was Wednesday evening, the 13th.

 6          JUDGE PROCTOR:  13th.  Did you view that to mean that

 7   there was a -- that some -- at least someone on the call had a

 8   reason to believe that if the case went to the Northern

 9   District, it could end up with Burke?

10          MR. ESSEKS:  No, Your Honor.  I don't think that's the

11   context in which it came up.

12          JUDGE PROCTOR:  I'm struggling with what context it

13   could have come up in.

14          MR. ESSEKS:  Yes.  And it may well be, Your Honor, that

15   Ladinsky had not yet been assigned to a judge.  I think there

16   was initial -- there was a judge initially assigned to Ladinsky,

17   which I think was Judge Manasco, who then recused herself.  And

18   then I think it was assigned to a magistrate judge, and I assume

19   the State declined to consent to litigation before that

20   magistrate judge.  And then it went to Axon, and I think that

21   Axon was not assigned until the next day.  So it may have been

22   in the context of a discussion about the Ladinsky team talking

23   about who they might be assigned to, but I'm not sure that

24   that's what was going on.

25          JUDGE PROCTOR:  Well, it was on April 13 that Judge

1   Marks entered the show-cause order; right?

2            MR. ESSEKS:  Correct.

3            JUDGE PROCTOR:  At that time you knew that Judge Axon

4   had the case, because as I recall your declaration and others,

5   you thought you would be going -- having your case go to Judge

6   Axon at that point.  Am I misrecollecting that?

7            MR. ESSEKS:  On the 13th, I don't think so, Your Honor.

8            JUDGE PROCTOR:  All right.

9            MR. ESSEKS:  Actually, it could be, Your Honor.  I'm

10  not sure.

11           JUDGE PROCTOR:  I think you're right.  I think,

12  actually, the case wasn't assigned to Judge Axon until the 14th

13  of April.  So I think you're actually right.  Judge Watkins just

14  pointed that out.

15           Look.  I know your father's in the hospital.  We're

16  going to get you out of here today.

17           MR. ESSEKS:  Thank you.

18           JUDGE PROCTOR:  But we've got to be kind to our court

19  reporter.  We've been going two hours and 20 minutes.  We're

20  going to take a short break and resume.  I promise you, though,

21  we're committed to getting you back with your family.

22           MR. ESSEKS:  Great.  Thank you very much.

23           JUDGE PROCTOR:  Ten minutes.

24      (Recess was taken from 4:20 p.m. until 4:33 p.m., after

25       which proceedings continued, as follows:)

1          JUDGE PROCTOR:  All right.  Ready to resume,

2    Mr. Esseks?

3          MR. ESSEKS:  Yes.

4          JUDGE PROCTOR:  Anything else you recall about

5    discussions surrounding judges in the northern or middle

6    districts about who would be a good draw or a bad draw?

7          MR. ESSEKS:  Not general discussions, no, Your Honor.

8          JUDGE PROCTOR:  Have you been able to think more about

9    the timing of the conversations you're recalling?  I'm still

10   struggling with wondering why -- understanding why Judge Burke's

11   name would have come up when you weren't even certain you were

12   going to the Northern District, and neither Judge Axon nor Judge

13   Burke even had the case at that point.

14         MR. ESSEKS:  Your Honor, I don't have a clear answer to

15   that.  I believe that we -- the only thing that makes any sense

16   to me is that we were talking about potential assignments.

17         JUDGE PROCTOR:  The what if?

18         MR. ESSEKS:  Yeah.

19         JUDGE PROCTOR:  Who it might be?

20         MR. ESSEKS:  Yes.

21         JUDGE PROCTOR:  But what we understand is even before

22   Walker got transferred and assigned to Judge Burke, you were

23   told Judge Burke was a bad draw.

24         MR. ESSEKS:  Yes.

25         JUDGE PROCTOR:  And was that the sentiment of others in

1    the case as well, to your knowledge?

2            MR. ESSEKS:  Well, Your Honor, I don't remember any

3    discussions about Judge Burke prior to that Friday.  And --

4            JUDGE PROCTOR:  You mean that Wednesday?

5            MR. ESSEKS:  Well, I don't remember any discussions on

6    our team prior to Friday about Judge Burke.  And, you know, I'm

7    just circling back to the challenge that we had on our team,

8    which is that we didn't have local intelligence.

9            JUDGE PROCTOR:  All right.

10           MR. ESSEKS:  So the information that I was getting from

11   the Ladinsky team was more information -- more sort of what I

12   believed to be local information than I had from my team.

13           JUDGE PROCTOR:  All right.

14           JUDGE WATKINS:  But I understand that you have raised

15   the -- threats is probably too strong a word, but you had raised

16   the potential that you were going to -- that your team might try

17   to take the lead over the Ladinsky team on Wednesday because you

18   already had a motion for TRO/PI pending; is that right?

19           MR. ESSEKS:  Well, take the lead, Your Honor, only in

20   the following sense:  That what we were -- the point of that

21   Wednesday evening call from my perspective was simply to alert

22   the Ladinsky team that in Walker in the Middle District, we were

23   going to file a brief responding to Chief Judge Marks' order to

24   show cause in which we were going to say, Your Honor, the

25   first-filed rule shouldn't be applied here because Walker is

 1  further advanced than Ladinsky is because we had filed a PI

 2  motion and they had not.

 3          And that's the only way -- the only context in which we

 4  were making a comparison, and I wanted them to hear that from us

 5  as opposed to read it in the papers we filed because I did not

 6  want to contribute to tension.

 7          JUDGE BEAVERSTOCK:  Is that kind of because of your

 8  experience with those other entities in the past?

 9          MR. ESSEKS:  Yes, Your Honor.

10          JUDGE PROCTOR:  All right.  But then you-all actually

11  do end up going to the Northern District.

12          MR. ESSEKS:  Yes.

13          JUDGE PROCTOR:  For the reasons you've already

14  explained, you are now dealing with the tension of wanting to

15  move the case forward expeditiously, but also concern about the

16  ability to manage and execute the litigation based upon the

17  problems with the personalities and groups that you've already

18  described.

19          MR. ESSEKS:  Correct.

20          JUDGE PROCTOR:  And now we're to the point where we'd

21  like to ask you about the decision to dismiss, the actual

22  decision to dismiss.  I realize your side was more collaborative

23  than the Ladinsky side, but who was involved in making the

24  decision to dismiss?  Not informing the decision, but making the

25  decision.

 1          MR. ESSEKS:  So I think that that was -- I was in that

 2  group; Ms. Hartnett was in that group; Ms. Borelli, Ms. Egyes,

 3  and Ms. Faulk from the ACLU of Alabama.  So the legal directors

 4  or lead lawyers from each of the organizations.  But also it was

 5  a discussion that involved a broader range of people from the

 6  team.  It certainly involved Mr. Strangio and Ms. Nowlin-Sohl

 7  from my team.

 8          JUDGE PROCTOR:  But what -- at what point do you

 9  understand the decision was made, we are dismissing the Walker

10  action under Rule 41?

11          MR. ESSEKS:  Late on Friday afternoon.

12          JUDGE PROCTOR:  At that point, what communications had

13  occurred with the Ladinsky side?

14          MR. ESSEKS:  So at that point, I had not spoken to

15  anybody from the Ladinsky team other than on that Wednesday

16  evening conference call.

17          JUDGE PROCTOR:  That you already told us about.

18          MR. ESSEKS:  Yes.  Earlier on Friday afternoon, there

19  was a call with some members of the Walker team and some members

20  of the Ladinsky team to start talking about how we might put the

21  cases together.  I mentioned that earlier.  Ms. Nowlin-Sohl was

22  on that call, and I'm not sure who else from our team.  I know

23  she was on because I remember getting a debrief from her about

24  the call.

25          JUDGE PROCTOR:  Was there a reason you were not on that

1  call?

2          MR. ESSEKS:  Yes.  I was in St. Louis visiting family.

3          JUDGE PROCTOR:  All right.  And so the main purpose of

4  that call as you understood it was, can we and how are we going

5  to work together.

6          MR. ESSEKS:  It was the beginning of that discussion,

7  Your Honor.

8          JUDGE PROCTOR:  And how would you characterize the

9  description of that conference that you received?

10         MR. ESSEKS:  Well, so I think that the -- I think that

11  there was a fairly constructive discussion that happened.  Prior

12  to that discussion happening, my understanding is that

13  Mr. Charles reached out -- or maybe Ms. Nowlin-Sohl, maybe both

14  of them -- to the folks on the Ladinsky team to propose a call.

15  And I believe that Mr. Charles got a call from Ms. Levi from the

16  Ladinsky team, saying, in essence, we don't have time for this.

17  I can give you the answers to all of your questions.  A call is

18  a waste of time.

19         And that was, to me, an example of the kind of --

20         JUDGE PROCTOR:  This didn't surprise you.

21         MR. ESSEKS:  It did not surprise me.  It was the kind

22  of challenge that I anticipated.  Because in any case that

23  involved that many different entities, you know, team calls is

24  the way you get anything done.  And so that was a bad omen in my

25  mind.

1          JUDGE PROCTOR:  Okay.  What is the first point at which
2    you recall the dismissal word coming up?
3          MR. ESSEKS:  Sometime that Friday afternoon, Your
4    Honor.  I can't place it in time more specifically from that.
5          JUDGE PROCTOR:  And who was the first person on your
6    side to propose, have we considered voluntarily dismissing?
7          MR. ESSEKS:  Your Honor, I don't know who raised it
8    first on the team.  The first person that I heard about it from
9    I believe was Mr. Strangio, who was relaying to me a
10   conversation that he had had with other members of the team.
11         JUDGE PROCTOR:  Of the Walker team?
12         MR. ESSEKS:  Correct.
13         JUDGE PROCTOR:  Had you, yourself, independently
14   thought about that prospect before hearing it from the team?
15         MR. ESSEKS:  I think I had, Your Honor, and I was -- so
16   I know that that Friday afternoon, I was concerned about Rule 41
17   and concerned about the possibility of the State answering and
18   of then being stuck in a case with all of these different
19   parties and not having a way forward.  And I don't remember if I
20   came up with that on my own or if that was an idea put in my
21   head by other people.  I just don't remember.
22         JUDGE PROCTOR:  All right.  How did you balance out in
23   your mind the tensions there?
24         MR. ESSEKS:  In terms of getting to a place of
25   saying --

```
 1          JUDGE PROCTOR:  I think you've already spoken to this,
 2   but I just want to make sure I'm giving you a chance -- I'm not
 3   sure you closed the loop on it.  How do you balance out, we need
 4   to get this case litigated, we need to defeat this statute, we
 5   need to dismiss this case, which means we're not going to get as
 6   quick a result as we would like?
 7          MR. ESSEKS:  So I -- obviously, Your Honor, I ended up
 8   in a place of saying that the better decision was to dismiss.
 9   And I think I felt that -- I was worried, as I said earlier,
10   about getting stuck.  And dismissal -- my understanding was
11   dismissal put our clients in the same position that they would
12   have been in had we never filed the lawsuit in the first place.
13   Which meant that they could or we could on their behalf file a
14   new case potentially on Monday if the discussions over the
15   weekend had gone well.
16          JUDGE PROCTOR:  At the time that you and your team
17   decided to dismiss the case, were you satisfied that some form
18   or fashion, this challenge to the statute was going to go
19   forward somewhere by someone?
20          MR. ESSEKS:  Yes, Your Honor, in the sense that I was
21   certainly sure that if the other groups decided for whatever
22   reason not to go forward, something that I did not expect them
23   to do, but if they weren't going to do it, we were absolutely
24   going to refile and try to take down the statute.  I assumed
25   that the other groups wanted to go forward just as we wanted to
```

1    go forward, and so, yes, I assumed that -- I was confident that

2    there would be litigation filed that would attack that statute

3    in short order.  It just wasn't clear to me who it was going to

4    be.

5            JUDGE PROCTOR:  Did you get any sense that the State of

6    Alabama was aware of these concerns you had about filing an

7    answer or motion for summary judgment and locking you out of the

8    ability to self-determine voluntary dismissal?

9            MR. ESSEKS:  Your Honor, no.  We did not call up the

10   Attorney General's office and say, hey --

11           JUDGE PROCTOR:  No, I know.  I didn't know if you got

12   an independent --

13           MR. ESSEKS:  No.  I had no basis from the Attorney

14   General's office to be worried about --

15           JUDGE PROCTOR:  This is just speculative, what if.

16           MR. ESSEKS:  This was just a general concern that,

17   like, I knew this was a thing -- I knew this was an option that

18   we had.  I knew that the option could be closed by actions that

19   we didn't control, and so that was a significant contributor to

20   the urgency that I felt around making a decision and giving us

21   the space to figure this stuff out.

22           JUDGE PROCTOR:  And I'm just curious if there was

23   anything more to it than that.

24           I've been on the bench 19 years.  I don't know many

25   defendants who have come in and said, Judge, we'd like to file

1  an answer within a week, not within the time frame provided by

2  the rules.  You didn't have a factual basis for being concerned

3  about that?  It was just a what if?

4       MR. ESSEKS:  Yes.  It's a thing that I know some

5  defendants do.  And I had no basis to think that that was going

6  to happen in this case, but I was worried --

7       JUDGE PROCTOR:  What do some defendants do?  I'm not

8  following.

9       MR. ESSEKS:  That is, I believe that some defendants

10 file an early answer in order to take away the plaintiffs'

11 right --

12       JUDGE PROCTOR:  Let me be clear about what I'm asking

13 about.  Let me just go right at you and ask it this way.

14       What I'm hearing you saying is we didn't -- we were

15 concerned about getting Judge Burke, and we didn't know if we --

16 one, we were getting locked in with working with these people

17 who had been problematic over the years, and at this point we

18 hadn't worked with them in eight years because of some of those

19 things.  And two, we might get locked into Judge Burke.  Were

20 you concerned that Alabama might say, they have a bad draw, we

21 have a good draw, let's answer so they're locked in to having

22 Judge Burke?  Was that a concern?

23       MR. ESSEKS:  Your Honor, I think it was in the mix.  It

24 was not my primary concern by a long shot.

25       JUDGE PROCTOR:  But that was a concern?

1           MR. ESSEKS:  It was, yes, because -- yes.

2           JUDGE PROCTOR:  All right.  With the information that

3    you had from Ladinsky counsel about Burke or Axon, did you take

4    any steps to verify or confirm or question their conclusion that

5    one's a good draw, the other is a bad draw?

6           MR. ESSEKS:  There was -- I believe there was at least

7    some additional research done about Judge Burke on my team.

8           JUDGE PROCTOR:  I'm sorry.  Say it again.

9           MR. ESSEKS:  My team did some additional research about

10   Judge Burke.

11          JUDGE PROCTOR:  Okay.  What was that?

12          MR. ESSEKS:  The only thing that sticks in my mind,

13   Your Honor, is that apparently -- I believe I got this from a

14   document put out by the Alliance for Justice -- it was prepared

15   at the time that Judge Burke was nominated to be a federal

16   judge, and it's a document that asserts that Judge Burke had a

17   portrait of Jefferson Davis in his chambers.

18          JUDGE PROCTOR:  All right.  And how did you think that

19   correlated to being a bad draw?  Not trying to put words in your

20   mouth.  I'm trying to ask.

21          MR. ESSEKS:  I understand, Your Honor.  As a plaintiff

22   civil rights lawyer, that did not seem to be a good fact to me.

23          JUDGE PROCTOR:  I understand.  It was as simple as

24   that.

25          MR. ESSEKS:  Correct.

```
 1              JUDGE PROCTOR:  Anything else about Judge Burke that
 2  you confirmed or sought information about?
 3              MR. ESSEKS:  That's all I remember, Your Honor.
 4              JUDGE PROCTOR:  All right.  Was there any discussion
 5  about, hey, we think these people are off on their legal
 6  positions from time to time.  We think they emphasize the wrong
 7  claims; the wrong approach.  Before we just take what they're
 8  telling us at face value, let's verify it.
 9              MR. ESSEKS:  Verify the information about Judge Burke?
10              JUDGE PROCTOR:  About Burke or Axon.
11              MR. ESSEKS:  Well, I mean, two things, Your Honor.  One
12  is we did do at least a little bit of information -- three
13  things.  We did a little bit more research; two, the time frame
14  was short; three, I was in a position where, as I had mentioned
15  earlier, the sort of local intelligence coming from the Ladinsky
16  team seemed to be -- was certainly in greater supply than it was
17  for my team.
18              JUDGE PROCTOR:  They had more experienced local --
19              MR. ESSEKS:  Counsel.  Absolutely.
20              JUDGE PROCTOR:  Yes.  Fair enough.  So you were not --
21  were you on the Saturday call?
22              MR. ESSEKS:  Yes, Your Honor.
23              JUDGE PROCTOR:  Okay.  Tell me about -- how long did it
24  last?
25              MR. ESSEKS:  I believe it was an hour or less.
```

1          JUDGE PROCTOR:  And I think you've already given me the

2   names of who was on that.

3          MR. ESSEKS:  I think so.

4          JUDGE PROCTOR:  Was there any specific information

5   discussed about how this case was going to be reinitiated?  And

6   when I say this case, I meant this issue, this challenge to the

7   statute.

8          MR. ESSEKS:  Well, the discussion, Your Honor, focused

9   on whether and how we would work together.  So it was

10  significantly focused on decision-making structure and issues

11  like this.

12         JUDGE PROCTOR:  I take it at some point, though,

13  everyone concluded, we can't work together.  This isn't going to

14  work.

15         MR. ESSEKS:  Well, it was a tense call.  It was --

16         JUDGE PROCTOR:  Were voices raised?

17         MR. ESSEKS:  It was acrimonious.

18         JUDGE PROCTOR:  Fair.  When it became acrimonious, did

19  everyone agree that, hey, we're not going to be able to work

20  this out, we're not going to be able to refile this together?

21  Was that a consensus?

22         MR. ESSEKS:  Well, not -- so it was an uncomfortable

23  call.  I don't remember exactly how we left it, but I certainly

24  came away from the call feeling that this would be super hard.

25  And I proceeded to have discussions, first one on one with each

1    of the legal directors from the --

2              JUDGE PROCTOR:  After the call, you surveyed everyone?

3              MR. ESSEKS:  After the call, I made a series of calls.

4    And I spoke to my boss and I spoke -- I spoke to some other

5    people on my team, and then I had a call with just the ACLU

6    team.

7              JUDGE PROCTOR:  Who's your boss?

8              MR. ESSEKS:  A person named Louise Melling.

9              JUDGE PROCTOR:  Okay.  I want to get to those

10   conversations in a moment, but I still want to wrap up the

11   conference call with the different constituents in the two cases

12   on that Saturday that lasted an hour or less.

13             Was there a conclusion reached, we're not going to be

14   able to work together, or was that just left open and we both

15   had to make our own decisions?

16             MR. ESSEKS:  Well, Your Honor, I think that we left the

17   call without a plan for how we would work together, but also

18   without crystal clarity that we were not working together.  We

19   left it, I think, that we would get back in touch.

20             JUDGE PROCTOR:  All right.  And that's when you

21   surveyed your team to say, what do you think?

22             MR. ESSEKS:  Yes, Your Honor.

23             JUDGE PROCTOR:  And what did they think?

24             MR. ESSEKS:  They shared my view that this was not

25   going to work.

1    JUDGE PROCTOR:  At what point did you decide, we're

2  out, we're not refiling Walker in any shape or form?

3    MR. ESSEKS:  Later that afternoon on Saturday.  So I

4  spoke to a range of people individually, then I had a call with

5  just the ACLU team, and then we had a call with the full Walker

6  team.  And on that call, I said, look, I am seriously

7  considering having the national ACLU not participate in any next

8  stage of this litigation, but I need to talk more.  And I told

9  the other groups, you should think -- you should do whatever

10 internal discussions you need to have, and we'll reconvene

11 later.

12    So that afternoon I spoke again with the national ACLU

13 team.  We decided we were not going to go forward.  I informed

14 the rest of the Walker team that the national ACLU was not going

15 to go forward, and then heard subsequently from Lambda that they

16 were also not going to go forward.

17    JUDGE PROCTOR:  That same day?

18    MR. ESSEKS:  That same afternoon.  And that afternoon

19 as well heard from Cooley that they were not going to go

20 forward.

21    JUDGE PROCTOR:  And any other -- was there anyone from

22 the Walker team that was still considering going forward as of

23 midnight Saturday?

24    MR. ESSEKS:  I think the Transgender Law Center was

25 still having internal discussions about what to do, and the ACLU

 1   of Alabama was also in that place.  I think the ACLU of Alabama,

 2   being on the ground here in Alabama, felt an extra degree of

 3   commitment and urgency around being part of fighting this law.

 4        JUDGE PROCTOR:  And what I'm perceiving as I hear you

 5   and others talk about this is Ms. Faulks may not have had the

 6   same experience -- since she was new at the ACLU Alabama, may

 7   not have had the same concerns about working with the other

 8   side?

 9        MR. ESSEKS:  Yes.  Certainly she was in a position to

10   have an independent relationship with the other organizations,

11   and her organization felt even more keenly than we did the need

12   to participate.

13        JUDGE PROCTOR:  Were you informed at some point, then,

14   that everybody on the Walker side, Walker team, was out and that

15   Ladinsky was going to go forward with some filing, whatever that

16   may look like?  Ladinsky counsel.  Not the Ladinsky plaintiffs,

17   but --

18        MR. ESSEKS:  On Sunday morning I wrote to everyone who

19   was on that Saturday morning call, the legal directors of the

20   national orgs.

21        JUDGE PROCTOR:  On both the Walker and the Ladinsky

22   teams?

23        MR. ESSEKS:  Correct.  And added in Tish Faulks.  And

24   said that ACLU National, Lambda Legal, and Cooley were stepping

25   back.  We would not file new litigation.  And that TLC was still

1    in the process of thinking through what it was going to do, and

2    that the ACLU of Alabama was interested in talking to Ladinsky

3    counsel about the possibility of ACLU of Alabama joining them in

4    a new lawsuit.

5          JUDGE PROCTOR:  Have you seen any media reports about

6    the coverage of this case in which Ms. Eagan was quoted as

7    saying the case would be refiled?

8          MR. ESSEKS:  I have seen that.  Yes, Your Honor.

9          JUDGE PROCTOR:  Were you aware of it at the time, that

10   she was saying the case would be refiled?

11         MR. ESSEKS:  No, Your Honor.  I became aware of that in

12   connection with the order that Judge Burke filed in Walker on

13   that Monday.

14         JUDGE PROCTOR:  So you knew at least by then, Ms. Eagan

15   was purportedly telling the media that the case would be refiled

16   imminently?

17         MR. ESSEKS:  Yes.  And that was not a surprise.  I

18   fully expected the Ladinsky counsel team to file a new lawsuit.

19         JUDGE PROCTOR:  Was that discussed before that Monday

20   when you saw Judge Burke's order, that we're going forward,

21   we're going to refile?

22         MR. ESSEKS:  Your Honor, I think the premise of the

23   meeting on Saturday morning was that some mix of us was going to

24   file a new lawsuit, but the question was, which of us.

25         JUDGE PROCTOR:  It's going to be both or one or the

1    other.  Those are the three options.

2            MR. ESSEKS:  Or some combo.

3            JUDGE PROCTOR:  Well, that would be both or --

4            MR. ESSEKS:  Yes.

5            JUDGE PROCTOR:  I take it what you're saying there is

6    there may be a couple of groups that drop out.

7            MR. ESSEKS:  Yes.

8            JUDGE PROCTOR:  And there could be some subset of the

9    two groups go forward in unity.

10           MR. ESSEKS:  Yes, indeed.  So that Sunday morning, I

11   thought it was entirely possible that, for example, the ACLU of

12   Alabama would join the Ladinsky counsel group in what became

13   Ecknes-Tucker.  That did not happen, obviously, but I thought

14   that was a possibility.

15           JUDGE PROCTOR:  On that Saturday or Sunday, was there

16   ever discussion from the Walker team, the Ladinsky team, or both

17   about what a new lawsuit would look like?  Where and who?

18           MR. ESSEKS:  There was a little discussion of that on

19   Saturday.  We did not get very far.

20           JUDGE PROCTOR:  What was discussed?

21           MR. ESSEKS:  The discussion was what plaintiffs to use.

22           JUDGE PROCTOR:  Was that our plaintiffs versus your

23   plaintiffs or just new plaintiffs?

24           MR. ESSEKS:  It was existing plaintiffs or new

25   plaintiffs or a combo of existing plaintiffs and new plaintiffs.

 1   It was a question of existing claims, all of the existing claims

 2   from the two cases, or narrowing some of them down.  But we did

 3   not get into -- we did not get very far into those discussions.

 4          JUDGE PROCTOR:  Did it come up at all in that

 5   conversation about where to file in terms of district or who to

 6   seek in terms of judge?

 7          MR. ESSEKS:  There was discussion about the possibility

 8   of filing in the Northern District and of filing in the Middle

 9   District.

10          JUDGE PROCTOR:  What was discussed about that?

11          MR. ESSEKS:  Just that they were -- that they were

12   options.

13          JUDGE PROCTOR:  Did anybody advocate one position or

14   the other or explain advantages or disadvantages about one

15   position or the other?

16          MR. ESSEKS:  Your Honor, I am not remembering details

17   of that.  I'm sure -- I believe there were discussions.  I don't

18   remember who was saying what.

19          JUDGE PROCTOR:  All right.  But you think judges did

20   come up, you just can't recall who or what was said?

21          MR. ESSEKS:  Yes.

22          JUDGE PROCTOR:  All right.  On Wednesday you told us

23   that -- was Ms. Eagan on that call?

24          MR. ESSEKS:  No.  You mean the Saturday call or the

25   Wednesday call?

```
 1              JUDGE PROCTOR:  I'm sorry.  The Saturday call.  Yes.

 2              MR. ESSEKS:  The Saturday call, Ms. Eagan was not on

 3   that call.

 4              JUDGE PROCTOR:  That wasn't any of the law firms, that

 5   was just the organizations' directors.

 6              MR. ESSEKS:  Correct.

 7              JUDGE PROCTOR:  But Ms. Eagan had told you and others

 8   on Wednesday, Axon, good draw; Burke, bad draw.  That never came

 9   up again on Saturday in terms of if we're going to refile this,

10   that's something we ought to be thinking about?

11              MR. ESSEKS:  I think there were discussions, Your

12   Honor.  I can't remember exactly what -- who was where.  There

13   was discussion about filing in the Northern District and whether

14   a case could be filed in the Southern Division of the Northern

15   District, if there is such a thing, as opposed to the Huntsville

16   division.

17              JUDGE PROCTOR:  There's a central jury area that

18   contains the Southern Division.

19              MR. ESSEKS:  And there was a discussion about whether

20   to be in the Middle District.

21              JUDGE PROCTOR:  And the reason for filing in a division

22   would be judge driven?  That's a question.  I'm not making the

23   assertion.

24              MR. ESSEKS:  Yes.

25              JUDGE PROCTOR:  All right.  Let me ask you this,
```

1  because I don't want to belabor your time here.  I want you back

2  to your family.  If you recall anything more about that, would

3  you notify your counsel so we can follow up with you about that?

4         MR. ESSEKS:  Of course.

5         JUDGE PROCTOR:  I'm going to return to a question I

6  think I asked earlier.  I just want to make sure I got the

7  answer that you -- a clear answer.

8         You were satisfied that you're not leaving your clients

9  hanging because you knew their interests were going to be

10 litigated, you just weren't sure how or where.  Is that a fair

11 statement?

12        MR. ESSEKS:  Yes, Your Honor.  And I'm gratified that

13 Judge Burke issued a wonderful order --

14        JUDGE PROCTOR:  Hashtag irony?

15        MR. ESSEKS:  Hashtag irony.

16        -- that protects our clients, thanks to amazing work by

17 the Ecknes-Tucker team.

18        JUDGE PROCTOR:  You wished you knew that was going to

19 occur back on that day.

20        MR. ESSEKS:  Certainly the intelligence we got was not

21 accurate.

22        JUDGE PROCTOR:  It's like I go back to that analogy I

23 gave you about a lawyer.  Sometimes I've been told that lawyers

24 aren't very good, and I find out they're actually quite good.

25 Just all could be a bad day or a bad piece of information.

```
 1            MR. ESSEKS:  Correct.

 2            JUDGE PROCTOR:  Thank you for your candor.

 3            MR. ESSEKS:  Thank you, very much.

 4            JUDGE PROCTOR:  Appreciate it.  I hope your father

 5   makes a speedy recovery.

 6            MR. ESSEKS:  Thank you.  I appreciate that.

 7            MR. RAGSDALE:  Can my people go?

 8            JUDGE WATKINS:  Moses?

 9            MR. RAGSDALE:  Just paraphrasing Moses.  I don't want

10   to get too deep into it.  I mean, obviously, we're willing to

11   stay.  I would love to get Mr. Esseks out of here.

12            JUDGE PROCTOR:  I've already released him.  Go back to

13   your family.

14            (Mr. Esseks excused.)

15            JUDGE PROCTOR:  I don't see any reason why we need your

16   folks to stay tonight if they can catch flights back out.  I'm

17   sure you would recommend they do that.  I would if I were you.

18            MR. RAGSDALE:  I will.

19            JUDGE PROCTOR:  But we're going to start back in the

20   morning fresh at nine a.m., and we'll take up the Ladinsky side

21   at that point.  I know everybody would be interested in starting

22   earlier, but we actually have some scheduling conflicts that

23   we're working through, and nine a.m. we think is the earliest we

24   can get back going in the morning.

25            MR. RAGSDALE:  And, obviously, it goes without saying,
```

 1  in addition to Mr. Esseks, if any of my clients, if you have

 2  additional questions for them, we, obviously, can arrange that.

 3          JUDGE PROCTOR:  Right.

 4          MR. RAGSDALE:  Thank you.

 5          JUDGE PROCTOR:  All right.  Thank you.  We will be in

 6  recess until nine a.m. tomorrow.

 7          MR. BUCK:  Your Honor, the same goes for the other

 8  witnesses who testified today?  They're released?

 9          JUDGE PROCTOR:  Correct.  Correct.  As I said, all the

10  Walker -- I think the Walker folks are released.  I don't think

11  there's any reason to keep them.  Something tells me we'll see

12  y'all back tomorrow, though.

13      (Proceedings concluded at 5:05 p.m.)

14                  *  *  *  *  *  *  *  *  *  *  *

15                  COURT REPORTER'S CERTIFICATE

16      I certify that the foregoing is a correct transcript

17  from the record of the proceedings in the above-entitled matter.

18      This 10th day of October, 2023.

19

20                          /s/ Patricia G. Starkie
                            Registered Diplomate Reporter
21                          Certified Realtime Reporter
                            Official Court Reporter
22

23

24

25