```
 1              UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF ALABAMA
 2    _____

 3              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
 4    _____

 5              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ALABAMA
 6    _____

 7
      IN RE:
 8    AMIE ADELIA VAGUE, et al.      CASE NO.: 2:22-mc-3977-WKW

 9
                       SEALED DOCUMENT
10
                 *  *  *  *  *  *  *  *  *  *  *  *
11
                     EVIDENTIARY HEARING
12
                 *  *  *  *  *  *  *  *  *  *  *  *  *
13
      BEFORE THE HONORABLE W. KEITH WATKINS, UNITED STATES
14
      DISTRICT JUDGE, THE HONORABLE R. DAVID PROCTOR, UNITED
15
      STATES DISTRICT JUDGE, and THE HONORABLE JEFFREY U.
16
      BEAVERSTOCK, UNITED STATES DISTRICT JUDGE, at Montgomery,
17
      Alabama, on Thursday, November 3, 2022, commencing at
18
      9:10 a.m.
19
                 *  *  *  *  *  *  *  *  *  *  *  *  *
20
                         APPEARANCES
21
      APPEARING ON BEHALF OF CARL CHARLES, TARA BORELLI,
22    JAMES D. ESSEKS:

23    Mr. Barry Alan Ragsdale
      Attorney at Law
24    DOMINICK FELD HYDE, P.C.
      1130 22nd Street South - Suite 4000
25    Birmingham, Alabama
```

```
 1                    APPEARANCES, Continued:

 2   ALSO APPEARING ON BEHALF OF CARL CHARLES, TARA BORELLI,
     JAMES D. ESSEKS:
 3
     Mr. Warren Neil Eggleston
 4   Attorney at Law
     KIRKLAND & ELLIS, LLP
 5   1301 Pennsylvania Avenue, NW
     Washington, DC 20004
 6
     APPEARING ON BEHALF OF KATHLEEN HARTNETT:
 7
     Mr. Christopher B. Driver
 8   Mr. Brannon J. Buck
     Attorneys at Law
 9   BADHAM & BUCK, LLC
     2001 Park Place North, Suite 500.
10   Birmingham, Alabama 35203

11   and

12   Mr. Matthew L. Kutcher
     Attorney at Law
13   COOLEY LLP
     55 Hudson Yards
14   New York, NY 10001

15   APPEARING ON BEHALF OF AMIE VAGUE, JEFFREY DOSS,
     MELODY EAGAN:
16
     Mr. Samuel Holley Franklin
17   Attorney at Law
     LIGHTFOOT FRANKLIN & WHITE LLC
18   400 20th Street North
     Birmingham, Alabama
19
     APPEARING ON BEHALF OF ABIGAIL TERRY, BRENT RAY, MICHAEL
20   SHORTNACY:

21   Mr. Bruce Frederick Rogers
     Attorneys at Law
22   BAINBRIDGE MIMS ROGERS & SMITH, LLP
     600 Luckie Drive, Suite 415
23   Birmingham, Alabama 35223

24

25
```

```
 1                       APPEARANCES, Continued:

 2   APPEARING ON BEHALF OF ASAF ORR, SHANNON MINTER, SCOTT MCCOY,
     DIEGO SOTO, JESSICA STONE, JENNIFER LEVI, SARAH WARBELOW,
 3   CYNTHIA WEAVER:

 4   Mr. Robert D. Segall
     Attorney at Law
 5   COPELAND, FRANCO, SCREWS & GILL
     444 South Perry Street
 6   Montgomery, Alabama 36104

 7                     * * * * * * * * * * * *

 8               Proceedings reported stenographically;

 9               transcript produced by computer

10                   * * * * * * * * * * * *

11      (The following proceedings were heard before the Honorable

12       W. Keith Watkins, United States District Judge, the

13       Honorable R. David Proctor, United States District Judge,

14       and the Honorable Jeffrey U. Beaverstock, United States

15       District Judge, at Montgomery, Alabama, on Thursday,

16       November 3, 2022, commencing at 9:10 a.m.:)

17      (Call to Order of the Court)

18           JUDGE PROCTOR:  Have a seat.  All right.  We are

19   resuming the panel's hearing in 22mc3977.  I think our first

20   order of business, subject to any input we have from the lawyers

21   for the attorneys, is to do an interview by video of Mr. Orr, if

22   I recall correctly; is that correct, Mr. Segall?

23           MR. SEGALL:  Yes, Your Honor.

24           JUDGE PROCTOR:  And, Mr. Segall, we've accommodated

25   you.  Sorry.  I hope you have bounced back from both illness and
```

1    travel.

2            MR. SEGALL:  And, Your Honor, I very much appreciate

3    the courtesy of the Court --

4            JUDGE PROCTOR:  We are all glad to do that.

5            MR. SEGALL:  -- in doing that.  I would like to say two

6    quick things.

7            JUDGE PROCTOR:  Be glad to hear it.

8            MR. SEGALL:  One is you were kind enough to permit me

9    to read the transcript.  And at the beginning of the August 3-4,

10   the parties asked for a continuing objection on the basis of

11   privilege.  I would like -- which you granted.  You denied, but

12   you denied the objections.

13           JUDGE PROCTOR:  We overruled the objection, but we gave

14   you the right to assert the objection globally on these matters.

15           MR. SEGALL:  Right.  And I would like to be treated as

16   having made a similar objection on August 3, 4.  And I would

17   also, Your Honor, like for today's purposes to have a continuing

18   objection on the basis of all the privileges that have been

19   mentioned, work product, attorney-client, common interest, joint

20   client, et cetera.

21           JUDGE PROCTOR:  And that's the interesting road we've

22   kind of navigated, it seems, in this matter is we started off

23   with a limited waiver where the parties came in and -- I'm not

24   sure you said this, but other counsel said this -- that we don't

25   have anything to hide, we're going to be cards up, we're going

1  to explain this decision to you.  And I think even -- what I

2  recall was even when Judge Burke convened the initial status

3  conference in Eknes-Tucker, Mr. Doss and Ms. Eagan were prepared

4  to explain to him all the decisions that were made about this.

5          On the other hand, we certainly understand we've not

6  made you provide us documents, the Q and A sheet, the talking

7  points that Doss was going to use either here or before Judge

8  Burke at that hearing.  So we're all right with y'all asserting

9  anything we're not actually saying is work product we're

10 reserving our work product objection.  But I thought that there

11 had been a decision to be somewhat candid with the Court about

12 why these decisions were made.  Am I missing the boat on my

13 recollection here?

14         MR. SEGALL:  Well, you're correct that I didn't say

15 anything during May 20 at all about that.  But if I understand

16 the Court's ruling -- and, of course, we gave declarations.  And

17 in those declarations, we've, in my judgment, violated one or

18 more privileges.

19         JUDGE PROCTOR:  Well, you -- I wouldn't say you

20 violated it.  I would say there was a limited waiver of the work

21 product privilege, not the attorney-client privilege but the

22 work product privilege.  Is that a fair assessment?

23         MR. SEGALL:  Well, we actually preserved it.  I mean,

24 in our filing, we say we're doing this without waiving any of

25 those --

```
 1          JUDGE PROCTOR:  Right.
 2          MR. SEGALL:  -- privileges, recognizing the Court's
 3   determination.  And that is, of course, what we're going to do
 4   today.  We're going to answer all of the questions.  And one
 5   reason I'm saying what I am now is to avoid making any
 6   objections during the Court's questioning.
 7          JUDGE PROCTOR:  Right.  Fair enough.  We're going to
 8   treat -- to answer your question that you were asking when you
 9   stood, we're going to treat you the same way we have treated
10   everyone else.  And that is that to the extent that you are --
11   other than what you're answering and/or volunteering to the
12   Court, you're preserving your right to object on work product
13   and attorney-client privilege grounds to any other information.
14   Is that what you're asking?
15          MR. SEGALL:  Yes.  And to be treated as though I was
16   present on August 3.  In other words, that the privilege didn't
17   just arise when your client -- or my clients are testifying.  I
18   also had privileges related to the testimony of all witnesses.
19          JUDGE PROCTOR:  Okay.
20          MR. SEGALL:  To the extent that they might have been
21   testifying about communications with my clients.
22          JUDGE PROCTOR:  All right.
23          MR. SEGALL:  So I just want to be noted, if Your Honor
24   doesn't mind, as participating in the raising of the privilege
25   on August 3 and August 4.
```

```
 1              JUDGE PROCTOR:  Fair enough.

 2              MR. SEGALL:  Okay.  Thank you.

 3              JUDGE PROCTOR:  All right.  Let's do this.  Let's go

 4    ahead and have counsel identify yourselves for the record and

 5    anyone else who's in the courtroom to please identify yourself.

 6              MR. RAGSDALE:  I'll start.  I'm Barry Ragsdale.

 7              JUDGE PROCTOR:  And representing?

 8              MR. RAGSDALE:  Lawyers from the ACLU -- you put me on

 9    the spot now to remember my groups -- as well as Lambda Legal

10    and Transgender Law Center.

11              JUDGE PROCTOR:  Thank you.

12              MR. EGGLESTON:  Your Honor, Neil Eggleston, Kirkland &

13    Ellis.  Cocounsel with Mr. Ragsdale on this same list.  I

14    thought you might ask, so I wrote the four down.

15              JUDGE PROCTOR:  Very well.

16              MR. EGGLESTON:  Just so she doesn't have to do it,

17    Kristen Bokhan is also with Kirkland & Ellis and is in the

18    courtroom here today.

19              JUDGE PROCTOR:  All right.  Thank you.

20              MR. EGGLESTON:  Thank you.

21              MR. BUCK:  Your Honor, Brannon Buck on behalf of

22    Kathleen Hartnett, who is the one remaining Cooley attorney who

23    is still involved.

24              JUDGE PROCTOR:  Right.

25              MR. DRIVER:  And Chris Driver, similarly here for
```

1  Kathleen Hartnett.

2         JUDGE PROCTOR:  All right.  Good seeing you,

3  Mr. Driver.

4         MR. FRANKLIN:  Sam Franklin.  I represent my partners

5  Melody Eagan and Jeff Doss.

6         JUDGE PROCTOR:  All right.  Thank you.

7         MR. ROGERS:  And Bruce Rogers representing the two

8  remaining King & Spalding partners, Brent Ray and Michael

9  Shortnacy.

10        JUDGE PROCTOR:  I notice you also like to sit in that

11 jury box.

12        MR. ROGERS:  Well, Segall took my seat, Your Honor.

13        JUDGE PROCTOR:  All right.  Mr. Segall, do you want

14 to --

15        MR. SEGALL:  I wasn't here August 3 and 4, but I

16 understood he was there.  I appreciate his saving a seat for me.

17        JUDGE PROCTOR:  There you are.

18        MR. SEGALL:  Your Honor, I represent the witnesses for

19 today, Jennifer Levi of GLAD; Scott McCoy, Jennifer Stone, and

20 Diego Soto of the Southern Poverty Law Center; Sarah Warbelow

21 and Cynthia Weaver of the Human Rights Campaign Foundation; Asaf

22 Orr, who will be the first witness; and Shannon Minter for the

23 National Center for Lesbian Rights.

24        JUDGE PROCTOR:  All right.  Thank you so much for that.

25        All right.  Are we ready to get started, then?

```
1              All right.  I think we have a total -- we have two

2    witnesses appearing by video in this hearing.  Mr. Orr will

3    begin.  And we also have Mr. Minter, who will be appearing by

4    video as well later.

5              MR. SEGALL:  Yes, Your Honor.

6              JUDGE PROCTOR:  I understand he's had a -- some

7    incident with a knee or something like that?

8              MR. SEGALL:  Yes, Your Honor.

9              JUDGE PROCTOR:  All right.  And we're glad to

10   accommodate both of them.

11             MR. SEGALL:  Thank you.

12             JUDGE PROCTOR:  Okay.  Let's bring online Mr. Orr to

13   the extent he isn't already online.

14             THE COURTROOM DEPUTY:  Good morning, Mr. Orr.  Would

15   you please take yourself off mute.  You're on mute.

16             MR. ORR:  Yes.  Good morning.  I can hear you just

17   fine.  Thank you.

18             THE COURTROOM DEPUTY:  How about now?

19             MR. ORR:  That's even better.

20             THE COURTROOM DEPUTY:  Can you turn up your mic a

21   little bit for me?

22             MR. ORR:  Sure.  Does that help?

23             THE COURTROOM DEPUTY:  Yes.  What about for you-all?

24             JUDGE PROCTOR:  That's fine.  We might need you to

25   project just a little bit more.  Can you hear me okay, Mr. Orr?
```

```
 1              MR. ORR:  Yes, I can hear you just fine.  Thank you.
 2              JUDGE PROCTOR:  All right.  Great.  Thank you.  All
 3    right.  I'm going to ask that you allow our courtroom deputy to
 4    give you the oath.
 5        (Asaf Orr, the witness, was sworn and testified via video
 6          teleconference.)
 7              JUDGE PROCTOR:  All right.  Mr. Orr, thank you.  I'm
 8    going to get us started this morning with a few just background
 9    questions.  My colleagues will jump in as appropriate.
10              Give us just a quick thumbnail sketch of your bio and
11    litigation experience just generally.
12              MR. ORR:  Sure.  I've been a litigator at the National
13    Center For Lesbian Rights for almost 11 years.  During that time
14    I have litigated cases in state and federal courts around the
15    country.  I do civil rights work, work, you know -- so bringing
16    cases under Section 1983 as well as federal and state
17    antidiscrimination laws.
18              MR. SEGALL:  Is there any way to make it louder?
19              JUDGE PROCTOR:  Yes.  We're going to work on the
20    volume.
21              MR. ORR:  I apologize.  My computer mic is clearly not
22    up to snuff.
23              JUDGE PROCTOR:  Maybe if you just leaned in.  We would
24    rather have volume than appearance.
25              MR. ORR:  I'm trying to avoid the glare of the light
```

1  above me.

2          JUDGE PROCTOR:  That's much better.

3          MR. ORR:  Okay.

4          JUDGE PROCTOR:  All right.  Thank you.

5          Now, you were on the Ladinsky litigation team; is that

6  correct?

7          MR. ORR:  That's correct.

8          JUDGE PROCTOR:  All right.  And how would you

9  characterize your role vis-a-vis the other counsel on the

10  Ladinsky litigation team?

11          MR. ORR:  So because of my role as director of the

12  Transgender Youth Project at the National Center For Lesbian

13  Rights, I helped -- as I indicated in my affidavit, I helped

14  gather the Ladinsky team.  I was not a decision-maker, but given

15  my experience in work in this area, you know, I did have a lot

16  of input into the matters discussed by the team but was not a

17  decision-maker.

18          JUDGE PROCTOR:  What role did you have in determining

19  and/or recruiting who would be party plaintiffs in the

20  litigation?

21          MR. ORR:  That was a significant role of mine.  You

22  know, I developed contacts throughout the state of Alabama when

23  State Legislature first considered what is now SB184 back in

24  2020, even slightly prior to that, in anticipation of bills like

25  it being introduced in Alabama and elsewhere.  And so I had

1   reached out to my contacts to speak with potential plaintiffs

2   and, you know, made recommendations to the team about which

3   plaintiffs we should include and those that we really shouldn't.

4           JUDGE PROCTOR:  So you had some role in putting

5   together the litigation team as far as the lawyers as well as

6   giving input, if not doing the footwork, on determining

7   plaintiffs to be included in the lawsuit?

8           MR. ORR:  Yes.  That is accurate.

9           JUDGE PROCTOR:  All right.  Let's break those up a

10  little bit, then.  How did the litigation team get put together?

11  Just give me the executive summary of that.

12          MR. ORR:  Sure.  We -- when this first bill was

13  introduced, we decided that if it was going to pass, that we

14  wanted to be involved in a challenge to the law.  We had been

15  having those conversations with GLAD, GLBTQ Legal Advocates &

16  Defenders, and my first call was to Mr. Ray at King &

17  Spalding -- he's an attorney that I've worked with as cocounsel

18  on a number of cases -- and asked if his firm would be

19  interested in cocounseling with us on this potential case.  And

20  when they agreed, we then searched for local counsel and were

21  connected with Ms. Eagan in the Lightfoot firm.  And so it was

22  really those four entities that formed the initial Ladinsky

23  team.  And then SPLC and HRC came on later.

24          JUDGE PROCTOR:  So this was a process that started as

25  early as 2020, and each year when the legislation was being

1  considered, there was some thought given to what legal challenge

2  would be mounted if the legislation passed?

3          MR. ORR:  Yes.  The legislation changed in language

4  over those years, and so, you know, we would temporarily disband

5  the legal team after the legislative session ended and bring it

6  back together once the new legislative session began and the

7  bill was reintroduced.

8          JUDGE PROCTOR:  And I take it that the discussions

9  about what parties to include may have changed from year to year

10  as well.

11          MR. ORR:  That is correct, Your Honor.  Some of the

12  plaintiffs that we had been speaking with or contemplated

13  including in what ultimately became the Ladinsky case moved out

14  of the state or otherwise, you know, were no longer interested

15  in participating as plaintiffs for a variety of reasons.

16          JUDGE PROCTOR:  All right.  Walk me through the process

17  just generally that occurred with respect to inclusion of party

18  plaintiffs to name in a complaint.

19          MR. ORR:  So, really, what we were looking for in

20  putting together the plaintiffs for the complaint was, one, we

21  wanted to get a broad swath of experiences of transgender young

22  people, both geographically throughout the state but also, you

23  know, having transgender male and transgender female plaintiffs

24  and who were at different stages in their transition.  And

25  beyond that, we also wanted to have providers, given that this

1  law not only applies to parents of transgender young people but

2  also providers.

3           JUDGE PROCTOR:  Were there a number of candidates for

4  those slots such that you had to maybe vet who would have been

5  the best one for each slot?

6           MR. ORR:  There certainly were a number of families we

7  were speaking to and considering in each iteration, but -- so as

8  we do with any case, we vet our plaintiffs in terms of whether

9  or not we think that they will -- that they'll have a story that

10  would be compelling, whether they would be able to handle the

11  emotional rigors of being involved as a plaintiff in a case like

12  this, among other factors.

13           JUDGE PROCTOR:  And were there other groups that you

14  were consulting or communicating with along the way other than

15  the ones who actually were part of your litigation team about

16  these efforts?

17           MR. ORR:  You know, I -- I vaguely recall discussions

18  with organizations that ended up sort of forming the Walker

19  team --

20           JUDGE PROCTOR:  Right.

21           MR. ORR:  -- because we were looking for plaintiffs at

22  about the same time, you know.  But I don't recall discussion

23  about plaintiffs -- there was discussion about one plaintiff who

24  there was a question as to which organization contacted this

25  potential plaintiff first.  But that potential plaintiff is

```
 1   not -- was not a plaintiff in either Ladinsky or Eknes-Tucker.
 2   That family moved out of the state prior to the filing of these
 3   lawsuits.
 4          JUDGE PROCTOR:  All right.  And putting aside the
 5   Walker organizations -- and I'll follow up with more about that
 6   in a moment, but just putting them aside -- were there any other
 7   organizations that you consulted or who contributed to the
 8   effort to challenge the statute, directly or indirectly?
 9          MR. ORR:  I think the only other entity or person that
10   I can think of would be Dr. Ladinsky, who helped connect us with
11   some of the families that we spoke to, some of whom are
12   plaintiffs in the current litigation.
13          JUDGE PROCTOR:  Was that your primary source for
14   assessing candidates, or were there other sources as far as
15   candidacy for party plaintiff status?
16          MR. ORR:  There were other sources, but that was a
17   significant source.
18          JUDGE PROCTOR:  Was the Magic City Acceptance Academy
19   one of those?
20          MR. ORR:  No.
21          JUDGE PROCTOR:  Have you had any communication with the
22   Magic City Acceptance Academy about anything related to this
23   challenge or this -- these issues related to the challenge?
24          MR. ORR:  Not that I can recall, and I don't believe I
25   did.
```

```
 1          JUDGE PROCTOR:  Are you aware of anyone else on the
 2    Ladinsky or Eknes-Tucker litigation team who had any such
 3    communications with the Magic City Acceptance Academy?
 4          MR. ORR:  No.
 5          JUDGE PROCTOR:  All right.  Have you heard of any
 6    interactions the Magic City Acceptance Academy had with respect
 7    to these matters?
 8          MR. ORR:  The only -- I do know that one or two of
 9    the -- one or both of the plaintiff children in the Ladinsky
10    case did attend the Magic City Acceptance School.  But beyond
11    that, I don't know of any connection to that entity.
12          JUDGE PROCTOR:  All right.  Let's go back to the
13    Walker -- the Walker case and the persons involved in that.
14    What communications, if any, did you have with any of the
15    organizations or lawyers that were in the Walker case?  And just
16    give me by category now.  I'll follow up with specific questions
17    by category, but just categorically, what kind of
18    communications, if any, would you have had with them?
19          MR. ORR:  So we -- prior to the filing of the Ladinsky
20    and Walker cases, we did have discussions about, you know,
21    potential challenges to SB184.  And as I indicated, I think the
22    purpose of those discussions was to dissuade them from filing a
23    lawsuit.  Following the filing of the litigation, we did have
24    some discussions in response to Chief Judge Marks' order to show
25    cause.  And then we did have some discussions regarding the
```

1  Walker team seeking input from or insight from us into the

2  judges -- the judge they had been assigned for their case.

3           JUDGE PROCTOR:  All right.  And who would you have

4  had -- if you had the communications, who did you specifically

5  communicate about those matters with?

6           MR. ORR:  In the first category, it would have been --

7  the only person -- the only two people I can really remember on

8  those calls, and there may have been others, would be Ms. Tara

9  Borelli and Ms. Sharon McGowan, who used to be the legal

10 director at Lambda but is no longer there.

11          JUDGE PROCTOR:  All right.  How about on the issue of

12 the show cause in the Walker case?

13          MR. ORR:  And the two -- the two latter categories

14 would have been with Mr. Carl Charles primarily.  I do recall

15 that there was a telephone call regarding the order to show

16 cause, and I can't remember exactly who was on that call.  I

17 know that he was, and I believe Mr. Esseks from the ACLU was on

18 that call.  And there were certainly others, but I can't recall

19 them.

20          JUDGE PROCTOR:  All right.  Thank you.  And this next

21 question is to just orient us to a time frame, not to suggest to

22 you any dates or time frame.  But what I recall is that the

23 statute passed more quickly than the lawyers monitoring this

24 thought it might.  I want to say it passed on April 7 and was

25 signed by the Governor on April 8 and that both sides then,

 1  Walker and Ladinsky, kind of sprang into more feverish action to
 2  get a complaint filed and your side was particularly interested
 3  in being first to file.  Does that sound about right to you?
 4        MR. ORR:  Yes, that sounds about right.  We did not
 5  expect SB184 to pass, given that the legislative session was
 6  within hours of ending.  And so, yes.
 7        JUDGE PROCTOR:  And my recollection further is that you
 8  were the first to file in the Northern District of Alabama, and
 9  I think it was on that Friday.
10        MR. ORR:  Correct.
11        JUDGE PROCTOR:  I think it was filed after hours, so it
12  was not docketed until the 11th, on the Monday, but that you did
13  get the complaint in electronically on that Friday, late
14  afternoon.
15        MR. ORR:  That's correct.
16        JUDGE PROCTOR:  And that further, the Walker case was
17  filed in the Middle District of Alabama on the following Monday,
18  so the next business day, but three days later.
19        MR. ORR:  That is my recollection as well.
20        JUDGE PROCTOR:  All right.  So I'd like to have you
21  walk us through your best recollection of the events that were
22  kind of kicked off on the filing on Friday, on that Friday all
23  the way through the events of the next following weekend, that
24  following Friday, Saturday, Sunday.  Okay?  That's the time
25  frame I'm looking at for purposes of these next questions.

```
 1              MR. ORR:  Okay.  Sure.

 2              JUDGE PROCTOR:  What communications were you having

 3    with the Walker counsel up to the time of the filing of your

 4    team's lawsuit?

 5              MR. ORR:  I don't believe that -- well, I did not have

 6    any communications with the Walker team in those sort of days

 7    kind of following -- or around the filing of the lawsuit.  Once

 8    the lawsuit was filed, we let them know that we had filed our

 9    lawsuit, but there wasn't really much communication that I'm

10    aware of beyond that.

11              JUDGE PROCTOR:  All right.  And how would you -- so

12    were reports coming to you about communications with the Walker

13    counsel from other people on your team, then?

14              MR. ORR:  No.  What I recall is that, you know, we had

15    received kind of differing intel about how long Governor Ivey

16    would take to consider whether to sign SB184, and so we were

17    having internal discussions about sort of our time line in

18    preparations for filing.  But I don't recall any reports of

19    communications with the Walker team.

20              JUDGE PROCTOR:  All right.  But there was an -- you

21    were aware that Walker -- the Walker team was contemplating

22    filing a separate lawsuit and that they were likely filing that

23    in the Middle District of Alabama.

24              MR. ORR:  Yes.  By that time we knew that they were

25    filing the lawsuit.  We didn't -- and that they would be filing
```

 1    in the Middle District.  We had no other information beyond

 2    that.  Or I had no other information beyond that.

 3             JUDGE PROCTOR:  All right.  Stepping back for a moment,

 4    then, from that time frame, I take it one of the things your

 5    team had to decide is where you were going to file your lawsuit;

 6    in other words, which venue, which district.  Take me through

 7    what you recall about those discussions.

 8             MR. ORR:  So those discussions are probably the

 9    earliest discussions we had back in 2020 when we first

10    constituted the litigation team.  You know, we discussed just

11    sort of location, you know, where we were likely to get

12    plaintiffs, the sort of ease of access to the courthouse given

13    that most of us would be coming into either Birmingham or

14    Montgomery or Mobile.  And we also considered just generally the

15    draw of judges in each district.  And I think that is really the

16    scope of what we considered.

17             JUDGE PROCTOR:  And when you were deciding where to

18    file, to what extent, if any, did the issue of judges who may

19    receive the case come up?

20             MR. ORR:  Just -- I think we talked generally about who

21    sat on the bench in each district and sort of the -- our

22    assessment of how those -- how judges would respond to the types

23    of claims that we would be raising, their -- you know, how they

24    might hear and respond to some of the expert testimony that is

25    required in this case or in a case like this.  You know, given

1   that there really hasn't been much litigation around transgender

2   issues in the federal courts in Alabama, we tried to kind of

3   gauge based on what was out there and do kind of a general

4   assessment.  But there wasn't -- we didn't go, for example,

5   judge by judge in that discussion.

6           JUDGE PROCTOR:  And to what detail did those

7   discussions devolve into?

8           MR. ORR:  It was really -- I do recall them being, you

9   know, not very extensive.  I recall that the -- we quickly,

10  relatively quickly, felt confident that the Northern District

11  would be the most appropriate venue for where we wanted to file.

12  And as I indicated in my affidavit, we stuck to that since the

13  beginning.

14          JUDGE PROCTOR:  And to what degree did the judge you

15  would likely draw in the Northern District play into the

16  propriety of the filing there?

17          MR. ORR:  We didn't have any sense of the likelihood of

18  drawing any particular judge.  It was more -- it was more an

19  odds -- you know, how we felt about were we more or less likely

20  to draw a judge that we thought would be a good draw from the

21  little information that we could gather.

22          JUDGE PROCTOR:  Would it be fair to say, then, that

23  your assessment -- the team's assessment, not your individual

24  assessment but the team's assessment -- was that there was a

25  higher chance of a good draw in the Northern District as

1  compared to the Middle District?

2         MR. ORR:  That was generally -- yes.  And I think it

3  would -- but that wasn't, I should say, the only factor.  It was

4  also, you know, location of local counsel, ease of getting to

5  Birmingham as well as, I believe at the time in 2020 and

6  subsequently even in the Ladinsky case, the sort of ease for our

7  clients.  Given that most were in the Birmingham area, that felt

8  to be the most appropriate.

9         JUDGE PROCTOR:  All right.  Thank you.  Was there any

10  discussion with Walker counsel pre-filing of Ladinsky or Walker

11  about judges and where the best potential for getting a

12  favorable judge would be?

13         MR. ORR:  The only discussions I recall were with the

14  Walker team indicating that they planned to file in the Middle

15  District and that they intended to file -- or indicate that it

16  was a related case to Corbett, which was a case pending at the

17  time before Judge Thompson.

18         JUDGE PROCTOR:  Did they give any specifics as to the

19  actions they would take to accomplish that?  Did they discuss,

20  for example, that they were going to file a civil cover sheet

21  that related their case to Corbett?

22         MR. ORR:  I don't recall them talking about

23  specifically what they would do, just that that was their plan

24  was to treat -- to ask that the Court treat this as a related

25  case to Corbett.

```
 1          JUDGE PROCTOR:  Did they -- was there anything
 2  indicated about either a direct or indirect contact with Judge
 3  Thompson or Judge Thompson's chambers about the relation to
 4  Corbett?
 5          MR. ORR:  Not that I can recall, no.
 6          JUDGE PROCTOR:  I'm sorry?
 7          MR. ORR:  No, not that I can recall.
 8          JUDGE PROCTOR:  Was there any discussion that you
 9  recall about them filing a motion, formal motion, to have the
10  case assigned to Judge Thompson or reassigned to Judge Thompson?
11  And I'm talking about the Walker case.
12          MR. ORR:  Yes.  I do recall a member of the Walker team
13  mentioning to me that they understood -- or at least they
14  thought that indicating on the civil cover sheet when they filed
15  it would have triggered I guess a review by Judge Thompson or
16  something to determine whether or not it was a related case and
17  that they later learned that they needed to file a motion and
18  did so.  But this was after the filing of their complaint.
19          JUDGE PROCTOR:  All right.  Now, at some point, you
20  became aware that in the Walker case, Chief Judge Marks had
21  issued a show cause order concerning whether Walker should be
22  transferred to the Northern District under the first-filed rule.
23          MR. ORR:  Yes.
24          JUDGE PROCTOR:  And my recollection from a moment ago,
25  you mentioned that there was a conference call about the show
```

1    cause order that occurred between the Walker team and the

2    Ladinsky team.

3              MR. ORR:  That's correct.

4              JUDGE PROCTOR:  Prior declaration and oral testimony in

5    this matter has indicated to me that that occurred on the

6    Wednesday, maybe in the afternoon, of that key week.

7              MR. ORR:  I don't remember the exact date, but that

8    sounds about right.

9              JUDGE PROCTOR:  Wednesday or Thursday.  I guess it

10   depends on whose recollection we're looking at.

11             MR. ORR:  That sounds about correct, yes.

12             JUDGE PROCTOR:  Were you on that call?

13             MR. ORR:  I was.

14             JUDGE PROCTOR:  Give me as thorough a recollection as

15   you have about what occurred on that call.

16             MR. ORR:  So what I remember from that call, the Walker

17   team indicated that their plan was to respond to Chief Judge

18   Marks' order and indicate that in the interest of judicial

19   efficiency, that it would be most appropriate for the Ladinsky

20   case to be transferred down to the Middle District and have both

21   cases before Judge Thompson, consistent with their motion to

22   relate Walker to Corbett.  During the call -- the purpose of the

23   call was to determine whether or not the Ladinsky team would

24   consent to that or at least indicate agreement with their

25   position regarding their arguments regarding judicial

1    efficiency.

2         And I recall us being very clear that, you know, we

3    believed that the first-filed rule applies, would not want to

4    indicate otherwise.  And that is -- you know, and the call ended

5    with the Walker team essentially indicating that, you know,

6    their plan at that point was to still proceed as they had

7    indicated they would, meaning that they would respond to the

8    show cause order by requesting that both Ladinsky and Walker be

9    transferred to Judge Thompson.  And that is what I remember.

10        JUDGE PROCTOR:  And what was the status of Ladinsky at

11   that point in terms of the judicial assignment during -- at the

12   time of that call?

13        MR. ORR:  At the time of the call, I believe we were

14   still before Magistrate Judge Cornelius.

15        JUDGE PROCTOR:  Okay.

16        MR. ORR:  It was either that or we had just been

17   transferred to Judge Axon.

18        JUDGE PROCTOR:  All right.  So -- and do you have --

19   you don't have a firm recollection either way about where it

20   was, timingwise, on that?

21        MR. ORR:  Now that I think about it a little bit more,

22   I'm leaning more towards that we were before Judge Axon by that

23   point.

24        JUDGE PROCTOR:  All right.  During the phone call, you

25   said that the Walker counsel's position was we think you ought

1  to agree for Ladinsky to be transferred to the Middle District

2  because we are trying to relate our case to Corbett and have it

3  assigned to Judge Thompson.  Fair summary?

4        MR. ORR:  Yes, Your Honor.

5        JUDGE PROCTOR:  And what came up about Judge Thompson

6  during that call other than he had had Corbett and there was an

7  effort to relate Walker to Corbett on the civil cover sheet?

8        MR. ORR:  I think, you know, only the discussions

9  regarding, you know, the fact that given Judge Thompson's

10 experience presiding over the Corbett case, that he had already

11 heard a lot of expert testimony or reviewed expert opinion sort

12 of that would have been related to what we would submit in a

13 case like this such that it would have been -- he would have had

14 experience with the material and that the need for educating him

15 about the -- sort of this area of medicine would be slightly

16 easier, given his experience with Corbett.

17       JUDGE PROCTOR:  Were you familiar with the Corbett

18 litigation in terms of what it dealt with?

19       MR. ORR:  Yes, generally.  I was not -- I read Judge

20 Thompson's opinion in that case, but beyond that -- and knew

21 that it existed prior, but beyond that, I didn't know anything

22 else.

23       JUDGE PROCTOR:  Well, and to be fair, let me ask you

24 this.  Was it -- was Walker counsel suggesting to you that Judge

25 Thompson is essentially the subject matter expert who's dealt

1 with these issues or was it that he would be a favorable draw

2 that would be more likely to see the case from our perspective

3 or both?

4       MR. ORR:  My recollection is that it was more the

5 former.  And I will say just generally, in my experience, you

6 know, dealing with transgender adult issues is -- although it

7 can be -- has its own challenges, that transgender youth is

8 significantly more challenging, regardless, just because of the

9 age of the plaintiffs involved.  So, you know, I don't --

10 hopefully, that answers your question.

11       JUDGE PROCTOR:  Well, the reason I'm asking is Corbett

12 dealt with a driver's license designation of gender or sex on

13 the driver's license itself; correct?

14       MR. ORR:  Yes, Your Honor.

15       JUDGE PROCTOR:  By definition, that means that

16 litigation only would have affected those -- if it's a

17 restricted driver's license, 15, if it's a driver's license, 16

18 and above from the LBGTQ community; correct?

19       MR. ORR:  Right.  It would have affected transgender

20 people as young as 15 or 16 who could obtain a license.  Yes.

21       JUDGE PROCTOR:  So that is a smaller swath of youth

22 compared to what this statute that you're dealing with in Walker

23 and Ladinsky and Eknes-Tucker dealt with, correct?

24       MR. ORR:  Yes, but it would have dealt -- I think, if I

25 remember correctly, what was really being challenged in that

1   case was the requirement that a transgender person undergo

2   surgery prior to obtaining a correction of the sex listed on

3   their driver's license.  And so there would have been testimony

4   regarding treatment for gender dysphoria and why surgery is a

5   discriminatory policy.  And so it would have gotten into some of

6   the treatment issues that are being directly discussed very

7   explicitly in the litigation challenging SB184.

8           JUDGE PROCTOR:  All right.  And on that question, I

9   guess my follow-up is at some point during that conversation,

10  did the Ladinsky team state to the Walker team any assessment of

11  what the Ladinsky team's conclusion was about whether relating

12  Walker to Corbett was going to be successful or not?

13          MR. ORR:  I don't recall --

14          JUDGE PROCTOR:  That was kind of a -- that wasn't a

15  very good question.  Let me try again.  Let me just say it this

16  way.  As I review these declarations, it seems to me that at

17  some point in that call, the Ladinsky team told the Walker team,

18  we don't think that's going to be successful, or at least the

19  Ladinsky team, within its own huddle, said, we don't think

20  that's going to be successful.  Did that come up at all in the

21  conference call?

22          MR. ORR:  I don't recall expressing any opinion about

23  how successful we thought the motion to relate the case to

24  Corbett would be.  I don't recall sharing that with the Walker

25  team.  But certainly within the Ladinsky team, we thought the

```
 1  likelihood of that succeeding was low to not at all possible.

 2          JUDGE PROCTOR:  As we say in Alabama, slim to none?

 3          MR. ORR:  Yes.

 4          JUDGE PROCTOR:  All right.  The reason I'm wondering if

 5  that didn't come up on the call, because I think during that

 6  call, there was also a discussion about what happens if Walker

 7  comes to the Northern District of Alabama.  What would be our

 8  judicial situation then.  Did that come up, to your

 9  recollection, in that -- on that call?

10          MR. ORR:  I do recall discussion of the first-filed

11  rule and our belief that, you know, if in fact Judge Marks --

12  Chief Judge Marks ordered that Walker be transferred to the

13  Northern District, that it would simply just be assigned to

14  whichever judge we were assigned to at that point, which, as I

15  indicated, I believe at the time was Judge Axon.

16          JUDGE PROCTOR:  Was there any discussion about Judge

17  Axon and her judicial philosophy or disposition toward a set of

18  claims like this during that call?

19          MR. ORR:  I don't know if it occurred during that call,

20  but I do recall sharing with the Walker team -- if it wasn't on

21  that call, at some other point -- that we believed Judge Axon

22  was a good draw for this case.

23          JUDGE PROCTOR:  Okay.  So following up from that, I

24  want to go back and ask something I don't think I asked before.

25  Who do you specifically recall being on that teleconference?
```

1    Was it a teleconference or a Zoom call?

2            MR. ORR:  I believe it was a Zoom call.

3            JUDGE PROCTOR:  Who do you remember being on that Zoom

4    call?

5            MR. ORR:  The two people that are coming to mind are

6    Mr. Carl Charles and Ms. Nowlin Li from ACLU.

7            JUDGE PROCTOR:  Ms. Li?

8            MR. ORR:  Yes.

9            JUDGE PROCTOR:  All right.  And who from the Ladinsky

10   side besides yourself was on that phone call or Zoom call?

11   Excuse me.

12           MR. ORR:  I believe Mr. Diego Soto was on the call.  I

13   don't recall whether anyone from HRC was on the call.  I know

14   that there were other people.  I just -- I don't remember who.

15           JUDGE PROCTOR:  Was Ms. Eagan on the call from

16   Lightfoot?

17           MR. ORR:  I feel like there was someone from Lightfoot,

18   but I'm not sure that it was her.

19           JUDGE PROCTOR:  How about folks from King & Spalding?

20   Any of them on the call?

21           MR. ORR:  This would be speculation, but if anyone was

22   to be on the call, my guess is that it would have been

23   Mr. Shortnacy.

24           JUDGE PROCTOR:  Okay.  And how about Mr. Minter?  Was

25   he on that call?

 1              MR. ORR:  Possibly.

 2              JUDGE PROCTOR:  So you don't have a firm recollection

 3    other than Soto, Carl Charles, and Li and yourself in terms of

 4    who was on the call?

 5              MR. ORR:  That's correct.  And I know that Ms. Levi was

 6    not on the call.

 7              JUDGE PROCTOR:  All right.  What makes that stand out

 8    in your mind?

 9              MR. ORR:  I recall her letting me know that she was

10    unable to attend and asked me to update her afterwards.

11              JUDGE PROCTOR:  Was Ms. Hartnett on the call?

12              MR. ORR:  I don't recall.

13              JUDGE PROCTOR:  All right.  What specifically was

14    discussed about Judge Axon and her being a good draw during that

15    call?  And then I'm going to have a follow-up after you answer

16    this part.

17              MR. ORR:  You know, Your Honor, I'm not sure that we

18    discussed Judge Axon at all on that call, but I'm happy to

19    answer that question generally in terms of what we --

20              JUDGE PROCTOR:  Let me broaden it, then, so it's not

21    asking you about that specific call.  You did have some

22    communications with Walker counsel about Judge Axon, whether it

23    was on that call or otherwise?

24              MR. ORR:  Yes.

25              JUDGE PROCTOR:  Tell me about those.

 1          MR. ORR:  I recall it being just either a very short

 2     conversation or an email indicating that we thought Judge Axon

 3     was a good draw.  We felt confident that she would listen to all

 4     the expert testimony and be engaged in that material.  I think

 5     that was really the extent of our discussions regarding Judge

 6     Axon.

 7          JUDGE PROCTOR:  Was that your independent conclusion or

 8     is this something that others expressed to you in terms of that

 9     conclusion?

10          MR. ORR:  That would have been something that we got

11     from either Ms. Eagan and Mr. Doss or both.

12          JUDGE PROCTOR:  All right.  So they were the local

13     counsel, so they became the source for the scouting report on

14     Judge Axon and other judges?

15          MR. ORR:  That was the main source of our information,

16     yes.

17          JUDGE PROCTOR:  What were secondary sources, if any?

18          MR. ORR:  We did do some -- each time that we were

19     assigned a judge, we would do a search on Westlaw looking for

20     similar cases that the judges had previously decided, not just

21     about transgender issues but more broadly, for example, about

22     Title IX or Title VII and other federal sex discrimination

23     claims.

24          JUDGE PROCTOR:  All right.  What was it that either

25     Eagan or Doss said about Judge Axon in terms of why they

 1   believed that she would listen to the evidence, listen to the

 2   experts, and be a good judge on this case?

 3            MR. ORR:  I just recall it being based on their

 4   experience with her both prior to her nomination and

 5   confirmation to the bench as well as their experience appearing

 6   before her.

 7            JUDGE PROCTOR:  All right.  Was there any other

 8   specific information you recall?

 9            MR. ORR:  No.

10            JUDGE PROCTOR:  Any other general information you

11   recall?

12            MR. ORR:  About Judge Axon?

13            JUDGE PROCTOR:  Yes.

14            MR. ORR:  No, Your Honor.

15            JUDGE PROCTOR:  Were you aware at any point that Judge

16   Axon's husband practiced with Ms. Eagan's husband at a law firm?

17            MR. ORR:  Yes.  Now that you say that specifically, I

18   do remember Ms. Eagan mentioning that.  Yes.

19            JUDGE PROCTOR:  Was there any other information about

20   Judge Axon's family other than that that you recall hearing from

21   anyone as it related to the assessment of Judge Axon?

22            MR. ORR:  I don't believe it was in relation to any

23   assessment of her, but I do remember -- I believe it was

24   Ms. Eagan indicating that Ms. Axon has -- Judge Axon, excuse me,

25   has children.

```
1              JUDGE PROCTOR:  All right.  Anything specific along

2    those lines other than the fact that she has children?

3              MR. ORR:  Not that I can recall.

4              JUDGE PROCTOR:  Was there any other assessment of any

5    other judges on that conversation that you recall -- regardless

6    of when it occurred, were there any other assessments of judges

7    in the Northern District other than Judge Axon?

8              MR. ORR:  We did discuss Judge Manasco, although very

9    briefly, given she recused herself from the Ladinsky case

10   quickly, which we anticipated or we -- after -- as I think I

11   indicated, after filing the Ladinsky case, we learned that Judge

12   Manasco sits on the board of the Children's Hospital, so it was

13   not surprising to us that she recused herself from the case.

14   And I do recall having similar discussions regarding Magistrate

15   Judge Cornelius, although given that she's a magistrate, we did

16   not want to dig in too far, given the possibility that

17   defendants could decide not to consent and that we would be

18   assigned an Article III judge.

19             JUDGE PROCTOR:  The point being that you would do your

20   assessment of her if she actually gained consent and handled the

21   case?

22             MR. ORR:  That's correct.

23             JUDGE PROCTOR:  All right.  I'm looking at other

24   declarations and yours, and I see a pattern here.  And the

25   pattern maybe is best articulated in another declaration other
```

 1   than yours.  I'm just being clear that I'm asking about

 2   something you didn't write but that was being represented as the

 3   view of the Ladinsky team.  The Ladinsky team thought that Judge

 4   Manasco was a good draw.  The Ladinsky team thought that Judge

 5   Cornelius was a good draw.  The Ladinsky team thought that Judge

 6   Axon was a very good draw.  Any rationale or recollection -- any

 7   recollection you have about the rationale or reasoning behind

 8   why that would be the assessment?

 9        MR. ORR:  You know, I don't recall any difference in

10   sort of our assessment or gradations in terms of -- you know,

11   between Judge Manasco, Magistrate Judge Cornelius, and Judge

12   Axon.

13        JUDGE PROCTOR:  All right.

14        MR. ORR:  I do recall us, you know, at least initially,

15   thinking that if defendants consented to Magistrate Judge

16   Cornelius, that we would do the same, but I don't recall any

17   gradations between the three.

18        JUDGE PROCTOR:  Do you have any water there with you or

19   do you need to get any?

20        MR. ORR:  Unfortunately, I don't.  And I can't.  So

21   I'll do my best.

22        JUDGE PROCTOR:  Don't want anybody to think I deprived

23   you of a water break.

24        All right.  So at some point after these discussions,

25   it became -- the Walker counsel consented to the transfer, and

 1  the transfer was finalized later that week; correct?  The

 2  transfer of Walker.

 3          MR. ORR:  That's my understanding, yes.

 4          JUDGE PROCTOR:  And Walker -- were you in the courtroom

 5  or otherwise available on the very first day when I walked

 6  through the procedural path that these cases took?

 7          MR. ORR:  Yes, I was there in person.

 8          JUDGE PROCTOR:  So you're aware, then, that when the

 9  transfer comes in under the first-filed rule to the Northern

10  District of Alabama, the clerk's office has to make an

11  assessment about which division it goes to because there was not

12  a specific designation of a division in the transfer order;

13  correct?

14          MR. ORR:  I do recall that.

15          JUDGE PROCTOR:  And because all the parties that were

16  resident in the Northern District were actually in our

17  Northeastern Division or northern jury area, the clerk's office

18  would have randomly assigned that to a judge from that division

19  and that jury area.  You're aware of that?

20          MR. ORR:  Yes.  That was not our understanding of how

21  it would go, but since hearing your description of the process

22  in the in-person hearing, now I know.

23          JUDGE PROCTOR:  Well, and this is the strong impression

24  I had as I was giving that description, looking out into my

25  audience.  I saw a lot of heads turn at each other and say, oh,

1  okay, that makes sense.  That's what happened but we didn't know

2  that.  Fair?

3          MR. ORR:  That's fair.

4          JUDGE PROCTOR:  But what you did know at the time was

5  that it got assigned to Judge Burke.

6          MR. ORR:  Yes.

7          JUDGE PROCTOR:  And that caused concern among your

8  team; correct?

9          MR. ORR:  Well, initially, we thought it was just a

10  clerical error.  As I indicated in my declaration, another

11  member of our team, Ms. Terry, had communications with Judge

12  Axon's -- a member of her staff who indicated that -- at least

13  they believed that it would just be transferred directly to

14  Judge Axon's chambers.  And so our initial impression was that

15  it was a clerical error and that by, you know, day's end, it

16  would be moved from Judge Burke's chambers to Judge Axon.

17          JUDGE PROCTOR:  All right.  I want to go back to the

18  point you just raised about communication with somebody on Judge

19  Axon's staff.  You were not the one who made that call.

20          MR. ORR:  Correct.

21          JUDGE PROCTOR:  Was that Ms. Hoverman Terry who made

22  the call?

23          MR. ORR:  Yes.

24          JUDGE PROCTOR:  And she reported it to the group?

25          MR. ORR:  Yes.

```
1            JUDGE PROCTOR:  Were you aware that she was going to

2   make -- be making a contact with the Court before she did or did

3   you just receive a report about this after it occurred?

4            MR. ORR:  I know that she was going to make a contact

5   with the Court regarding the -- our forthcoming pro hac vice

6   motions because there are requirements in the local rules that

7   you indicate your home address on the motions.  And we wanted to

8   inquire with Judge Axon's staff if there was any way that we

9   could -- if the judge wanted us to file those, if we could file

10  them under a seal.

11           JUDGE PROCTOR:  Or give a business address.  Just -- in

12  other words, you just -- counsel in a case like this would be

13  sensitive about and concerned regarding, you know, personal

14  identifying information in such a filing.  Perfectly

15  understandable.

16           MR. ORR:  That's correct.  That's correct.

17           JUDGE PROCTOR:  But that was the only purpose that that

18  call was made.  It is just to address the PHV motions that were

19  anticipated?

20           MR. ORR:  That was my understanding.  I don't recall

21  any communications suggesting that we seek information about,

22  you know, the process for what would happen if Walker was sent

23  up to the Northern District.  So I'm not sure how that

24  information came about.

25           JUDGE PROCTOR:  But Ms. Hoverman Terry reported back to
```

1   the group that the staff member she spoke with had indicated to

2   her that Walker would be assigned to Judge Axon.

3             MR. ORR:  That is correct.

4             JUDGE PROCTOR:  Did you think that odd at the time,

5   that you're calling about PHV motions in Ladinsky and a staff

6   member volunteers information about what would occur with

7   Walker?

8             MR. ORR:  I didn't think it odd, only because I assumed

9   that the staff member did not volunteer that information, that

10  Ms. Hoverman Terry must have asked a question that prompted that

11  response.

12            JUDGE PROCTOR:  Did Ms. Hoverman Terry tell you that

13  she asked a question that prompted that response?

14            MR. ORR:  I'm trying to remember her report back.  I

15  think she just stated that as information that she obtained from

16  the staff member she spoke to.  So I don't recall that she

17  indicated that she asked a question or whether this Court staff

18  member volunteered that information.

19            JUDGE PROCTOR:  So it didn't register with you at the

20  time whether this was volunteered or asked about, and it fit

21  with what you understood was going to occur anyway.

22            MR. ORR:  That was my understanding of how the

23  first-filed rule would work.  Yes.

24            JUDGE PROCTOR:  And have you litigated first-filed rule

25  issues in federal court before?

 1          MR. ORR:  No.

 2          JUDGE PROCTOR:  So it may come as some surprise to you,

 3   then, to understand that the first-filed rule is not a

 4   judge-centric rule, it's a district-centric rule.  In other

 5   words, first-filed rule is what gets a case transferred from one

 6   district to another.

 7          MR. ORR:  I do recall that Mr. Soto had done some

 8   research about the first-filed rule and recounted that during

 9   one of our team calls.  But I guess his recitation of what it

10   was, as he suggested it to me, was judge-specific, not

11   district-specific.  But that was clearly my misunderstanding.

12          JUDGE PROCTOR:  We'll talk to Mr. Soto later.  I'll

13   give him his complex civil litigation exam then.  All right.

14          MR. ORR:  Far more appropriate for him.

15          JUDGE PROCTOR:  Fair enough.

16          Let me ask you this.  And I need a candid response to

17   this.  What, if anything, are you aware of either Walker

18   counsel, Ladinsky counsel, or someone who had an interest in the

19   outcome of this case making any other contacts with the clerk's

20   office of the Northern District of Alabama?

21          MR. ORR:  I am unaware of any other contacts with any

22   other judges' chambers in either the Northern or Middle

23   Districts.

24          JUDGE PROCTOR:  All right.  Categorically unaware of

25   any such thing?

 1          MR. ORR:  Correct.  The only contact I'm aware of is

 2     the one that Hoverman Terry made to Judge Axon's staff.

 3          JUDGE PROCTOR:  Did you ever hear about Mr. Charles

 4     contacting Judge Thompson's staff?

 5          MR. ORR:  I do not recall any -- no.

 6          JUDGE PROCTOR:  Fair enough.

 7          All right.  On Friday of the week following your filing

 8     of Ladinsky -- so, in other words, seven days after the

 9     filing -- is when things got interesting; right?

10          MR. ORR:  Things started moving.  Yes.

11          JUDGE PROCTOR:  All right.  At some point late that

12     afternoon, the parties were working together with the State to

13     prepare a motion to consolidate Walker with Ladinsky; correct?

14          MR. ORR:  Yes, and our understanding -- I don't know if

15     we had stopped working on that after hearing from Mr. LaCour

16     that the State intended to file a motion to bring the Walker

17     case to Judge Axon's chambers.

18          JUDGE PROCTOR:  So those communications occurred in

19     stages.  First, you -- the Ladinsky team and the Walker team

20     agreed that there would be a motion to consolidate.  And when

21     they called the State to consult about that, it was learned that

22     the State was already working on its own motion seeking the same

23     relief.

24          MR. ORR:  That sounds like what happened, yes.

25          JUDGE PROCTOR:  All right.  What do you recall being

1   discussed between the Walker and the Ladinsky teams about

2   consolidation and how that would work and look?

3          MR. ORR:  The only discussions I recall were purely

4   about logistics as to which team needed to file the motion and

5   if it needed to be filed by Walker counsel in the Walker case,

6   by Walker counsel in Ladinsky, or by Ladinsky counsel in the

7   Ladinsky case.  And I think the ultimate conclusion was that the

8   Ladinsky team should file it in the Ladinsky case before Judge

9   Axon, and that is my understanding what the plan was until we

10  had heard from the State.

11         JUDGE PROCTOR:  At that point, was there a

12  discussion -- were there discussions relating to what

13  consolidation would look like going forward as to the two

14  separate teams?

15         MR. ORR:  Not at that point, no.  Not that I was

16  involved in.

17         JUDGE PROCTOR:  Everyone agreed that we're going to

18  consolidate the cases.  And was the thinking on your side we'll

19  figure that out later?

20         MR. ORR:  The thinking was that, yes, let's consolidate

21  them, figure out who these cases are before, and then figure out

22  a path forward, obviously quickly, given the -- that Walker

23  already had a PI motion pending and we were on the heels of

24  filing our own.

25         JUDGE PROCTOR:  In fact, you had planned to file it

1  later that day was the hope; right?

2         MR. ORR:  That is correct.

3         JUDGE PROCTOR:  On that Friday, I should say.

4         MR. ORR:  Yes, that's correct.

5         JUDGE PROCTOR:  How would you describe the Ladinsky

6  command and control structure in terms of decision-making on --

7  in the Ladinsky case?

8         MR. ORR:  The decision-makers, from my perspective, you

9  know, from the nonprofit legal organizations, you know, as far

10 as the heads of each of those organizations, was Shannon Minter

11 for the National Center For Lesbian Rights, Ms. Levi for GLAD,

12 Ms. Warbelow for HRC, and Mr. McCoy for SPLC.  And then from the

13 firms, Mr. Ray and Mr. Shortnacy from King & Spalding and

14 Ms. Eagan and Mr. Doss from Lightfoot.

15        JUDGE PROCTOR:  All right.  Was there a particular

16 captain that would make calls and make -- be the buck stops

17 here, or was it more collaborative?

18        MR. ORR:  I was not involved in those conversations.  I

19 will say our general approach is more collaborative, so that

20 would be my inclination as to how those calls were run.

21        JUDGE PROCTOR:  All right.  Going back to the

22 conversation you had had with Walker counsel about the prospect

23 of either your case going to the Middle or their case going to

24 the Northern District, was there a preliminary discussion about

25 who would take the lead if the cases ended up in either

1  district, in the same district?

2       MR. ORR:  Not on that call, although, again, I don't

3  know if there were other calls between sort of decision-makers

4  of those two teams about that issue prior to or around that time

5  or prior to the dismissals of the initial -- of Walker and

6  Ladinsky.

7       JUDGE PROCTOR:  Are you familiar with any party -- not

8  a lawyer, but a party -- having a communication with either the

9  Middle District or Northern District clerk's office employees?

10      MR. ORR:  No.

11      JUDGE PROCTOR:  So there's discussion about the

12 consolidation motion but, to your knowledge, not a lot of

13 discussion about what consolidation looks like in terms of the

14 two teams working in front of the same judicial officer;

15 correct?

16      MR. ORR:  Yes.  And I think that was in part because we

17 were unsure of how the -- whichever judge it was going to be

18 before would ultimately want to handle the motion for

19 preliminary injunction, if there was going to be an evidentiary

20 hearing, as Judge Burke ordered, or if it was going to be

21 decided on the papers.  So I think part of that -- the reason

22 why those discussions may not have yet occurred is that

23 uncertainty.

24      JUDGE PROCTOR:  So -- and to be clear, when you filed

25 first, you didn't have your motion for a temporary restraining

1  order, preliminary injunction, ready to go, but you're aware

2  that when Walker filed, they filed a motion for a TRO or

3  preliminary injunction; correct?

4          MR. ORR:  Yes.

5          JUDGE PROCTOR:  And I think there was also some

6  discussion on the Ladinsky side about amending the complaint to

7  add a claim or -- and/or clarify some claims.  And that was

8  going to affect the scope of a motion that would be filed?

9          MR. ORR:  Yes.  We decided to file the Ladinsky

10 complaint, you know, as soon as we could after Governor Ivey

11 signed SB184.  At the time we filed, we had already had plans to

12 add the plaintiff -- the Zoe plaintiffs as well as add a free

13 speech claim, which we ultimately did in the Eknes-Tucker.

14         JUDGE PROCTOR:  All right.  At that point -- again, up

15 until you received Judge Axon's order, everyone was under the

16 impression that the Walker case would be assigned to Judge Axon

17 and would proceed from there.

18         MR. ORR:  That's correct.

19         JUDGE PROCTOR:  But then you received Judge Axon's

20 order assigning her case to Judge Burke.

21         MR. ORR:  Yes.

22         JUDGE PROCTOR:  My understanding is that that spurred

23 more than one conference call among all the groups, whether the

24 Ladinsky team and Walker team in their huddles and even a call

25 or two between the Ladinsky and Walker teams.

1          MR. ORR:  Yes.

2          JUDGE PROCTOR:  Which one of those calls would you have

3    been a direct participant in, either -- whether or not you had a

4    speaking role, just which ones would you have been on the call

5    for?

6          MR. ORR:  The two calls that I recall being on that

7    afternoon was a call with Mr. Minter, which was just the two of

8    us, and then later a call -- an internal call with the Ladinsky

9    team.  And, you know, my -- as I think I indicated in my

10   declaration, my purpose was not really to contribute but to

11   listen in in order to be able to convey information to our

12   clients since I was the main point of contact for the Ladinsky

13   plaintiffs.

14         JUDGE PROCTOR:  Now, was there -- I've seen this in

15   your declaration, I believe, and others, that if Judge Burke had

16   been just randomly assigned to this case, there would have been

17   no issue with Judge Burke.

18         MR. ORR:  That's correct.  We knew in filing in the

19   Northern District that there was always a chance we could be

20   randomly assigned to him.

21         JUDGE PROCTOR:  But what made you think that the Walker

22   case was not randomly assigned when it came in to the Court?

23         MR. ORR:  Our mistaken belief about the logistics and

24   how the first-filed rule would work.  And I think, in part,

25   based on what Ms. Hoverman Terry had relayed to us from Judge

1    Axon's staff just suggested to us that there may have been

2    something other than the random assignment.

3            JUDGE PROCTOR:  What was that?  I'm still struggling,

4    as I've heard all this testimony for a number of hearings now.

5    What was the theory as to what occurred?

6            MR. ORR:  We really had no idea as to what had

7    occurred.  You know, we were all very confused by it.  And I

8    think what I recall is that, you know, the -- whatever action we

9    were going to take we wanted to do quickly, you know.  And if

10   the ultimate decision was to dismiss the Ladinsky case, that we

11   wanted to do it quickly in order to be able to avail ourselves

12   of Rule 41 before the defendants had an opportunity to file an

13   answer.

14           JUDGE PROCTOR:  When is the first time that idea was

15   floated that you recall?

16           MR. ORR:  I recall discussing it with Mr. Minter, and

17   it was discussed on the internal Ladinsky call.  I don't recall

18   if there was any discussion prior to that, although my call with

19   Mr. Minter, from my recollection, was not long after we had seen

20   Judge Axon's order transferring Ladinsky to Judge Burke.

21           JUDGE PROCTOR:  So chronologically, Judge Axon's order

22   comes in.  The next step you recall is being on a phone call

23   with just you and Minter.

24           MR. ORR:  That's correct.

25           JUDGE PROCTOR:  After that there was a call with a

1    broader scope of the Ladinsky team?

2           MR. ORR:  Yes.

3           JUDGE PROCTOR:  And after that call was a joint phone

4    conference of some type, Zoom or phone, with Walker and Ladinsky

5    counsel discussing this matter.

6           MR. ORR:  That is possible.  I don't recall being on

7    that particular joint call.  I do recall mention within -- you

8    know, either with Mr. Minter or within the Ladinsky team call

9    that there had been discussions with folks from the Walker team,

10   but I -- I had no discussions with the Walker team that day.

11          JUDGE PROCTOR:  All right.  So you wouldn't have been

12   on that -- on the last call I just asked about.

13          MR. ORR:  No.

14          JUDGE PROCTOR:  But you're aware that such a call had

15   occurred?

16          MR. ORR:  I knew that there were discussions generally.

17          JUDGE PROCTOR:  So it was -- the first time that

18   dismissal came up was in your one-on-one call with Minter

19   immediately after the order came out?

20          MR. ORR:  It was soon after.  I don't know how

21   immediate it was, but it was close in time.

22          JUDGE PROCTOR:  Well, do I recall that Judge -- do you

23   remember what time Judge Axon's order was entered?

24          MR. ORR:  I recall it being around four o'clock Central

25   Time, but I could be --

```
 1            JUDGE PROCTOR:  And do you remember what time the
 2   dismissal of the case occurred?
 3            MR. ORR:  It was within a couple of hours.
 4            JUDGE PROCTOR:  So all of this happened pretty
 5   immediately is my point.
 6            MR. ORR:  Okay.
 7            JUDGE PROCTOR:  It may have been minutes, it may have
 8   been 20 minutes, it may have been 30 minutes, but pretty quickly
 9   you and Mr. Minter got on the call and discussed this.
10            MR. ORR:  Correct.
11            JUDGE PROCTOR:  Take me through what you recall about
12   that conversation.
13            MR. ORR:  I recall us discussing the possibility of
14   dismissal as an option.
15            JUDGE PROCTOR:  Was that your idea or his idea at
16   first?
17            MR. ORR:  It would have -- it would have come from -- I
18   believe it came from him.  I don't recall thinking about
19   dismissal.  I do remember sharing a concern that it could be
20   perceived as a move for judge shopping, but as we talked through
21   sort of the concerns, you know, the confusion around why the
22   case -- why the Walker case had been assigned to Judge Burke as
23   opposed to not directly to Judge Axon as well as the need for
24   the Walker and Ladinsky teams to -- or a desire among the Walker
25   and Ladinsky teams now to really consolidate their case into one
```

1    case as opposed to kind of two parallel tracked cases, you know,

2    that there was significant reasons for dismissing -- for

3    dismissing the case, irrespective of whether it was before Judge

4    Burke or before Judge Axon.

5            JUDGE PROCTOR:  Did it occur to you before Mr. Minter

6    referenced it that dismissal would be an option that should be

7    considered?

8            MR. ORR:  I don't recall thinking -- that thought

9    crossing my mind.  No.

10           JUDGE PROCTOR:  Did it surprise you when he suggested

11   that?

12           MR. ORR:  I don't think it surprised me.  It just -- I

13   just had the concern that I had expressed, you know, wanting to

14   make sure that we don't leave the impression that we were doing

15   this for, you know, an improper purpose.

16           JUDGE PROCTOR:  The reason I ask that question, though,

17   is just what I understand to be the feverish pitch at which your

18   team was attacking this litigation.  The same day that judge --

19   that Governor Ivey signs the legislation, you filed the lawsuit.

20   You filed it knowing you would probably need to amend the

21   complaint.  You filed it knowing you didn't have a motion for

22   TRO or preliminary injunction ready to go.  Everyone knew this

23   was -- and you've litigated these matters before where you've

24   sought interim relief to stop a statute from going forward;

25   correct?

```
 1          MR. ORR:  We have.  Not -- I don't recall a situation

 2  like this where we had filed a lawsuit, you know, right after

 3  the -- a bill was signed.  But, yes, I have been involved in

 4  litigation where we have sought preliminary injunctive relief.

 5          JUDGE PROCTOR:  Did you and Mr. Minter discuss the fact

 6  that if you dismissed this action, that was going to delay

 7  getting the very relief that you were seeking to obtain early?

 8          MR. ORR:  We had discussed that, that possibility.  You

 9  know, we -- I think at the very early stages of kind of what was

10  thought -- the possible strategy going forward after dismissal

11  was that we would refile in the Northern District.  You know,

12  our feeling at the time was that the delay would be, at best,

13  minimal.

14          JUDGE PROCTOR:  Delay would be minimal if you're

15  refiling -- dismissing and refiling a lawsuit?

16          MR. ORR:  You know, we were confident that, you know,

17  we would be able to find new plaintiffs, if needed, in short

18  order and redo what we needed to in the complaint to refile it

19  within a matter of days.

20          JUDGE PROCTOR:  Well, you could have waited a couple

21  days to file initially and had a motion for a TRO to accompany a

22  more well-orged complaint; correct?

23          MR. ORR:  We made the decision, though, that we wanted

24  to be the first filed.

25          JUDGE PROCTOR:  Okay.  So first filed was what -- being
```

1    first filed was what drove that decision.

2           MR. ORR:  Correct.

3           JUDGE PROCTOR:  That's understandable.  All right.  But

4    let's ask this.  Let me ask this.  What about Judge Burke came

5    up on your call with Mr. Minter?

6           MR. ORR:  I don't know that it was anything -- you

7    know, with regards to Judge Burke, we had -- I think it was just

8    a concern regarding how he might analyze the legal claims in

9    this case based on prior opinions when he was on the criminal

10   court of appeals and just a concern that his prior political

11   affiliations may make him less receptive to the type of expert

12   testimony that we would need to put forward in a case like this.

13          JUDGE PROCTOR:  So was there already a scouting report

14   on Judge Burke in place by the time that Judge Axon's order was

15   entered, or was that scouting report done after the order was

16   received?

17          MR. ORR:  I know that we had done some -- former

18   cocounsel Palladino, formerly from King & Spalding, did some

19   further in-depth research, although I don't remember the timing

20   of it.  You know, I know it was after the filing of the Ladinsky

21   case, likely after the Walker case was assigned to Judge Burke.

22   But, you know, there was no sort of formal scouting report, as

23   you put it, but that was just the -- that was the extent of the

24   discussions we had had previously.

25          JUDGE PROCTOR:  When you hung up with Minter in that

 1  one-on-one call, were you under the impression that the case was

 2  going to be dismissed?

 3          MR. ORR:  I was under the impression that it was his

 4  opinion that the cases should be dismissed, but I don't know

 5  whether at that point, you know, the decision-makers within

 6  Ladinsky had reached consensus or whether there was consensus

 7  between the two litigation groups.

 8          JUDGE PROCTOR:  All right.  And you weren't a

 9  decision-maker in this.  You were just being consulted as a

10  sounding board?

11          MR. ORR:  Correct.

12          JUDGE PROCTOR:  In that call, was there any discussion

13  about refiling other than the fact that the case would need to

14  be refiled?

15          MR. ORR:  I think other than -- not other than sort of

16  his initial thought that we would refile in the Northern

17  District.

18          JUDGE PROCTOR:  Did that cause you any concern about

19  the optics of that, that we're going to dismiss this case and

20  then turn around and refile it?

21          MR. ORR:  I do remember -- I do remember saying

22  something to the effect of that it would likely be -- given sort

23  of my understanding of how these cases are assigned, that it

24  would likely be assigned back to Judge Burke, but that was

25  speculation.

 1          JUDGE PROCTOR:  Was that your speculation or someone

 2   else's speculation?

 3          MR. ORR:  That was my speculation.

 4          JUDGE PROCTOR:  All right.  Did Minter ever acknowledge

 5   that if it's refiled in the Northern District, it could very

 6   well go right back to Judge Burke?

 7          MR. ORR:  I don't remember what his response was to

 8   that statement.

 9          JUDGE PROCTOR:  Actually, his intent was just the

10   opposite, to refile so as not to get Judge Burke; correct?

11          MR. ORR:  My understanding of the purpose was to ensure

12   that we -- that we filed and were given a randomly assigned

13   judge.  I don't know that -- I think that was really the -- the

14   goal was to sort of -- given the way the process had gone and

15   the confusion and uncertainty, that we had -- that the team felt

16   because of that, wanting to regain that certainty.  I think that

17   was the purpose.

18          JUDGE PROCTOR:  Can you tell us in good faith that if

19   the same perceived procedural irregularity regarding this

20   assignment had occurred and this case had gone to somebody

21   besides Judge Burke, and, in particular, a judge who the team

22   viewed as very good -- a very good draw, that the case still

23   would have been dismissed?

24          MR. ORR:  Given that I was not a decision-maker, I

25   don't want to speculate.  I do think that there were still

 1   significant reasons warranting the dismissal and refiling.  You

 2   know, as I indicated in my declaration, the two cases that were

 3   filed, Ladinsky and Walker, were very different.  They took very

 4   different approaches as to what were the constitutional

 5   infirmities with SB184.  And, you know, frankly, there was sort

 6   of thought about how we were going to actually run this case in

 7   terms of the decision-making structure, at least in my mind, a

 8   concern about that.  As, you know, I indicated previously, you

 9   know, we tried to dissuade the Walker team from filing their

10   lawsuit.  So --

11          JUDGE PROCTOR:  Were you concerned that the dismissal

12   may be viewed as judge shopping?

13          MR. ORR:  I was initially concerned about that, but as

14   I indicated, you know, through my discussions with Mr. Minter

15   and discussing the -- the reasons behind the possibility of

16   pursuing dismissals, although there may be that perception, that

17   that is certainly not what we were doing.

18          JUDGE PROCTOR:  Well, but optics play a role in life;

19   correct?

20          MR. ORR:  Sure.

21          JUDGE PROCTOR:  So there must have been some very

22   serious countervailing consideration you had.  What was it?

23          MR. ORR:  You mean to justify dismissal in light of the

24   optics that it would appear to be judge shopping?

25          JUDGE PROCTOR:  Yes.

 1          MR. ORR:  I think, again, I can only speculate as to

 2   what Mr. Minter was thinking.  But from my perspective, the need

 3   to consolidate these cases and figure out a plan forward --

 4   given that -- you know, the possibility that we would likely be

 5   headed towards a preliminary injunction hearing within a matter

 6   of weeks, you know, the need to coordinate ourselves was a

 7   significant consideration, at least in my mind.

 8          JUDGE PROCTOR:  But that was a consideration when the

 9   two sides agreed to work toward consolidation; correct?  That

10   wasn't anything new.

11          MR. ORR:  You know, I -- yes, but I think the one

12   difference is that at the time, you know, when we knew that both

13   cases were going to be filed and that there was this possibility

14   that they would be consolidated, I don't believe that Judge

15   Burke had yet issued his order setting a conference, a status

16   conference, with the parties, which, you know, at least in my

17   mind, indicated that he intended to move very quickly on the

18   motion for preliminary injunction and TRO.  And I think it made

19   that possibility far more real.

20          JUDGE PROCTOR:  All right.  Anything else you recall

21   about the conversation with Minter other than this is a strange

22   development with the cases going to Judge Burke and I think his

23   view that we ought to dismiss the cases or dismiss our case?

24          MR. ORR:  Nothing else that I recall, no.

25          JUDGE PROCTOR:  Did you two discuss any of the

 1   conditions that would be determined for any type of dismissal;

 2   for example, we need to talk to the Walker counsel and see if

 3   they're going to dismiss?

 4          MR. ORR:  I do recall that there was going to be some

 5   discussions with the Walker counsel, but beyond that, I don't

 6   remember.

 7          JUDGE PROCTOR:  All right.  Then you get on a call with

 8   your team.  Who do you recall being on that phone call besides

 9   you and Minter?

10          MR. ORR:  Ms. Eagan was on that call.  I believe

11   Ms. Warbelow and Mr. McCoy were on that call as well.  But

12   beyond that, I don't remember, although I'm certain that there

13   were other people on that call.

14          JUDGE PROCTOR:  All right.  How long did that call

15   last?

16          MR. ORR:  Probably about 20 minutes, because we wanted

17   to make sure that I had enough time to reach out to the

18   plaintiffs and seek their -- inform them of what had happened

19   and sort of get their decisions as to what they wanted to do.

20          JUDGE PROCTOR:  Well, one of the things we kind of

21   viewed as off limits is any communications with your clients, so

22   I'm not going to ask you about those.  But you did get consent

23   of your clients to consider dismissal?

24          MR. ORR:  Yes.

25          JUDGE PROCTOR:  And that occurred between your phone

1   call with Minter and the phone call with the Ladinsky team more

2   broadly?

3           MR. ORR:  I think that occurred -- I believe it

4   actually occurred after the larger team call between the larger

5   team call and the dismissal.

6           JUDGE PROCTOR:  I see.  On the larger team call,

7   though, our understanding is that Ms. Eagan gave an assessment

8   of Judge Burke.

9           MR. ORR:  I don't recall that.

10          JUDGE PROCTOR:  All right.  So in your declaration,

11  paragraph 21 on page 9, you said that the purpose for your

12  listening in on the call was to accurately convey the situation

13  to your clients as well as their options for responding to this

14  new information, and you eventually did that.

15          MR. ORR:  That's correct.

16          JUDGE PROCTOR:  So you were going to be -- it was going

17  to be necessary for you to be in command of some details in case

18  they asked questions of you about what happened and why are you

19  making this recommendation.

20          MR. ORR:  Correct.

21          JUDGE PROCTOR:  But earlier in that same paragraph you

22  say, I don't remember what was said, as I was not a

23  decision-maker and believe the decision-makers likely already

24  had had separate conversations amongst themselves and the

25  decision-makers in the Walker -- and the Walker team.

1          MR. ORR:  Yes.

2          JUDGE PROCTOR:  So help me understand this.  On the one

3    hand, you're saying I had to pay really careful attention to

4    this call because even though I wasn't a decision-maker, I was

5    going to have to communicate all this information to my clients.

6    On the other hand, you're saying I really didn't pay much

7    attention because I wasn't a decision-maker.  Do you understand

8    the disconnect I'm seeing in those two statements?

9          MR. ORR:  Sure.  So I should say it was a very -- as

10   I'm sure you can imagine, it was a very harried few hours and,

11   you know, a lot was going on.  And I wanted to -- I remember

12   my -- in trying to focus but also feeling my attention a little

13   divided, wanting to make sure that I both had the information I

14   needed to communicate to our clients but also, you know, through

15   that paragraph, wanted to, you know, really indicate that I was

16   not a decision-maker.  I -- you know, my understanding was

17   that -- at least my recollection and impressions from the call

18   was that dismissal was the option or was the, you know, sort of

19   avenue that the team thought best to pursue.  So I apologize for

20   the confusion that I caused with my wording of that paragraph.

21         JUDGE PROCTOR:  Well, someone else who was on that call

22   told us in this very courtroom that Eagan reported to the team

23   on that very call that there was a zero percent chance of

24   success on a motion for TRO or preliminary injunction in front

25   of Burke.  Are you telling us that you don't recall any such

1  statement being made?

2       MR. ORR:  I don't recall.  It's entirely possible that

3  Ms. Eagan said those things.  I do not recall her saying

4  anything like that.

5       JUDGE PROCTOR:  That seems like a pretty significant

6  statement that you should recall, if it was made, in the context

7  of this whole matter.

8       MR. ORR:  What I do recall, not necessarily being on

9  that call, is sort of a general concern about whether Judge

10  Burke would be a good draw for a case like this, the conclusion

11  being that we had concerns about him as a draw, again, given

12  some of the decisions that he previously made on the criminal

13  court of appeals.  But, you know, I don't remember anything

14  beyond that.

15       JUDGE PROCTOR:  And I'm not lecturing, but I'm giving

16  you a chance to be clear on this.  And maybe you have been

17  clear.  Not asking -- I'm not suggesting you retract -- retrace

18  your ground and think about this, but you might want to think

19  about this.  You realize that if you recall something and say

20  you don't recall something, that's inappropriate.

21       MR. ORR:  Yes.  And I'm telling you what I recall

22  generally Ms. Eagan saying, although I can't pinpoint it to that

23  call, and I certainly don't recall the particular statement that

24  someone else had testified to --

25       JUDGE PROCTOR:  Do you remember Judge Burke coming up

 1  at all on the call and how he might lean or be predisposed on

 2  matters like this?

 3          MR. ORR:  I am sure that that was discussed on the

 4  call.

 5          JUDGE PROCTOR:  What do you recall about that?

 6          MR. ORR:  I'm sorry, Your Honors.  I don't recall any

 7  specifics from that discussion.  The only things that I can draw

 8  on are sort of what I recall are the general impressions from --

 9  that we received from the Lightfoot folks regarding Judge Burke.

10          JUDGE PROCTOR:  Did anybody make a statement along the

11  lines of, it seems that Judge Burke reached out and snatched or

12  grabbed this case from Judge Axon, that there's something

13  untoward going on here?

14          MR. ORR:  I do remember some speculation about that.  I

15  don't remember who made a statement like that, but that does

16  sound familiar.

17          JUDGE PROCTOR:  What did you hear from Minter about his

18  call with the Walker team that followed this Ladinsky team call?

19          MR. ORR:  The only thing I remember hearing from

20  Mr. Minter regarding the Walker team is that they too agreed to

21  dismiss their case and that we would discuss over the weekend,

22  you know, what the new case would look like in terms of

23  plaintiffs, in terms of venue, in terms of how our teams would

24  consolidate and organize themselves.

25          JUDGE PROCTOR:  What specifically do you remember about

1   those matters, Mr. Minter saying to you?

2           MR. ORR:  About -- on that Friday or any later point?

3           JUDGE PROCTOR:  I'm sorry?

4           MR. ORR:  Are you referring to on that Friday or

5   following the dismissal?

6           JUDGE PROCTOR:  At any point.

7           MR. ORR:  Okay.

8           JUDGE PROCTOR:  So my understanding is after the

9   dismissals were filed, the decision-makers from the various

10  groups had discussions regarding how to proceed.  And you just

11  indicated a couple of issues related to that, venue that there

12  would be refiling in, when would the refiling occur, who would

13  be on the refiling, what would the claims look like, those type

14  of things.  What did you hear from Mr. Minter about those

15  discussions?

16          MR. ORR:  So what I had heard from Mr. Minter,

17  Mr. Minter asked me to try to start searching for new potential

18  plaintiffs to include in this future filing.  And I -- again, I

19  don't remember the time line, but I believe it was on Saturday I

20  had heard from Mr. Minter that the decision was to file with all

21  new plaintiffs and file in the Middle District.  Around that

22  same time, he recounted to me that the discussions about

23  bringing this as sort of one consolidated case started to break

24  down and that the Walker team were not sure if they were going

25  to proceed with us or would not file -- would or not participate

1  at all.  That's what I recall.

2         JUDGE PROCTOR:  All right.  So Minter reported to you

3  that Walker was not going to go forward.  The Ladinsky team, in

4  some configuration, was going to go forward but not with the

5  Ladinsky parties, rather, with a brand new lawsuit in the Middle

6  District with new plaintiffs; correct?

7         MR. ORR:  Correct.

8         JUDGE PROCTOR:  And did he say why the decision was

9  made to file in the Middle District?

10        MR. ORR:  It was out of a concern -- we wanted to be

11 clear that this was not for the purpose of judge shopping, that

12 this was really a function of our clients making the decision

13 not to proceed with the Ladinsky case.  And given our interest

14 in challenging this law, we found and did find new plaintiffs

15 who were and wanted to, again, convey to the Court that the

16 dismissal was not an attempt at judge shopping.

17        JUDGE PROCTOR:  For at least two years, you

18 contemplated -- your team contemplated filing this suit and were

19 ready to file it whenever legislation along these lines passed;

20 correct?

21        MR. ORR:  Yes.

22        JUDGE PROCTOR:  And you would start the team -- you'd

23 build the team or restart the team and then put the team into

24 hibernation after each legislative session when no legislation

25 passed.

1          MR. ORR:  Correct.

2          JUDGE PROCTOR:  So the team was assembled and assessing

3  a filing of some type in 2020, 2021, and 2022.

4          MR. ORR:  Correct.

5          JUDGE PROCTOR:  And under -- at each juncture along

6  those lines at those times, your team's assessment was we're

7  filing in the Northern District of Alabama.

8          MR. ORR:  That assessment was made in 2020.  We did not

9  revisit it in subsequent years.

10          JUDGE PROCTOR:  Well, you revisited it, at least in

11  part, when you were invited to transfer your case to the Middle

12  District at the invitation of the Walker counsel; correct?

13          MR. ORR:  No.  We made clear to the Walker counsel that

14  we were not moving from the Northern District.

15          JUDGE PROCTOR:  That's the point.  You made that

16  decision.

17          MR. ORR:  Okay.

18          JUDGE PROCTOR:  You made the decision, no, we're in the

19  Northern District, we're staying in the Northern District.  For

20  the better part if not more than two years, we've been committed

21  to litigating this case in the Northern District of Alabama.

22          MR. ORR:  That's accurate.

23          JUDGE PROCTOR:  But by the Saturday morning following

24  your dismissal, if not the Friday night following your

25  dismissal, the decision is made, well, we'll just decamp and go

1    to the Middle District of Alabama.

2         MR. ORR:  I think that decision was made, in

3    significant part, because of a concern or wanting to, again,

4    convey to the Court that this was -- that the dismissal was not

5    an attempt at forum shopping or judge shopping, but I was not

6    involved in those conversations.

7         JUDGE PROCTOR:  I know that's been a constant refrain

8    from you and others, but you understand why that could easily

9    look like judge shopping.  We have a judge that we don't want in

10   the Northern District of Alabama.  What's the best way to avoid

11   that judge?  File in a different district.  You understand the

12   optics of that, don't you?

13        MR. ORR:  I do.  Yes.

14        JUDGE PROCTOR:  And that was discussed before the

15   filing in the Middle District; correct?

16        MR. ORR:  I was not involved in the

17   discussions involving --

18        JUDGE PROCTOR:  That's not what I asked.  I asked if

19   that was discussed, if you're aware that was discussed.

20        MR. ORR:  I'm sure it was discussed.  I was not --

21   after the dismissals, my sole task was finding new plaintiffs.

22   And so the discussion regarding where to file and with what

23   plaintiffs, those discussions were had among the

24   decision-makers.  And, you know, Mr. Minter conveyed the

25   information that I indicated to you that he conveyed to me.  But

 1  my sole focus, you know, given that we wanted to refile very

 2  quickly, was on securing new plaintiffs.

 3          JUDGE PROCTOR:  Did you play the central role in

 4  finding the new plaintiffs?

 5          MR. ORR:  I played a significant role, again.  Given

 6  the timing, certainly, others -- others participated as well.

 7          JUDGE PROCTOR:  Who?

 8          MR. ORR:  The Noe plaintiffs, Southern Poverty Law

 9  Center had been in contact with them.  Dr. Koe is someone that

10  the human rights folks, HRC folks, had been in contact with.

11  Those are the two that are jumping out to me as folks that I did

12  not have the initial contact with.

13          JUDGE PROCTOR:  Which plaintiffs in Eknes-Tucker were

14  you responsible for signing up and bringing on board?

15          MR. ORR:  That would be the Reverend Eknes-Tucker, the

16  Boe family and the Koe family.

17          JUDGE PROCTOR:  Well, let's use -- you're using

18  pseudonyms.  I'm just trying to make sure we keep a clean record

19  here.

20          MR. ORR:  Sure.

21          JUDGE PROCTOR:  Where is that family from, just so I

22  know which one we're talking about?

23          MR. ORR:  Sure.  The Boe family is from Montgomery.

24  That's certainly within the Middle District --

25          JUDGE PROCTOR:  All right.  Let's do this.  Instead of

1  even using pseudonyms, just to keep them clear, let's identify

2  county because these were -- as I recall, there were three

3  different plaintiffs from three different counties, Lee County,

4  Cullman County, and what was the third one?

5          MR. ORR:  Was it Coffee County?

6          JUDGE PROCTOR:  It was somewhere in the Wiregrass

7  district, as I recall.

8          MR. ORR:  It's in -- what is that, southeastern part of

9  the state?

10         JUDGE PROCTOR:  Yes.  All right.  Which one of those

11  three families did you suggest the team be included in the new

12  lawsuit in Eknes-Tucker?

13         MR. ORR:  I suggested the family from the Montgomery

14  area -- I'm not sure which county that is.  I'm sorry, Your

15  Honor -- as well as the family from Cullman County, the Reverend

16  Eknes-Tucker -- I believe it's Jefferson County -- and -- sorry.

17  I'm going through the plaintiffs in my head.  We've since

18  amended, so I'm trying to remember -- make sure to talk about

19  the initial plaintiff lineup.  I spoke with Dr. Austin as well,

20  who's also in Jefferson County at UAB.  And I did end up

21  speaking to Dr. Zoe, who is from I believe Coffee County, but

22  it's down in southeastern Alabama.

23         JUDGE PROCTOR:  A substantial portion of the plaintiffs

24  in the Eknes-Tucker case, though, were Northern District of

25  Alabama residents; correct?  You had Eknes-Tucker, the Cullman

1    County family, and the doctor.

2          MR. ORR:  The doctor and the reverend.

3          JUDGE PROCTOR:  Yes.

4          MR. ORR:  Correct.

5          JUDGE PROCTOR:  Eknes-Tucker.  Well, it seems to me

6    that if most of the folks or a substantial plurality of the

7    folks that you're filing on behalf of are Northern District, was

8    there not discussion about, well, it makes sense to file in the

9    Northern District?

10         MR. ORR:  I was not privy to any such discussions.

11         JUDGE PROCTOR:  Nobody got local counsel in Montgomery?

12         MR. ORR:  No.  We -- I don't think there was ever any

13   discussion of switching local counsel from Lightfoot.

14         JUDGE PROCTOR:  But one of the advantages of -- one of

15   the reasons you told me earlier that you picked the Northern

16   District for the initial filing was Lightfoot was centrally

17   located there in Birmingham; correct?

18         MR. ORR:  Yes.  And my understanding, though, and one

19   of the reasons that we initially chose them as local counsel was

20   their experience throughout the federal courts in the federal

21   courts throughout Alabama.

22         JUDGE PROCTOR:  Well, there's no question they have

23   that, but I think you've said one of the factors was our local

24   counsel was right there in Birmingham as far as --

25         MR. ORR:  Yes.

1          JUDGE PROCTOR:  -- another reason why the Northern

2    District was chosen back in 2020.

3          MR. ORR:  That is certainly one of the reasons.  You

4    know, we do have -- the Southern Poverty Law Center is located

5    in Montgomery.  One of the reasons we looked at that as a factor

6    is sort of access to office space and be able to -- a place to

7    sort of convene and work.  And so the Southern Poverty Law

8    Center was able to provide that in Montgomery.

9          JUDGE PROCTOR:  All right.  We're going to take a short

10   recess.

11         Mr. Orr, if you would just stay on the line, we may

12   very well be concluded with you, but we would like to stretch

13   our legs and let you -- maybe if you can go get some water, that

14   might help.

15         MR. ORR:  Thank you, Your Honor.

16         JUDGE PROCTOR:  We'll reconvene in no less than ten

17   minutes.

18      (Recess was taken from 11:13 a.m. until 11:30 a.m., after

19        which proceedings continued, as follows:)

20         JUDGE PROCTOR:  All right.  Mr. Orr, we just have a

21   couple of wrap-up questions here.

22         MR. ORR:  Sure.

23         JUDGE PROCTOR:  To what extent was Rule 41 discussed

24   before the actual dismissal under Rule 41?

25         MR. ORR:  That was the sole purpose for moving as

1    quickly as we did, was to be able to use Rule 41 before

2    defendants were able to file an answer.  But that's the extent

3    of the discussion I remember.

4          JUDGE PROCTOR:  And the idea being that we would then

5    be locked in to this case being in its current posture and would

6    not be able to do anything to affect that if the State were to

7    file an answer or move for summary judgment?

8          MR. ORR:  Correct.

9          JUDGE PROCTOR:  And was there any discussion about

10   whether that was -- we're just concerned that the State may do

11   that, or was there actual intelligence or a factual basis for

12   believing the State may do that?

13         MR. ORR:  I don't recall any -- you know, any comments

14   or statements from defense counsel to that effect.  It was just

15   a concern that it was something they could do very quickly

16   without -- obviously, without consulting us to file an answer

17   and deprive us of the ability to use Rule 41.

18         JUDGE PROCTOR:  Was there any discussion to the effect

19   of they seem pretty happy with Judge Burke?

20         MR. ORR:  I mean, the only thing I can recall is, you

21   know, to the extent we had concerns about Judge Burke, you know,

22   from the perspective of the State, those would be hopeful

23   things.

24         JUDGE PROCTOR:  All right.  Let me just say this.

25   We're wrapping up, but I'm just concerned about something.

 1  There was no "to the extent" you had concerns about Judge Burke.
 2  In fairness, you had grave concerns about Judge Burke.  Fair?
 3          MR. ORR:  Yes, Your Honor.  And I didn't mean to
 4  suggest that we didn't at that time have concerns.  What -- all
 5  I was suggesting was that, you know, the things that we believed
 6  would be reasons why Judge Burke would not be a good draw for a
 7  case like this would be reasons that the State would believe
 8  that he would be a good draw.
 9          JUDGE PROCTOR:  You're about to take a deposition here
10  soon, so we need to get you going; right?
11          MR. ORR:  I'm about to defend a deposition.  Yes, Your
12  Honors.
13          JUDGE PROCTOR:  About to defend a deposition.  All
14  right.
15          Have you had a chance to think back more on that
16  Ladinsky team call and any discussions about Judge Burke such
17  that you've been able to recollect things you didn't previously
18  recollect?
19          MR. ORR:  No, Your Honor.
20          JUDGE PROCTOR:  So let me tell you the struggle I'm
21  having right now.  What was the number one goal in filing the
22  Ladinsky case?  What was the pot of gold that your team was
23  after?
24          MR. ORR:  To obtain a permanent injunction against
25  SB184, preventing it from being enforced.

1          JUDGE PROCTOR:  So you're on a phone call knowing that
2    that's the goal of the litigation, and you can't recall whether
3    or not someone said we have a zero percent chance of getting
4    that with the current judge assigned to the case?
5          MR. ORR:  You know, I don't remember those specific
6    words.  As I indicated --
7          JUDGE PROCTOR:  Well, hold on.  Let me be clear.  Hold
8    on.  I'm not asking about specific words.  Let me -- if you
9    think I was asking about -- if you think I was trying to pin the
10   tail on the donkey, let me be very clear.  Any words to the
11   effect of, we don't have a good shot in front of Judge Burke and
12   we need to do something about that.
13         MR. ORR:  I don't recall it specifically being said
14   during that call, though it would not surprise me if it --
15         JUDGE PROCTOR:  Take specifics out of it.  That's what
16   I just asked you.  Generally, do you remember a discussion about
17   Judge Burke and his propensity for a leaning in this case?
18         MR. ORR:  I'm sorry, Your Honor.  I really don't
19   remember that call very well at all.  You know, I do remember
20   those discussions occurring generally in our calls and prior
21   to -- so it could have been on that call or it could have been
22   on prior calls with the Ladinsky team.  I can't pinpoint it to
23   that call.
24         JUDGE PROCTOR:  All right.  Okay, then.  Now that
25   you've broadened that that way, what do you recall other than

1  what you've already told me -- and you haven't told me much

2  about this area -- about discussions regarding Judge Burke?

3          MR. ORR:  I recall it being conveyed that -- a concern

4  that Judge Burke would not be a good draw for this case and

5  then, you know, what I have recounted to you regarding the

6  concerns, given some of the opinions he authored while on the

7  criminal court of appeals.

8          JUDGE PROCTOR:  That's just something that was reported

9  to you.  You didn't do the independent research or Westlaw

10 search about that?

11         MR. ORR:  That is correct.  I did not.

12         JUDGE PROCTOR:  All right.  I think that concludes our

13 examination of you.  Thank you.

14         MR. ORR:  Thank you, Your Honors.  And I appreciate the

15 opportunity to testify by video.  Thank you very much for that

16 opportunity.

17         JUDGE PROCTOR:  All right.  Have a good day.

18         MR. ORR:  You, too.  Thank you.

19         JUDGE PROCTOR:  Is Ms. Stone available?

20         MR. SEGALL:  Get Ms. Stone?

21         JUDGE PROCTOR:  Yes.

22     (The witness, Jessica Stone, was sworn.)

23         JUDGE WATKINS:  Good morning, Ms. Stone.  I'm Judge

24 Watkins.  I think that we've kind of met.  Just give us your

25 legal name because your name has appeared two different ways in

 1    some of our records.  What's your name?

 2          MS. STONE:  Jessica Lynn Stone.  I think sometimes it's

 3    just the L., but Jessica Lynn Stone.

 4          JUDGE WATKINS:  Okay.  Jessica Lynn Stone.  All

 5    right.  You're a staff attorney or at the time a year ago --

 6    well, in April, you were a staff attorney at Southern Poverty

 7    Law Center; correct?

 8          MS. STONE:  Yes.

 9          JUDGE PROCTOR:  Are you still that?

10          MS. STONE:  As of yesterday, I'm a senior staff

11    attorney on November 1 for the new fiscal year, because I'm now

12    a certain amount longer out of law school, but I -- yes, I still

13    work for Southern Poverty.

14          JUDGE WATKINS:  Okay.  Congratulations.  How long are

15    you out of law school?

16          MS. STONE:  Five years.

17          JUDGE WATKINS:  Okay.  You made a statement in the -- I

18    believe in the May 20 -- a very brief statement in the May 20

19    proceedings.  And I don't know if you've reviewed that statement

20    or not, but is there anything that you recall about that

21    statement that you would change today or that you want to add

22    any expansion of what you said before?

23          MS. STONE:  I think it's still pretty accurate.  I

24    mean, I did review the testimony of the transcript --

25          JUDGE WATKINS:  Would you pull the microphone down just

1    a little bit so we can hear you?  There you go.

2         MS. STONE:  I did review the testimony, the transcript

3    of my testimony, and I think I would still answer the questions

4    the same way.  I mean, my memory was closer in time then, so I

5    trust that I was accurate about the timing of how everything

6    happened.

7         JUDGE WATKINS:  Okay.  So on that Friday afternoon when

8    this -- Friday, Good Friday afternoon, you took off a little bit

9    early and you were not involved in any of the discussions about

10   dismissal.

11        MS. STONE:  No.  As I said, I kept my computer open for

12   several hours.  So when I stopped actively working, like sitting

13   with my computer on my lap working -- because I was working from

14   home -- I stopped and I moved to the kitchen.  And I had the

15   computer open so I could see emails coming in, and I did see the

16   order.  So I saw the emails when the Walker case was assigned to

17   Judge Burke, and then I saw -- and then we were continuing with

18   preparing our substantive -- our substantive work, and I saw the

19   emails coming in about that.

20        And then I think -- I believe I still had my computer

21   open because this is on Eastern Time, so at like five something

22   or other, after five o'clock, so after close of business, I

23   still had my computer open.  I saw the email come in

24   transferring our case to Judge Burke and the notice from the

25   Court, I mean -- when I say "email," the notice come in.  And --

1  or at least someone forwarding it.  I don't think I was admitted

2  to the Court, so I don't think I was getting them directly, but

3  someone forwarded it.  And then people -- I saw email traffic

4  about scheduling a phone call, but at that point in time I was

5  running out of time.  I knew I didn't have time to join a phone

6  call that would probably be half an hour or an hour, and so I

7  did not join that phone call.

8          And at that point, I'm guessing sometime around -- when

9  I say I'm guessing, it's hard to remember the exact times.  But

10 sometime after that email came in but either during the time of

11 the call that I was not on or just before it, I closed my

12 computer.  I shut it down for the day, which ended up being for

13 the whole weekend because I had other plans that weekend

14 already.  And then I went and did other stuff.  I got ready to

15 go to dinner.  And then after I was done getting ready to go to

16 dinner but before leaving for dinner, I checked my phone to see

17 what was going on.

18          And as I said, I just messaged internally with Scott

19 and Diego, like, what's going on?  What was the decision?  I

20 think I said something along the lines like, oh, so we're just

21 going to  -- it is what it is, like we're just going to move

22 forward.  And that's when I was told the decision, no, we're

23 both voluntarily dismissing and going to consolidate.  And I

24 think I was just -- I was like, okay, or asked something along

25 the lines of how are we doing that, but I didn't engage

1   substantively in the conversation.  And then I was -- then I
2   stopped responding when I had to leave for dinner.
3          JUDGE WATKINS:  All right.  Did you understand at that
4   time the reasons for the Rule 41 dismissal?  Was that explained
5   to you or was it kind of implied?
6          MS. STONE:  No.  The reasons -- I think that -- that
7   day I don't think there were reasons.  There was no mention of a
8   rule, at least not to me.  I mean, there might have been on the
9   call, but there was no legal authority explained to me that day
10   of the dismissal.
11          JUDGE WATKINS:  All right.  On that day or in your work
12   in the case, let's just say from Wednesday until that Friday
13   night when you went to dinner, were you a party to any
14   discussions about the assignment of the case and how the
15   assignments were going and Judge Axon in particular?
16          MS. STONE:  Well, I forget which day -- when we went
17   from Magistrate Judge Cornelius to Judge Axon.  So I remember
18   having conversations earlier that week when we were assigned
19   Magistrate Judge Cornelius, and I think my understanding was
20   that we were willing to proceed in front of her but then one of
21   the -- we assumed one of the defendants did not consent to
22   proceeding in front of a magistrate.
23          JUDGE WATKINS:  When you say "her," you mean Judge
24   Cornelius.
25          MS. STONE:  Judge Cornelius.  Yes.  And then we were

1  assigned to Judge Axon, and I don't remember whether that

2  happened Wednesday or Thursday.  It did happen -- it didn't

3  happen Friday.  We were already in front of her by Friday.  And

4  I believe -- I don't remember if there was a call -- actually,

5  there probably was a call, because I think we have a -- we

6  generally tend to have a standing call on Thursdays for just

7  case updates, regardless.  So I --

8          JUDGE WATKINS:  On this particular case or every case?

9          MS. STONE:  No, this particular case, just as a

10 standing call every Thursday.  Sometimes it gets cancelled, but

11 if there's anything to discuss.  So I think there was a call

12 that Thursday and we talked generally about Judge Axon, and the

13 consensus was that we were perfectly happy proceeding in front

14 of Judge Axon.  By then she was our third judge.  We had no

15 issues with Axon either way.

16         And we were getting ready to proceed.  We were working

17 on filing our PI motion and updating our declarations, and we

18 were also working on amending our complaint to add an additional

19 plaintiff and were ready to file.  We were getting ready to file

20 that in front of Judge Axon as soon as possible.

21         JUDGE WATKINS:  Your job in all of this was drafting

22 the proposed pleadings and sending them up the line?

23         MS. STONE:  On the Ladinsky matter -- so at this time,

24 the Ladinsky matter --

25         JUDGE WATKINS:  Right.

 1          MS. STONE:  -- I didn't have a hand in drafting

 2 anything myself.

 3          JUDGE WATKINS:  So why were you on the call is my

 4 thought.

 5          MS. STONE:  I had been brought in when -- when SPL --

 6 from -- my understanding is that SPLC became involved in this

 7 case -- Southern Poverty Law Center became involved in this case

 8 through conversations at a higher level between I assume Scott

 9 and then folks at some of these other organizations and other

10 law firms.  And then when it looked like we were joining the

11 case, I had a -- I was still a relatively new attorney.  This is

12 back in 2021.  I was still a relatively new attorney and didn't

13 have a heavy caseload, and so I was asked to come in as a junior

14 attorney on the case.  But a lot of the stuff was already -- a

15 lot of the drafting tasks and division of responsibility had

16 already been divvied up between the other organizations.

17          JUDGE WATKINS:  This was done even before the 2022

18 legislative session?  There was also a file built?

19          MS. STONE:  Yes.

20          JUDGE WATKINS:  Now, on these Thursday calls, who would

21 have been in charge?  Who would have led the call?  Who would

22 have been the moderator of those calls ordinarily?

23          MS. STONE:  At the time, it would probably be a

24 varying -- this is not a call that has the -- always has a set

25 agenda -- sometimes it's sent out in advance -- and so it's kind

1   of whoever jumps on first.  Often -- I mean, I would say that

2   the people most heavily involved, not necessarily in this

3   particular decision but in drafting and leading the case forward

4   and asking questions, would be several of the attorneys at K&S,

5   King & Spalding, the Lightfoot attorneys, and then Asaf.

6   They're generally the ones with the most information.

7            MR. ORR:  Mr. Orr?

8            MS. STONE:  Mr. Orr, yes.  The ones with the most

9   information about new things that are being drafted and -- or

10   anything like that.  So one of them would probably have taken

11   the lead on that call.  I don't remember who.

12           JUDGE WATKINS:  Now I'm talking specifically about that

13   Thursday.  You believe there was a call that Thursday, your team

14   call.

15           MS. STONE:  I believe there was a call that Thursday to

16   discuss where are we at with the amended complaint?  Where are

17   we at with getting ready to file our PI?  Any insight into

18   experience proceeding in front of Judge Axon?  And so most

19   likely, that insight would have come from one of the Lightfoot

20   attorneys because they practiced most often in Alabama.

21           JUDGE WATKINS:  Do you recall any one of the Lightfoot

22   attorneys giving you that insight in that -- giving the team

23   that insight during that call?

24           MS. STONE:  I don't remember if it was on that call or

25   an email, but I think, generally, the consensus was that we were

1  fine with Judge Axon and we were perfectly happy to be

2  proceeding in front of Judge Axon.

3              JUDGE WATKINS:  But because Lightfoot was a Birmingham

4  firm, most of your information about Judge Axon would have come

5  probably from the Lightfoot lawyers?

6              MS. STONE:  Yes.  The only other -- I believe the only

7  other Alabama -- I could be wrong about this, but the only other

8  Alabama barred attorney is Diego on my team.  But even though

9  he's -- Diego barred -- barred here in Alabama, I don't -- he

10 doesn't have -- I don't think he has extensive experience

11 practicing in front of Alabama courts.  My particular team --

12 currently, this is our only case in Alabama.

13             JUDGE WATKINS:  All right.  So your only case in

14 Alabama?

15             MS. STONE:  At the moment.  And actually, since I've

16 been --

17             JUDGE WATKINS:  What office are you from?

18             MS. STONE:  I'm in Atlanta.

19             JUDGE WATKINS:  Oh, you're in Atlanta.  And Diego is --

20 I mean Soto is?

21             MS. STONE:  He was here in Montgomery.  He has moved to

22 Atlanta.  But our team is a small -- our team is a small team,

23 and so we don't necessarily only deal with cases in our state

24 where we live.  We deal with cases all through the region that

25 SPLC works in, the general South, and then we also have some

1  cases outside -- some legacy cases outside of the South.  And we

2  just don't have capacity to bring tons of cases, so we're not in

3  and out of Alabama courts every other day.

4      JUDGE WATKINS:  In that Thursday call or at any other

5  time, did you hear a scouting report on Judge Axon?

6      MS. STONE:  I believe I either heard or read -- I don't

7  know exactly what you mean by a scouting report, but people were

8  pulling -- I know at least by email, people were pulling, like,

9  the kind of public analytics, like what was her public testimony

10 in front of the Senate Judiciary Committee and like Westlaw,

11 like summaries of what she had -- like how she had ruled in

12 previous preliminary injunctions and that kind of stuff.  And

13 then the Alabama folks were just giving a sense of like what

14 they knew about her as a judge from previous experience

15 practicing in front of her, like what it would be like.

16     JUDGE WATKINS:  All right.

17     MS. STONE:  I can't -- I don't remember specifically

18 whether it was oral -- I think it was a combination of oral on

19 that call and some things being shared by email.

20     JUDGE WATKINS:  Some have described her as being a good

21 draw or a very good draw.  Did you hear that kind of a

22 discussion?

23     MS. STONE:  I don't know if I heard "very," but I

24 believe, yeah, we were -- we were happy.  I think people phrased

25 her as a good draw.  I think --

1          JUDGE WATKINS:  So in your prior testimony, you said

2    that you were never on any calls with any attorneys from the

3    Walker team; is that correct?

4          MS. STONE:  That is correct.

5          JUDGE WATKINS:  But you did have a connection with the

6    Noe, N-O-E, plaintiffs?

7          MS. STONE:  Yes.  So --

8          JUDGE WATKINS:  What county were they in?

9          MS. STONE:  They are in Lee County.

10         JUDGE WATKINS:  Lee County.  Right.

11         MS. STONE:  They're in Lee County.  They're plaintiffs

12   in the new Eknes-Tucker -- well, Boe now -- matter.  Like -- so

13   as I said, I didn't work at all that weekend, so once I shut my

14   computer down, five something or other -- like I said, I was

15   only kind of monitoring it before then.  But once I shut my

16   computer down, then I put my phone away.  I went to dinner.  I

17   didn't pick either of them up again all weekend.  I log in

18   9 a.m., 9:15 a.m. Monday morning, and I'm catching up on all my

19   emails.  And then I get a message from Scott saying can you join

20   a call -- I think it went to both Diego and I -- was like can

21   one of you join a call with a potential plaintiff in 15

22   minutes --

23         JUDGE WATKINS:  Would that have been --

24         MS. STONE:  -- but that was --

25         JUDGE WATKINS:  I don't want to know details, but would

1   that have been the Noe plaintiff?

2       MS. STONE:  That was -- yeah.  That was Ms. Noe.  And

3   then from there, I joined that call, I took notes, and then from

4   there, it -- she became our client and started preparing

5   pleadings for the new matter with -- at least -- and so my -- so

6   when I said I didn't have a primary drafting role in anything on

7   the Ladinsky matter, that changed, in part, for the Boe matter.

8   I took the lead in communicating that Monday with Ms. Noe and

9   helping draft her declaration and ensuring her facts in the

10  complaint, in the new complaint, were accurate based on my calls

11  with her and confirming those with her.  So that was my drafting

12  task with the new case.

13      JUDGE WATKINS:  Is it fair to say you were not

14  monitoring what the Walker people were doing on their -- that

15  was kind of their business and not your business when this was

16  going on the week -- I'm talking about the week of Easter.

17      MS. STONE:  Well, we received copies -- we had signed

18  up for copies of their public filings.  We have this online

19  service by which we can sign up for case notifications for cases

20  that we are not on and they send a notice -- a notice when

21  anything is filed in the case.  And if someone -- I believe the

22  way the service works, this online service works, is if someone

23  in that case, like an attorney in that case, is also signed up

24  for the same service, we will get a free copy of the filing as

25  well.  I don't remember if we got copies of the filings or if we

```
 1   just got notification.
 2          JUDGE WATKINS:  But you were on the notification list?
 3          MS. STONE:  So we got notifications, but everything was
 4   after -- after they filed.  So if they filed something in their
 5   court, we would get an email saying, oh, the Walker -- the
 6   Walker team filed this motion and we would see what it said.
 7   But I was not part of any -- I had no knowledge or
 8   communications of anything they were doing prior to their
 9   filings.
10          JUDGE WATKINS:  Okay.  So it's my understanding of the
11   time line that Judge Burke got the transfer of the Walker case
12   on Friday -- maybe it was Thursday, but I think it might have
13   been Friday -- but that around four o'clock that afternoon,
14   which you probably would have still been monitoring, of course,
15   it would be five where you were, that Judge Burke entered an
16   order for a Monday status conference in Huntsville on the Walker
17   case.  At that time, Judge Axon had not entered the order
18   transferring the Ladinsky case to Judge Burke; is that correct?
19          MS. STONE:  That sounds right, yes.  I believe -- I
20   believe -- yeah, I believe we found out that the Walker case had
21   been assigned to Judge Burke, and then I -- yeah, I believe we
22   knew that Judge Burke had set a status conference before our
23   case --
24          JUDGE WATKINS:  So that would have been only in Walker.
25          MS. STONE:  Yes.
```

```
 1              JUDGE WATKINS:  All right.  So if I have that at
 2   4:42 p.m. on that afternoon Judge Axon's order came down, it
 3   would take time for people to figure out what was going on.  It
 4   was Friday afternoon.  Some, like you, were already off line, so
 5   there was no compulsion for your team to appear before -- no
 6   direct compulsion, no order, for your team to appear before
 7   Judge Burke in Huntsville on Monday; is that correct?
 8              MS. STONE:  Yes.  So it was -- would have been 5:42 my
 9   time.
10              JUDGE WATKINS:  Right.
11              MS. STONE:  If I go back in my email, I see 5:42, not
12   4:42.  But, yes.  I do not believe -- I have no memory of there
13   ever being any order for us to appear in front of Judge Burke.
14              JUDGE WATKINS:  All right.  So the first you knew of
15   Judge Burke actually having this case, was it Monday morning or
16   were you actually involved -- you were kind of monitoring and
17   saw that something had happened important late Friday afternoon.
18              MS. STONE:  Yes.  So when you say "this case," if you
19   mean Ladinsky --
20              JUDGE WATKINS:  I mean Ladinsky.
21              MS. STONE:  Yeah.  I saw -- I saw the 5:42 -- 5:42
22   Eastern Time, 4:42 Central Time -- notice come in that our case
23   had been transferred to Burke.  And that's when people decided
24   we should talk about this, let's schedule a call.  And that's
25   the call I did not join.
```

 1          JUDGE WATKINS:  All right.  So why would there -- were

 2   you aware of why there would need to be a discussion about Judge

 3   Burke having both cases on that Friday afternoon?  Was there

 4   some concern expressed among the team, either generally or

 5   specifically, that Judge Burke was a bad draw, just point-blank?

 6          MS. STONE:  I think -- well, I think those are -- I see

 7   those as two separate questions.

 8          JUDGE WATKINS:  You can take them as separate.  Go

 9   ahead.

10          MS. STONE:  Why there was a need for a discussion

11   was -- why people were like, oh, we were transferred, we need to

12   have a call, immediate call, is just there was a lot of

13   confusion.  I think before Judge Burke had set the status

14   conference -- because this all went down in one day.  So earlier

15   that morning when we found out that Judge Burke had been

16   assigned the Walker matter but before he had issued the order

17   for the status conference, I think everyone thought it was like

18   a clerical error.  Everyone -- I think everyone thought that

19   when the judge in the Middle District had transferred hers --

20   had transferred the Walker matter to the Northern District,

21   everyone assumed it was to consolidate the cases under the

22   first-filed rule.  And so I think people thought that it was a

23   clerical error sending it to Judge Burke and it would be shortly

24   resolved to send the Walker matter to Judge Axon because why

25   consolidate both cases in the Northern District if you're going

1  to have them proceed in front of two different judges.  That
2  didn't make sense to us under the first-filed rule.
3         And so we were expecting that to happen, and then Burke
4  set the status conference.  And I believe they were like, oh,
5  this is not going to be -- this is not coming from the clerk.
6  This is coming from the judge.  And then our case gets
7  transferred, and it was just a lot of, like, what just happened?
8  We don't understand what just happened.  What do we do?  Because
9  there was a -- I wasn't part of any of these discussions, but I
10 was aware via email traffic that people were communicating on
11 filing a motion for consolidation.  And so it was like who was
12 going to write this, who was going to file this.  I never even
13 saw a draft of that.  I don't know if there even is a draft of
14 that.  But I think it was just -- the reason for a call --
15        JUDGE WATKINS:  That was pre Judge Burke, though.
16        MS. STONE:  Pre Judge Burke.  Yes.
17        JUDGE WATKINS:  Right.
18        MS. STONE:  So I think the reason for a call was just
19 the general sense of we don't know what just happened, this is
20 confusing, we need to talk about this.  People are just
21 speculating why --
22        JUDGE WATKINS:  Did you also have some information from
23 Ms. Terry prior to that that the Walker case would be going to
24 Judge Axon or most likely going to Judge Axon?
25        MS. STONE:  Yeah.  I believe Ms. Terry spoke to

1    someone -- not the judge herself, obviously, but someone in

2    Judge Axon's chambers.  I don't remember exactly who.  I think

3    the reason she called was to inquire about a question on pro hac

4    vice motions because because this was a sensitive case, there

5    was concern about filing pro hac vice motions on the public

6    docket with people's home addresses, given the state of

7    political violence and the risk of political violence and

8    whatnot.

9            JUDGE WATKINS:  But then the conversation went further

10   than that.

11           MS. STONE:  And then -- so I think that's why she

12   called.  And I think that was right around the time it got

13   transferred to Judge Burke and there was -- I don't know exactly

14   what was said, but I think there was something like, oh, no, you

15   just need a motion, it will transfer to Judge Axon to

16   consolidate.  It's just -- I think that's what gave us the sense

17   that it was a clerical error.  It was like, oh, this is just

18   happening, but, oh, it will be consolidated in front of Judge

19   Axon soon, once you file the motion.

20           JUDGE WATKINS:  Did Ms. Terry tell you that or did you

21   hear her say that?

22           MS. STONE:  I think I received an email.  I think I

23   received an email.

24           JUDGE WATKINS:  All right.  What was the first

25   assessment -- and I'll call it a scouting report again -- the

1    initial scouting report, like you thought you were going to play

2    Tennessee, but now you're playing Georgia?  So what was the

3    first reaction someone had to Judge Burke being assigned to the

4    case, if you heard any reactions?

5         MS. STONE:  I don't think people thought -- I think

6    people did not have good feelings about Judge Burke.  I don't

7    think people thought that he was a good draw.

8         JUDGE WATKINS:  Yes.  That's consistent with what we're

9    seeing from other statements.

10        Did you hear anybody say that, though?

11        MS. STONE:  The word -- did anyone use the word "bad

12   draw"?  I'm not sure.  I don't know if it was phrased

13   particularly with that language.  It might have been.  There

14   might -- there are a lot of attorneys, so there might have been

15   some email or some message from somebody saying Burke is a bad

16   draw, but I don't -- I don't know if that particular word was --

17   those particular words were used, but I do think that was the

18   sentiment.  I don't think people thought he was the best draw we

19   could have gotten for this case.

20        JUDGE WATKINS:  Did you hear anyone use a phrase that

21   he snatched the case or it looks like he snatched the case or

22   even suggesting that he snatched the case or words to that

23   effect?

24        MS. STONE:  Yeah.  I think there were words to that

25   effect.  I don't think anyone was necessarily saying.  I think

1  they were just like -- it was part of the what happened, we

2  don't know what happened.  And then -- yeah.  So I think that

3  was part of the speculation of something that might have

4  happened.

5       JUDGE WATKINS:  Do you know anyone who had that

6  speculation?

7       MS. STONE:  I believe Scott said something to that

8  effect.

9       JUDGE WATKINS:  Now, when you say "Scott," McCoy?

10      MS. STONE:  Yes.  Scott said something to that effect.

11 I'm not sure exactly -- I don't remember exactly which words he

12 used, but he expressed concern that that could have been what

13 happened.  And there may have been one of the other attorneys.

14 I don't know if they used the same words, but I think there

15 might have been two people -- I don't -- yeah, like I said, I'm

16 not quite sure exactly who was the other person who expressed

17 similar concern about -- not using -- I don't know if they both

18 used the words "snatched" or "grabbed" or whichever were the

19 words you just used, but expressed concern that when we -- what

20 we thought was a clerical error turned into Judge Burke having

21 both cases through some communication that we didn't know about.

22 But it was just -- we didn't, obviously, know about any of this.

23      JUDGE WATKINS:  Right.  Okay.

24      I believe that's all I have of this witness.  Do you

25 have anything?

```
 1            JUDGE PROCTOR:  No.

 2            JUDGE WATKINS:  Thank you, ma'am.

 3            MS. STONE:  Sure.

 4            MR. SEGALL:  Thank you.

 5            JUDGE WATKINS:  Are you excusing her?

 6            JUDGE PROCTOR:  Yes.

 7            MS. STONE:  Are you sure?

 8            JUDGE WATKINS:  Yes.

 9            JUDGE PROCTOR:  Actually, I was going to see if you

10  were excusing her.

11            MR. SEGALL:  She can go to Atlanta?

12            JUDGE PROCTOR:  Yes.

13            JUDGE WATKINS:  Two to one, she's excused.

14            MS. STONE:  Okay.

15            JUDGE PROCTOR:  Judge Beaverstock has not weighed in.

16            Counsel, we're probably ready to start our next

17  witness.  We've told y'all we're going to take a break at 12:30

18  for lunch.  And we know we have Mr. Minter who's available from

19  1:30 to --

20            MR. SEGALL:  You said any time, I think, between 1:30

21  and 3:30.

22            JUDGE PROCTOR:  Right.

23            JUDGE WATKINS:  Be prepared to begin any time --

24            JUDGE PROCTOR:  Was it 1:00 and 3:00?  I can't remember

25  the time frame we said.  What did you tell him?
```

```
 1            MR. SEGALL:  I think it was 1:30 to 3:30.

 2            JUDGE PROCTOR:  1:30 to 3:00, 3:30?

 3            JUDGE WATKINS:  3:30, I think.

 4            JUDGE PROCTOR:  Okay.

 5            MR. SEGALL:  I think.

 6            JUDGE PROCTOR:  So what I would propose is we'll start

 7   with the next witness.  At 1:30, we're going to start Minter,

 8   though, whether we're finished with that witness or not.  So we

 9   may take a time-out from that witness and move to Mr. Minter and

10   then we'll go back to that witness.  Just giving you kind of the

11   lineup we're thinking about here.

12            MR. SEGALL:  Okay.

13            JUDGE PROCTOR:  All right?  With that, I think we're

14   ready to hear from Mr. McCoy.

15            MR. RAGSDALE:  Are we still breaking at 12:30?

16            JUDGE PROCTOR:  We are.

17            JUDGE WATKINS:  Yes.

18            JUDGE PROCTOR:  So what we expect is McCoy will go

19   until 12:30, half hour or so lunch break, resume McCoy until

20   1:30.  If we finish him, great.  If not, he may get to go into

21   the penalty box for a while.

22            MR. RAGSDALE:  Fair enough.  Thank you.

23            JUDGE PROCTOR:  Or, shall we say, back into the

24   clubhouse.

25            MR. RAGSDALE:  Whatever it is.  Yes.
```

 1          JUDGE PROCTOR:  Penalty box probably is the wrong

 2    connotation.

 3       (Scott McCoy, the witness, was sworn.)

 4          JUDGE PROCTOR:  All right.  Thank you, Mr. McCoy.  I'm

 5    Judge Proctor.  I'm going to lead off, at least, on asking you

 6    some questions.

 7          MR. MCCOY:  Okay.

 8          JUDGE PROCTOR:  What exactly is your position with your

 9    organization?

10          MR. MCCOY:  Yes, sir.  I am the interim deputy legal

11    director for -- in the legal department, and my area is LGBTQ

12    rights and special litigation.

13          JUDGE PROCTOR:  Okay.  And who works with you in that

14    area?

15          MR. MCCOY:  So in that practice group we have several

16    attorneys.  I think at this point we have seven attorneys total,

17    Mr. Soto and Ms. Stone, a couple of other senior attorneys --

18    one is a senior supervising attorney, couple of senior

19    attorneys -- and a couple of just staff attorneys.  We also have

20    a paralegal that works in our practice group.

21          JUDGE PROCTOR:  And you were part of the legal team in

22    Ladinsky; correct?

23          MR. MCCOY:  Correct.  Yes, Your Honor.

24          JUDGE PROCTOR:  And was it just the three of you that

25    participated on the legal team in Ladinsky?

1          MR. MCCOY:  That's correct, yes.  Mr. Soto and

2    Ms. Stone.

3          JUDGE PROCTOR:  Did you consult with anyone else at

4    your organization or -- about the matters that we're looking at

5    in terms of filing the Ladinsky case, prosecuting the Ladinsky

6    case, or dismissing the Ladinsky case?

7          MR. MCCOY:  No, Your Honor.  In our structure -- I

8    might as well just explain it.  So we have a chief legal

9    officer, we have a deputy that is over legal management, and

10   then we have a deputy legal director that is a -- for --

11   director of strategic litigation.  So those --

12         JUDGE PROCTOR:  Is that a hierarchy?

13         MR. MCCOY:  It is.

14         JUDGE PROCTOR:  Those report to each other?

15         MR. MCCOY:  Yes.  So CLO is at the top, and the two

16   intermediate are director of strategic litigation and director

17   of legal management, and then the deputy director is where I am,

18   is the next down from that.

19         JUDGE PROCTOR:  All right.

20         MR. MCCOY:  So the folks above in that triad are aware

21   generally of the cases that the deputy legal directors and their

22   practice groups are bringing, but they don't have any input or

23   say or day-to-day decision-making about the things that you just

24   identified.

25         JUDGE PROCTOR:  All right.  So in other words, they

1  would have been aware, might have signed off on going forward,

2  but wouldn't be involved in day-to-day.

3        MR. MCCOY:  Right.  For instance, they would have known

4  that we were in a coalition considering bringing a legal

5  challenge to the SB184 law that is the subject matter of

6  Ladinsky, Walker, and Eknes-Tucker.

7        JUDGE PROCTOR:  And who are in those positions?

8        MR. MCCOY:  Sure.  So at this time, we had an interim

9  deputy -- or we had interim CLO that -- Melvina -- and I'm

10  completely -- I don't know why I'm spacing on her last name.

11       JUDGE PROCTOR:  We won't tell her you did that.

12       MR. MCCOY:  Yeah.  Thank you.  I appreciate it.  And

13  then in the director of strategic litigation position was Nancy

14  Abudu.  And the director of legal management was another woman

15  that is really -- it's more like she's in charge of things like

16  the paralegals and other legal professionals and things like

17  that.

18       JUDGE PROCTOR:  More administrative?

19       MR. MCCOY:  Yes, that's right.

20       JUDGE PROCTOR:  All right.  But it was you, Mr. Soto,

21  and Ms. Stone that were involved in the day-to-day aspects of

22  this.

23       MR. MCCOY:  Yes, sir.

24       JUDGE PROCTOR:  Would you have briefed anyone else,

25  consulted with anyone else, done anything along those lines, or

1   is this just -- this is your case?

2           MR. MCCOY:  Yeah.  So --

3           JUDGE PROCTOR:  You run it.

4           MR. MCCOY:  That's correct.  We -- I do have like -- in

5   the management structure, we have -- I have weekly check-ins

6   with both the director of strategic litigation and the director

7   of legal management.  And, you know, we talk about, like, you

8   know, what's happening in certain cases, but it's a report more

9   than anything.  And so I would have reported to them what was

10  happening in these various cases in my portfolio; but in terms

11  of the day-to-day decision-making and things like that, that's

12  delegated to me and those are my decisions.

13          JUDGE PROCTOR:  Is there a distinction in what

14  decisions you make compared to what decisions you need to

15  consult on?  Can you delineate --

16          MR. MCCOY:  Yeah.  Only to the extent -- so in terms of

17  whether or not we actually pursue litigation, like so whether or

18  not to bring a case in a particular subject matter or area,

19  there is discussion with that three management group.  Even the

20  DLDs will do litigation memos and will say, like, here's a

21  proposed case that we're thinking about bringing, and we will

22  discuss it and that kind of thing.  That's the only

23  decision-making there is in terms of the cases in my portfolio

24  for my practice group.

25          JUDGE PROCTOR:  All right.  What about dismissal?

```
 1          MR. MCCOY:  Same thing.  Same thing.  Those levels are
 2   considered to be strategic and tactical decisions that fall at
 3   the deputy legal director level.
 4          JUDGE PROCTOR:  That's your level.
 5          MR. MCCOY:  That's my level.
 6          JUDGE PROCTOR:  Okay.  So in other words, you would not
 7   have had to go up the chain about -- you would brief them on
 8   filing, but once -- in particular here, dismissal of this
 9   action, that's not anything you would have had to seek clearance
10   or guidance or permission on.
11          MR. MCCOY:  That's correct.  I would, you know, let
12   them know that, like, you know, we had filed the case, that we
13   were bringing a challenge.  But in this situation with the
14   dismissal it was merely reporting that we had done the dismissal
15   as opposed to seeking permission to do the dismissal.
16          JUDGE PROCTOR:  So it would be informational.
17          MR. MCCOY:  Yes.  That's right.
18          JUDGE PROCTOR:  What level of information -- and the
19   reason I'm asking this is I would like to know what you reported
20   to your boss so I would know what was most significant to you as
21   it relates to this.
22          MR. MCCOY:  Sure.
23          JUDGE PROCTOR:  So what would you have reported to
24   your -- that triad about the dismissal of this action?
25          MR. MCCOY:  Well, let me clarify, first of all.  So at
```

 1   this time, the triad was actually missing a piece because the

 2   director of strategic litigation, Nancy Abudu, as you may be

 3   aware, was nominated to a position on the Eleventh Circuit Court

 4   of Appeals.  She had actually gone on leave and was not even at

 5   the organization.

 6           JUDGE PROCTOR:  She wasn't even consulted.

 7           MR. MCCOY:  That's right.  I reported to the interim

 8   CLO at the time.  And the report was, you know, essentially, we

 9   have this case, basic explanation, which is in the affidavit or

10   the declaration here, about the circumstances surrounding what

11   was happening with the transfer between Axon and -- Judge Axon

12   and Judge Burke, so a paragraph length of these were the

13   circumstances.  And the group consensus was that we dismiss the

14   case.

15           JUDGE PROCTOR:  Now, I totally understand that when you

16   go into nomination, they tell you to stop doing everything.

17           MR. MCCOY:  Right.

18           JUDGE PROCTOR:  I'm really more interested in,

19   informationally, what you're reporting --

20           MR. MCCOY:  Right.

21           JUDGE PROCTOR:  -- more so even than who you reported

22   it to.

23           MR. MCCOY:  Right.

24           JUDGE PROCTOR:  So when you say it was a paragraph,

25   what would that paragraph have been?

1           MR. MCCOY:  The substance of what is in my

2  declaration --

3           JUDGE PROCTOR:  Okay.

4           MR. MCCOY:  -- is what I reported.  So the -- I'm

5  sorry.  I'm referring to the declaration.  I didn't ask if I

6  could do that.  Is it okay if I have a copy of my declaration

7  and refer to it?

8           JUDGE PROCTOR:  Yes.  This is not a memory test.

9           MR. MCCOY:  Okay.  Good.  I just wanted to, yeah, make

10 sure that that was okay in terms of process.  So --

11          JUDGE PROCTOR:  Are you referring to paragraph 25, page

12 8, starting at the bottom of page 8?

13          MR. MCCOY:  Yes.  Right.  Yes.  From 25 to -- yeah, 26,

14 yeah, 27.  25 to 27, basically.

15          JUDGE PROCTOR:  Okay.  Thank you.

16          All right.  Let's go back, then, to early on.  What

17 would you -- how would you characterize your organization's role

18 on the Ladinsky team?

19          MR. MCCOY:  So our role at the outset was -- as I

20 explain in my declaration, SPLC has a policy department and we

21 monitor what's happening at the Alabama Legislature and the

22 other legislatures across the states that we operate in.  And so

23 we were tracking this particular piece of legislation even in

24 the earlier prior years when it didn't pass, but this year it

25 happened to pass.

1          So we were involved in the coalition and we would share

2    at that time updates from our policy folks who were active on --

3    at the Capitol and give reports about, you know, what the

4    chances are, what was happening, where the status of the bills

5    were, things of that nature.  And so in the beginning, that's

6    kind of a lot of what we were doing.

7          And then as we moved and the bill passed, we were just

8    part of the litigation team, ready to represent the clients that

9    we had in Ladinsky and provide resources and attorneys and

10   litigate the case alongside of our partners.

11         JUDGE PROCTOR:  All right.  Walk me through, then -- so

12   from '20 and in '21 and '22, the team was largely formed.  I

13   think there may have been a late addition right before the '22

14   actual complaint filing; correct?

15         MR. MCCOY:  Are you referring to HRC coming in?  Yes,

16   that's correct.  Originally we had been working with NCLR and

17   GLAD.  And in -- and I think in '21, right, so this was the --

18   no, this was the '21 legislature.  So in the prior year, I think

19   King & Spalding was still involved and Lightfoot was still

20   involved.  And it just so happened in this -- you know, once the

21   bill passed, that HRC then approached our group and asked --

22         JUDGE PROCTOR:  HRC had a plaintiff they were thinking

23   about filing for, and the decision was made to include them,

24   work together, rather than have another filing?

25         MR. MCCOY:  Correct.  Yeah.

```
 1              JUDGE PROCTOR:  Duplicate?

 2              MR. MCCOY:  Yes.

 3              JUDGE PROCTOR:  All right.  That helps me.  So how

 4    would you characterize command and control structure of the

 5    litigation team?

 6              MR. MCCOY:  As I mentioned in my declaration, I mean,

 7    there are a lot of cooks in this kitchen.  That certainly is

 8    true.  We have lots of attorneys and organizations, but -- so I

 9    think Shannon and Asaf from NCLR --

10              JUDGE PROCTOR:  That's Minter and Orr?

11              MR. MCCOY:  Yeah.  I'm sorry.  I'll be more formal.

12              JUDGE PROCTOR:  That's fine.  We just want to know who

13    you're talking about.

14              MR. MCCOY:  Yeah.  And Jennifer Levi from GLAD, I

15    consider them -- and us as well -- to be kind of more steeped in

16    the substantive aspects of the law.  And then our local counsel

17    at K&S, you know, they were, you know, knowledgeable in the

18    substance as well but also just very knowledgeable about the

19    local practices and practitioners and things like that, which

20    you would expect from your local counsel.  We operate --

21              JUDGE PROCTOR:  I thought local counsel was Lightfoot.

22              MR. MCCOY:  Lightfoot.  Yeah.

23              JUDGE PROCTOR:  And King & Spalding was out of Chicago,

24    Atlanta, LA.

25              MR. MCCOY:  Yes, yes.  That's correct.  There were some
```

 1   of the King & Spalding attorneys that had ties to Alabama.  So

 2   you're right.  But Lightfoot is local counsel for sure.  I don't

 3   want to mischaracterize that at all.

 4            JUDGE PROCTOR:  Just clarifying.  That's --

 5            MR. MCCOY:  Yeah.  So, yeah.  Our model was very much

 6   consensus-based and we would divvy up tasks and things, you

 7   know, kind of as needed and put our shoulders to the wheel in

 8   various ways.  We would have weekly calls where -- we would have

 9   litigation team calls where we would, you know, discuss work and

10   things, communicate via email and phone and whatnot, and Teams,

11   things like that.  And so, yeah.

12            I don't know if I'm answering your question, though.

13   Is there something else --

14            JUDGE PROCTOR:  You are.  I'm just trying to get a

15   sense of how everyone worked together.

16            MR. MCCOY:  Yeah.  That's right.  That's it.

17            JUDGE PROCTOR:  Now, you're -- where are you based?

18            MR. MCCOY:  I'm based in our Miami office.

19            JUDGE PROCTOR:  All right.  But do you spend time in

20   the Alabama office as well?

21            MR. MCCOY:  Not for a long time.  So originally, when I

22   came to SPLC a little more than eight years ago, I actually was

23   in the Montgomery office here, was here for two years, and then

24   moved to Tallahassee, Florida, where I opened our office in

25   Tallahassee and then, a year and a half ago, ended up down in

1    Miami.  I actually live in Broward County and work remotely from

2    my home, but I'm associated with the Miami office now.

3             JUDGE PROCTOR:  You keep getting closer to the

4    equator.

5             MR. MCCOY:  Right.  For someone who doesn't enjoy the

6    heat, I don't know why I'm living where I'm living, but, you

7    know.

8             JUDGE PROCTOR:  All right.  How would you characterize

9    your then Alabama ties?  Did you develop some Alabama ties when

10   you were here in Montgomery?

11            MR. MCCOY:  Yes.  I mean, it's been six -- almost

12   seven -- six years since I lived here in Alabama.  I worked --

13   when I was here living in Alabama, I was a senior staff attorney

14   in this practice group.  We had a different deputy legal

15   director at the time.  And the reason why I'm interim is because

16   that deputy legal director left and I've been in this position

17   now.  So, yes, I had some ties.

18            I did not have many cases -- actually, I only think I

19   had a couple of cases that I worked on in the federal courts in

20   Alabama in my time here.  One was actually a case -- was a case

21   by a fellow named Paul Hard that we had in front of Judge

22   Watkins.  And the other one was the marriage equality cases,

23   which we had in the Southern District in front of -- I think it

24   was Judge Searcy.  And then I had some work in the Alabama

25   courts.  But -- so I had a general knowledge of the various

1    judges at that time, but it's been quite a bit of time since

2    I've been here and been practicing in Alabama in terms of the

3    current judges that are currently on the bench.

4            JUDGE PROCTOR:  By the way, Judge Watkins I think is an

5    Auburn fan, so he understands interim.

6            JUDGE WATKINS:  There goes your lunch.

7            MR. MCCOY:  I did my best to stay out of that football

8    fight, even though it was very hard, while I was here.

9            JUDGE PROCTOR:  Here's why I'm asking the question.

10           MR. MCCOY:  Yeah.  Yeah.

11           JUDGE PROCTOR:  Would you -- how was your relationship

12   with the Walker counsel, would you say?  Did you -- your

13   organization, it seemed like, was one of the ones, maybe

14   different than some of the other Ladinsky organizations, that

15   actually worked with some of those other groups on other

16   matters.

17           MR. MCCOY:  Yeah.  So I'll explain that as well.  So

18   just like the folks that we work with, whether it's HRC or GLAD

19   or NCLR, those national groups that litigate in this space and

20   operate in the LGBTQ rights space -- National ACLU and Lambda

21   Legal and the Transgender Law Center -- we also, in other places

22   and other contexts, will cocounsel with them as well.  For

23   instance, in Florida right now, we are cocounseling on a case

24   with Lambda Legal on a challenge to a law in Florida.  So, yes.

25   I mean, we know those folks in other contexts.  We're also

1   participating in litigation and cocounseling with them.

2          So, I mean, it's not a huge world.  We know each other,

3   certainly.  I think in my declaration I mentioned that there

4   were a couple of times when I would reach out to Sharon McGowan

5   at Lambda Legal, who was their -- at the time, their I think

6   chief legal officer.  So, you know, we would talk occasionally

7   and update each other on various matters that we had around the

8   country.  And, of course, if we were cocounseling with each

9   other, we would talk more frequently.

10         JUDGE PROCTOR:  All right.  My understanding,

11  particularly from the Walker side of the case, is that they had

12  concerns about working with the Ladinsky team, not because of

13  you, but because of some of the other organizations.  Were you

14  aware of that?

15         MR. MCCOY:  No.  That's news to me.

16         JUDGE PROCTOR:  Okay.  Fair enough.  That saves you a

17  number of questions to answer.

18         MR. MCCOY:  I mean, you know, in this circumstance, I

19  considered -- because you had the two kind of two competing

20  groups.  I considered us to be competitors in some sense but

21  wanting the same end, essentially; right?  You know, we had

22  competing cases.  And so to a certain extent, you know, that is

23  manifest, I think, as you look at what happened as well because,

24  you know, we wanted to be the first filed case.  We had been

25  working on this for a while and, you know, wanted to be in the

1  driver's seat.  And so even though I respect them and we wanted

2  the same things, that's kind of how I treated the other group.

3          JUDGE PROCTOR:  Were you part of the Ladinsky team's

4  discussions and efforts to be the first filed case compared to

5  Walker?

6          MR. MCCOY:  Well, I don't -- I don't think -- or at

7  least I don't remember having any conversations with the Walker

8  team about being first filed.

9          JUDGE PROCTOR:  No, I'm talking about --

10         MR. MCCOY:  I think in the --

11         JUDGE PROCTOR:  -- centralized to the Ladinsky team,

12 the goal was to be the first out of the box.

13         MR. MCCOY:  Oh, yes.  Yes, I was.  Yes.  And I

14 thought -- I agreed.  I thought that was an important thing to

15 do.  And I --

16         JUDGE PROCTOR:  Okay.

17         MR. MCCOY:  Some of communications -- I'm sorry.  Go

18 ahead.

19         JUDGE PROCTOR:  Why?

20         MR. MCCOY:  Well, we wanted to be the first filed case

21 because when you're the first filed case, if there is a

22 consolidation at some point in time, you're in the driver's seat

23 and you get a little more control over the course of the

24 litigation.  And there's certainly value to that.  So I think

25 that's why we wanted to be the first filed case.

```
 1            JUDGE PROCTOR:  Okay.  And that's why, as soon as this
 2   statute was signed by the Governor, I think it was later the
 3   same day --
 4            MR. MCCOY:  April 8th.  Yes.
 5            JUDGE PROCTOR:  -- the Ladinsky complaint was filed?
 6            MR. MCCOY:  Yeah.  It was Friday, April the 8th, that
 7   Governor Ivey signed the bill.  I think she might have done it
 8   in the afternoon.  But we immediately, then, kind of began the
 9   scramble to finalize the complaint so that we could try to get
10   it on file Friday night so that we -- and we knew it wouldn't be
11   docketed that night because the clerk's office was going to be
12   closed, but the hope was that if we put it on file on Friday
13   night, that come Monday morning, we would then be docketed and
14   be the first filed case.
15            JUDGE PROCTOR:  It is, after all, the first filed, not
16   the first docketed rule.
17            MR. MCCOY:  I think that's right, yes.
18            JUDGE PROCTOR:  All right.  So that meant the -- our
19   understanding is the case was filed later on Friday evening,
20   even though it was contemplated at that time there would
21   probably need to be an amendment to the complaint --
22            MR. MCCOY:  Correct.  That's right.
23            JUDGE PROCTOR:  -- and there was not a motion for a TRO
24   or preliminary injunction ready to go.
25            MR. MCCOY:  That's right.
```

1      JUDGE PROCTOR:  What communications did you have with

2  Walker counsel in advance of the Ladinsky filing?

3      MR. MCCOY:  Yeah.  So I mentioned in my

4  declaration again -- so before we filed, I had communicated

5  with, again, Sharon McGowan, who is the chief legal officer --

6  or was at the time.  Sharon and I have a relationship.  Like we

7  said, we're cocounseling in some other things.

8      JUDGE PROCTOR:  She's at Lambda Legal?

9      MR. MCCOY:  She's at Lambda Legal.  I'm sorry.  Yeah.

10  She's at Lambda Legal.  So, you know, I asked her, you know,

11  hey, what are you guys planning?  Are you planning on filing

12  tonight?  Selfishly, I was trying to find out if the race to the

13  courthouse was on.  And so we had -- I tried to get that piece

14  of information.  And she said that, no, they were probably going

15  to file Monday morning.  So we -- I shared that information and

16  I thought that was good, in a way, for us because we wanted to

17  be the first filed case.

18      I think we also had an exchange about -- where we

19  identified who we were going to use, like who were their experts

20  going to be and who were our experts going to be.  But other

21  than that, that's the only communication that I had with anyone

22  from the Walker team about filing on the 9th -- or, no, I'm

23  sorry, the 8th.

24      JUDGE PROCTOR:  And I think there was some discussion,

25  maybe even a draft exchanged, of a common interest agreement?

 1          MR. MCCOY:  Oh, right.  Yes.  Thank you.  Yes.  Sharon

 2   and I had discussed that as we were moving forward in our

 3   tracks, that it would make sense to engage in a common interest

 4   agreement.  And we had one, you know, in principle and in -- you

 5   know, kind of verbally or via email.  And then we agreed that we

 6   would then memorialize that in writing.  And I think I sent her

 7   a draft of a common interest agreement about the same time.

 8          JUDGE PROCTOR:  Was there any discussion about whether

 9   there ought to be a joint filing, join forces, file together,

10   work together?

11          MR. MCCOY:  Not that I recall.

12          JUDGE PROCTOR:  Just the assumption all along was that

13   we're operating on two separate tracks, we're going to file.

14   Was there any discussion about two bites at the apple may be a

15   good thing?

16          MR. MCCOY:  Not at this time.  Later on, I think in the

17   context of the order to show cause motion --

18          JUDGE PROCTOR:  Yes.  We'll get to that.  I'm just

19   asking at this time.

20          MR. MCCOY:  Yeah, yeah.  But not at this -- not that I

21   recall at this time.  No, I don't think so.

22          JUDGE PROCTOR:  I appreciate you drawing that

23   distinction.

24          MR. MCCOY:  Yeah.

25          JUDGE PROCTOR:  I am referring just to pre-filing right

1   now.

2          MR. MCCOY:  Yes.  Yep.

3          JUDGE PROCTOR:  Okay.  Was -- did the Walker counsel

4   ever discuss with you the issue of trying to relate the Walker

5   case to the Corbett case?

6          MR. MCCOY:  Not with me, no.  I never had that

7   conversation.  I was aware that -- whether it was from --

8   probably -- if I remember correctly, from reports back from

9   other team -- Ladinsky counsel members or from seeing the

10  filings themselves from the Walker case that they were -- had

11  filed related to the Corbett case.  But I never discussed that

12  with them.

13         JUDGE PROCTOR:  And forgive me for this, but was your

14  organization involved in Corbett?

15         MR. MCCOY:  No, we were not.

16         JUDGE PROCTOR:  I didn't think so.

17         MR. MCCOY:  Yeah.  We were not.

18         JUDGE PROCTOR:  Did the Walker counsel ever say

19  anything about trying to get Judge Thompson to hear their case?

20         MR. MCCOY:  I think they were hoping, by filing it as a

21  related case, that that was the intent, but I never had any --

22         JUDGE PROCTOR:  I mean discussed Judge Thompson with

23  you.

24         MR. MCCOY:  Oh, no, no.  I never had any conversations

25  with any of the Walker counsel about relating the case, getting

 1  Judge Thompson, any of that.  No.

 2            JUDGE PROCTOR:  All right.

 3            MR. MCCOY:  I did not.

 4            JUDGE PROCTOR:  At some point, though, you became aware

 5  that Chief Judge Marks had issued a show cause order in the

 6  Walker case about whether it ought to be transferred to the

 7  Northern District of Alabama under the first-filed rule?

 8            MR. MCCOY:  Right.  Yes.  That's right.

 9            JUDGE PROCTOR:  Did you have any discussions with

10  Walker counsel about that or subsequent to that order being

11  entered?

12            MR. MCCOY:  I did not.

13            JUDGE PROCTOR:  Okay.  We're at 12:30, so I think it's

14  lunch time.  We talked with your counsel, Mr. Segall, about the

15  fact that we may need to break for lunch.  And full candor,

16  we're going to be back -- aim to be back at 1:00.

17            MR. MCCOY:  Okay.

18            JUDGE PROCTOR:  We're going to go -- I'm sorry?

19            MR. SEGALL:  1:30?

20            JUDGE PROCTOR:  One o'clock.  We may not be right back

21  at 1:00, but we're going to try to.  We're going to try to get

22  as much of him done as we can before we take up your other

23  client at 1:30.

24            MR. SEGALL:  Okay.

25            JUDGE PROCTOR:  We're having to schedule Mr. Minter in

1  specifically for when he's available.

2       MR. MCCOY:  I heard that -- yeah, that Mr. Minter has a

3  knee issue.

4       JUDGE PROCTOR:  Yes.  All right.  So if you wouldn't

5  mind, just we'll recess and we'll be back as close to 1:00 as

6  possible.

7       MR. MCCOY:  Yes, Your Honor.

8    (Recess was taken from 12:31 p.m. until 1:16 p.m., after

9     which proceedings continued, as follows:)

10       JUDGE PROCTOR:  Have a seat.  All right, Mr. McCoy.

11  Ready to resume?

12       MR. MCCOY:  Yes, sir.

13       JUDGE PROCTOR:  Thank you for accommodating us on our

14  break.

15       MR. MCCOY:  I benefited from it too, so no problem at

16  all.

17       JUDGE PROCTOR:  I think we all did.

18       Okay.  I think when we broke that we were doing some

19  preliminary discussions about maybe communications with the

20  Walker team.

21       MR. MCCOY:  Yes, sir.

22       JUDGE PROCTOR:  And I was somewhat restricting my

23  inquiry to communications before filing the Ladinsky suit and

24  then the Walker suit.  When the show cause order occurred, were

25  you on any phone calls with the Ladinsky and the Walker team

1  about how to respond -- about the show cause order and the

2  issues it raised?

3          MR. MCCOY:  So, there was a call on April 13th, I

4  think, that the Walker counsel had reached out to someone on our

5  team asking to meet and discuss.  That's discussed in paragraph

6  17 of my declaration.

7          JUDGE PROCTOR:  Right.

8          MR. MCCOY:  And actually, I wanted to correct this.

9  The last line of paragraph 17 is that SPLC didn't attend that

10  call but other private plaintiffs' counsel did.  At the time, my

11  recollection was that that was the case.  But since preparing

12  and thinking about this, I'm pretty sure that there was someone

13  from SPLC on that particular April 13th call with the Walker

14  counsel.  And I'm not sure, but if I'm not mistaken, I think it

15  was Mr. Soto.

16          JUDGE PROCTOR:  All right.

17          MR. MCCOY:  And, of course, I'm sure he would have

18  addressed that in his declaration.

19          JUDGE PROCTOR:  But you were not.

20          MR. MCCOY:  But I was not.

21          JUDGE PROCTOR:  That's my main point.

22          MR. MCCOY:  That's right.

23          JUDGE PROCTOR:  Did you get a report from anyone about

24  that?

25          MR. MCCOY:  Yes, Your Honor.

1          JUDGE PROCTOR:  What was reported to you about that

2   conference?

3          MR. MCCOY:  Yeah.  So what I recall -- and, again, I

4   put this in my declaration in paragraph 18 -- but essentially

5   that they were trying to ascertain kind of our thinking or if we

6   had a position about whether or not -- or how we would react if

7   they argued that the case should, you know -- their case should

8   remain in the Middle District and that it should be in front of

9   a Middle District judge and that, in fact, that we should be

10   transferred down to them.

11          My recollection is that we, almost to the person, if

12   not everyone, pretty much thought the idea that the Walker case

13   would go to Judge Thompson was -- I think the word I might have

14   used was "fantasy" just because -- and I think someone used the

15   phrase "Hail Mary."  I mean, so -- and I personally, just

16   because of my position at SPLC, right, we have a team of lawyers

17   that are litigating in front of Judge Thompson in the Braggs

18   case against the Alabama Department of Corrections, so I had

19   some insight that I knew that Judge Thompson was -- that the

20   Braggs case was one of his last, if not his last, you know, big

21   case and that he was trying to retire and that the chances of

22   him taking anything new were quite remote.

23          So given that kind of feeling among our group, I think

24   we were more inclined to stay out of it and not take a position.

25   And, frankly, because we were -- we had our first filed case in

1  the Northern District, we were happy to stay in the Northern

2  District with the first filed case.  And I think at this

3  point -- I guess at that point we hadn't had our assignment to

4  Judge Axon yet.  We were still assigned to Magistrate Judge

5  Cornelius because the State had not filed its refusal to consent

6  to the magistrate.  So -- and, again, I think, you know, the

7  thought was if the cases -- if the cases remain separate and

8  they remain in the Middle District, that whoever they ended up

9  with we would potentially have two shots at, you know,

10 invalidating the law.  And so we were happy with and ready to

11 proceed with Judge Cornelius in the Northern District.

12       And so -- but I think there was a fear that if they had

13 mentioned that we had a position or that they had consulted with

14 us, that it might leave the impression that we had an opinion or

15 had a position, and we wanted to make sure that wasn't the case

16 or wasn't conveyed.

17       JUDGE PROCTOR:  Right.

18       MR. MCCOY:  And so that's what was -- what I remember

19 being reported back from the folks that did attend that

20 particular meeting with Walker counsel.

21       JUDGE PROCTOR:  Was it reported back to you at all

22 about any assessment during that April 13 conference about

23 judges and which judges would be favorable and not favorable?

24       MR. MCCOY:  I think there was an assumption that Judge

25 Thompson -- I mean, the Walker counsel had been trying mightily

1   to get in front of Judge Thompson, I think.  And so I think

2   there was a sense that Judge Thompson would be a favorable

3   judge.  But, again, because we all thought that that was

4   fantasy, it really --

5              JUDGE PROCTOR:  Was that part of the invitation from

6   Walker counsel to draw you to the Middle District?

7              MR. MCCOY:  I never -- I don't -- I never got an

8   invitation to this particular meeting or any substantive

9   invitation other than maybe --

10             JUDGE PROCTOR:  Well, I use that loosely.  I mean --

11             MR. MCCOY:  Yeah, yeah.  Oh, no.

12             JUDGE PROCTOR:  There was discussion about, hey,

13  shouldn't you be coming down to us, not us coming up to you.

14             MR. MCCOY:  Oh, I don't remember any conversation like

15  that, no.

16             JUDGE PROCTOR:  All right.  What would you -- anything

17  else that stands out about the April 13 call that you haven't

18  already told me?

19             MR. MCCOY:  No, Your Honor, I don't think so.  I think

20  what's in my declaration is basically the -- and to the extent

21  that I paraphrased it correctly just now.

22             JUDGE PROCTOR:  Okay.  So on the next day, on April 14,

23  Ladinsky is reassigned to Judge Axon.

24             MR. MCCOY:  Right.  Correct.

25             JUDGE PROCTOR:  And you said in your declaration,

 1  paragraph 19, we viewed that draw as a good development and were

 2  preparing to proceed before her.

 3          MR. MCCOY:  Correct.

 4          JUDGE PROCTOR:  Your colleague, Mr. Soto, has told us

 5  that they viewed the Manasco assignment as good, the Cornelius

 6  assignment as good, and the Axon assignment as very good.

 7          MR. MCCOY:  That was --

 8          JUDGE PROCTOR:  I know you don't know that.  I'm just

 9  telling you that --

10          MR. MCCOY:  Yeah.  No, no.  That's good to know.  But

11  that's consistent with what my recollection is, because I

12  recollect that at the time that the Judge Axon assignment was

13  made, that there was some communication back and forth, in

14  particular, from local counsel at Lightfoot, that they were

15  happy to proceed in front of Judge Axon.  And I think as, you

16  know, we discussed before, I was -- I had not been in this

17  jurisdiction for a while.  And so when it came to, you know,

18  judge assessments, I deferred and relied, you know, fairly

19  significantly on Lightfoot because they practice in the area.

20          JUDGE PROCTOR:  Did Lightfoot say why they pegged the

21  judges that way?

22          MR. MCCOY:  I think generally things like, you know,

23  they had a perception that the judge was smart, hard worker, had

24  family circumstances that perhaps might make them amenable,

25  generally things like that, judicial philosophy that they might

1  be more inclined than another judge to be receptive to the legal

2  theories that we were, you know, advocating for on behalf of our

3  clients, things of that -- that's the nature of the discussion

4  that I remember.

5          JUDGE PROCTOR:  What about family circumstances?  What

6  are you referring to there?

7          MR. MCCOY:  So I remember things like, you know -- I

8  think if they have kids, right, this case is about kids and

9  about -- we're advancing a parental rights, you know, argument,

10 things of that nature.  I think there was some general

11 discussion or maybe thought that some of those circumstances

12 might play in our favor.

13         JUDGE PROCTOR:  Was there anything in particular about

14 Judge Axon and family circumstances that came up?

15         MR. MCCOY:  No.  I just remember that -- I think -- I

16 think Ms. Eagan perhaps had experience, knew her or practiced in

17 some way with her, but I don't remember in great detail exactly,

18 like, what it was.  I just remember some discussion of maybe

19 kids.

20         JUDGE PROCTOR:  At what point did Mr. Minter engage in

21 this process?  My understanding from his declaration was that he

22 wasn't as involved until the legislation actually passed and

23 things started getting geared up.

24         MR. MCCOY:  I think that's -- I think that's right.

25         JUDGE PROCTOR:  All right.

1          MR. MCCOY:  You know, on the early calls when the bill

2   was working its way through the Legislature towards the end of

3   the Legislature, I remember Mr. Minter being on those calls and,

4   you know, preparing for a potential challenge.  So I don't think

5   I have any reason to disagree with that characterization.

6          JUDGE PROCTOR:  Did he have any views about judges that

7   he spoke to you about?

8          MR. MCCOY:  Not that I can remember, no.

9          JUDGE PROCTOR:  Skipping ahead a little bit -- I'm

10  going to come back to some of these events, now, but I just had

11  a -- while we're on that subject of Mr. Minter, who made the

12  decision to dismiss this action?

13          MR. MCCOY:  Our plaintiffs made the decision to dismiss

14  this action.

15          JUDGE PROCTOR:  Who made the decision to recommend it

16  to the plaintiffs?

17          MR. MCCOY:  That is a decision that I think we

18  collectively came to as a legal team.

19          JUDGE PROCTOR:  Was Mr. Orr the one responsible for

20  contacting them and informing them about this?

21          MR. MCCOY:  Yeah.  My recollection is I think that he

22  was the one that reached out to the plaintiffs, had a

23  conversation with them about the circumstances, and then

24  reported back that while disappointed, they understood the

25  circumstances and had agreed to -- that it made sense to dismiss

 1  their claims.

 2          JUDGE PROCTOR:  Did you ever have any communications

 3  with Carl Charles about the Walker case?

 4          MR. MCCOY:  None.

 5          JUDGE PROCTOR:  Okay.  All right.  We're going to take

 6  a break, it's close to 1:30 here, and excuse you from the

 7  courtroom.

 8          MR. MCCOY:  Yes, sir.

 9          JUDGE PROCTOR:  But stay close by.

10          MR. MCCOY:  I will.  I'll be outside.

11          (Mr. McCoy was excused from the courtroom.)

12          JUDGE PROCTOR:  All right.  Mr. Minter, welcome.

13          MR. MINTER:  Thank you.

14          JUDGE PROCTOR:  It's good to have you virtually with

15  us.  I'm going to ask our courtroom deputy to please administer

16  the oath to you.

17     (Shannon Minter, the witness, was sworn and testified via

18      video teleconference.)

19          JUDGE PROCTOR:  Thank you, Mr. Minter.  I know we -- so

20  I understand you've had a mishap.

21          MR. MINTER:  Yes, sir.  And I really appreciate you-all

22  accommodating me.  I'm very grateful for that.

23          JUDGE PROCTOR:  All right.  Any diagnosis yet?

24          MR. MINTER:  Yes.  I was at the orthopedist this

25  morning, and it is arthritis.

1          JUDGE PROCTOR:  Oh, that's -- growing old is not for

2     the weak.

3           All right.  So let's do this.  Give me an overview of

4     your litigation -- experience in litigation and, in particular,

5     any experience you've had other than the Ladinsky case

6     litigating in Alabama.

7          MR. MINTER:  Okay.  Yeah.  Well, I have been practicing

8     now almost 30 years.  It will be 30 years in 2023.  I've been at

9     NCLR that whole time, so my whole practice has been on LGBT and

10    civil rights cases.  And I was involved in -- I was counsel in a

11    marriage case in Alabama a few years ago representing same-sex

12    couples seeking the right to marry in Alabama.  I may have been

13    involved in some family law cases going further back, but I

14    apologize, I can't recall any specific cases right now.

15         JUDGE PROCTOR:  All right.  How would you -- how about

16    just general litigation experience?  Do you litigate often?

17         MR. MINTER:  Yes, sir.  We do litigate a lot.  Yes, we,

18    you know, regularly bring cases in federal court.  Also we do a

19    good bit of state court litigation.

20         JUDGE PROCTOR:  All right.  Let's talk about Ladinsky

21    in particular.  You were part of the legal team that prepared

22    and filed the Ladinsky case; correct?

23         MR. MINTER:  Yes, sir.

24         JUDGE PROCTOR:  And I'm trying to save us all some time

25    by just accelerating a few points here, but if I say something

1  that doesn't register or that you need to correct, please stop

2  me.

3          MR. MINTER:  Okay.

4          JUDGE PROCTOR:  My understanding is that your team was

5  largely intact, maybe with the exception of HRC, going back to

6  2020?

7          MR. MINTER:  Yeah, I think that's correct.  I don't

8  actually fully remember exactly specifically when SPLC came on,

9  just to say, but --

10         JUDGE PROCTOR:  All right.  With that possible

11  exception, though, largely your team was monitoring the Alabama

12  Legislature's consideration of the statutory matters that you've

13  litigated in the Ladinsky case?

14         MR. MINTER:  Yes, sir.

15         JUDGE PROCTOR:  And thought it might pass in 2020, but

16  it did not.  Thought there was a chance it may pass in 2021, but

17  it did not.  And then when it passed in 2022, you engaged and

18  filed the Ladinsky case.

19         MR. MINTER:  Correct.  That's correct.

20         JUDGE PROCTOR:  And you were aware at some point in

21  time that there was another group planning to file the Walker or

22  what became the Walker case.

23         MR. MINTER:  Yes.

24         JUDGE PROCTOR:  We're familiar generally with the folks

25  in the Walker side -- the Walker case and the folks in the

1  Ladinsky case.  Had any of those two groups worked together in
2  the past?
3        MR. MINTER:  Oh, yes.  You know, sure.  We have brought
4  cases before with Lambda Legal.  We have cocounseled cases with
5  them.  We've cocounseled cases with the ACLU.  The marriage case
6  I mentioned in Alabama, we cocounseled that with the ACLU of
7  Alabama.  So, yes, we have worked with those groups before.
8        JUDGE PROCTOR:  But in this situation, the two sides
9  were planning separate litigation, although a common purpose,
10  somewhat competitive, about where they wanted to get their case
11  filed and even who would file first.
12        MR. MINTER:  Yes.  That is exactly right.
13        JUDGE PROCTOR:  And we understand that was particularly
14  important to you and the Ladinsky team to be the first to the
15  courthouse in order to be in first filed position.
16        MR. MINTER:  Yeah, it was.  You know, rightly or
17  wrongly, I felt strongly that I wanted our kind of approach to
18  the case to be the one that was heard.  And I was really --
19  yeah, it was very important to me that we -- if we, at all,
20  could -- would be the first case filed and would be the lead
21  case.
22        Not that it really matters, I don't think, but up
23  until -- I had somehow been under the misimpression that the
24  other -- the ACLU-Lambda team was not going to file in Alabama.
25  So I had been kind of laboring under that misimpression until

1   relatively around the time the legislation passed.  So I was

2   just -- yeah, I was -- I was disappointed by that and then I was

3   very anxious about us trying to be the first case filed.

4           JUDGE PROCTOR:  Did you have any communications with

5   the Walker litigation team about the fact that there would be

6   the potential of two different suits filed?

7           MR. MINTER:  No, not in -- no.  I had had a

8   conversation back in 2021, I think, which is where I had gotten

9   this misimpression, that we had had a kind of agreement that we

10  would focus on -- NCLR and GLAD would focus on Alabama and they

11  would focus on other states.  But, no, I hadn't -- no, I

12  didn't -- not in 2022, no.

13          JUDGE PROCTOR:  Do you have any information other than

14  what you've heard from others about the filing of the Walker

15  case, the civil cover sheet in the Walker case that related it

16  to Corbett, or any attempts to draw Judge Thompson as the judge

17  in the Walker case?

18          MR. MINTER:  No.  No.

19          JUDGE PROCTOR:  At some point, though, a show cause

20  order is entered by Chief Judge Marks.  And did you become aware

21  of that at some point?

22          MR. MINTER:  Yes, uh-huh.  When he issued the order, I

23  was aware of it.

24          JUDGE PROCTOR:  It was a she who issued the order, but,

25  yes.

1          MR. MINTER:  Oh, sorry.  I'm sorry.  I apologize.  I

2     didn't realize that.

3          JUDGE PROCTOR:  That's all right.  Just making sure

4     we're on the same page here.

5          What communications, if any, did you have with the

6     Ladinsky team about the show cause order in the Walker case?

7          MR. MINTER:  Very few.  I was not really -- I was

8     focused very much on trying to get our PI papers together.  That

9     was very much my concern.  I was really worried that we didn't

10    have them together yet, and that was what I was working on

11    very -- every spare moment.  So I was not really -- I wasn't --

12    I trusted other people on the team to be tracking what was going

13    on with the Walker case and to deal with that.  I don't remember

14    how I learned, was it through email or phone conversation, that

15    the show cause order had issued.  And some -- something to the

16    effect that the Walker team, I think, was thinking of possibly

17    filing something in response that would have suggested to the

18    Court that our case get consolidated with their case in front of

19    Judge Thompson.  And that was not something we were interested

20    in.  I understood that we let them know that, and that's pretty

21    much it.

22         JUDGE PROCTOR:  Who was your contact to -- on these

23    matters to inform you about what was being discussed and decided

24    between the Walker counsel and the Ladinsky counsel?  Who was

25    your source --

```
 1          MR. MINTER:  Sorry.  There wasn't like one -- I didn't
 2   have like one specific source.  I think there was some
 3   discussion of it on our email, our group email.  I'm sure I
 4   talked to -- I'm sure I talked to somebody on our team at some
 5   point about it.  I don't remember -- I don't have any specific
 6   recollection of who that would have been.
 7          JUDGE PROCTOR:  All right.  Did you participate -- and
 8   I don't recall when -- let me see if I can't get your
 9   declaration up here.  This might help me remember.  Forgive me.
10   We've got a number of witnesses in this matter, and sometimes it
11   blends together on who was involved in which decisions and
12   conversations.  But were you at all on a Wednesday, April 13,
13   phone conference with -- between Ladinsky counsel and Walker
14   counsel regarding Walker counsel wanting to talk about the show
15   cause order?
16          MR. MINTER:  No, sir.  I have no recollection of being
17   on any call like that.
18          JUDGE PROCTOR:  You're aware there was a call at this
19   point?
20          MR. MINTER:  Uh-huh.  Yeah.
21          JUDGE PROCTOR:  Did you direct anyone or give anybody
22   your viewpoints about the call in advance of it since you were
23   not on it?
24          MR. MINTER:  I just don't remember if I did or not.  I
25   quite possibly could have.  I mean, I know very clearly what my
```

1  view was, that we were -- had no interest in consenting to or

2  agreeing to them seeking to pull us over with them.  And I

3  probably did convey that to someone.  I just -- I do not recall

4  any specific conversation.

5          JUDGE PROCTOR:  All right.  At some point, though, you

6  became aware that the Walker case was transferred to the

7  Northern District?

8          MR. MINTER:  Walker -- yes.  Yes.

9          JUDGE PROCTOR:  Okay.  And so Judge Marks had entered a

10  show cause order and eventually the Walker counsel had consented

11  to the order, withdrawn their request that the case be assigned

12  to Judge Thompson, and they were sent north?

13          MR. MINTER:  Yes.

14          JUDGE PROCTOR:  And Walker was then assigned to Judge

15  Burke.

16          MR. MINTER:  Uh-huh.

17          JUDGE PROCTOR:  If you could say yes or no.

18          MR. MINTER:  Yes.  Yes, sir.  Yes, sir.  I definitely

19  remember that.

20          JUDGE PROCTOR:  Now, were you in the courtroom at our

21  very first hearing where I walked through procedurally what had

22  happened in Walker?  I don't think you were.

23          MR. MINTER:  No, sir.  I just wanted to think

24  carefully.  No, sir.  I was not in the courtroom until the PI

25  hearing in Eknes-Tucker.

```
1              JUDGE PROCTOR:  Right.

2              JUDGE WATKINS:  He's not one of the lawyers listed in

3   this.

4              JUDGE PROCTOR:  That's right.  So that's what made me

5   think he was not actually here.

6              So let me give you the benefit of an explanation I gave

7   counsel and your colleagues on that first day.

8              Walker was transferred to the Northern District under

9   the first-filed rule.  And what happened is there -- usually

10  what happens when a case is filed in a district, there's a civil

11  cover sheet that is -- accompanies the case, the complaint

12  indicates, often, which division the case is being filed in.

13  When the case is originally filed in a district it usually is

14  traditional to indicate what division the case is being filed

15  in.  But when a case is transferred in from another district, if

16  the transfer order does not have an indication about division,

17  then the clerk's office has to make a determination about which

18  division the case being transferred in ought to go to.

19             The Walker case had only Northern District of Alabama

20  plaintiffs who resided in the Northeastern Division, which is

21  part of the northern jury area.  And our case assignment system

22  of our Court is driven largely by jury area, which is comprised

23  of divisions.  The clerk's office looked at that when it came in

24  and assigned it to the Northeastern Division, therefore, the

25  northern jury area, and the case was randomly assigned on the
```

1  wheel based upon the judges' drawing cards out of that

2  particular jury area, and Judge Burke was randomly assigned the

3  case when it came in -- the Walker case when it came in.  All

4  right?

5          MR. MINTER:  Yes, sir.  Thank you.

6          JUDGE PROCTOR:  Now, my understanding -- go ahead.

7          MR. MINTER:  No.  I'm sorry.  Go ahead.

8          JUDGE PROCTOR:  Now, so my understanding is your team

9  did not understand procedurally how that occurred.

10          MR. MINTER:  That's right.  Yes.  We didn't know that.

11 Yeah.  And we did wonder why the case went -- didn't just go

12 straight to Judge Axon.  I mean, just to be clear, I don't think

13 we attributed any great significance to that; but I think, as I

14 said in my declaration, I did notice it and wonder about it, but

15 I didn't -- I thought it would -- I just assumed that it would

16 get transferred over to Judge Axon, you know, in the normal

17 process.  Yeah.

18          JUDGE PROCTOR:  Well, and I also gave this explanation

19 about what happened next.  Of course, you're more familiar with

20 what occurred in Ladinsky.  It was originally assigned to Judge

21 Manasco, who recused.  It then went to Judge Cornelius, who did

22 not gain the consent of all parties.  And then it went back on

23 the wheel and went to Judge Axon.  You're familiar with that?

24          MR. MINTER:  Yes, sir.  Yes.

25          JUDGE PROCTOR:  Now, the parties in their

1  declarations -- I think you included -- have told us that they

2  were paying some attention to which judge had the case and

3  trying to -- on a real-time basis, trying to assess what that

4  meant for the case, which -- when a judge got a case.  Fair

5  statement?

6          MR. MINTER:  Yes, fair.

7          JUDGE PROCTOR:  And some of your colleagues have told

8  us that Judge Manasco was viewed as a good draw, Judge Cornelius

9  was viewed as a good draw, but that Judge Axon was viewed as

10  even a better view than the first two.  Was that your

11  assessment?

12          MR. MINTER:  No, I didn't know that, honestly.  I knew

13  that we were fine with Judge Axon and hopeful that she would be,

14  you know, sympathetic to our cause.  I did not -- was not aware

15  of the comparative between Judge Manasco and Magistrate Judge

16  Cornelius and Judge Axon.

17          JUDGE PROCTOR:  Did you --

18          MR. MINTER:  I had not heard that until you said it.

19          JUDGE PROCTOR:  I'm sorry?

20          MR. MINTER:  I had not heard that until you just said

21  it.

22          JUDGE PROCTOR:  All right.  When you learned that Judge

23  Burke had set the Walker case for a status conference, though,

24  is that the first time you started getting concerned?

25          MR. MINTER:  Yeah.  Yes.  That is exactly right.  Yeah.

1    That puzzled me and concerned me.

2           JUDGE PROCTOR:  Now, you said in your declaration, I

3    didn't understand why the Court would diverge from the

4    first-filed rule and was unhappy that as a result, our case

5    would be second filed to Walker and possibly even get left

6    behind altogether since the Walker plaintiffs already filed a

7    motion for a temporary restraining order.  Do you recall that

8    portion of your declaration?

9           MR. MINTER:  Yes.  Yes.  Yes, sir.  That is --

10          JUDGE PROCTOR:  I want to focus you in on the

11   first-filed rule portion of that.  Explain to me what you

12   understand and maybe even what you understood at the time the

13   first-filed rule provided for.

14          MR. MINTER:  Just that when a case is filed, for

15   example, as it was in this case, you know, challenging a

16   particular law, and then another case is filed raising the same

17   challenge to the same law on the same claims, that the

18   first-in-time case -- well, the later filed case would be

19   consolidated with the first filed case, and that whatever judge

20   was assigned to hear the first filed case would hear both of the

21   cases.  The second one would be transferred and consolidated

22   with the first filed case.

23          JUDGE PROCTOR:  Now, did you do the research on the

24   first-filed rule or did you rely upon others to explain that to

25   you?

```
 1          MR. MINTER:  You know, gosh.  I'm just familiar with
 2   the rule from prior litigation.  So I didn't do any -- at that
 3   stage, any like original research or anything like that.  It's
 4   just more something I kind of take -- took -- was taking for
 5   granted.
 6          JUDGE PROCTOR:  All right.  But would it surprise you
 7   to learn the Eleventh Circuit has described the first-filed rule
 8   a little differently than what you just articulated?
 9          MR. MINTER:  Gosh.  Well, when I later did look at
10   Eleventh Circuit case law on it, it seemed the same as what I
11   had thought, but I'm sure I could easily have missed an
12   important nuance.
13          JUDGE PROCTOR:  Well, the point of the first-filed rule
14   is, though, that it provides a vehicle for moving a case from
15   one district to another.  The first-filed rule doesn't come into
16   play, per se, when you have an intradistrict set of filings.
17          MR. FRANKLIN:  Judge, excuse me again.  I don't want to
18   interrupt, but I made a prior objection when we were here on
19   August 3 and 4 to the Court stating that that is the law or that
20   it's a given proposition.  And --
21          JUDGE PROCTOR:  I think what I did on August 3 and 4 is
22   I read you the Eleventh Circuit case.  I didn't state it.  I
23   read it.
24          MR. FRANKLIN:  Well, and I may have said -- and I can't
25   remember and don't have the transcript to look back, but I think
```

1    I --

2         JUDGE PROCTOR:  I have a recollection of having the

3    Eleventh Circuit case in my lap and reviewing it.

4         MR. FRANKLIN:  Okay.  Did I perhaps raise and point out

5    that even Your Honor, in a case in the Northern District of

6    Alabama as recent as September 17, 2021, referred to the first

7    filed case being a practice, interdistrict, in the Northern

8    District of Alabama?

9         JUDGE PROCTOR:  You're not impugning my point.  You're

10   actually establishing --

11        MR. FRANKLIN:  Intradistrict.

12        JUDGE PROCTOR:  -- that there is a difference between

13   the first-filed rule and the practice of a case going to the

14   first filed judge.

15        MR. FRANKLIN:  Okay.

16        JUDGE PROCTOR:  That's the distinction.

17        MR. FRANKLIN:  All right.

18        MR. SEGALL:  Same result.

19        MR. FRANKLIN:  Okay.

20        JUDGE PROCTOR:  Well, no, it's not the same result.

21   The first-filed rule, to be clear -- and we're not going to

22   spend a lot of time on this.  I'll just say it again.  The

23   first-filed rule is the case goes to the first filed judge to

24   determine if the cases should be consolidated.  But the case

25   can't go to that first filed judge to determine if the cases

1   should be consolidated if it's in a wholly different district.

2   You can't do a transfer of the case intracourt.  So the point is

3   you've got to get the case over to the district in which the

4   other -- the first filed case exists in order for that to make

5   an assessment.

6           And, again, guys, look.  I understand you have a

7   different view of this.

8           MR. SEGALL:  Judge, when I said same result, I mean if

9   the cases are consolidated, I don't care whether you call it

10  "rule" or you call it "practice," the practice in the Northern

11  District and every court I've ever been in in my lifetime, it

12  goes to the lower case number.

13          JUDGE PROCTOR:  Not so.

14          MR. SEGALL:  Whether it's a practice or a rule, that's

15  the expectation.  That's all we're saying.

16          JUDGE PROCTOR:  That's not necessarily so.  It often

17  makes sense.

18          MR. SEGALL:  Right.  There are exceptions to

19  everything.

20          JUDGE PROCTOR:  Hold on.  Hold on.  Let's not talk over

21  each other.

22          It often makes sense.  But I was walking him through an

23  explanation that we provided you, and he hasn't received it.  So

24  I'm trying to be fair to him.  So you're actually slowing this

25  process down by making this point, but all I'm trying to do is

1    explain to him what happened here.  Okay?

2           Now, look.  If you want to cite the most recent case

3    that I've been involved in, talk to Mr. Ragsdale on the break

4    because we've just had this exact same situation come up in Blue

5    Cross Blue Shield.

6           Have you seen that order, Mr. Ragsdale?

7           MR. RAGSDALE:  I have, Your Honor.

8           JUDGE PROCTOR:  All right.  So we had Blue Cross Blue

9    Shield.  I've been the MDL judge for ten years now.  Hate to say

10   it that way.  We had a class settlement of subscribers.  There

11   were opt-outs who filed six different lawsuits, I think, in our

12   district.  The earliest filed case that went to an Article III

13   judge -- I think maybe an earlier one went to a magistrate judge

14   or didn't get consent -- was Judge Manasco.  So it's Judge

15   Manasco's job to decide what should happen to these cases.

16   Should they be consolidated?  She determined that they should

17   be.  Unfortunately for me, she also determined they ought to go

18   to me because I had the experience already working on the MDL

19   case that involves the same issues and already had that in

20   place.  So if you want to talk about the most recent case where

21   this has happened, I think that's the most recent case where

22   this has occurred.

23          But I'm trying to just give Mr. Minter the benefit --

24   the same benefit that all of you have and all the other lawyers

25   who have appeared in this case have of understanding what

1  happened.  Okay?  So let's just treat it that way.  I'm not

2  trying to get him to comment on the law, but I'm just guiding

3  him through this discussion.  All right?

4        MR. FRANKLIN:  And I apologize if it appears that I'm

5  slowing it down, which is the last thing in the world I want to

6  do.  But I feel like if something is asked that is not, at least

7  in my view, consistent with what a rule or practice is, that I

8  have to make an objection.

9        JUDGE PROCTOR:  Well, that's fine.

10        MR. FRANKLIN:  But I tried not to object.

11        JUDGE PROCTOR:  That's fine.  And it's your role to

12  argue what you think the law is and should be.  It's the

13  Eleventh Circuit's role to define what the law is.

14        So, look.  I'll be glad to do this.  Let's pick another

15  time.  You get all your friends together.  You come up to the

16  courtroom.  We'll have a complex civil litigation class, and

17  I'll give you an exam at the end of it.  Okay?  But we're not

18  going to do that right now.  Fair?

19        MR. FRANKLIN:  That's fair.  I just -- I've made my

20  objection.

21        JUDGE PROCTOR:  All right.  Back to Mr. Minter, the

22  point was that Judge Axon decided the cases should be

23  consolidated but also decided that she was not going to take the

24  two cases and, instead, Judge Burke would, who was randomly

25  drawn on the second case, because she was in the midst of a

 1  criminal trial that was ongoing.  She believed that this was
 2  going to require a bunch of attention and a great deal of time
 3  and just did not feel that she would be able to get -- realizing
 4  the importance of a case like this, getting to a TRO early,
 5  getting the parties in early, she determined that she just
 6  didn't have the bandwidth to do that at the time.  I think she
 7  was in a four-defendant case with an eight or 18 --
 8  four-defendant trial with an eight or 18-defendant case that
 9  looked like it was going to go into a second or third week.
10  That's what happened.  Okay?
11          Nothing -- and I think everyone in the courtroom, in
12  fairness -- and, again, Mr. Franklin may disagree with me on
13  this point, too -- said, oh, wish we had known that before.  We
14  didn't realize that, though.  The order wasn't clear to us.
15  Okay?  So you're caught up now on the same -- hopefully, you're
16  on the same page everyone else is.
17          MR. MINTER:  Yes, sir.
18          JUDGE PROCTOR:  What I want to focus you in on, though,
19  is we've got kind of a fork in the road here as we assess what
20  the parties -- what the lawyers in this case's motives were.
21  Were they so shocked and concerned by what they viewed as a
22  procedural irregularity they decided to dismiss this case
23  because they were just -- couldn't get past it, even though they
24  never asked the Court to clarify what happened, or did they
25  dismiss this case because they didn't want Judge Burke hearing

1   it?  That's really what this decision comes down to.  And that's

2   why I'm asking some of these questions.  It's not to get you to

3   agree or disagree with me about what the procedural process was.

4   But I think what the Eleventh Circuit said about it is a data

5   point.

6           Now, having said that -- so I'm going to ask you some

7   questions so we can try to figure out what was driving this

8   decision.  Fair enough?

9           MR. MINTER:  Yes, sir.

10          JUDGE PROCTOR:  I can't be any more cards-up than that

11   about where we are right now.

12           So explain this to me.  We've been led to understand

13   that you were the first one who brought up dismissal.  And you

14   brought it up in a conversation with Mr. Orr almost immediately

15   after Judge Burke set Walker for a status conference in

16   Huntsville and Judge Axon entered her order assigning Ladinsky

17   to Burke.  Is that a fair statement?

18          MR. MINTER:  I definitely thought -- it is a fair

19   statement that I thought about that option right away, yes.  I

20   don't remember having a conversation with my colleague Asaf.  I

21   believe I -- it's totally plausible that I did.  I just don't

22   have a specific recollection of it.  But that kind of doesn't

23   matter because, yes, it was -- I had -- that was my idea.

24          JUDGE PROCTOR:  All right.  So we understand there was

25   a --

 1          MR. MINTER:  I had thought of it immediately.  Yeah.

 2          JUDGE PROCTOR:  Mr. Orr has told us there was a

 3   conversation that he had with you, and then there was a

 4   conversation that you and he participated in with the other

 5   Ladinsky counsel who were available that afternoon.  And then

 6   there was -- Mr. Orr was charged with calling clients to get

 7   consent for dismissal.  Then there was -- although I don't think

 8   he was involved with it, there was a conversation with the

 9   Walker team later on that Good Friday, April 15.  And then by

10   about six o'clock or so that afternoon, dismissal of the Walker

11   case and then the Ladinsky case were filed in that order.  Does

12   that sound like a correct chronology to you?

13          MR. MINTER:  It does, Your Honor.  You know, I can't

14   recall specifically now.  I may have had additional

15   conversations with individual team members or -- I just don't

16   recall.  But, yes, everything you said corresponds to my

17   memory -- everything you said happened.  Yes.

18          JUDGE PROCTOR:  Now, before all that, though, before

19   Judge Burke was even assigned Walker or before you knew he was

20   assigned to Walker and before Judge Axon entered her order

21   transferring Ladinsky to Burke, there were discussions between

22   Walker counsel and Ladinsky counsel about consolidation of the

23   cases before Judge Axon.  Correct?

24          MR. MINTER:  That is my understanding, yes.  I wasn't

25   part of those conversations, but I was aware they were happening

1    in the background.

2         JUDGE PROCTOR:  Were you giving input and direction to

3    others about those conversations?

4         MR. MINTER:  I don't recall giving specific input.  I

5    may have and I don't recall it.  I don't recall that.  Aside

6    from, you know, again, I didn't want to -- oh, no, we're past

7    that.  This is not about them trying to consolidate us with --

8    in front of Judge Thompson.

9         JUDGE PROCTOR:  No, this is after we're clear that

10   Walker was coming to the Northern District and they were going

11   to both be in the Northern District.  The idea was, well -- you

12   understood that whether by court action or party motion, the

13   cases would be in front of the same judge, and you thought that

14   judge would be Axon.

15        MR. MINTER:  Yes, sir.  Yes, sir.  Absolutely yes.  And

16   I don't recall having conversation in which I gave specific

17   direction.  I may have.  Again, what I recall from that time is

18   being monomaniacally focused on trying to get our PI papers

19   together.  But I very well might have had conversations.  I just

20   don't have specific recollection of them at this point.

21        JUDGE PROCTOR:  The point being, though, that your

22   Ladinsky team was necessarily contemplating that they would have

23   to litigate this case alongside the Walker team in front of the

24   same judge.

25        MR. MINTER:  Yes, sir.  Yes, sir.  Yes, sir.  And our

1  expectation and assumption was that, you know, they would be --

2  we would be the lead case and they would be consolidated with

3  us.  But, yeah, I was reconciled that we would have to, you

4  know, navigate that complexity of having them consolidated with

5  us.  Yes.

6         JUDGE PROCTOR:  Did it ever occur to you that maybe the

7  judge who ended up with the two cases might have some view about

8  how the cases were managed through pretrial?

9         MR. MINTER:  It probably should have, but not really,

10  no.  I mean, probably should have.

11         JUDGE PROCTOR:  To be clear, as I listen to all this

12  explanation we've received in each of these hearings about how

13  we were in the driver's seat, we wanted to remain in the

14  driver's seat, that just ignores a lot of realities of

15  litigation, and that is the judge probably has a lot to say

16  about how the cases proceed.  And the judge can't possibly make

17  those decisions until he gets all the parties before him or her.

18  It also ignores the fact that you guys didn't have a TRO at the

19  time and the Walker case did.

20         MR. MINTER:  Yes.  Yes.  No, I totally hear what you're

21  saying.  It was -- I was very upset with us and disappointed

22  with us that we didn't have our PI motion ready.  I felt a lot

23  of responsibility.  I mean, this is a horribly important issue.

24  I thought that our approach to the case was going -- you know,

25  was going to be the best way to approach it.  You know, again,

1 rightly or wrongly, I'm sure that sounds very self-aggrandizing,

2 probably, and I see that.  You know, I see that, but that was

3 the mind-set that I was in.  I really wanted us to have a chance

4 to shape the case.

5        And that's -- and we weren't -- you know, I think we

6 had thought that -- the law didn't pass two years in a row.  I

7 think we thought it was quite possibly not going to pass again.

8 Then I think we thought Governor Ivey was going to take a little

9 bit of time to sign it.  She didn't.  She signed it the next day

10 after the Legislature passed it.  And we were caught

11 flat-footed, even though we shouldn't have been, because we had

12 our team together for that, you know, three years at that point,

13 but we were.  And so that's -- I completely understand and hear

14 what you are saying.

15        JUDGE PROCTOR:  Here's what I need to know from you.

16 What if you had -- well, let me -- actually, let me ask you this

17 first.  What conversations, concrete conversations, did you have

18 with your team about the consolidation of the two cases in front

19 of who you thought would be the judge, Judge Axon?

20        MR. MINTER:  I don't recall having specific

21 conversations about that.  Well, wait.  If you mean -- well, no.

22 Okay.  Sorry.  No, I think I know what you're -- I think I know

23 what you're asking.

24        We did have conversations about how was that

25 mechanically going to happen, like logistically and

1   procedurally, how that was going to happen.  Again, I was not

2   personally involved in that.  I was letting others deal with

3   that because I was trying to get our PI motion finished.  But I

4   did see emails and might well have been on some kind of group

5   calls where it was discussed.  I don't remember.

6          But I know that -- I remember there was an email

7   communication that one of the King & Spalding attorneys had

8   spoken to Judge Axon's deputy, who indicated that the case was

9   going to be -- or that Walker was going to be consolidated

10  before her.  And I think there was some discussion about how

11  that was -- who needed to file a motion to make that happen.

12  There was emails about that, about -- and I think there was some

13  communication with a clerk in Judge Burke's office about how --

14  who was supposed to file the motion.  And then I think that also

15  there was conversation I think with the Walker team and the

16  attorney general about the Attorney General's Office filing the

17  motion.  So there were a number of conversations going on about

18  the logistics and what would be the proper procedure to seek

19  consolidation of the two cases.  Yeah.

20         JUDGE PROCTOR:  All right.  Throughout all that,

21  though, you were having to discuss with your team how you were

22  going to have these two cases mesh and go forward together;

23  right?

24         MR. MINTER:  Well, I don't recall like getting into

25  that.  I don't recall -- I mean, that would have been the next

1   stage of discussion, I think, about, like, how are we going to

2   navigate this and make it work and coordinate.  I don't recall

3   having any substantive discussions with our team about --

4        JUDGE PROCTOR:  Well, here's the problem I'm having

5   understanding your position in this matter.  What I'm hearing

6   you say, on the one hand, is that was such a significant issue

7   for us that it ultimately drove us to dismiss this case, along

8   with other factors, Burke, what we perceived to be a procedural

9   irregularity of how the case got to Burke.  Okay?  But the

10  thing that was most critical was we didn't feel good about this

11  important task we had representing our clients and trying to

12  prosecute our clients' rights if we could not be in good control

13  of the litigation going forward, and that's what drove us to

14  dismiss the action.  Am I accurately stating your view?

15       MR. MINTER:  Yes, sir.  Yes.

16       JUDGE PROCTOR:  But at the same time, we're hearing

17  that up until the time you dismissed the case, you hadn't even

18  done much in the way of talking with your own team, much less

19  the Walker team, about how these cases should go forward and the

20  nuts and bolts of consolidation.  We had agreed to consolidate,

21  but we hadn't even talked about what consolidation would look

22  like.

23       MR. MINTER:  I didn't think we had any choice about

24  whether to agree to consolidation, just to say.  I mean, I

25  thought that was kind of a foregone conclusion.  And, yeah, my

1   focus was on having their case consolidated with our case and,

2   again, getting our motion for a preliminary injunction together.

3        JUDGE PROCTOR:  Were you planning on filing it that

4   day, later that day, the motion for preliminary injunction?

5        MR. MINTER:  Which -- I'm sorry.  Which day?

6        JUDGE PROCTOR:  Were you planning on filing the motion

7   for preliminary injunction later on Friday, April 15th?  Wasn't

8   that the plan?

9        MR. MINTER:  No.  We were not ready.  We would not have

10  been able to.  No.  I was hoping we would be able to file it on

11  Monday.

12       JUDGE PROCTOR:  All right.  And so you get notice from

13  someone that Judge Burke has set Walker for this status

14  conference at ten a.m. on the following Monday; correct?

15       MR. MINTER:  Yes, sir.

16       JUDGE PROCTOR:  And that was set in Huntsville.

17       MR. MINTER:  Yes.

18       JUDGE PROCTOR:  Did it ever occur to you that we don't

19  need to consolidate this case, we just need to have the cases

20  proceeding on parallel tracks and we can go to Judge Burke and

21  say, we have slightly different theories, we would like to

22  present -- give each side the opportunity to present their

23  theories at a hearing?

24       MR. MINTER:  Well, my worry at the time was they had

25  already filed their motion for a TRO and a PI.  They had already

1   been set for a status conference.  I wasn't even sure we had, at

2   that point -- I mean, we weren't a party to the status

3   conference.  I didn't even know if we would be able to show up

4   and speak at the status conference or who would be able to go.

5   So I wasn't -- I mean, I -- my fear, my fear, you know, rightly

6   or wrongly, was that we were going to quite possibly be left

7   behind, that -- and this -- and with not -- I mean, there's not

8   anybody doing -- I mean, I'm not suggesting Judge Burke was

9   doing anything wrong.  He got a TRO and he set a status

10  conference.  But from -- you know, from my point of view,

11  what -- I had thought we were on one track, which was going to

12  slow that down and have us -- both cases be in front of Judge

13  Axon, and we had the breathing room that we desperately needed

14  to get our papers together, and then that rug got pulled out --

15  just very surprisingly got pulled out from under us.  And -- no,

16  I was worried -- I was not sanguine about us just showing up

17  Monday, and I didn't know if we would even be able to be heard

18  or what we would, you know, be saying at that time.  Yeah.  That

19  was my worry.

20         JUDGE PROCTOR:  What do you recall about your team --

21  the Ladinsky team's assessment, internal assessment, of the

22  judges assigned at various times to this litigation?

23         MR. MINTER:  I don't recall hearing anything at the

24  time about Judge Manasco or the magistrate judge.  Again, I

25  was -- really just had my head in a tunnel focused on our

1 papers.  I do recall some discussion about Judge Axon and that

2 she -- some hope that she might be sympathetic to the case.

3          JUDGE PROCTOR:  What was the basis for your --

4          MR. MINTER:  She did a lot of work with children.

5          JUDGE PROCTOR:  Tell me about that.

6          MR. MINTER:  Just that she had done a lot of work with

7 children and might therefore be receptive to -- you know, the

8 case is about kids and that she had kids herself and -- yeah.

9 Just that, you know, there was -- you know, hoping that she

10 might be receptive.

11          JUDGE PROCTOR:  Every judge on the Court at that time,

12 if I'm counting my judges and categorizing them correctly, had

13 kids.  So I don't know what that -- I'm not sure what to make of

14 that.  Was there something specific?

15          MR. MINTER:  Yeah.  No.  I -- well, just -- my

16 understanding was that she had done work specifically around

17 organizations that dealt with various children's issues.  There

18 was that.  And, you know, in all honesty, there may have been

19 some -- it wasn't intentional, for sure, but maybe like some

20 unconscious gender bias, thinking that, you know, somebody who's

21 a mom might particularly be receptive.  But that's what I

22 recall, just -- and then I think people would -- some people had

23 had just positive experiences in front of her.  I mean, it was

24 nothing very extensive or deep.  I mean, it was more just like,

25 oh, well, hope.  I hope that she will be sympathetic.

1          JUDGE PROCTOR:  Was there anything specific that you

2   can remember about that area other than what you've told me?

3          MR. MINTER:  People had good experiences in front of

4   her.  I think some people had some degree of personal, you know,

5   relationship with her.

6          JUDGE PROCTOR:  Who?

7          MR. MINTER:  She seemed like a -- I don't recall,

8   honestly.  I mean, I assume it would have been some of the

9   Alabama folks, but I do not recall who said they had some -- you

10  know, knew her to some degree socially.  And then that she had

11  worked on these children's issues related --

12         JUDGE PROCTOR:  Tell me about that.

13         MR. MINTER:  I can't remember the exact organizations.

14  I want to say it was -- was it a YMCA?  I'm not sure.  But that

15  she had had some kind of -- done some sort of work advocating

16  for kids.

17         JUDGE PROCTOR:  How about Judge Burke?  What came up

18  about Judge Burke in your assessments of judges?

19         MR. MINTER:  Same.  That he was very conservative.

20  Just that he was an extremely -- viewed as an extremely

21  conservative judge.

22         JUDGE PROCTOR:  On the phone conference that the

23  Ladinsky team had on April 15 in the afternoon, we have been

24  informed that one of the lawyers on that call said that there

25  was a zero percent chance that Judge Burke would grant a

1  preliminary injunction in the case if he had the case.  Do you

2  recall that?

3          MR. MINTER:  I actually don't.  I don't recall that.

4          JUDGE PROCTOR:  You're on that call?

5          MR. MINTER:  I mean, it definitely -- I think I was on

6  that call.  I mean, there were a lot of calls that day.  I think

7  I was on a call with our team.  I definitely recall people --

8  some people expressing very serious concern that -- about

9  that -- how conservative he was deemed to be.  I don't recall

10 that specific statement.  I just want to be clear.  I'm not

11 saying it wasn't said.  I'm just telling you I don't recall.

12          JUDGE PROCTOR:  So I'm struggling with this because

13 you're not the first person today who was on that call.  And we

14 didn't invent this.  This was told to us by another witness and

15 in various forms implied by some other witnesses.  But the point

16 is, what was your most important objective in filing this

17 lawsuit?

18          MR. MINTER:  Well, we really wanted to get the law

19 enjoined, preliminarily enjoined, before it went into effect if

20 we possibly could.  That was our goal.

21          JUDGE PROCTOR:  That was the singular objective, to

22 make sure this statute did not go into effect or, even if it

23 went into effect, would be unenforced and declared

24 unconstitutional or invalid by a court; right?

25          MR. MINTER:  Well, sure.  I mean, yeah.  That -- we

1  were really concerned about the impact of the law, and that was

2  the goal, yes.

3           JUDGE PROCTOR:  So here's what I'm trying to

4  understand.  We've been told that during this phone

5  conversation, a lawyer said there's a zero percent chance that

6  Judge Burke would grant that relief.  And you don't recall that?

7           MR. MINTER:  I'm sorry, sir.  I do not.  I do not.

8           JUDGE PROCTOR:  You're not saying it didn't occur.

9  You're just saying if it occurred, you don't recall it.

10          MR. MINTER:  Yes.  I do not recall that statement.  I

11 mean, I definitely recall people voicing concerns.

12          JUDGE PROCTOR:  What do you recall about that?

13          MR. MINTER:  Like what I recall is just -- there was

14 not any -- I don't remember anything specific, any specific

15 basis for it other than just that Judge Burke was, you know,

16 considered to be a very, very conservative judge, and that that,

17 you know -- he might not be very receptive to our case.

18          JUDGE PROCTOR:  And to the contrary, you were told that

19 Judge Axon would be potentially receptive to your case?

20          MR. MINTER:  I mean, you know, maybe, yeah.  Possibly.

21 Possibly.  I don't think by any means, you know -- I mean, you

22 know, I'm aware she's also a conservative judge and, you know,

23 pretty much figured good chance, no matter who got the case,

24 that we would be in front of a more conservative judge.  That's

25 okay.  I mean, that's -- we deal with that all the time.  Yeah.

1    We just, you know, have to trust in the process and

2    presenting -- it just makes -- it just makes me and -- feel more

3    weight, I would say, just more of the kind of weight of making

4    sure that we do the best possible job that we can, you know,

5    because we know that we may be in front of a judge that's not

6    got like a predisposition to be sympathetic to our legal

7    arguments and probably may not know much about the topic, you

8    know, the -- they might, but, you know, most people don't.  So

9    that's more my, you know, orientation to it.

10            JUDGE PROCTOR:  So explain this to me.  On the one

11   hand, you are wanting to file this lawsuit literally on the same

12   day the Governor signs it into law.  And time is of the essence;

13   right?

14            MR. MINTER:  Yes.

15            JUDGE PROCTOR:  That's one of the things that you deal

16   with when you litigate in this area, particularly when you're

17   challenging a statute that's recently passed, is time is of the

18   essence.

19            MR. MINTER:  Yep.

20            JUDGE PROCTOR:  How did dismissal of this action help

21   you with the "time is of the essence" matter?

22            MR. MINTER:  Well, I mean, that was not the only

23   factor.  I had wanted -- again, I really thought our approach

24   was going to be the best approach.  You know, that may be right

25   or wrong, but I felt that very strongly.  Really wanted us --

1  thought we were going to have more time.  We didn't.  Governor

2  Ivey signed it way sooner than we thought she was going to.

3         We were able to get our complaint on file and then just

4  furiously working to get our PI together, and this other case

5  got filed.  I thought it was going to be okay because, you know,

6  I was counting on, whether it's a rule or practice, that because

7  we were the first filed case, that -- I just -- I fully assumed

8  that the case would -- that we would be the lead case and their

9  case would get consolidated with ours.  And there was a lot of,

10 you know, back and forth about all that, but, you know, I don't

11 need to repeat everything that just happened.

12         JUDGE PROCTOR:  No, but --

13         MR. MINTER:  But, yeah, at that point, time -- you

14 know, the time would have been -- I mean, the time was battling

15 against the desire to have a strong voice in how the case was

16 presented and shaped because we were just going to get the one

17 chance.  So there was some -- you know, definitely some tension

18 there, but we still felt the time pressure horribly and were,

19 like, we've got to file a new case, like, ASAP.  So the time

20 pressure was there and was constant and looming and very

21 weighty.  But I was willing to forego like a day or so to have

22 us have the hope of being able to present the case in what I

23 thought would be the best way.

24         JUDGE PROCTOR:  Before you agreed or decided to dismiss

25 the Ladinsky case, did you instruct anyone to go to the Walker

1   counsel and make sure they were agreeing to dismiss the Walker
2   case as well?
3           MR. MINTER:  I called them.  I called my -- I called
4   one of the attorneys on the Walker team to see if they were --
5   what they were thinking.
6           JUDGE PROCTOR:  Who was that?
7           MR. MINTER:  Kathleen Hartnett.
8           JUDGE PROCTOR:  Okay.  And what did she say?
9           MR. MINTER:  She indicated that they were thinking
10  along the same lines.
11          JUDGE PROCTOR:  Did you condition dismissal of Ladinsky
12  on Walker has got to dismiss first?
13          MR. MINTER:  You know, I don't think we expressly did.
14  I mean, I think it was just like kind of an assumption that it
15  wouldn't really make sense.
16          JUDGE PROCTOR:  If Ms. Eagan told us that that was a
17  condition of dismissal, would that be incorrect?
18          MR. MINTER:  No.  No, I don't think that's incorrect.
19  I mean, I'm just saying I don't remember it being, like, that
20  starkly expressed.  But it doesn't matter because it was --
21  yeah, it was implicit.  It was at least implicit.
22          JUDGE PROCTOR:  Well, you were concerned about having
23  Ladinsky proceed and not being in the driver's seat with Walker.
24  If you dismissed without Walker's agreement --
25          MR. MINTER:  Yeah.  That wouldn't get us --

1          JUDGE PROCTOR:  -- then they are absolutely -- they're

2    in the only seat.

3          MR. MINTER:  Yes, sir.  That's why -- yeah.  It was

4    almost like it's so obvious and baked in, it didn't need to be

5    said.  But, yeah, it was -- yes, that was understood, I would

6    say.  And maybe -- and maybe said.  I don't recall that, but it

7    doesn't -- you know, yes.  That was the whole idea.  That was

8    the whole idea.  It wouldn't do any good for us, for -- you

9    know, for us just to dismiss and go away.  That would not

10   advance our ability to try to have our voice heard in

11   challenging the law.

12         JUDGE PROCTOR:  But when you dismissed, there was

13   clearly the intent to refile the case somewhere at some pretty

14   close point in time.

15         MR. MINTER:  Yes.

16         JUDGE PROCTOR:  Any specific, concrete decisions about

17   that made at the time of dismissal?

18         MR. MINTER:  No.

19         JUDGE PROCTOR:  It's just that we know we have to

20   refile this, but we need to call a time-out here and start over?

21         MR. MINTER:  Yeah.  Yes.

22         JUDGE PROCTOR:  Did you have any discussions with

23   Mr. Orr, the Ladinsky team, or anybody from the Walker team

24   about where and when a new case would be refiled?

25         MR. MINTER:  Yeah.  We had a lot of discussions about

 1  that.

 2         JUDGE PROCTOR:  And I'm sorry.  I meant before

 3  dismissal.

 4         MR. MINTER:  Oh, before dismissal?

 5         JUDGE PROCTOR:  Yes.

 6         MR. MINTER:  Before dismissal.  Nothing is popping into

 7  my mind before dismissal.  I mean, we didn't have -- I mean,

 8  there was almost like no time to have discussion about anything.

 9  It was a very compressed time frame.

10         Oh.  Oh, no.  We did.  Yes.  I'm sorry.  I do remember.

11  I do remember.  Yeah, I do remember.  Sorry.  Yeah.

12         JUDGE PROCTOR:  You did have that.

13         MR. MINTER:  I do remember having some discussions

14  about that.  At the time, I was thinking we could refile with

15  the same plaintiffs.  You know, I was just going on the view

16  that under Rule 41, voluntary dismissal, you know, you wipe the

17  slate clean and, you know, if you want to -- if the same

18  plaintiffs want to file another case, they can.  Just to note, I

19  subsequently changed my view on that.  But at that time, I was

20  thinking, yeah, we could file with the same plaintiffs.  We

21  could file in -- I don't know, actually.  Yeah.  I mean, it

22  wasn't anything very detailed or whatever.  Just the idea that

23  we could -- we could even, you know, use the same -- use some or

24  all the same plaintiffs.

25         JUDGE PROCTOR:  Just refile this case.  Any discussions

 1    about where the case would be refiled?

 2          MR. MINTER:  Yeah.  I think we had initially thought

 3    just file -- we'd file in the Northern District.

 4          JUDGE PROCTOR:  Any discussions about which division it

 5    would be refiled in?

 6          MR. MINTER:  I'm not really up on the divisions, but I

 7    think there was some thought about, well, if we don't want --

 8    you know, if we're thinking Judge Burke is not a good draw, we

 9    probably don't want to file in his division.

10          JUDGE PROCTOR:  That's what I'm asking about.  All

11    right.  Was there discussion about refiling in Montgomery?

12          MR. MINTER:  In the Middle District?

13          JUDGE PROCTOR:  Yes.

14          MR. MINTER:  Yes.  I just can't remember exactly when.

15    I mean, obviously, that's where we did end up refiling.  I know

16    there was definitely discussion about that as soon as the next

17    day.  There may have been discussion -- yeah, I think -- I think

18    from the Walker folks.  The Walker folks were more inclined, I

19    think -- I'm not sure I'm remembering this correctly, honestly.

20    But, yeah, I think there probably was discussion about, well, we

21    could file in the Middle District.

22          JUDGE PROCTOR:  And as you've said, ultimately, that's

23    what occurred, with a new slate of plaintiffs in a new district.

24          MR. MINTER:  Yes, sir.

25          JUDGE PROCTOR:  Was that motivated in whole or in part

 1   by any desire not to have Judge Burke on the case?

 2           MR. MINTER:  Yes.  Yes.  I mean, we were trying to --

 3   you know, we weren't sure what the heck had just happened, and

 4   we're not sure he would be a good draw for the case.  That was

 5   part of it.  That was part of it.

 6           JUDGE PROCTOR:  When you say "we," who are you

 7   referring to, the decision-makers?

 8           MR. MINTER:  Yes, sir.  And I should say "I."  Yes.

 9           JUDGE PROCTOR:  Well --

10           MR. MINTER:  As part of my thinking.

11           JUDGE PROCTOR:  All right.  So that's a question we

12   have.  Was this your decision, was this a collaborative

13   decision, or was this someone else's decision?

14           MR. MINTER:  I definitely was a major -- it was

15   definitely my decision.

16           JUDGE PROCTOR:  Were there other decision-makers?

17           MR. MINTER:  Yeah.  I mean, there -- yes.  I mean,

18   There's decision-makers on the team.

19           JUDGE PROCTOR:  Who were they?  Who would you describe

20   as the decision-makers on the decision to, first, dismiss,

21   second, refile, and third, determine the circumstances of the

22   refiling in terms of parties and venue?

23           MR. MINTER:  Definitely me.  I mean, we were trying to,

24   you know, make decisions by consensus and have everyone's input.

25   But if you're looking at who's, like, really driving the

1  decisions, I think it would be me and probably Jennifer Levi

2  from GLAD.

3          JUDGE PROCTOR:  How about your firm counsel?  Who was

4  involved in those decisions?  The law firm counsel.

5          MR. MINTER:  Yes, sir.  From King & Spalding?  You

6  know, they have folks on the team who were involved in

7  discussions and giving input.  And y'all know -- I mean, they're

8  on the papers.  But, I mean, they -- I would say they were not

9  driving -- you know, they were not driving the decisions.

10          JUDGE PROCTOR:  Were they giving input and advice to

11  you about the decision?

12          MR. MINTER:  To some degree.  To some degree.

13          JUDGE PROCTOR:  Let me understand this.  I don't think

14  you ever signed a complaint, did you?

15          MR. MINTER:  No.

16          JUDGE PROCTOR:  And you weren't a client.  You're not a

17  plaintiff in any of these cases; correct?

18          MR. MINTER:  No, sir.  Oh, no.  Of course not.

19          JUDGE PROCTOR:  To define your role, you're a lawyer in

20  these cases.

21          MR. MINTER:  Yes.

22          JUDGE PROCTOR:  Now, not enrolled in the case, but

23  related to the case in terms of giving some supervisory or other

24  input into how the cases get handled.

25          MR. MINTER:  Yes, sir.

1          JUDGE PROCTOR:  Would you have shared your views about

2    these things that I've just asked you about with Ms. Eagan?

3          MR. MINTER:  Sure.  Yeah.

4          JUDGE PROCTOR:  With Mr. Doss?

5          MR. MINTER:  Yes.

6          JUDGE PROCTOR:  With Mr. Ray of King & Spalding?

7          MR. MINTER:  Yes, although I will say that, you know --

8          JUDGE PROCTOR:  Well, he was out of pocket, wasn't he?

9          MR. MINTER:  Yeah.  I was going to say he was -- I

10   think he was even out of the country or something.

11         JUDGE PROCTOR:  Yes.

12         MR. MINTER:  Yes, he was out of pocket.

13         JUDGE PROCTOR:  The most opportune international trip

14   ever taken in Alabama litigation history.  But how about

15   Mr. Shortnacy?

16         MR. MINTER:  Sure.

17         JUDGE PROCTOR:  Anyone else?  I'm just trying to make

18   sure -- and Ms. Levi, obviously; correct?

19         MR. MINTER:  Yes.

20         JUDGE PROCTOR:  How about Mr. Orr?

21         MR. MINTER:  In terms of sharing views and including

22   him in discussions?  To some degree, but, I mean, he's

23   definitely not making decisions.

24         JUDGE PROCTOR:  Fair.  And that's what I'm trying to

25   draw is who was giving either direct input or actually making

1    decisions in this.  How about from Southern Poverty Law Center?

2    Would that be Mr. McCoy?

3             MR. MINTER:  Yes.

4             JUDGE PROCTOR:  Anyone else?  And I don't know to what

5    degree the other organizations were at this level.  That's what

6    I'm trying to figure out.

7             MR. MINTER:  I think that's it.  I think that would

8    cover it.

9             JUDGE PROCTOR:  All right.  Now, one of the things the

10   Walker counsel have told us is that one of their concerns about

11   working with the Ladinsky counsel -- and I think I'm remembering

12   this correctly --

13            Counsel, please jump in if you think I'm misstating

14   this.  That is an invitation.

15            -- is that they were concerned that your command and

16   control structure was different than theirs.  They thought they

17   were more collaborative and that you, to a large degree, and

18   Ms. Levi, to a lesser degree, were driving the Ladinsky case.

19   Would you disagree with their view of that?  And I understand

20   that they were not on the inside of your case and that may not

21   be the correct view.

22            MR. MINTER:  Well, I don't have any idea, of course,

23   about what their internal decision-making was.  But, yeah.  No,

24   I would not disagree.  I think it's very fair to say that

25   Jennifer and I were the primary decision-makers.

```
 1           JUDGE PROCTOR:  All right.  Were you not concerned that
 2  if you are dismissing a case because you're concerned about
 3  being in front of Judge Burke and you're considering refiling a
 4  case in an area like a division or a district where Judge Burke
 5  is unlikely to draw it to avoid Judge Burke, that that might
 6  smell as judge shopping?
 7           MR. MINTER:  You know, I mean, when we -- just to be
 8  clear about this, my thought that we should dismiss the case was
 9  not, by any means, just because the case had ended up in front
10  of Judge Burke.  It was because of all the stuff -- I don't need
11  to repeat it, but that we were going to be at a very big
12  disadvantage to the Walker case in terms of possibly even -- I
13  mean, I thought possibly their whole PI motion might proceed
14  before we had a chance to get into the mix.  That was a very
15  huge factor.  And then the way that it got to Judge Burke was
16  very confusing and distressing.  I didn't know -- I did not
17  understand that process or how or why that had happened.
18           So for all those reasons, I thought it would be the
19  best thing for the case to voluntarily dismiss it before the
20  State answered.  I thought we had an unconditional right to do
21  that, so I thought we were -- that was totally fine and proper,
22  as far as I knew.
23           JUDGE PROCTOR:  Let me ask you this --
24           MR. MINTER:  Then --
25           JUDGE PROCTOR:  Go ahead.  Sorry.  I didn't mean to
```

1  interrupt you.

2         MR. MINTER:  Go ahead.

3         JUDGE PROCTOR:  No, finish up.

4         MR. MINTER:  Okay.  And then, as I mentioned before, I

5  actually thought it would be okay to file a new case even with

6  some of the -- all or some of the same plaintiffs.  In the video

7  conference call that we had between the two teams on Saturday,

8  someone from the Walker team raised the concern about using the

9  same plaintiffs.  And that -- I was like -- that caught my

10 attention.  I had not thought that would be a problem.  So then

11 I did -- I consulted some civil procedure experts, I did some

12 research, and I thought that -- I still thought we could

13 actually file with the same plaintiffs but that it would just --

14 to avoid the appearance of judge shopping, that we should not,

15 that we should have -- we should just -- we should have new

16 plaintiffs.

17        JUDGE PROCTOR:  When you say --

18        MR. MINTER:  So that's the process --

19        JUDGE PROCTOR:  Go ahead.  Sorry.  I keep interrupting

20 you.  I think it's the Zoom call.  I keep thinking you're

21 finished up.

22        MR. MINTER:  I'm sorry.  No.  I'm --

23        JUDGE PROCTOR:  When you said you consulted and did

24 research, was that on Rule 41?

25        MR. MINTER:  Yes.  Yes.  Well, yes.  Yeah, Rule 41.

1    Yeah.  Voluntary dismissal and then with relationship to being

2    able to file a new case.

3         JUDGE PROCTOR:  Was it your view that if you dismissed

4    under Rule 41 before there was an answer or a motion for summary

5    judgment, that that would be self-executing and that would not

6    limit you in any way from refiling the case?

7         MR. MINTER:  I did think that.

8         JUDGE PROCTOR:  And I think that is correct.  Did you

9    also think, though, that that would put the case beyond any

10   specter of being questioned in terms of judge shopping?

11        MR. MINTER:  When that issue goes -- was raised about

12   the -- using the same plaintiffs, creating that potential

13   appearance of judge shopping, yeah, I was like -- I mean, I took

14   that very seriously.  As soon as I heard it, I was like, that's

15   a big deal and we need to be very careful about that.  And

16   that -- then I did the consulting and the research and ended up

17   feeling very strongly that we really should not.  We should have

18   new plaintiffs to avoid any possible problem with that.

19        JUDGE PROCTOR:  As I perceive it, one of the positions

20   that the lawyers' lawyers in this matter have taken is that Rule

21   41 may -- and this is not their words, this is my

22   characterization -- makes this bullet proof.  We can't go in and

23   question the dismissal or the refiling of the case.  Was that in

24   any way something you considered before the dismissal and/or

25   before the refiling of Eknes-Tucker?

1          MR. MINTER:  No.  I mean, no.  That -- I just wasn't

2    thinking in those terms whatsoever.  I thought just under Rule

3    41(a), I didn't even -- I just thought it's not remarkable.  You

4    can dismiss before the State has answered.  And, no, I just

5    wasn't -- the way you're describing it is not any way I've ever

6    thought about it.  And I assume the Court can, you know, make

7    any --

8          JUDGE PROCTOR:  Now, you mentioned Saturday

9    conversations.  I'm not going to belabor those, but can you just

10   give us the high points of what occurred on that Saturday?  My

11   understanding is on Friday, both sides agreed to dismiss and to

12   get on the phone for some conference Saturday and see what next

13   steps would be or ought to be; correct?

14         MR. MINTER:  Yes.  And I thought we had -- I thought we

15   had agreed that we would work together and we would file a new

16   case together, but -- yeah, the Saturday call did not go well.

17   I mean, I -- the first thing that -- one of the first things

18   that emerged on that call was that that view was not shared that

19   we had already reached -- I thought we had already agreed we

20   were going to work together, file a new case, and that the call

21   was going to be like how are we going to work together.  But the

22   Walker folks, from their point of view, they did not think we

23   had agreed to that yet.  And so they wanted to sort of decide --

24   I don't know -- their positions were sort of like, well,

25   depending on whether we can come up with a way to work together

1    that we feel okay about, we may or may not come together.

2            JUDGE PROCTOR:  What were the decision points, as you

3    understood them to be, related to what had to be agreed to to

4    work together?  I mean, what were the type of things that the

5    parties needed to be on the same page about?

6            MR. MINTER:  Like who would make decisions and the --

7    like, literally, what would be the decision-making process.

8            JUDGE PROCTOR:  The command and control of the case?

9            MR. MINTER:  Yes.  Yeah.

10           JUDGE PROCTOR:  Anything else?

11           MR. MINTER:  I mean, that was the big sticking point.

12   We couldn't -- yeah.  That was the bottleneck.

13           JUDGE PROCTOR:  All right.  And at the end of that day,

14   Walker announced to you and you told your team that they were

15   not going to refile.

16           MR. MINTER:  I thought it was on Sunday, but, yes.

17           JUDGE PROCTOR:  Okay.  Maybe that weekend.  Let's put

18   it that way.

19           MR. MINTER:  Yeah.  Yeah, yeah.  Yeah.  Yes.

20           JUDGE PROCTOR:  But you had that commitment from them,

21   and you told them that you were going to refile.

22           MR. MINTER:  Oh, yeah.  I mean, I think they assumed

23   that we would.  I mean, that was the whole idea.  Y'all go ahead

24   and do this.  There's too many cooks in the kitchen.  We can't

25   work this out.  Somebody needs to challenge this law.  Go.  You

1   know, go forward and do that.

2         JUDGE PROCTOR:  The case was refiled on the

3   following -- well, I shouldn't say the case was refiled.  That's

4   incorrect.  Eknes-Tucker was filed on the following Tuesday.

5         MR. MINTER:  Yep.  We got our complaint filed the next

6   Tuesday.

7         JUDGE PROCTOR:  When did the Eknes -- when did work

8   begin on the Eknes-Tucker complaint?

9         MR. MINTER:  Right away.  That weekend.

10         JUDGE PROCTOR:  Would it have been on the Sunday after

11   the decision was made that you're going forward but they're not

12   or even before that?

13         MR. MINTER:  I think -- I don't -- I think it was

14   that -- would have been that Sunday.  I mean, there may have --

15   honestly, I don't -- I don't -- I can't -- I don't recall if we

16   had been doing any work before that.

17         JUDGE PROCTOR:  Do you have a recollection of exactly

18   who the parties were in Eknes-Tucker?  You said they were new,

19   and I think that's correct, that none of the parties in Ladinsky

20   or Walker or Eknes-Tucker overlap; correct?

21         MR. MINTER:  Correct.  Yeah.  There's no overlap at

22   all.

23         JUDGE PROCTOR:  You sued -- in Eknes-Tucker, filed in

24   the Middle District, you sued on behalf of plaintiffs who were

25   from the Northern District.  And I think there were at least

1  three, as I recall, a Cullman family and child, a Birmingham

2  pastor, and I want to say a Birmingham physician as well.  Does

3  that sound right?

4         MR. MINTER:  I believe so, yeah.

5         JUDGE PROCTOR:  Were you at all concerned that naming

6  Northern District parties might create questions about the

7  filing -- decision to file in the Middle District?

8         MR. MINTER:  No, I really wasn't, because some of our

9  other plaintiffs were from the Middle District.  So, no, I

10 really wasn't.

11        JUDGE PROCTOR:  Did anyone take the position that --

12 let me be clear.  You've already told me you're not suggesting

13 that Judge Burke did anything improper.  You just had a question

14 about the procedural path that the case took and were concerned

15 about how that would affect things, both in terms of management

16 of the litigation, control of the litigation, and, to some

17 degree, being in front of Judge Burke, a more conservative

18 judge.

19        MR. MINTER:  Yes, sir.

20        JUDGE PROCTOR:  So I'm not suggesting that he did

21 anything improper, but some of your colleagues seem to speculate

22 about that, at least based upon things we've heard and seen in

23 this case.  Do you recall anything about that?

24        MR. MINTER:  A little bit.  I mean, there was, you

25 know -- I certainly don't think anyone alleged that to be the

1  fact or certainly happening.  I mean, yeah, I think there were

2  questions like, is it possible, you know, that for some reason,

3  he wanted to reach out and take the case?  Even that I'm not

4  even sure would be improper.  But there was some discussion of

5  that as a possibility.  But I want to be very clear.  I mean,

6  there was no one saying, oh, yes, that's what's going on here

7  for sure.  It was just speculation.

8          JUDGE PROCTOR:  All right.  Let me ask you this.  Are

9  you aware of any efforts made by either the Walker case or the

10  Ladinsky case or, for that matter, the Eknes-Tucker case, to

11  make contact with court personnel about how the assignment

12  process would work, should work, or did work?

13          MR. MINTER:  No.  I just want to be clear, though.  I

14  think the answer is no, if I'm understanding your question

15  correctly.  I've already mentioned there was like somebody

16  from -- a junior attorney from the King & Spalding team like had

17  a conversation with Judge Axon's deputy.

18          JUDGE PROCTOR:  Yes.  I'm not talking about that.  I'm

19  talking about --

20          MR. MINTER:  Okay.

21          JUDGE PROCTOR:  -- are you aware of any party or

22  representative of a party other than the lawyers in this case.

23          MR. MINTER:  Party?

24          JUDGE PROCTOR:  Yes.

25          MR. MINTER:  No.  No, I am not aware of anything like

1  that.

2          JUDGE PROCTOR:  What other organizations were involved

3  in support of this effort, throughout both the litigation and

4  the other efforts, to avoid this statute or strike down this

5  statute?  Any others?  Were there lobbying groups?  Were there

6  anything along those lines?

7          MR. MINTER:  So groups working to oppose the

8  legislation?

9          JUDGE PROCTOR:  Yes.  Opposing the legislation or --

10          MR. MINTER:  I mean -- I'm sure there are.

11          JUDGE PROCTOR:  I'm asking that you're aware of.  I'm

12  not asking whether there --

13          MR. MINTER:  Sorry.  Yeah, of course.  Sorry.  I mean,

14  nothing -- nobody -- none are coming to mind right now.  I mean,

15  maybe --

16          JUDGE PROCTOR:  Was the Magic City Acceptance Academy

17  involved in any way in these efforts?

18          MR. MINTER:  Probably.  I don't have any direct,

19  firsthand knowledge of that.

20          JUDGE PROCTOR:  Has anyone ever told you about their

21  involvement?

22          MR. MINTER:  About their involvement?  I mean, I

23  know -- I learned about them as a group.  I still don't know

24  that much about them.  Obviously, I'm just not entirely sure

25  what that is.  I mean, I might have been informed that they were

1   lobbying against the law.  I just -- I don't recall.

2          JUDGE PROCTOR:  Mr. Minter, what we're going to do is

3   take about a ten-minute break.  We may have some follow-up

4   questions.  We'll let you know.

5          MR. MINTER:  Okay.

6          JUDGE PROCTOR:  But just bear with us.

7          MR. MINTER:  Sounds good.  Thank you.

8          JUDGE PROCTOR:  If you want to stretch your legs or get

9   a sip of water or anything else, just feel free to do that.  And

10  appreciate your attentiveness.  We'll be back in about ten

11  minutes.

12         MR. MINTER:  Okay.  Thank you.

13     (Recess was taken from 2:52 p.m. until 3:08 p.m., after

14       which proceedings continued, as follows:)

15         JUDGE PROCTOR:  I think we've concluded with

16  Mr. Minter.

17         MR. SEGALL:  Your Honor, may I ask him a question?

18         Mr. Minter, can you hear me?

19         MR. MINTER:  Yes, I can.

20         MR. SEGALL:  There's one thing I want to be sure I

21  understand your testimony about.  Could you please refer to

22  paragraph 13 of your declaration?  Do you have your declaration?

23         MR. MINTER:  Yes, I do.

24         MR. SEGALL:  This is on the issue of why the

25  Eknes-Tucker case was filed in the Middle District.

```
1              MR. MINTER:  Yes.
2              MR. SEGALL:  What you say is we filed in the Middle
3   District because many of our plaintiffs live there and because
4   of our concerns about the prior departure from the first-filed
5   rule in the Northern District.  Can you explain what your
6   concern was there.
7              MR. MINTER:  Yes.  And I just want to acknowledge that
8   the panel has corrected -- you know, maybe we didn't understand
9   it correctly.  But as we understood it, we thought that what had
10  happened -- I thought that what had happened was a departure
11  from what would normally happen from what I thought was the
12  application of the first-filed rule.  And there just -- we had a
13  lot of questions and uncertainty about that.  We just did not
14  know what had happened.  And, yeah, part of the reason for
15  filing in the Middle District was just to get away from those
16  uncertainties.  And, you know, we didn't know the answers to the
17  questions and concerns that we had, so we just wanted some new
18  plaintiffs and to file in a different district.
19             MR. SEGALL:  Am I correct you wanted to avoid the
20  unknown circumstances from which you had just extracted yourself
21  under Rule 41; is that correct?
22             MR. MINTER:  Yes.  Exactly.
23             MR. SEGALL:  Let me ask you this.  Did you recognize
24  when the case was filed in the Middle District of Alabama that
25  the possibility existed that you could, in some fashion, be
```

1    assigned -- your case could -- to Judge Burke?  Did you

2    recognize that as a possibility?

3          MR. MINTER:  Yes.  Yes.  Of course we recognized that.

4    I recognized that that might be a possibility.  It's a

5    high-profile case, there had been the cases filed in both

6    districts, he had -- at one time was the last judge to have the

7    cases.  And so, sure, I knew that was a possibility.

8          MR. SEGALL:  Were you and your team committed --

9    regardless of what judge drew the assignment in the Middle

10    District, Judge Burke or any other judge in the state of

11    Alabama, federal judge in the state of Alabama, were you and the

12    Ladinsky team committed to go forward with whoever that judge

13    was?

14          MR. MINTER:  Absolutely.  Yeah.  No question.

15          MR. SEGALL:  And, in fact, that's what you have done;

16    correct?  You did get assigned to Judge Burke, and y'all moved

17    straight ahead; correct?

18          MR. MINTER:  Yes.  Yes.

19          MR. SEGALL:  All right.  That's all, Your Honor.

20          JUDGE WATKINS:  Mr. Segall, I know it's the same team,

21    but you just referred to Ladinsky.  You meant Eknes-Tucker.

22          MR. SEGALL:  Yes, I did, Your Honor.

23          JUDGE PROCTOR:  And follow-up to that, Mr. Minter, not

24    only did you go forward in front of Judge Burke, you actually

25    prevailed before Judge Burke; correct?

 1          MR. MINTER:  We did.  We sure did.  So far, yes.  Yes,

 2  we did.

 3          JUDGE PROCTOR:  Subject to what the Eleventh Circuit

 4  might say on that issue.

 5          MR. MINTER:  That is correct.  That is correct.

 6          JUDGE PROCTOR:  All right.  I have a follow-up question

 7  to what Mr. Segall just asked you.  You said we filed in the

 8  Middle District, referring to Eknes-Tucker; correct?

 9          MR. MINTER:  Yes.

10          JUDGE PROCTOR:  Because many of our new plaintiffs

11  lived there.  Actually, there were seven new plaintiffs in

12  Eknes-Tucker; correct?

13          MR. MINTER:  I think that's correct.

14          JUDGE PROCTOR:  Well, you had Eknes-Tucker, Brianna

15  Boe, James Zoe, Megan Poe, Cathy Noe, Jane Moe, and Dr. Rachel

16  Koe.  Correct?

17          MR. MINTER:  Yes, sir.

18          JUDGE PROCTOR:  That's seven.

19          MR. MINTER:  Yep.

20          JUDGE PROCTOR:  Eknes-Tucker was from -- is from

21  Jefferson County in the Northern District; correct?

22          MR. MINTER:  I believe so.

23          JUDGE PROCTOR:  James Zoe, on behalf of minor child

24  Zachary Zoe, is in Jefferson County in the Northern District;

25  correct?

 1            MR. MINTER:  Yes, sir.

 2            JUDGE PROCTOR:  Megan Poe, individually and on behalf

 3    of minor child Allison Poe, is from Cullman County in the

 4    Northern District; correct?

 5            MR. MINTER:  I believe so.

 6            JUDGE PROCTOR:  And Dr. Jane Moe is from Jefferson

 7    County in the Northern District; correct?

 8            MR. MINTER:  Yes.

 9            JUDGE PROCTOR:  So actually, the majority of the

10    plaintiffs you sued on behalf of were from the Northern

11    District.

12            MR. MINTER:  You are correct.

13            JUDGE PROCTOR:  How did that, then, affect you in terms

14    of filing in the Middle District when, actually, the minority of

15    the parties that you sued on behalf of were from the Middle

16    District?  That disconnects with me.

17            MR. MINTER:  I hear you.  I hear you on that.  I mean,

18    we have plaintiffs from the Middle District, which is sufficient

19    to file in the Middle District, and we definitely wanted to get

20    away from what the -- from our point -- from my point of view

21    had been a kind of a procedural morass that left me with

22    questions and concerns in the Northern District.  So as long as

23    we had plaintiffs in the Middle District, I felt okay about

24    filing in the Middle District.

25            JUDGE PROCTOR:  You -- one of the things, I think, your

1   team indicated is that when they were vetting or assessing

2   judicial officers, they looked at their -- not just cases

3   involving transgender issues or, relatedly, LGBTQ issues but

4   also Title VII and Title IX issues; correct?

5          MR. MINTER:  When the team was trying to --

6          JUDGE PROCTOR:  Was assessing these judges, trying to

7   get a handle on their judicial philosophy when you were looking

8   at Manasco and Cornelius and Axon and Burke.

9          MR. MINTER:  Yeah.  I mean, I was not personally

10   involved in the looking into that, and I don't remember hearing

11   anything at the time, concurrently, contemporaneously, about

12   Judge Manasco or Magistrate Cornelius.  I do remember hearing a

13   bit about Judge Axon.  So those sound like the kind of -- I

14   mean, that would make sense to look at those kind of cases as

15   well, so I have no doubt that we did that -- that the team did

16   that.  I didn't do it myself, and I don't actually recall seeing

17   anything specific about Title IX or Title VII.  But it makes

18   sense to look at -- it would make sense to look at that.

19          JUDGE PROCTOR:  All right.  Was there any assessment of

20   judges in the Middle District, to your knowledge, when you filed

21   Eknes-Tucker?

22          MR. MINTER:  Not to my knowledge.

23          JUDGE PROCTOR:  All right.  Any follow-up to that,

24   counsel?

25          MR. SEGALL:  Well, you may not know, Mr. Minter, but I

1  recall some testimony that Judge Marks, who originally drew the

2  Walker case, got rave reviews from the Ladinsky team.  Do you

3  recall that?  Maybe not.

4          MR. MINTER:  No recollection.

5          MR. SEGALL:  All right.  Thank you.

6          That's all, Your Honor.

7          MR. SEGALL:  And I recall Judge Huffaker got rave

8  reviews.  Do you recall that?

9          MR. MINTER:  No, sir, I don't.

10          MR. SEGALL:  Thank you.

11          JUDGE PROCTOR:  It has not been lost on the panel --

12          MR. SEGALL:  And Judge Watkins would have gotten rave

13  reviews.

14          JUDGE PROCTOR:  -- that no one has said what reviews

15  Proctor or Watkins got.

16          MR. SEGALL:  And Proctor.  And Beaverstock.

17          JUDGE PROCTOR:  All right.  Thank you, Mr. Minter.

18          MR. MINTER:  Thank you.  I just want to thank y'all

19  very much for accommodating me remotely.  I really appreciate

20  it.  Thank you.

21          JUDGE PROCTOR:  All right.

22          MR. SEGALL:  Shall I?

23          JUDGE PROCTOR:  Yes.  We'll bring Mr. McCoy back in,

24  resume that.

25          (Mr. McCoy present.)

```
 1            JUDGE PROCTOR:  All right.  Mr. McCoy, thank you for

 2   your patience with us.  Ms. Baxter has already administered the

 3   oath to you.  You're still under oath, obviously.

 4            MR. MCCOY:  Yes, sir.

 5            JUDGE PROCTOR:  No need to do that again.

 6            All right.  We're moving along pretty quickly, and I

 7   appreciate your candor so far.  Let's see if we can move the

 8   ball a little further down the field here.

 9            MR. MCCOY:  Sounds good.

10            JUDGE PROCTOR:  I think you had already indicated that

11   you did not have substantive discussions with the Walker team

12   before or after their filing.  And I don't recall -- I'm sorry

13   if I don't recall this, but I think you said you were not -- you

14   did not believe you were on the April 13 call --

15            MR. MCCOY:  That's -- yeah.  No, I wasn't.

16            JUDGE PROCTOR:  -- with the Walker team when they were

17   trying to assess where they were with respect to Judge Marks' --

18            MR. MCCOY:  Correct.

19            JUDGE PROCTOR:  -- April show cause order.

20            MR. MCCOY:  That's correct.

21            JUDGE PROCTOR:  Obviously, the transfer was finalized.

22   The Walker case was sent over to the -- was transferred to the

23   Northern District.  You were in the courtroom, I believe, in the

24   first hearing where we walked through, procedurally, what had

25   happened there.
```

```
 1            MR. MCCOY:  Yes.

 2            JUDGE PROCTOR:  Was that news to you when you heard all

 3    that?

 4            MR. MCCOY:  It absolutely was.  At least the part of it

 5    about the reason -- the part where it was explained that Judge

 6    Axon was in the middle of a multidefendant criminal trial.

 7            JUDGE PROCTOR:  Right.

 8            MR. MCCOY:  That was new information to me.

 9            JUDGE PROCTOR:  And it may have answered some of your

10    questions about how Walker got to Judge Burke in the first place

11    on a random assignment.

12            MR. MCCOY:  In a big way, I think.  Yes.

13            JUDGE PROCTOR:  All right.  To what degree were you

14    involved on a real-time basis picking up on the Thursday

15    transfer of Walker into the Northern District through the

16    dismissal of the Walker and Ladinsky cases late in the afternoon

17    on Friday, April 15?

18            MR. MCCOY:  Sure.  So if memory serves, we were -- we

19    had gotten the assignment to Judge Axon, and we were working

20    to -- we still had not filed our first amended complaint, which

21    we were planning on doing and were drafting.  We had not filed

22    the PI yet, which we were continuing to finalize the materials

23    for the PI so we could file that.  So that process was

24    happening.

25            Once we had gotten the assignment to Judge Axon, we
```

1   were also working on our pro hacs.  And that's when Abigail,

2   Abby, had called Judge Axon's courtroom deputy asking about a

3   particular issue with the pro hacs, which was whether or not we

4   needed to put our home addresses in our pro hacs.  And there was

5   some concern about a case like this that is controversial, kind

6   of, as it was, about putting that kind of personal information

7   into the record.  And Abby had reported back to us that she --

8   that the courtroom deputy for Judge Axon had indicated that the

9   Walker case was coming over to her.  And so Abby reported that

10  to us, reported about the pro hac issue, so we proceeded with

11  those things.

12          At some point in that afternoon or on the 15th, I

13  believe it was, we had also heard from Walker counsel that they

14  had been temporarily assigned to Judge Burke.  And that was

15  curious to us because we were not sure why -- given the transfer

16  to the Northern District and the first-filed rule, why it would

17  even need to go to another judge.  So that was odd, at least to

18  us.  And so -- but based on their conversations with -- the

19  Walker counsel's conversations with either a courtroom deputy or

20  a clerk or someone in Judge Burke's chambers, it was explained

21  to us that a motion to move Walker from Burke to Axon was

22  necessary for the consolidation.

23          And so there was discussion of a motion being drafted

24  for that purpose, and we would have to file that in front of

25  Judge Axon.  At least that was our understanding.  And so that

1    discussion was being had.  I was privy to all of that just

2    basically via email and conversations.

3            Then in the afternoon on the 15th, we get the order

4    from Judge Axon transferring the case to Judge Burke.  And so we

5    were communicating via email, and then we -- the Ladinsky

6    counsel were communicating via email.  We had a call about that.

7    I participated in that call and those kind of electronic

8    discussions about what was going on.

9            JUDGE PROCTOR:  Emails?

10           MR. MCCOY:  Emails, yeah.  And that's what's described

11   in -- the substance of those conversations is what's described

12   in my declaration from basically 24 to 27.

13           And then after that, I was not involved in any

14   conversations with the Walker counsel after we had had our

15   internal Ladinsky conversations about what to do.  And Mr. Orr

16   had had the conversations with our clients and reported back

17   that they had decided that it was right that we should dismiss.

18   Anything after that I didn't participate in any of those

19   conversations with Walker, but I had reports from them from

20   other people from the Ladinsky team.  So that was my

21   involvement.

22           MR. SEGALL:  I think he meant Mr. Minter.

23           MR. MCCOY:  Well, so Mr. Orr talked to our clients.

24   Mr. Minter was the one who communicated with the Walker counsel

25   and reported back to us, but I wasn't on those conversations.

1          JUDGE PROCTOR:  All right.  So Mr. Minter -- at what

2   point was the decision made to dismiss the case, from your

3   viewpoint?

4          MR. MCCOY:  Well, we had our -- so the times -- also,

5   forgive me, because I was in Eastern time zone and, of course,

6   this was all happening in Central time zone.  But roughly -- I

7   think it was like 5:40 something we got the order -- I think

8   Ms. Eagan forwarded us the order from Judge Axon.  And then for

9   the next hour, basically, we were having conversations -- the

10  Ladinsky counsel with ourselves were having conversations about

11  what's going on.  What do we do?  How do we handle this?  It was

12  in that time frame that we decided that we should advise our

13  clients of the situation and recommend that they exercise their

14  Rule 41 dismissal rights.

15         Shortly after that -- so it was in that context,

16  probably after the conversation or the team meeting, the virtual

17  meeting of the Ladinsky counsel among ourselves, it was at that

18  point when the recommendation was made.  And then once Mr. Orr

19  had talked with the clients and communicated back that they had

20  given us permission to dismiss the case, I guess at that point

21  was the point when all things that had to be done in order to

22  dismiss the case on our side were done except for filing the

23  actual notice of dismissal, which happened later because we had

24  to write it and all that.

25         JUDGE PROCTOR:  Right.  All right.  So let me make sure

1  I'm -- let me break this down just a little bit and make sure I

2  understand what your specific recollection is about each of

3  these stages of that decisional process.

4        MR. MCCOY:  Sure.

5        JUDGE PROCTOR:  Were you aware of any conversation

6  between Shannon Minter and Asaf Orr that preceded the Ladinsky

7  team phone conference?

8        MR. MCCOY:  No conversation that -- whether by phone or

9  email between the two of them?

10       JUDGE PROCTOR:  By phone or Zoom.  I don't know which.

11       MR. MCCOY:  No.  The only conversations that I had or

12  knew about were the ones that I was involved in because I'm a

13  part of our email communications.

14       JUDGE PROCTOR:  So the first of those subsequent to the

15  receipt of Judge Axon's order was a Zoom call with whoever was

16  available from the Ladinsky team -- and it was internal to the

17  Ladinsky team only -- where there was some discussion about what

18  do we do now.

19       MR. MCCOY:  Right.  Exactly.  So we get Judge Axon's --

20       JUDGE PROCTOR:  You were on that call?

21       MR. MCCOY:  Yes, absolutely.

22       JUDGE PROCTOR:  Okay.

23       MR. MCCOY:  We get Judge Axon's order.  It's circulated

24  around via email, we have some discussions via email, and then

25  we're like let's hop on a call to discuss this.

```
1              JUDGE PROCTOR:  Right.

2              MR. MCCOY:  So the Ladinsky team then hops on a -- I

3    say a call.  It was either a Zoom call or a Teams, whatever the

4    platform was.

5              JUDGE PROCTOR:  Right.

6              MR. MCCOY:  We all got together as the Ladinsky team

7    and discussed.  And I was a part of that call.  Absolutely.

8              JUDGE PROCTOR:  Okay.  And who do you recall speaking

9    up on that call?  A lot of people?  Just a few people?

10   Somewhere in between?

11             MR. MCCOY:  No, I mean, I think -- I think we all

12   chimed in.  I think -- I remember Michael, Shannon, Melody.  We

13   were all having a conversation, just like we kind of had been

14   before, about kind of the circumstances and what to do.  So, I

15   mean, I don't remember anyone in particular.

16             JUDGE PROCTOR:  Give me last names, just for the

17   record.

18             MR. MCCOY:  Oh, I'm sorry.  Melody Eagan, Shannon

19   Minter.

20             JUDGE PROCTOR:  Michael Shortnacy?

21             MR. MCCOY:  Michael Shortnacy, from what I remember.  I

22   mean, it very well -- our calls were usually, you know, anybody

23   that wanted to talk could talk and, you know, would be heard.

24   That's kind of how we operated.  I don't think there was anyone

25   that necessarily was -- at that point was ringleading.  We were
```

1 all just kind of trying to figure out what to do because we were

2 all pretty confused about what was going on.

3       JUDGE PROCTOR:  So you were not aware at that point

4 that Orr and Minter had already discussed the need to dismiss

5 the case in a one-on-one call?

6       MR. MCCOY:  I didn't -- no.  I wasn't aware of the -- a

7 one-on-one call between them?  No.

8       JUDGE PROCTOR:  Who was the first person who raised

9 dismissal on the Ladinsky team call?

10       MR. MCCOY:  I honestly don't remember who the first

11 person to raise that was.

12       JUDGE PROCTOR:  Was there a discussion -- but at the

13 end of that call, there was a leaning toward dismissal, if not a

14 subject to client approval, we are dismissing; right?

15       MR. MCCOY:  Yeah.  I think that's right.  I think the

16 consensus was that we -- that, yeah, we needed to advise our

17 clients to exercise their Rule 41 rights to voluntarily dismiss.

18       JUDGE PROCTOR:  Okay.  And was Mr. Orr charged with

19 contacting the clients to give -- have that conversation with

20 them?

21       MR. MCCOY:  Yes.  That's my recollection.

22       JUDGE PROCTOR:  Okay.  Up to the point at which that

23 decision was made to recommend dismissal subject to the client's

24 consent, what was discussed about judges on that call?

25       MR. MCCOY:  Well, the only thing that I think -- oh.  I

1   think the bulk of the discussion was kind of, one, how we got to

2   where we were.  I think there was a general consensus that

3   between Axon and Burke, we would rather have Judge Axon.  And so

4   I think, frankly, that was basically the crux of it.

5          JUDGE PROCTOR:  Would it be fair to take it a step

6   further and say you didn't want Burke?

7          MR. MCCOY:  No.  We wanted the judge we had, which was

8   Axon.

9          JUDGE PROCTOR:  I know, but I'm asking a different

10  question.  You now have Burke.  We don't want Burke.  Was that

11  part of the conversation?

12         MR. MCCOY:  No.  I think -- no, I think the -- no, it

13  wasn't focused on Burke.  The focus of the discussion was we

14  were the first filed case, we're before Judge Axon, who we were

15  happy to proceed in front of.  What looks like a situation we

16  don't understand is happening because we're being transferred

17  inconsistent with our understanding of the first-filed rule.  We

18  were thinking about lots of things.  We didn't know if there was

19  a seniority thing at play that we didn't know about, if Burke

20  was more senior to Axon.

21         JUDGE PROCTOR:  Actually, it's just the opposite.

22         MR. MCCOY:  Yeah.  I mean, a lot of things were

23  discussed.  I, you know, cynically made a comment to the group

24  that, you know, I felt -- it felt like that things were being

25  pulled away from Axon and that Burke was taking the case.

 1          JUDGE PROCTOR:  I saw that in some declarations, and I

 2   think we've had some testimony about that.  And I have just got

 3   to ask you, what on earth would lead you to make that statement?

 4          MR. MCCOY:  All of the totality of the circumstances.

 5   Every expectation that we had was that the first-filed rule was

 6   in play.  Axon -- Judge Axon's chambers had told us the case was

 7   going to her.  Judge Burke's chamber had told us how -- the

 8   process to engage in to get the case consolidated in Judge

 9   Axon's Court, consistent with the first-filed rule, which we

10   expected to be how this was going to go.  And so it didn't look

11   right.  It didn't feel right.  Something was going on.  And in a

12   moment of cynicism, I made that suggestion.  And I also said to

13   the people that I made it to, this is probably too cynical and I

14   would never say this to anyone outside of this group.

15   Unfortunately, here I am now having to share that outside of

16   this group.  But, you know, I will admit it might not have been

17   my finest moment, but we were thinking and trying to think

18   through all the things that could happen, and my cynical mind

19   went there.

20          JUDGE PROCTOR:  Explain this to me.  And I asked this

21   question to another -- you're not the first one who's gotten

22   this question.  I asked this in a different hearing to a

23   different person.  You immediately go to a very uncharitable

24   motivation, and whether cynically --

25          MR. MCCOY:  Well, I don't know if I immediately went

1    there.  We talked about lots of things.

2           JUDGE PROCTOR:  Let me finish the question.

3           MR. MCCOY:  Okay.

4           JUDGE PROCTOR:  You immediately go to a fairly

5    uncharitable characterization of what occurred here without any

6    legal or factual basis to suggest that Judge Burke would reach

7    out and grab this case away from Judge Axon.  And yet you-all

8    have dismissed this action, refiled in the Middle District with

9    brand new plaintiffs, talked about judges all up and down the

10   oceanfront, and want us to understand that judge shopping just

11   wasn't a part of this.  What should I make of that?

12          MR. MCCOY:  Well, one, the premise of your question is

13   incorrect.

14          JUDGE PROCTOR:  Okay.  Correct the premise.

15          MR. MCCOY:  I did not immediately jump to the most

16   nefarious.  There was a conversation going on and lots of things

17   were being discussed.  I am not in the habit of publicly

18   impugning the courts or the judges or the judiciary, and I said

19   as much when I made this comment in our group.

20          The factual basis, I explained to you for why something

21   suspicious looked like it was happening.  Every indication we

22   had and every understanding we have of how the system works

23   under the first-filed rule was pointing -- all those indicators

24   were pointing in one direction and, all of the sudden, the

25   opposite happens.  And so that was the factual basis for why my

1    mind went there eventually in our conversations.

2            JUDGE PROCTOR:  Who made the decision about whether the

3    cases should be grouped together?

4            MR. MCCOY:  Should be grouped together?

5            JUDGE PROCTOR:  Yes.

6            MR. MCCOY:  Who makes that decision?

7            JUDGE PROCTOR:  Who made the decision in this case?

8            MR. MCCOY:  When were the cases grouped together?

9            JUDGE PROCTOR:  Was it not done by Judge Axon's order

10   that she is transferring her case?

11           MR. MCCOY:  Oh, I'm sorry.  I misunderstood.  Yes,

12   Judge Axon is the one that entered the order and put in the

13   order judicial efficiency.  So that was -- that was a reason for

14   the transfer, but it wasn't much of an explanation for the

15   transfer.

16           JUDGE PROCTOR:  Did you ever think to ask for an

17   explanation?

18           MR. MCCOY:  Well, this was Friday, Good Friday.  The

19   courts were closed.  Our only option for asking -- so we did --

20   we were trying to think how do we undo this, if we can undo it.

21   The first opportunity would have been Monday to ask presumably

22   Judge Burke because now the cases are in front of Judge Burke.

23   I don't think we could ask Judge Axon because, I mean, that

24   would seem weird to us.  Equally, though, asking Judge Burke

25   also seemed a little fraught.  We were worried that if the State

1  filed an answer, that they would extinguish our clients' rights

2  under Rule 41 to voluntarily dismiss their case.  So I think the

3  State's attorneys are good attorneys and smart enough to maybe

4  think that they would like Judge Burke for the same flip side

5  reasons why we may not like Judge Burke.

6          JUDGE PROCTOR:  But you never heard that from anybody

7  attributed to the State, that they wanted --

8          MR. MCCOY:  No, no.  But --

9          JUDGE PROCTOR:  You just assumed that because you

10  didn't want Judge Burke.

11          MR. MCCOY:  No.  I assumed that because between Axon

12  and Burke, we thought that they might prefer to have Burke.

13          JUDGE PROCTOR:  That's what I'm saying.  You assumed

14  that because you had the opposite assumption.  If we think we

15  want Judge Axon, then --

16          MR. MCCOY:  No, those aren't opposite things.  We

17  wanted Judge Axon.

18          JUDGE PROCTOR:  But didn't want Judge Burke.

19          MR. MCCOY:  Well, I guess by reason, you could argue

20  that, but we weren't dismissing to avoid Burke.

21          JUDGE PROCTOR:  I hear what you're saying, but I'm

22  asking a different question.

23          MR. MCCOY:  Okay.

24          JUDGE PROCTOR:  We've heard testimony from others about

25  this call that occurred among the Ladinsky team, and we've heard

1    statements attributable to people on the call about Burke.

2          MR. MCCOY:  Right.

3          JUDGE PROCTOR:  What's your best recollection of every

4    statement made about Burke on that call?

5          MR. MCCOY:  That we would -- that Burke would not be as

6    good of a judge for us as Judge Axon would be and that we would

7    lose our being the first filed case.  We would be now behind

8    Walker in front of Burke.

9          JUDGE PROCTOR:  So what made you think that you would

10   lose your position as first filed or your ability to control the

11   litigation, your end of the litigation, based upon this

12   transfer?

13         MR. MCCOY:  Because --

14         JUDGE PROCTOR:  At this point, the cases were not

15   consolidated by Judge Axon's order; correct?

16         MR. MCCOY:  No, I suppose not.  I suppose they were

17   just --

18         JUDGE PROCTOR:  They were simply put in front of the

19   same judicial officer.

20         MR. MCCOY:  Right.  Exactly.

21         JUDGE PROCTOR:  So at this point, you're not even

22   consolidated.  You still have a stand-alone case and an

23   opportunity to go before the judge on your case; correct?

24         MR. MCCOY:  I think at Friday night, at that time,

25   that's not actually how we were understanding what was going to

 1  be happening.  I think our understanding was that if our case
 2  got transferred to Judge Burke, that we would then fall in
 3  behind the Walker case.
 4          JUDGE PROCTOR:  Do you think Judge Burke would have any
 5  type of opportunity to discuss and decide how the cases ought to
 6  be managed?
 7          MR. MCCOY:  Possibly at that -- at the Monday status
 8  conference.  But, again, we were worried about the State cutting
 9  off our abilities to have our clients exercise their Rule 41
10  rights.
11          JUDGE PROCTOR:  Well, I understand all that, too.
12  You're dismissing your case and wanting to be able to exercise
13  the right.  Let's exercise it while we have it.  But there are
14  obvious disadvantages to dismissing this case, the Ladinsky
15  case, at that juncture; right?
16          MR. MCCOY:  Well, there was the slight slowdown and
17  then having to pull together, you know, a case to -- a new case
18  to file.
19          JUDGE PROCTOR:  Well, time is of the essence.  A slight
20  slowdown is a slowdown.
21          MR. MCCOY:  Yes.  I don't dispute that.
22          JUDGE PROCTOR:  Did you specifically talk with others
23  about Rule 41 and our unfettered right, as I think you were
24  putting it, to dismiss this action as one of the reasons why we
25  need to go ahead and dismiss it?

1           MR. MCCOY:  I think that was part of the -- my

2    recollection is that that was part of the conversation in the

3    call because we were talking about voluntary dismissal.  And

4    Rule 41 is the rule that provides that.

5           JUDGE PROCTOR:  Was there any discussion about we can't

6    be questioned about refiling wherever we want to in front of

7    whoever we want to at whatever point we determine based upon

8    this Rule 41 protection?

9           MR. MCCOY:  I don't know if those kind of conversations

10   happened at that call on that afternoon, but I know that we

11   were -- and I say in my declaration that we were concerned about

12   looking like we were judge shopping, which we weren't, and we

13   had been doing some research about Rule 41 dismissals and judge

14   shopping and determined that the best course would be to have

15   all new plaintiffs and to file that where we thought it made

16   sense to file it.  And so those conversations, I don't know if

17   they were in that meeting, but happened after the dismissal.

18          JUDGE PROCTOR:  Okay.  You need to explain this to us.

19   We're not judge shopping; at the same time, we're researching

20   judge shopping and what the indicia of judge shopping are and

21   what it may --

22          MR. MCCOY:  Right.

23          JUDGE PROCTOR:  -- what could be found to be judge

24   shopping.

25          MR. MCCOY:  We didn't want to be accused of judge

1    shopping.

2         JUDGE PROCTOR:  So that means you understood at least

3    the optics of this.

4         MR. MCCOY:  I think it was part of the conversation,

5    yeah.

6         JUDGE PROCTOR:  Okay.  Was there -- let's go back to my

7    question.  I don't think I got an answer to it.  Tell me

8    everything you remember being discussed about Judge Burke in

9    that conversation.

10        MR. MCCOY:  Okay.  I think I did.  I think the

11   conversation was that Judge Axon would have been a better judge

12   for us and that we wanted to keep Judge Axon.  I don't

13   remember -- I mean, someone might have said that, yeah, we just

14   don't think Judge Burke is going to be receptive to our legal

15   theories.  But honestly, I don't remember if the focus was on

16   Judge Burke as much as it was on what we were seeing and

17   perceiving as procedural, you know, irregularities and the

18   desire to keep the first filed case in front of Judge Axon.

19        JUDGE PROCTOR:  We have been told by someone on that

20   call that the following statement was made by a lawyer on the

21   call.

22        MR. MCCOY:  All right.

23        JUDGE PROCTOR:  We have a zero percent chance of

24   prevailing on our PI motion if Judge Burke has this case.  Was

25   that statement made?

 1         MR. MCCOY:  I don't remember someone making that

 2    statement, but I don't dispute -- if someone else -- one of my

 3    colleagues swore that that statement was made, I don't have any

 4    reason to doubt it.

 5         JUDGE PROCTOR:  And are you just saying that just

 6    wasn't a factor in this dismissal, that we don't think we could

 7    win in front of Judge Burke?

 8         MR. MCCOY:  No.  I can't say for people on the call

 9    that that had no weight in the conversation; but for me, at

10    least, if wasn't the main driver.

11         I mean, look.  I didn't think that Judge Burke would be

12    as good a judge for us as Judge Axon.  I think that was -- I

13    think people know that.  I think --

14         JUDGE PROCTOR:  And yet he ruled in your favor on the

15    preliminary injunction motion.

16         MR. MCCOY:  Right.  I know.  And, listen.  I'll be the

17    first one to stand here and admit that my cynicism was misplaced

18    and that -- and that you're right.  You know, our fears were

19    misplaced.  Because Judge Burke wrote a PI decision that I,

20    frankly, wouldn't have changed a word of.  So you're exactly

21    right.

22         JUDGE PROCTOR:  So we can learn --

23         MR. MCCOY:  And I stand chastened in that fact.

24         JUDGE PROCTOR:  We can learn a little about

25    prejudgment; correct?

 1           MR. MCCOY:  Absolutely we can.  I have.

 2           JUDGE PROCTOR:  All right.  Well, let's get back to

 3    this issue, though, rather than that moral quandary.  There was

 4    discussion about whether Burke would be good or bad for the

 5    case.  You just don't recall the exact terms used?

 6           MR. MCCOY:  Yeah.  I think that's fair, and also that

 7    there were -- yes, I think that's right.

 8           JUDGE PROCTOR:  Was there discussion about we will

 9    refile this promptly, not dismissing this and walking away from

10    the fight?

11           MR. MCCOY:  No.  Well, one, "refile" implies, which is

12    a bad choice of words -- and I know that Ms. Eagan used it,

13    but --

14           JUDGE PROCTOR:  You know that who used it?  I'm sorry?

15           MR. MCCOY:  Ms. Eagan, in the press, I think used that.

16    I think that's what you're referring to.  We were not -- at that

17    point, the conversations were not that we were going to walk

18    away.  It was that we were going to file a new case.

19           JUDGE PROCTOR:  But that's -- my question is

20    that whether we call it filing a different claim, refiling the

21    same claim, filing for these parties, refiling for different

22    parties, we're going to get this back in the court system.

23           MR. MCCOY:  Yes.  I think that's right.  And there were

24    conversations at some point, whether or not it was directly

25    after this or after -- on to the next Saturday with the Walker

1    counsel, about, okay, does it make sense to file one case

2    consolidated together and litigate the action, you know,

3    together or not.  And I wasn't on the April 16th call.  That was

4    Saturday.  I couldn't be on the call in the morning, but I gave

5    my proxy to Shannon Minter, who was on that call and that

6    discussion, and then learned afterwards, later in the afternoon,

7    that there wasn't agreement to do that.  And so we went to work,

8    working on filing a new case with all new plaintiffs and some

9    new claims.

10       JUDGE PROCTOR:  Why a new case with new plaintiffs in a

11   new district?

12       MR. MCCOY:  Because our understanding of judge shopping

13   is you file a case in a district with the same plaintiffs, you

14   get a judge, if you don't like that judge, you dismiss, and then

15   you take your same plaintiffs, you file again somewhere else,

16   take another shot at it, and try to get a new judge.  And we

17   didn't want to do that.  We were trying to avoid that.  We

18   didn't want to be accused of judge shopping.

19       JUDGE PROCTOR:  But you didn't want to get that same

20   judge.

21       MR. MCCOY:  Well, I -- I mean, listen.  Because of the

22   irregularities, I was worried about whether or not we would --

23   if we filed in a jurisdiction in the Northern District, that we

24   might end up with Judge Burke again.  But we -- because we

25   were -- well, we would experience the same problems we

 1   experienced before with not having what we perceived to be a

 2   random wheel and the first-filed rule being, you know, the

 3   governing rule.

 4          JUDGE PROCTOR:  Background question.  What was your

 5   major in undergrad?

 6          MR. MCCOY:  My major in undergrad?  It was a combined

 7   political science, philosophy, and economics degree.

 8          JUDGE PROCTOR:  I was going to guess English because

 9   you're well-spoken.

10          MR. MCCOY:  Oh, well, I appreciate that.  Thank you

11   very much.

12          JUDGE PROCTOR:  But "refile" is a transitive verb that

13   means to file again.  Didn't you file this same lawsuit on

14   behalf of different parties again in a different district?

15          MR. MCCOY:  We filed a new lawsuit with new parties

16   with some of the same claims but also new parties with new

17   claims.

18          JUDGE PROCTOR:  But you were already going to amend the

19   complaint in the Northern District in Ladinsky with these new

20   claims; right?

21          MR. MCCOY:  No.  Actually, we -- Reverend Tucker was

22   not a part of the First Amendment complaint that we were

23   thinking about filing when we were still in front of Judge Axon.

24          JUDGE PROCTOR:  No, but you were going to assert a

25   First Amendment claim in an amendment.  We've been told that by

 1  those who were drafting -- working on drafting an amended

 2  complaint in the Ladinsky case.

 3          MR. MCCOY:  Oh, sorry.  I didn't remember that Reverend

 4  Tucker was being contemplated.

 5          JUDGE PROCTOR:  I didn't say anything about Reverend

 6  Tucker.  I said about the claims.

 7          MR. MCCOY:  Oh.

 8          JUDGE PROCTOR:  You were going to assert a First

 9  Amendment claim.

10          MR. MCCOY:  Okay.  I had forgotten that that was the

11  case.

12          JUDGE PROCTOR:  All right.

13          MR. MCCOY:  I guess I'll also add the claims aren't our

14  claims.  The claims are the plaintiffs' claims.  Right?

15          JUDGE PROCTOR:  Well, what you did between the time

16  Ladinsky was dismissed voluntarily and the time Eknes-Tucker was

17  filed was to go find some new plaintiffs; right?

18          MR. MCCOY:  Yes.

19          JUDGE PROCTOR:  And, for example, you gave Mr. Orr and

20  others that responsibility to go find us some new clients.

21          MR. MCCOY:  Right.  I guess it might have been easier

22  for us just to file the exact same case with the exact same

23  plaintiffs, again, wouldn't it, though, if we were looking to

24  judge shop?

25          JUDGE PROCTOR:  Well, that definitely would be less

1  effort.

2        MR. MCCOY:  Why would we be worried about going to the

3  trouble of finding all new plaintiffs again?

4        JUDGE PROCTOR:  Because you don't want to be accused of

5  judge shopping.  You've already answered that question.

6        MR. MCCOY:  Right.  Right.  And because we weren't.

7        JUDGE PROCTOR:  The point, though, is that -- and,

8  look, there's nothing untoward about this.  There's nothing

9  improper about it, but there's two types of ways that cases can

10 get filed, at least.  One is when a plaintiff walks into a

11 lawyer's office and says, I have a problem, and the lawyer

12 listens and files the complaint.  And another is when a lawyer

13 identifies a problem, wants to correct a societal ill,

14 perceived, and goes and finds a plaintiff to help do that.

15        MR. MCCOY:  Yeah.

16        JUDGE PROCTOR:  People who are on the --

17 philosophically, positionally have the same concerns.  This is

18 the latter case; right?  These are cases where organizations

19 decided these cases needed to be filed, and you had a

20 combination of plaintiffs either volunteering or being recruited

21 to be represented parties; right?

22        MR. MCCOY:  Yeah.  I think that's right.

23        JUDGE PROCTOR:  Okay.  And your role was as a lawyer in

24 the case.  Even though you did not make an appearance in

25 Ladinsky, you were still a lawyer on the case working with the

1  lawyers that actually made the appearance; right?

2         MR. MCCOY:  Well, actually, I think I -- I think --

3  actually, we didn't do the pro hacs yet, did we, in Ladinsky.

4         JUDGE PROCTOR:  Well, maybe you planned to come in.

5  Maybe --

6         MR. MCCOY:  Yeah.  No, absolutely.  It was -- yeah, the

7  pro hacs were being drafted.

8         JUDGE PROCTOR:  And that may be what Hoverman Terry was

9  calling about.

10         MR. MCCOY:  Right.

11         JUDGE PROCTOR:  Yours among others.

12         MR. MCCOY:  Yeah.  Absolutely.

13         JUDGE PROCTOR:  So help me understand this.  What she

14  told us was that it was totally out of the blue when the docket

15  clerk told her, and by the way, the Walker case is going to be

16  assigned to Axon.  That she didn't ask about that, that was just

17  told to her at the end of the conversation about PHV motions.

18         MR. MCCOY:  Sorry.  This is Abby?

19         JUDGE PROCTOR:  Yes.  Abby Hoverman Terry?  Is that --

20  am I pronouncing that correctly?

21         MR. MCCOY:  Right.  Sorry.  Yes.  I think maybe you

22  used a married name in there as well, I think, maybe.  Anyway,

23  yes.  Abby was the one that talked with Judge Axon's --

24         JUDGE PROCTOR:  Was she Hoverman at the time she made

25  the call and she's Terry now?

1          MR. MCCOY:  I want to say maybe yes.

2          JUDGE PROCTOR:  I think she told us she was recently

3  married.

4          MR. MCCOY:  Yeah.  Sorry.  That's why I was -- that's

5  why I was, like, confused for a moment.

6          JUDGE PROCTOR:  Okay.  But the point I'm raising is she

7  wasn't calling to ask about the Walker case.  She wasn't even

8  Walker counsel.

9          MR. MCCOY:  That's right.  No.  She was talking about

10  the pro hac vice motions.

11          JUDGE PROCTOR:  Any -- do you have any explanation for

12  how that would have taken place that just some clerk's office

13  employee would have just volunteered that at the end of a call

14  about a wholly different case?

15          MR. MCCOY:  I don't, Your Honor.  I don't.  All I know

16  is that that's what was reported back to the group after that

17  call was made contemporaneously.

18          JUDGE PROCTOR:  Are you aware, including just having

19  heard about it, of any effort made by someone other than counsel

20  in this case to make contact with court employees about where

21  the Walker case would end up if it came to the Northern

22  District?

23          MR. MCCOY:  All right.  I want to make sure that I

24  understand.  So would you, one more time?

25          JUDGE PROCTOR:  And I'll break that down.  I'm not

1  asking about any calls to Judge Thompson's chambers that you

2  might have heard about in Walker --

3        MR. MCCOY:  Okay.

4        JUDGE PROCTOR:  -- or any calls that Ms. Terry or

5  Hoverman made to the docket clerk.  I'm not even asking about

6  the calls to Judge Burke's chambers about how to file a motion

7  for consolidation.  I'm talking about a nonlawyer making an

8  inquiry of the Northern District of Alabama's clerk's office, an

9  employee of that office, concerning the assignment or the

10 potential assignment of these cases.

11        MR. MCCOY:  I have never heard that before.

12        JUDGE PROCTOR:  Okay.

13        MR. MCCOY:  One thing that I do remember is so after

14 Abby reported back about her conversation about the pro hacs and

15 the courtroom deputy had said -- told her that the case was

16 coming to Judge Axon, I remember that -- whether it was an email

17 or in a conversation or -- I can't remember that exactly, but

18 Ms. Eagan made the reference, well, that's good, because it

19 doesn't sound like Judge Axon would be recusing.  So at the time

20 I think --

21        JUDGE PROCTOR:  Any reason that people thought she may

22 recuse?

23        MR. MCCOY:  I don't know what the reason would have

24 been, but I just remember her making the comment.  I guess

25 that's also to tell you, like, how that information was received

 1  by the rest of the group.  We were like, oh, good, we got this

 2  piece of information from Judge Axon's chambers.

 3          JUDGE PROCTOR:  Are you aware of any effort by someone

 4  other than lawyers in this case and even the parties in this

 5  case, a third party, of trying to do investigation about a judge

 6  and his or her family and predisposition on these claims?

 7          MR. MCCOY:  No, never.  Never heard that.

 8          JUDGE PROCTOR:  Before the case was dismissed, before

 9  the Ladinsky case was dismissed, to be clear, was there an

10  agreement that the Walker case would also be dismissed as a

11  condition to the Ladinsky case dismissal?

12          Do you want me to state that another way?

13          MR. MCCOY:  No, no, no.  I'm just trying to remember.

14  I mean, I think the idea was that we would both dismiss, but I

15  don't know if there was an agreement.  Again, I think Mr. Minter

16  and maybe others were the ones that had the conversations with

17  Walker counsel.  And any reporting back I was getting was

18  just -- yeah, was that.  I don't think there was a lot of

19  in-depth, detailed reporting back about kind of what the plan

20  was.  We were working to make sure that we got our dismissal

21  drafted and filed.

22          JUDGE PROCTOR:  But you weren't going to dismiss if

23  Walker wasn't, were you?

24          MR. MCCOY:  I mean, yeah.  I think that would be --

25  that would be odd because then we would not be the first filed

1   case, we would be the Noe case, and if they were left, they

2   would be the ones leading the case.  And if we filed again, you

3   know, we would be clearly not the first filed case.

4        JUDGE PROCTOR:  Going back to this comment you just

5   attributed to Ms. Eagan about it's good that Axon was not

6   recusing, did anybody else hear or -- was that spoken?  Was that

7   in an email?  What was the context of that comment?

8        MR. MCCOY:  I don't remember.  My guess is that it

9   might have been in an email.

10        JUDGE PROCTOR:  Were you part of the discussions on

11   Saturday about whether or not the cases might be refiled

12   together and the two sides work together?

13        MR. MCCOY:  No.  That was the -- that was the call, I

14   think.  The Walker folks reached out to schedule that call.  We

15   were trying to schedule it.  I was planning to, but they ended

16   up scheduling it at I want to say, my time, like maybe 9:30 in

17   the morning, and I couldn't participate.  And so I gave Shannon

18   Minter my proxy and said, I can't be on this call.  Mr. Soto and

19   Ms. Stone also couldn't be.  So it turned out that on that

20   Saturday call, no one from SPLC was on.  But I, you know, told

21   Shannon, do whatever you think, you know.

22        JUDGE PROCTOR:  That was your proxy, whatever you

23   think, we'll go along with?

24        MR. MCCOY:  Basically it was, like, I trust you,

25   Shannon.  You know, if you think -- you know, if you think that

1  whatever is worked out works, then that's fine with me.  I've

2  known Shannon for a long time and, in that context, trusted him

3  and others.  I mean, he wasn't the only one on the call.  There

4  were many other people from our team on the call, too, so.

5          JUDGE PROCTOR:  Well, you trust him.  He just told us

6  that one of the factors for filing in the Middle District is

7  they didn't want to be in front of Burke.  Is that true?  Is

8  that accurate, as far as --

9          MR. MCCOY:  "They" meaning us as the Ladinsky counsel

10 team?

11         JUDGE PROCTOR:  Yes.  The Ladinsky team.  Yes.

12         MR. MCCOY:  If that's what Shannon says, then I don't

13 have reason to dispute that.

14         JUDGE PROCTOR:  Was that your view, too?  I don't want

15 to be in front of Burke.  Let's file in the Middle District.

16         MR. MCCOY:  I didn't think that Judge Burke would be as

17 good of a judge as Axon.

18         JUDGE PROCTOR:  I understand that.  I'm not asking for

19 relative comparison.  I'm asking what the reason was for filing

20 in the Middle District.  You've told me that there were a number

21 of reasons.

22         MR. MCCOY:  Oh.  So -- oh, no.  No.  For filing the new

23 case in the Middle District?  In my declaration I tell you the

24 two reasons.  One is because our defendants and a number of

25 plaintiffs were venue laid in the Middle District.  And the

1    other one was I was worried about being thrown back into the

2    same can of worms with the procedural issues that we had that

3    got us to where we were.

4          JUDGE PROCTOR:  So your point is that -- on the first

5    point, we're going to recruit new plaintiffs and make this a

6    Middle District focused case?

7          MR. MCCOY:  I'm sorry.  My point was?

8          JUDGE PROCTOR:  We're going to go get some new clients,

9    file in the Middle District, and make it a Middle District

10   focused case.

11         MR. MCCOY:  Yeah.  I think that's what -- I think

12   that's what we all decided to do.  And I was fine with that

13   because I was, one, venue laid because of the plaintiffs that we

14   had and the defendant that we had, and I was a little skittish

15   about the process in the Northern District at that point.

16         JUDGE PROCTOR:  There were seven plaintiffs in

17   Eknes-Tucker?

18         MR. MCCOY:  I think that's right.

19         JUDGE PROCTOR:  Eknes-Tucker --

20         MR. MCCOY:  Right.  Two doctors and four families.

21         JUDGE PROCTOR:  -- a pastor from Jefferson County in

22   the Northern District.

23         MR. MCCOY:  Right.

24         JUDGE PROCTOR:  Brianna Boe, individually and on behalf

25   of Michael Boe, a parent and child, in Montgomery County in the

1  Middle District.

2          MR. MCCOY:  Okay.

3          JUDGE PROCTOR:  James Zoe, individually and on behalf

4  of minor child Zachary Zoe, from Jefferson County in the

5  Northern District.

6          MR. MCCOY:  Okay.

7          JUDGE PROCTOR:  Megan Poe, individually and on behalf

8  of a minor child, Allison Poe, a parent and child in Cullman

9  County in the Northern District.

10         MR. MCCOY:  I thought Cullman was in the Middle

11  District.

12         JUDGE PROCTOR:  Cullman is north of Birmingham.

13         MR. MCCOY:  Then that's my misunderstanding.

14         JUDGE PROCTOR:  Okay.  Cathy Noe, individually and on

15  behalf of a minor child, Christopher Noe, a parent and child in

16  Lee County in the Middle District.

17         MR. MCCOY:  Lee.  Middle.  Yeah.

18         JUDGE PROCTOR:  Yes.  Dr. Jane Moe, a doctor from

19  Jefferson County in the Northern District.

20         MR. MCCOY:  Uh-huh.

21         JUDGE PROCTOR:  And Dr. Rachel Koe, a doctor in the

22  12th Judicial Circuit down in the Wiregrass District in the

23  Middle District.  That sound about right?

24         MR. MCCOY:  Yeah.  And then the various defendants that

25  match up with all of those folks.

```
 1          JUDGE PROCTOR:  Well, but the defendants -- other than
 2  the state officials sued, the defendants were really just a
 3  function of which -- who was the enforcing officer on behalf of
 4  the plaintiffs in the jurisdiction you chose for Eknes-Tucker;
 5  correct?
 6          MR. MCCOY:  That's right.  But, for instance, we didn't
 7  file in the Southern District because there was no one in the
 8  Southern District.
 9          JUDGE PROCTOR:  Right.
10          MR. MCCOY:  Neither plaintiffs or defendants.
11          JUDGE PROCTOR:  But the point is you just told me that
12  one of the reasons you went to the Middle District is because of
13  the number of parties that you would -- the parties in the
14  Middle District predominated; but actually, it was just the
15  opposite.
16          MR. MCCOY:  No.  We had a --
17          JUDGE PROCTOR:  The Northern District had more parties.
18          MR. MCCOY:  Well, what I meant to say, we had a number
19  of plaintiffs and defendants that were in the Middle District
20  that justified filing in the Middle District.
21          JUDGE PROCTOR:  Yes.
22          MR. MCCOY:  You're right.  We could have filed in the
23  Northern District.  I thought that would have been a bad idea.
24          JUDGE PROCTOR:  So parties had nothing to do with it
25  because you had more parties, actually.
```

```
1              MR. MCCOY:  No.

2              JUDGE PROCTOR:  And your local counsel, your local

3    counsel was in the Northern District; correct?

4              MR. MCCOY:  Yes.

5              JUDGE PROCTOR:  Two blocks from the courthouse;

6    correct?

7              MR. MCCOY:  I don't know where their office is.

8              JUDGE PROCTOR:  I'll represent to you it's about two

9    and a half blocks from the courthouse.

10             MR. MCCOY:  Then I'll believe you.

11             JUDGE PROCTOR:  In 2020, were you involved in the

12   discussions about filing if there was legislative enactment in

13   2020?

14             MR. MCCOY:  Yeah, I believe so.  Yeah.  At that point,

15   we were part of the -- yeah, the team that was planning on

16   litigating.

17             JUDGE PROCTOR:  2021, same thing?

18             MR. MCCOY:  Yes.

19             JUDGE PROCTOR:  And then 2022 --

20             MR. MCCOY:  Sorry.

21             JUDGE PROCTOR:  -- the legislation actually passed.

22             MR. MCCOY:  Yeah.  Sorry.  So 2022 -- I keep

23   forgetting -- I keep thinking -- I'm a year off.  So 2022, yes.

24   2021, yes.  And I think I would have to go back and look and see

25   if 2020 we were or not.
```

1          JUDGE PROCTOR:  Okay.

2          MR. MCCOY:  But certainly the most recent two years, we

3   were.

4          JUDGE PROCTOR:  We have been told, though, that from

5   2020 forward until Ladinsky was filed, there was a consistent

6   decision that we're going to file in the Northern District, that

7   there were questions about whether there ought to be a filing in

8   the Middle District.  In fact, there was even an invitation from

9   Walker counsel to transfer Ladinsky to the Middle District and

10  hopefully be in front of Judge Thompson, but that decision was

11  consistently stuck to, made and then continued, no, we're going

12  to file in the Northern District.

13         MR. MCCOY:  Okay.

14         JUDGE PROCTOR:  Is that correct, as far as you know?

15         MR. MCCOY:  I don't remember in 2021 the discussions

16  about where the plan was to file.  I don't remember any

17  discussion of an invitation for us to transfer to the Middle

18  District and be -- and try to get in front of Thompson, even

19  though that's probably what was discussed at one of the meetings

20  that I wasn't at.

21         JUDGE PROCTOR:  Right.  That was never reported to you?

22         MR. MCCOY:  Not an invitation.

23         JUDGE PROCTOR:  Well, the point -- what we've been told

24  is on that Wednesday call that you've already told me you

25  weren't on --

1          MR. MCCOY:  Right.

2          JUDGE PROCTOR:  -- but I thought you indicated that

3    they might have briefed you on --

4          MR. MCCOY:  Yeah, I got a briefing.

5          JUDGE PROCTOR:  -- was that Walker counsel set up the

6    call to talk about we are trying to decide whether to oppose the

7    show cause order.

8          MR. MCCOY:  Right.

9          JUDGE PROCTOR:  We've already filed a motion to have

10   our case in front of Judge Thompson.  We've marked our case

11   related to Corbett --

12         MR. MCCOY:  Right.

13         JUDGE PROCTOR:  -- and asked that it be assigned to

14   Judge Thompson.

15         MR. MCCOY:  Right.

16         JUDGE PROCTOR:  And we think it would be better not for

17   us to go to the Northern District but for y'all to come here to

18   the Middle District and be in front of Judge Thompson.

19         MR. MCCOY:  Yeah.

20         JUDGE PROCTOR:  You've already told me --

21         MR. MCCOY:  Nonsense.

22         JUDGE PROCTOR:  -- you thought that was fanciful.

23         MR. MCCOY:  Yeah.  I thought that was nonsense.

24         JUDGE PROCTOR:  But the point is --

25         MR. MCCOY:  And I think -- well, I guess -- and I think

1    our group came to the consensus that that didn't make any sense

2    for a number of reasons.  One, we weren't going to get in front

3    of Thompson.  Two, we wanted to be the first filed case and

4    we --

5            JUDGE PROCTOR:  And three, you had already picked your

6    venue and got your case filed.

7            MR. MCCOY:  We were in the -- yeah.  We were happy with

8    Judge -- at that point, I think it was Magistrate Judge

9    Cornelius.

10           JUDGE PROCTOR:  Yes.  And you were happy with Judge

11   Axon?

12           MR. MCCOY:  Well, Melody was -- advised that -- and

13   local counsel advised that Judge Axon would be a fine judge to

14   have, so.

15           JUDGE PROCTOR:  Okay.  Let me ask you this.  There

16   was -- let's just be candid.  There were concerns about Burke

17   and his judicial --

18           MR. MCCOY:  Yeah.  All to say --

19           JUDGE PROCTOR:  -- philosophy and the fact that he was

20   a state candidate, elected in Alabama, a pretty red state.  I'm

21   not characterizing this.  I'm just reporting to you what people

22   have told us.

23           MR. MCCOY:  Right.  Right.  I was just going to say, we

24   don't have to start being candid now.  I've been being candid

25   the whole time.

1          JUDGE PROCTOR:  Yes.  But I'm about to get really

2   candid here.

3          MR. MCCOY:  All right.

4          JUDGE PROCTOR:  I'm going to ask you a question.

5          MR. MCCOY:  Then do it.

6          JUDGE PROCTOR:  Let's say the case had been randomly

7   assigned to Burke off the bat and Walker got transferred in and

8   went to Axon and you got this glowing report about Cornelius and

9   Axon.  And out of the blue, as far as you're concerned, this

10  case was transferred by Burke to Axon, even though Burke was

11  first filed.

12         MR. MCCOY:  Yeah.

13         JUDGE PROCTOR:  Are we dismissing on Friday at six

14  o'clock?

15         MR. MCCOY:  You know, it's hard to know without being

16  in that circumstance.  But, I mean, that seems like a bank error

17  in your favor, and --

18         JUDGE PROCTOR:  That's a great Monopoly line.

19         MR. MCCOY:  I mean, I don't want to be flippant.

20  It's -- the circumstances are different.  It's hard to know in

21  the moment what would have been going on.

22         JUDGE PROCTOR:  I'm putting you in the moment.  Are you

23  dismissing then?

24         MR. MCCOY:  I honestly don't know.  And, one, it's not

25  up to me.  And I don't know what my decision on that would be.

1          JUDGE PROCTOR:  Okay.

2          JUDGE WATKINS:  Mr. McCoy, there's been a lot of

3     discussion about Rule 41.

4          MR. MCCOY:  Yes, sir.

5          JUDGE WATKINS:  And I know you-all thought about it,

6     probably researched it.  Rule 41 applies to a plaintiff.  We're

7     not here today about plaintiffs.  We're here today about

8     lawyers.  Rule 41(b), it seems to me, would have been relevant

9     to your thoughts.  No one has mentioned it.  But after the

10    filing of a notice of dismissal or stipulation of dismissal

11    signed by all parties, (b) says that if the plaintiff previously

12    dismissed any federal or state court action based on or

13    including the same claim, a notice of dismissal operates as an

14    adjudication on the merits; in other words, with prejudice.  And

15    the notes reflect that that would be the same as what we used to

16    call a directed verdict.

17         Did your team consider that when it decided not to file

18    any of the Ladinsky plaintiffs -- not to join them in the action

19    in the Middle District?

20         MR. MCCOY:  Not that I recall.  That's the first time

21    that that has been raised to me.

22         JUDGE WATKINS:  So that, in effect, is a sanction on a

23    plaintiff.  But, again, would you agree with me that has nothing

24    to do with the lawyers' actions?

25         MR. MCCOY:  If I understand -- I'm not sure I

1   understand you correctly, but I think the lawyer is not barred

2   or -- from bringing a claim for another plaintiff who has a

3   claim, I think, is my answer.  I think I understand correctly.

4           JUDGE WATKINS:  All right.  I think I'll take it.

5           MR. MCCOY:  Okay.

6           JUDGE WATKINS:  That's all I have.

7           JUDGE PROCTOR:  Well, in follow-up to that, then, if a

8   party has some unconditional right before the filing of an

9   answer or a motion for summary judgment being filed to dismiss,

10  that doesn't really govern lawyer conduct, does it?  That's just

11  what the parties' right is under the Federal Rules of Civil

12  Procedure.

13          MR. SEGALL:  Your Honor, you're asking him a legal

14  question.  And --

15          JUDGE PROCTOR:  He's a lawyer.

16          MR. SEGALL:  Yeah, but I'm saying the courts say yes.

17  In a lawyer disciplinary proceeding, you cannot punish the

18  lawyer for exercising his right -- Eighth Circuit -- exercising

19  his rights under Rule 41.  And I've never seen a case that

20  says --

21          JUDGE PROCTOR:  I'm sure there's an objection to the

22  question in there somewhere.

23          MR. SEGALL:  I'm sorry?

24          JUDGE PROCTOR:  I'm sure there's an objection to the

25  question in there somewhere, not a speech.

```
1              MR. SEGALL:  Yes.  Yes.

2              MR. MCCOY:  I'll do it.  Objection.  And then I'll let

3    him --

4              JUDGE PROCTOR:  No.  You let him finish before --

5              MR. MCCOY:  No, no.  I'm staying out of it.

6              JUDGE PROCTOR:  You would want your client to let the

7    lawyer talk before you --

8              MR. MCCOY:  Absolutely.  No.  I'm sorry.  I should not

9    have said a word.  Go.

10             JUDGE PROCTOR:  No.  Look, Mr. Segall, you can't eat

11   your cake and have it, too.  You can't say we looked at 41 and

12   thought we had the unfettered right to dismiss and go refile

13   wherever we want.  Because that's what he's told me.  That's

14   what others have told me.  So I'm just asking what they

15   considered about Rule 41 along the way.

16             MR. SEGALL:  That's fine, Judge.  As long as I'm up,

17   can I mention one last thing?

18             JUDGE PROCTOR:  You may.

19             MR. SEGALL:  Very quickly, before I forget it.  You

20   mentioned, as a preface to the question about what Mr. McCoy had

21   said about suspicions about what could have happened -- you said

22   you read that somewhere.  And I just wanted to point out, it's

23   in his declaration.

24             MR. MCCOY:  Oh.

25             JUDGE PROCTOR:  All right.  I don't think it's only in
```

 1  his declaration.  That's my point.  All right.

 2          JUDGE WATKINS:  I don't have any other questions.

 3          JUDGE PROCTOR:  Well, I'd like him to answer my

 4  question.

 5          MR. MCCOY:  I'm sorry.

 6          JUDGE PROCTOR:  Did you consider the fact that while

 7  Rule 41 defines your clients' rights, that you also have an

 8  obligation as a lawyer to make sure you're doing the right

 9  thing?

10          MR. MCCOY:  Yes.  I understand that we lawyers are

11  bound by the Rules of Professional Ethics.  Absolutely.

12          JUDGE PROCTOR:  And would you -- I'm not saying -- I'm

13  not -- this is not a trick question, a trap question.

14          MR. MCCOY:  No, no.

15          JUDGE PROCTOR:  This is just a -- if you, in fact, did

16  take steps to manipulate the random assignment, that's just

17  wrong.  You can't do that as a lawyer, can you?

18          MR. MCCOY:  I agree.  I don't think it's right to judge

19  shop or to manipulate the system.  And I don't think we did

20  that.

21          JUDGE PROCTOR:  No.  Let me be clear.  We keep saying

22  judge shopping, and we're using that as a shorthand term for

23  something.  But there's -- judge shopping, in and of itself, is

24  not necessarily impermissible.  If you have -- at the beginning

25  of the case, if you are trying to decide whether to file in the

1   Northern District or the Middle District -- and one of your

2   other colleagues has told me this was actually the

3   consideration, we thought we had more favorable draws of judges

4   in the Northern District than even the Middle District, that's

5   one of the reasons we decided to go -- there's nothing wrong

6   with that.

7           MR. MCCOY:  Right.

8           JUDGE PROCTOR:  It's just that once the ball's been

9   snapped, you can't call an audible and try to go somewhere else

10  in any manipulative way.  That's what I'm referring to as judge

11  shopping.

12          MR. MCCOY:  Right.  And I don't disagree that that's

13  true, and I don't think that's what we did.

14          JUDGE PROCTOR:  Okay.  Thank you.

15          MR. MCCOY:  Yep.

16          JUDGE PROCTOR:  All right.  You're excused.

17          We're going to take a short break.  And we'll have

18  Mr. Soto next.

19          MR. RAGSDALE:  Your Honor, may I ask a question before

20  you leave?

21          JUDGE PROCTOR:  You may.

22          MR. RAGSDALE:  The Magic City Acceptance Academy has

23  come up for the first time, as I understand it, today.  I will

24  tell you within the last month or so, I've contemplated taking

25  them on as a client.  If they have a role in this case, I would

1   kind of like -- if it can be disclosed to us, I would like to

2   know what it is.

3           JUDGE PROCTOR:  Let me talk to my colleagues.

4           MR. RAGSDALE:  That's why I wanted to talk to you

5   before our --

6           JUDGE PROCTOR:  That's a fair question.

7           MR. RAGSDALE:  Thank you, Your Honor.

8           MR. FRANKLIN:  Well, and might I also request, because

9   I think it's related, Judge Proctor, there have been a number of

10  questions today suggesting that perhaps there has been some

11  contact by somebody other than --

12          JUDGE PROCTOR:  I'll take that under advisement, too.

13  I would like to talk to these two.  I think that's a fair

14  question, too, Sam.

15          MR. FRANKLIN:  Thank you.

16          JUDGE PROCTOR:  I give you credit where credit's due.

17          MR. SEGALL:  Could y'all tell us, Judge, how late you

18  plan to go?

19          JUDGE PROCTOR:  We're going to talk about that here in

20  just a minute.  Mr. Soto is next.

21      (Recess was taken from 4:13 p.m. until 4:33 p.m., after

22        which proceedings continued, as follows:)

23          JUDGE PROCTOR:  All right.  Counsel, you asked about a

24  couple of matters.  First, scheduling.  We're going to go until

25  six tonight and resume at eight in the morning.  Okay?  If we --

1   it may be 6:02, but we're going to try to break as close to six

2   as possible.

3              Second, Mr. Ragsdale, there's no reason at all that you

4   cannot undertake representation of Magic City Acceptance.  We

5   did have some questions about some things that were reported;

6   but nevertheless, they're not going to be part of this inquiry

7   in any way, shape, or form.  I knew that when you asked the

8   question.  I just needed to make sure the panel was authorizing

9   me to mention that.

10             And then the third thing is, in response to

11  Mr. Franklin's question --

12             You stood.  Is there a question about Magic City?

13             MR. RAGSDALE:  I take it you're not inclined to share

14  with us what information you do have about that?

15             JUDGE PROCTOR:  That's correct.  Because it -- you

16  know, if we base any decision or finding on it, you'll have a

17  chance to respond to it.

18             MR. RAGSDALE:  Fair enough.

19             JUDGE PROCTOR:  And the same thing, same rule applies,

20  Mr. Franklin, to your -- since our last hearing, information has

21  come to us that nobody in Ladinsky but someone else made an

22  inquiry of one of our clerk's office employees about this

23  matter.  And we were just trying to make sure that no one in

24  Ladinsky was aware of that or authorized it or participated in

25  it.  And at this point, we don't have a reason to think they

1    did.  But we still need to ask the question.

2         MR. RAGSDALE:  That causes me to say there's also

3    nobody affiliated with Walker?

4         JUDGE PROCTOR:  Yeah.  I don't know exactly.  That's

5    what we're trying to figure out.  We don't know.

6         MR. RAGSDALE:  Okay.  Will you let us know?

7         JUDGE PROCTOR:  We will let you -- I just said we'll

8    let you know if there's anything that you need to know and

9    respond to.  We will not come out of the blue and make an

10   extrajudicial finding on anything that you haven't had a chance

11   to be aware of and comment on and address head-on.  And this is

12   not a lawyer.

13        MR. RAGSDALE:  Okay.

14        JUDGE PROCTOR:  Just to be clear.  So it's nobody on

15   the Walker side who's part of this inquiry.  Let me be clear

16   about that.

17        MR. RAGSDALE:  Okay.  Thank you.

18        MR. FRANKLIN:  And I guess my -- I appreciate that

19   information, Your Honor.  And I guess my only concern remains

20   whether or not either the panel is doing certain inquiries or

21   investigations outside the proceeding and hearing --

22        JUDGE PROCTOR:  The panel is not.

23        MR. FRANKLIN:  -- or other people are submitting

24   information or attempting to have some input --

25        JUDGE PROCTOR:  Mr. Franklin, I've already answered

1   your question.  If there's anything that has a bearing upon this

2   matter, it will be brought to your attention and you'll have a

3   chance to respond to it.

4           MR. FRANKLIN:  Thank you.

5           JUDGE PROCTOR:  At this point, I'm just trying to

6   figure out what your lawyers know.  I'm not suggesting that they

7   were involved.  What I wondered is if they were even aware of

8   the matter.  It sounds like they aren't.  So it doesn't have a

9   bearing on them if they're not.  Okay?

10          And I just got a text that we're muted, maybe?  Or I'm

11  muted?

12          JUDGE BEAVERSTOCK:  There was just something on the

13  screen a second ago.

14          THE COURTROOM DEPUTY:  It's not muted anymore.

15          JUDGE PROCTOR:  All right.

16          THE COURTROOM DEPUTY:  There's a 30-second delay, but

17  they can hear now.

18          JUDGE PROCTOR:  Okay.  Thank you.

19          MR. DRIVER:  Your Honor, a final question unrelated to

20  this.  If you'll notice, I'm alone for a moment.  Brannon had to

21  go to a bar commission meeting or something of that sort.  If he

22  comes back after five but before six, will he be able to get in,

23  or should I just tell him to hold stay outside?

24          THE COURTROOM DEPUTY:  They close at 5:15 at the

25  latest.

```
 1              MR. DRIVER:  Okay.  That's fine.  I can probably --
 2              JUDGE WATKINS:  We don't necessarily have to him here.
 3   It won't be a problem.
 4              JUDGE PROCTOR:  That all depends on how much he trusts
 5   you.
 6              MR. DRIVER:  Well, let's not leave it that way.
 7              JUDGE PROCTOR:  All right.  Any questions about what we
 8   discussed?  All right.
 9       (Diego Soto, the witness, was sworn.)
10              JUDGE PROCTOR:  All right.  Mr. Soto, the good news for
11   you is when you get later in the day, you get less questions.  I
12   think we have a pretty good handle on some things.  I want to
13   isolate on some others, though.
14              Give me what you perceive to be your role in the
15   Ladinsky case.
16              MR. SOTO:  So I did not join the Ladinsky team until
17   early March, and by that point, the train was running real fast.
18              JUDGE PROCTOR:  March of 2022, to be clear?
19              MR. SOTO:  Correct.  So I, frankly, don't remember
20   doing much for that case.  I was basically just a staff attorney
21   there to help if there was last-minute research, editing,
22   proofing, that sort of stuff.
23              JUDGE PROCTOR:  All right.  And so from March 2022
24   until the Ladinsky case was dismissed, would you have been more
25   in a support role, then?
```

1          MR. SOTO:  Correct.

2          JUDGE PROCTOR:  And so you would -- but you would have

3   been privy to some conversations, although not a decision-maker?

4          MR. SOTO:  That's correct.

5          JUDGE PROCTOR:  Was it a situation where you would give

6   input, volunteer input, or mostly just do as directed on the

7   matter, research this, draft that?

8          MR. SOTO:  It really depends.  Frankly, I'm having a

9   hard time, this late, remembering what was Ladinsky and what's

10  not, because the team has been the same.  But I think for the

11  most part, a lot of the major decisions had been made, and so I

12  was just there as support.

13         JUDGE PROCTOR:  All right.  I want to direct you to

14  page 2 of your declaration.

15         MR. SOTO:  May I look at it?

16         JUDGE PROCTOR:  You may.  That's why I'm directing you

17  to it.  I've told other witnesses, this is not a memory test.

18  At any point, if you want to look at your declaration, we

19  welcome that.  None of these questions are intended to trip you

20  up.  They're just intended to flesh out things or maybe answer

21  questions that you haven't addressed in your declaration.

22          All right.  I found this interesting.  Ever read

23  Genesis, Chapter 1, the Creation account?

24         MR. SOTO:  It's been a while since I was in Catholic

25  High School, Your Honor.

```
 1              JUDGE PROCTOR:  Certain elements of the Creation were

 2    good.

 3              MR. SOTO:  Yes.

 4              JUDGE PROCTOR:  When man was created, it was very good.

 5              MR. SOTO:  I think I know where this is going.

 6              JUDGE PROCTOR:  Yeah.  So you said you considered Judge

 7    Manasco a good draw, Judge Cornelius a good draw, and Judge Axon

 8    a very good draw.  Now, I know those weren't your words.  You're

 9    attributing those to the Ladinsky team and what its

10    consideration was.  Walk me through the foundation for your

11    declaration statements there.

12              MR. SOTO:  Sure, Your Honor.  So as I make clear here,

13    I don't know anything personally about these judges.

14              JUDGE PROCTOR:  That's what I'm suspecting.

15              MR. SOTO:  Yeah.  So where this came from was, you

16    know, we'd got the docket alert by email that the case was

17    assigned to, in the first instance, Judge Manasco.  And then

18    local counsel who was more familiar with these judges I think

19    essentially just said what I wrote, that we considered it a good

20    draw.  They considered Judge Cornelius a good draw.  And then I

21    think the distinction, which is I think where Your Honor is

22    going with the question -- I think there was just more

23    familiarity with Judge Axon by some of the local counsel, so

24    they described her as a very good draw.

25              JUDGE PROCTOR:  Did they have anything specific that
```

 1  you recall that described that familiarity?  Context.  Examples.
 2         MR. SOTO:  Sure.  So if I'm remembering correctly, as
 3  far as familiarity with her -- and I don't know that this is
 4  necessarily why they considered her a very good draw -- I
 5  believe one of the local counsel -- I hope I'm not mixing this
 6  up with Judge Manasco.  I believe one of the local counsel maybe
 7  grew up with her, if I remember correctly.
 8         JUDGE PROCTOR:  Actually, I think one of the local
 9  counsel grew up with Judge Manasco.
10         MR. SOTO:  Okay.  Then I'm confused.
11         JUDGE PROCTOR:  I think it was Mr. Doss knew
12  Ms. Manasco in their younger --
13         MR. SOTO:  Yeah.  So -- yeah, that sounds right.  As
14  far as Judge Axon, the only familiarity I can recall standing
15  here is I believe she serves on the board of Children's.
16         JUDGE PROCTOR:  I think that's, again, Judge Manasco.
17         MR. SOTO:  Oh, no.  I'm failing this memory test.
18         JUDGE PROCTOR:  Well, that's -- I'm not wanting you to
19  hang yourself, so I'm trying to give you some assistance there.
20  I'm just curious.  What do you recall hearing -- let's ask it
21  this way rather than -- what do you recall hearing about Judge
22  Axon that led you to perceive that the team viewed her as a very
23  good draw?
24         MR. SOTO:  Given that everything I thought I remembered
25  about Judge Axon is actually about Judge Manasco, I don't think

1   I remember anything about Judge Axon.

2          JUDGE PROCTOR:  All right.

3          MR. SOTO:  And I'm pretty sure the words used that I

4   recall were that local counsel considered her a very good draw.

5   I don't remember the basis for it.

6          JUDGE PROCTOR:  Did you do any research about these

7   judges yourself?

8          MR. SOTO:  No, sir.

9          JUDGE PROCTOR:  Were you around when anybody reported

10  on any research about these judges, either through electronic

11  report or oral report?

12         MR. SOTO:  I don't recall specifics except I remember

13  Mr. Shortnacy, his firm would pull -- I think they call it the,

14  like, Westlaw Almanac.  And he must have pulled that for one or

15  all of these judges, but I never looked at any of that.  It was

16  just a lot of information.

17         JUDGE PROCTOR:  Okay.  What did you understand that

18  was -- what did you understand the assessment of Judge Burke to

19  be?

20         MR. SOTO:  I think, as I wrote in my declaration, that

21  he was considered to be very conservative.

22         JUDGE PROCTOR:  Anything that stands out in your

23  recollection as to why that judgment was assigned to him?

24         MR. SOTO:  At the time that he was assigned to

25  Ladinsky, no.

1          JUDGE PROCTOR:  All right.  Did you ever hear anyone

2  indicate in your presence, whether it was, again, electronically

3  or in a Zoom or phone call or Teams call, we don't want Judge

4  Burke?  That's -- that's a bad draw.  We don't want to be in

5  front of Judge Burke.

6          MR. SOTO:  I don't recall any specific conversation or

7  email or otherwise where that was said, but I feel like that was

8  the sentiment, that ideally, we would not -- you know, there

9  were good draws, and then I think the team would have considered

10  him a not good draw, probably a bad draw.  But -- and I think I

11  say this in the declaration as well.  I don't recall anyone

12  saying he's a bad draw and, you know, we would toss the case if

13  we got him.

14          JUDGE PROCTOR:  Did you have -- I realize you were not

15  involved in any of these decisions, not even -- did you even

16  give input into any of the decisions about dismissal, refiling,

17  where to refile, anything along those lines?

18          MR. SOTO:  So I certainly don't consider myself a

19  decision-maker.  I think where I struggle with the did I

20  participate was sometimes I was copied on an email or I would

21  listen in on a phone call.  But, for example, the phone call

22  about what do we do, do we dismiss or not, I didn't speak on

23  that call.

24          JUDGE PROCTOR:  That was on that Friday afternoon,

25  April 15?

1           MR. SOTO:  Correct.

2           JUDGE PROCTOR:  Good Friday?

3           MR. SOTO:  Correct.

4           JUDGE PROCTOR:  What do you recall about that phone

5   call?

6           MR. SOTO:  So I had just left the gym and saw an email

7   invitation to it.  The phone call had already started.  I don't

8   remember how long into the call they were by the time I joined.

9   I don't -- frankly, I was driving home, and I don't recall

10  anything specific.  But what I do remember was just the

11  decision -- there seemed to be a consensus, at least, among the

12  team, whoever was talking, that we probably should dismiss the

13  case.

14          JUDGE PROCTOR:  And do you remember -- who do you

15  recall specifically saying that?

16          MR. SOTO:  I don't recall anyone specifically.

17          JUDGE PROCTOR:  All right.  Do you recall there being

18  any discussion about the prospects of success before Judge Burke

19  if he -- now that he had the case?

20          MR. SOTO:  I don't recall anyone specifically saying

21  that, but I think it's entirely possible someone said, you know,

22  we're not likely to succeed in front of him.

23          JUDGE PROCTOR:  Do you remember any discussion about

24  how Rule 41 would play into a dismissal?

25          MR. SOTO:  In that phone conversation?  I certainly

1   don't remember, in that phone conversation, anything about Rule

2   41, but I do recall after it seemed like the train was moving to

3   dismiss the case, that I believe it was my supervisor,

4   Mr. McCoy, who suggested that we needed to file it quickly

5   before defendants filed something that would eliminate the

6   option to dismiss voluntarily.  But other than that, I don't

7   recall anything specific about the rule.

8           JUDGE PROCTOR:  Were you involved in any way in talking

9   with the clients about dismissal?

10          MR. SOTO:  No, sir.

11          JUDGE PROCTOR:  Do you remember any discussions about

12  what the conditions of dismissal ought to be, if any?  For

13  example, Walker's going to have to agree to dismiss before we

14  dismiss.

15          MR. SOTO:  I do not recall anything about that, Your

16  Honor.

17          JUDGE PROCTOR:  Were you at all concerned about

18  dismissing a case that -- in a situation like this where time

19  was of the essence to work toward getting an order blocking or

20  not enforcing the statute?

21          MR. SOTO:  At the time -- I don't -- I don't recall

22  anything specific going through my mind on that point.  I think

23  there was still time before the law took effect, but that's

24  probably why it wasn't really at the forefront for me.

25          JUDGE PROCTOR:  And I'm not trying to put words in your

1   mouth, but it sounds like you were pretty new to the team.

2           MR. SOTO:  Yes.

3           JUDGE PROCTOR:  Not thinking that you needed to be

4   keeping up or giving input about these decisions, that people

5   with more knowledge and more experience than you were going to

6   be making these decisions?

7           MR. SOTO:  That's correct.  And I'll add, the idea

8   before all this arose was that I would sort of be the point

9   person for SPLC and that Mr. McCoy could take a back seat, and

10  then he ended up taking those reins back over from me.

11          JUDGE PROCTOR:  You got bumped back to the back seat.

12          MR. SOTO:  Gladly.

13          JUDGE PROCTOR:  After you just got out of the car

14  altogether if you had your choice; right?

15           All right.  Did you hear Mr. McCoy indicate his view

16  that there was something irregular or improper about Judge

17  Axon's order and the procedural mechanism of the case going to

18  Judge Burke?

19          MR. SOTO:  Yes, Your Honor.  And I don't recall if it

20  was on that Friday evening phone call where the decision was

21  made to dismiss or if maybe it was another -- in some other

22  conversation.  But, yes, he did say something to that effect.

23          JUDGE PROCTOR:  You graduated law school in 2016?

24          MR. SOTO:  Correct.

25          JUDGE PROCTOR:  And went -- I mean, your career has

1  been at Southern Poverty?

2           MR. SOTO:  Yes.

3           JUDGE PROCTOR:  Did you do any type of internship or

4  clerkships prior to that?

5           MR. SOTO:  No clerkships, unfortunately, but I did do a

6  few internships during law school, yes.

7           JUDGE PROCTOR:  All right.  In federal court?

8           MR. SOTO:  Both -- well, two internships with the

9  United States Department of Justice and then one with the

10  Superior Court of the District of Columbia.

11           JUDGE PROCTOR:  All right.  You were in the courtroom

12  when you heard me explain procedurally how these two cases -- or

13  am I --

14           MR. SOTO:  No.  So I was excused from the first

15  hearing.

16           JUDGE PROCTOR:  Oh, that's right.  We did excuse you.

17  Well, I won't bore you with all the details, but are you aware

18  that there were explanations for how this occurred within the --

19           MR. SOTO:  About -- I'm sorry.  I didn't mean to --

20           JUDGE PROCTOR:  No.  Go ahead.

21           MR. SOTO:  About why Ladinsky was transferred?

22           JUDGE PROCTOR:  Ladinsky was -- well, first of all, why

23  Walker -- you're aware there was a transfer by Judge Marks --

24           MR. SOTO:  Correct.

25           JUDGE PROCTOR:  -- under the first-filed rule to the

1   Northern District.

2           MR. SOTO:  I am.

3           JUDGE PROCTOR:  You're aware that that was randomly

4   assigned from the Northeastern Division, where the parties in

5   the Northern District were located that were part of that case,

6   to Judge Burke?

7           MR. SOTO:  Correct.

8           JUDGE PROCTOR:  Judge Axon had the first filed case,

9   but she was in a criminal trial --

10          MR. SOTO:  Correct.

11          JUDGE PROCTOR:  -- that was expected to go even longer

12  than it actually went but would have affected her bandwidth to

13  jump right on a case like this, and that she asked Judge Burke

14  to take the case since he had the other case, and she

15  transferred her case to him based upon that.

16          MR. SOTO:  Yes.  I'm --

17          JUDGE PROCTOR:  And you saw the order.

18          MR. SOTO:  Correct.

19          JUDGE PROCTOR:  Okay.  And I don't want to speak for

20  others, but I think everyone agrees that would have been great

21  information on April 15.  Appreciate hearing it now, but wish we

22  had known that on April 15.

23          MR. SOTO:  That is an understatement, Your Honor.

24          JUDGE PROCTOR:  Okay.  Do you have any -- so I'm going

25  to ask you a little -- you're listening in.  You're not a

 1  participant in that you're not speaking up on these calls, not

 2  making the decisions.  I've asked this question of some others.

 3  What if Burke had been -- had the Ladinsky case and Axon had

 4  gotten the Walker case and Burke had been in trial and Burke had

 5  transferred his case to Axon because he couldn't handle Ladinsky

 6  and Walker at that point?  Do you think under those

 7  circumstances, based upon the tenor of what you heard, that

 8  there would have been discussions about dismissing the case

 9  then?

10          MR. SOTO:  So essentially, the irregularity, but the

11  other way?

12          JUDGE PROCTOR:  The question is irregularity versus the

13  judge that was going to hear the case.

14          MR. SOTO:  Yes.  I mean, it -- to an extent, I have to

15  speculate.  I imagine there would at least be conversations.  I

16  think I mentioned in my declaration, I had been researching the

17  first-filed rule for a completely unrelated matter.  So --

18          JUDGE PROCTOR:  You had been researching what?

19          MR. SOTO:  The first-filed rule for a completely

20  unrelated matter.  So --

21          JUDGE PROCTOR:  Well, can I give you my law school

22  exam?  I finally have somebody who I think is pretty close to

23  law review and all that good stuff.

24          MR. SOTO:  So it was on my mind certainly, and --

25          JUDGE PROCTOR:  Well, and I'm not -- this isn't a legal

1    question.  This is just understanding the context.

2           MR. SOTO:  No, I understand the question.

3           JUDGE PROCTOR:  The first-filed rule, a case has to --

4    if I'm the first filed in the District of Columbia and there's a

5    case in the District of Maryland that's related, I can't just

6    reach out and consolidate that case with mine; right?

7           MR. SOTO:  I'm sorry.

8           JUDGE PROCTOR:  The first filed case can't reach out

9    and get the second filed case across the district line.

10          MR. SOTO:  I actually -- I don't know.  That was a

11   question for me.

12          JUDGE PROCTOR:  Okay.  I think everybody in the

13   courtroom would agree you can't do that.  I don't have

14   jurisdiction over that case.  I'm not a judicial officer in the

15   District of Maryland.  What you have to do is file something in

16   the District of Maryland to get the case to the D.C. District;

17   right?

18          MR. SOTO:  Yeah.  And when I -- I'm sorry, Your Honor.

19   When I said that I wasn't sure, I had seen examples of where

20   judges ordered the parties to go and have that other case

21   transferred.  So for me, it was a question --

22          JUDGE PROCTOR:  Oh, so the side door of I am expecting

23   y'all to go work out with the other side and get it transferred

24   to me.

25          MR. SOTO:  I remember --

```
 1              JUDGE PROCTOR:  But it's got to be a party-initiated

 2   motion or the district court in the second filed case has to

 3   enter the order.  In this case, it was a show cause order;

 4   right?

 5              MR. SOTO:  Yes.

 6              JUDGE PROCTOR:  The point being Judge Manasco, Judge

 7   Cornelius, Judge Axon, Judge Burke could not have just

 8   consolidated Walker, because it was filed in a different

 9   district.

10              MR. SOTO:  I -- frankly, I'm lost, but I take it, yes.

11              JUDGE PROCTOR:  Well, if you're lost already, then I'm

12   not going to make you go any further.

13              MR. SOTO:  I take back that I am familiar with the

14   first-filed rule in that case.

15              JUDGE PROCTOR:  Well, I'll give you credit for this.

16   You're at least admitting that.

17              Okay.  Were you aware of any discussions about refiling

18   this case or -- so one witness properly called me out on

19   refiling.  That's not -- I'm not -- I'm not trying to indicate

20   that.  On filing another case after the dismissal of Ladinsky.

21              MR. SOTO:  Yes, I believe that came up during that

22   Friday evening call.

23              JUDGE PROCTOR:  That you were on with just the Ladinsky

24   team, or was that also discussed in a subsequent call with

25   Ladinsky and Walker counsel intermixed?
```

1        MR. SOTO:  So I was on that Friday call that I

2   believe -- and, again, I was in the car, but I assumed that it

3   was only the Ladinsky team.  And I remember just generally the

4   decision was we'll dismiss the cases and then file some new

5   case.  But --

6        JUDGE PROCTOR:  We'll talk with Walker about dismissing

7   Walker and we'll dismiss Ladinsky, and then we will refile

8   something -- we'll file an additional case.

9        MR. SOTO:  Something to that effect.

10       JUDGE PROCTOR:  To be determined where, who, when, et

11   cetera.

12       MR. SOTO:  Correct.  I think that's right.

13       JUDGE PROCTOR:  Were you on a subsequent call where

14   Ladinsky and Walker counsel discussed this together?

15       MR. SOTO:  No, I was not.

16       JUDGE PROCTOR:  You were not on that call.

17       MR. SOTO:  No.

18       JUDGE PROCTOR:  That's what I was trying to get at.

19   But you're aware that this decision, it was not a let's dismiss

20   and walk away.  It's, let's dismiss and fight another day.

21       MR. SOTO:  Correct.

22       JUDGE PROCTOR:  Okay.  And did the question of which

23   judge we would have in a new case come up in that discussion?

24       MR. SOTO:  I'm sorry.  The Friday evening discussion?

25       JUDGE PROCTOR:  On the Friday Ladinsky discussion you

1  just told me you were in --

2         MR. SOTO:  Correct.

3         JUDGE PROCTOR:  -- where there was an agreement that

4  let's -- we'll dismiss our case, talk to Walker about dismissing

5  their case, and we'll figure it out after that.

6         MR. SOTO:  I don't recall anything about what judge we

7  would have in a newly filed case.

8         JUDGE PROCTOR:  All right.  Was there a discussion,

9  though, about this will allow us not to be in front of Judge

10 Burke?

11        MR. SOTO:  Given that I don't remember where they said

12 that -- or if it even came up of where we would file, I don't

13 believe that was discussed.

14        JUDGE PROCTOR:  All right.  Were you aware of any

15 discussions or information after those calls about filing in the

16 Middle District the Eknes-Tucker case?

17        MR. SOTO:  Specific conversations, no.  But I became

18 aware that it was decided that the new case would be filed in

19 the Middle District.

20        JUDGE PROCTOR:  How did you become aware of that?

21        MR. SOTO:  From Mr. McCoy.

22        JUDGE PROCTOR:  And what did Mr. McCoy say to you about

23 that?

24        MR. SOTO:  So he had reached out to me at some point

25 over that weekend because I think I was the only person actually

1    physically located in Montgomery and if I remember correctly,

2    you have to hand file new cases.  So he reached out to say that

3    we're filing in the Middle District, can you file on Monday.

4           JUDGE PROCTOR:  And it actually ended up getting filed

5    on Tuesday, as I recall.

6           MR. SOTO:  I think that's right.

7           JUDGE PROCTOR:  Did he say why they were filing in the

8    Middle District?

9           MR. SOTO:  So he had shared that it was decided that we

10   would file in the Middle District and that he had learned about

11   some reasons from Shannon Minter about that.

12          JUDGE PROCTOR:  So he didn't share exactly what those

13   reasons were?

14          MR. SOTO:  No, sir.  He shared a text message from

15   Mr. Minter laying out what Mr. Minter had apparently learned

16   from folks at Lightfoot about that.

17          JUDGE PROCTOR:  And what was that?

18          MR. SOTO:  So I think it was filing in the Middle

19   District would make -- would be -- I don't know how to explain

20   it.  I think the more different that the new case was from

21   Ladinsky, the less likely it would give the impression that we

22   were trying to judge shop.  So one way I guess they concluded

23   was you file in a completely new court, it doesn't look like

24   you're just trying to go back into that same draw in your first

25   court.

1          JUDGE PROCTOR:  All right.

2          MR. SOTO:  And then I believe another part was having

3    new clients so, again, it doesn't look like your clients are

4    just trying to get back into the random draw and try again.

5          JUDGE PROCTOR:  Okay.  I need a little more detail than

6    that.  That's a conclusion.  I'm just wondering what you

7    actually -- what was communicated to you.

8          MR. SOTO:  I think it was essentially that, Your Honor.

9    It was if we file in the Middle District, it's a different

10   court, different judges, new clients -- I mean, new plaintiffs.

11         JUDGE PROCTOR:  What would be the advantage -- what did

12   you understand would be the advantage of doing that?

13         MR. SOTO:  Well, I think there was a worry that if we

14   file a new case, it's going to look like we're judge shopping.

15   And so my impression was they wanted to avoid looking like we're

16   judge shopping and actually avoid judge shopping.  And so I

17   guess folks either were researching or whatever and thought, you

18   know, if we go to a completely different court, it doesn't look

19   like we're trying to get just back in the random draw for, you

20   know, a new judge.  And, of course, we ended up with not only a

21   new court but entirely new plaintiffs, I guess because folks

22   realized if you have old clients, even if they go to a new

23   court, that, too, can look like it's judge shopping and probably

24   would be judge shopping.  So we're going to proceed with

25   completely new plaintiffs.

1          JUDGE PROCTOR:  All right.  I think that's all the

2  questions we have for you.

3          MR. SOTO:  Thank you, Your Honor.

4          JUDGE PROCTOR:  Like I said, when you go late and

5  you're not as involved, that certainly helps your time before

6  the panel.

7          MR. SOTO:  Thank you, Your Honors.

8          JUDGE PROCTOR:  All right.  Thank you.

9          Do you have any follow-up, Mr. Segall?

10          MR. SEGALL:  Just waiting for instructions, Judge.

11          JUDGE PROCTOR:  All right.  I think we are ready for

12  Ms. Warbelow.

13          Oh, actually -- hey, actually, let's go with Ms. Weaver

14  first.

15          MR. SEGALL:  I think she'll be short.

16      (The witness, Cynthia Weaver, was sworn.)

17          JUDGE PROCTOR:  Thank you.  How are you today?

18          MS. WEAVER:  I'm good.

19          JUDGE PROCTOR:  I'm Judge Proctor.  Appreciate you

20  being here to answer our questions.  How would you define your

21  role in the Ladinsky case litigation team?

22          MS. WEAVER:  Sure.  So I started at HRC as the

23  litigation director in January.  And around I think late March,

24  early April, I learned that HRC will be joining several other

25  organizations to challenge SB184.  My main role in the Ladinsky

1    case was -- actually, I guess it's more in Eknes-Tucker -- was

2    to discuss with a client of ours who would be a plaintiff in the

3    case.  And my client was added as a plaintiff in the

4    Eknes-Tucker case and not in the Ladinsky case.

5            JUDGE PROCTOR:  All right.  Would you characterize that

6    as a fairly minor role, then?

7            MS. WEAVER:  Yes.

8            JUDGE PROCTOR:  Okay.  What conversations -- you were

9    not a decision-maker.  Fair?

10           MS. WEAVER:  Right.

11           JUDGE PROCTOR:  Okay.  Would you have given input on

12   any decision involving the following matters?  Whether and when

13   to file Ladinsky, whether and how to dismiss Ladinsky, whether,

14   how, and when to file Eknes-Tucker?

15           MS. WEAVER:  I did not offer input in those three.

16           JUDGE PROCTOR:  On any of those?

17           MS. WEAVER:  No.

18           JUDGE PROCTOR:  Okay.  Who would have been your main

19   source of information about what was occurring in this

20   litigation?

21           MS. WEAVER:  My supervisor, Sarah Warbelow.

22           JUDGE PROCTOR:  Take me through what you recall about

23   discussion with Ms. Warbelow about the dismissal of Ladinsky.

24           MS. WEAVER:  I did not speak with her that Friday.

25           JUDGE PROCTOR:  Were you on any of the calls that

1  Friday?

2          MS. WEAVER:  No, I was not on the calls.

3          JUDGE PROCTOR:  Okay.  That's what I recalled, anyway.

4  Yes.  Did you talk to her over the weekend?

5          MS. WEAVER:  I spoke to her Saturday.

6          JUDGE PROCTOR:  And did she characterize any of the

7  decisions or meetings that had occurred on Friday with you?

8          MS. WEAVER:  She mentioned that the -- both Ladinsky

9  and Walker cases would be dismissed.  The intention was for the

10 parties to potentially join a case together to streamline the

11 litigation and that there was -- I think there was a call on

12 Saturday that occurred between some attorneys about getting the

13 logistics of that together.  And then I think later on that

14 weekend, we learned that the Walker team was not going to file

15 or join the Ladinsky team in the lawsuit.

16         JUDGE PROCTOR:  Did she get into any of the details

17 about the dismissal of Ladinsky on Friday late afternoon, early

18 evening?

19         MS. WEAVER:  No.

20         JUDGE PROCTOR:  So you learned on the weekend following

21 that Friday that Ladinsky had been dismissed.

22         MS. WEAVER:  I learned Friday.  So I was being

23 copied --

24         JUDGE PROCTOR:  You're seeing emails.

25         MS. WEAVER:  -- on the emails, yes.

```
 1              JUDGE PROCTOR:  But you got -- the first conversation

 2   after that by anyone was with Ms. Warbelow that following

 3   weekend, that weekend?

 4              MS. WEAVER:  The next day, Saturday.

 5              JUDGE PROCTOR:  That Saturday.

 6              MS. WEAVER:  Yes.

 7              JUDGE PROCTOR:  And did she explain to you why the

 8   decision was made to dismiss Ladinsky?

 9              MS. WEAVER:  The understanding was that there were

10   some -- the team thought there were some procedural errors or

11   deviations from the first-filed rule.  And because time was of

12   the essence, that the team thought by dismissing and filing a

13   new case would kind of reset the case to be going through the

14   random judicial assignment system.

15              JUDGE PROCTOR:  And you're referring to Judge Axon's

16   order reassigning Ladinsky to Judge Burke, who had the Walker

17   case?

18              MS. WEAVER:  Yes.

19              JUDGE PROCTOR:  What did you think of hearing that, you

20   know, because time is of the essence, we're going to dismiss the

21   Ladinsky case?

22              MS. WEAVER:  I was concerned about moving quickly

23   because we were all trying to get the papers together, trying to

24   get the PI motion together.  So I knew that, you know, there

25   wasn't much time to put together.  So my immediate concern was
```

1   actually just getting -- proceeding as fast as we can.  And to

2   start over again was a concern, but --

3          JUDGE PROCTOR:  What has been -- what was your

4   experience before joining your current organization?

5          MS. WEAVER:  I was senior counsel in the New York City

6   Law Department's Affirmative Litigation Division's Impact

7   Litigation Unit.

8          JUDGE PROCTOR:  All right.  How much time did you spend

9   in federal court in that position?

10          MS. WEAVER:  Most of my cases during that time were in

11   federal court.

12          JUDGE PROCTOR:  When you said "patent," I guessed that.

13          MS. WEAVER:  I said -- sorry.  I said most of my time

14   during -- most of my cases during that time were in federal

15   court.

16          JUDGE PROCTOR:  That's what I'm saying.  When you said

17   "patent," I figured that was the case, that you would be in

18   federal court with patent litigation.

19          MS. WEAVER:  No, I didn't say patent litigation.

20          JUDGE PROCTOR:  Well, I misheard you, then.

21          MS. WEAVER:  I can still -- I was in the affirmative

22   litigation division impact litigation unit.

23          JUDGE PROCTOR:  Oh, impact.

24          MS. WEAVER:  I know.

25          JUDGE PROCTOR:  I thought you said I did affirmative

 1   action litigation and patent litigation.  I thought, well, that

 2   is an interesting combination.

 3          All right.  Fair enough.  Thank you.

 4          Did you personally perceive some procedural

 5   irregularity, or were you counting on -- depending on others to

 6   make that connection for you?

 7          MS. WEAVER:  I was relying on my colleagues on the team

 8   because I was told very specifically to focus on client

 9   engagement, the immediate next steps at the time.

10          JUDGE PROCTOR:  Okay.  But you were concerned that if

11   time was of the essence, if we're starting a brand new case,

12   that could be a concern?

13          MS. WEAVER:  That would give me concern.  I also -- I

14   went through the -- as the emails were coming in, the ones I was

15   copied on, I would -- I think I tried to understand what was

16   happening.  And I understood why -- I understood the concerns

17   about what was perceived as like a procedural deviation from the

18   first-filed rule.  I don't think that's right.

19          JUDGE PROCTOR:  Were you excused from attending the

20   first hearing?

21          MS. WEAVER:  I was not.

22          JUDGE PROCTOR:  You were here?

23          MS. WEAVER:  I was here.

24          JUDGE PROCTOR:  So you heard my explanation about how

25   all that occurred.

```
 1              MS. WEAVER:  Yes.

 2              JUDGE PROCTOR:  Nothing really irregular.  Maybe some

 3    mystery, but would you agree nothing really irregular?

 4              MS. WEAVER:  That did not sound irregular to me.

 5              JUDGE PROCTOR:  Okay.  And so in order to understand

 6    whether something is irregular, sometimes you have to ask some

 7    questions; right?

 8              MS. WEAVER:  Yes.

 9              JUDGE PROCTOR:  Did you hear anybody say, hey, time

10    out, maybe we ought to just get explanation before we haul off

11    and dismiss this case?

12              MS. WEAVER:  I don't remember -- like skimming through

13    the emails at that time, I don't recall reading that.  I'm

14    trying to think.  I don't recall reading that in the emails.

15              JUDGE PROCTOR:  Okay.  And other than your

16    communications with Ms. Warbelow, the information you would have

17    about this would have been from email traffic?

18              MS. WEAVER:  Yes.  And what happened was that -- so I

19    was not near my computer during that time.  I had some other

20    obligations.  And I was trying to catch up as I was doing --

21    going through this obligation.

22              JUDGE PROCTOR:  You were not digesting this real time.

23    You were just --

24              MS. WEAVER:  I wasn't.  I really couldn't.

25              JUDGE PROCTOR:  You were reviewing a bunch of emails
```

1  and trying to synthesize them.

2         MS. WEAVER:  I was pushing a stroller and picking up my

3  second kid.  So it was very difficult to read and, like, corral

4  two kids together.

5         JUDGE PROCTOR:  You had other things you were doing on

6  a Friday afternoon.

7         MS. WEAVER:  It was fantastic.  But then when I got

8  back, Asaf had called me and just said, hey, did you see the

9  emails?  He just wanted to check and see if I understood and got

10 the emails.

11        JUDGE PROCTOR:  So that was Mr. Orr?

12        MS. WEAVER:  Yes.  Oh, I'm sorry.  That's Mr. Orr.

13        JUDGE PROCTOR:  Did he ever give you an explanation

14 about what was going on?

15        MS. WEAVER:  That was a very short call.  I think he

16 just told me that -- we went through the emails to get me caught

17 up, and that was it.

18        JUDGE PROCTOR:  Based upon -- whether it was a

19 discussion with Mr. Orr, Ms. Warbelow, or this email traffic you

20 saw, did you understand that one of the reasons for dismissing

21 the case was because the litigants -- that counsel were

22 concerned about being in front of Judge Burke?

23        MS. WEAVER:  No.  I think the bulk of the emails were

24 concerned about we had -- the case was assigned to one judge.

25 There were communications from another law firm with the

1   courtroom deputy saying that the Walker case was going to be

2   transferred over to the same judge.  And then when the case was

3   transferred over to Judge Burke, folks were very confused and

4   concerned.  And decisions were being made in a very short period

5   of time.

6         JUDGE PROCTOR:  You had some role in communications

7   with clients?

8         MS. WEAVER:  Yes.

9         JUDGE PROCTOR:  And Mr. Orr did as well?

10        MS. WEAVER:  Yes.

11        JUDGE PROCTOR:  Were you involved at all in consulting

12  clients about the dismissal?

13        MS. WEAVER:  No, because my client wasn't named yet in

14  the Ladinsky case.

15        JUDGE PROCTOR:  Was your client eventually named in the

16  Eknes-Tucker case?

17        MS. WEAVER:  Oh, that's right.  So I did -- I'm sorry.

18  So I did not talk to any of the plaintiffs in the Ladinsky case.

19  For the plaintiff that was added in the Eknes-Tucker case, I did

20  quickly call her just to let her know that the case was being

21  dismissed and that we're moving forward, we're assessing next

22  steps, and that there could be a new case to be filed.

23        JUDGE PROCTOR:  Was that client eventually named in the

24  Eknes-Tucker case?

25        MS. WEAVER:  Yes.

 1          JUDGE PROCTOR:  So, to be clear, the client -- and I

 2   don't need to know the name.  I'm just -- let's identify the

 3   person as the client at this point.

 4          MS. WEAVER:  Right.

 5          JUDGE PROCTOR:  The client was not a plaintiff in

 6   Ladinsky but was a plaintiff in Eknes-Tucker.

 7          MS. WEAVER:  Yes.

 8          JUDGE PROCTOR:  But you had kept this client abreast of

 9   the developments involving Ladinsky, you were informing her that

10   Ladinsky was being dismissed, there would be another case filed,

11   and she may be a party in that new case?

12          MS. WEAVER:  Right.  The reason was I didn't want her

13   to be upset if she sees --

14          JUDGE PROCTOR:  She's not -- you don't want to have her

15   asking what's going on.

16          MS. WEAVER:  Right.

17          JUDGE PROCTOR:  Just give me, as best you can, what

18   Ms. Warbelow told you on that Saturday.  Just give me as

19   complete a narrative about that as possible.

20          MS. WEAVER:  So during the call on Saturday, I was told

21   that there were attorneys on the Walker team and the Ladinsky

22   team talking about like next steps, moving forward to

23   consolidate the cases together.  But then there were attorneys

24   on the Walker case who -- the way it was relayed to me, that

25   there was maybe a change of heart or maybe it was

1   miscommunication, but that they weren't -- it wasn't clear at

2   that point that they would litigate with us.  And then I found

3   out -- I don't remember if it was later that Saturday or Sunday,

4   but that's when I found out that the Walker team was not going

5   to file a new case or litigate with us.

6           JUDGE PROCTOR:  But that the Ladinsky team was going

7   forward with the new case?  You learned that at some point?

8           MS. WEAVER:  New case.  Yes.

9           JUDGE PROCTOR:  What were you told about the new case?

10          MS. WEAVER:  That we had other plaintiffs living

11  elsewhere in Alabama, some in the Middle District, and that we

12  would file a new case with new plaintiffs.

13          JUDGE PROCTOR:  Were you told where it was going to be

14  filed?

15          MS. WEAVER:  Eventually I was told.  I don't remember

16  if it was -- like the decision was certain at that point or not.

17  But eventually, I knew it was going to be filed in the Middle

18  District.

19          JUDGE PROCTOR:  All right.  And what were you told when

20  you were told about that?

21          MS. WEAVER:  I'm sorry.  Could you ask that question

22  again?

23          JUDGE PROCTOR:  Yes.  You said eventually I was told.

24  What were you told?

25          MS. WEAVER:  That the case would be filed in the Middle

1   District.

2        JUDGE PROCTOR:  Were you told why?

3        MS. WEAVER:  The main reason I remember hearing was

4   that we had some plaintiffs, like, in the Middle District, so it

5   made sense to file there and that it would make sense to file

6   there to avoid an appearance of judge shopping.

7        JUDGE PROCTOR:  Okay.  Now, were you -- did you ever

8   enroll as counsel in the Eknes-Tucker case?

9        MS. WEAVER:  Yes.

10       JUDGE PROCTOR:  So you're familiar with that

11  litigation.

12       MS. WEAVER:  Yes.

13       JUDGE PROCTOR:  There are seven plaintiffs in

14  Eknes-Tucker?

15       MS. WEAVER:  I know we had some plaintiffs that had

16  been voluntarily dismissed, but --

17       JUDGE PROCTOR:  Well, when it was originally filed, it

18  was filed on behalf of seven plaintiffs.

19       MS. WEAVER:  I believe so.

20       JUDGE PROCTOR:  Eknes-Tucker, who is a pastor in

21  Jefferson County.

22       MR. SOTO:  Yes.

23       JUDGE PROCTOR:  And you live in Alabama?

24       MS. WEAVER:  I live in New York.

25       JUDGE PROCTOR:  Oh, you live in New York.  Okay.  But

1   are you familiar generally with the geography of Alabama?

2          MS. WEAVER:  Yes.

3          JUDGE PROCTOR:  So you know there's a Middle District

4   and a Northern District?

5          MS. WEAVER:  Yes.

6          JUDGE PROCTOR:  The Middle District is basically just

7   north of Montgomery down the eastern side of Alabama.  The

8   Northern District is basically north of Montgomery to -- upper

9   third of the state, maybe.

10         MS. WEAVER:  Yes, sir.

11         JUDGE PROCTOR:  And the Southern District really didn't

12  come into play here; correct?

13         MS. WEAVER:  That's right.

14         JUDGE PROCTOR:  So let's just walk through what you

15  just told me about, well, most of the plaintiffs we're filing on

16  behalf of are Middle District, so we're going to file in the

17  Middle District.  Actually, would it surprise you to learn that

18  four of the seven plaintiffs originally named in the

19  Eknes-Tucker case were from the Northern District of Alabama?

20         MS. WEAVER:  Well, I knew that there were plaintiffs

21  from different -- from the two different districts, but I think

22  at the time, that was the reason that I learned was the reason

23  for filing in the Middle District.

24         JUDGE PROCTOR:  But you learned that on Saturday,

25  Sunday, Monday, in that time frame?

1          MS. WEAVER:  It was during that time period, yeah.

2          JUDGE PROCTOR:  And the case was filed on Tuesday, the

3    Eknes-Tucker case?

4          MS. WEAVER:  That's right.

5          JUDGE PROCTOR:  So right after you were told that it's

6    going to be kind of a Middle District centric case with Middle

7    District centric clients, when it was actually filed, it was --

8    the majority of the plaintiffs were from the Northern District.

9    You had Eknes-Tucker from Jefferson County, James Zoe on behalf

10   of minor child Zachary Zoe, from Jefferson County, Megan Poe on

11   behalf of minor child Allison Poe from Cullman County, and

12   Dr. Jane Moe -- and I know these are pseudonyms except for

13   Eknes-Tucker -- from Jefferson County.  Jefferson and Cullman

14   County, I'll represent to you, are in the Northern District.

15   Does that not cause you concern when you're told that and you

16   ended up filing this case that had actually more Northern

17   District of Alabama plaintiffs than Middle District?

18         MS. WEAVER:  I had many concerns at the time about just

19   everything in general.  It was just a very hectic period of

20   time.  I was really, again, more concerned about getting my

21   clients situated, getting their information to the team

22   properly.

23         And I think going back to the dismissal, it was -- my

24   understanding was that the main reason was really because there

25   was concern about a procedural error that made sense to me at

 1   the time.  So I was not quite focused on that particular point

 2   you're making in terms of where the various plaintiffs reside.

 3            JUDGE PROCTOR:  What did you understand this procedural

 4   error, as it was characterized to be, had anything to do with

 5   getting this case litigated?

 6            MS. WEAVER:  I'm sorry.  Can you repeat the question

 7   again, Your Honor?

 8            JUDGE PROCTOR:  Okay.  So we've heard from a number of

 9   people that there was this procedural error or irregularity

10   or -- it's been described different ways.  What did that have

11   anything to do with getting the case litigated as soon as

12   possible?

13            MS. WEAVER:  My understanding was that there was

14   confusion about how the case was being assigned through all the

15   transfers, deviating from the first-filed rule.  I knew that

16   there was a concern like that Friday, given the email exchanges,

17   and I was not -- so that's -- I think they were very much, like,

18   focused around, like, the activity in that fairly short period

19   of time at that time.

20            JUDGE PROCTOR:  Did anybody ever explain to you,

21   though, how this would affect the outcome of the case, this

22   procedural irregularity or however you want to --

23            MS. WEAVER:  No.  I don't think anyone mentioned about

24   outcome.  It sounds like the concern was making sure that the

25   case starts -- that the inception of the case being filed and

1  like the early -- at the early stage, that it's setting out like

2  the proper course.

3           JUDGE PROCTOR:  Just using the pseudonym, not an actual

4  identity, who was your client that you were in contact with

5  before the filing of Eknes-Tucker?

6           MS. WEAVER:  James Zoe.

7           JUDGE PROCTOR:  From Jefferson County?

8           MS. WEAVER:  Yes.

9           JUDGE PROCTOR:  In the Northern District.

10          MS. WEAVER:  Yes.

11          JUDGE PROCTOR:  Now, was that a client that you had

12  been in contact with even before the Ladinsky filing?

13          MS. WEAVER:  Yes.

14          JUDGE PROCTOR:  And were there any other clients

15  that -- and you worked with the HRC Foundation or the Human

16  Rights Campaign; is that correct?

17          MS. WEAVER:  Yes.

18          JUDGE PROCTOR:  Was that -- my understanding is you

19  were -- your organization was thinking about filing on behalf of

20  one or more persons and got in contact with the other Ladinsky

21  organizations and counsel about either filing together or

22  perhaps going your own way; is that right?

23          MS. WEAVER:  That's right.

24          JUDGE PROCTOR:  And the decision was made that you

25  would join up with them and file with them.

1           MS. WEAVER:  Yes.

2           JUDGE PROCTOR:  Were there any other HRC Foundation

3  clients beside James Zoe who were named in either Ladinsky or in

4  Eknes-Tucker?

5           MS. WEAVER:  We did not sign -- retain anyone except

6  for James Zoe at that point.

7           JUDGE PROCTOR:  Okay.  I think that's all the questions

8  we have for you.  Anything else you want us to know, though,

9  before we --

10           MS. WEAVER:  No.  Just thank you for your time.  I

11  appreciate having the opportunity to speak to the panel today.

12           JUDGE PROCTOR:  All right.  Thank you.

13           Ms. Warbelow.

14      (Sarah Warbelow, the witness, was sworn.)

15           JUDGE PROCTOR:  Thank you, Ms. Warbelow.  Appreciate

16  you being here.  I'm Judge Proctor.  Were you here for our

17  initial hearing way back when?

18           MS. WARBELOW:  Yes, I was.

19           JUDGE PROCTOR:  All right.  So you have a familiarity

20  with kind of how, procedurally, this is all set up.

21           MS. WARBELOW:  Yes, I do.

22           JUDGE PROCTOR:  But that was news to you that day in

23  terms of how Walker worked its way through the first-filed rule

24  transfer into Judge Burke and then how Ladinsky worked its way

25  to Judge Axon and eventually to Judge Burke?

 1            MS. WARBELOW:  I'm sorry, sir.  I don't -- I'm not sure

 2   I understand your question.

 3            JUDGE PROCTOR:  The question is, I laid out

 4   procedurally how each of those cases worked their way through

 5   the federal judicial system.

 6            MS. WARBELOW:  Yes.  That was the first time I had any

 7   knowledge of that.

 8            JUDGE PROCTOR:  Yes.  And my strong impression that day

 9   when I explained that was that everybody in the courtroom kind

10   of looked around like, if only we had known that on April 15.

11            MS. WARBELOW:  I think that was a lot of shock.  That

12   was certainly my sense.

13            JUDGE PROCTOR:  All right.  What -- how would you

14   characterize your role in the Ladinsky case and the Eknes-Tucker

15   case?

16            MS. WARBELOW:  So we came into the Ladinsky case quite

17   late, and as a result, you know, we were very deferential to our

18   cocounsel.  You know, we did not engage in the same level of

19   decision-making, note keeping, all of those types of things that

20   we would do when we were driving independently a case.

21            JUDGE PROCTOR:  So I just learned from your colleague

22   that y'all had a client who was not -- and we've just used

23   pseudonyms, we don't know the identity --

24            MS. WARBELOW:  That's right.

25            JUDGE PROCTOR:  -- but who was not named in the

1  Ladinsky case but ended up being a plaintiff in the Eknes-Tucker

2  case.

3          MS. WARBELOW:  That is correct.

4          JUDGE PROCTOR:  And I think the pseudonym was Zoe.

5          MS. WARBELOW:  That is correct.

6          JUDGE PROCTOR:  And my understanding is the occasion of

7  you associating with the other counsel in this case, both firm

8  and organizational counsel, was that you had a client who was

9  interested in the outcome of this, you were contemplating filing

10 a separate suit but explored whether it would make sense for you

11 to just work on the Ladinsky case instead.

12         MS. WARBELOW:  That's correct.

13         JUDGE PROCTOR:  My strong impression from just talking

14 to your colleague was that she's pretty new and was not a

15 decision-maker or even giving input about these matters.

16         MS. WARBELOW:  That's correct.  She was hired as our

17 litigation director in January of this year, so very new to the

18 organization, new to even sort of the relationships with other

19 attorneys within the nonprofits.

20         JUDGE PROCTOR:  And pretty new in March when y'all

21 first got in contact with these other counsel --

22         MS. WARBELOW:  That is correct.  Yes, I am the one who

23 did the outreach.

24         JUDGE PROCTOR:  -- with concern about this legislation.

25         MS. WARBELOW:  Uh-huh.

 1          JUDGE PROCTOR:  But you were briefed on the development

 2  of things by your colleagues in the Ladinsky case as it worked

 3  its way through the filing to dismissal.

 4          MS. WARBELOW:  Yes.  Yes.  I mean, certainly both

 5  Cynthia and I participated in calls, were on email chains, and,

 6  you know, had conversations particularly with the other

 7  nonprofit attorneys.

 8          JUDGE PROCTOR:  All right.  On April 13, there was a --

 9  after learning of the existence of the Walker case, you became

10  aware that Judge Marks had entered an order to show cause as to

11  why Walker should not be transferred under the first-filed rule

12  to the Northern District; correct?

13          MS. WARBELOW:  Correct.

14          JUDGE PROCTOR:  And I think what you've indicated to

15  us -- and you're welcome to have your declaration out and in

16  front of you.

17          MS. WARBELOW:  Thank you.  I appreciate that.

18          JUDGE PROCTOR:  I assure you nothing -- I'm not trying

19  to trip you up on your declaration.  If that would be of aid to

20  you, please ask for a moment to review it or consult it at any

21  point.  On April 13, you say you signed off on an email, drafted

22  and edited, explaining why it may be best to have two bites at

23  the apple.  Why not -- if we can arrange it, let's let our

24  Walker friends take a shot at invalidating the statute in the

25  Middle District, and we'll take our shot here in the Northern

1    District.

2            MS. WARBELOW:  That is correct.

3            JUDGE PROCTOR:  But you're aware that there was also a

4    conversation or conference between the two teams after the show

5    cause order.

6            MS. WARBELOW:  Yes.

7            JUDGE PROCTOR:  Were you on that conference?

8            MS. WARBELOW:  I'm very embarrassed to say that I

9    cannot remember.  I had my minor child with me that week who was

10   not in school as a result of spring break.  I was extremely

11   distracted that week.  I know based on my own records that I

12   indicated that I was available for that call.  I don't remember

13   being on that call, but I absolutely cannot say that I was not

14   on the call.

15           JUDGE PROCTOR:  Okay.  But you were briefed about the

16   call --

17           MS. WARBELOW:  Yes, that's right.

18           JUDGE PROCTOR:  -- or the issues discussed in the call.

19   And your view and the view of others was at the time, Judge

20   Cornelius, who is a magistrate judge in the Northern District,

21   was assigned to Ladinsky, and that people were comfortable with

22   her and thought they ought to just stay the course and keep the

23   case in the Northern District.

24           MS. WARBELOW:  That's correct.

25           JUDGE PROCTOR:  Because you're aware there was an

 1  invitation from the Middle District Walker case to consent to

 2  having your case transferred to the Middle District rather than

 3  vice versa.

 4        MS. WARBELOW:  And we declined to do so.

 5        JUDGE PROCTOR:  What do you recall being discussed

 6  about that invitation to come south rather than the Walker case

 7  going north?

 8        MS. WARBELOW:  Yeah.  You know, my memory is that we

 9  were really reluctant to give up our first filed status, that

10  there were clear discrepancies in how the Walker team intended

11  to litigate this matter and how the Ladinsky -- our team

12  intended to litigate the matter and that we also just didn't

13  think that their plan of having their case --

14        JUDGE PROCTOR:  Relating to Corbett?

15        MS. WARBELOW:  -- moved as a portion of Corbett was

16  realistic.

17        JUDGE PROCTOR:  I think one other member of your team

18  has said fanciful.

19        MS. WARBELOW:  I think that's probably an accurate

20  statement.

21        JUDGE PROCTOR:  I think the main thing that was

22  communicated by the Ladinsky team, as I understand it, on April

23  13 was twofold:  one, we're not interested in coming to the

24  Middle District, and two, don't mention us.  We're not -- we

25  don't want to do anything that would affect our filing here and

1  we're not -- we're not taking the position in any way, shape, or

2  form about whether you ought to be transferred here.

3          MS. WARBELOW:  That's correct.  And that we don't want

4  you to give the impression or appearance that we are okay with

5  it, because we do want to remain the first filed.

6          JUDGE PROCTOR:  Okay.  All right.  Well, eventually,

7  you're aware the Walker counsel decided not to oppose transfer,

8  withdrew its motion to have the case assigned to Judge Thompson,

9  and was transferred to the Northern District.

10         MS. WARBELOW:  That is correct, but we did not have any

11  knowledge -- I should say I didn't have any knowledge of that,

12  and I don't believe anybody else did, until that order was

13  filed.

14         JUDGE PROCTOR:  Right.  That's what I meant.  You

15  eventually learned that they had withdrawn the motion and been

16  transferred.

17         MS. WARBELOW:  Yes.

18         JUDGE PROCTOR:  And I think you said in your

19  declaration the decision was made to confer the next week about

20  how the two cases might orient toward each other?

21         MS. WARBELOW:  Right.  Once their case was transferred

22  to the Northern District, the expectation was that the two would

23  be consolidated and that we would need to figure out how to work

24  together.  There was initially a call set up for two p.m.  It

25  was a holiday weekend, and so the decision was made to

1    reschedule.

2           JUDGE PROCTOR:  There was going to be a call at

3    two p.m. on that Friday, April 15, but it was going to be

4    rescheduled to next week.

5           MS. WARBELOW:  That's right.

6           JUDGE PROCTOR:  And then you learned that the Ladinsky

7    case had been transferred to Judge Burke --

8           MS. WARBELOW:  That's correct.

9           JUDGE PROCTOR:  -- and that Judge Burke had set the

10   Walker case for a status conference at ten a.m. on Monday.

11          MS. WARBELOW:  That's correct.

12          JUDGE PROCTOR:  Were you on any -- the Ladinsky team

13   call that discussed those matters that occurred about five

14   o'clock or so that Friday afternoon?

15          MS. WARBELOW:  Yes, I was.

16          JUDGE PROCTOR:  Okay.  What do you recall being

17   discussed during that phone call?

18          MS. WARBELOW:  I really just remember an overall sense

19   of shock, people not understanding what had happened, and

20   feeling a need to make a decision very rapidly about whether or

21   not we would file a Rule 41 motion because there was a narrow

22   window in which to do it or risk that there would be a response

23   from the defendants.

24          JUDGE PROCTOR:  Well, it's not a Rule 41 motion.  It's

25   a 41 dismissal; right?

1          MS. WARBELOW:  Apologies.  Yes.

2          JUDGE PROCTOR:  Yes.  Because it's self-executing is

3    the point.

4          MS. WARBELOW:  Yes.

5          JUDGE PROCTOR:  So I struggle to understand.  This has

6    been explained to me a number of times.  I'm not acting like

7    I've never heard the explanation.  I'm still trying to

8    understand this point.  Time is of the essence.  The statute has

9    been signed by the Governor one week ago today.  It's due to go

10   into effect at some point in the near future.  And we're

11   thinking about dismissing our action and starting over.  Explain

12   that to me.

13         MS. WARBELOW:  Yeah.  I mean, I am not sure that I can

14   give you a fantastic explanation for it.  I don't believe that I

15   was privy to all of the conversations that were happening around

16   that.  As I said, I participated in the five o'clock p.m.

17   conversation.  I was not working that day.  I was trying to care

18   for my minor child.  And I think I probably missed out on a lot

19   of the conversations that were happening.

20         The impression that I was left with was that what was

21   happening was a distraction to the case and it was unclear how

22   the Walker team was ending up, then, what would effectively be

23   the first filed case and we were being transferred to them, and

24   that the decision was made to sort of move forward and start

25   afresh.

1         JUDGE PROCTOR:  Okay.  What role did Judge Burke having

2    the two cases play into that, to your understanding?

3         MS. WARBELOW:  But the bigger concern was really that

4    what was expected to happen, that the Walker case would be

5    transferred to Judge Axon, was the driving factor, much more so

6    than the fact that it was Judge Burke.  I mean, I really believe

7    that if we had been in front of Judge Burke, that had been the

8    judge we drew from the very beginning or, you know, when Judge

9    Manasco had to recuse herself, that if the tables had been

10   turned and that it had been Judge Axon that all of a sudden it

11   had been transferred to unexpectedly, we would have had the same

12   concerns in that circumstance, and that if everything had gone

13   as expected with the Walker case being transferred, if Judge

14   Burke had been our drawn judge, that we would remain the first

15   filed case, we would not have moved forward with dismissing the

16   case.

17        JUDGE PROCTOR:  The order from Judge Axon, though, did

18   not consolidate the cases.  It just reassigned her case to Judge

19   Burke.

20        MS. WARBELOW:  The expectation was that they would

21   ultimately be consolidated.

22        JUDGE PROCTOR:  All right.  Well, if they were

23   consolidated -- let me ask you this.  What would you -- how

24   would you characterize your federal litigation experience?

25        MS. WARBELOW:  I have actually fairly limited federal

 1    litigation experience.  I am not new to federal litigation, but

 2    the bulk of my practice has been in amicus work over the years.

 3          JUDGE PROCTOR:  Well, you understand that Rule 16,

 4    among other things, dictates that the Court manages the

 5    litigation; right?

 6          MS. WARBELOW:  Uh-huh.

 7          JUDGE PROCTOR:  So I've heard a lot of discussion about

 8    the parties being concerned that we're going to lose first filed

 9    status, we're not going to be in control of the Ladinsky case

10    any longer.  The point is that all those things could be

11    addressed in the initial conference in front of Judge Burke;

12    correct?

13          MS. WARBELOW:  Certainly those things could be

14    addressed.  You know, again, we were trying to be very

15    deferential to the other attorneys who expressed some very

16    serious concerns.  And, you know, as I said in my declaration, I

17    did not perceive anything to be happening to be unethical or

18    inappropriate.  And given that there was a right under Rule 41

19    to dismiss, it did not strike me as a major concern.

20          JUDGE PROCTOR:  Do you believe Rule 41 allows you to

21    dismiss and refile to avoid a judge?

22          MS. WARBELOW:  I think it allows you to dismiss for any

23    reason.  I think what your subsequent actions are is a different

24    question.

25          JUDGE PROCTOR:  All right.  During the -- I know you've

1   already said you had a minor child you were having to take care

2   of and were maybe in and out of the conversation.

3          MS. WARBELOW:  Yes.

4          JUDGE PROCTOR:  That's a fair buffer to my next

5   question, but my next question is, what do you recall during

6   that five o'clock conversation, if anything, about the prospects

7   of the case going forward, as far as success, in front of Judge

8   Burke?

9          MS. WARBELOW:  I don't have memory of that.  That's not

10  to say that it wasn't discussed, but I do not have memory of it.

11         JUDGE PROCTOR:  Okay.  Do you remember anything

12  specifically being mentioned about Judge Burke on that five

13  o'clock call?

14         MS. WARBELOW:  I remember there being raised concerns

15  about Judge Burke's conservative leanings.  I cannot say if it

16  was on that five o'clock call or an email or something else, but

17  I do remember there being some concerns raised about that.

18         JUDGE PROCTOR:  Now, you said this earlier in your

19  testimony before us a moment ago, and it's in your declaration

20  at paragraph 18, that if the Ladinsky case had been just

21  assigned to Judge Burke randomly at the beginning, you don't

22  think we would be here right now.

23         MS. WARBELOW:  That is correct.

24         JUDGE PROCTOR:  Let me ask you this.  What if the

25  Ladinsky case had been assigned to Judge Burke, the Walker case

 1    transferred and went to Cornelius or Judge Axon, and Judge Burke

 2    entered an order transferring the case to Judge Cornelius or

 3    Judge Axon.  Would we be here now?

 4            MS. WARBELOW:  Possibly.  I mean, I think we would have

 5    had very serious discussions about why, as a first filed case,

 6    we were all of a sudden being transferred to another judge.

 7            JUDGE PROCTOR:  What discussions do you recall about

 8    filing Eknes-Tucker, both when, where, who, and what?

 9            MS. WARBELOW:  Sure.  So my memory of the discussions

10    happening included feeling that it was important that there were

11    all new plaintiffs to avoid any appearance of judge shopping and

12    also that it would be wise to not file in the Northern District

13    for the same reason, not that anybody thought we were engaged in

14    judge shopping, but we just didn't want to give any impression

15    that that was happening.

16            JUDGE PROCTOR:  Who did you perceive to be the most

17    driving force behind the decision about dismissal and refiling,

18    if anyone?  Who do you think had the biggest voice, the largest

19    role in making those decisions?

20            MS. WARBELOW:  Yeah.  I would say from the nonprofits

21    the two people who had the greatest decision-making power were

22    Jennifer Levi and Shannon Minter and, from the law firms, the

23    Lightfoot attorneys.

24            JUDGE PROCTOR:  Okay.  What specifically do you recall

25    the Lightfoot attorneys saying about these issues?

```
 1          MS. WARBELOW:  I don't recall anything specific.
 2          JUDGE PROCTOR:  How about Minter?
 3          MS. WARBELOW:  Just that there were concerns about this
 4   happening in the way that it did and as swiftly as it did.
 5          JUDGE PROCTOR:  How about Levi?
 6          MS. WARBELOW:  Similar concerns as --
 7          JUDGE PROCTOR:  All right.  Why do you understand --
 8   other than the decision to try to avoid judge shopping -- that
 9   was why the case, as I understand it -- you're telling me that's
10   why the case was not filed in the Northern District.
11          MS. WARBELOW:  To avoid the appearance of judge
12   shopping.  Correct.
13          JUDGE PROCTOR:  Different question, maybe it's related,
14   substantially related.  Why was the decision made to file it in
15   the Middle District?
16          MS. WARBELOW:  Because that's where we had plaintiffs.
17          JUDGE PROCTOR:  Okay.  What do you mean by that?
18          MS. WARBELOW:  That we had folks who were being
19   negatively impacted by the law who lived within the Middle
20   District, and that would be an appropriate venue.
21          JUDGE PROCTOR:  But the client that you had and that
22   was actually a party in Eknes-Tucker was actually in the
23   Northern District.
24          MS. WARBELOW:  That's correct.  Not to say that all of
25   the plaintiffs were in the Middle District, but that there were,
```

 1  in fact, numerous plaintiffs who were appropriately within the

 2  Middle District.

 3          JUDGE PROCTOR:  Numerous implying most?

 4          MS. WARBELOW:  I don't know the exact numbers.

 5          JUDGE PROCTOR:  Well, I do.  That's why I'm asking

 6  these questions.  There were seven plaintiffs originally, and

 7  there may have been some dismissals in Eknes-Tucker.

 8          MS. WARBELOW:  Yes, that's correct.

 9          JUDGE PROCTOR:  But the snapshot in time is what

10  occurred when the case was filed.

11          MS. WARBELOW:  Uh-huh.

12          JUDGE PROCTOR:  The case was filed.  It was filed on

13  behalf of seven plaintiffs.  Does that sound about right?

14          MS. WARBELOW:  That's correct.

15          JUDGE PROCTOR:  Eknes-Tucker, who was a pastor in

16  Jefferson County.

17          MS. WARBELOW:  Uh-huh.

18          JUDGE PROCTOR:  Are you from Alabama?

19          MS. WARBELOW:  I am not.

20          JUDGE PROCTOR:  Where are you from again?

21          MS. WARBELOW:  I'm originally from Michigan.  I

22  currently live outside of the District of Columbia.

23          JUDGE PROCTOR:  Generally familiar with Middle District

24  versus Northern District?

25          MS. WARBELOW:  Generally.

```
1              JUDGE PROCTOR:  So you're going to have to just trust
2    me on some of these geographic things, it sounds like.
3              MS. WARBELOW:  Absolutely.
4              JUDGE PROCTOR:  Okay.  Jefferson County was
5    Eknes-Tucker.  That's in the Northern District.  Boe, B-O-E, was
6    from Montgomery.  That's in the Middle District.
7              MS. WARBELOW:  Uh-huh.
8              JUDGE PROCTOR:  Zoe, your client, Jefferson County,
9    Northern District.
10             MS. WARBELOW:  That's correct.
11             JUDGE PROCTOR:  Poe, Megan Poe, Cullman County.  That's
12   in the Northern District.  Noe, Cathy Noe, Lee County.  That's
13   in the Middle District.  That's Auburn.
14             MS. WARBELOW:  Uh-huh.
15             JUDGE PROCTOR:  Dr. Moe, Jefferson County, Northern
16   District.  And Dr. Koe, K-O-E, 12th Judicial Circuit, one of the
17   counties down there, maybe Coffee or somewhere like that, that
18   is in the Middle District.  So four of the seven plaintiffs that
19   Eknes-Tucker filed on behalf of were actually Northern District
20   plaintiffs.  Does that surprise you?
21             MS. WARBELOW:  I knew it was close.  I'm not sure I --
22   like I said, I couldn't have told you exactly what the split
23   was.  I mean, if you had told me it was one in the Middle
24   District, I would have been shocked.  I mean, my understanding
25   was that there were numerous plaintiffs who were in the Middle
```

1   District.

2         JUDGE PROCTOR:  Well, there weren't numerous.  If three

3   is the number, more than one.

4         MS. WARBELOW:  Three out of four doesn't strike me

5   as a --

6         JUDGE PROCTOR:  I'm sorry?

7         MS. WARBELOW:  Three out of seven, you know, three live

8   in one and four in the other.  That doesn't strike me as a

9   really significant divide.

10        JUDGE PROCTOR:  But if one is taking care not to look

11   like one's judge shopping, wouldn't -- if you're filing in the

12   Middle District and you're hanging your hat on numerous

13   plaintiffs are in the Middle District, wouldn't you at least

14   want most of the plaintiffs to be in the Middle District?

15        MS. WARBELOW:  That certainly didn't occur to me.  I

16   suppose if it had, we could have declined to represent one of

17   the plaintiffs.  But we felt strongly we wanted to make sure

18   that the Court had an opportunity to hear from multiple people

19   who were negatively impacted by the pending law.

20        JUDGE PROCTOR:  Were you involved in deciding who would

21   be included other than your client?

22        MS. WARBELOW:  Yes.  I had conversations with -- sorry.

23   Let me just double-check what her pseudonym is.  I believe it's

24   Dr. Koe.  I believe it was Dr. Koe is who I had conversations

25   with that weekend.

1          JUDGE PROCTOR:  All right.  What -- did you have any

2   understanding about why the Cullman plaintiff was chosen?

3          MS. WARBELOW:  No.

4          JUDGE PROCTOR:  All right.  I think that was all the

5   questions we had for you.

6          MR. SEGALL:  One question, Your Honor.

7          JUDGE PROCTOR:  Go ahead, Mr. Segall.

8          MR. SEGALL:  Referring to paragraph 19 of your

9   declaration, I just want you to tell the Court whether that's

10  accurate.

11         MS. WARBELOW:  Yes, that is.

12         MR. SEGALL:  Thank you.

13         JUDGE PROCTOR:  And for the record, paragraph 19 of

14  your declaration reads, in the filing of Eknes-Tucker, a joint

15  decision was made by the Eknes-Tucker team to file in the Middle

16  District of Alabama to avoid both the unusual circumstances that

17  caused Ladinsky to be dismissed and any appearance of judge

18  shopping.

19         MS. WARBELOW:  That is correct.

20         JUDGE PROCTOR:  Are you prepared to say today that

21  Judge Burke had nothing to do with filing in the Middle

22  District?

23         MS. WARBELOW:  Well, I wouldn't say nothing.  I mean, I

24  think that's what I'm referring to here in terms of the unusual

25  circumstances.  But it isn't, in my view, Judge Burke himself so

1   much as what happened that resulted in the cases being

2   transferred to him.

3           JUDGE PROCTOR:  Did anyone ever characterize to you or

4   in your presence the odds of winning a preliminary injunction

5   motion in front of Judge Burke?

6           MS. WARBELOW:  Not to my memory.  My memory, as I may

7   have stated before, is that people raised concerns about his

8   conservative leanings, but I don't remember anybody saying that

9   means X would be a likely outcome.  Again, I was in and out of

10  these conversations.  It is absolutely possible that somebody

11  did say that.  I just simply don't recall hearing that.

12          JUDGE PROCTOR:  All right.  Anything else?  Follow-up

13  to that?

14          All right.  Thank you.

15          All right.  Counsel, we got done by six.

16          MR. SEGALL:  Are we going to do anything after the

17  witness tomorrow?

18          JUDGE PROCTOR:  We had not scheduled anything after the

19  witness tomorrow.  I think we're going to -- we're going to

20  probably -- the three of us will probably pull together and kind

21  of see where we are.

22          MR. SEGALL:  But as far as we're concerned, after the

23  testimony --

24          JUDGE PROCTOR:  Yes.  Unless there's anything you'd

25  want to address with us briefly after the testimony.  That's up

1    to you.

2            MR. SEGALL:  Okay.

3            MR. FRANKLIN:  I'm sorry.  Are we starting at eight in

4    the morning?

5            MR. SEGALL:  He's commuting.  I just need to --

6            JUDGE PROCTOR:  Back when we were young?

7            MR. FRANKLIN:  Yes.  Well, I'll be here.

8            MR. DRIVER:  I'm young, and I still don't want to be

9    here at eight.

10       (Evening recess at 5:56 P.M.)

11                    * * * * * * * * * * * *

12                    COURT REPORTER'S CERTIFICATE

13           I certify that the foregoing is a correct transcript

14   from the record of the proceedings in the above-entitled matter.

15           This 10th day of October, 2023.

16

17                                /s/ Patricia G. Starkie
                                  Registered Diplomate Reporter
18                                Certified Realtime Reporter
                                  Official Court Reporter
19

20

21

22

23

24

25