**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

---

*In re* **Amie Adelia Vague** *et al.*                **Case No. 2:22-mc-3977-WKW**

**\*\* SUBMITTED IN CAMERA \*\***

**<u>DECLARATION OF JEFFREY P. DOSS</u>**

1.      My name is Jeffrey P. Doss.  I am over the age of nineteen and am otherwise competent to make this declaration, which is based on my personal knowledge.  I am providing in this declaration my personal mental operations, opinions, thoughts, and conclusions – which otherwise qualify as work product – about the topics identified in the Order, entered on July 8, 2022, and as directed by the Panel in the Order, entered on July 25, 2022.

2.      I am a partner at Lightfoot, Franklin & White LLC ("Lightfoot") in Birmingham, Alabama and have been a member in good standing of the Alabama State Bar continuously since September 2009.  I am admitted to practice before the U.S. Supreme Court; the U.S. Court of Appeals for the Sixth Circuit; the U.S. Court of Appeals for the Eleventh Circuit; the U.S. District Courts for the Southern, Middle, and Northern Districts of Alabama; and the U.S. Bankruptcy Courts for the Southern, Middle, and Northern Districts of Alabama.

3.      Before joining Lightfoot in 2010, I clerked for the Hon. James H. Hancock and the Hon. R. David Proctor, both of the U.S. District Court for the Northern District of Alabama.

1

4.     I have never been disciplined by any bar association or court, nor have I have ever been investigated for – let alone accused of – any potential violation of any rule of professional conduct or rule of court.

5.     I am counsel of record for the plaintiffs in the case styled *Eknes-Tucker, et al. v. Marshall, et al.*, Case No. 2:22-CV-184-LCB-CWB, currently pending in the U.S. District Court for the Middle District of Alabama ("the *Eknes-Tucker* Litigation"). I was counsel of record for the plaintiffs in the case styled *Ladinsky, et al. v. Ivey, et al.*, Case No. 2:22-CV-47-LCB, previously pending in the U.S. District Court for the Northern District of Alabama ("the *Ladinsky* Litigation").

6.     At no point in connection with the *Eknes-Tucker* Litigation or the *Ladinsky* Litigation have I attempted to manipulate the random assignment of judges or to "judge shop." Nor am I aware of anyone associated with the *Eknes-Tucker* Litigation or the *Ladinsky* Litigation who has attempted to manipulate the random assignment of judges or to "judge shop."

7.     As background, for approximately two years, the Alabama Legislature has considered legislation aimed at restricting a transgender minor's access to legitimate medical treatment. In 2020, Lightfoot became associated with a group of attorneys (most, if not all, of whom are my co-counsel in the *Eknes-Tucker* Litigation and none of whom are the attorneys for the *Walker* Litigation) who were monitoring the Alabama Legislature's consideration of such legislation and planning a legal challenge if such legislation was enacted.

8.     On Friday, April 8, 2022, Governor Ivey signed into law the Alabama Vulnerable Child Compassion and Protection Act ("the Act"). That evening, I electronically submitted a copy of our complaint in the *Ladinsky* Litigation to the Clerk's Office for the U.S. District Court for the Northern District of Alabama ("the Northern District").

9.      Before filing any lawsuit, the attorneys for the *Ladinsky* Litigation were generally aware that other organizations were planning to challenge the Act's legality.  We understood that whichever lawsuit was filed first would receive precedence under the "first-filed action" rules recognized in the Eleventh Circuit.  For the attorneys associated with the *Ladinsky* Litigation, it was very important to us – and in the interest of our clients – to ensure that we filed the first challenge to the Act.  We also had a number of clients – including two UAB physicians – who worked within the Northern District.  Thus, for a very long time and as borne out with the *Ladinsky* Litigation, our plan had been to file a challenge to the Act in the Northern District.  To be clear, although other organizations were also planning to challenge the Act, we viewed them as "friendly rivals" – not co-counsel.

10.      On the morning of Monday, April 11, 2022, the Northern District's Clerk's Office electronically docketed the complaint for the *Ladinsky* Litigation.  Although the *Ladinsky* Litigation was electronically docketed on Monday morning, it was deemed as having been filed on Friday, April 8, 2022.  At some point during that day, we learned that the case styled *Walker, et al. v. Marshall, et al.*, Case No. 5:22-CV-480-LCB, had been filed by another set of attorneys in the Middle District ("the *Walker* Litigation").  Because the *Ladinsky* Litigation had been docketed first, we felt confident that, under the "first-filed action" rules, our case would take precedence over the *Walker* Litigation.

11.      The Clerk's Office randomly assigned Judge Manasco to the *Ladinsky* Litigation.  The attorneys for the *Ladinsky* Litigation took no action in response to the random assignment of the case to Judge Manasco.

12.      Later that day – still Monday, April 11, 2022 – Judge Manasco entered an order of recusal, and as a consequence, the Clerk's Office randomly reassigned the *Ladinsky* Litigation to

Judge Cornelius.  That evening, I electronically filed a motion for certain plaintiffs in the *Ladinsky* Litigation to proceed pseudonymously.

13.     The attorneys for the *Ladinsky* Litigation took no action in response to the random assignment of the case to Judge Cornelius.

14.     In the background, the attorneys for the *Ladinsky* Litigation were working tirelessly to finalize an amended complaint and a motion for a preliminary injunction.  When the complaint for the *Ladinsky* Litigation was filed initially, we did not include certain types of claims, such as ones alleging that the Act violates the First Amendment (through referrals by pediatricians or counseling by non-medical individuals) or that the Act has the effect of criminalizing a parent's travel from Alabama to another state in order to obtain the proscribed treatments for the parent's child.  Because neither the amended complaint nor the motion for a preliminary injunction was complete, we decided to defer serving the defendants in the *Ladinsky* Litigation.  Although the research was murky, based on my review of it, it appeared that service of the original complaint would not be sufficient for the amended complaint or the motion for a preliminary injunction.  Thus, to avoid having to serve the defendants in the *Ladinsky* Litigation two times – once with the initial complaint and a second time with the amended complaint and the motion for a preliminary injunction and, correspondingly, incurring unnecessary expense – we decided not to serve the defendants until those pleadings were complete.

15.     The work to finalize those pleadings was ongoing, but our best estimates suggested that we would be ready to file those pleadings by no later than Tuesday, April 19, 2022.  Accordingly, contrary to the assertions by the Solicitor General for the State of Alabama at the May 20, 2022 hearing, we were not "doing nothing" during this week – the team was working

4

around-the-clock to finalize the motion for a preliminary injunction and to consider whether and to what extent we should amend the complaint.

16.     By Wednesday, April 13, 2022, two attorneys for the State of Alabama appeared for Governor Ivey and Attorney General Marshall in the *Ladinsky* Litigation. They did not waive service of process. Another Lightfoot attorney, Amie A. Vague, and I researched whether and to what extent their notices of appearance could qualify as general appearances, thus waiving service of process. We concluded that the notices of appearance did not waive service of process. That placed our calculation back as it was: defer service until the new pleadings were complete.

17.     On Thursday, April 14, 2022, the Clerk's Office randomly reassigned the *Ladinsky* Litigation to Judge Axon. I assumed that the reassignment occurred because the defendants in the *Ladinsky* Litigation declined consent to dispositive jurisdiction by Judge Cornelius – I knew that we had not declined consent. In any event, the attorneys for the *Ladinsky* Litigation took no action in response to the random assignment of the case to Judge Axon.

18.     From my perspective, having the case assigned to Judge Axon made sense. Judge Axon sits in Birmingham; the *Ladinsky* Litigation was a Southern Division case; many of our plaintiffs resided within the Southern Division; and the proximity of the Northern District's Birmingham courthouse to Lightfoot ensured that this pro bono matter remained economical. In addition, I have appeared before Judge Axon many times and have always found her to be well-prepared and conscientious.

19.     I had been monitoring the docket of the *Walker* Litigation throughout the week and learned from that review that the attorneys for the *Walker* Litigation, in response to Judge Marks's show cause order, had assented to transfer of their case to the Northern District. At some point on Friday, April 15, 2022, I learned from a member of my team – and I do not recall whom – that the

5

*Walker* Litigation had been transferred from the Middle District to the Northern District pursuant to the first-filed action rules. Consistent with the well-settled procedure of the Northern District, I expected the *Walker* Litigation to be consolidated into the *Ladinsky* Litigation, such that (1) any decision regarding consolidation would be decided by Judge Axon, as the judge to whom the first-filed case was assigned; (2) if a motion to consolidate were granted, then the *Walker* Litigation would be reassigned to Judge Axon; and (3) if the *Ladinsky* Litigation and the *Walker* Litigation were consolidated, then the *Ladinsky* Litigation would be the "lead case," as the first-filed case between the two.

20.     The attorneys for the State of Alabama apparently had the same understanding that I did. The attorneys for the State of Alabama, through at least one telephone call and an email, communicated with my law partner, Melody H. Eagan, that they intended to file a motion to consolidate with Judge Axon, not with Judge Burke, who had been assigned the *Walker* Litigation.

21.     At around 4:40 p.m. on Friday, April 13, 2022 – before the attorneys for the State of Alabama filed their motion to consolidate – Judge Axon entered a single-sentence order: "In the interest of efficiency and judicial economy, this case is hereby transferred to Judge Liles C. Burke" ("the Transfer Order").[1] After entry of the Transfer Order, the attorneys for the State of Alabama communicated to us that they no longer planned to file a motion to consolidate.

---

[1]     At the May 20, 2022 hearing, the Panel advised the subjects of this inquiry that Judge Axon reassigned the case because she was trying a two-week criminal case. If Judge Axon had provided that explanation to the parties on Friday, April 15, 2022 – whether in the order or via conference call – we very likely would have proceeded with the *Ladinsky* Litigation. We have never suggested that Judge Burke or Judge Axon did anything improper, but there was significant uncertainty, coupled with a fast-moving case. Decisions had to be made quickly, and I made the best decisions I could, with the information that I had at the time.

6

22.     At the time, the Transfer Order was surprising and concerning.  To be clear, the judge to whom the case was transferred was not my concern – my concern was procedural.  As with Judge Axon, I have appeared many times before Judge Burke.  And, like Judge Axon, I have found Judge Burke to be well-prepared and conscientious.  But it has long been the practice in the Northern District that, when there are two related cases, a motion to consolidate must be filed in the first-filed case and then the cases, if they are consolidated, are consolidated before the first-filed case's judge.  That rule preserves the random of assignment of judges.

23.     Judge Axon did not recuse.  Nor did Judge Axon direct the Clerk's Office to randomly reassign the *Ladinsky* Litigation to another judge.  And the stated reason – "efficiency and judicial economy" – did not make sense to me.  Judge Burke had been assigned the *Walker* Litigation for less than one day.  In that short time, Judge Burke had only set the *Walker* Litigation for a status conference – expressly not to discuss the "merits" of the case, according to his order – thirty minutes to an hour before the Transfer Order was entered.  This was not a situation where one judge had already devoted significant resources to a case.

24.     Again, I am not suggesting that Judge Axon or Judge Burke did anything improper.  From an outsider looking in, though, all I knew was that the standard procedure, which had been recognized by the Court for many years, was not followed.  Given the political sensitivities of the *Ladinsky* Litigation, it gave me concern that there was an appearance of a different procedural rule being applied to the case.  If the *Ladinsky* Litigation proceeded, I felt obligated to inquire about the circumstances surrounding the atypical assignment process.  To do so, though, would present very difficult issues.  For starters, no lawyer ever wants to raise such an awkward issue.  Moreover, the Transfer Order came at the end of the business day on a Friday – before a holiday weekend – and there was no effective way to get additional information about its basis.  There was also no

7

certainty as to whether or how any reconsideration of the Transfer Order or any challenge to it could be made. The more pressing concern was the practical effect of raising the issue: given the Act's 30-day effective date, time was precious, and if any issue was raised with the assignment process, it had the potential to plunge the case into a procedural sideshow that risked derailing the case.

25.     As mentioned, before the Transfer Order was issued, Judge Burke set the *Walker* Litigation for a status conference in Huntsville on Monday, April 18, 2022. Even after the Transfer Order was entered by Judge Axon, Judge Burke did not expand the status conference to include the *Ladinsky* Litigation. In fact, the *Walker* Litigation and the *Ladinsky* Litigation were not then, nor have they ever been, consolidated. From my perspective, it appeared that the *Walker* Litigation was inching ahead of the *Ladinsky* Litigation in terms of precedence – in contravention of an important strategic goal we had since the outset. Moreover, considering that the *Walker* Litigation was assigned to the Northeastern Division, it was unclear whether the two cases would have to proceed in Huntsville rather than in Birmingham.

26.     Several attorneys for the *Ladinsky* Litigation participated in a conference call following the Transfer Order. I participated. I do not recall which attorneys outside Lightfoot were on that call. After weighing the options, considering the totality of the circumstances, and with our clients' authorization, we decided that the cleanest, most straightforward route for getting the case back on track was to dismiss pursuant to Federal Rule of Civil Procedure 41 and to file a new lawsuit. I fully supported that decision. At the time, I was unaware of any restriction on a party's right to voluntarily dismiss a lawsuit, provided that the defendant had not yet answered or filed a motion for summary judgment. I am still unaware of any restriction of the party's right to do so.

27.    I learned that the attorneys for the *Walker* Litigation reached the same decision –
that they, too, would voluntarily dismiss their case.  I cannot speak to why the attorneys for the
*Walker* Litigation made their decision, but I understood that there were initial discussions – before
any dismissal notice was filed – between certain attorneys for the *Ladinsky* Litigation and certain
attorneys for the *Walker* Litigation about whether and how to file a single, consolidated lawsuit
challenging the Act so that the clunkiness of two competing lawsuits could be avoided in the future.

28.    I had minimal communications that afternoon with certain attorneys for the *Walker*
Litigation.  As for my communications with the attorneys for the *Walker* Litigation, my point-of-
contact was Kathleen Hartnett of the Cooley law firm (there may have been other attorneys copied
on communications, but my impression was that Ms. Hartnett was the relevant point person).  The
two teams understood that, if we voluntarily dismissed, we would have to do so in coordination;
otherwise, we ran the risk of one group voluntarily dismissing and then spurring the attorneys for
the State of Alabama to answer a complaint, thereby eliminating the right to voluntary dismissal.
To avoid any further procedural quagmire or delay, I believed we needed to pursue a notice of
dismissal, which is self-executing, rather than a dismissal motion, which is not.  Accordingly, I
had limited communications about the timing of the voluntary dismissal notices to ensure that they
were filed in quick succession.  In that regard, the attorneys for the *Ladinsky* Litigation and the
attorneys for the *Walker* Litigation "coordinated" but for the limited purpose of ensuring that both
sets of plaintiffs would exercise their unconditional dismissal rights.

29.    Following the dismissals for the *Ladinsky* Litigation and the *Walker* Litigation,
certain attorneys for each case further communicated about the possibility of filing a single,
consolidated complaint to challenge the Act.  I was not part of those discussions – as I understand
it, they were handled between representatives for the non-profit organizations – but I was kept

apprised of their developments by Ms. Eagan (via telephone, as she had had telephone conversations directly with our co-counsel) and our co-counsel (via e-mail) who participated directly in those discussions. Although that possibility was considered, we eventually learned on Saturday, April 16, 2022 or Sunday, April 17, 2022 that the attorneys for the *Walker* Litigation decided not to further pursue any challenge to the Act. After learning that the attorneys for the *Walker* Litigation made that decision, I never heard anything about those attorneys planning to file anything further.

30.     The attorneys for the *Ladinsky* Litigation, therefore, considered what steps to take next. At no point after the dismissal of the *Ladinsky* Litigation did we consider abandoning a challenge to the legality of the Act. Although we briefly considered filing a new lawsuit with one or more of the plaintiffs from the *Ladinsky* Litigation, we ultimately decided not to do so. We had other clients – who were going to be added to the amended complaint to be filed in the *Ladinsky* Litigation – as well as contacts in the community through our co-counsel. Accordingly, my co-counsel worked over the weekend and into the first day or so of the following week to finalize a new slate of plaintiffs to challenge the Act. Other co-counsel worked diligently to revise the pleadings to reflect this new slate of plaintiffs.

31.     By around Monday, April 18, 2022, we had assembled a new set of plaintiffs with standing to challenge the Act's legality. In many ways, the new set of plaintiffs presented a more robust challenge to the Act: not only could we raise challenges as we had in the *Ladinsky* Litigation, but we could also raise challenges on First Amendment grounds (including a challenge by a pastor who provided counseling and moral support as well as by a pediatrician who referred

10

patients to UAB) as well as on the grounds that the Act criminalized a parent's decision to transport a minor across state lines to secure otherwise-lawful treatment.[2]

32.    As with the *Ladinsky* Litigation, we knew it was important to include as defendants not only the State of Alabama's chief law enforcement officers – the Governor and the Attorney General – but also the local district attorneys for the counties where the plaintiffs resided or worked.  Once we finalized our new set of plaintiffs, certain lawyers on the team identified the local district attorneys for the relevant counties.  With the new set of defendants, the center of gravity was no longer in the Northern District but, instead, the Middle District.  To my knowledge, nothing about the naming of the proper defendants was in any way intended to affect the random assignment of judges or to cause any recusal.

33.    After working over the weekend and into the following week, by Tuesday, April 19, 2022, Lightfoot sent a courier to Montgomery to conventionally file the new complaint – the *Eknes-Tucker* Litigation – in the Middle District.  We did not designate the case as being related to any case, as there was no open case.  We hoped for and expected a random judge assignment in the Middle District.

34.    The Clerk's Office for the Middle District did not electronically docket the *Eknes-Tucker* Litigation until almost 6:00 p.m. on Wednesday, April 20, 2022 (i.e., over 24 hours after we filed the complaint).  The case was randomly assigned to Judge Huffaker.  Within a few minutes, however, Judge Huffaker assigned the case to Judge Burke.  When the case was assigned

---

[2]    Ultimately, this was very important.  At the preliminary injunction hearing in the *Eknes-Tucker* Litigation, the State of Alabama conceded that (1) speech, on its own, could not be prosecuted under the Act; and (2) parents could not be prosecuted for transporting their minor children to other states where the proscribed treatments were permitted.  Accordingly, by adding these claims to the *Eknes-Tucker* Litigation, we ensured that the Act's scope was properly limited.

to Judge Burke, we were given no notice and no input.  At the time, I did not understand why the *Eknes-Tucker* Litigation was being assigned to a judge in another district.  Regardless, we took no action in response to these assignments.

35.     After the case had been electronically docketed, we worked through the night on finalizing the motion for a preliminary injunction.  I electronically filed the motion for a preliminary injunction after midnight that evening.  The next day – Thursday, April 21, 2022 – we personally served all but one of the defendants with a copy of the new complaint and the motion for a preliminary injunction.

36.     Thus, although we filed the motion for a preliminary injunction on the night of Wednesday, April 20, 2022, we were only a day or two behind schedule if the *Ladinsky* Litigation had continued (as described above, we had aimed to file the motion for a preliminary injunction along with an amended complaint by around Monday, April 18, 2022 or Tuesday, April 19, 2022).  To me, the extra day or two was strategically beneficial: we eliminated the procedural uncertainty that potentially clouded the *Ladinsky* Litigation, and with our new set of plaintiffs, we had a more robust challenge to the Act.

37.     That same Thursday, April 21, 2022, we began preparing for a status conference in Montgomery before Judge Burke (he had set it immediately upon his assignment of the case from Judge Huffaker).  During that day, an attorney for the *Eknes-Tucker* Litigation – and I do not recall whom – discovered on a media website a copy of an order entered by Judge Burke in the *Walker* Litigation.  In that order, which Judge Burke had apparently entered on Monday, April 18, 2022, Judge Burke suggested that the attorneys for the *Walker* Litigation had engaged in "judge shopping."  This was the first time I had ever seen that order.  To my knowledge, no one associated

12

with the *Ladinsky* Litigation or the *Eknes-Tucker* Litigation knew about that order at the time that we filed the *Eknes-Tucker* Litigation.

38.     Seeing the order was concerning to me. I knew that we had not engaged in judge shopping, and I was unaware of anything to suggest that the attorneys in the *Walker* Litigation had engaged in judge shopping. At the status conference before Judge Burke on Friday, April 22, 2022, the attorneys for the State of Alabama asserted that we had engaged in "judge shopping" and that the United States, seeking to intervene, was attempting to "launder" our supposed misdeeds. Being accused by the attorneys for the State of Alabama, in open court, of having engaged in "judge shopping," especially when such an accusation was untrue and malicious, was unsettling. My co-counsel, Ms. Eagan, offered in response to explain to Judge Burke the reason for the voluntary dismissal (and to provide exactly the explanation detailed above). Judge Burke changed the subject and moved on. He asked no questions of us about it. From my perspective – and considering that Judge Burke entered his order in the *Walker* Litigation and not in the *Ladinsky* Litigation – it appeared that Judge Burke was not concerned by the decisions of the attorneys for the *Ladinsky* Litigation.

39.     In light of that background, I provide the following specific answers the Panel's questions:

        a.     "The actual or potential judicial assignments in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*." I am generally aware of discussions among my co-counsel in the *Ladinsky* Litigation and the *Eknes-Tucker* Litigation concerning the "actual or potential judicial assignments" in the Northern District and the Middle District. I along with my colleagues at Lightfoot provided local insight regarding our judges. Never, though, did our discussions concern

13

efforts to manipulate the random assignment of judges or to engineer a particular assignment of a judge.

b.      "Any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, and/or *Eknes-Tucker* that related to any action or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama." I am unaware of any actions or decisions taken in the course of preparing to file the *Ladinsky* Litigation or the *Eknes-Tucker* Litigation that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern District or the Middle District. As detailed above, the attorneys for the *Ladinsky* Litigation and the *Eknes-Tucker* Litigation took no action in response to any random assignment of judges. The voluntary dismissal in the *Ladinsky* Litigation occurred only after there was not, from our perspective, a random assignment of a judge.

c.      "Any action or decision that relates to which parties to name in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, where to file each action, and all the reasons related to any such decision about who to name and where to file." For the *Ladinsky* Litigation and the *Eknes-Tucker* Litigation, my co-counsel were largely responsible for screening potential clients through their community contacts. I generally understand that clients were included who (1) had standing to challenge the Act and (2) had factual backgrounds that provided clean legal challenges to be made regarding the Act. No plaintiff was selected for the purpose of affecting the random case assignment procedure in the Northern District or the Middle District. For the *Ladinsky* Litigation and the *Eknes-Tucker* Litigation, we included the two chief law enforcement defendants in the State of Alabama – the Governor and the Attorney General – as well as the local district attorneys

14

for the counties where our plaintiffs resided or worked. No defendant was selected for the purpose of affecting the random case assignment procedure in the Northern District or the Middle District. In terms of where to file, the *Ladinsky* Litigation's focus was the Southern Division of the Northern District – most of our clients resided or worked in the Southern Division of the Northern District, and as a result, except for the Governor and the Attorney General, most, if not all, of our defendants worked within the Southern Division of the Northern District. For the *Eknes-Tucker* Litigation, its focus was different – we had a number of defendants working within the Middle District, as opposed to the Northern District. Filing in the Middle District also helped ensure the "fresh start" we were hoping for after dismissing the *Ladinsky* Litigation. I am unaware of including any plaintiff or any defendant for the purpose of affecting any random judicial assignment. I am also unaware of filing the *Ladinsky* Litigation or the *Eknes-Tucker* Litigation in either the Northern District or the Middle District for the purpose of affecting any random judicial assignment.

    d.  "Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*." Lightfoot, along with most of our co-counsel, has been involved with monitoring the State of Alabama's efforts to criminalize transgender healthcare since 2020. When Lightfoot was engaged in 2020, most, if not all, of the organizations and law firms currently serving as attorneys of record in the *Eknes-Tucker* Litigation (and previously in the *Ladinsky* Litigation) were already associated. The only organization that was added relatively recently was the Human Rights Campaign, but it associated with the team before the filing of the *Ladinsky* Litigation. I am unaware of any attempt to associate other law firms or the actual association of other law firms to work with the *Ladinsky* Litigation or the *Eknes-Tucker* Litigation.

e.        "Any and all actions or decisions that relate to coordination and/or dismissal

of the *Ladinsky* and *Walker* cases and the reasons for dismissals, including but not limited to (1)

the conference call that occurred on April 15, 2022 and (2) any other communications between

*Ladinsky* counsel and *Walker* counsel on that topic." As described above, the attorneys for the

*Ladinsky* Litigation coordinated with the attorneys for the *Walker* Litigation about the timing of

dismissal to ensure that neither group's unconditional right to dismiss was eliminated – if one

group voluntarily dismissed and the other did not quickly do so, then the attorneys for the State of

Alabama could quickly file a short answer.   In that regard, I am personally aware of that

communication.   As to the "conference call," I am uncertain which one that the Panel is

referencing.  Certain attorneys for the *Ladinsky* Litigation had a conference call on the afternoon

of Friday, April 15, 2022 to weigh our options in light of the Transfer Order from Judge Axon.  I

have discussed that call above.  I am aware of a call between certain attorneys for the *Ladinsky*

Litigation and certain attorneys for the *Walker* Litigation occurring after our conference call, but I

was not part of those discussions.

f.        "Any and all actions that relate to the decision to file *Eknes-Tucker* in the

United States District Court for the Middle District of Alabama." As described above, the decision

to file the *Eknes-Tucker* Litigation in the Middle District considered a variety of factors, including

(1) the locations of the plaintiffs and (2) the locations of the defendants.  In addition, filing in a

new court would provide a clean, fresh start after the procedural issues that arose in the *Ladinsky*

Litigation.

g.        "Any knowledge you have that relates to (1) preparation for the hearing in

this matter (including circulation of any Q&A document), and (2) the questions expected to be

asked or that were actually asked by the court at the May 20, 2022 hearing." In preparation for

16

the May 20, 2022 hearing, I communicated with my attorneys, Samuel H. Franklin and M. Christian King, along with my co-counsel at Lightfoot. I also communicated with co-counsel at King & Spalding and their general counsel as well as with Robert Segall, counsel for my co-counsel in the *Eknes-Tucker* Litigation. Those communications are privileged. In addition, to gather my thoughts for the May 20, 2022 hearing and at the direction of my counsel for the purpose of providing legal advice, I prepared a written summary of the proceedings in the *Ladinsky* Litigation and the *Eknes-Tucker* Litigation as well as draft answers to potential, anticipated questions that could be posed by the Panel. When I created that document, I contemporaneously marked it as "privileged" because I believed that it was privileged and maintain that it is privileged. That document contained facts communicated by me and other Lightfoot attorneys to our attorneys in order to get their advice on my hoped-for chance to provide an explanation at the May 20, 2022 hearing. I received input on that document from Ms. Eagan, Ms. Vague, and my attorneys. I understand the document was shared with counsel for others in the *Ladinsky* Litigation. It was my plan entering the May 20, 2022 hearing to speak and answer the Court's questions on behalf of the entire *Ladinsky* / *Eknes-Tucker* team, to the extent I could do so. I have not relied on that document for the purpose of preparing this declaration.

h.      "The identity of each attorney, not included in the style of the original order, whom you are aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced above and the details of each such person's involvement." The only attorney of whom I am aware is Shannon Minter of the National Center for Lesbian Rights. Mr. Minter was involved in the team's decision to dismiss the *Ladinsky* Litigation and the decision to file the *Eknes-Tucker* Litigation in the Middle District (including the decision about

17

which plaintiffs to include and the decision not to include any plaintiffs from the *Ladinsky* Litigation in the *Eknes-Tucker* Litigation).

40.     Other than with (1) counsel representing the Lightfoot attorneys and (2) certain co-counsel in the *Eknes-Tucker* Litigation as well as Ms. Eagan and Ms. Vague but only prior to the May 20, 2022 hearing, I have not had any communications with anyone regarding any matters related to the July 8, 2022 Order or that were addressed by the Panel and counsel during the May 20, 2022 hearing.  As to communications with certain co-counsel in the *Eknes-Tucker* Litigation, I do not recall the specific details, but those communications occurred before the May 20, 2022 hearing and concerned generally (1) recommendations for potential counsel if they wished to retain their own; (2) the logistics of the May 20, 2022 hearing; and (3) discussions of the chronology in the *Ladinsky* Litigation.  To be clear, though, there were no discussions in an effort to synchronize stories, "get everyone on the same page," etc.  As to the communications with Ms. Eagan and Ms. Vague, those communications included my attorneys and were made in anticipation of the May 20, 2022 proceeding and, therefore, are privileged.

41.     This Panel announced this inquiry to inquire into any actions taken for the purpose of manipulating the random case assignment procedure.  As to the *Ladinsky* Litigation and the *Eknes-Tucker* Litigation, as set forth above, I am not aware of any action that was taken that had any impact on that procedure.  The voluntary dismissal in the *Ladinsky* Litigation was in direct response to a *sua sponte* action by the Court and, from an outsider's perspective, a deviation from the well-settled "first-filed action" rule in the Northern District, of which the plaintiffs had no notice or opportunity for input.  The assignment of the *Eknes-Tucker* Litigation to Judge Burke, which has never been challenged by the attorneys for the *Eknes-Tucker* Litigation, came as a result of action by the Court.  I have to the best of my knowledge and belief fully complied with the

directives contained in the July 8, 2022 Order, subject to protecting applicable privileges according to the Panel's July 25, 20222, order.

*        *        *        *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Jeffrey P. Doss

Dated: _July 27, 2022_

19