**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

*In re* Amie Adelia Vague, *et al.*    )        **Case No. 2:22-mc-3977-WKW**
                                        )
                                        )

**NOTICE OF FILING *IN CAMERA* DECLARATIONS OF**
**JENNIFER L. LEVI, SCOTT D. MCCOY, SHANNON MINTER, ASAF**
**ORR, DIEGO A. SOTO, SARAH WARBELOW, AND CYNTHIA WEAVER**

Pursuant to the Court's July 8, 2022 order (Doc. 22) and July 25, 2022 order (Doc. 41), Jennifer L. Levi, Scott D. McCoy, Shannon Minter, Asaf Orr, Diego A. Soto, Sarah Warbelow, and Cynthia Weaver (collectively, Nonprofit *Ladinsky* Counsel), through undersigned counsel, give notice of their submission of the attached declarations *in camera*.

Although the Court clarified that it "is not seeking the disclosure of privileged *communications*," the Court nonetheless denied Nonprofit *Ladinsky* Counsel's motion for protective order (Doc. 27) and ordered them to include responsive work product in their *in camera* declarations. (Doc. 41 at 4). To the extent Nonprofit *Ladinsky* Counsel's declarations, in compliance with that order,

1

contain information protected by the attorney–client privilege, the work product doctrine, the common interest doctrine, or the joint-client doctrine, Nonprofit *Ladinsky* Counsel maintain, and do not waive, those privileges and objections and request that the Court not consider those portions of the declarations. Nonprofit *Ladinsky* Counsel maintain that they have not previously waived any of said privileges.

Nonprofit *Ladinsky* Counsel further request that the Court place their declarations under seal and not make them available to any other judge or person without first giving Nonprofit *Ladinsky* Counsel an opportunity to object and be heard.

Undersigned counsel notes for the Court that Nonprofit *Ladinsky* Counsel's responses to Matter 7, which ordered them to disclose "[a]ny knowledge [they] have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing," (Doc. 22 at 3), are similar because they are based on language proposed by undersigned counsel.

Respectfully submitted.

July 27, 2022

/s/ *Robert D. Segall*
Robert D. Segall
Copeland, Franco, Screws & Gill, P.A.
444 South Perry Street
Post Office Box 347

2

Montgomery, Alabama 36101-0347
Phone: (334) 834-1180
Fax: (334) 834-3172
Email: segall@copelandfranco.com

*Counsel for Jennifer L. Levi, Scott D.
McCoy, Shannon Minter, Asaf Orr,
Diego A. Soto, Sarah Warbelow, and
Cynthia Weaver*

# DECLARATION

## OF

# JENNIFER L. LEVI

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

---

*In re* **Amie Adelia Vague** *et al.*          **Case No. 2:22-mc-03977-WKW**

## <u>DECLARATION OF JENNIFER LEVI</u>

### <u>Background</u>

1.      My name is Jennifer Levi. I am the Director of the Transgender Rights Project at GLBTQ Legal Advocates & Defenders (GLAD). In that capacity, I work on legal issues relating to claims brought on behalf of transgender adults and minors, among other matters.

### <u>My Role on the Alabama Litigation Team</u>

2.      I was asked by the National Center for Lesbian Rights to serve on a legal team focused on challenging a law in Alabama restricting medical treatment for transgender minors. To the best of my recollection, I was asked to serve on that team at least a year before the law passed. It may well have been longer ago than that.

3.      My primary role on the Alabama litigation team has been to assist in the development of the underlying legal claims to challenge the State of Alabama's Vulnerable Child Compassion and Protection Act (the "Act"), passed by the Alabama Legislature on April 7, 2022, and signed into law by Governor Kay Ivey on April 8, 2022. I was brought onto the team because of my knowledge and experience in constitutional and other legal challenges to laws affecting transgender persons, and because of my knowledge and experience regarding medical care and treatment for transgender minors.  As I am not a regular practitioner in Alabama (and in fact, I had never practiced in Alabama prior to the *Ladinsky* case), I was not brought onto the team to handle the procedural or day-to-day aspects of litigating the case, nor did I assume responsibility for those matters.  To the best of my recollection, I had no direct communications with any of the plaintiffs in the *Ladinsky* case before the case was filed. In the later-filed *Eknes-Tucker* case, I recall joining one or more calls with one or more families that eventually became plaintiffs in the case and I recall one casual hallway discussion with Reverend Eknes-Tucker during the preliminary injunction hearing.  Before I joined the *Ladinsky* case team, I was not personally familiar with any judges in Alabama, nor did I have any knowledge of their track records or reputations.

**Decisions Regarding Filing the *Ladinsky* Case**

4.      I was not directly involved with matters relating to which parties to name in the *Ladinsky* case or where in Alabama the case should be filed.

5.      I was involved in many calls where other attorneys with direct relationships to potential plaintiffs in the *Ladinsky* case reported on conversations they had with those potential plaintiffs. However, I do not recall having any conversations with plaintiffs or potential plaintiffs in the *Ladinsky* case before that case was filed. I do not recall the details of why the specific named plaintiffs became parties to the case, but I recall that our team thought we should file suit on behalf of one or more medical providers as well as families impacted by the law.

6.      My understanding is that the *Ladinsky* case was filed in the Northern District of Alabama primarily because the plaintiffs in that case had a connection with the jurisdiction. That is, my understanding was that most of the plaintiffs either resided in or worked in the Northern District. I do not have a specific recollection of any conversations about where to file the *Ladinsky* case, but it is possible that, over the time that I worked on preparation for the case, I was on calls where such discussions occurred. Although I may have been part of such conversations, I do not recall their content, and I deferred to other counsel on the decision of where to file *Ladinsky*.

3

7.      I was prepared to litigate the *Ladinsky* case before any judge to which the case was assigned, and I believe that our entire legal team was likewise prepared to do so.

**My Knowledge of the *Walker* Case**

8.      Over a year before the Act passed, I learned that a separate group of nonprofit organizations ("the Walker team") intended to file a case in the Middle District of Alabama challenging the Act, if it were to pass, and that they intended to designate their case as related to a prior lawsuit that had been adjudicated by Judge Thompson. I had, and have, no knowledge about the Walker team's decisions regarding who to name as plaintiffs in that case.  During the year between learning about the Walker team's intention to file a case, and the passage of the Act, I had a few communications with lawyers associated with the legal team that eventually brought the Walker case about their intention to mark their case as a related case to one heard previously by Judge Thompson.

9.      At some point after the *Walker* case was filed, I learned from various communications including among the Ladinsky team but also from someone connected to the *Walker* team, though I don't know recall who that was, that the Walker team might attempt to have *Ladinsky* transferred to the Middle District as part of their effort to get their case in front of Judge Thompson.  My view was that

we should do nothing with respect to the Walker team's effort to get their case before Judge Thompson.

**Judge Assignment in *Ladinsky***

10.    After the *Ladinsky* case was filed, I paid very little attention initially to the assignment of a judge to the case. My understanding, then and now, was and is that the *Ladinsky* case was filed in the ordinary course and was assigned to a judge through the court's random case assignment procedures. I understood that the judge to whom the case was initially assigned recused herself because she had a connection to one of the parties in the case. I do not recall knowing about that connection prior to the filing of the Ladinsky case.

11.    After the initial judge recused herself, the case was assigned to a magistrate judge. I had no view about that assignment. In discussions with others on the *Ladinsky* legal team, I learned that the State of Alabama would likely object to the assignment. For that reason, we, the lawyers for the *Ladinsky* team, took no action.  Shortly thereafter, the docket reflected that there was not unanimous consent to assign the case to the magistrate judge, and the case was again reassigned, this time to Judge Axon.

12.    I initially had no view of the assignment of the case to Judge Axon. I heard from others on the *Ladinsky* team that they had a favorable view of Judge Axon for this case.

**Transfer of *Walker* to the Northern District; Efforts to Transfer *Walker* to Same Judge As *Ladinsky***

13.    On April 15, 2022, a lawyer from the Walker team, Carl Charles, contacted me and informed me that the *Walker* case had been transferred from the Middle District of Alabama to the Northern District. When the *Walker* case was transferred to the Northern District, it was assigned to Judge Burke.

14.    Attorney Charles asked me whether the *Ladinsky* team would object to the Walker team's effort to get the *Walker* case transferred to the judge presiding over the *Ladinsky* case. I told Mr. Charles that I thought the *Ladinsky* team lawyers would have no objection to that. At that time, I assumed that the Walker team would need to file a motion before their current judge to seek such a transfer.

15.    I learned later in the day on April 15, 2022, from an attorney on the Walker team (it may have been Attorney Charles, though I am not certain of that), that the *Ladinsky* lawyers, not the Walker lawyers, would need to file a motion to seek to have the *Walker* case transferred to the judge handling the *Ladinsky* case. That seemed like an unusual process to me and not one with which I was familiar. I told Attorney Charles that I would consult with lawyers from the *Ladinsky* team.

16.    I did consult with lawyers from the *Ladinsky* team, and they told me they had no objection to our team's filing a motion seeking the transfer of the *Walker* case to the judge presiding over the *Ladinsky* case. The Walker team lawyers (I believe it was Attorney Charles as well as Lynly Egyes, and perhaps others) told me

6

that they would prepare the papers that the *Ladinsky* team needed to file. I told Attorney Charles that I would await a draft of the motion.

17.    While I was still waiting for the draft of the motion later on April 15, I needed to step away from work for several hours. That was a difficult day for me to fully commit to work obligations for at least two reasons. One was that it was the first night of Passover, an important holiday to my family. The second was that my child, a high school senior, was captaining their high school ultimate frisbee team and I was going to watch them play for the first time that season. I knew I needed to step away from work for a discrete period of time – at least 2 hours, I believed at the time I stepped away – and would not be able to directly be involved with the filing of the motion that the Walker team was asking the *Ladinsky* team to file. I also knew that getting the materials filed was time-sensitive.  Accordingly, I told others on the team that they would need to coordinate the filing of the motion to transfer the Walker case to the *Ladinsky* court in my absence.

18.    At approximately 4:15 PM EDT on April 15, 2022, I stepped away from matters relating to the litigation and let other attorneys from the *Ladinsky* team communicate with the Walker team about the efforts to transfer the *Walker* case to the *Ladinsky* court.  During my child's ultimate frisbee game, they suffered a serious knee injury.  Because of this, I was not able to quickly join discussions that were

initiated during my absence.  I did, however, resume taking work calls sometime

later that evening while I was still tending to my child's injury.

**Decision to Dismiss *Ladinsky***

19.    Once I resumed work calls on the evening of April 15, I learned that a

number of things had occurred during the time I had stepped away. For one, I learned

that the judge to whom the *Walker* case had been assigned (Judge Burke) had set a

status conference for that case for the following Monday (April 18). I also learned

that after the Walker status conference had been set, the *Ladinsky* case, the first-filed

case, had been transferred to Judge Burke, even though *Walker* was the second-filed

case. I was surprised when I heard that because my last expectation before stepping

away from work was that our team would be filing a motion to transfer the *Walker*

case to the judge presiding over our case, the *Ladinsky* case, and I thought it would

have been routine for that motion to be granted since our case had been the first-filed

one. It seemed unusual and concerning to me both that the *Walker* case was now set

for a status conference on the following Monday and that our case, the first-filed

one, had been transferred to the judge presiding over the *Walker* case and did not

have a status conference scheduled at all.  This was concerning to me as it suggested

that the *Ladinsky* case would become a tagalong to the *Walker* case.  In addition, at

some point on April 15, I was part of communications among lawyers on the

*Ladinsky* team in which they said that they had concerns about the prospects of our

case before Judge Burke.  I did not have any view at the time of Judge Burke, but I had no reason to disagree with my colleagues' assessment.  For all of these reasons, following communications with my colleagues on the *Ladinsky* team, I agreed to advise our clients to dismiss the *Ladinsky* case.  To be clear, however, had our case originally been assigned to Judge Burke through the court's random selection procedure, we would not have voluntarily dismissed the case despite that Judge Burke was not considered a good draw for our case.  The trigger for dismissal was the way Judge Burke received the case.

20.    Amidst these discussions among Ladinsky counsel, I was aware of Federal Rule of Civil Procedure 41(a)(1)(A)(i), which allows a plaintiff to dismiss an action without a court order before the opposing party serves an answer. Members of our team expressed the view that the State of Alabama might file an answer very quickly in order to cut off our right to dismiss the case under Rule 41; accordingly, they believed we should file our dismissal as soon as possible on April 15.  Although my role on the team was not geared toward local dynamics, procedural matters, or the day-to-day aspects of the litigation, I agreed with the decision to recommend dismissal of the *Ladinsky* case to our clients.

21.    It is my understanding that other lawyers on our team spoke to our clients and obtained their consent to dismiss the *Ladinsky* case in the late afternoon or evening of April 15, 2022.  The *Ladinsky* dismissal was filed at 6:33 PM CDT.

**Dismissal of *Walker***

22.     During the April 15, 2022 discussions about dismissing the *Ladinsky* case, members of our legal team stated a desire to talk to the Walker lawyers and to suggest that they also dismiss their case. The thought was for the two teams to join forces, coordinate our claims, and file a new case on which all of the lawyers across the *Ladinsky* and Walker teams would collaborate. While joining forces was not ideal from the *Ladinsky* team's point of view, we thought we had little choice but to do so given that both groups had filed lawsuits challenging the Act.  And, if the two sets of lawyers joined forces, the *Ladinsky* lawyers' case would not be a tagalong case.  We hoped we could develop a process for working together cooperatively. I volunteered to have a conversation with a lawyer or lawyers from the Walker team to state the views of the *Ladinsky* team and to suggest they dismiss their case as well. I believe others on the *Ladinsky* team expressed this view to the Walker team too.

23.     At some point after I resumed work matters on the evening of April 15, 2022, I had a conversation that was, to the best memory serves, with attorney Kathleen Hartnett, one of the lawyers on the Walker team. Attorney Hartnett agreed that the Walker team would dismiss their case and join forces with the lawyers from the *Ladinsky* case to file a new case. Although we discussed some details about where the case would be filed and who the parties might be, no final decisions on those matters were made during that phone call.

10

24.     The Walker team filed their dismissal of the *Walker* case at 6:24 PM CDT on April 15, 2022.

**Discussions Regarding Filing a New Case**

25.     The next day, April 16, 2022, I participated in a joint call among the lawyers who worked for the non-profit legal organizations that were counsel in both the *Ladinsky* and *Walker* cases. The purpose of the call was to discuss the possibility of the teams joining forces to challenge the Act in a new lawsuit, and how that would work.  We spoke about how decisions would be made across the proposed larger legal team. It was quickly apparent that we could not agree on many things, including where to file a new case, who the plaintiffs would be, and how disagreements among counsel would be resolved. We concluded the call with no final agreements made.

26.     In addition, on April 16, 2022, I participated in calls with members of the *Ladinsky* team to discuss individuals who would be impacted by the Act and who might be able to serve as plaintiffs in a new case. I do not recall having any direct contact with potential plaintiffs on April 16 or 17, but I heard from others on our team who said they had engaged in these conversations.  During these discussions and throughout the days on April 16 and April 17, I voiced my strong view that no individuals who had been a party in the *Ladinsky* case could or should be a party in the new case.  While I believed the *Ladinsky* plaintiffs had an absolute right to dismiss their claims, and my initial research led me to believe it would not be

11

unethical to re-file the same case with the same plaintiffs, in an abundance of caution I thought it would be preferable to file a new case with new plaintiffs.

27.     I was also involved in a number of conversations on that weekend, April 16-17 about where to file the new case. I expressed the view that the new case should not be filed in the same district where the *Ladinsky* case had been filed and dismissed.  The reason for this view related to the concerns that our team had about the unusual transfer of the *Ladinsky* case to the judge presiding over the second-filed case. I thought that filing the new case in the Northern District of Alabama created a high risk that the case would be reassigned to the judge to whom the *Ladinsky* and *Walker* cases had eventually been assigned. I knew, however, that this was a risk regardless of where we filed. I, and my entire team, committed to move ahead with filing and litigating a new case regardless of the judge to whom it would be assigned.

28.     Ultimately, the Walker team did not join forces with the *Ladinsky* team. The *Ladinsky* team lawyers filed a new case, the *Eknes-Tucker* case, on April 19, 2022, in the Middle District of Alabama.  None of the plaintiffs from the *Ladinsky* case were a party to the *Eknes-Tucker* case.  The case was transferred to the Northern District and assigned to Judge Burke.  We did not take any action to try to get the case reassigned, and we then proceeded to litigate the case before Judge Burke.

29.     I am not aware of any efforts by *Ladinsky* counsel to cause the case to be assigned or reassigned to any particular judge.  Although I agreed with the

decision to file *Eknes-Tucker* in the Middle District of Alabama for the reasons set forth above, I am not aware of any efforts by *Eknes-Tucker* counsel to cause the case to be assigned or reassigned to any particular judge within the Middle District of Alabama.  I am not aware of any efforts to secure the recusal of any judge assigned to any of the *Ladinsky*, Walker, or Eknes-Tucker cases in either the Northern or Middle Districts of Alabama.

30.    I am not aware of any actions or decisions that relate to attempts to associate law firms to work with counsel in the *Ladinsky*, Walker, or Eknes-Tucker cases.

**Preparation for May 20, 2022 Hearing**

31.    After the May 10, 2022, Order was entered, ordering attorneys to appear before a three-judge panel so that it could inquire into alleged judge-shopping, I had some communications with other attorneys subject to the order on the topic of hiring counsel.  During these calls, I received suggestions relating to my goal of securing Alabama counsel. I also exchanged remarks with counsel to whom I spoke about our general concerns regarding the hearing.

32.    On or about May 13, I along with the other non-profit lawyers involved with the *Ladinsky* and Eknes-Tucker cases retained Bobby Segall as counsel.  From that date forward, I do not recall having any non-privileged communications with any of the other *Ladinsky* or Eknes-Tucker attorneys regarding the Order.   I

participated in telephone calls with my counsel, Bobby Segall, and the attorneys from NCLR, GLAD, HRC, and SPLC, all of whom were also represented by Bobby Segall, about the May 20, 2022 hearing. A document of anticipated questions and proposed, truthful answers was created and circulated by Mr. Segall based on those telephone conversations.  My counsel has advised me that these were attorney-client privileged communications and that other privileges such as common interest, joint client, and work product apply as well.

33.     The Court's July 8 Order states: "Counsel are reminded that they SHALL NOT have communications with anyone *other than their own counsel* related to this Order or that were addressed by the court and counsel during the May 20, 2022 hearing" (emphasis added).  Moreover, the Court's July 25, 2022 Order states that "the Panel is not seeking the disclosure of privileged communications." Consistent with the Court's guidance, I am not disclosing attorney-client privileged communications to the Court.

34.     I have never seen the purported Q&A document referenced in Paragraph 7 of the July 8 Order, and I was not aware of its existence until it was referenced in the order.

**Other Involved Attorney**

35.     Attorney Shannon Minter was not included in the style of the original order of this Court and has been involved in giving input and recommendations and making strategy decisions relating to the *Ladinsky* and Eknes-Tucker cases.

**Conclusion**

36.     At all times, I have complied with Orders issued by this tribunal, and I commit to do so as long as this proceeding continues.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: July 27, 2022

*/s/ Jennifer Levi*

# DECLARATION

# OF

# SCOTT D. MCCOY

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

---

*In re* **Amie Adelia Vague**, *et al.*     )
                                            )     **Case No. 2:22-mc-3977-WKW**
                                            )

**DECLARATION OF SCOTT D. MCCOY**
**IN RESPONSE TO THIS COURT'S JULY 8, 2022 ORDER, DOC. 22**

Pursuant to the Court's July 8, 2022 order, Doc. 22, I declare under penalty of perjury that the following is true and correct:

1.      I am interim Deputy Legal Director ("DLD") for LGBTQ Rights & Special Litigation at the Southern Poverty Law Center ("SPLC") based in SPLC's Miami, Florida office.

2.      I was counsel to the Plaintiffs in the *Ladinsky v. Ivey* case and am currently counsel for the private Plaintiffs in the *Eknes-Tucker v. Marshall* case. I was not then and am not currently counsel to any of the Plaintiffs in the *Walker v. Marshall* case.

3.      SPLC's litigation team for both the *Ladinsky* and *Eknes-Tucker* cases

consisted of myself, Senior Staff Attorney Diego Soto, and Staff Attorney Jessica Stone ("SPLC Counsel"). In my role as interim DLD, I have authority to make tactical and strategic decisions about cases within my practice group's portfolio, including without limitation, plaintiff identification and retention, defendant selection, filing jurisdictions and venue, and dismissal. Mr. Soto and Ms. Stone provide input on those decisions, but ultimately, for SPLC, I am the decisionmaker. No other SPLC attorneys worked or works on these cases and there are no other attorneys who were or are involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced in the Court's July 8, 2022 order, Doc. 22.

4.      With respect to the *Ladinsky* and *Eknes-Tucker* cases, SPLC was and is a part of a litigation coalition that includes attorneys from the National Center for Lesbian Rights, GLBTQ Legal Advocates and Defenders, the Human Rights Campaign Foundation, King & Spalding, LLP, and Lightfoot, Franklin & White LLC (together, "Private Plaintiffs' Counsel"). Decision-making within this co-counsel group generally was and is consensus-based.

5.      Private Plaintiffs' Counsel started tracking the anti-transgender youth healthcare bills from the start of the 2022 Alabama legislative session, just as we had done in the 2021 legislative session as well. SPLC has a Policy Department that has staff dedicated to monitoring and advocacy on bills of interest to it in the

2

Alabama legislature. SPLC Counsel regularly provided updates to Private

Plaintiffs' Counsel regarding the progress and status of anti-transgender bills,

including SB 184, the "Vulnerable Child Compassion and Protection Act" (the

"Act").

6.      As the 2022 Alabama Session progressed and it appeared increasingly

likely that SB 184 would be approved by the legislature, Private Plaintiffs' Counsel

began drafting a complaint and other materials to support a request for preliminary

injunctive relief. In February and March 2022, Private Plaintiffs' Counsel

identified Drs. Morissa Ladinsky and Hussein Abdul-Latif (as providers) and two

families with transgender children from Shelby and Jefferson Counties as

plaintiffs. These plaintiffs were chosen because they were subject to enforcement

of the Act and because they resided in the Northern District of Alabama. Private

Plaintiffs' Counsel desired to file the *Ladinsky* case in the Northern District

because it was our view that we were most likely to draw what we considered to be

a good judge for our case. None of these plaintiffs was chosen for any other

reasons.

7.      The *Ladinsky* defendants were chosen solely because they were

believed to have enforcement authority for the Act and therefore were necessary

parties to ensure that if the Act were enjoined, the injunction would be complete

and effective. None of these defendants were chosen for any other reasons.

8.      The Alabama legislature passed SB 184 on April 7 and Governor Ivey signed it into law on April 8. This was much more quickly than we had anticipated, and it caused us to work quickly to finalize the complaint for filing. Private Plaintiffs' Counsel wanted to be the first filed case. We were aware that there was another coalition of groups also working on developing a challenge to the Act. Wanting to be the first filed case, we considered ourselves to be in a race to the courthouse with the other coalition. Private Plaintiffs' Counsel had discussion on Friday, April 8 about whether we could get our complaint on file that night or whether we could continue to work over the weekend and file first thing Monday morning. We were concerned that doing so might mean that we would not be the first filed case.

9.      I reached out to Lambda Legal once the bill had passed to ask where the other group was planning to file their lawsuit. I was told that they were planning to file in the Middle District of Alabama. I informed them that we planned to file in the Northern District. We acknowledged our common interest agreement among their group and Private Plaintiffs' Counsel, and we exchanged a draft of a written common interest agreement. I did not convey any other information to them about Private Plaintiffs' Counsel's plans, nor did I learn anything else about their plans.

10.      On the evening of April 8, as we were trying to finalize our complaint

4

and get it on file first, I asked Lambda Legal whether they were going to get their complaint filed that night. They indicated that they were likely to file on Monday. I conveyed this information to Private Plaintiffs' Counsel.

11.     The *Ladinsky* case was filed in the evening on Friday, April 8 and docketed on Monday, April 11. We succeeded in being the first filed case. *Ladinsky* was first assigned to Judge Anna M. Manasco, who recused herself. The case was then reassigned to Magistrate Judge Staci G. Cornelius. Private Plaintiffs' Counsel were prepared to consent to proceed under Judge Cornelius, but defendants ultimately did not consent. The case was then assigned to Judge Annemarie Carney Axon.

12.     Later in the day on Monday, April 11, the other group filed their case, *Walker v. Marshall*, in the Middle District. The *Walker* case was assigned to Chief Judge Marks.

13.     *Walker* plaintiffs were represented by Lambda Legal, the American Civil Liberties Union Foundation, the American Civil Liberties Union of Alabama Foundation, Transgender Law Center, and Cooley LLP (together, "*Walker* Counsel").

14.     The plaintiffs in *Walker* were two families with transgender children, one from Lee County and one from Limestone County. The defendants in *Walker* were Attorney General Marshall and the district attorneys for the relevant counties.

15.     On April 12, *Walker* Counsel filed a motion to have their case reassigned to Judge Thompson. They had filed their case as a related case to another of Judge Thompson's cases, *Corbitt v. Taylor*.

16.     On April 13, Chief Judge Marks issued an order for *Walker* Counsel to show cause why their case should not be transferred to the Northern District and consolidated with the first-filed case, *Ladinsky*.

17.     In light of Chief Judge Marks' Order to Show Cause, *Walker* Counsel reached out to Private Plaintiffs' Counsel asking to discuss *Walker* Counsel's response to the Order to Show Cause. A call was scheduled for the evening of April 13. SPLC Counsel did not attend that call but other of Private Plaintiffs' Counsel did.

18.     Although there was some feeling that Private Plaintiffs' Counsel should take no position should *Walker* be transferred to Judge Thompson and file a motion to consolidate *Ladinsky* with *Walker* I believe the consensus was that there was not anything for us to do, and that, as the first filed case, we would prefer not to be transferred to the Middle District. We thought that even if *Walker* was transferred to Judge Thompson, it made sense to keep the cases separate and take potentially two shots at enjoining the Act. In any event, we were very skeptical that *Walker* would end up before Judge Thompson and instead expected that *Walker* would be transferred to the Northern District and consolidated with *Ladinsky*

before Judge Axon under the first-filed rule. We communicated to *Walker* Counsel that no mention should be made in their response to the Order to Show Cause that there had been even a consultation with Private Plaintiffs' Counsel. Private Plaintiffs' Counsel did not want there to be any suggestion in the response that they supported the *Walker* response.

19.     On April 14, when *Ladinsky* was transferred to Judge Axon, we viewed that draw as a good development and were preparing to proceed before her.

20.     Later in the evening on April 14, *Walker* Counsel filed their response to Chief Judge Marks' Order to Show Cause in which they expressed that they did not oppose the transfer of the *Walker* case to the Northern District to be adjudicated alongside *Ladinsky*.

21.     Because we were under the impression that we would be proceeding under Judge Axon, we called Judge Axon's courtroom deputy to inquire about Judge Axon's preference for pro hac vice motions, in particular, whether attorneys need list their home addresses on the motion papers. We learned from Judge Axon's deputy that the *Walker* case was being transferred to Judge Axon and how to prepare the pro hac vice papers. This conversation led us to believe that the *Ladinsky* and *Walker* cases would be proceeding before Judge Axon consistent with the first-filed rule.

22.     On April 15, we learned from *Walker* Counsel that their case had been

assigned to Judge Burke and that a status conference was set before Judge Burke

for the next Monday, April 18. A call or virtual meeting with *Walker* Counsel was

planned for later that day to discuss how to proceed litigating the consolidated

cases together. I did not participate.

23.     Later in the day on April 15, *Walker* Counsel informed Private

Plaintiffs' Counsel that they had been told by one of Judge Burke's clerks that the

lead case (*Ladinsky*) would have to move to consolidate the *Walker* case before

Judge Axon in order to move the case from Judge Burke. We were of the view that

Judge Burke would not be a good judge for our case (or at least not as good as

Judge Axon), and, as the first filed case, we did not want to lose primacy by being

consolidated with the later-filed *Walker* case. We agreed to review a draft motion

to consolidate *Walker* with *Ladinsky* before Judge Axon. We were confident that

under the first-filed rule that such a motion before Judge Axon would be granted.

24.     At 5:47 PM on April 15, Judge Axon entered an order transferring the

first-filed *Ladinsky* case to Judge Burke "in the interests of efficiency and judicial

economy." No other information was provided.

25.     This action was of great concern to us because it was inconsistent with

our understanding of the first-filed rule and the information that we had received

from both Judge Axon's and Judge Burke's chambers. We found it very

suspicious, and I expressed to my co-counsel that it looked to me like Judge Burke

was trying to grab the case outside of the normal course. We did not understand why the *Walker* case was not automatically transferred to the judge presiding over the first filed case. There did not seem to be any reason for the *Walker* case to be assigned to Judge Burke at all. We were also concerned that we had lost our first-filed position that would have allowed us to be lead counsel in the case and control the tactical and strategic decisions in the prosecution of the case.

26.     Because we did not know procedurally how to go about trying to undo what we viewed as an already procedurally aberrant transfer, because we were suspicious of the circumstances leading to where we were, and because we were concerned that any challenge to the transfer would take precious time and resources away from the primary objective of enjoining the Act before it went into effect, we decided that the best thing to do was to advise our clients to voluntarily dismiss their case, which they chose to do. Time was of the essence because we understood that defendants could extinguish our clients' right to voluntary dismissal under Rule 41(a)(1)(A)(i) by filing an answer, so we were forced to act quickly in a very compressed timeframe.

27.     Certain members of Private Plaintiffs' Counsel communicated with *Walker* Counsel about the situation. I was not privy to those conversations, nor do I have knowledge of what was discussed other than that they too decided to advise their clients to dismiss their case, which they chose to do, and that there were

discussions about trying to cooperate and file a consolidated, single complaint. *Walker* Counsel filed their voluntary dismissal about ten minutes before we filed ours. I should add here that had *Ladinsky* been randomly assigned to Judge Burke in the first instance, there would have been no Rule 41dismissal. Also, if Judge Burke had been assigned randomly to a first-filed case other than *Ladinsky* with *Ladinsky* subsequently transferred to Judge Burke in compliance with the first-filed rule, there would have been no Rule 41 dismissal.

28.     The next day, on April 16, certain of Private Plaintiffs' Counsel and *Walker* Counsel discussed cooperating on filing a new case but ultimately were not successful in reaching agreement. On April 17, *Walker* Counsel informed Private Plaintiffs' Counsel that they were abandoning their efforts and would not file a new case. SPLC Counsel were not involved in any of these conversations and only learned of the substance and outcomes after the fact from co-counsel.

29.     Private Plaintiffs' Counsel determined that we could not file a new case on behalf of any of the plaintiffs in *Ladinsky* because it would create the impression that we were judge shopping—which we were not. With the consent of the plaintiffs from the *Ladinsky* case, Private Plaintiffs' Counsel began preparing another lawsuit with entirely new plaintiffs and additional claims.

30.     Private Plaintiffs' Counsel identified two doctors, a pastor, and four families with transgender children who were directly impacted by the Act. Rev.

Eknes-Tucker resides in Jefferson County as does one of the families. One of the families resides in Montgomery County, one in Lee County, and one in Cullman County. One of the doctors practices in Birmingham and the other practices in a location in the Middle District. None of the plaintiffs in the *Eknes-Tucker* case were involved in the *Ladinsky* case (or the *Walker* case). The defendants were the Governor, Attorney General, and the district attorneys for each of the relevant counties where the plaintiffs reside. Private Plaintiffs' Counsel chose to file the *Eknes-Tucker* case in the Middle District for two reasons: because a number of the plaintiffs and defendants are from the Middle District, and because we were wary of a repeat of the procedural problems that we had faced in the *Ladinsky* case, and because we were worried about drawing Judge Burke again because we were uncertain as to whether he was associated with the procedural irregularities. We did not file in the Middle District in an attempt to get any particular judge. We expected the ordinary, random assignment process to work and would accept whatever judge we were assigned.

31.     The *Eknes-Tucker* case was assigned to Judge Huffaker. We would have proceeded under Judge Huffaker in due course and without complaint. Later in the evening on April 20, Judge Huffaker gave up the case to Judge Burke. While this was surprising to us as well, it became clear the next day that Judge Huffaker's transfer of the case to Judge Burke was prompted by Judge Burke's April 18 Order

in the *Walker* case, which was forwarded to the chief judges of all the federal judicial districts in Alabama, explaining that Judge Burke had been assigned the *Walker* and *Ladinsky* cases, which also challenged the Act, and that he suspected judge shopping may be in play.

32.    I do not have any knowledge of and did not participate in any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama.

33.    I do not have any knowledge of and did not participate in any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, or *Eknes-Tucker*.

34.    I participated in telephone calls with my counsel, Bobby Segall, and calls with my counsel and the attorneys from NCLR, GLAD, HRC, and SPLC, all of whom were represented by Bobby Segall, about the May 20, 2022 hearing. A document of anticipated questions and proposed, truthful answers was created and circulated based on those telephone conversations. In addition, on the afternoon before the May 20 hearing, Bobby Segall sent his clients a talking points memo to be used by Jeff Doss in making a statement to the panel on behalf of all Private

Plaintiffs' Counsel.  On the advice of my counsel, and on the basis of attorney-client, common interest, and work product privileges, I object to producing these documents or setting out the content of the documents.

35.    I have not discussed the actual questions that were asked by the Panel or the Special Master at the May 20, 2022 hearing with anyone. I have otherwise complied with the Panel's order of July 8, 2022.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct.

This declaration was executed on the 27th day of July, 2022.


_____
Scott D. McCoy (Fla. Bar No. 1004965)
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd., Ste. 3750
Miami, Florida 33131
T: (786) 347-2056
F: (786) 237-2949
E: Scott.McCoy@splcenter.org

# DECLARATION

# OF

# SHANNON MINTER

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| *In re* **Amie Adelia Vague,** *et al.* | )<br>)<br>) | **Case No. 2:22-mc-03977-WKW** |

## <u>DECLARATION OF SHANNON MINTER IN RESPONSE TO THIS COURT'S JULY 8, 2022 ORDER, DOC. 22</u>

I, Shannon Minter, declare as follows:

**Question One: The actual or potential judicial assignments in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*;**

1. The Alabama Legislature first considered legislation that would ban medical treatments for transgender minors in 2019. Starting that year, my organization (NCLR) began preparing to challenge such a law if it passed. After the law failed to pass for several years in a row, we were hopeful it would fail to pass this year as well. When it did pass, we were scrambling to get a complaint and a motion for a preliminary injunction ready to file. While the legal team had been having regular calls throughout 2022, I rarely participated in them until the bill passed the legislature, at which point I reengaged and began editing the draft

1

complaint and engaging in discussions about our legal arguments and claims. When Governor Ivey signed the bill, we wanted to be the first case filed so we filed our complaint right away, even though we had not yet completed our motion for a preliminary injunction.

2.   To the best of my recollection, I was not personally involved in discussions about specific Alabama federal district court judges before filing, nor do I recall having any knowledge about specific Alabama federal district court judges, other than being generally aware that Judge Thompson was considered a good draw for civil rights cases. I was aware that we were filing in the Northern District based on a widely shared view that civil rights plaintiffs had the best chance of drawing a favorable judge in that district, but that was not based on my own personal knowledge.

3.   Around the time the legislature passed the law, I became aware from other members of our team that another team of lawyers including the ACLU also intended to file a case and that they were seeking to have it deemed a related case to *Corbitt* in front of Judge Thompson. I don't recall having any conversations or communications with anyone from the Walker team about the issue and had no involvement in their decisions.

4. When *Ladinsky* was assigned to a magistrate judge, I was in favor of consenting for our case to be heard by a magistrate, although some others on our

2

team were not sure and thought an Article III judge might be more appropriate given the gravity of the case. I did not have any prior familiarity with or specific knowledge about the specific magistrate judge assigned our case. When the State declined to consent and the case was assigned to Judge Axon after the first judge to which it was assigned recused herself, I did not have any prior knowledge about Judge Axon either and had no thought of taking any action to have the case assigned to a different judge.

5. When *Walker* got transferred to the Northern District pursuant to the first-filed case rule, I was not surprised or concerned—that was consistent with what I had expected to happen after their related case request was denied. When *Walker* got transferred to Judge Burke, I was somewhat surprised that it didn't get assigned directly to Judge Axon, but didn't think too much of it, as I expected that it would be transferred to her in due course. I don't recall knowing anything specific about Judge Burke at the time. When I learned that Judge Burke had set the *Walker* case for an immediate status conference and that, shortly thereafter, Judge Axon sua sponte transferred the case to him, I was very surprised and concerned. I didn't understand why the court would diverge from the first-filed rule and was unhappy that, as a result, our case would be second fiddle to *Walker* and possibly even get left behind altogether since the Walker plaintiffs had already filed a motion for a temporary restraining order.  I anticipated that our approaches to the case and to the

legal issues would diverge significantly from *Walker*, and I was concerned that we would not have the first chance to shape those issues before the court.

6.  I also learned that Judge Burke was considered a very conservative judge who might turn out to be a particularly bad draw for our case. That was not because of any concern that he would be personally biased, but rather that a conservative judge might not be receptive to our legal arguments, which rested on substantive due process and the premise that discrimination against transgender people is sex discrimination. The fact that Judge Burke was considered a very conservative judge increased my concern about his having gotten the case through a departure from the first-filed rule with no explanation in the transfer order as to why there had been such a departure. Given this unexpected turn of events and its potential negative impact on our clients, I suggested to our team that we consider talking to our clients about whether to voluntarily dismiss their case, and that we should reach out to the Walker team to see what they were planning. We did so and learned that they were also considering that option. After some other members of our legal team consulted with our clients (I personally did not speak with them), we voluntarily dismissed *Ladinsky*, with the intention that we would regroup with the legal team bringing the *Walker* case and see if the two legal teams could work together to bring a new case to challenge the law. I thought doing so was important given the harm the law was going to cause.  While I did not relish the prospect of trying to mesh our divergent

4

approaches, I thought that was preferable to having the *Walker* team in the driver's seat, as would have been the case if *Ladinsky* were consolidated with *Walker* rather than the other way around.

7. To be clear, if *Ladinsky* had been assigned to Judge Burke rather than to Judge Axon in the first instance, I would not have suggested or supported dismissing the case.  The same is true had Judge Burke been randomly assigned the first-filed case and *Ladinsky*, as the second filed case, had been transferred to him pursuant to the first-filed rule.   Under those circumstances, I would not have suggested or supported dismissing the case.

8.  We dismissed our clients' case that evening, and the *Walker* plaintiffs did so as well. The next day, we talked with some of the attorneys from the *Walker* team on a video conference call but were unable to agree on how to work together. The next day after that, ACLU attorney James Esseks let us know the *Walker* counsel were not going to bring a new case, either with us or separately. We then moved forward to find new plaintiffs and file a new case. When the *Ladinsky* plaintiffs voluntarily dismissed their case, HRC (one of the legal groups on our team) already represented an additional family with a transgender child who wished to join the *Ladinsky* lawsuit. We had planned to amend the complaint to add them to *Ladinsky*, so I knew we already had at least one client who wished to challenge the law. I also believed my colleague Asaf Orr, was in touch with other families in Alabama, and I

5

knew there were other families and medical providers who were very concerned about the law and who likely would want to be plaintiffs.

**Question Two: Any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, and/or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama.**

9.  I had no role in *Walker*. I was not involved in any actions or decisions in preparing to file *Ladinsky* or *Eknes-Tucker* that were intended to cause, caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama. We filed *Eknes-Tucker* in the Middle District because many of our plaintiffs resided there and because of our concerns about the prior departure from the first-filed rule in the Northern District. We were not seeking the assignment or reassignment of *Eknes-Tucker* to any specific judge in the Northern or Middle Districts of Alabama. I knew there was a chance a new case would be assigned or transferred back to Judge Burke, and while I hoped that would not happen, I was prepared to move forward if it did.

**Question Three: Any action or decision that relates to which parties to name in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, where to file each action, and all the reasons related to any such decision about who to name and where to file;**

10.  I had no role in deciding which parties to name in *Walker*. We decided which parties to name as defendants in *Ladinsky* and *Eknes-Tucker* based on which state and local defendants would be responsible for enforcing the law against our

plaintiffs. We filed *Ladinsky* in the Northern District because many of our plaintiffs were there and because we believed our chance of drawing a judge who would be receptive to a civil rights case was greater there. We filed *Eknes-Tucker* in the Middle District because many of our plaintiffs were there and because of our concerns about the prior departure from the first-filed rule in the Northern District.

**Question Four: Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*.**

11.  I was not involved in any action or decision relating to associating law firms on the *Walker* team. NCLR and King & Spaulding have been working together to prepare to bring a challenge to any Alabama law banning medical care for transgender minors since 2019, when such legislation was first introduced in Alabama. We asked the Lightfoot firm to join our legal team because we recognized we would benefit greatly from having attorneys who practice full time in Alabama on the team, and because the firm is highly regarded. We asked Jennifer Levi to join our team based on her deep expertise in transgender legal issues. We asked SPLC to join, based on their deep roots in Alabama and their day-to-day monitoring of legislative activity on this issue in the Alabama legislature.  And we asked HRC to join when they reached out to let us know they represented a family who was directly threatened by the law. We thought it made sense to add their plaintiff to our case

7

rather than to have them bring a separate case. I am unaware of any attempts to associate any other law firms or any discussions about doing so.

**Question Five: Any and all actions or decisions that relate to coordination and/or dismissal of the *Ladinsky* and *Walker* cases and the reasons for dismissal, including but not limited to (1) the conference call that occurred on April 15, 2022 and (2) any other communications between *Ladinsky* counsel and *Walker* counsel on that topic;**

12.  I was concerned by the unexpected transfer of *Ladinsky* to Judge Burke for the reasons already described. On April 15 (the day that transfer happened), I discussed those concerns with some individual members of our legal team and then took part in a team call, where others voiced similar concerns. We discussed various options, including possibly contesting the transfer based on the court's departure from the first-filed rule. We decided that doing so would not be a good use of our limited time and resources and that we should consider voluntarily dismissing our case. Part of the reason we did not think contesting the transfer was a viable option was our recognition that we had only a small window of opportunity to voluntarily dismiss without prejudice which would close as soon as an answer was filed.  I reached out to an attorney from the *Walker* team to see if they were considering doing so as well. I participated in a conference call between the two teams to discuss the possibility of voluntarily dismissing both cases. At some point either during or after the call (I no longer remember which), both teams indicated that, pending further consultation with and final decisions by their respective clients, they were

going to do so, with the understanding that we would then seek to work together to bring a new case. The two teams then had some further communications to discuss the logistics and timing of filing the motions to dismiss. I had some individual communications with one of the *Walker* attorneys to flag the need for a call between the two teams over the weekend if possible, given the short time before the law would take effect.

**Question Six: Any and all actions that relate to the decision to *file Eknes-Tucker* in the United States District Court for the Middle District of Alabama;**

13.   We filed in the Middle District because many of our new plaintiffs lived there and because of our concerns about the prior departure from the first-filed rule in the Northern District.

**Question Seven: Any knowledge you have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing; and**

14.   In preparation for the May 20, 2022, hearing, I participated in telephone calls with my counsel, Bobby Segall, and in calls with Mr. Segall and other attorneys represented by him from NCLR, GLAD, HRC, and SPLC. A document of anticipated questions and proposed, truthful answers was created and circulated based on those telephone conversations.  In addition, on the afternoon before the May 20 hearing, Bobby Segall sent his clients a talking points memo to be used by Jeff Doss in making a statement to the panel on behalf of all *Ladinsky* counsel.  On

the advice of my counsel, and on the basis of attorney-client, common interest, joint-client, and work product privileges, I object to producing these documents or setting out their contents.

**Question Eight: The identity of each attorney, not included in the style of the original order, whom you are aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced above and the details of each such person's involvement.**

15. In addition to retaining Bobby Segall, I have sought legal counsel regarding this investigation from a few other lawyers. Apart from those privileged communications, I am not aware of any other attorneys who had any substantive involvement regarding the subjects referenced above. I consulted a couple of civil procedure experts outside of our team relating to the filing of *Ecknes-Tucker*, but they did not have any input into our team's decision-making.

16. I have not discussed the contents of my declaration with any other declarant.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of July 2022.

/s/ Shannon Minter
Shannon Minter, Esq. (CA SBN. 261650)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
T: (415) 365-1310

10

F: (415) 392-8442
E: sminter@nclrights.org

# DECLARATION

# OF

# ASAF ORR

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| *In re* **Amie Adelia Vague,** *et al.* | ) ) ) | **Case No. 2:22-mc-03977-WKW** |

## DECLARATION OF ASAF ORR IN RESPONSE TO THIS COURT'S JULY 8, 2022 ORDER, DOC. 22

1.      I am a lawyer at the National Center for Lesbian Rights (NCLR). The following statements are true and to the best of my knowledge, information, and belief, formed after a reasonable inquiry under the circumstances. If called to testify about them, I would competently testify the same.

2.      I was counsel to the Plaintiffs in *Ladinsky v. Ivey* and am currently counsel for the Private Plaintiffs in *Eknes-Tucker v. Marshall*.

3.      I have been involved in preparing a legal challenge to the Alabama Vulnerable Child Compassion and Protection Act (hereinafter "the Act") since it was first introduced in the Alabama Legislature in 2020.

4.      NCLR and GLBTQ Legal Advocates and Defenders (GLAD) were the initial groups that formed the foundation of the *Ladinsky* and *Eknes-Tucker* teams.

When preparing to bring a case like this, we typically co-counsel with a law firm that can provide pro bono assistance. I reached out to Brent Ray at King & Spalding LLP. I worked with Mr. Ray on numerous cases over the past decade, including several cases involving medical treatment for transgender youth. Given his prior experience in that area, our good working relationship, and the firm's presence in Atlanta, King & Spalding seemed to be an ideal partner in this important case.

5.     Next, with the assistance of Mr. Ray, we began looking for local counsel. Mr. Ray was referred to Melody Eagan because of her excellent reputation as a trial lawyer and her extensive litigation experience in the federal courts in Alabama. NCLR, GLAD, King & Spalding, and Lightfoot, Franklin & White were the original legal team formed in early 2020.

6.     The Southern Poverty Law Center (SPLC) asked to join the team, either in 2020 or 2021, and we welcomed them for several reasons: (1) their reputation as a preeminent civil-rights organization; (2) their deep ties to the State of Alabama; (3) the unique resources they brought to the team, such as a legislative team that could keep us updated on the Act's progress through the legislature; and (4) the good and longstanding relationship between NCLR and SPLC. The Human Rights Campaign (HRC) asked to join the team approximately a week before the filing of the complaint in *Ladinsky*. HRC was independently considering a legal challenge to the Act, but instead asked to combine resources with our team. Like SPLC, HRC

2

brought additional resources to the team and is a frequent collaborator with NCLR on a wide range of projects.

7.     One of the first questions the original legal team discussed was venue. Consistent with our obligation to represent our clients competently and diligently, we explored a variety of factors related to venue, including, but not limited to, the location of our potential clients, ease of travel, local counsel's experience and familiarity with the judges in each venue, and the general makeup of the bench itself. Based on that wholistic review, the team ultimately decided to file what became *Ladinsky v. Ivey* in the Northern District of Alabama. That decision was made in 2020 and did not waver.

8.     The possibility of strategically adding particular lawyers, law firms, plaintiffs, or defendants to circumvent or interfere with the random assignment of judges was never a consideration that was mentioned, let alone a factor in our decision on venue for *Ladinsky* (and as I explain below, none of those considerations factored into the decision to file *Eknes-Tucker* in the Middle District of Alabama).

9.     In the time leading up to the filing of the complaints in *Ladinsky* and *Walker*, I participated in several calls with members of the *Walker* team. From my perspective, the objective of those calls was to dissuade the *Walker* team from challenging the Act and instead challenging one of the many other bills concerning transgender youth that had been enacted in other states. Undeterred, the *Walker* team

3

reiterated their plan to file their challenge to the Act in the Middle District of Alabama and to relate *Walker* to *Corbitt*, a case that was pending before Judge Thompson.

10.    To be clear, however, the decisions regarding venue for *Ladinsky* and *Walker* were made separately and independently from one another.

11.    Recognizing that the two lawsuits challenging the Act were unavoidable, we decided to keep one another more informed about our respective plans, but did not coordinate any aspect of our lawsuits. In fact, as soon as Governor Ivey signed the Act we moved quickly to file *Ladinsky* in hopes of filing before *Walker*. We wanted to make sure to file first even though we already had plans to amend the complaint to add the Zoe family and a free speech claim, and were not yet ready to file our motion for preliminary injunction.[1] We saw two key benefits of being the first-filed: (1) if consolidated, we could get to keep our choice of venue, the Northern District of Alabama; and (2) being the first-filed case would hopefully give us more control over the litigation in the event the cases were consolidated.

---

[1] Contrary to Mr. LaCour's assertions before this Panel on May 20, 2022, the reason for the delay in the filing of the planned motion for preliminary injunction in *Ladinsky* had nothing to do with the motion filed in *Walker* to have that case transferred to Judge Thompson. We believed that the Act would not pass out of the Alabama Legislature as the close of the legislative session was fast approaching. As a result, we had not completed drafting our motion for preliminary injunction by the time the Act was passed and signed by Governor Ivey. Thus, that delay would have occurred irrespective of whether the motion to transfer *Walker* was granted.

12.     At some point around this time, counsel for *Ladinsky* and *Walker* discussed a Common Interest Agreement to allow counsel to exchange information as our respective cases proceeded on their separate tracks. But, given the course of those cases there was not much opportunity—or need—for the sharing of information.

13.     Naturally, once *Ladinsky* was randomly assigned, we tried to learn everything we could about each judge we had been assigned. And, the *Walker* team did the same. For example, a member of the *Walker* reached out to get our team's impressions and insights about Chief Judge Marks as a jurist.

14.     When Chief Judge Marks issued the Order to Show Cause regarding the consolidation of *Walker* with *Ladinsky*, the *Walker* team contacted the *Ladinsky* team to discuss their response. Specifically, the *Walker* team indicated that their plan was to suggest that, in the interest of judicial economy, *Ladinsky* and *Walker* should be transferred to Judge Thompson. Although I can no longer recall the specifics of the conversations, I do recall us being very careful to ensure that nothing in the pleadings filed by *Walker* suggested that the first-filed rule should not apply, or made any statement that could be interpreted as eschewing the random-assignment process or seeking to influence the Court's internal operations.

15.     I followed up that conversation with an e-mail to members of the *Walker* team memorializing our request that their response to the Order to Show

Cause should not mention any consultation with the *Ladinsky* counsel, or suggest that we take any position on Chief Judge Marks's proposed consolidation of *Ladinsky* and *Walker* or on the *Walker* team's plan to transfer both cases to Judge Thompson. I made those statements for numerous reasons, not the least of which was to avoid the appearance of forum or judge shopping, which the *Ladinsky* team had no intention of doing. It was my understanding that the *Ladinsky* team would make no effort to be transferred from Judge Axon's court irrespective of the judge assigned to *Walker* and, if possible, litigate the two cases separately.

16.     The *Walker* team ultimately made the decision to consent to the transfer. Around that same time, the *Ladinsky* team had been in contact with Judge Axon's staff, initially about our then-forthcoming motions for *pro hac vice* admission and then about what would happen if *Walker* were transferred to the Northern District of Alabama. Abigail Terry, the member of the *Ladinsky* team who had been in communication with Judge Axon's staff, reported back that she was informed that *Walker* was being transferred to Judge Axon.

17.     Soon after *Walker* was transferred to the Northern District of Alabama, I was informed by the *Walker* team that the case had been assigned to Judge Burke and asked for the *Ladinsky* team's impressions of him, which I indicated were not positive, concerns that were based on an initial review of some of his opinions prior to joining the federal bench and information regarding his political affiliations prior

to becoming a judge. I recall expressing that *Walker* was likely inadvertently assigned to Judge Burke and that, consistent with the first-filed rule and the information we received from Judge Axon's staff, the case would be transferred to Judge Axon soon.

18.     Around that same time, I recall Ms. Eagan reporting back to the *Ladinsky* team that she had a conversation with Edmund LaCour, Solicitor General for the State of Alabama, during which he indicated the state's intent to move to consolidate *Ladinsky* and *Walker* before Judge Axon. This further gave me the impression that the assignment to Judge Burke was temporary—or in error—and that both cases would eventually be before Judge Axon.

19.     Not long afterwards, we received notice that Judge Axon transferred *Ladinsky* to Judge Burke. The transfer was made without any explanation for why there was a deviation from the first-filed rule, causing significant confusion and concern. To be clear, although some of that concern was tied to our initial analysis of Judge Burke's prior opinions and what that might mean for the claims raised in *Ladinsky*, the team's concerns centered around the circumstances of the transfer of *Walker* and the later transfer of *Ladinsky*, neither of which followed the expected process. The fact that Judge Burke scheduled a status conference in *Walker* before *Ladinsky* was transferred to him further heightened those concerns.

20.     Between learning of the transfer of *Ladinsky* to Judge Burke and the *Ladinsky* team call, I spoke with Shannon Minter, Legal Director for the National Center for Lesbian Rights and the decisionmaker for NCLR on the *Ladinsky* team. We discussed the possibility of dismissing the matter and I conveyed my concern that dismissing and refiling could be perceived as an attempt at forum shopping. But, as we talked through that concern, it became clear that there were substantive, and even dispositive, reasons for dismissing *Ladinsky* that were unrelated to Judge Burke, namely: (1) the unexplained process by which *Ladinsky* was reassigned to Judge Burke appeared inconsistent with the random case assignment procedures and the first-filed rule; (2) as a result of that process, it was unclear whether *Ladinsky* was still the lead case, despite being the first filed, which was of particular importance to the *Ladinsky* team as previously noted; (3) *Walker* and *Ladinsky* were two different cases in their framing and the claims asserted, and were at different stages (*Walker* already had a motion for preliminary injunction pending); and (4) the various groups of lawyers who had not planned on working together were suddenly in a situation where coordination was paramount. Dismissing and refiling would have addressed each of those concerns. By refiling we could once again be confident that the judge was randomly assigned to the case. And, the time between dismissal and refiling would have allowed the *Ladinsky* and *Walker* teams to consolidate the

8

complaints and organize our teams to seamlessly litigate this new case, which we saw as a benefit for all involved including Defendants and the Court.

21.     Although I am confident that I attended the *Ladinsky* team call to discuss the transfer to Judge Burke and the possibility of dismissing *Ladinsky*, I don't recall saying much, if anything, and don't remember what was said as I was not a decisionmaker and believed that the decisionmakers likely already had had separate conversations amongst themselves and with the decisionmakers from the *Walker* team. My purpose was to listen so that I could accurately convey the situation to our clients as well as their options for responding to this new information, which I did.

22.     Very soon after the dismissals were filed, the decisionmakers from the various groups had numerous discussions regarding how to proceed, which, in part, included a discussion regarding plaintiffs and venue. Although the initial plan was to proceed with some of the original plaintiffs from *Ladinsky* and *Walker*, in the interest of making clear that the dismissal was not an attempt at forum shopping, I was informed that we would be using an entirely new set of plaintiffs and filing in the Middle District of Alabama.

23.     Because I had developed deep connections in Alabama in preparation to challenge the Act, I played a central role in finding new plaintiffs for what is now *Eknes-Tucker v. Marshall*. The focus of those efforts was to find plaintiffs that

illustrated the wide range of harms the Act would cause if permitted to go into effect. The defendants were selected entirely based on the location of each plaintiff.[2]

24.     During the discussions of which plaintiffs and defendants to include in this new complaint, the team never considered whether naming a particular plaintiff or defendant would require any of the judges in the Middle District of Alabama to recuse themselves. To this day, I am unaware whether any of the plaintiffs or defendants in *Eknes-Tucker* or *Ladinsky* had any relationship with members of the bench in either district, except for Judge Manasco, a relationship we learned of after we filed the complaint in *Ladinsky*. Even still, the reason for including Drs. Ladinsky and Abdul-Latif as plaintiffs was based on their central role in the medical care of transgender adolescents in Alabama and because of the significant effect the Act would have on their practice and patients. They were not added to circumvent the random case assignment process.

25.     I participated in telephone calls with my counsel, Bobby Segall, and calls with my counsel and the attorneys from NCLR, GLAD, HRC, and SPLC, all of whom were represented by Bobby Segall, about the hearing on May 20, 2022. A

---

[2] Contrary to Mr. LaCour's statement to this Panel on May 20, 2022, Pastor Paul Eknes-Tucker joined as a plaintiff out of a concern that the breadth of the Act would have criminalized his pastoral counseling with a family of a transgender child. Further, Pastor Eknes-Tucker was not added simply to bring a First Amendment challenge to the Act. As previously noted, we planned to amend *Ladinsky* to add that claim, *supra* ¶ 12, and the free speech claim in *Eknes-Tucker* was brought by all Plaintiffs against all Defendants, *see* Dkt. 1, ¶¶ 121–126.

document of anticipated questions and proposed, truthful answers was created and circulated based on those telephone conversations.  In addition, on the afternoon before the May 20 hearing, Bobby Segall sent his clients a talking points memo to be used by Jeff Doss in making a statement to the panel on behalf of all *Ladinsky* counsel.  On the advice of my counsel, and on the basis of attorney-client, common interest, joint-client, and work product privileges, I object to producing these documents or setting out the content of the documents.

26.    Shannon Minter, NCLR's Legal Director, is the only attorney that I am aware of who was not included in the style of the original order, but who had input or other involvement in the subjects outlined in the Panel's order dated July 8, 2022 for *Ladinsky* or *Eknes-Tucker*.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This declaration was executed the 27th day of July, 2022.

/s/ Asaf Orr
_____
Asaf Orr, Esq. (CA SBN. 261650)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
T: (415) 365-1326
F: (415) 392-8442
E: aorr@nclrights.org

11

# DECLARATION

# OF

# DIEGO A. SOTO

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

---

|  |  |  |
|---|---|---|
| *In re* **Amie Adelia Vague,** *et al.* | ) ) ) | **Case No. 2:22-mc-3977-WKW** |

**DECLARATION OF DIEGO A. SOTO**
**IN RESPONSE TO THIS COURT'S JULY 8, 2022 ORDER, DOC. 22**

Pursuant to the Court's July 8, 2022 order, Doc. 22, I declare under penalty of perjury that the following is true and correct:

1.      My name is Diego Armando Soto. I graduated law school in May 2016 and joined the Southern Poverty Law Center in Montgomery, Alabama as a Law Fellow that fall. I was promoted to Staff Attorney in 2018 and Senior Staff Attorney in 2021. My supervisor is Scott McCoy, Esq. I am barred in Alabama and the District of Columbia. I am a member of the bars of the United States Court of Appeals for the Fifth Circuit and the United States District Courts for the Middle District of Alabama and Northern District of Alabama.

1

**Matter 1: The actual or potential judicial assignments in *Ladinsky*, *Walker*, and/or *Eknes-Tucker***

    **A.    Actual judicial assignments in *Ladinsky***

    2.    On April 11, I learned that *Ladinsky* had been assigned to Judge Manasco. I knew nothing about Judge Manasco. It appeared to me that the *Ladinsky* team considered her a good draw but expected her to recuse because the lead plaintiff, Dr. Ladinsky, works at Children's Hospital of Alabama, on whose board Judge Manasco serves.

    3.    Later that day, I learned that Judge Manasco recused in *Ladinsky* and that *Ladinsky* had been reassigned to Judge Cornelius. I knew nothing about Judge Cornelius. It appeared to me that the *Ladinsky* team considered her a good draw. It appeared to me that the consensus of the *Ladinsky* team was to consent to her exercising dispositive jurisdiction. I do not know what decision (if any) was actually made on whether the *Ladinsky* plaintiffs should consent to Judge Cornelius's exercising dispositive jurisdiction or even whether the *Ladinsky* plaintiffs filed their consent or declination form before *Ladinsky* was reassigned to Judge Axon.

    4.    On April 14, I learned that the parties in *Ladinsky* had not unanimously consented to the dispositive jurisdiction by a magistrate judge and that *Ladinsky* had been reassigned to Judge Axon. I knew nothing about Judge Axon. It appeared to me that the *Ladinsky* team considered her a very good draw.

5.     On April 15, I learned that Judge Axon had entered an order transferring *Ladinsky* to Judge Burke. I personally was very surprised by Judge Axon's order because it vaguely referenced efficiency and judicial economy interests, did not address the first-filed rule, and did not give the parties an opportunity to weigh in. It appeared to me that the *Ladinsky* team had similar opinions. I personally was unsure how transferring *Ladinsky*, the first-filed case, to the judge with the second-filed case would affect *Ladinsky*'s standing as the first-filed case. I also was concerned about the case's chances of success, given my general understanding at the time that Judge Burke is very conservative.

**B.     Potential judicial assignments in *Ladinsky***

6.     Sometime before *Ladinsky* was filed, I learned that *Ladinsky* could be assigned to any judge within the Northern District, including a judge in Huntsville, whom, it appeared to me, my co-counsel in *Ladinsky* considered very conservative and whom I later learned to be Judge Burke, but I did not know (and still do not know) precisely how the Northern District or the Southern Division assign cases. To the best of my recollection, I am not aware of any communication in which any of the *Ladinsky* counsel even suggested the possibility of dismissing under Rule 41 or taking any other action to circumvent Judge Burke should he receive the random assignment of the case.

7.     Before *Ladinsky* was filed, I generally understood that, if *Ladinsky*

3

were assigned to a magistrate judge and any party declined consent to the magistrate judge's exercising dispositive jurisdiction, then *Ladinsky* would be assigned to an Article III judge.

8.      On April 13, I learned that the *Walker* team planned to argue, in response to Chief Judge Marks's show cause order, that *Ladinsky* could be transferred to the Middle District and consolidated with *Walker* before Judge Thompson. It appeared to me that the consensus of the *Ladinsky* team was not to take a position on the matter because there would be value in having both cases proceed in their respective courts, that we would be fine with the judges in the Northern District, and that, although we probably should not object to transfer of *Ladinsky* to Judge Thompson if that were actually to occur because he would be a good assignment for the cases, no one thought that was likely to occur. It is my understanding that the *Ladinsky* team did not want the *Walker* team to imply in any way that the *Ladinsky* team was joining or otherwise supporting the *Walker* team's request to get before Judge Thompson.

### C.      Actual judicial assignments in *Walker*

9.      On April 12, I learned that *Walker* had been assigned to Chief Judge Marks. I knew nothing about Chief Judge Marks. It appeared to me that the *Ladinsky* team considered her smart, thoughtful, and hard-working.

10.     On April 15, I learned that *Walker* had been assigned to Judge Burke.

4

Based on the research I had done into the first-filed rule, I personally was very surprised to learn that, upon transfer to the Northern District, *Walker* had been assigned to Judge Burke instead of to Judge Axon, who had been assigned *Ladinsky*, the first-filed case. After all, *Ladinsky*'s being filed first appeared to be the reason why Chief Judge Marks transferred *Walker* to the Northern District in the first place. Nonetheless, I expected either Judge Burke or Judge Axon herself to transfer *Walker* to Judge Axon to be consolidated with *Ladinsky*.

### D.   Potential judicial assignments in *Walker*

11.    Before *Walker* was filed, I knew generally that *Walker* could be assigned to a judge in the Middle District, but I did not know (and still do not know) precisely how the Middle District or the Northern Division assign cases.

12.    On April 11, I learned that the *Walker* team designated *Walker* as related to *Corbitt*, a case assigned to Judge Thompson, but they were waiting to see whether Judge Thompson took a different view.

13.    On April 12, I learned that the *Walker* plaintiffs moved to reassign *Walker* from Chief Judge Marks to Judge Thompson.

14.    On April 13, I learned that the *Walker* team planned to argue, in response to Chief Judge Marks's show cause order, that judicial economy concerns warranted keeping *Walker* in the Middle District and transferring *Walker* to Judge Thompson. It is my understanding that the *Walker* team wanted to have *Walker*

assigned to Judge Thompson because he dealt with transgender justice issues in another case. They followed the same procedures they (I do not know to whom on the *Walker* team they were referring) successfully used in the past to designate *Walker* as related to a case before Judge Thompson. In the past, the clerk's office would assign the new case to Judge Thompson based on the designation, and Judge Thompson would decide whether to keep the new case. The clerk's office instead assigned *Walker* to Chief Judge Marks and told their filer that the complaint had been marked as expedited because it requested a temporary restraining order (TRO). Someone (I do not recall who) told them that they would need to file a motion to transfer to Judge Thompson. Someone (I do not recall who) called Judge Thompson's chambers because they were about to file a motion for TRO. They did not know whether *Walker* would be transferred to Judge Thompson or whether Judge Thompson was involved in deciding that question. The *Walker* team thought that it would be ideal for both cases to proceed independently in their separate courthouses.

15.     As with the *Walker* team's plan (described in paragraph 8 above) to argue that *Ladinsky* could be transferred to the Middle District, it appeared to me that the consensus of the *Ladinsky* team was not to take a position on the *Walker* team's effort to stay in the Middle District and reassign *Walker* to Judge Thompson.

6

16.     In my opinion, the *Walker* team's attempts to assign, and then transfer, *Walker* to Judge Thompson were unlikely to succeed. It is my understanding that the *Ladinsky* team had similar opinions.

17.     On April 14, I learned that the *Walker* team was retooling their response to Chief Judge Marks's show cause order in light of the State's response to the show cause order and the State's response to the *Walker* plaintiffs' motion to transfer *Walker* to Judge Thompson.

18.     I later learned that the *Walker* plaintiffs filed a response to Chief Judge Marks's show cause order not opposing transfer to the Northern District and withdrawing their pending motion to reassign *Walker* to Judge Thompson.

19.     In the morning of April 15, I learned that Judge Axon's courtroom deputy told the *Ladinsky* team that *Walker* was being transferred to Judge Axon.

20.     That afternoon, I learned that someone from Judge Burke's chambers told the *Walker* team that the only way *Walker* could be transferred to Judge Axon was if *Ladinsky* moved to consolidate *Walker* with *Ladinsky* before Judge Axon. It is my understanding that the *Ladinsky* team planned to file such a motion before learning that Judge Axon had transferred *Ladinsky* to Judge Burke.

### E.     Actual judicial assignments in *Eknes-Tucker*

21.     On April 20, I learned that *Eknes-Tucker* had been assigned to Judge Huffaker and that Judge Huffaker reassigned *Eknes-Tucker* to Judge Burke.

### F.     Potential judicial assignments in *Eknes-Tucker*

22.     Before *Eknes-Tucker* was filed, I knew generally that *Eknes-Tucker* could be assigned to a judge in the Middle District, but I did not know (and still do not know) precisely how the Middle District or the Northern Division assign cases.

**Matter 2: Any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, and/or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama**

23.     I did not participate in, and have no knowledge of, any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, and/or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama.

**Matter 3: Any action or decision that relates to which parties to name in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, where to file each action, and all the reasons related to any such decision about who to name and where to file**

### A.     Any action or decision that relates to which parties to name in *Ladinsky*, where to file *Ladinsky*, and all the reasons related to any such decision about who to name and where to file

24.     I did not participate in, and have no knowledge of, any action or decision that relates to which parties to name in *Ladinsky*, where to file *Ladinsky*, or the reasons related to any such decision about who to name or where to file. To the best of my recollection, these decisions about which parties to name in *Ladinsky* and where to file *Ladinsky* preceded my joining the *Ladinsky* team on

March 9, 2022.

25.     To the extent the Court is also asking about decisions *not* to name certain parties in *Ladinsky*, it is my understanding that, before I joined the *Ladinsky* team in March, it was decided (I do not know by whom) that some potential plaintiffs would no longer be named parties. Then, on April 8, after Governor Ivey signed the Act that day, I learned that two plaintiffs, who had been potential plaintiffs starting the day before, would not be named parties in the original complaint, but would instead be added in an amended complaint, so that the complaint could be filed that evening without further delay.

**B.     Any action or decision that relates to which parties to name in *Walker*, where to file *Walker*, and all the reasons related to any such decision about who to name and where to file**

26.     I did not participate in, and have no knowledge of, any action or decision that relates to which parties to name in *Walker* or any reason related to any such decision about who to name.

27.     On or about April 7, I learned that *Walker* would be filed in the Middle District. I did not participate in, and have no knowledge of, any reason related to any decision about where to file *Walker*.

**C.     Any action or decision that relates to which parties to name in *Eknes-Tucker*, where to file *Eknes-Tucker*, and all the reasons related to any such decision about who to name and where to file**

28.     On April 16, I learned that the new case, which became *Eknes-Tucker*,

9

would be filed in the Middle District. It is my understanding that one reason for

filing the new case in the Middle District was to avoid the appearance of judge

shopping. It is my understanding that it was thought at the time that filing a new

case in the Northern District, from where *Ladinsky* and *Walker* had just been

dismissed, would create the appearance of judge shopping, whereas filing a new

case in an entirely new district where our previous judges could not be assigned

would avoid that appearance. It is also my understanding that another reason for

filing the new case in the Middle District was that it was believed the case's

chances of success would not be bad before the judges there.

29.     On April 18, I learned that the new case, which became *Eknes-Tucker*,

would have all new plaintiffs compared with *Ladinsky* and *Walker*. It is my

understanding that one reason for having no overlap in plaintiffs between *Ladinsky*

and *Walker* on the one hand and *Eknes-Tucker* on the other hand, was to avoid the

appearance of judge shopping. I did not participate in the decision to name them as

parties. It is my understanding and opinion that each plaintiff added a unique

perspective to the case. It is my understanding that a reason for including some of

the plaintiffs was their location within the Middle District, which would allow us

to name additional defendants in the Middle District and ensure venue was proper

and convenient in the Middle District. It is my understanding that the defendants

were named because they have authority to enforce the Act as to some or all of the

plaintiffs.

**Matter 4: Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, and/or *Eknes-Tucker***

    **A.**    **Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky* and *Walker***

30.    I did not participate in, and have no knowledge of, any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky* or *Walker*.

    **B.**    **Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Eknes-Tucker***

31.    On April 15, I learned that the *Ladinsky* and *Walker* teams would attempt to file a new, combined case to challenge the Act and that they would meet the next day to figure out how and where to do so.

32.    Although it is my understanding that some members of the *Ladinsky* team and some members of the *Walker* team talked on April 16, I did not participate in that call, I do not know who participated in that call, and I do not know what was said or decided on that call.

33.    On April 17, I learned that the *Walker* team decided not to file a new lawsuit to challenge the Act with the *Ladinsky* team so that the *Ladinsky* team could proceed as expeditiously and efficiently as possible. I did not participate in

that decision.

34.     I also learned that the ACLU of Alabama was interested in possibly joining the *Ladinsky* team to file a new case. To the best of my recollection, the ACLU of Alabama never joined the team in any way. I did not participate in, and have no knowledge of, any discussions about their joining.

35.      To the best of my recollection, the *Ladinsky* team is the same as the *Eknes-Tucker* team and no other law firms were actually associated with the *Eknes-Tucker* team before *Eknes-Tucker* was filed.

**Matter 5: Any and all actions or decisions that relate to coordination and/or dismissal of the *Ladinsky* and *Walker* cases and the reasons for dismissal, including but not limited to (1) the conference call that occurred on April 15, 2022 and (2) any other communications between *Ladinsky* counsel and *Walker* counsel on that topic**

36.     On April 15, after Judge Axon transferred *Ladinsky* to Judge Burke, some members of the *Ladinsky* team got on a call. I joined the call after I left an hour-long class at Orangetheory Fitness in Prattville, Alabama at approximately 5:15PM. I do not recall who else attended that call, except I know McCoy did and Stone did not. I do not believe anyone outside the *Ladinsky* team was on the call. I do not recall speaking during the call. Although I recall the general decision to dismiss *Ladinsky* and file a new case, I do not recall anything specific that was said.

37.     After the call, I learned that the *Walker* team decided to dismiss

12

*Walker*, that *Walker* was dismissed, and that *Ladinsky* was dismissed. It is my understanding that the cases were quickly dismissed that evening to preempt a responsive pleading by defendants, which would have eliminated the plaintiffs' right to unilaterally and voluntarily dismiss their cases.

38.     I did not participate in, and have no knowledge of, any other communications between *Ladinsky* counsel and *Walker* counsel about the dismissal of *Ladinsky* and *Walker*.

**Matter 6: Any and all actions that relate to the decision to file *Eknes-Tucker* in the United States District Court for the Middle District of Alabama**

39.     I incorporate by reference paragraph 28 above.

**Matter 7: Any knowledge you have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing**

40.     I participated in telephone calls with my counsel, Bobby Segall, Esq., and in calls with my counsel and the attorneys from NCLR, GLAD, HRC, and SPLC, all of whom were represented by Segall, about the May 20, 2022 hearing. A document of anticipated questions and proposed, truthful answers was created and circulated based on those telephone conversations. In addition, on the afternoon before the May 20 hearing, Segall sent his clients a talking points memo to be used by Jeffrey Doss, Esq. in making a statement to the panel on behalf of all *Ladinsky* counsel. On the advice of my counsel, and on the basis of the attorney–client

privilege, the work product doctrine, the common interest doctrine, and the joint-client doctrine, I object to producing these documents or setting out the content of the documents.

41.     I do not have knowledge of any questions that were actually asked by the Court at the May 20, 2022 hearing. Because I was excused from attendance, McCoy and Stone recounted the hearing's public portions for me, namely that the subjects of this inquiry were sworn in, that they were divided into groups based on knowledge and authority, and that the State was permitted to present evidence. As for the nonpublic portions, McCoy did not testify that day. Stone merely described that a special master was appointed to question the more junior attorneys and that the topics of the questions he asked were sometimes very specific and sometimes very general without disclosing the substance of any question in any way. I do not know what Stone or anyone else was asked or what Stone or anyone else testified.

**Matter 8: The identity of each attorney, not included in the style of the original order, whom you are aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced above and the details of each such person's involvement.**

42.     It is my understanding, which could be mistaken, that Sharon McGowan, Esq., then of Lambda Legal, might have participated in, or might have knowledge of, the decisions to file *Walker* in the Middle District and to relate *Walker* to *Corbitt*.

* * *

14

43.     I have not shared or discussed this declaration with any other attorney who is a subject of this inquiry. Except as already described in paragraph 41 above, I have not had any communications with anyone other than with my own counsel regarding any matters related to the Court's July 8, 2022 order or that were addressed by the Court and counsel during the May 20, 2022 hearing.

44.     I have commenced efforts to preserve all communications, relating in any way to the topics listed in the Court's July 8, 2022 order, and all work product related in any way to *Ladinsky*, *Walker*, and *Eknes-Tucker*, including by engaging SPLC's IT department. On July 9, I realized that my SPLC-issued iPhone was set to keep text messages saved only for 30 days and that the iCloud account for that iPhone was not set to save text messages. I had those settings for as long as I can recall, well before I joined the *Ladinsky* team, because that iPhone has only 32 GB of storage capacity, that iCloud account has only 5 GB of storage capacity, and I rarely use that iPhone to text anyway. I immediately changed those settings to keep text messages forever and to save text messages to the iCloud account. Although it is possible that I used that iPhone to text about the matters listed in the Court's July 8, 2022 order, I do not recall any specific text message conversations.

Executed on July 26, 2022.

Diego A. Soto

**DECLARATION**

**OF**

**SARAH WARBELOW**

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA**

*In re* **Amie Adelia Vague,** *et al.*      )     **Case No. 2:22-mc-3977-WKW**

**DECLARATION OF SARAH WARBELOW
IN RESPONSE TO THIS COURT'S JULY 8, 2022 ORDER, DOC. 22**

I, Sarah Warbelow, declares as follows:

1. I submit this declaration based upon my personal knowledge.
2. To the best of my ability this declaration is a full, complete, and transparent disclosure of my participation in and knowledge of the events and issues raised by this court.  I have not discussed this Declaration with anyone other than my counsel, and I have otherwise complied with this Panel's order of July 8, 2022.

**A. The actual or potential judicial assignments in *Ladinsky*, *Walker*, and/or *EknesTucker*;**

3. The Human Rights Campaign (HRC) joined the *Ladinsky* litigation team (National Center for Lesbian Rights, GLBTQ Legal Advocates & Defenders, Southern Poverty Law Center, King & Spaulding, and Lightfoot) on April 6, 2022.  HRC approached the Ladinsky team on behalf of a client we were representing to ask to join their planned litigation. Our plaintiff is a patient

1

of Doctor Ladinsky. The decision to file in the Northern District of Alabama had been made prior to HRC joining the *Ladinsky* team. I had no concerns with that decision and Cynthia Weaver, also of HRC, did not share any concerns with me.

4. Because HRC was a late comer to the *Ladinsky* team the HRC attorneys were deferential to the decisions of the other attorney decision makers. If I had thought anything was unethical or contrary to the law, I would have brought it to the attention of the other attorney decision makers and objected to the actions. My memories are limited because I did not take copious notes in the way that I typically do when my team and I are driving the litigation decisions and because nothing that I witnessed said or done by the *Ladinsky* team seemed problematic.

5. On April 11, 2022, the *Ladinsky* team learned that our case had been assigned to Judge Anna Manasco. The general assessment was that she was neither the best nor worst judge we could have drawn, and that overall she was a good draw. We learned that Judge Manasco would likely need to recuse herself because she is on the board of the hospital that employs Dr. Ladinsky. Later that day, Judge Manasco did recuse herself and the *Ladinsky* case was reassigned to Judge Staci G. Cornelius. Judge Cornelius was also considered to be an overall good draw. At that time, the possibility was raised that it would be helpful to have a decision from an Article III judge and that we might request reassignment to an Article III judge.

6. Also on April 11, 2022, the *Ladinsky* team learned that the *Walker* team was seeking to have the *Walker* case related to the *Corbitt* case. To my knowledge, no one on the *Ladinsky* team was consulted with nor had any input into the *Walker* team's decision.

7. On April 12, 2022, the *Ladinsky* team learned that the *Walker* case had been assigned to Judge Emily Marks. The *Ladinsky* team thought that Judge Marks was a good draw for the *Walker* team and shared that with them.

8. On April 13, 2022 the *Walker* team reached out to inform the *Ladinsky* team that the Walker team planned to respond to Judge Marks order directing the parties to show cause as to why the *Walker* case should not be transferred to the Northern District by arguing that their case should be kept in the Middle District and should be transferred to Judge Thompson. A call was requested with representatives of each organization to discuss the implications for the

2

*Ladinsky* case.  One, or maybe more, attorneys on the *Ladinsky* team indicated that it could be a net good if the *Ladinsky* case ended up with the *Walker* case in front of Judge Thompson but that there was significant value in having two opportunities to have a good decision.

9. Also on April 13, 2022, I signed off on an email drafted and edited by other members of the *Ladinsky* team to the *Walker* team explaining that there was value in having two opportunities to knocking down the law and that while we did not have a problem with them mentioning the possibility of the cases being consolidated before Judge Thompson that they not mention any consultation with us in their papers and not to suggest that the *Ladinsky* team had any position on consolidation. My understanding was that the *Ladinsky* team wanted the *Walker* team to refrain from any implication in its papers that the *Ladinsky* team agreed to be transferred to the Middle District or otherwise supported the transfer. There was a call scheduled between the *Walker* team and the *Ladinsky* team that day. I indicated availability to participate in that call on behalf of HRC, however, I do not believe that I actually joined. I am unable to say definitively that I did not join.

10. On April 13, 2022, the issue was raised on the *Ladinsky* team whether just to save time, we should decline to accept the United States Magistrate Judge (because at least one defendant would ultimately do so), and it might be well to find out right away who our judge would be.  It was also agreed that even if our draw was not as good as Judge Marks, that does not mean we should alter our strategy in any way relative to remaining the first filed case.  Ultimately it was decided that the *Ladinsky* team should stay the course with the magistrate judge.  Subsequently, we learned that a review of Judge Cornelius's civil rights related cases did not result in the discernment of any particular leaning, but she had referred to parents' fundamental rights in a case that denied grandparents rights and standing.

11. On April 14, 2022, the *Ladinsky* case was assigned to Judge Annemarie Carney Axon. Overall, the *Ladinsky* team considered her a fine draw.

12. Also on April 14, 2022, the *Ladinsky* team saw the *Walker* team filing in response to Judge Marks' order. The *Walker* team did not run the filing by anyone on the *Ladinsky* team and ultimately decided not to oppose transfer to the Northern District to be consolidated with *Ladinsky* before Judge Axon.

3

13. On April 15, 2022, the *Ladinsk*y team learned that Judge Axon's courtroom deputy expected that the *Walker* case was being transferred to Judge Axon. Later that morning the *Ladinsky* team learned that the *Walker* case had been assigned to Judge Burke. The collective assumption appeared to be that the assignment was temporary.

14. A meeting was set for the *Walker* team and the *Ladinsky* team to talk at 2pm CT on April 15, 2022 regarding coordination of the soon to be consolidated cases. It was ultimately rescheduled with an intent to speak early the following week to allow the *Ladinsky* team to finalize an amended complaint and preliminary injunction motion.

15. On April 15, 2022, at approximately 4:45pm CT, the *Ladinsky* team learned that the *Ladinsky* case had been transferred to Judge Burke.  I did not see the email right away because I was not working that day.  It was my impression that the *Ladinsky* attorneys were shocked not only because the transfer appeared highly unusual in that it was contrary to the first-filed rule without any explanation for the deviation, but also because *Ladinsky* would no longer be the lead case after such an effort had been made to file the first lawsuit. The possibility of asking Judge Axon to reconsider was raised.

16. A call was held a little after 5pm CT on April 15, 2022 for the *Ladinsky* team.  I have very little memory of the call other than a sense of shock and a feeling of pressure to make a decision about whether to seek a voluntary dismissal under rule 41. This is the only time in my practice that I have encountered an unexpected transfer.

17. At 6:35pm CT on April 15, 2022, the Ladinsky team entered a notice of voluntary dismissal.

18. It is my belief that if the *Ladinsky* case had been assigned to Judge Burke rather than Judge Manasco, Judge Cornelius, or Judge Axon at any of the preceding junctures, the *Ladinsky* team would not have sought to voluntarily dismiss the *Ladinsky* case even though the *Ladinsky* team was concerned about Judge Burke's conservative leaning. In addition, it is my belief that if *Ladinsky* had been the second filed case and had then been transferred to Judge Burke as the judge on the first-filed case, the *Ladinsky* team would not have sought to dismiss the case.

**B. Any actions or decisions taken in the course of preparing to file Ladinsky, Walker, and/or Eknes-Tucker that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama;**

19. In the filing of *Eknes-Tucker*, a joint decision was made by the *Eknes-Tucker* team to file in the Middle District of Alabama to avoid both the unusual circumstances that caused *Ladinsky* to be dismissed and any appearance of judge shopping.

20. I am unaware of any other conversation, decisions, or actions taken by any counsel in or related to *Ladinsky* or *Eknes-Tucker* in the course of preparing to file that related to action or plans that were intended to cause, actually caused, or may have cause the assignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama. I have no reason to believe that any counsel in or related to *Ladinsky* or *Eknes-Tucker* in the course of preparing to file intended to take action or make plans that were intended to cause, actually caused, or may have cause the assignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama.

21. After the filing of the *Walker* case, I learned that the *Walker* team sought to have the *Walker* case reassigned to Judge Thompson as related to the *Corbitt* case.

**C. Any action or decision that relates to which parties to name in Ladinsky, Walker, and/or Eknes-Tucker, where to file each action, and all the reasons related to any such decision about who to name and where to file;**

22. Decisions related to which parties to name in *Ladinsky* were made prior to HRC joining the *Ladinsky* team. It had been the intention to add the Zoes, whom HRC was representing, to the *Ladinsky* case as part of the amended complaint. Because the amended complaint was not filed prior to seeking a voluntary dismissal, the Zoes were never part of the *Ladinsky* case.

23. Because the Zoes were never part of the *Ladinsky* case, they became named plaintiffs in the *Eknes-Tucker* case. None of the plaintiffs in the *Eknes-Tucker* case were plaintiffs in the *Ladinsky* case.

5

24. In addition to the Zoes, I had contact with Dr. Rachel Koe after the *Ladinsky* case had been voluntarily dismissed. She had been identified as someone who might be interested in being a plaintiff by HRC's Alabama State Director.

25. In preparing to file *Eknes-Tucker*, it appears that the base line assumption from all of the counsel was that all of the defendants would remain the same except that District Attorneys would be added or dropped depending upon where the plaintiffs resided. Someone expressed an Interest in keeping the Jefferson County DA in the Eknes-Tucker case. I have no knowledge as to why. At no time to my knowledge did any counsel suggest a desire to name a defendant for purposes of creating a conflict or appearance of conflict with any judge in any federal district court in Alabama.

**D. Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in Ladinsky, Walker, and/or EknesTucker;**

26. I was not involved in associating the two law firms that were counsel in *Ladinsky.* The lawyers in *Ladinsky* remained the lawyers for the *Eknes-Tucker* case. I also have no knowledge of how the *Walker* team was put together.

27. On April 16th, after the dismissal of both the *Ladinsky* and *Walker* cases, a small group of attorneys from the non-profits on the *Ladinsky* and *Walker* teams had a conversation about potentially working together on a new case. Ultimately the decision was made by the *Walker* team to not bring any new case.

**E. Any and all actions or decisions that relate to coordination and/or dismissal of the Ladinsky and Walker cases and the reasons for dismissal, including but not limited to (1) the conference call that occurred on April 15, 2022 and (2) any other communications between Ladinsky counsel and Walker counsel on that topic;**

28. It is my understanding that there was one call between a member of the *Ladinsky* team and a member of the *Walker* team prior to dismissal of the

*Ladinsky* case. I subsequently learned that those attorneys proposed working jointly on a new case. Other than this call, I am unaware of any other calls that took place on April 15th between any members of the *Ladinsky* team and the *Walker* team.

29. I have very little memory of the conference call that was limited to the *Ladinsky* team on April 15, 2022 other than a sense of shock and a feeling of pressure to make a decision about whether to seek a voluntary dismissal under rule 41. It was my impression that the *Ladinsky* attorneys were shocked not only because the transfer appeared highly unusual in that it was contrary to the first-filed rule without any explanation for the deviation, but also because *Ladinsky* would no longer be the lead case after such an effort had been made to file the first lawsuit.

30. On April 16th, after the dismissal of both the *Ladinsky* and *Walker* cases, a small group of attorneys from the non-profits on the *Ladinsky* and *Walker* teams had a conversation about potentially working together on a new case. It was quickly clear that the teams had different strategies and ideas about decision making. It seemed unlikely that consensus could be reached. The conversation was proposed on the morning of April 16th.

31. On April 17th, the *Walker* team informed the *Ladinsky* team that it would not be moving forward with new litigation.

**F. Any and all actions that relate to the decision to file Eknes-Tucker in the United States District Court for the Middle District of Alabama;**

32. In the filing of *Eknes-Tucker*, a joint decision was made by the *Eknes-Tucker* team to file in the Middle District of Alabama.  My understanding is that this choice was made to avoid both the unusual circumstances that caused *Ladinsky* to be dismissed and any appearance of judge shopping.

**G. Any knowledge you have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing; and**

33. I participated in telephone calls with my counsel, Bobby Segall, and calls with my counsel and the attorneys from NCLR, GLAD, HRC, and SPLC, all of whom were represented by Bobby Segall, about the May 20, 2022 hearing. A document of anticipated questions and proposed, truthful answers was created and circulated based on those telephone conversations.  In addition, on the afternoon before the May 20 hearing, Bobby Segall sent his clients a talking points memo to be used by Jeff Doss in making a statement to the panel on behalf of all Ladinsky counsel.  On the advice of my counsel, and on the basis of attorney-client, common interest, and work product privileges, I object to producing these documents or setting out the content of the documents.

**H. The identity of each attorney, not included in the style of the original order, whom you are aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced above and the details of each such person's involvement**

34. Shannon Minter, Legal Director for the National Center for Lesbian Rights, was involved in the overall strategy and decision making for *the Ladinsky* and *Eknes-Tucker* cases. He was involved in conversations to which I was not privy either because they occurred prior to HRC joining the *Ladninsky* case or because they were one off conversations with other decision makers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This declaration was executed the 25th day of July, 2022.

/s/ Sarah Warbelow
Sarah Warbelow, Esq. (MI SBN. P66690)
HUMAN RIGHTS CAMPAIGN FOUNDATION

1640 Rhode Island Ave, NW
Washington, DC 20036
T: (202) 572-8981
F: (202) 628-0517
E: swarbelow@hrc.org

# DECLARATION

# OF

# CYNTHIA WEAVER

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| *In re* **Amie Adelia Vague,** *et al.* | ) ) ) | **Case No. 2:22-mc-3977-WKW** |

### DECLARATION OF CYNTHIA CHENG-WUN WEAVER
### IN RESPONSE TO THIS COURT'S JULY 8, 2022 ORDER, DOC. 22

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

### BACKGROUND

1)      I make this declaration in accordance with the Order dated July 8, 2022 (Dkt. No. 22) and attest to compliance with the same Order.

2)      On January 10, 2022, I began working as the Litigation Director for the Human Right Campaign ("HRC") Foundation, which is the educational arm of HRC and where the impact litigation work is housed.

3)      Around the beginning of April 2022, I learned that the HRC Foundation would be joining the GLBT Legal Advocates and Defenders, National Center for Lesbian Rights, Southern Poverty Law Center, King & Spalding LLP, and Lightfoot, Franklin & White LLC, in a lawsuit

challenging the recently passed Alabama law that criminalizes the provision and administration of transition-related medical care to individuals under the age of majority.

4)      Given the HRC Foundation's late entry into a lawsuit involving a team that has been working together for an extended period of time, as well as my new involvement as an attorney in this impact litigation space, I understood my task was to focus on client engagement with parents of a transgender child.  I understood that the HRC Foundation would not drive the strategic planning of the case and would offer assistance as the litigation team saw fit.

5)      Because the HRC Foundation joined this litigation team right before SB 184 became law, there was insufficient time to add my clients to the *Ladinsky* complaint as plaintiffs. I understood my clients would be included in an amended complaint after the *Ladinsky* complaint was filed, which would likely be the first-filed case challenging SB 184.  I was concerned that my clients would not be included in a motion requesting a preliminary injunction but then learned that the litigation team would not file one before filing the amended complaint as the court papers were still being drafted and revised.

## INQUIRY TOPICS

6)      Among the inquiry topics set forth in the Order dated July 8, 2022, I only participated in the inclusion of plaintiffs as discussed herein.

7)      With respect to the actual or potential judicial assignments in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, I did not participate by way of offering input or recommendations in those discussions.  Due to my targeted responsibilities, as well as my general minimal concern with judicial assignments, I directed limited attention to this topic.  My knowledge of this topic derived from emails I was copied on.  Specifically, I was included in email communications involving:

a.   When a judge was assigned to a case;

b. Reports such as from Westlaw about Judges Cornelius, Axon, and Burke;

c. How in the Northern District of Alabama, magistrate judges are in the civil draw such that a party would have to decline such jurisdiction in order to have an Article III judge assigned;

d. Consideration of consenting to magistrate jurisdiction in *Ladinsky*;

e. A conference call with the *Walker* team about their desire to keep their case in the Middle District of Alabama and transfer the case to Judge Thompson;

f. The *Walker* team wanting the *Ladinsky* case to be transferred to their district and be consolidated;

g. Attorneys on the *Ladinsky* team expressing surprise that the *Walker* team sought to mark their case related to a prior case they litigated before Judge Thompson;

h. The *Walker* team agreeing to transfer their case to the Northern District after the Alabama Attorney General's Office consented to said transfer;

i. A phone call between an associate from King & Spalding and the Courtroom Deputy for Judge Axon discussing what to include in *pro hac vice* admission applications to protect attorneys' safety while being notified by the same Courtroom Deputy that the *Walker* case would be transferred to Judge Axon;

j. The *Walker* team informing the *Ladinsky* team that their case was assigned to Judge Burke and not Judge Axon, even though Judge Axon was the judge on the first-filed case and whose Courtroom Deputy had notified the *Ladinsky* team that the *Walker* case would be transferred to her; and

3

    k.   The *Walker* team informing the *Ladinsky* team that Judge Burke's law clerk stated the *Ladinsky* team, having the first-filed case, can move to consolidate the cases to be potentially heard before Judge Axon.

8)    I understood from the email communications that the *Ladinsky* team and *Walker* team each preferred to stay as separate cases in order to be in a position to drive the strategic planning of their cases.

9)    With respect to any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, and/or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama, I did not participate in such discussions. Other than what is otherwise included in this declaration, I do not have further knowledge on this topic.

10)    With respect to any action or decision that relates to which parties to name in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, where to file each action, and all the reasons related to any such decision about who to name and where to file, I recommended to my supervisor, Sarah Warbelow, that parents of a boy who is transgender and the boy may join the *Ladinsky* lawsuit. As attested, they were not included in the *Ladinsky* lawsuit but were added to the *Eknes-Tucker* lawsuit. I also contacted a pediatrician about their interest in the law and whether they would feel comfortable challenging it in what would be *Eknes-Tucker*. This doctor, connected to me through a colleague at HRC, declined to join the lawsuit. With respect to defendants, I was only aware that district attorneys of counties in which the plaintiffs reside were named as necessary parties to enjoin the Alabama law. My knowledge on this piece with regard to defendants derived from a team call. I understood that *Ladinsky* was filed in the Northern District based on the location of

4

the plaintiffs' residences.  I understood that there were other potential plaintiffs from the Middle District, which contributed to the filing of *Eknes-Tucker* in the Middle District.

11)      With respect to any action or decision that relate to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, I did not participate, nor have any knowledge of any such actions or decisions. When the HRC Foundation joined the *Ladinsky* / *Eknes-Tucker* team, the legal team was already in place.

12)      With respect to any action or decision that relates to coordination and/or dismissal of the *Ladinky* and *Walker* cases and the reasons for dismissal, including but not limited to (i) the conference call that occurred on April 15, 2022 and (ii) any other communications between *Ladinsky* counsel and *Walker* counsel on that topic, I did not participate by way of offering input or recommendations in those discussions.  My knowledge of this topic derived from emails I was copied on.  Specifically, I was included in email communications involving:

   a.   The transfer of the *Ladinsky* case from Judge Axon to Judge Burke with an invitation to join a call to discuss the transfer, on April 15, 2022;

   b.   Emails discussing how both *Ladinsky* and *Walker* teams would dismiss their cases and consolidate into one case in order to streamline litigation.

13)      I did not participate in the discussions leading to the dismissal of the *Ladinsky* case or the *Walker* case.  During the time of these discussions, I was picking up my children from daycare and then aftercare at the public school, then caring for them when my husband was working; thus, I could not follow what was taking place.  I understood that the *Ladinsky* case was the first-filed case and that its transfer to be consolidated with the *Walker* case was a procedural error or did not follow rules of the district.  I understood there was confusion and concern among

the attorneys as to what had occurred, which was different from what was relayed by Judge Axon's Courtroom Deputy and was different from what should be done pursuant to the first-filed rule. I understood that the dismissal of *Ladinsky* was done to obtain a judge through the court's random assignment system as it appeared to the attorneys that the first-filed rule was circumvented.

14)     With respect to the topic of any action or decision to file *Eknes-Tucker* in the United States District Court for the Middle District of Alabama, I did not offer input in those discussions. As attested, I understood we may have plaintiffs already residing in the Middle District. I also believe the reason to file a new case with new plaintiffs in the Middle District of Alabama was to avoid an accusation of judge-shopping.

15)     With respect to any knowledge I have that relates to (i) the preparation for the hearing in this matter (including circulation of any Q&A document), and (ii) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing, I participated in telephone calls with my counsel, Bobby Segall, and calls with my counsel and the attorneys from NCLR, GLAD, HRC, and SPLC, all of whom were represented by Bobby Segall, about the May 20, 2022 hearing. A document of anticipated questions and proposed, truthful answers was created and circulated based on those telephone conversations. In addition, on the afternoon before the May 20 hearing, Bobby Segall sent his clients a talking points memo to be used by Jeff Doss in making a statement to the panel on behalf of all Ladinsky counsel. On the advice of my counsel, and on the basis of attorney-client, common interest, and work product privileges, I object to producing these documents or setting out the content of the documents.

16)     With respect to the topic of the identity of each attorney, not included in the style of the original order, whom I was aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced above and the details of each such person's

involvement, I know that Shannon Minter was involved in discussions with the *Walker* team on dismissing the *Ladinsky* and *Walker* cases.  He was also copied on many of the emails that I was copied on.

17)   In compliance with the Panel's sequestration order, I have not spoken with any attorney from either team about the questions they were asked by the Panel or Justice Harwood, nor have I discussed my declaration with anyone other than my attorney.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 27, 2022

___/S/____ Cynthia Cheng-Wun Weaver_____
                    Cynthia Cheng-Wun Weaver

7