UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| *In re* **Amie Adelia Vague, et al** | ) | Case No. 2:22-mc-03977-WKW |
| | ) | (Middle District of Alabama) |

### DECLARATION OF JAMES ESSEKS

I, James Esseks, declare as follows:

1. I am providing this *in camera* Declaration as required by the Panel's July 8, 2022 Order in the above referenced proceeding. By doing so, I am not waiving any privilege, including the attorney client privilege and the protections of the attorney work product doctrine. The matters stated herein are based upon my personal knowledge and are true and complete to the best of my recollection.

2. I understand the Panel's July 25, 2022 Order (ECF 41) requires me to disclose work product responsive to the topics in the Panel's July 8, 2022 Order. To comply with that Order, I am, on the advice of counsel, disclosing certain information protected by the work product doctrine in this declaration. To preserve

my objection to the sharing of this information, I have highlighted this protected information in blue throughout my declaration. I further understand that in submitting this information *in camera* under order of the Panel, I am not waiving any privilege protected by the work product doctrine.

3. I graduated from Yale College in 1987 and Harvard Law School in 1991. I have been employed by the American Civil Liberties Union ("ACLU") since 2001, first as Litigation Director of the LGBTQ & HIV Project and then as Director of that Project starting in 2010. Prior to joining the ACLU, I was a partner at Vladeck, Waldman, Elias & Engelhard, PC. I also clerked for the Honorable Robert L. Carter, United States District Judge for the Southern District of New York, and the Honorable James R. Browning, United States Circuit Judge for the Ninth Circuit.

4. I am admitted to the New York and California Bars. I have also been admitted to practice in several federal district courts, the Second, Third, Fourth, Sixth, Seventh, Ninth, and Eleventh Circuit Courts of Appeals, and the Supreme Court of the United States.

5. I am in good standing in every Bar to which I am admitted. I have never had disciplinary or grievance proceedings filed against me, and I have never been denied admission to any federal court.

## Role In The *Ladinsky*, *Walker*, And *Eknes-Tucker* Cases

6. The ACLU became involved in preparing the litigation that was ultimately filed as *Walker v. Marshall*, No. 2:22-cv-00167 (M.D. Ala) ("*Walker*") in early 2020, when felony healthcare ban legislation was first introduced in Alabama.

7. In 2020, the ACLU was working with the ACLU of Alabama, Lambda Legal, and the law firm BakerHostetler to prepare for a potential case challenging the felony healthcare ban. When the Alabama 2020 legislative session closed without passing this legislation, we stopped preparing to litigate until the 2021 legislative session.

8. In 2021, another felony healthcare ban was introduced in Alabama. The ACLU again partnered with the ACLU of Alabama and Lambda Legal to prepare for litigation. At this point, we brought the Cooley law firm into the team to replace BakerHostetler. When the Alabama 2021 legislative session closed again without passing legislation, the team again stopped all preparations until the 2022 legislative session.

9. In 2022, a similar felony healthcare ban was again introduced in the Alabama legislature. This time, Transgender Law Center joined the ACLU, the ACLU of Alabama, Lambda Legal, and Cooley ("*Walker* counsel") in preparing to file a constitutional challenge if the bill became law. The Governor of Alabama

signed the felony healthcare ban, SB 184, into law on April 8, 2022. Our team filed *Walker* on April 11, 2022.

10. In early 2020, after the ACLU and Lambda Legal had decided to develop a lawsuit challenging the felony healthcare ban bill should it pass, I became aware that other legal organizations, including the National Center for Lesbian Rights ("NCLR") and GLBTQ Legal Advocates & Defenders ("GLAD"), were also preparing to file litigation challenging the legality of a felony healthcare ban in Alabama. To the best of my recollection, I gained this awareness from conversations with attorneys on my staff, who had spoken with attorneys at NCLR. The ACLU decided it did not want to create one joint case with ACLU, ACLU of Alabama, Lambda Legal, NCLR, and GLAD challenging the law together, and instead chose to pursue its own case with the ACLU of Alabama and Lambda Legal. While the ACLU has on occasion brought joint litigation with NCLR and collaborated with GLAD on litigation, my experience is that the greater the number of organizations involved in planning litigation, the more difficult it is to come to ground on legal strategy and quickly respond to case events. In addition, I knew that the ACLU and Lambda Legal on the one hand, and NCLR and GLAD on the other, sometimes had different takes on strategic questions in litigation and felt strongly about their positions, and I thought a partnership with all of these organizations would be challenging.

11. Furthermore, it is not uncommon for the various LGBTQ legal organizations to file multiple, separate cases in different courts challenging the same law or practice. For instance, this occurred frequently when the organizations were all simultaneously litigating separate marriage equality cases in the same states. I was not surprised by NCLR and GLAD's intention to file litigation challenging Alabama's law, nor was it abnormal for two teams of organizations to be pursuing separate litigation in the same state.

12. I was not involved in the preparation, filing, or litigation of *Ladinsky v. Ivey*, No. 5:22-cv-00447 (N.D. Ala.) ("*Ladinsky*").

13. After *Ladinsky* was voluntarily dismissed, I understood that *Ladinsky* counsel were considering filing a separate case challenging SB 184. Aside from this general awareness, I was not involved in the preparation or filing of *Eknes-Tucker v. Marshall*, No. 2:22-cv-00184 (M.D. Ala.). I have also not consulted with *Eknes-Tucker* counsel on the litigation of that case.

### Responses To The Panel's July 8, 2022 Order (ECF 22) Topics

**1.  The actual or potential judicial assignments in *Ladinsky*, *Walker*, and/or *Eknes-Tucker***

14. I did not perform any work regarding the actual or potential judicial assignments in *Ladinsky* or *Eknes-Tucker*. I am aware of the actual judicial assignments in both cases. *Ladinsky* was initially assigned to Judge Manasco, who

recused herself from the case. It was then assigned to a magistrate judge, and then to Judge Axon and later transferred to Judge Burke. *Eknes-Tucker* was assigned to Judge Burke.

15. In 2020, when the ACLU first began exploring litigation, the ACLU was litigating a separate but similar case in the United States District Court for the Middle District of Alabama, *Corbitt v. Taylor*, No. 2:18-cv-00091 (M.D. Ala.) ("*Corbitt*"). *Corbitt* challenged Alabama's policy requiring proof of gender-affirming surgery to change the gender marker on one's driver's license. Judge Thompson presided over *Corbitt*. In 2020, Judge Thompson had not yet issued an order on the merits in *Corbitt*.

16. The ACLU and its partner organizations decided to mark the new case as related to *Corbitt,* if and when it was filed. The new case would involve a substantial overlap in science, facts, and legal arguments, and judicial efficiency would be furthered if Judge Thompson presided over both *Corbitt* and the new case. Marking the two cases as related remained the plan in 2021 and 2022.

17. The ACLU members of the *Walker* team were aware of developments in the *Corbitt* case because some members of the ACLU and ACLU of Alabama team were also counsel in *Corbitt*. We knew that Judge Thompson issued an order granting judgment for the plaintiffs in *Corbitt* in January 2021. The State of Alabama appealed *Corbitt* to the Eleventh Circuit. That appeal was briefed in 2021

and argued on March 15, 2022; the Court has not yet issued its order. I understood when *Walker* was filed that *Corbitt* was still pending because it was on appeal, and the Eleventh Circuit would remand the case either for further proceedings or entry of judgment.

18. The team believed that by marking *Walker* as related to *Corbitt*, the clerk's office would send the case to Judge Thompson for him to decide whether he agreed the two cases were related. We later learned that this was not the actual practice in M.D. Alabama.

19. When the team filed *Walker*, the case did not immediately receive a judge assignment or case number.

20. On April 12, the M.D. Alabama clerk's office informed *Walker* counsel that *Walker* would be expedited because the complaint requested a temporary restraining order. I did not understand what the clerk's office meant by the case being expedited at that point, before we had filed a motion for preliminary relief. Since we expected the case to be initially reviewed by Judge Thompson, I suggested that a member of the *Walker* team call Judge Thompson's clerk to alert the Court that plaintiffs would be shortly filing a motion for a temporary restraining order and/or preliminary injunction. Carl Charles volunteered to do so. I wanted the Court to know our motion was coming so that the Court would wait for that motion before scheduling a hearing based solely on the allegations in the Complaint.

21. In a later conversation on April 12, after Mr. Charles had already spoken to Judge Thompson's chambers, a different member of *Walker* counsel learned from the M.D. Alabama clerk that we needed to file a motion to reassign the case to Judge Thompson rather than simply check the related case box on the case opening form.

22. After *Walker* counsel received this information from the M.D. Alabama clerk, I learned that *Walker* had been assigned to Chief Judge Marks.

23. Shortly after receiving the assignment, Chief Judge Marks issued an Order to Show Cause why the *Walker* case should not be transferred to the United States District Court for the Northern District of Alabama ("N.D. Alabama") and consolidated with the *Ladinsky* case. After receiving the defendants' response to that Order to Show Cause, *Walker* counsel decided not to oppose transfer. ==We felt that transfer was likely inevitable.==

24. The *Walker* team learned that *Ladinsky* had been assigned to Judge Axon in N.D. Alabama. Because Chief Judge Marks's Order to Show Cause contemplated consolidation of the two cases, the *Walker* team believed that the *Walker* case would be assigned to Judge Axon upon transfer. Instead, *Walker* was assigned to Judge Burke. The *Walker* team became aware that the State Attorney General's Office was drafting a motion to transfer the *Walker* case to Judge Axon, and I am further aware that members of the *Walker* and *Ladinsky* teams discussed

8

whether to file a similar motion, though I was not personally a party to that conversation. However, *Ladinsky* was then also transferred to Judge Burke, mooting those motions. I did not know why *Ladinsky* was transferred to Judge Burke until the May 20, 2022 hearing before the panel in this proceeding.

2. **Any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, and/or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama**

25. I did not participate in and do not have knowledge of any actions or plans that were intended to cause, actually caused, or may have caused the actual or potential recusal of any judge in the Northern or Middle Districts of Alabama in any of the *Ladinsky*, *Walker*, or *Eknes-Tucker* cases.

26. I did not participate in and do not have knowledge of any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment of any judge in N.D. Alabama or M.D. Alabama in the *Ladinsky* or *Eknes-Tucker* cases.

27. I incorporate my response to Topic 1 concerning *Walker* counsel's actions that were intended to cause, actually caused, or may have caused the assignment or reassignment of judges in the *Walker* case.

9

**3.      Any action or decision that relates to which parties to name in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, where to file each action, and all the reasons related to any such decision about who to name and where to file**

28.     I did not participate in and have no knowledge of any actions or decisions relating to which parties to name in the *Ladinsky* and *Eknes-Tucker* cases.

29.     I did not have direct contact with the ultimate plaintiffs in *Walker*, and I was not part of the team that contacted and investigated potential plaintiffs. Lambda Legal and the ACLU of Alabama led that effort. I participated in team meetings where potential plaintiffs were discussed and agreed with the ultimate decision to name the Walker and White families. I understood that the reason for choosing these plaintiffs was they were willing plaintiffs who were going to experience extreme harm from the law going into effect.

30.     I recall that the team originally planned to name a third plaintiff family, but ultimately decided not to name them because the youth plaintiff's declaration was not ready for submission by the filing date, and he would be nineteen (making the law inapplicable to him) within a year of filing the case.

31.     I recall attending conference calls among the *Walker* team where we discussed who to name as defendants. We ultimately chose the defendants named in *Walker* because they were in a position to enforce the law we were challenging.

32.     I did not participate in any decisions relating to where to file *Ladinsky* or *Eknes-Tucker*. Prior to the filing of *Ladinsky* and *Walker*, I was aware that NCLR,

10

GLAD, and the Southern Poverty Law Center intended to file their case in N.D. Alabama. Before *Eknes-Tucker* was filed, I was aware that counsel for *Ladinsky* was considering filing a new case in federal court in Alabama.

33. The *Walker* team chose to file the *Walker* case in M.D. Alabama because *Corbitt* had been filed in M.D. Alabama, and we planned to mark the two cases as related; and because the attorney general and other defendants were located in that district. Furthermore, we were aware that the *Ladinsky* team planned to file in N.D. Alabama, and we did not want to file in the same district.

4. **Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, and/or *Eknes-Tucker***

34. I did not participate in and do not have any knowledge of any attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky* or *Eknes-Tucker*.

35. As stated above, in 2020 the ACLU and other organizations worked with BakerHostetler on plans to challenge a felony healthcare ban in Alabama. In 2021, the team decided to work instead with Cooley moving forward. At that time, the ACLU was litigating a case with Cooley in Idaho with a transgender plaintiff, and through that connection the ACLU approached Cooley about joining the effort that culminated in the filing of *Walker*.

11

36. As with most ACLU cases, we partnered with the local ACLU affiliate, in this case the ACLU of Alabama, to be local counsel on the *Walker* case. I do not recall any discussions concerning whether to hire or consult with additional local counsel.

5. **Any and all actions or decisions that relate to coordination and/or dismissal of the *Ladinsky* and *Walker* cases and the reasons for dismissal, including but not limited to (1) the conference call that occurred on April 15, 2022 and (2) any other communications between *Ladinsky* counsel and *Walker* counsel on that topic**

37. As early as 2020, the ACLU was aware NCLR and other legal organizations were also exploring litigation in Alabama. During this time period, the ACLU decided it did not want to partner with those organizations and instead chose to pursue its own case with the ACLU of Alabama and Lambda Legal. While both teams were aware of each other, we did not coordinate or collaborate to file the *Walker* and *Ladinsky* cases.

38. Between the time Chief Judge Marks issued her Order to Show Cause on April 13 and the time *Walker* was assigned to Judge Burke in N.D. Alabama on April 15, the *Walker* team grew increasingly concerned over the workability of coordinating decision-making and strategy among the eight organizations and three law firms who were all now involved as co-counsel in the consolidated litigation. Working with *Ladinsky* counsel would have required extensive director-level resource dedication, and I was particularly concerned that I would not have been

able to delegate tasks to my team given the complicated relationship dynamics between the *Ladinsky* and *Walker* groups. At the same time, the *Walker* team had invested significant resources preparing and filing its case, so it took a couple of days to think through whether to change course.

39. By April 15, 2022, *Walker* had been transferred to N.D. Alabama, both *Walker* and *Ladinsky* had been reassigned to Judge Burke, and Judge Burke had issued an order requiring all parties to appear for a status conference the following business day, Monday, April 18.

40. On April 15, I was traveling from New York to St. Louis to visit family. During my travels, I received updates from my team on the assignment of *Ladinsky* to Judge Burke and Judge Burke's order setting a status conference. I am aware that on April 15, the *Walker* team discussed next steps, including the possibility of dismissal. I was not a part of that conversation, but I did offer input to *Walker* counsel who were. I supported the decision to dismiss *Walker*.

41. I agreed to dismiss *Walker* for several reasons: We needed time and space to explore whether we could reshape the two cases into one case, bridging differences between the two teams in terms of claims, plaintiffs, and expert witnesses; if the state answered our complaint before we dismissed, our options for dismissal would be much more limited; the unexplained transfer of *Ladinsky* from Judge Axon to Judge Burke to be consolidated with *Walker*; the assignment to Judge

13

Burke; and an additional concern voiced by one of the plaintiff families, which is protected by the attorney-client privilege.

42. I did not have any conversations concerning dismissal with *Ladinsky* counsel prior to the dismissal of the two cases, but I learned from other *Walker* counsel that *Ladinsky* counsel also planned to dismiss their case.

43. The morning after we dismissed *Walker*, I participated in a call with leaders from the *Walker* and *Ladinsky* teams to discuss next steps and whether to join forces and file a new case in Alabama. Early in the call, it became apparent to me that due to complicated relationship dynamics among team members of the many involved organizations and differences of opinion concerning case strategy and decision-making structure, it would be extremely challenging for the ACLU to move forward in partnership with the former *Ladinsky* counsel to file a new case. Over the weekend of April 16-17, after consultation with other *Walker* team members, I decided that the ACLU would not be a part of a new Alabama case if one were filed.

**6.     Any and all actions that relate to the decision to file *Eknes-Tucker* in the United States District Court for the Middle District of Alabama**

44. I was not involved in and do not have any knowledge of any actions that relate to the decision to file *Eknes-Tucker* in the Middle District of Alabama.

**7.     Any knowledge you have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing**

45.     Following the May 10, 2022 Order opening this proceeding, the *Walker* team hired Barry Ragsdale of Dominick Feld Hyde, P.C. to represent *Walker* counsel named in this matter.

46.     From my recollection, Mr. Ragsdale met with the decision-makers on the *Walker* team, including me, multiple times prior to the hearing on May 20, 2022, and met with the full *Walker* counsel group three or four times prior to the hearing. I understand that the Panel's July 25, 2022 Order (ECF 41) clarified that the Panel is not seeking any attorney-client privileged communications or requiring the declarants to waive the attorney-client privilege, and so I do not describe the contents of those privileged communications.

47.     At Mr. Ragsdale's request, to aid in his representation of *Walker* counsel at the May 20 hearing, I reviewed and edited a document containing potential questions the Panel might ask and factual information responsive to those questions. I also reviewed and edited drafts of the pre-hearing brief submitted by *Walker* counsel and a timeline created, at Mr. Ragsdale's direction, by Cooley and other members of the *Walker* team to help Mr. Ragsdale prepare for the May 20 hearing. To my knowledge, the Q&A document, pre-hearing brief drafts, and timeline have never been shared outside of the *Walker* team and our retained counsel.

15

48. I did not speak to anyone aside from counsel to prepare for the May 20, 2022 hearing. I did review some research independently prepared by an ACLU attorney concerning the right to voluntarily dismiss a case.

**8. The identity of each attorney, not included in the style of the original order, whom you are aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced above and the details of each such person's involvement**

49. Joshua Block, a Senior Staff Attorney at the ACLU, was a member of the team preparing to litigate a healthcare ban in Alabama in 2020 and 2021. To my recollection, during those time periods he was involved in conversations concerning whether to mark the new case as related to *Corbitt*. Mr. Block was not a member of the team in 2022, and played no role in filing, litigating, or dismissing the case. After receiving the May 10, 2022 Order initiating this proceeding, Mr. Block took it upon himself to research the right to voluntarily dismiss a case. While I did not direct him to perform this research, I did review it as part of my preparation for the May 20, 2022 hearing.

50. Sharon McGowan and Camilla Taylor of Lambda Legal were involved in aspects of the *Walker* case. Ms. McGowan attended some *Walker* counsel meetings prior to the case filing, during which the team may have discussed whether

to mark the case as related to *Corbitt*, which parties to name, and where to file. Camilla Taylor attended the April 16 call with *Ladinsky* counsel.

### Attestation of Sequestration Order Compliance

51. I attest that I have not discussed with any individuals named in the May 10, 2022 Order the substance of any testimony given by those individuals during the May 20, 2022 hearing, including any questions asked or answers given. I further attest that I have not discussed the contents of my declaration with anyone other than my counsel in this proceeding.

52. Following the status conference on June 17, 2022, I received notes created by my counsel that contained a description of some of the substance of Mr. Charles' May 20, 2022 testimony, which I sent to members of the client group before reading the notes, with Mr. Ragsdale's permission. Shortly thereafter, at Mr. Ragsdale's direction, I sent a second email telling the group that those notes were sent in error and asking them to delete them because they inadvertently disclosed some of the substance of testimony. I deleted the notes and have not reviewed them since I sent that second email.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 27, 2022

Southfield, Massachusetts

                                              /s/ James Esseks_____
                                              James Esseks