UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| *In re* **Amie Adelia Vague, et al** | ) | Case No. 2:22-mc-03977-WKW |
| | ) | **(Middle District of Alabama)** |

## DECLARATION OF TARA BORELLI

I, Tara Borelli, declare:

1. I am providing this *in camera* Declaration as required by the Panel's July 8, 2022 Order in the above referenced proceeding. By doing so, I am not waiving any privilege, including the attorney client privilege and the protections of the attorney work product doctrine. The matters stated herein are based upon my personal knowledge and are true and complete to the best of my recollection.

2. I understand the Panel's July 25, 2022 Order (ECF 41) requires me to disclose work product responsive to the topics in the Panel's July 8, 2022 Order. To comply with that Order, I am, on the advice of counsel, disclosing certain information protected by the work product doctrine in this declaration. To preserve

my objection to the sharing of this information, I have highlighted this protected information in blue throughout my declaration. I further understand that in submitting this information *in camera* under order of the Panel, I am not waiving any privilege protected by the work product doctrine.

3. I received my Bachelor's Degree from the University of California, Davis in 1998, and my law degree from the University of California, Berkeley in 2001. Early in my legal career I was an associate at Proskauer Rose, represented domestic violence victims at a nonprofit legal organization called Break the Cycle, and briefly practiced intellectual property law at a firm in Seattle, Washington. In 2006, I joined Lambda Legal as a Staff Attorney. Lambda has four levels of attorneys, ranked from most junior to most experienced: staff attorneys, senior attorneys, counsel, and senior counsel. I am currently senior counsel. Throughout my career at Lambda Legal, I have litigated in federal and state courts across the country on behalf of LGBTQ clients. My docket has included cases involving marriage equality and the now defunct federal Defense of Marriage Act, sexual orientation and gender identity discrimination, and healthcare and sports bans against transgender individuals, among others.

4. I am admitted to practice law in California (2001), Washington (2005), and Georgia (2013). I have been admitted to the Fourth, Ninth, Eleventh, Federal, and District of Columbia Circuit Courts of Appeals, as well as the Supreme Court of

the United States. I have also been admitted directly or through *pro hac vice* motions to practice under supervision in several federal district courts.

5.  I have never had any ethical complaint filed against me, and I have never been denied admission to practice in any court.

### **Role In The *Ladinsky*, *Walker*, And *Eknes-Tucker* Cases**

6.  Lambda Legal became involved in preparing the litigation that was ultimately filed as *Walker v. Marshall*, No. 2:22-cv-00167 (M.D. Ala) ("*Walker*") in or around early 2020. I became personally involved with the team preparing the litigation that ultimately became *Walker* around the same time.

7.  In 2020, the organizations preparing to file litigation were Lambda Legal, the ACLU, and the ACLU of Alabama. We were assisted by BakerHostetler. Legislation criminalizing gender-affirming care for individuals under the age of 19 did not pass in 2020, and the team did not move forward with litigation at that time.

8.  In 2021, a similar bill was introduced in Alabama's legislature. Lambda Legal, the ACLU, and the ACLU of Alabama again began preparing to file litigation if the bill became law, this time with the Cooley law firm. Legislation again did not pass in 2021, and the team again did not move forward with litigation.

9.  In 2022, Lambda Legal, the ACLU, the ACLU of Alabama, and Cooley again began preparing to file litigation. In March 2022, Transgender Law Center also joined our team. By 2022, my role on the team was to supervise the other

3

Lambda Legal attorneys, provide guidance and support, and coordinate with other senior members of our partner legal organizations. While I was less involved in the day-to-day preparation of the case, I was responsible for the other Lambda Legal attorneys' work on the case, and they ran key decisions by me.

10. The Governor of Alabama signed SB 184 into law on April 8, 2022. Our organizations filed *Walker* on April 11, 2022.

11. I became aware that other legal organizations, particularly the National Center for Lesbian Rights ("NCLR") and GLBTQ Legal Advocates and Defenders ("GLAD"), were also preparing to file litigation challenging the legality of a gender-affirming healthcare ban in 2020.

12. In the 16 years that I have worked at Lambda Legal, I have become familiar with the various other legal organizations advocating on behalf of LGBTQ individuals, including the ACLU LGBT & HIV Project, Transgender Law Center, NCLR, and GLAD. While these organizations share a common mission, they are not always strategically aligned, and ultimately Lambda Legal did not desire to work with NCLR and GLAD to file litigation in Alabama. I understood that two separate teams of legal organizations were pursuing challenges to Alabama's healthcare ban, and that we would likely operate on separate tracks.

13. I was not involved in the preparation, filing, or litigation of *Ladinsky v. Ivey*, No. 5:22-cv-00447 (N.D. Ala.) ("*Ladinsky*").

14. With regard to *Eknes-Tucker v. Marshall*, No. 2:22-cv-00184 (M.D. Ala.) ("*Eknes-Tucker*"), around the time that counsel voluntarily dismissed *Ladinsky*, I became aware that NCLR and GLAD were considering filing a separate case challenging SB 184. Aside from this general awareness, I was not involved in the preparation or filing of, and have not been involved in the litigation of *Eknes-Tucker*.

**Responses To The Panel's July 8, 2022 Order Topics**

**1. The actual or potential judicial assignments in *Ladinsky*, *Walker*, and/or *Eknes-Tucker***

15. Aside from my general knowledge of the actual judge assignments in *Ladinsky* and *Eknes-Tucker*, I did not participate in any work concerning potential judicial assignments in those two cases. I am aware that *Ladinsky* was originally assigned to Judge Manasco, who recused herself. It was then assigned to Judge Axon, and, finally, to Judge Burke. I am aware that *Eknes-Tucker* was assigned to Judge Burke.

16. As early as 2020, the *Walker* team discussed the idea of marking a new case as related to *Corbitt v. Taylor*, 2:18-cv-00091 (M.D. Ala.) ("*Corbitt*"). *Corbitt* was a case brought by the ACLU involving transgender medical care and legal issues—specifically, a constitutional challenge to Alabama's surgery requirement to change the gender marker on a driver's license. I understood that, as in *Corbitt*,

5

adjudicating a challenge to a gender-affirming healthcare ban would require expertise on the science regarding gender-affirming healthcare and on particular constitutional issues, including the applicable level of scrutiny under the Equal Protection Clause. I understood that Judge Thompson of the United States District Court for the Middle District of Alabama ("M.D. Alabama") was presiding over *Corbitt*. By marking a new case as related to *Corbitt*, I believed that the case would be reviewed to determine if the two cases were related.

17. During the 2021 and 2022 Periods, the team continued its plan to mark the new case as related to *Corbitt*.

18. When the team filed *Walker*, we marked the case as related to *Corbitt*. The case was initially assigned to Chief Judge Marks. Shortly after Chief Judge Marks received assignment, she issued an Order to Show Cause why *Walker* should not be transferred to the United States District Court for the Northern District of Alabama ("N.D. Alabama") and consolidated with *Ladinsky*. The *Walker* team ultimately decided not to oppose that transfer, believing that transfer was inevitable. The *Walker* team believed the case would be assigned to Judge Axon upon transfer, who was presiding over *Ladinsky*. Instead, *Walker* was assigned to Judge Burke.

6

**2.      Any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, and/or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama**

19.     I did not participate in and do not have knowledge of any actions or plans that were intended to cause, actually caused, or may have caused the actual or potential recusal of any judge in the Northern or Middle Districts of Alabama in any of the *Ladinsky*, *Walker*, or *Eknes-Tucker* cases.

20.     I did not participate in and do not have knowledge of any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment of any judge in N.D. Alabama or M.D. Alabama in the *Ladinsky* or *Eknes-Tucker* cases.

21.     As explained above, the *Walker* team marked *Walker* as related to *Corbitt* with the belief that this action would cause the case to be reviewed for potential assignment to Judge Thompson.

22.     After *Walker* was assigned to Chief Judge Marks on April 12, 2022, we learned from the clerk's office in M.D. Alabama that, in addition to marking the *Walker* case as related to *Corbitt* on the case-opening form, we also needed to file a motion to reassign the case to Judge Thompson. The *Walker* team filed that motion on April 12.

7

23. When Chief Judge Marks issued the Order to Show Cause why *Walker* should not be transferred to N.D. Alabama and consolidated with *Ladinsky* on April 13, the *Walker* team initially planned to oppose the transfer to N.D. Alabama. However, we believed the transfer was likely inevitable. Ultimately, the team filed a response consenting to the transfer.

24. *Walker* counsel also believed, based on the text of the Order to Show Cause, that when the case was transferred to N.D. Alabama, it would be consolidated with *Ladinsky* before Judge Axon. When *Walker* was instead assigned to Judge Burke, the team puzzled over why the two cases were now before two different judges in the same district. I am aware that members of the *Walker* team spoke to members of the *Ladinsky* team following *Walker*'s assignment to Judge Burke concerning whether the teams should request consolidation before Judge Axon, who was already presiding over the first of the two actions that had been filed. I did not participate in that conversation.

25. The *Ladinsky* case was transferred to Judge Burke before any motion to consolidate the cases was filed.

8

**3.      Any action or decision that relates to which parties to name in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, where to file each action, and all the reasons related to any such decision about who to name and where to file**

26.     I did not participate in and have no knowledge of any actions or decisions relating to which parties to name or where to file the *Ladinsky* and *Eknes-Tucker* cases.

27.     I was involved in and/or aware of conversations with potential plaintiffs during the 2020 and 2021 Periods, including the Walker and White families, who ultimately became our plaintiffs in 2022.

28.     I understand that we chose to work with and to name the Walker and White families because they were prepared and willing to join a lawsuit. Additionally, both had transgender daughters well under the age of 19 whose current or future gender-affirming medical treatment would be prohibited under Alabama's law.

29.     I further understand that the ACLU of Alabama was working with a third family to join the case as potential plaintiffs. However, their son was 18, and Alabama's law would not apply to him as of his nineteenth birthday. Furthermore, this plaintiff's declaration was not file-ready on the eve of the *Walker* complaint filing opening the case. For these reasons, the team decided not to proceed with this family as plaintiffs.

30. I recall discussions among the *Walker* team concerning which defendants to name. The team ultimately decided to name the State Attorney General because he is the state's chief law enforcement officer, as well as the district attorneys located where our plaintiffs lived.

31. The *Walker* team planned to file its litigation in M.D. Alabama. This plan was due in part to the team's belief that the case was related to *Corbitt*.

4. **Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, and/or *Eknes-Tucker***

32. I did not participate in and do not have knowledge of any attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky* or *Eknes-Tucker*.

33. Lambda Legal, the ACLU, and the ACLU of Alabama worked with BakerHostetler in 2020 to prepare litigation. We connected with BakerHostetler because a partner of that firm was a Lambda Legal board member and was eager to work with Lambda Legal.

34. In 2021, the team engaged the law firm of Cooley rather than BakerHostetler. The partner with whom we had previously been working at BakerHostetler had left that firm to start her own practice, and she no longer had capacity to partner with Lambda Legal and our partner organizations working in Alabama. I understand that the ACLU recommended Cooley because the ACLU

10

was already working with Cooley on other litigation impacting transgender individuals.

35. I understood that the ACLU of Alabama was local counsel on the *Walker* case. I recall that after we filed the *Walker* Complaint, certain members of the *Walker* team considered whether we should engage additional local counsel to support the ACLU of Alabama. We ultimately did not engage any other local counsel.

**5. Any and all actions or decisions that relate to coordination and/or dismissal of the *Ladinsky* and *Walker* cases and the reasons for dismissal, including but not limited to (1) the conference call that occurred on April 15, 2022 and (2) any other communications between *Ladinsky* counsel and *Walker* counsel on that topic**

36. As stated above, while both the *Walker* and *Ladinsky* teams were generally aware of each other's litigation-related efforts in Alabama, from early on the two groups of organizations worked independent of each other to prepare separate litigation.

37. On April 15, 2022, I attended a deposition in another case from approximately 12:00 PM Eastern Time to 6:00 PM Eastern Time. I later became aware that while I was in the deposition, several developments occurred in the *Walker* case. These included the transfer of *Ladinsky* to Judge Burke and the issuance of an order to appear the following Monday, April 18.

11

38. I was not a part of any meeting or call between *Walker* counsel and/or *Ladinsky* counsel on April 15. I did speak to Carl Charles after my deposition ended. Mr. Charles informed me that the *Walker* team had participated in a call and discussed dismissing the case. I trusted the judgment of the *Walker* counsel on the April 15 call and supported their decision to dismiss. In particular, I supported dismissal because I was concerned about the in-person status conference Judge Burke had ordered with only one business day's notice for Monday, April 18, the assignment to Judge Burke, and the feasibility of consolidating the *Ladinsky* and *Walker* cases in one proceeding. I also understood that Rule 41 grants plaintiffs an absolute right to voluntarily dismiss a case.

39. On April 16, 2022, I spoke to Camilla Taylor concerning a conference call that had occurred that morning among senior leaders from the *Walker* and *Ladinsky* teams. It was clear to me following the call that Lambda Legal would not be able or willing to collaborate with NCLR or GLAD to file another case challenging Alabama's gender-affirming healthcare ban. Because it was equally clear to us that NCLR and GLAD planned to file another case, we agreed that Lambda Legal should focus its efforts on its other cases outside of Alabama. Despite our decision not to proceed, Lambda Legal was confident that litigation challenging Alabama's law would be pursued, likely by the counsel that had filed *Ladinsky*.

**6.     Any and all actions that relate to the decision to file *Eknes-Tucker* in the United States District Court for the Middle District of Alabama**

40.     I did not participate in and do not have knowledge of any actions that relate to the decision to file *Eknes-Tucker* in M.D. Alabama.

**7.     Any knowledge you have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing**

41.     Following the May 10, 2022 Order opening this proceeding, the *Walker* team hired Barry Ragsdale of Dominick Feld Hyde, P.C. to represent *Walker* counsel named in this matter.

42.     From my recollection, Mr. Ragsdale met with the leaders from the *Walker* team organizations, including me, several times to learn about the case and to prepare for the May 20, 2022 hearing.  He also met with the full *Walker* counsel team three or four times prior to the hearing.  I understand that the Panel's July 25, 2022 Order (ECF 41) clarified that the Panel is not seeking any attorney-client privileged communications or requiring the declarants to waive the attorney-client privilege, and so I do not describe the contents of those privileged communications.

43.     At Mr. Ragsdale's request, to aid in his representation of *Walker* counsel at the May 20 hearing, I helped draft a document containing potential questions the Panel may ask and factual information responsive to those questions. I also reviewed drafts of the pre-hearing brief submitted by *Walker* counsel and a

13

timeline created by Cooley and other members of the *Walker* team to help Mr. Ragsdale prepare for the May 20 hearing. To my knowledge, the Q&A document, pre-hearing brief drafts, and timeline have never been shared outside of the *Walker* team and our retained counsel.

44. I did not speak to anyone outside of my discussions with Mr. Ragsdale and *Walker* counsel to prepare for the May 20 hearing.

**8. The identity of each attorney, not included in the style of the original order, whom you are aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced above and the details of each such person's involvement.**

45. Camilla Taylor, Lambda Legal's Deputy Legal Director for Litigation, was consulted by Lambda Legal members of the *Walker* counsel team when the *Walker* team was deciding whether to dismiss the case. I spoke with Ms. Taylor concerning the dismissal of *Walker*, and she was a part of the April 16 call with other leadership from the *Walker* and *Ladinsky* teams.

46. Sharon McGowan, Lambda Legal's then Legal Director, participated in *Walker* team meetings where some of the topics of this Order may have been discussed. Ms. McGowan also participated in communications with Mr. Ragsdale in advance of the May 20, 2022 hearing as part of the Lambda Legal client team he represents. Ms. McGowan left Lambda Legal in June 2022 to pursue other opportunities.

47. I am aware of no other attorneys involved in the filing of the *Walker* litigation in 2022 or the decision to dismiss that litigation.

### Attestation of Sequestration Order Compliance

48. I attest that I have not discussed with any individuals named in the May 10, 2022 Order the substance of any testimony given by those individuals during the May 20, 2022 hearing, including any questions asked or answers given. I further attest that I have not discussed the contents of my declaration with anyone other than my counsel in this proceeding.

49. Following the status conference on June 17, 2022, I received notes created by my counsel that contained a description of some of the substance of Mr. Charles' May 20, 2022 testimony. Shortly thereafter, I received a second email telling me that those notes were sent in error and asking me to delete them because they inadvertently disclosed some of the substance of testimony. I have not reviewed those notes since receiving the second email, and I deleted them.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 27, 2022

Avondale Estates, Georgia

                                                        */s/ Tara Borelli*  
                                                        Tara Borelli