**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

---

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

---

| | | |
|---|---|---|
| *In re* **Amie Adelia Vague, et al** | ) | **Case No. 2:22-mc-03977-WKW** |
| | ) | **(Middle District of Alabama)** |


**DECLARATION OF CARL S. CHARLES**

I, Carl S. Charles, declare:

      1.     I am providing this *in camera* Declaration as required by the Panel's July 8, 2022 Order in the above referenced proceeding.  By doing so, I am not waiving any privilege, including the attorney client privilege and the protections of the attorney work product doctrine. The matters stated herein are based upon my personal knowledge and are true and complete to the best of my recollection.

      2.     I understand the Panel's July 25, 2022 Order (ECF 41) requires me to disclose work product responsive to the topics in the Panel's July 8, 2022 Order.  To comply with that Order, I am, on the advice of counsel, disclosing certain information protected by the work product doctrine in this declaration. To preserve

my objection to the sharing of this information, I have highlighted this protected information in blue throughout my declaration. I further understand that in submitting this information *in camera* under order of the Panel, I am not waiving any privilege protected by the work product doctrine.

3.      I graduated from the University of Denver Sturm College of Law in December 2013.  After graduation, I was a Skadden Fellow at the ACLU from 2014 to 2016.  I then worked as an attorney for the New York City Commission on Human Rights until June 2017, when I took a position as a Law Fellow in the Transgender Rights Project at Lambda Legal.  Following that one-year fellowship, I became a Staff Attorney with A Better Balance, a nonprofit legal organization focused on wage and hour litigation and sex discrimination.  I specifically worked to secure paid sick leave and family leave benefits for LGBTQ individuals caring for same-sex partners or other family.  In February 2019, I re-joined Lambda Legal as a Staff Attorney.  I was promoted to Senior Attorney at the end of February 2022.

4.      I am admitted to practice law in the Commonwealth of Massachusetts, the State of New York, and the State of Georgia.  I have been admitted to the Southern, Northern, and Eastern District Courts of New York, as well as the Second, Fourth, Ninth, and Eleventh Circuit Courts of Appeals.  I have been admitted through *pro hac vice* motions to practice under supervision in several additional federal courts.

5.     I have never had any ethical complaint filed against me, and I have never been denied admission to practice in any court.

### Role In The *Ladinsky*, *Walker*, And *Eknes-Tucker* Cases

6.     Lambda Legal became involved in preparing the litigation that was ultimately filed as *Walker v. Marshall*, No. 2:22-cv-00167 (M.D. Ala) ("*Walker*") in or around early 2020.  I became personally involved in preparing the litigation that ultimately became *Walker* around the same time.

7.     In 2020, the organizations preparing to file litigation were Lambda Legal, the ACLU, and the ACLU of Alabama.  BakerHostetler was the law firm working pro bono with our organizations.  When the Alabama 2020 legislative session closed without passing legislation criminalizing gender-affirming care for individuals under the age of 19, the team paused all preparations for litigation until the 2021 legislative session.  Throughout my declaration, I refer to this period as the "2020 Period."

8.     In 2021, a bill to criminalize gender-affirming care for individuals under the age of 19 was again introduced in Alabama's legislature.  Lambda Legal, the ACLU, and the ACLU of Alabama again began preparing to file litigation if the bill became law.  At this point, the law firm working with our organizations was Cooley LLP.  When the Alabama 2021 legislative session closed without passing the legislation we planned to challenge, the team again paused all preparations until

the 2022 legislative session.  Throughout my declaration, I refer to this period as the "2021 Period."

9.     In 2022, a bill to criminalize gender-affirming care for individuals under the age of 19 was again introduced in the Alabama legislature.  Lambda Legal, the ACLU, and the ACLU of Alabama again began preparing to file litigation.  In March 2022, Transgender Law Center also joined our team.  Cooley continued to be the law firm working pro bono with our organizations.  The Governor of Alabama signed SB 184 into law on April 8, 2022.  Our team filed *Walker* on April 11, 2022.

10.     I became aware that other legal organizations, particularly the National Center for Lesbian Rights ("NCLR") and GLBTQ Legal Advocates and Defenders ("GLAD"), were also preparing to file litigation challenging the legality of the same law during the 2020 Period.

11.     While Lambda Legal, the ACLU, Transgender Law Center, NCLR, and GLAD all work to challenge laws and policies that harm the LGBTQ community, these organizations are not necessarily aligned in the legal strategies they pursue or their preferences for managing the litigation process.  From the beginning of the *Walker* litigation, I understood that neither Lambda Legal and the ACLU nor NCLR and GLAD wanted to collaborate to file litigation in Alabama.  Thus, two groups of organizations working to file separate cases in Alabama formed early on.  While we were aware of each other, it was my understanding from our first preparations in the

4

2020 Period onward that neither group was interested in joining together to file one lawsuit.

12.     I was not involved in the preparation, filing, or litigation of *Ladinsky v. Ivey*, No. 5:22-cv-00447 (N.D. Ala.) ("*Ladinsky*").

13.     Around the time that counsel in *Ladinsky* voluntarily dismissed that case, I became aware that NCLR and GLAD were considering filing a separate case challenging SB 184 in a federal district court in Alabama.  Aside from this general awareness, I was not involved in the preparation or filing of, and have not been involved in the litigation of, *Eknes-Tucker v. Marshall*, No. 2:22-cv-00184 (M.D. Ala.).

### Responses To The Panel's July 8, 2022 Order Topics

**1.     The actual or potential judicial assignments in *Ladinsky*, *Walker*, and/or *Eknes-Tucker***

14.     In the 2020 Period, one of the members of our team proposed the idea of marking the potential new case as related to *Corbitt v. Taylor*, 2:18-cv-00091 (M.D. Ala.) ("*Corbitt*").  From these discussions, I learned that Judge Thompson was presiding over *Corbitt*.  Through the *Corbitt* litigation, Judge Thompson had learned about the various aspects and types of gender-affirming medical care.

15.     In 2020, the team discussed marking a potential new case as related to *Corbitt*.  The two cases involved similar constitutional arguments, and both required

an understanding of gender-affirming medical care—something Judge Thompson already had from presiding over *Corbitt*.

16.     In the 2020 Period, the team planned to mark a new case as related to *Corbitt*.  I understood that marking a case as related to another case in the same district does not automatically mean the same judge will be assigned to the new case.

17.     During the 2021 and 2022 Periods, the team continued its plan to mark the new case as related to *Corbitt*.

18.     The *Walker* team marked the case as related to *Corbitt* on the case opening form.  *Walker* was assigned to Chief Judge Marks at some point on April 12, 2022, the day after it was filed.  *Walker* was later transferred to N.D. Alabama, which the *Walker* team decided not to oppose.  Once the case was transferred, it was assigned to Judge Burke.

19.     I learned from Asaf Orr of NCLR that the *Ladinsky* case was initially assigned to Judge Manasco in N.D. Alabama, but she recused herself from the case. Mr. Orr later told me the *Ladinsky* case had been assigned to Magistrate Judge Staci Cornelius.  Later, Mr. Orr informed me that the *Ladinsky* case had been reassigned to Judge Axon.  Ultimately, *Ladinsky* was reassigned again to Judge Burke.

20.     I am aware that *Eknes-Tucker* was assigned to Judge Burke.

**2.     Any actions or decisions taken in the course of preparing to file *Ladinsky*, *Walker*, and/or *Eknes-Tucker* that relate to any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment to, or the actual or potential recusal of, any judge in the Northern or Middle Districts of Alabama**

21.     I did not participate in and do not have knowledge of any actions or plans that were intended to cause, actually caused, or may have caused the actual or potential recusal of any judge in the Northern or Middle Districts of Alabama in any of the *Ladinsky*, *Walker*, or *Eknes-Tucker* cases.

22.     I did not participate in and do not have knowledge of any actions or plans that were intended to cause, actually caused, or may have caused the assignment or reassignment of any judge in N.D. Alabama or M.D. Alabama in the *Ladinsky* or *Eknes-Tucker* cases.

23.     As stated above, in 2020 Lambda Legal, the ACLU, and the ACLU of Alabama discussed marking a potential new case as related to *Corbitt*, which the team believed would cause the new case to be assigned to Judge Thompson if he agreed the two cases were related.  That remained the plan in 2021 and 2022.

24.     After *Walker* was assigned to Chief Judge Marks on April 12, 2022, the *Walker* team filed a motion to transfer the case to Judge Thompson, arguing that the case was related to *Corbitt*.

25.     Chief Judge Marks issued the Order to Show Cause on April 13.  The *Walker* team ultimately decided not to oppose the transfer to N.D. Alabama.  Based

on the text of the Order to Show Cause, the *Walker* team believed that when the case was transferred, it would be consolidated with *Ladinsky* and assigned to Judge Axon, who had been assigned to preside over *Ladinsky*.

26.     When *Walker* was instead assigned to Judge Burke and not consolidated with *Ladinsky* before Judge Axon, Julie Veroff of Cooley called Judge Burke's deputy clerk and asked what *Walker* counsel needed to do to request the transfer of the *Walker* case to be heard by Judge Axon.  The clerk informed Julie that *Ladinsky* counsel—not *Walker* counsel—needed to file a motion to consolidate the two cases to effectuate the transfer.

27.     On April 15, after learning this information from Judge Burke's deputy clerk, I participated in a conference call with Jennifer Levi of GLAD, Lynly Egyes of Transgender Law Center, Li Nowlin-Sohl of the ACLU, and Kathleen Hartnett of Cooley.  At that time, we requested of Jennifer Levi that *Ladinsky* counsel file the motion to consolidate the two cases before Judge Axon.  Around this time, the *Walker* team learned that the defendants were also planning to file a motion to consolidate the two cases in N.D. Alabama.

28.     The *Ladinsky* case was transferred to Judge Burke before *Ladinsky* counsel filed the motion to consolidate, and at this point the request to transfer *Walker* to Judge Axon was mooted.

3.    **Any action or decision that relates to which parties to name in *Ladinsky*, *Walker*, and/or *Eknes-Tucker*, where to file each action, and all the reasons related to any such decision about who to name and where to file**

29.    I did not participate in and have no knowledge of any actions or decisions relating to which parties to name or where to file the *Ladinsky* and *Eknes-Tucker* cases.

30.    I was involved in conversations with potential plaintiffs during the 2020 and 2021 Periods.  In 2022, I also interacted with the Walker and White families who were our plaintiffs.

31.    We chose to name the Walker and White families because they had actionable claims, and they were prepared and willing to join a lawsuit. Additionally, both had transgender daughters under the age of 19 whose current or future gender-affirming medical treatment would be prohibited under Alabama's law.

32.    I further understand that the ACLU of Alabama was working with a third family to join the case as potential plaintiffs.  However, their son was 18 and was likely leaving the state for college, and Alabama's law would not apply to him as of his nineteenth birthday.  The team decided not to proceed with this family as plaintiffs.

33.    I was present for meetings where the *Walker* team discussed who to name as defendants.  I recall the group thinking that the State Attorney General and

county district attorneys would be the officials enforcing the law, and therefore were the properly named defendants.

34.     I recall that the *Walker* team planned to file its litigation in M.D. Alabama fairly early on, likely during the 2020 Period.  This plan was due in part to the team's plan to mark the new case as related to *Corbitt*.

35.     I am aware of an additional concern regarding where to file raised by one of the plaintiff families, which is protected by the attorney-client privilege.

**4.     Any action or decision that relates to attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky*, *Walker*, and/or *Eknes-Tucker***

36.     I did not participate in and do not have any knowledge of any attempts to associate other law firms or the actual association of other law firms to work with counsel in *Ladinsky* or *Eknes-Tucker*.

37.     I recall that in 2020, when Lambda Legal, the ACLU, and the ACLU of Alabama were first considering litigation, the law firm working with our organizations on the potential matter was BakerHostetler.  Legislation criminalizing gender-affirming health care for individuals under nineteen did not pass in 2020.

38.     In 2021, when this legislation was introduced again, Lambda Legal, the ACLU, and the ACLU of Alabama engaged Cooley to join the team rather than BakerHostetler.

39.     I understood that the ACLU of Alabama was local counsel on the *Walker* case.  I recall that after the case was transferred to N.D. Alabama, Lambda Legal internally discussed whether we would need to hire local counsel in that district in case no one from the *Walker* team was admitted to practice in N.D. Alabama.  I do not recall researching or discussing any specific firms.

**5.     Any and all actions or decisions that relate to coordination and/or dismissal of the *Ladinsky* and *Walker* cases and the reasons for dismissal, including but not limited to (1) the conference call that occurred on April 15, 2022 and (2) any other communications between *Ladinsky* counsel and *Walker* counsel on that topic**

40.     There was no coordination with the *Ladinsky* team prior to the cases being filed.  The *Walker* team knew that the *Ladinsky* team was planning to file a case in N.D. Alabama.  The *Walker* team planned to file its case as soon as possible after SB 184 was signed into law in an effort to be the first-filed case.

41.     On April 15, 2022, I was a part of a Zoom meeting for another case where Lambda Legal was also partnering with Cooley. While on this call, I and the Cooley attorneys saw the order come in transferring *Ladinsky* to Judge Burke.  After this event, members of the ACLU, ACLU of Alabama, and Transgender Law Center joined the Zoom call to discuss this development.

42.     While this Zoom meeting was ongoing, I understand that there was a separate conference call among some of the decision-makers of the *Walker* and *Ladinsky* teams.  I did not join that call.  I subsequently learned that during that call,

members of each team shared that they were considering the possibility of dismissal within their separate teams.  Each team decided to dismiss its case.  I understand that during this call, the teams did not decide whether they would file a new case challenging Alabama's law together.

43.    I further understand that on the morning of April 16, 2022, there was another conference call between senior members of the *Walker* and *Ladinsky* teams. I did not participate in that call.

44.    I later learned that the April 16 call between *Walker* counsel and *Ladinsky* counsel had not been productive, due in part to past and ongoing professional and personal conflict between some of the attorneys on the call.  It was clear to Lambda Legal that we would not be able to work with GLAD and NCLR if they chose to file new litigation.  I understand that the ACLU came to the same conclusion.  Despite our decision not to proceed, Lambda Legal was confident that litigation addressing our plaintiffs' claims would be pursued by someone.   I supported the decision to not file a new case challenging SB 184.

**6.     Any and all actions that relate to the decision to file *Eknes-Tucker* in the United States District Court for the Middle District of Alabama**

45.    I did not participate in and do not have knowledge of any actions that relate to the decision to file *Eknes-Tucker* in M.D. Alabama.

**7.   Any knowledge you have that relates to (1) preparation for the hearing in this matter (including circulation of any Q&A document), and (2) the questions expected to be asked or that were actually asked by the court at the May 20, 2022 hearing**

46.   I recall that shortly after receiving notice of the May 10, 2022 Order initiating *In re Vague*, *Walker* counsel hired Barry Ragsdale to represent us in this proceeding.

47.   I recall attending approximately four meetings with Mr. Ragsdale, which occurred over the telephone, Zoom, or in person, prior to the May 20, 2022 hearing.

48.   I reviewed drafts of the pre-hearing brief submitted by *Walker* counsel and a timeline created by Cooley and other members of the *Walker* team that I understand was created at Mr. Ragsdale's request to help him prepare for the May 20, 2022 hearing.  I also received and reviewed a Q&A document the night prior to the hearing.  To my knowledge, the Q&A document, pre-hearing brief drafts, and timeline have never been shared outside of the *Walker* team and our retained counsel.

49.   I did not speak to anyone outside of my discussions with Mr. Ragsdale and *Walker* counsel to prepare for the May 20 hearing.

**8.    The identity of each attorney, not included in the style of the original order, whom you are aware of being involved in any input, recommendation, decision, or strategy regarding any of the subjects referenced above and the details of each such person's involvement.**

50.    Josh Block, an attorney from the ACLU, was involved in discussions in 2020 and 2021 concerning whether to relate a potential new case to *Corbitt*.  To my knowledge, Mr. Block was not a part of the *Walker* counsel team in 2022, and he did not participate in the ultimate decision to mark the two cases as related.

51.    Camilla Taylor, Lambda Legal's Deputy Legal Director for Litigation, was consulted by Lambda Legal members of the *Walker* counsel team when the *Walker* team was deciding whether to dismiss the case.  I spoke with Ms. Taylor on April 15, 2022 concerning the possibility of dismissal.  Additionally, I believe Ms. Taylor participated in a call between senior members of the *Walker* counsel and *Ladinsky* counsel teams on April 16, though I did not participate in that call.

52.    Sharon McGowan, Lambda Legal's former Chief Strategy Officer and Legal Director, participated in some discussions with the *Walker* team's counsel, Mr. Ragsdale, leading up to the May 20, 2022 hearing.  I am also aware that from time to time, Ms. McGowan attended *Walker* team meetings and it is possible, but I have no recollection of, her offering input, recommendations, decisions, or strategies related to Topics 1-3 of the July 8, 2022 Order.

**9.      Topics requested by the Panel in Note 2 of the July 8, 2022 Order**

**(a)      Any and all communications (written or oral) in which you participated and/or about which you are aware that relate to the decision to mark *Walker* as related to *Corbitt*;**

53.     As I stated in my response to Topic 1, I recall that in the 2020 Period, soon after Lambda Legal, the ACLU and the ACLU of Alabama began considering filing litigation in Alabama, one of the organizations raised the idea of marking the new case as related to *Corbitt*.

54.     To the best of my knowledge, this suggestion was first raised by the ACLU. The ACLU and the ACLU of Alabama were counsel in *Corbitt*.

55.     In 2020, Judge Thompson had not yet issued a decision in *Corbitt*.

56.     During the 2021 Period, the organizations again planned to mark the new case as related to *Corbitt*. During the 2021 Period, an attorney from the ACLU asked if *Corbitt* was closed in M.D. Alabama, and another attorney reminded the team that the *Corbitt* plaintiffs had a motion for fees pending in M.D. Alabama. This attorney also informed the team that the *Corbitt* plaintiffs and defendants had agreed the motion should remain pending until the appeal before the Eleventh Circuit concluded. I understood from this communication that *Corbitt* remained pending in M.D. Alabama while it was on appeal in the Eleventh Circuit.

57.     When Lambda Legal, the ACLU, and the ACLU of Alabama began preparing for litigation again in 2022, the organizations again planned to mark the new case as related to *Corbitt*.

58.     I further recall that in 2021, Cooley attorneys researched the procedures for marking a case as related to another case in M.D. Alabama.  The Cooley attorneys reported back to the broader *Walker* team, including me, that they had found no specific definition of "related cases" in M.D. Alabama.  The Cooley attorneys also reported back that the M.D. Alabama rules had no specific procedures for marking a case as related to another case in the district.

59.     Based on the information described above, the *Walker* team understood that there were valid arguments for marking *Walker* as related to *Corbitt* and the procedure for doing so was to check the box on the case opening form.

**(b)     The identity of anyone else involved in any way in deciding to mark *Walker* as related to *Corbitt* and implementing that decision, or efforts to have Judge Thompson handle the *Walker* case**

60.     Each of the decision-makers on the *Walker* team, including Tara Borelli, James Esseks, Lynly Egyes, Tish Faulks, and Kathleen Hartnett, were involved in deciding to mark *Walker* as related to *Corbitt*.

61.     In addition to these decision-makers, Chase Strangio, Kaitlin Welborn and I were involved in the decision whether to mark *Walker* as related to *Corbitt*.

62.     To my knowledge, Tish Faulks implemented that decision when she filed the *Walker* case in M.D. Alabama with a case opening form that checked the related case box.

63.     I further recall that in the 2020 and 2021 Periods, an ACLU attorney named Josh Block was involved in discussions concerning whether to relate a potential new case to *Corbitt*.  Mr. Block was not a part of the *Walker* counsel team in 2022 and did not participate in the ultimate decision to mark the two cases as related.

64.     I further recall that in 2022, Li Nowlin-Sohl of the ACLU shared with the team that based on her experience in other courts, the procedure for marking a case as related to another case in the district was to check the box on the case opening form.  Additionally, during the 2021 Period, Cooley attorneys researched potential judges in N.D. Alabama and M.D. Alabama as well as related case procedures and rules.  I do not know which Cooley attorneys performed this research.

**(c)     Any and all actions in advance of the May 20, 2022 hearing in which you participated or about which you are aware that relate to any efforts to have Judge Thompson handle the *Walker* case**

65.     As described above, I am aware that members of the *Walker* team discussed relating a new case to *Corbitt* in the 2020, 2021, and 2022 Periods.  In 2022, attorneys from Cooley researched procedures for marking a new case as related to a previously filed case in M.D. Alabama.  Based on team members'

experiences in other federal courts, the team determined that the process for marking *Walker* as related to *Corbitt* was to check the related case box on the case opening form. The team did so, and Tish Faulks filed the *Walker* case opening forms and Complaint on April 11, 2022.

66.     In addition to these actions taken in advance of filing *Walker*, the *Walker* team learned on April 12, 2022 that in M.D. Alabama we would need to file a motion to relate *Walker* to *Corbitt*. We further learned that *Walker* had been randomly assigned to Chief Judge Marks. To the best of my knowledge, this information was learned through a call from Adam Katz of Cooley to the M.D. Alabama clerk. Based on this information, the *Walker* team began drafting a motion to transfer *Walker* to Judge Thompson, who was presiding over *Corbitt*. We filed that motion on April 12.

67.     I am not aware of any other actions taken to relate *Walker* to *Corbitt* or to have Judge Thompson preside over *Walker*.

**(d)     Any and all communications with any chambers staff about the *Walker* case, including but not limited to its purported relatedness to *Corbitt***

68.     In advance of the May 20 hearing, I had not reviewed all of my prior correspondence and actions involving the *Walker* planning and litigation. Based on my preparation for the hearing, I did not expect to be questioned by the Panel, particularly on topics unrelated to the decision to dismiss the *Walker* case, which I

understood from the Panel's May 10, 2022 Order was the focus of the Panel's inquiry.

69.    I offer to the Panel my sincerest apologies in this declaration, as I did at the May 20 hearing, for my forgetfulness.  I did not intend at the May 20 hearing to mislead or offer incomplete testimony to the Panel.

70.    In the process of preparing for this hearing, and after reviewing the transcript of my testimony from the May 20, 2022 hearing, I am now reminded of the context in which I made a call to the chambers of Judge Thompson on April 12, 2022.

71.    Now that I have reviewed the relevant materials, I recall that I did place the call, and spoke with someone in Judge Thompson's chambers, who took down my name and phone number.  I provide the following information in response to the Panel's July 8, 2022 Order.

72.    On April 12, the *Walker* team planned to file a motion for a preliminary injunction.  The team received information that the *Walker* case was being expedited. The team wanted to inform chambers that we would be shortly filing a motion for a preliminary injunction in light of the case's apparent expedited status.  At this time, we believed that the case would at least initially be in Judge Thompson's chambers for a determination of relatedness. (We did not yet know that the case had been assigned to Chief Judge Marks.)  *Walker* team members from each organization and

Cooley communicated regarding whether to call Judge Thompson's chambers to inform the clerks that our preliminary injunction motion would be filed shortly. On April 12, James Esseks sent a request to the *Walker* team asking someone to call Judge Thompson's chambers and convey that information. I offered to make the call.

73.     I called Judge Thompson's chambers following Mr. Esseks's request. During my conversation with Ben Gunning, who I assumed was one of Judge Thompson's clerks, I told him that a case called *Walker v. Marshall* had been filed on April 11, that it had been marked as related to *Corbitt*, and that the *Walker* team expected to file a motion for preliminary injunction shortly. I provided Mr. Gunning with the *Corbitt* case number when he asked for it. Mr. Gunning also asked for the *Walker* case number. I told him that we had not yet received a case number, and that it was my understanding that there was no case number yet because we had a pending motion for the plaintiffs to proceed under pseudonyms. I said that we wanted to flag for Judge Thompson that there was a motion for a temporary restraining order/preliminary injunction to be filed that afternoon because we had been told that the complaint was being expedited and wanted to make sure Judge Thompson was aware of and had the opportunity to see the motion. Mr. Gunning repeated back everything I said to ensure he understood what I said and promised to pass along the

information.  He also took down my name and phone number.  I reported back the details of the call to other members of the *Walker* team.

74.     At the time I made the call to Judge Thompson's chambers, we believed the case had not yet been assigned to any Judge because we did not yet have a case number.  We believed that *Walker* would be initially assigned to Judge Thompson to determine whether the case was related to *Corbitt* and decide whether he would keep assignment.

75.     After I called Judge Thompson's clerk, the team learned that Chief Judge Marks had been assigned to preside over *Walker*.

76.     After learning of Chief Judge Marks's assignment, Adam Katz, a Cooley attorney, spoke to a M.D. Alabama clerk.  That clerk apparently informed Mr. Katz that *Walker* was in fact assigned to Chief Judge Marks and counsel needed to file a motion to relate *Walker* to *Corbitt*; it was not sufficient to check the related case box on the case opening form.  I understood that this was a clerk of the court and not a clerk of any judge's chambers.

77.     Based on my recollection, on the evening of April 14, while I was on a Zoom meeting with other members of the *Walker* team, Julie Veroff of Cooley informed those of us on the call that a friend of a friend at Equal Justice Initiative had heard from a current clerk of Judge Thompson that Judge Thompson had wanted to accept assignment of the *Walker* case.  This information did not impact the *Walker*

team's determination that transfer to N.D. Alabama was inevitable and our decision not to oppose transfer in our response to Chief Judge Marks' Order to Show Cause.

78.     I also understand that Julie Veroff called Judge Burke's deputy clerk to determine how to transfer the *Walker* case from Judge Burke to Judge Axon, who at the time was assigned to preside over the *Ladinsky* case.

79.     I did not ever call the chambers of Judges Marks, Axon, Burke, or any other judge in M.D. Alabama or N.D. Alabama other than the call I made to Judge Thompson's chambers described above.

80.     I am not aware of any of the other *Walker* team members calling any judge's chambers concerning the *Walker* litigation, except where indicated in my declaration.

**(e)     Information about who discussed the idea of making, directed, or was aware of the phone call to Judge Thompson's chambers.**

81.     As discussed above, on April 12, members of every organization on the *Walker* team discussed whether to call Judge Thompson's chambers for the purpose of informing chambers that we would be imminently filing a motion for a temporary restraining order/preliminary injunction.

82.     James Esseks requested that someone on the team call chambers, and I volunteered to do so.

## **Attestation of Sequestration Order Compliance**

83.     I attest that I have not discussed with any individuals named in the May 10, 2022 Order the substance of any testimony given by those individuals during the May 20, 2022 hearing, including any questions asked or answers given. I further attest that I have not discussed the contents of my declaration with anyone other than my counsel in this proceeding.

84.     Following the status conference on June 17, 2022, I and others on the *Walker* team received notes created by my counsel that contained a description of some of the substance of my May 20, 2022 testimony.   Shortly thereafter, we received a second email telling us that those notes were sent in error and asking us to delete them because they inadvertently disclosed some of the substance of my testimony.  I have not reviewed those notes since receiving the second email, and I deleted them.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: August 1, 2022

Atlanta, Georgia

*/s/ Carl S. Charles*_____
Carl S. Charles